# In The Matter Of:

*Mystic Landing, LLC   v.*
*Pharmacia Corporation, et al., etc.*

---

*Peter M. Grela*
*Vol. 1, March 14, 2005*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

*Original File GRELA.V1, 137 Pages*
*Min-U-Script® File ID: 2503199574*

# Word Index included with this Min-U-Script®

Mystic Landing, LLC  v.
Pharmacia Corporation, et al.
Case 1:04-cv-10180-NMG    Document 66-6    Filed 04/04/2005    Page 2 of 28

Peter M. Grela
March 14, 2005

Page 1

Volume I
Pages 1 to 137
Exhibits 1-17
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MYSTIC LANDING, LLC,            :
    Plaintiff,                  :
    vs.                         : Civil Action No.
                                : 04-10180 NMG
PHARMACIA CORPORATION,          :
SOLUTIA INC. and MONSANTO       :
COMPANY,                        :
    Defendants.                 :
PHARMACIA CORPORATION and       :
MONSANTO COMPANY,               :
    Third-Party Plaintiffs,     :
    vs.                         :
MODERN CONTINENTAL              :
CONSTRUCTION CO., INC.,         :
    Third-Party Defendant.      :
PHARMACIA CORPORATION,          :
    Third-Party Plaintiff,      :
    vs.                         :
BOSTON EDISON COMPANY,          :
    Third-Party Defendant.      :
BOSTON EDISON COMPANY,          :
    Fourth-Party Plaintiff,     :
    vs.                         :
O'DONNELL SAND & GRAVEL,        :
INC., and MARY O'DONNELL,       :
    Fourth-Party Defendant.     :

Page 2

DEPOSITION OF MYSTIC LANDING, LLC, by its
designee PETER M. GRELA, a witness called on behalf
of the Defendants and Third-Party Plaintiffs
Pharmacia Corporation and Monsanto Company, taken
pursuant to Rule 30(b)(6) of the Federal Rules of
Civil Procedure, before Anne H. Bohan, Registered
Diplomate Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of
Foley Hoag LLP, Seaport World Trade Center West, 155
Seaport Boulevard, Boston, Massachusetts, on Monday,
March 14, 2005, commencing at 10:42 a.m.
PRESENT:
Hinckley Allen Synder LLP
    (by Doreen M. Zankowski, Esq.)
    28 State Street, Boston, MA 02109-1775,
    for the Plaintiff, Third-Party Defendant
    and the Deponent.
Foley Hoag LLP
    (by John M. Stevens, Esq. and
    Elisabeth DeLisle, Esq.)
    Seaport World Trade Center West,
    155 Seaport Boulevard, Boston, MA
    02210-2600, for the Defendants and
    Third-Party Plaintiffs Pharmacia
    Corporation and Monsanto Company.
Morrison Mahoney LLP
    (by Douglas B. Otto, Esq.)
    250 Summer Street, Boston, MA 02210-1181,
    for the Third-Party Defendant and
    Fourth-Party Plaintiff Boston Edison
    Company.

Page 3

[1]              INDEX
[2]
WITNESS:   DIRECT CROSS REDIRECT RECROSS
[3]
Peter M. Grela
[4] (By Mr. Stevens)    6          134
    (By Mr. Otto)       118
[5]
[6]
                 EXHIBITS
[7]
EX. NO.                      PAGE
[8]
    1  30(b)(6) Notice of Deposition of 10
[9]     Mystic Landing, LLC
[10]  2  Printout re: Filings of Mystic 12
[11]     Landing, LLC with Massachusetts
         Secretary of State
[12]  3 Document entitled "Quitclaim Deed"  13
         signed by Mary O'Donnell, dated
[13]     June 21, 2001, with attached
         Exhibit A
[14]
    4  Document entitled "Option    18
[15]     Agreement," dated May 1, 1996,
         between Mary O'Donnell and Modern
[16]     Continental Construction Co., Inc./
         Obayashi, with attached Exhibits A
[17]     through C
[18]  5  Document entitled "Option    19
         Agreement," dated May 1, 1996,
[19]     between Mary O'Donnell and Modern
         Continental Construction Co.,
[20]     Inc./Obayashi, with attached
         Exhibit C
[21]
    6 Document entitled "Assignment and  23
[22]     Assumption of Rights and Obligations,"
         dated June 19, 2001, between Modern
[23]     Continental Construction Co., Inc.,
         Obayashi and Mystic Landing, LLC
[24]

eter M. Grela    Case 1:04-cv-10180-NMG    Document 66-6    Filed 04/04/2005    Page 4 of 38

Mystic Landing, LLC v.
ol. 1, March 14, 2005    Pharmack Corporation, et al., etc.



**Page 4**

EXHIBITS, Continued

EX. NO.      PAGE

7 Rizzo Associates, Inc., document 32
entitled "Phase II Field
Investigation Report" dated June 19,
2001

8 Plan entitled "Construction 42
Staging Everett Laydown Yard,
22 Chemical Lane" dated 1/23/97

9 Plan entitled "Construction 42
Staging Everett Laydown Yard,
22 Chemical Lane" dated October 9,
1996

10 Photograph containing blue and 59
brown drums

11 Photograph of steel pile and large 64
piece of construction equipment

12 Photograph containing plastic 69
bags of garbage and various waste
materials

13 Plan entitled "Modern Continental 76
Everett, Massachusetts, Alternate C"

14 Environmental Science Services, 78
Inc., document entitled
"Preliminary Assessment, Waterfront
Development, Everett and Boston,
Massachusetts" dated April 12, 2002

15 Plan entitled "Mystic River 85
Landing, Everett, Massachusetts"
dated April 10, 2003

16 Letter dated October 13, 2004, to 103
Doreen M. Zankowski from Adam P.
Kahn, with attached photograph
and six sheets of data

**Page 5**

EXHIBITS, Continued

EX. NO.      PAGE

17 Letter dated August 27, 2002, to 107
Adam Kahn from Doreen M. Zankowski,
with attached cost estimates

**Page 6**

### PROCEEDINGS

MR. STEVENS: Before we begin, counsel have
stipulated that the witness will have an opportunity
to read and sign the deposition transcript, but that
the notarization of his signature is waived. Have I
correctly stated those stipulations?

MS. ZANKOWSKI: Yes.

MR. OTTO: Yes.

### PETER M. GRELA

a witness called for examination by counsel for the
Defendants, having been satisfactorily identified by
the production of his U.S. Passport and being first
duly sworn by the Notary Public, was examined and
testified as follows:

### DIRECT EXAMINATION
### BY MR. STEVENS:

Q: Could you please state your full name and
residential address.

A: Peter M. Grela, 66 Blackburnian Road,
Weston, Massachusetts 02493.

MS. ZANKOWSKI: John, are you going to
reserve all objections except as to form?

MR. STEVENS: That's what the rule
provides.

Page 7

[1] MS. ZANKOWSKI: All right. Just want to
[2] make sure we're clear.
[3]    Q: Are you employed, Mr. Grela?
[4]    A: No.
[5]    Q: When were you most recently employed?
[6]    A: Friday, March 11, 2005.
[7]    Q: In what capacity were you employed as of
[8] last Friday.
[9]    A: As vice president of Modern Continental
[10] Construction.
[11]    Q: How long did you work for Modern
[12] Continental Construction?
[13]    A: 17 years.
[14]    Q: Can you describe for us, in narrative form,
[15] the various positions you held over those 17 years
[16] in chronological order.
[17]    A: Yes. When I first started I was the
[18] controller responsible for accounting and financial
[19] functions of the company. That was until
[20] approximately 1992. In 1992 I took over as chief
[21] financial officer, through 2002, responsible
[22] essentially for the same things, including all
[23] banking relationships, surety relationships,
[24] business transactions, financial affairs. In 2002 I

Page 8

[1] left the CFO position, took over as — I had been a
[2] vice president, took over as — took over troubled
[3] projects and claim resolution for troubled projects.
[4] And that concluded this past Friday.
[5]    Q: What were the circumstances of the
[6] termination of your employment?
[7]    A: It was a planned exit. The company is
[8] currently in a wind-down, and it was a scheduled
[9] termination.
[10]    Q: Is it your intention to stay in the area?
[11]    A: Yes, it is.
[12]    Q: What is the schedule for the wind-down of
[13] Modern Continental?
[14]    A: There really isn't a schedule; it's just a
[15] matter of completion of the balance of their
[16] projects.
[17]    Q: What will then happen to the company's
[18] remaining assets?
[19]    A: I'm not sure.
[20]    Q: There is no planned disposition of those
[21] assets, to your knowledge?
[22]    A: There is some form of — there's some
[23] disposition planned, but I am not privy to those
[24] specifics.

Page 9

[1]    Q: Do you have any affiliation with Mystic
[2] Landing?
[3]    A: Can you explain "affiliation."
[4]    Q: Are you a person authorized to act on
[5] behalf of Mystic Landing?
[6]    A: Today?
[7]    Q: Yes.
[8]    A: No.
[9]    Q: Were you ever a person authorized to act on
[10] behalf of Mystic Landing?
[11]    A: Yes.
[12]    Q: During what period of time were you so
[13] authorized?
[14]    A: From its formation to somewhere until my —
[15] somewhere until probably 2002.
[16]    Q: When did you — what were the circumstances
[17] in which you ceased to be a person authorized to act
[18] for Mystic Landing?
[19]    A: When I relinquished my position as CFO, I
[20] also relinquished my position to act on behalf of
[21] Mystic Landing.
[22]    MR. STEVENS: I ask that the Notice of
[23] Deposition, the three-page Notice of Deposition
[24] dated March the 4th, 2005, be marked for

Page 10

[1] identification as Mystic Exhibit 1.
[2]    (Document marked as Mystic
[3] Exhibit 1 for identification)
[4]    Q: Mr. Grela, I'm showing you the document
[5] that's been marked for identification as Mystic
[6] Exhibit 1. I ask you if you've seen it.
[7]    A: Yes, I have.
[8]    Q: Do you understand that it is the notice
[9] pursuant to which you have appeared today?
[10]    A: I do.
[11]    Q: Do you understand that you have been
[12] designated by Mystic Landing to testify on its
[13] behalf as to information known to Mystic Landing
[14] concerning the subject matter set forth in Exhibit
[15] 1?
[16]    A: Yes, I do.
[17]    Q: What have you done to familiarize yourself
[18] with information known or available to Mystic
[19] Landing concerning the subject matters in
[20] preparation for your deposition?
[21]    A: I briefly reviewed a deposition that I
[22] carried out in a previous matter dating back to
[23] 1998.
[24]    Q: Did you look at any other documents?

**Page 11**

[1] A: No, I did not. Well, actually, there was a
[2] second deposition notice that came with this one, I
[3] looked at that also.
[4] Q: Did you look at any documents in the files
[5] of Mystic Landing?
[6] A: I did not.
[7] Q: Does Mystic Landing maintain files?
[8] A: I do not believe it does.
[9] Q: Are the files maintained by Modern
[10] Continental available to Mystic Landing?
[11] A: To the extent that they exist, they would
[12] be.
[13] Q: Did you look at any documents in the files
[14] of Modern Continental?
[15] A: No, I did not.
[16] Q: Did you speak with anyone who is
[17] knowledgeable concerning matters known to Mystic
[18] Landing?
[19] A: No, I did not.
[20] Q: Did you speak with counsel?
[21] A: No.
[22] MS. ZANKOWSKI: Yes, you did.
[23] A: Well, pertaining to what?
[24] MS. ZANKOWSKI: You can say yes.

**Page 12**

[1] A: Yes, okay, I spoke with counsel.
[2] Q: Now, do you understand that this — that
[3] the lawsuit in which Mystic's deposition is being
[4] taken involves property located on Alford Street and
[5] Broadway in Everett, Massachusetts?
[6] A: Yes.
[7] Q: Who owns that property?
[8] A: Mystic Landing, LLC.
[9] Q: When was Mystic Landing formed?
[10] A: I couldn't tell you the exact date but — I
[11] couldn't tell you the exact date.
[12] Q: Mystic Landing certainly knows when it was
[13] formed, does it not?
[14] A: Yes.
[15] MR. STEVENS: I ask that a one-page
[16] printout that summarizes filings by Mystic Landing
[17] with the Massachusetts Secretary of State be marked
[18] for identification as Mystic Exhibit 2.
[19] (Document marked as Mystic
[20] Exhibit 2 for identification)
[21] Q: Directing your attention to the document
[22] that's been marked as Mystic 2, Mr. Grela, does it
[23] inform you that Mystic was organized on June
[24] 7th, 2001?

**Page 13**

[1] A: Yes, it does.
[2] Q: Now, when did Mystic Landing acquire the
[3] property?
[4] A: Approximately the same time frame.
[5] MR. STEVENS: I ask that a five-page
[6] document entitled "Quitclaim Deed" dated June 21,
[7] 2001, be marked for identification as Mystic Exhibit
[8] 3.
[9] (Document marked as Mystic
[10] Exhibit 3 for identification)
[11] Q: Directing your attention to the document
[12] that's been marked for identification as Mystic
[13] Exhibit 3, Mr. Grela, I ask if you can identify it
[14] as a copy of the deed by which Mystic Landing
[15] acquired the property.
[16] A: Yes.
[17] Q: Does it inform you with greater precision
[18] that the date of the acquisition was June 21, 2001?
[19] A: Yes.
[20] Q: From whom did Mystic Landing acquire the
[21] property?
[22] A: Based on this document?
[23] Q: Do you recall? Mystic Landing surely knows
[24] from whom it acquired the property, does it not?

**Page 14**

[1] MS. ZANKOWSKI: Objection.
[2] A: Based on the document, it would appear that
[3] the property was conveyed from Mary O'Donnell.
[4] Q: Sir, you understand that you are to testify
[5] to matters — information known to Mystic Landing as
[6] to, among other topics, the purchase of the
[7] property?
[8] A: Yes.
[9] Q: I am asking, Mystic Landing surely knows
[10] from whom it purchased the property, does it not?
[11] MS. ZANKOWSKI: Objection.
[12] A: It does, but to answer your question the
[13] way it's worded might be deceptive.
[14] Q: From whom —
[15] A: Well —
[16] Q: — did Mystic landing acquire the
[17] property?
[18] A: Mystic Landing acquired the property from
[19] Mary O'Donnell, but it acquired it in an option to
[20] purchase essentially the property from Modern
[21] Continental. That's why I hesitated.
[22] Q: How much did Mystic Landing pay Mary
[23] O'Donnell to acquire the property?
[24] A: $300,000.

Page 15

[1]    Q: When did it make that payment?
[2]    A: It was approximately — the approximate
[3] time frame of June 21, 2001.
[4]    Q: By what means did it make the payment?
[5]    A: I do not recall.
[6]    Q: Did it make it in cash?
[7]    A: No, no.
[8]    Q: Did it make it by cashier's check?
[9]    A: It could have.
[10]   Q: Well, Mystic Landing surely knows by what
[11] means it made the payment, does it not?
[12]   MS. ZANKOWSKI: Objection.
[13]   A: I would have to go back and research it to
[14] give you an exact answer.
[15]   Q: And that's what you were supposed to do
[16] before this deposition, Mr. Grela.
[17]   MS. ZANKOWSKI: Objection.
[18]   Q: What inquiry did you make as to the payment
[19] of the consideration for the purchase?
[20]   A: Since receiving the Notice of Deposition?
[21]   Q: Yes.
[22]   A: None.
[23]   Q: So here today to testify on behalf of
[24] Mystic Landing as to the payment for this property,

Page 16

[1] you are not able to testify how Mystic Landing made
[2] this payment; is that correct?
[3]    MS. ZANKOWSKI: Objection.
[4]    A: If you were to word the question in a
[5] slightly different manner, I might be able to answer
[6] that question.
[7]    Q: By what means did Mystic Landing make the
[8] payment?
[9]    A: Whether it was a bank check or a check or a
[10] wire transfer, I don't think the difference between
[11] those is relevant.
[12]   Q: Do you know it was made by one of those
[13] three means?
[14]   A: Yes, it was.
[15]   Q: What record of that payment, if any, does
[16] Mystic Landing have?
[17]   A: There would be a copy of a bank statement,
[18] a copy of a cancelled check, a copy of a wire
[19] statement. One of those items.
[20]   Q: Has Mystic Landing produced those documents
[21] in response to Pharmacia and Monsanto's first
[22] request for production of documents served upon
[23] Mystic?
[24]   A: I do not know.

Page 17

[1]    Q: Sir, do you understand that one of the
[2] subjects as to which you were to testify was
[3] Mystic's response to the first request for
[4] production of documents?
[5]    A: I did not prepare the request for
[6] production of documents.
[7]    Q: Did you prepare to testify as to that
[8] subject matter?
[9]    A: No.
[10]   Q: Now, was there an agreement pursuant to
[11] which Mystic Landing was able to purchase the
[12] property for $300,000?
[13]   A: Can you be more specific.
[14]   Q: Did Mystic Landing purchase the property
[15] from Mary O'Donnell pursuant to an Option
[16] Agreement?
[17]   A: An Option Agreement in its name?
[18]   Q: Any Option Agreement.
[19]   A: (Attorney-client conference)
[20]   MS. ZANKOWSKI: If you don't understand the
[21] question, say you don't understand the question.
[22]   A: I don't understand the question.
[23]   Q: On June 21st, before it received the deed
[24] from Mary O'Donnell, did Mystic Landing have any

Page 18

[1] contractual rights to purchase the property?
[2]    A: I don't understand the question.
[3]    Q: On June 21st, if Mystic Landing tendered
[4] $300,000 to Mary O'Donnell, did she have an
[5] obligation to give Mystic Landing the deed to the
[6] property?
[7]    A: Under an Option Agreement with Modern
[8] Continental that was transferred to Mystic
[9] Landing, then, yes, I would say yes to that
[10] question.
[11]   MR. STEVENS: I ask that a document
[12] entitled "Option Agreement" dated May 1, 1996, and
[13] containing 15 numbered pages, be marked for
[14] identification as Mystic Exhibit 4.
[15]   (Document marked as Mystic
[16] Exhibit 4 for identification)
[17]   Q: Showing you the document that's been
[18] marked for identification as Mystic Exhibit 4, Mr.
[19] Grela, are you able to identify it as the Option
[20] Agreement to which you referred in your prior
[21] answer?
[22]   A: (Witness reviews document) Yes, it appears
[23] that is the appropriate Option Agreement.
[24]   Q: Was that Option Agreement in the form of

Page 19

[1] Mystic Exhibit 4 in effect on June 21, 2001?
[2] A: Yes.
[3] Q: Was it ever amended between May 1, 1996 and
[4] June 21, 2001?
[5] A: I don't believe so, no. No, I don't
[6] believe so.
[7] MR. STEVENS: I ask that a six-page
[8] document entitled "First Amendment to Option
[9] Agreement" be marked for identification as Mystic
[10] Exhibit 5.
[11] (Document marked as Mystic
[12] Exhibit 5 for identification)
[13] A: (Witness reviews document)
[14] Q: Have you had an opportunity to review the
[15] document that's been marked as Exhibit 5?
[16] A: Yes, I have.
[17] Q: Does it inform you and Mystic that in fact
[18] the Option Agreement marked as Exhibit 4 had been
[19] amended between May 1, 1996 and June 21, 2001?
[20] A: Yes, it does.
[21] Q: Are you able to identify this document as
[22] such an amendment?
[23] A: Yes.
[24] Q: Is it Mystic's understanding that Exhibit

Page 20

[1] 4, as modified to Exhibit 5, was the Option
[2] Agreement in effect on June 21, 2001?
[3] A: Yes.
[4] Q: Was it Exhibit 4, as modified by Exhibit 5,
[5] that gave Mystic Landing the right to purchase and
[6] Mary O'Donnell the obligation to sell the property
[7] for $300,000 on June 21, 2001?
[8] A: Yes.
[9] MS. ZANKOWSKI: Objection. The documents
[10] speak for themselves.
[11] Q: Now, was Mystic Landing the original holder
[12] of that option?
[13] A: No, it was not.
[14] Q: Who was?
[15] A: Modern Continental Construction Co., Inc./
[16] Obayashi, a Joint Venture.
[17] Q: Did that Joint Venture assign or otherwise
[18] transfer the option to Mystic Landing?
[19] A: Yes.
[20] Q: On what terms?
[21] A: Under the terms that they paid
[22] approximately $12 1/2 million to the Joint Venture
[23] for that right.
[24] Q: In what manner did Mystic make that payment

Page 21

[1] to the Joint Venture?
[2] A: Through a journal entry.
[3] Q: Did any cash change hands?
[4] A: Not cash, but there would have been an
[5] offset to an amount due from or an amount due to
[6] between the parties, which was a typical
[7] transaction.
[8] Q: Where did Mystic get the money?
[9] Q: Where did Mystic get the money?
[10] Q: Yes.
[11] A: Mystic would have had most likely an
[12] accounts receivable due from the Modern Continental/
[13] Obayashi Joint Venture.
[14] Q: How did that account receivable arise?
[15] A: In consideration for the option.
[16] Q: You said that Mystic had an account
[17] receivable from the Joint Venture; is that correct?
[18] A: Yes.
[19] Q: Funds were due from the Joint Venture to
[20] Mystic?
[21] A: No.
[22] Q: So it didn't have an account receivable?
[23] A: You said funds are due from the Joint
[24] Venture?

Page 22

[1] Q: To Mystic.
[2] A: No. The creation of the accounts
[3] receivable would have been as a result of
[4] consideration for giving the option to Mystic. In
[5] essence, Mystic paid $12 1/2 million to
[6] Modern/Obayashi for the right to exercise that
[7] option and the amount due was to be received from
[8] Modern/Obayashi.
[9] Q: So no cash change hands; is that correct?
[10] A: Physical cash, no.
[11] Q: No check was given?
[12] A: Not on that date.
[13] Q: At some subsequent time was a check given?
[14] A: I'm not sure.
[15] Q: Mystic knows whether it gave a check,
[16] didn't it?
[17] A: Mystic is an entity.
[18] Q: And you understand you're here to testify
[19] as to Mystic's knowledge?
[20] A: Yes, I do.
[21] Q: Did it give a check or otherwise pay that
[22] amount?
[23] A: I do not know.
[24] Q: Does Mystic have any records as to whether

Mystic Landing, LLC v. Case 1:04-cv-10180-NMG Document 66-6 Filed 04/04/2005 Page 9 of 38
Pharmacia Corporation, et al., etc.
Peter M. Grela
Vol. 1, March 14, 2005

Page 23

[1] it made such a payment?

[2] A: Yes, it would.

[3] Q: Do you know whether they have been produced

[4] in response to the first request for production of

[5] documents served upon Mystic by Pharmacia and

[6] Monsanto?

[7] A: No, I do not.

[8] Q: Was a note given to the Joint Venture at

[9] the time of the acquisition of the option?

[10] A: Probably not.

[11] MR. STEVENS: I ask that a three-page

[12] document entitled "Assignment and Assumption of

[13] Rights and Obligations," dated June 19, 2001, be

[14] marked for identification as Mystic Exhibit 6.

[15] (Document marked as Mystic

[16] Exhibit 6 for identification)

[17] A: (Witness reviews document)

[18] Q: Have you had an opportunity to review the

[19] document that's been marked as Exhibit 6, Mr.

[20] Grela?

[21] A: Yes, I have.

[22] Q: Can you identify it as the assignment by

[23] which Mystic acquired from the Joint Venture the

[24] option to purchase the property?

Page 24

[1] A: Yes, I can.

[2] Q: What was the price as shown in Exhibit 6?

[3] A: As shown, it was $20 million.

[4] Q: Was that amount ever paid?

[5] A: By journal entry.

[6] Q: Does a journal entry represent payment, Mr.

[7] Grela?

[8] A: Yes, I would say it does.

[9] Q: If you make a journal entry, then an amount

[10] has been paid?

[11] A: To the extent the entities are interrelated

[12] and maintain balances between entities, from my

[13] perspective, acting as a CFO for all these entities,

[14] it did.

[15] Q: Where did Mystic Landing get the money to

[16] pay it?

[17] A: It had a payable due. It had a payable due

[18] for a portion of it, and for another portion — if a

[19] portion of it is financed — well, it financed

[20] approximately $10 million from Banknorth, and then

[21] the balance would have been paid — would have been

[22] in an amount payable to the Joint Venture.

[23] Q: So Mystic borrowed $10 million of this

[24] money?

Page 25

[1] A: Yes.

[2] Q: To acquire the right to purchase the

[3] property?

[4] A: To acquire the right to purchase and pay,

[5] pay for the option.

[6] Q: Are there documents evidencing that

[7] borrowing?

[8] A: Sure. Yes.

[9] Q: Do you know whether they have been produced

[10] in response to the first request for production of

[11] documents served on Mystic?

[12] A: I do not know.

[13] Q: Does Mystic have those documents within its

[14] possession?

[15] A: Yes.

[16] Q: So it borrowed $10 million and acquired the

[17] other $10 million how?

[18] A: It did not acquire; it had an amount

[19] payable to.

[20] Q: To the Joint Venture?

[21] A: To the Joint Venture, which then may have

[22] swapped receivables or payables with the parent

[23] company.

[24] Q: You don't know?

Page 26

[1] A: I wouldn't be expected to know.

[2] Q: Mystic knows, does it not?

[3] A: Maybe.

[4] Q: You're saying Mystic may not know whether

[5] it paid $10 million of the purchase price?

[6] MS. ZANKOWSKI: Objection.

[7] A: To the extent it looked at a tax return,

[8] saw an accounts payable there, I guess Mystic would

[9] know.

[10] Q: Are there documents reflecting whether, and

[11] if so how, Mystic made this payment?

[12] A: Which payment?

[13] Q: The second $10 million of the $20 million

[14] due the Joint Venture.

[15] A: I'm not sure. It may still be owed.

[16] Q: Is there a note evidencing the indebtedness

[17] if it's still owed?

[18] MS. ZANKOWSKI: Objection. Asked and

[19] answered.

[20] A: I am not sure. Customarily we would not do

[21] notes between companies that were owned by the same

[22] group.

[23] Q: Is Obayashi owned by the same group as

[24] Modern Continental?

eter M. Grela
Mystic Landing, LLC v.
ol. 1, March 14, 2005
Case 1:04-cv-10180-NMG    Document 66-6    Filed 04/04/2005    Page 10 of 38
Pharmacia Corporation, et al., etc.

**Page 27**

A: No, Obayashi is not.

Q: And they're one of the two debtors, are they not, as one of the two Joint Venturers?

A: No, that's not the case.

Q: Does Obayashi have no interest in this portion of the Joint Venture?

A: That's correct.

Q: What interest did Obayashi have in the Joint Venture in June of 2001?

MS. ZANKOWSKI: Objection. He's here to answer for Mystic, right?

Q: If Mystic knows.

A: Can you repeat the question.

Q: What interest in the Joint Venture did Obayashi have in June of 2001?

A: Obayashi had some obligations to the Joint Venture, but the interest was bought out by Modern Continental Construction.

Q: So is it correct it was no longer a Joint Venture in 2001?

A: No, it was still a Joint Venture. However, originally it was a 60/40 Joint Venture. Modern was 60; Obayashi was 40. Sometime after that Joint Venture was formed in '96 — sometime after the

**Page 28**

Joint Venture was formed, Modern purchased Obayashi's 40 percent financial interest out, thereby essentially giving Modern 100 percent of the financial interest in the Joint Venture. And I say financial interest, because Obayashi still had some potential surety — well, bond obligation under the Joint Venture.

Q: So as of June 2001, Modern Continental owned all of the financial interest in the Joint Venture?

A: Yes.

Q: Have you now told us everything that you know concerning Mystic's payment to Mary O'Donnell or to the Joint Venture in connection with the acquisition of the property?

MS. ZANKOWSKI: Objection.

A: That's a very difficult question to answer. I answered the questions that you've asked. To the extent you've asked me every — I don't know, I can't answer that question.

Q: Has any portion of the consideration for the Option Agreement been refunded to Mystic?

A: I am not aware.

Q: In negotiating the Assignment and Option

**Page 29**

Agreement, who acted on behalf of Modern Continental?

A: I did.

Q: Who acted on behalf of Mystic?

A: I did.

Q: You bargained with yourself to set the price?

A: Essentially, yes.

MS. ZANKOWSKI: Objection.

Q: For whom did you make a good deal?

MS. ZANKOWSKI: Objection.

A: I made a fair deal for all parties.

Q: Who determined that?

MS. ZANKOWSKI: Objection.

A: Various individuals within the company.

Q: Is this an arm's-length transaction?

A: I'm not going to say it is or it isn't. I'm going to say it's a fair deal; it's not for me to judge whether it's an arm's-length transaction, to the extent that a common entity can probably not have an arms-length transaction.

Q: Have you participated in a number of real estate deals, Mr. Grela?

A: Yes, I have.

**Page 30**

Q: Generally, the purchaser wants to pay the lowest amount they can, don't they?

MS. ZANKOWSKI: Objection.

A: By the same token, the buyer wants to receive the highest amount.

Q: Correct. Who was trying to get the lowest amount for the buyer here?

MS. ZANKOWSKI: Objection.

A: I was.

Q: And who was trying to get the highest amount for the seller?

A: I was.

MS. ZANKOWSKI: Objection.

Q: What law firm represented Mystic Landing in connection with the June 21st purchase?

A: Hinckley Allen.

Q: What law firm represented —

A: Hinckley Allen & Snyder.

Q: — Modern Continental?

A: Hinckley Allen & Snyder. Just to clarify, the law firm was not involved in the negotiation of the purchase and sale, but the law firm was involved in administrative paperwork.

Page 31

[1] Q: Such as the preparation of the Assignment
[2] and Assumption of Rights and Obligations document?
[3] A: Yes.
[4] Q: In connection with the preparation and
[5] review of that document, what law firm represented
[6] Mystic Landing?
[7] MS. ZANKOWSKI: Objection.
[8] A: I'm going to say no law firm represented
[9] either side.
[10] Q: So when the law firm prepared Exhibit 6, it
[11] wasn't representing either side to that transaction?
[12] MS. ZANKOWSKI: Objection.
[13] A: It prepared it based on my request to
[14] prepare the document.
[15] Q: When you made the request, who were you
[16] acting on behalf of?
[17] A: Modern Continental and Mystic Landing.
[18] MR. STEVENS: Off the record.
[19] (Discussion off the record)
[20] MS. ZANKOWSKI: We're going to take a
[21] minute in the hall.
[22] MR. STEVENS: Okay.
[23] (A pause)
[24] MR. STEVENS: I ask that a document dated

Page 32

[1] June 19, 2001, entitled "Phase II Field
[2] Investigation Report," be marked for identification
[3] as Mystic Exhibit 7.
[4] (Document marked as Mystic
[5] Exhibit 7 for identification)
[6] MS. ZANKOWSKI: Let the record show that
[7] Exhibit 7 is not the full report but purports to
[8] be —
[9] MR. STEVENS: Let me just put a question on
[10] the record so that the witness can respond.
[11] Q: Showing you a large document entitled
[12] "Phase 2 Field Investigation Report," I ask if you
[13] can identify Exhibit 7 first as the cover and first
[14] pages through Figure 1 of that larger document.
[15] Figure 1 appears immediately after numbered Page 18
[16] in the larger document.
[17] A: What are you asking?
[18] Q: I'm asking just to have the record show
[19] that Exhibit 6 is the beginning portion through
[20] Figure 1 of the Phase II Field Investigation Report.
[21] MS. ZANKOWSKI: Objection. I think you
[22] want Exhibit 7.
[23] MR. STEVENS: Sorry, Exhibit 7.
[24] Q: Exhibit 7 is the initial portion of the

Page 33

[1] Phase II Field Investigation Report.
[2] A: (Witness reviews documents) It would
[3] appear that is correct.
[4] Q: Now, the date Exhibit 7 bears is June 19,
[5] 2001; is that correct?
[6] A: That is correct.
[7] Q: Who represented Mystic Landing in the
[8] purchase from Mary O'Donnell, what law firm?
[9] A: There really was not a law firm that
[10] represented us in the purchase. I represented
[11] Modern Continental, Modern Continental/Obayashi,
[12] Mystic Landing. To the extent that I asked Hinckley
[13] Allen to prepare documents, they prepared the
[14] documents. They didn't represent us in
[15] negotiations; all that work was done in-house.
[16] Q: Did Mystic Landing have a lawyer in June
[17] 2001?
[18] A: Did it have a lawyer? What do you mean by
[19] that?
[20] Q: Was it represented by a lawyer?
[21] A: Mystic Landing is simply a holding company.
[22] It doesn't have employees; it's a holding company.
[23] Q: Modern Continental was the managing agent
[24] of Mystic Landing, was it not?

Page 34

[1] MS. ZANKOWSKI: Objection.
[2] Did you answer that?
[3] THE WITNESS: I did not answer that.
[4] A: I'm not sure what the question is.
[5] Q: Modern Continental was the managing member
[6] of Mystic in June 2001, was it not?
[7] A: I think you have to be more specific.
[8] There are many companies which start with Modern
[9] Continental and then have — not a prefix but have
[10] other words behind it.
[11] Q: Modern Continental Companies, Inc., was the
[12] managing member of Mystic Landing in June 2001, was
[13] it not?
[14] A: You're looking at the operating agreement,
[15] I'm not. If you care to give it to me, I'll verify
[16] it.
[17] Q: I extend the record. Are you now able to
[18] testify on behalf of Mystic that its managing member
[19] was Modern Continental —
[20] A: Companies, Inc., period.
[21] Q: — Companies, Inc. What lawyers
[22] represented Modern Continental Companies, Inc., in
[23] June 2001?
[24] A: They're a holding company also, so it's not

Page 35

like they would have counsel per se. I can tell
you, they've never paid a legal bill. So it's hard
to answer that question.
   Q: Who were the officers of Modern Continental
Companies, Inc., in June of 2001?
   MS. ZANKOWSKI: Objection.
   A: Officers. I don't recall that.
   Q: Were they the same as the officers of
Modern Continental Construction Co., Inc.?
   A: They would be similar. The president would
be the same; the treasurer would be the same. There
might have been different vice presidents, but
they'd be similar.
   Q: There was overlap in the officers; is that
correct?
   MS. ZANKOWSKI: Objection.
   A: That would be correct.
   Q: Who represented — what law firm
represented Modern Continental Construction Co.,
Inc., in June of 2001?
   A: Many law firms.
   Q: Was Hinckley Allen among them?
   A: You have to understand, we have numerous
cases, numerous litigation; we have numerous

Page 36

attorneys.
   Q: And was Hinckley Allen among the law firms
that represented Modern Continental Construction
Co., Inc., in June 2001?
   A: Yes.
   Q: And information that was known to Modern
Continental Construction Company was, because of the
overlap in officers, known to Modern Continental
Companies, Inc.; isn't that correct, sir?
   MS. ZANKOWSKI: Objection.
   A: I can't answer the question. Your line of
questioning is so confusing, it's very difficult to
answer these questions. If you'd just ask me what
you want to know, explain it in simple terms, I'll
be happy to tell you, but trying to trap me into
something is very difficult to respond to.
   Q: Mystic Landing knew what was in Exhibit 7
before it bought the property, didn't it?
   MS. ZANKOWSKI: Objection.
   A: What is Exhibit 7?
   Q: It's right in front of you.
   A: Oh, I'm sorry, Exhibit 7. (Witness reviews
document) Mystic Landing is a holding company.
   Q: Mystic Landing was aware of the information

Page 37

[1] in Exhibit 7 before June 21, 2001, was it not?
[2] A: You speak of Mystic Landing as a human
[3] being. Mystic Landing was a holding company set up
[4] to acquire a piece of property.
[5] Q: Mystic Landing is an entity; it has
[6] knowledge.
[7] A: That's debatable, in my mind, my simple
[8] mind anyway. Ask me what you want. Ask me a simple
[9] — ask me a question that you want an answer to, but
[10] don't try and trick me into answering something
[11] wrongful.
[12] Q: Sir, the information in Exhibit 7 was
[13] available to Mystic Landing before June 21, 2001,
[14] was it not?
[15] A: To be honest with you, it may have been.
[16] Q: Sir, you have been designated to testify as
[17] to information available to Mystic Landing
[18] concerning certain designated subjects. You
[19] understand that, don't you?
[20] A: Yes, I do.
[21] Q: And one of those subjects is knowledge of
[22] environmental contamination before Mystic acquired
[23] the property. You understand that?
[24] A: Yes, I do.

Page 38

[1] Q: Did Mystic know of the information
[2] contained in Exhibit 7 before it acquired the
[3] property?
[4] MS. ZANKOWSKI: Objection. Asked and
[5] answered.
[6] A: I see a report; I see a date; I see the
[7] report existed on that particular date. The
[8] information in this report is not that familiar to
[9] me, but it probably shouldn't be, because I was
[10] really not involved on the — involved or concerned
[11] too much with the environmental issues on the
[12] property, because it's not my background.
[13] Q: Sir, you understand, you're here not to
[14] testify as to what information was available to
[15] Peter Grela as an individual but what information
[16] was available to Mystic Landing as an entity?
[17] A: Well, Peter Grela as an officer of the
[18] various companies essentially you can say
[19] represented Mystic Landing.
[20] Q: Mystic Landing knows whether it was aware
[21] of the information in Exhibit 7 on June 21, 2001,
[22] does it not?
[23] MS. ZANKOWSKI: Objection. Asked and
[24] answered.

Page 39

[1]  A: No, it doesn't, because I'm the one that
[2] created Mystic Landing, and I'm not sure I was aware
[3] of the information. There was so much information
[4] going on. I remember the items that were relevant
[5] to me. This necessarily may not have been relevant
[6] to me.
[7]  Q: Would you turn to Page 3 of Exhibit 7, Mr.
[8] Grela. On the page numbered 3, please, note the
[9] third sheet of paper.
[10]  A: Yes.
[11]  Q: It refers to testing — under Section 3.0
[12] on that page, it refers to testing done in 1995,
[13] does it not?
[14]  A: It does. I'm verifying. I'm verifying —
[15]  Q: Right.
[16]  A: — the third line in 3.0 on Page 3 says
[17] somebody "performed a limited subsurface
[18] investigation at the site in 1995."
[19]  Q: And it refers to finding contamination in
[20] those investigations, does it not?
[21]  MS. ZANKOWSKI: Objection. The exhibit
[22] speaks for itself.
[23]  A: Agreed.
[24]  Q: And on that same page, it refers to further

Page 40

[1] testing done in 1996 that shows contamination, does
[2] it not?
[3]  MS. ZANKOWSKI: Objection. The document
[4] speaks for itself.
[5]  A: I am not a PE or an environmental engineer,
[6] so I prefer not to respond to that question.
[7]  Q: Do you have any reason to believe that
[8] Mystic Landing did not have this exhibit, the
[9] document marked as Exhibit 7, on June 21, 2001?
[10]  A: I guess I don't know. I can only say that
[11] it wasn't relevant to their acquisition of the
[12] property. Since I acted on their behalf, it wasn't
[13] relevant to me, so I have to conclude that it wasn't
[14] relevant to them.
[15]  Q: Whether the property was contaminated or
[16] not was not relevant to Mystic's acquisition of the
[17] property?
[18]  A: No.
[19]  MS. ZANKOWSKI: Objection.
[20]  A: No, no.
[21]  MS. ZANKOWSKI: Is there a question there?
[22]  A: The issue of the contamination, whether it
[23] was assigned to Mystic Landing or anybody else, had
[24] been clarified, at least in my mind, earlier on in

Page 41

[1] the process. We didn't know what the contamination
[2] was. It was irrelevant, because we always felt the
[3] contamination was caused by Monsanto, and it would
[4] be remediated by Monsanto, or the remediation would
[5] be paid by Monsanto, similar to the site directly
[6] adjacent to the property across the tracks.
[7]  So when you ask me these questions, and why
[8] they're relevant and why they're not, that's why it
[9] wasn't relevant. Because whatever was there was
[10] there, it was clearly caused by Monsanto. It wasn't
[11] important to get to the bottom of it at that point
[12] in time, because we weren't using it for anything
[13] but a laydown area at that point in time. And
[14] whatever the cost of cleanup was going to be, I
[15] always felt Monsanto was going to end up paying for
[16] it.
[17]  MR. STEVENS: Move to strike.
[18]  Q: Mystic knew the property was contaminated
[19] on June 21, 2001, didn't it?
[20]  A: Yes. We knew there was some contamination.
[21]  Q: Now, when Mystic landing acquired the
[22] property on June 21, 2001, what use was being made
[23] of it?
[24]  A: The property was serving as a laydown

Page 42

[1] staging area for a or multiple construction projects
[2] in downtown Boston.
[3]  MR. STEVENS: I ask that a plan entitled
[4] "Construction Staging, Everett Laydown Yard, 22
[5] Chemical Lane," dated January 23, 1997, be marked
[6] for identification as Mystic Exhibit 8.
[7]  (Document marked as Mystic
[8]  Exhibit 8 for identification)
[9]  MR. STEVENS: And that a smaller plan
[10] entitled "Construction Staging, Everett Laydown
[11] Yard, 22 Chemical Lane," dated October 9, 1996, be
[12] marked for identification as Mystic Exhibit 9.
[13]  (Document marked as Mystic
[14]  Exhibit 9 for identification)
[15]  A: (Witness reviews documents)
[16]  Q: Have you had an opportunity to look at
[17] Exhibits 8 and 9, Mr. Grela?
[18]  A: Just now, yes, I have.
[19]  Q: Is one an earlier — is Exhibit 9 an
[20] earlier version of Exhibit 8 showing the plans for
[21] use of the property as a laydown yard?
[22]  MS. ZANKOWSKI: Objection.
[23]  A: Based on the date of the drawing, Exhibit 9
[24] would be dated October 9, 1996, and Exhibit 8 would

**Page 43**

be dated January 23, 1997.

[1] Q: When did the use of the property as a yard
[2] begin?

[3] A: It was somewhere in mid-1996. Our use, our
[4] use.

[5] MS. ZANKOWSKI: Who is "our"?

[6] A: "Our" being Modern Continental/Obayashi.

[7] Q: Now, did the use change over time?

[8] MS. ZANKOWSKI: Objection.

[9] A: Did Modern Continental's use change over
[11] time?

[12] Q: Yes.

[13] A: No. For the most part, no.

[14] Q: Does Exhibit 8 accurately show the use of
[15] the property as it was occurring on June 21, 2001?

[16] MS. ZANKOWSKI: Objection.

[17] A: I can't speak to specific detail, but I can
[18] say that in general, yes. In general, it was being
[19] used as a construction laydown storage area. If the
[20] gravel moved 15 feet over in one direction and
[21] manholes moved a couple hundred feet in another
[22] direction, I don't think that — would you consider
[23] that to be a change in use?

[24] Q: You're familiar with the configuration of

**Page 44**

[1] the property, are you not, Mr. Grela?

[2] A: Yes, for the most part, I am.

[3] Q: And there is a portion of the property that
[4] on the plan is to the right of Chemical Lane, is
[5] there not?

[6] MS. ZANKOWSKI: Objection.

[7] A: I'm not sure where Chemical Lane ends, but
[8] if you're speaking to the triangle —

[9] Q: There's a truncated triangle portion of the
[10] property, is there not?

[11] A: There is.

[12] Q: What use is shown on Exhibit 8 of that
[13] portion of the property? Exhibit 8 is the larger
[14] one.

[15] A: I mean, it says "office trailer."

[16] Q: What use was being made of that truncated
[17] triangle in June 2001?

[18] A: I'm not sure.

[19] Q: Mystic knows, does it not?

[20] MS. ZANKOWSKI: Objection.

[21] A: I'm not sure that Mystic would know.

[22] Q: Mystic paid no attention to the use of the
[23] property in 2001?

[24] MS. ZANKOWSKI: Objection.

**Page 45**

[1] A: Correct.

[2] Q: Mystic didn't care what was being done on
[3] the property?

[4] A: I wouldn't say it didn't care, but it had
[5] no reason to — it had no reason to know. It was
[6] being used as a laydown storage facility for a
[7] construction project, the use hadn't changed in six,
[8] seven or eight years, and there was no reason for
[9] Mystic to do anything.

[10] Q: Who was using the property in June 2001?

[11] A: The Modern Continental/Obayashi Joint
[12] Venture.

[13] Q: Did Mystic care what they were doing on the
[14] property?

[15] MS. ZANKOWSKI: Objection.

[16] A: Mystic, to the extent they were running the
[17] construction laydown facility, Mystic would not
[18] care. To the extent that they're doing something
[19] detrimental to the property, Mystic would care, but
[20] Mystic had no reason to believe that they were doing
[21] something detrimental to the property.

[22] Q: Did Mystic cause the property to be viewed
[23] to ascertain whether something detrimental was being
[24] done?

**Page 46**

[1] A: Mystic, as I've said before, Mystic was,
[2] and still is, a holding company for this property.
[3] The employees that would — not the employees but
[4] the same people that would have acted on behalf of
[5] Mystic would have acted on behalf of Modern
[6] Continental or Obayashi.

[7] So again, your line of questioning is
[8] trying to trap me. If you ask me a question that
[9] you're looking for an answer for, I'd be more than
[10] happy to give it to you.

[11] Q: Mr. Grela, you understand that Mystic
[12] Landing is an entity that is suing people for
[13] millions of dollars. You understand that, don't
[14] you?

[15] A: I understand that, but I also understand
[16] that we're not suing somebody for something that
[17] happened in 2001. We're suing for the long-term
[18] contamination of the property by Monsanto. To the
[19] extent you have something that you think happened on
[20] this magical date of December or whatever 2001, tell
[21] me what it is, and I'll answer if I knew about it or
[22] not. But I don't think it's relevant to the overall
[23] litigation.

[24] Q: Mr. Grela, the question is, you understand,

Mystic Landing, LLC v.
Pharmacia Corporation, et al, etc.
Case 1:04-cv-10180-NMG   Document 66-6   Filed 04/04/2005   Page 15 of 38
Peter M. Grela
Vol. 1, March 14, 2005

Page 47

[1] do you not, that Mystic Landing is an entity that is
[2] suing other parties for millions of dollars?
[3]   A: I understand that, yes.
[4]   Q: And in suing those entities for millions of
[5] dollars, it is making factual allegations. Do you
[6] understand that, sir?
[7]   A: Yes, I do.
[8]   Q: It is saying it is an entity that has
[9] certain knowledge. Do you understand that, sir?
[10]   A: To the extent they're making factual
[11] allegations — well, I prefer not to answer that
[12] question.
[13]   Q: You understand that by making the
[14] allegation, Mystic Landing is saying it knows
[15] something is true, correct, sir?
[16]   MS. ZANKOWSKI: Objection.
[17]   A: It certainly believes something is true,
[18] yes.
[19]   Q: You are here to testify as to various other
[20] things that Mystic may or may not know. You
[21] understand that, don't you, sir?
[22]   MS. ZANKOWSKI: Objection. And he has been
[23] doing that.
[24]   MR. STEVENS: He's saying Mystic. He's now

Page 48

[1] trying to claim Mystic is an entity that can't know
[2] anything.
[3]   MS. ZANKOWSKI: That's not what he's
[4] saying.
[5]   THE WITNESS: That's not what I'm saying at
[6] all.
[7]   MS. ZANKOWSKI: He's been answering
[8] questions all morning.
[9]   Q: Okay, Mr. Grela. Did Mystic know —
[10]   A: I'm not trying to be difficult, but to the
[11] extent that you haven't done the proper research to
[12] understand what the corporate structure was at that
[13] time for Modern Continental, don't try and make me
[14] look like an unwilling deponent. That's what you're
[15] trying to paint.
[16]   Q: Did Mystic know what was happening in June
[17] 2001 on the truncated triangle portion of the
[18] property?
[19]   MS. ZANKOWSKI: Objection. Asked and
[20] answered.
[21]   A: If you want to reword the question to say
[22] Mystic or the individuals that represented Mystic,
[23] then I'll answer the question.
[24]   Q: Mystic can only know things through

Page 49

[1] individuals that represented it. So when I use the
[2] word "Mystic," I'm using everyone, every entity,
[3] individual or entity, with whose knowledge Mystic is
[4] chargeable. You're here to testify for the
[5] organization, for the limited liability company.
[6]   A: And the question is?
[7]   Q: Did Mystic know what was going on on the
[8] truncated triangle portion of the property in June
[9] 2001?
[10]   MS. ZANKOWSKI: Objection. Asked and
[11] answered.
[12]   A: Mystic had no employees.
[13]   Q: Did Mystic know that the property was
[14] contaminated in June of 2001?
[15]   MS. ZANKOWSKI: Objection. Asked and
[16] answered.
[17]   A: Mystic certainly believed that the property
[18] was contaminated.
[19]   Q: But it had no employees.
[20]   MS. ZANKOWSKI: Objection.
[21]   A: That's correct.
[22]   MS. ZANKOWSKI: Excuse me. I'd like to go
[23] off the record and take a break for a moment.
[24]   MR. STEVENS: Sure.

Page 50

[1]   (Recess)
[2]           BY MR. STEVENS:
[3]   Q: Mr. Grela, does Exhibit 8 show the actual
[4] use of the site in 1997?
[5]   MS. ZANKOWSKI: Objection.
[6]   A: For the most part.
[7]   Q: Does Exhibit 9 show the actual use of the
[8] site in 1996?
[9]   MS. ZANKOWSKI: Objection.
[10]   A: For the most part.
[11]   Q: Are there any documents that show the
[12] actual use of the site between June 2001 and the
[13] present?
[14]   A: I'm not sure.
[15]   Q: Did you attempt to ascertain whether there
[16] are any such documents in the preparation for your
[17] deposition?
[18]   A: That specifically, no.
[19]   Q: Does anyone keep records of comings and
[20] goings on the site?
[21]   MS. ZANKOWSKI: Objection.
[22]   A: Project personnel, project personnel that
[23] are utilizing the site.
[24]   Q: And such documents exist, do they not?

[1]   A: They may.
[2]   Q: Are there any documents that show what
[3] materials come onto the site?
[4]   A: There may be; I don't know. I don't know.
[5]   Q: Are there documents that show deliveries of
[6] materials to the site?
[7]   A: There may be.
[8]   Q: Does Modern Continental keep track of what
[9] the Joint Venture acquires?
[10]   A: To an extent, yes.
[11]   Q: Does it bill the Commonwealth for some
[12] materials that it supplies on the contracts this
[13] yard is being used for?
[14]   MS. ZANKOWSKI: Objection.
[15]   A: I prefer not to answer that question. We
[16] don't typically bill the Commonwealth for specific
[17] materials; we bill the contractor for specific line
[18] items.
[19]   Q: Are there any line items for which you're
[20] reimbursed for materials?
[21]   A: Sure.
[22]   Q: Does the quantity of the materials affect
[23] your reimbursement?
[24]   MS. ZANKOWSKI: Objection.

[1]   A: I don't understand the question.
[2]   Q: On those line items, if you supply more
[3] materials, do you get more money?
[4]   A: Not necessarily. In some cases, sure; in
[5] some cases, no.
[6]   Q: On the cases that you do get more money, do
[7] you keep records of how much materials you're
[8] supplying?
[9]   MS. ZANKOWSKI: Objection. If you know.
[10]   A: It's an impossible question to really
[11] answer.
[12]   Q: Sir, you're saying it's impossible to
[13] answer whether you keep records of quantities of
[14] materials?
[15]   A: You're tying it into what you bill the
[16] Commonwealth of Massachusetts. To the extent you
[17] have to put in a million tons of structural steel or
[18] 1.1 million tons of structural steel and you bid an
[19] item lump sum, it's not relevant to the billing
[20] aspect. So I don't understand.
[21]   Q: Does anyone keep records of what's present
[22] on the property in its use as a laydown yard?
[23]   A: To the extent I know, sure. I'm sure there
[24] are some records of material that gets delivered.

[1] If you're asking me what's there today, I don't
[2] know. Items come; items go.
[3]   Q: Has an inventory ever been taken between
[4] 2001 and 2005?
[5]   A: I have no idea.
[6]   Q: What materials were present on the site
[7] between 2001 and 2005?
[8]   A: Items involved in civil construction:
[9] sand, gravel, equipment, manholes. Whatever you
[10] would need to — what you would typically expect to
[11] find on a project laydown facility.
[12]   Q: And what is that, Mr. Grela?
[13]   A: It depends on the project. In this
[14] particular case, it might be sand, it might be
[15] gravel. It might be materials that go into the
[16] project: structural steel, elevators and
[17] escalators.
[18]   Q: Sir, I'm not interested in what might be
[19] stored on the property; I'm interested in your
[20] knowledge as to what was stored on the property
[21] between 2001 and 2005.
[22]   MS. ZANKOWSKI: Objection.
[23]   A: Those are the types of items that were
[24] stored on the property.

[1]   Q: Don't tell me "the types of items"; tell me
[2] all of the types of items.
[3]   A: I can't tell you all of the types of items.
[4] I can tell you that I'm experienced enough to know
[5] what a construction yard is, and I can tell you I've
[6] been on site numerous times. It's a typical
[7] construction yard.
[8]   Q: What was there?
[9]   A: If you expect somebody to name specifically
[10] every item on 30 acres of property, I think that's a
[11] ridiculous request.
[12]   Q: Were any fuels or lubricants for vehicles
[13] stored there?
[14]   A: There certainly may have been.
[15]   Q: Were there?
[16]   A: There may have been, yes.
[17]   Q: Sir, yes or no: Do you know, were there?
[18] Not whether they may have been; I'm not asking you
[19] to speculate. Were they stored there?
[20]   MS. ZANKOWSKI: Objection. He answered.
[21]   A: To the extent — you would expect a certain
[22] amount of fuel, such as a 55-gallon drum or
[23] something, to be stored there, sure. That's what
[24] you would expect to find on a project yard.

Mystic Landing, LLC    v.
Pharmacia Corporation, et al., etc.
Case 1:04-cv-10180-NMG    Document 66-6    Filed 04/04/2005    Page 17 of 38

Peter M. Grela
Vol. 1, March 14, 2005

Page 55

[1] Q: Were they stored in this project yard?
[2] A: At some point.
[3] MS. ZANKOWSKI: Objection. Asked and
[4] answered.
[5] A: At some point, sure.
[6] Q: What metal materials were stored on the
[7] site?
[8] A: Structural steel and miscellaneous metals.
[9] Q: What metals other than steel?
[10] A: Items that you would typically find
[11] incumbent in a construction project.
[12] Q: What items are those, sir?
[13] A: Could be structural steel; could be
[14] miscellaneous metals; could be grates; could be some
[15] escalators out there. I'm not specifically
[16] interested in the makeup of the materials; it's more
[17] the finished product that's going into the
[18] construction work.
[19] Q: What metallic elements, other than iron,
[20] comprised materials that were stored at the site?
[21] A: I don't know.
[22] Q: Are records kept of what metal items are
[23] present at the site?
[24] A: There aren't specific records kept, for

Page 56

[1] instance, by Mystic Landing, LLC. To the extent
[2] Modern/Obayashi is using it for a project and there
[3] were deliveries, there would be an invoice attached
[4] to those deliveries of what physically went on the
[5] site. So those types of records would exist, not
[6] directly for Mystic Landing, LLC, but under the
[7] joint ventures that use them on the project yard, if
[8] that answers your question.
[9] Q: Are those records available to Mystic
[10] Landing?
[11] A: They're not Mystic Landing's records. I
[12] guess if Mystic Landing requested specific items
[13] from Modern Obayashi that maybe they could be found
[14] and turned over. That would be a very difficult
[15] task.
[16] Q: Do you know whether any of those records
[17] have been produced in response to the first request
[18] for production of documents served by Pharmacia and
[19] Monsanto?
[20] A: I don't know.
[21] Q: Did Mystic Landing — has Mystic Landing
[22] given permission for the Modern/Obayashi Joint
[23] Venture to use its property?
[24] A: I don't know.

Page 57

[1] Q: Is the joint venture using it without the
[2] permission of the owner?
[3] A: I've essentially testified already that
[4] there are no employees of Mystic Landing, LLC.
[5] Essentially to the extent that other employees in
[6] the control organization, if that infers knowledge,
[7] sure. If I was representing Mystic Landing, LLC,
[8] and I certainly was, did I know that Modern/Obayashi
[9] was using the property, of course.
[10] Q: Is there a written agreement for the use of
[11] the property?
[12] MS. ZANKOWSKI: Between?
[13] Q: Mystic Landing and the Joint Venture that's
[14] using it?
[15] A: Yes, I believe there is.
[16] Q: When was that agreement signed?
[17] A: It was probably done at the time of the $10
[18] million financing of Banknorth.
[19] Q: Has that written agreement been produced in
[20] response to the first request for production of
[21] documents?
[22] A: I don't know.
[23] Q: Under that agreement is Mystic Landing
[24] being paid for use of the property by the Joint

Page 58

[1] Venture?
[2] A: I believe yes.
[3] Q: At what rate?
[4] A: I do not recall. That number has changed.
[5] Q: Changed from what?
[6] A: I believe it's changed over time. I
[7] couldn't tell you what the current number is.
[8] Q: What, if any, liquids, other than vehicular
[9] fuels and lubricants, have been stored on the site
[10] between June 21, 2001 and 2005?
[11] A: I'm not aware of any.
[12] Q: Is it not typical to store such other
[13] liquids on a construction laydown yard?
[14] A: What type of liquids?
[15] Q: Other than vehicular fuels —
[16] A: Water?
[17] Q: — lubricants.
[18] A: Water?
[19] Q: I'm asking you.
[20] A: Of course, there's going to be some other
[21] form of liquid. I mean, are we talking a cup of
[22] coffee? Are we talking a 10-gallon water truck? Is
[23] it relevant to a 30-acre parcel? In my opinion, no.
[24] I mean, if there was some large amount of liquid on

eter M. Grela    Case 1:04-cv-10180-NMG    Document 66-6    Filed 04/04/2005    Page 18 of 38

Mystic Landing, LLC   v.
ol. 1, March 14, 2005                                                     Pharmacia Corporation, et al., etc.

**Page 59**

[1] that property, if you were storing it in some type
[2] of large tank system, absolutely, I would tell you.
[3] I'm not aware of any.
[4]     MR. STEVENS: I ask that a —
[5]     MS. ZANKOWSKI: Can we have a copy of the
[6] exhibits for us?
[7]     MR. STEVENS: I'm sorry. I will make
[8] copies when we're through. I'm leaving the
[9] originals free for you to have during the
[10] deposition.
[11]     MS. ZANKOWSKI: I wanted to leave with a
[12] package. But okay.
[13]     MR. STEVENS: Off the record.
[14]     (Discussion off the record.)
[15]     MR. STEVENS: I ask that a photograph
[16] showing, among other things, certain blue and brown
[17] drums be marked for identification as Mystic Exhibit
[18] ten.
[19]     (Photograph marked as Mystic
[20] Exhibit 10 for identification)
[21]     Q: Directing your attention to the document
[22] that has been marked as Exhibit 10, Mr. Grela, I ask
[23] if you can identify it as showing a portion of the
[24] site.

**Page 60**

[1]     A: No, I can't.
[2]     Q: You cannot?
[3]     A: No, I can't.
[4]     Q: When did you most recently see the site?
[5]     A: I've driven by it within the last month
[6] anyway. Was I physically onsite?
[7]     Q: Yes.
[8]     A: Physically on the property, oh, I don't
[9] know, maybe a year ago or so.
[10]     Q: Do you know that drums looking like the
[11] blue drums shown in this photograph would be stored
[12] on the site?
[13]     MS. ZANKOWSKI: Objection.
[14]     A: I don't know.
[15]     Q: Do you know that drums looking like the
[16] brown drums were stored on the site?
[17]     MS. ZANKOWSKI: Objection.
[18]     A: No, I don't.
[19]     Q: Were —
[20]     A: I don't know that they were; I don't know
[21] that they weren't. Am I surprised if they were?
[22] No, not at all.
[23]     Q: Mystic knows what was going on on its
[24] property during the four years it's owned it,

**Page 61**

[1] doesn't it?
[2]     A: Yeah. It knew that it was essentially
[3] leasing the property to the Modern/Obayashi Joint
[4] Venture to use as a laydown facility. And I don't
[5] know where this picture is from, but everything on
[6] this picture would be consistent with running a
[7] laydown facility.
[8]     Q: And Mystic knew that vehicular oils and
[9] lubricants were being stored on the property, didn't
[10] it?
[11]     A: It would assume that for a laydown testing
[12] area, you would have some of that. What is in any
[13] of this, I couldn't tell you. One of them is
[14] labeled water.
[15]     Q: Were vehicles and items of equipment fueled
[16] on the property?
[17]     A: I'm sure they were. That's why we paved
[18] the property prior to any type of construction
[19] laydown use on the property.
[20]     Q: Was the entire property paved?
[21]     A: A portion of the property that was to be
[22] used for a construction laydown area facility was
[23] paved.
[24]     Q: With what?

**Page 62**

[1]     A: Six inches of asphalt.
[2]     Q: Did Mystic make certain that no portion
[3] that was not paved was used for construction laydown
[4] activities?
[5]     A: Yes, that we did.
[6]     Q: Was any portion of the property used for
[7] breaking up steel structure that had formerly been a
[8] part of the elevated Central Artery?
[9]     A: Breaking up. Well, define "breaking up."
[10]     Q: Taking pieces and making them smaller
[11] pieces.
[12]     A: I'm sure that one is, probably.
[13]     Q: Did it or did it not happen on the
[14] property?
[15]     A: I don't have a personal knowledge, but I
[16] would certainly guess that it would have, sure.
[17]     Q: Mystic knows whether that happened on its
[18] property, doesn't it?
[19]     MS. ZANKOWSKI: Objection.
[20]     A: No, not specifically.
[21]     MS. ZANKOWSKI: He's testifying to the best
[22] of his knowledge.
[23]     MR. STEVENS: He's here to testify on —
[24]     MS. ZANKOWSKI: I understand that.

Page 63

[1]    MR. STEVENS: — Mystic's knowledge.
[2]    MS. ZANKOWSKI: I understand that.
[3]    A: Did I, as a representative of Mystic,
[4] physically stand out there and see that being done?
[5] No. But it certainly would not surprise me that
[6] they were marshaling steel out there.
[7]    Q: Did Mystic make certain that any such
[8] activity took place only on paved areas of the
[9] property?
[10]    A: When you say "make certain," we didn't post
[11] a security guard there. But the project people, the
[12] decision was made prior to Mystic owning the
[13] property, when we first started using the property,
[14] to pave the property. Now, to the extent somebody
[15] stacked some barriers on an unpaved portion, that's
[16] not a big deal, but anyplace where you're running a
[17] construction operation, we said that we would pave
[18] it.
[19]    Q: By reference to Exhibit 8, what portions of
[20] the property were paved?
[21]    MS. ZANKOWSKI: Objection. He testified
[22] that he didn't know that this exhibit — wrong one.
[23] Strike it.
[24]    A: It's hard to answer. In general — how do

Page 64

[1] I answer it so that —
[2]    Q: Was the entire — was the entire truncated
[3] triangle paved?
[4]    A: No, I don't believe the triangle was paved.
[5] The triangle I don't believe was paved. The area —
[6] the major rectangular area from our property line
[7] off of Alford Street back to where the stockpile was
[8] paved.
[9]    MR. STEVENS: I ask that a photograph
[10] showing a steel pile and a large piece of
[11] construction equipment be marked for identification
[12] as Mystic Exhibit 11.
[13]    (Photograph marked as Mystic
[14] Exhibit 11 for identification)
[15]    A: (Witness reviews document)
[16]    Q: Showing you the document that's been marked
[17] as Exhibit 11, can you identify it as showing a
[18] portion of the property?
[19]    A: I can't.
[20]    Q: You're not aware of the — you cannot do so
[21] by reference to the distinctive high trestle
[22] structure behind it, the electrical carrying
[23] structure?
[24]    A: Actually, I can't. But if you tell me —

Page 65

[1] I'm assuming you took the picture or somebody
[2] working for you took the picture. If you tell me
[3] it's the property, I'll agree.
[4]    MS. ZANKOWSKI: No, you won't.
[5]    Q: Did activity of the type shown in the
[6] photograph take place on the property?
[7]    A: It could very well have, sure.
[8]    Q: Did it?
[9]    A: Well, if you're telling me that this is the
[10] property, then clearly it is.
[11]    Q: Mystic knows whether such activity took
[12] place on the property it owned, doesn't it?
[13]    MS. ZANKOWSKI: Objection.
[14]    A: I wasn't physically there to view it. If
[15] you took a picture of the property and it was there,
[16] then it's there.
[17]    Q: Is the activity shown in Exhibit 11 what
[18] you referred to as managing metal?
[19]    A: It certainly could be, yes.
[20]    Q: What —
[21]    A: Oh, managing metal?
[22]    Q: Yes.
[23]    A: What do you mean, "managing metal"?
[24]    Q: I'm using your term, Mr. Grela.

Page 66

[1]    A: I didn't say "managing." I might have said
[2] "marshaling." Marshaling steel is a little bit
[3] different. This would be what looks to be just
[4] cutting up steel, probably to ship out, salvage.
[5]    Q: Is this the type of activity that Mystic
[6] made sure took place only on paved areas?
[7]    A: No, no, this probably wouldn't be. No
[8] reason really.
[9]    Q: At what times between June 2001 and the
[10] present were debris or waste material stored on the
[11] property?
[12]    MS. ZANKOWSKI: Objection.
[13]    A: Construction materials were stored on the
[14] property throughout that entire time.
[15]    Q: What do you mean by "construction
[16] materials"?
[17]    A: Materials either incorporated or coming off
[18] of a construction project.
[19]    Q: Materials coming off a construction project
[20] could be waste or debris; is that correct?
[21]    MS. ZANKOWSKI: Objection.
[22]    A: You have to define "waste" and "debris."
[23]    Q: Did Modern/Obayashi have any subcontractors
[24] who used the property?

Page 67

[1] A: Most likely, yes.

[2] Q: Does Mystic know whether they had

[3] subcontractors who used the property?

[4] A: Yes.

[5] Q: What subcontractors used the property?

[6] A: I couldn't tell you all of the

[7] subcontractors that used the property, but I know

[8] that there would have been subcontractors that used

[9] the property.

[10] Q: What are the ones that you can identify?

[11] A: I'm sure Mary O'Donnell Construction.

[12] Testa Corporation. There could be numerous others,

[13] numerous others.

[14] Q: What did Mary O'Donnell or an entity

[15] affiliated with her do on the property during its

[16] period of ownership by Mystic Landing?

[17] A: For us she — not for Mystic Landing but

[18] for Modern/Obayashi.

[19] Q: What did she do during the period of Mystic

[20] Landing's ownership for Modern/Obayashi?

[21] A: I don't know if she was still involved with

[22] the property when it was — when Mystic Landing

[23] purchased the property. Clearly prior to that she

[24] was involved managing the project yard. I just

Page 68

[1] don't —

[2] Q: Does Mystic know whether she or one of her

[3] companies was taking actions on the property during

[4] its period of ownership?

[5] A: No, Mystic doesn't know.

[6] Q: What was Testa doing on the property during

[7] Mystic Landing's period of ownership?

[8] A: Scope of services for one of the Central

[9] Artery projects.

[10] Q: What was its scope of services?

[11] A: Various scopes. The largest scope was

[12] taking down the elevated Central Artery, to the

[13] extent they used our storage laydown facility as

[14] part of that.

[15] Q: During what period of time was Testa using

[16] the property for that purpose?

[17] A: 2002, 2003, 2004. Probably using it today.

[18] Q: Is Testa performing that work pursuant to a

[19] written contract with the Joint Venture?

[20] A: Actually, the Testa contract is not with

[21] the Joint Venture. The Joint Venture was originally

[22] the one that got involved with the property, there

[23] was a specific project. Currently it's a different

[24] group of projects that are utilizing the yard.

Page 69

[1] Q: Is Testa performing the Central Artery work

[2] pursuant to a written contract with someone?

[3] A: With Modern, yes. With Modern Continental

[4] Construction Co., Inc.

[5] Q: Do you know whether that contract has been

[6] produced in response to Modern and Monsanto and

[7] Pharmacia's first request for production of

[8] documents?

[9] A: I don't know.

[10] Q: Are there other written subcontracts

[11] applicable to the work of other subcontractors who

[12] are performing activities on the property?

[13] A: To the extent that a specific

[14] subcontractor working on a Modern Continental or

[15] Modern Continental/Obayashi project happens to be

[16] on that site, there would be a subcontract

[17] agreement. Certainly not with Mystic Landing.

[18] MR. STEVENS: I ask that a photograph

[19] showing various plastic bags of what appears to be

[20] garbage and various waste materials be marked for

[21] identification as Mystic Exhibit 12.

[22] (Photograph marked as Mystic

[23] Exhibit 12 for identification)

[24] Q: Showing you the document that's been marked

Page 70

[1] as Exhibit 12, Mr. Grela, I ask if you can identify

[2] it as a photograph of a portion of the property.

[3] A: No, I could not.

[4] Q: Were materials, such as shown in Exhibit

[5] 12, stored on the property?

[6] A: I wouldn't say they were stored. They

[7] could very well be, not stored.

[8] Q: Were they placed on the property?

[9] A: They could have been placed a short time

[10] until they were thrown in the dumpster, sure.

[11] Q: Materials like this were taken from a place

[12] of origin, placed on the property, and then

[13] transferred for final disposal?

[14] MS. ZANKOWSKI: Objection.

[15] A: They could have been. Could have been

[16] certainly.

[17] Q: Were they?

[18] A: To the extent the guy picked up the trash

[19] out of the barrel, brought it to Everett, stuck it

[20] on the ground, and threw it in a dumpster, yeah, I'm

[21] sure that happened.

[22] Q: What testing of material that was treated

[23] in that way was performed before it was placed on

[24] the property?

Mystic Landing, LLC v.
Pharmacia Corporation, et al., etc.
Case 1:04-cv-10180-NMG    Document 66-6    Filed 04/04/2005    Page 21 of 38
Peter M. Grela
Vol. 1, March 14, 2005

Page 71

[1] MS. ZANKOWSKI: Objection.
[2] A: To the extent any type of — well, I can't
[3] answer that question.
[4] Q: In its agreement with Modern for use of the
[5] property, did Mystic require that certain testing be
[6] performed?
[7] MS. ZANKOWSKI: Objection.
[8] A: There was no specific — no. I can't
[9] answer that.
[10] Q: Did the agreement place any conditions on
[11] Modern's use of the property?
[12] A: I cannot recall the specific requirements,
[13] if there were any.
[14] Q: Did it require that Modern comply with the
[15] laws in its use of the property?
[16] A: Without seeing the actual agreement, I
[17] couldn't tell you. But I would think — well, I
[18] shouldn't — I don't know.
[19] Q: Now, the property is currently being used
[20] in the construction industry; is that correct?
[21] A: It is currently being used, yes, as a
[22] laydown area.
[23] Q: That current use does not involve
[24] excavation, does it?

Page 72

[1] A: Not alongside materials, no.
[2] Q: Since June 21, 2001, has Mystic Landing had
[3] any plans to develop the property for any different
[4] industrial use?
[5] A: Since 2001? I don't know, I just don't
[6] know.
[7] Q: Sir, you understand that one of the topics
[8] you've been designated to testify to is Mystic's
[9] development plans?
[10] A: I am just saying, I know we have looked at
[11] residential plans. If somebody had looked at some
[12] industrial plans, I just may not know about it.
[13] Q: Sir, the purpose of this deposition is to
[14] find out what Mystic has done and what Mystic knows,
[15] if it has planned any different industrial
[16] development, does it not?
[17] MS. ZANKOWSKI: And he's answering to the
[18] best of his knowledge.
[19] A: This is a very — there are proposals that
[20] come in from various individuals, organizations, all
[21] the time. To the extent that one of them dealt with
[22] something industrial, then yes, but I'm not aware of
[23] it. I just know there are many people interested in
[24] the site. The plans that we have worked on are

Page 73

[1] residential and mixed-use development.
[2] Q: So the record is clear, Mr. Grela, you are
[3] not aware, are you, of any plan by Mystic to develop
[4] the property for some industrial use other than the
[5] use it is now engaged in?
[6] MS. ZANKOWSKI: Objection.
[7] A: When you say "plan," is that a discussion?
[8] Is it something that's been reduced to writing?
[9] Could we have talked about an industrial concept
[10] maybe for the property and had a half-hour
[11] conversation; does that constitute a plan? I don't
[12] know; I don't know what you're asking. If you ask
[13] it another way, maybe I can help you.
[14] Q: Have you ever seen anything in writing that
[15] proposes another industrial use for the property?
[16] A: Ever or since 2001?
[17] Q: Since 2001.
[18] A: I don't recall.
[19] Q: You don't recall having seen anything; is
[20] that correct?
[21] A: I recall plenty of residential — did it
[22] have maybe a small industrial component to it?
[23] There's all kinds of items that we've been talking
[24] about. Most of them center around residential.

Page 74

[1] Q: Do you recall seeing any proposal for any
[2] industrial development of the property?
[3] MS. ZANKOWSKI: Objection. Asked and
[4] answered.
[5] A: I think I already answered that, I don't
[6] recall. But I want to clarify. To the extent there
[7] was a residential — a 700-unit residential
[8] development that had a small marina attached to it,
[9] if you refer to like a marine use as industrial use,
[10] then I guess I have.
[11] Q: The marina that's planned is a recreational
[12] marina, is it not?
[13] A: You park boats, probably fix boats there.
[14] I'm asking you the question. If you deem that to be
[15] any form of industrial use, then I want to say I
[16] have seen it.
[17] Q: You're not aware of anything other than the
[18] marina; is that correct?
[19] MS. ZANKOWSKI: Objection. That's not what
[20] he testified to.
[21] Q: That you might consider an industrial use.
[22] A: I certainly can't remember any.
[23] Q: Now, Mystic has —
[24] A: If you know of any, if you know of any that

Page 75

I should have known about and you want to jar my
memory, then I might be able to help you.
    Q: Mr. Grela, you are here to testify as to
matters known or reasonably available to Mystic.
Now, Mystic has had plans to develop the property
for commercial and residential uses, has it not?
    A: We've had some conceptual plans, yes.
Yeah, they've looked at it.
    Q: At one time Mystic had a plan to develop
the property as a home for the Red Sox, did it not?
    A: Yes.
    Q: Has Mystic currently abandoned that plan?
    A: When you say "abandoned," we're not
actively working on developing it as a Red Sox site.
I don't want to say abandoned it, but we're not
currently working on it. If somebody were to show
up and want to relocate the Red Sox there right now,
we'd certainly pick it back up.
    Q: Did Mystic also plan a mixed residential,
commercial and recreational development of the site?
    A: Yes. That's been discussed for quite some
time.
    Q: Have there been successive iterations of
that development plan?

Page 76

[1]    A: I've seen numerous proposals. By the way,
[2] I want to clarify that. It has not been Mystic
[3] actively working on those specific development
[4] plans; it's usually a developer who has a concept
[5] that discusses with, potentially discusses with
[6] Mystic.
[7]    MR. STEVENS: I ask that a plan bearing a
[8] legend "Modern Continental Everett, Massachusetts,
[9] Alternate C" be marked for identification as Mystic
[10] 13.
[11]    (Document marked as Mystic
[12] Exhibit 13 for identification)
[13]    Q: Directing your attention to Exhibit 13, I
[14] ask if you can identify it as one of the plans
[15] considered by Mystic for the development of the
[16] property.
[17]    A: It looks familiar, yes, it looks familiar.
[18]    Q: This involved development of the property
[19] for office, commercial, restaurant and residential
[20] use?
[21]    A: Yes.
[22]    Q: It involved 23-story residential units?
[23]    A: I see that, 23 stories there. It clearly
[24] is identified on this plan, conceptual plan, clearly

Page 77

[1] a conceptual plan.
[2]    MR. STEVENS: Why don't we break, then.
[3]    (Luncheon recess from 12:43 p.m.
[4] to 1:38 p.m.)
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 78

[1]    AFTERNOON SESSION
[2]    MR. STEVENS: Is Exhibit 13 available to
[3] the witness?
[4]    MS. ZANKOWSKI: Yes.
[5]    MR. STEVENS: I ask that a document
[6] entitled "Preliminary Assessment," dated April 12th,
[7] 2002, be marked for identification as Mystic Exhibit
[8] 14.
[9]    (Document marked as Mystic
[10] Exhibit 14 for identification)
[11]    A: (Witness reviews document)
[12]    Q: Mr. Grela, have you had an opportunity to
[13] look at Exhibit 14?
[14]    A: The cover sheet.
[15]    Q: Can you identify it as a preliminary
[16] assessment that was done with respect to a proposed
[17] development of the property?
[18]    A: Based on the cover sheet, yes.
[19]    Q: From the cover sheet can you see that the
[20] development scheme of which it is a preliminary
[21] assessment is similar to the development scheme
[22] shown in Exhibit 13?
[23]    A: Yes, similar. Not exact but similar.
[24]    Q: There are two more office buildings shown

Page 79

[1] on Exhibit 14? It shows as vacant space in Exhibit
[2] 13.
[3]   A: The triangle is missing. This piece is
[4] missing.
[5]   Q: But both show development for commercial
[6] office use, high-rise residential, and marina and
[7] commuter boat; is that correct?
[8]   A: Yes.
[9]   Q: And they bear similar dates?
[10]   A: I don't see the Exhibit 13 as having a
[11] date. Maybe I just don't see it. Exhibit 14 is
[12] dated April 12, 2002.
[13]   Q: And although Exhibit 13 does not bear a
[14] date, there is printed near the lower right-hand
[15] corner a notation that one of the lawyers in this
[16] office received it in the same month that Exhibit 14
[17] was prepared; is that correct?
[18]   A: Okay. I see something that says "received
[19] 4/26/02."
[20]   Q: Now, did Mystic consider the permits and
[21] approvals that were necessary for the development of
[22] the concept embodied in Exhibits 13 and 14?
[23]   A: I don't know.
[24]   Q: Mystic knows whether it did that, doesn't

Page 80

[1] it?
[2]   A: Well, this was prepared for the Modern
[3] Continental Companies. It was not done by Mystic.
[4]   Q: If you could turn to Page 1 of Exhibit 14,
[5] please. Do you see that in Section 2.1.1, Modern
[6] was advised that "The proposed project will require
[7] a permit from the U.S. Army Corps of Engineers
[8] pursuant to Section 10 of the Rivers and Harbors Act
[9] of 1899"?
[10]   MS. ZANKOWSKI: Objection. The document
[11] speaks for itself.
[12]   Q: Do you see that, Mr. Grela?
[13]   A: I see the written words on the document.
[14]   Q: What, if anything, did Mystic or Modern do,
[15] in and after April 2002, to obtain a permit from the
[16] U.S. Army Corps of Engineers under Section 10 of the
[17] Rivers and Harbors Act?
[18]   A: I don't know.
[19]   Q: Mystic knows whether it's done anything,
[20] doesn't it?
[21]   A: I don't know.
[22]   Q: You just haven't bothered to find out, have
[23] you?
[24]   MS. ZANKOWSKI: Objection.

Page 81

[1]   A: It's not that I wouldn't have bothered to
[2] find out. This is a preliminary assessment, from
[3] what I can see off of this. To the extent that it
[4] may not currently be active...
[5]   Q: Sir, do you understand that you have been
[6] designated to testify as to information reasonably
[7] available to Mystic?
[8]   A: Yes, I do.
[9]   Q: And you understand it is reasonably
[10] available to Mystic to know whether or not it did
[11] anything to acquire a particular permit, don't you?
[12]   MS. ZANKOWSKI: Objection.
[13]   A: That's absolutely an unfair statement,
[14] because, with all due respect, the two documents,
[15] Exhibits 13 and 14, they're not even Mystic
[16] documents, to be honest with you.
[17]   Q: Sir, I'm not asking you about the document.
[18] I just used the document to draw your attention to a
[19] permit from the U.S. Army Corps of Engineers. And
[20] my question was, has Mystic done anything to obtain
[21] such a permit?
[22]   A: And my answer was, I don't know.
[23]   Q: And —
[24]   A: And your response was to belittle me for

Page 82

[1] not knowing, and I'm saying, why would I know?
[2]   Q: Because you've been designated by Mystic to
[3] testify as to matters known to it, you have an
[4] obligation to educate yourself as to those matters
[5] in preparation for this deposition. That's why.
[6]   A: And I have.
[7]   MS. ZANKOWSKI: Objection.
[8]   Q: What did you do to find out whether Mystic
[9] sought such a permit from the Army Corps of
[10] Engineers in preparation for this deposition?
[11]   MS. ZANKOWSKI: He is testifying to the
[12] best of his knowledge.
[13]   A: I testified I don't know.
[14]   MR. STEVENS: And that is insufficient. He
[15] is supposed to have acquainted himself as to what
[16] Mystic's knowledge is.
[17]   MS. ZANKOWSKI: To the extent he could, he
[18] did, and now he is testifying to the best of his
[19] knowledge.
[20]   A: And I didn't read Foley Hoag's annual
[21] report either. This is not a Mystic document. It's
[22] not a Mystic document.
[23]   Q: Would you turn to Page — look at the
[24] document. What, if anything, has Mystic done since

Page 83

[1] 2002 to the initiate review of the project under the
[ ] Massachusetts Environmental Policy Act?
[ ]    A: I believe that a review was started and is
[ ] in process but currently on hold.
[ ]    Q: Was an environmental notification form
[ ] filed with the Massachusetts Environmental Policy
[ ] Act unit?
[ ]    A: I believe — well, I don't know.
[ ]    Q: What, if anything, has Mystic done since
[ ] April 2002 to acquire a 401 Water Quality
[ ] Certification under the federal Clean Water Act?
[ ]    A: I don't know.
[ ]    Q: What, if anything, has Mystic done since
[ ] April 2002 to obtain a Chapter 91 approval under the
[ ] Public Waterfront Act?
[ ]    A: I don't know.
[ ]    Q: What, if anything, has Mystic done in or
[ ] since April 2002 to acquire a ruling of consistency
[ ] with the Coastal Zone Management Program plan?
[ ]    A: I don't know.
[ ]    Q: What, if anything, has Mystic done in or
[ ] after April 2002 to obtain approval from the Everett
[ ] Conservation Commission under the Wetlands
[ ] Protection Act?

Page 84

[1]    A: I don't know.
[2]    Q: What, if anything, has Mystic done since
[3] April 2002 to acquire approvals under the Ocean
[4] Sanctuaries Act?
[5]    A: I don't know.
[6]    Q: Has anyone ever told Mystic that the
[7] proposed development plans are subject to the Ocean
[8] Sanctuaries Act?
[9]    A: I don't know.
[10]    Q: Has anyone ever told Mystic that the
[11] proposed plans are not subject to the Ocean
[12] Sanctuaries Act?
[13]    A: I don't know.
[14]    Q: What, if anything, has Mystic done in or
[15] since April 2002 to obtain a Massachusetts Highway
[16] Department access permit for the planned
[17] development?
[18]    A: I do not know.
[19]    Q: What, if anything, has Mystic done in or
[20] since April 2002 to obtain a consent from the
[21] Executive Office of Transportation and Construction
[22] under Chapter 40, Section 54A of the General Laws?
[23]    A: I don't know.
[24]    Q: What, if anything, has Mystic done in or

Page 85

[1] after April 2002 to obtain a sewer extension
[2] connection permit from the Department of
[3] Environmental Protection Division of Water Pollution
[4] Control?
[5]    A: I don't know.
[6]    MR. STEVENS: I ask that a plan entitled
[7] "Mystic River Landing, Everett, Massachusetts,"
[8] dated April 10, 2003, be marked for identification
[9] as Mystic Exhibit 15.
[10]    (Document marked as Mystic
[11] Exhibit 15 for identification)
[12]    A: (Witness reviews document)
[13]    Q: Directing your attention to the document
[14] that's been marked as Mystic Exhibit 15, Mr. Grela,
[15] can you identify it as a subsequent proposal for
[16] development, subsequent to that shown in Exhibit 13?
[17]    A: Well, to be honest with you, maybe I should
[18] have commented to that latest round of questioning.
[19] This is a conceptual drawing, and the previous was a
[20] conceptual drawing, not a proposal, I don't believe.
[21] If you want to quiz me on this conceptual drawing,
[22] if we did 100 things that were never — that maybe
[23] we're not going to do...When I say that, if you
[24] want to take every conceptual plan that's ever been

Page 86

[1] done on this site and go through that line of
[2] questioning, fine, we can do that.
[3]    Q: Are there documents showing conceptual
[4] plans, other than a Red Sox ballpark and the plan
[5] shown in Exhibits 13 and 15, in the possession of
[6] Mystic or Modern?
[7]    A: Mystic or Modern, I'm sure there are
[8] plenty.
[9]    Q: Have they been produced in response to the
[10] document request?
[11]    A: Bear in mind, development proposals, I am
[12] sure that everything contemplated under your request
[13] for documentation, to the extent it exists and
[14] certainly a search was done, to the extent those
[15] documents are available, they have been sent forward
[16] to you. But there are other people that come up
[17] with conceptual plans for this property. It's not
[18] just Modern Continental plans; there are other
[19] people that come in and say, "Hey, let's take a look
[20] at this. Let's see what we can put here."
[21]    When you say or you intimate that we
[22] haven't turned over documents, to turn over
[23] documents from third parties and other parties that
[24] might be interested in this I think is a little

Mystic Landing, LLC    v.
Case 1:04-cv-10180-NMG    Document 66-6    Filed 04/04/2005    Page 25 of 38
Peter M. Grela
Pharmacia Corporation, et al., etc.
Vol. 1, March 14, 2005

Page 87

[1] onerous.
[2]    Q: Are there documents showing conceptual
[3] plans for the development of the properties in the
[4] possession of Mystic or Modern that differ from
[5] Exhibits 13 and 15?
[6]    A: There certainly may be.
[7]    Q: Are there, sir?
[8]    A: I cannot answer that question, because I
[9] don't know what other Modern entities or what other
[10] people affiliated with Modern may have put a
[11] conceptual plan together.
[12]    Q: What gives you the certainty that all
[13] documents that exist have been produced in response
[14] to the first request for production of documents?
[15]    A: Because —
[16]    MS. ZANKOWSKI: Objection.
[17]    A: Because a search was done and whatever was
[18] readily available was turned over.
[19]    Q: Who did the search?
[20]    A: Numerous people.
[21]    Q: Identify them for me.
[22]    A: I mean, I quickly go through my files. Bob
[23] Shepard, I believe. Max Marino.
[24]    Q: When did you do that?

Page 88

[1]    A: I did mine last Friday.
[2]    Q: You hadn't reviewed your files before last
[3] Friday?
[4]    A: Maybe on a previous deposition.
[5]    Q: In another lawsuit a long time ago?
[6]    A: Yes.
[7]    Q: But your files haven't been —
[8]    A: With respect to this deposition?
[9]    Q: No, at any time, with respect to this case.
[10]    A: Well, I've reviewed the files.
[11]    Q: When?
[12]    A: Over time, certainly prior to this. If
[13] you're asking me with respect to this deposition,
[14] what did I review...
[15]    Q: No. You said you were confident that
[16] everything has been produced in response to the
[17] document request. I asked you what gave you that
[18] confidence; you said a search was done. I asked
[19] you, who are the people who searched?
[20]    MS. ZANKOWSKI: Objection. His testimony
[21] is on the record.
[22]    MR. STEVENS: And his testimony has been
[23] all over the lot.
[24]    MS. ZANKOWSKI: Objection to that.

Page 89

[1]    Q: When did you first review —
[2]    A: I do not recall.
[3]    Q: How do you know Mr. Shepard reviewed his
[4] file?
[5]    MS. ZANKOWSKI: Objection.
[6]    A: I won't speak for Mr. Shepard. You can
[7] depose Mr. Shepard if you like.
[8]    Q: So you don't know that he reviewed his
[9] file?
[10]    A: Well, I know that he looked.
[11]    Q: How do you know that?
[12]    A: Because I talked to him.
[13]    Q: So Mr. Shepard told you he looked?
[14]    A: I know that he made an effort.
[15]    Q: Now, when, sir, did you most recently
[16] review your files for this case?
[17]    MS. ZANKOWSKI: If you know.
[18]    A: For this deposition?
[19]    Q: For this case, the case in which you've
[20] been designated to testify on behalf of Mystic.
[21]    A: I couldn't tell you an exact date. I've
[22] looked at these files over — well, there's numerous
[23] issues with respect to this property, and I can't
[24] recall when it was that I picked up the files for

Page 90

[1] this case, another case.
[2]    Q: When, if ever, did you look through your
[3] files for the purpose of Mystic or Modern's
[4] production of documents in this case?
[5]    A: I don't recall.
[6]    Q: Did you do so?
[7]    A: Yes, I'm sure I did. I'm sure I did.
[8]    Q: You're sure that you did?
[9]    MS. ZANKOWSKI: Objection. Asked and
[10] answered. He said he's sure he did.
[11]    Q: Are you sure you did, sir?
[12]    A: Yes, I'm sure I did.
[13]    Q: Did you transmit documents to counsel for
[14] production?
[15]    A: I'm sure I did.
[16]    Q: Do you recall having done so?
[17]    MS. ZANKOWSKI: Objection. He answered
[18] he's sure he did.
[19]    A: I don't recall specifically.
[20]    MR. STEVENS: No. He answered he's sure
[21] that he did, not that he did, that he remembers
[22] having done it.
[23]    Q: Did you?
[24]    A: I don't recall specifically writing a

Peter M. Grela        Case 1:04-cv-10180-NMG    Document 66-6    Filed 04/04/2005   Page 26 of 38   Mystic Landing, LLC  v.

Vol. 1, March 14, 2005                                           Pharmacia Corporation, et al., etc.

Page 91

transmittal letter, no.

Q: Do you recall specifically sending documents to counsel?

A: On numerous occasions I did. Whether it was with respect to this particular case, I don't know, I don't recall.

Q: During what period of time did you send documents to counsel on numerous occasions?

MR. STEVENS: Objection. Asked and answered.

A: Over the past five or six years.

Q: How many different occasions did you send documents to counsel?

A: I couldn't tell you, I couldn't tell you, but it's been numerous.

Q: How many times did you send documents to counsel within the past two years?

A: I couldn't tell you.

Q: Do you know that you've ever done it during the past two years?

A: I'm sure I did, yes.

Q: What did you send?

A: I don't recall. I believe I sent everything I had.

Page 92

Q: What was the volume of documents?

A: I don't recall the exact volume.

Q: What's your best recollection of the volume of documents you sent?

A: I don't recall. I probably just — I remember giving files to my secretary, told her to go through and take copies of what's in here and send it over.

Q: Did those documents include the agreement between Mystic and Modern for use of the property?

MS. ZANKOWSKI: Objection. He said he doesn't recall.

A: I don't recall.

MR. STEVENS: Don't answer for him. He hasn't said he doesn't recall.

MS. ZANKOWSKI: You've asked him five times.

MR. STEVENS: You make your objection.

MS. ZANKOWSKI: He said he doesn't recall. You can answer it if you recall.

Q: Now, I'll ask you again, sir: Have you seen in your files any conceptual plans for development of the property other than those shown in Exhibits 13 and 15?

Page 93

A: Not in my specific files.

Q: Have you ever seen them anywhere?

A: Yes. Walking by other people's offices, we see plans for the Everett site all the time.

Q: Do you know whether any of those things still exist?

A: I really don't.

Q: Have any of them been destroyed?

A: Oh, I'm sure they have.

Q: Have there been conceptual plans developed subsequently to April 10, 2003?

A: I don't know.

Q: What conceptual plans that do not involve the Red Sox have you seen, other than those shown in Exhibits 13 and 15?

A: I've seen conceptual plans for — since a particular date?

Q: At any time since June of 2001, what conceptual plans not involving the Red Sox have you seen for development of the property other than those set forth in Exhibits 13 and 15?

A: I've seen — I can't tell you specifics, but I've seen many different versions of these types of plans.

Page 94

Q: Describe them to me. How did they differ from Exhibits 13 and 15?

A: Some would have more office space; some would have less residential space. I've seen, just off memory, some that had like 750 residential units, some that had 450 residential units. I think there was one that had 550 residential units. I'm not the developer on this property. To the extent I've seen them, it wasn't my creation. I walked by somebody's office, this property has been discussed by many people as far as development. So my knowledge is gained not by what I've created on this particular project.

Q: Have you now given us Mystic's best knowledge of all of the development concepts that have been considered for the property since June of 2001?

MS. ZANKOWSKI: Objection.

A: I've given you my best thoughts.

Q: Did you talk with anyone else who might have additional knowledge as to concepts that were considered in preparation for your deposition?

A: Preparation for the deposition?

Q: Yes.

Page 95

[1]    A: No.
[2]    Q: Does Mystic have any reason to believe that
[3] fewer permits would be required for the development
[4] concept set forth in Exhibit 15 than would be
[5] required for the development concept set forth in
[6] Exhibit 13?
[7]    MS. ZANKOWSKI: Objection.
[8]    A: I don't have the knowledge base to answer
[9] that question.
[10]    Q: As you sit here today testifying on behalf
[11] of Mystic, can you say that you have any reason to
[12] believe that fewer permits would be required for the
[13] concept set forth in Exhibit 15 than would be
[14] required for the concept set forth in Exhibit 13?
[15]    MS. ZANKOWSKI: Objection. He's not a
[16] permit expert.
[17]    MR. STEVENS: You may say objection. He
[18] doesn't have to be an expert.
[19]    Q: Do you have any reason to believe —
[20]    A: I'm not an expert. I couldn't tell you
[21] what the development laws are, development rules.
[22]    Q: Sir, I'm just asking, do you have any
[23] reason to believe that the permit requirements for
[24] the concept set forth in Exhibit 15 would be less

Page 96

[1] than those required for the concept set forth in
[2] Exhibit 13?
[3]    MS. ZANKOWSKI: Objection.
[4]    A: I've answered the question.
[5]    Q: No, you haven't, sir. Could you answer it,
[6] please.
[7]    A: I don't have a knowledge base to be able to
[8] answer that question.
[9]    Q: So you have no knowledge suggesting that
[10] the requirements for permits associated with the
[11] concept of Exhibit 15 would be less than the
[12] requirements for the concept set forth in Exhibit
[13] 13?
[14]    MS. ZANKOWSKI: Objection.
[15]    A: I couldn't tell you if the requirements for
[16] Exhibit 13 were correct, never mind how they apply
[17] to 15. I don't have that type of background. I'm a
[18] financial guy; I don't have a development
[19] background.
[20]    Q: So, sir, because you don't have that
[21] background, testifying for Mystic today, you have no
[22] reason to believe that the requirements would be
[23] less for the concept in Exhibit 15 than it would be
[24] for the concept in Exhibit 13?

Page 97

[1]    MS. ZANKOWSKI: Objection. Is there a
[2] question there?
[3]    A: Less or more, less or more.
[4]    Q: What is the regulatory status of the
[5] property under the Massachusetts Contingency Plan?
[6]    A: I do not know.
[7]    Q: Could you refer to Exhibit 14, sir.
[8]    A: (Witness reviews document)
[9]    Q: For whom was Exhibit 14 prepared?
[10]    A: Exhibit 14 says it was prepared for the
[11] Modern Continental Companies, Inc.
[12]    Q: And that is Mystic Landing's managing
[13] member, is it not?
[14]    A: I believe — I'd have to refer back to the
[15] documents, but I believe it was.
[16]    Q: I don't know that it's been marked as an
[17] exhibit. If you'd like to look at the operating
[18] agreement.
[19]    A: Yes, that's correct.
[20]    Q: So that the record is clear, this Exhibit
[21] 14 was prepared for Mystic's managing member; is
[22] that correct?
[23]    A: I'm not so sure it was prepared for
[24] Mystic's managing member as it's a coincidence

Page 98

[1] that's the name of the ultimate holding company.
[2]    Q: It was prepared for Modern Continental
[3] Companies, Inc., correct, sir?
[4]    A: Yes.
[5]    Q: And Modern Continental Companies, Inc., is
[6] Mystic's managing member, correct, sir?
[7]    A: Yes.
[8]    Q: So matters known to the managing member
[9] are, by definition, known to Mystic, correct, sir?
[10]    MS. ZANKOWSKI: Objection.
[11]    A: Would you repeat that question again.
[12]    Q: I said, matters known to its managing
[13] member are known to Mystic, correct?
[14]    MS. ZANKOWSKI: Objection.
[15]    A: I don't know what you mean by that.
[16]    Q: Now, would you turn to Page 9 of Exhibit
[17] 14, please.
[18]    A: (Witness reviews document)
[19]    Q: On that page begins a "Massachusetts
[20] Contingency Plan Status Update." Do you see that,
[21] Mr. Grela?
[22]    A: Oh, yes. 3.0.
[23]    Q: If you turn over to the next page, Page 10,
[24] of Exhibit 14, you see the statement that "A Phase

eter M. Grela    Case 1:04-cv-10180-NMG    Document 66-6    Filed 04/04/2005    Page 28 of 38

Mystic Landing, LLC v.
ol. 1, March 14, 2005      Pharmacia Corporation, et al., etc.

---

**Page 99**

II Comprehensive Site Assessment Report and Phase
III Remedial Action Plan were due to the
Massachusetts Department of Environmental Protection
on January 17, 1999"?

MS. ZANKOWSKI: Objection. The document
speaks for itself.

A: I see that on the document.

Q: Was the statement made in this report by
its consultant to Mystic's managing member correct?

A: I don't know.

Q: Has Mystic subsequently filed a Phase II
Comprehensive Site Assessment Report and Phase III
Remedial Action Plan?

A: I do not know.

Q: Do you see the statement in the next bullet
that "A Phase III Remedy Implementation Plan was due
to the Massachusetts Department of Environmental
Protection on January 17, 2000"?

MS. ZANKOWSKI: Objection. I believe it
says "Phase IV," and the document speaks for itself.

Q: Do you see the statement that "A Phase IV
Remedy Implementation Plan was due to the Department
of Environmental Protection on January 17, 2000"?

MS. ZANKOWSKI: Objection. The document

---

**Page 100**

speaks for itself.

A: I see it right on the document, yes.

Q: Was that statement correct?

A: I do not know.

Q: Has Mystic since filed a Phase IV Remedy
Implementation Plan?

A: I do not know.

Q: Do you know whether Mystic has had any
communications with the Department of Environmental
Protection since June 2001?

A: No, I do not.

Q: Have you made any effort in preparation for
your deposition to acquaint yourself with the facts
whether Mystic has had any such communications?

A: No, I did not.

Q: Do you see in the next bullet the statement
that "A Response Outcome Statement was due to the
Department of Environmental Protection on January
17, 2002"?

MS. ZANKOWSKI: Objection. The document
speaks for itself.

A: I see the written words, yes.

Q: Was the statement correct in April 2002?

A: I do not know.

---

**Page 101**

Q: Has Mystic since filed a Response Action
Outcome Statement?

A: I do not know.

Q: If you could turn over to Page 13. In the
bullet on the bottom of the page, do you see the
first statement that "Several 120-day reporting
conditions identified at the Site have not been
reported to the Department of Environmental
Protection"?

MS. ZANKOWSKI: Objection. The document
speaks for itself.

A: I see the written words.

Q: Do you see the beginning of the next
sentence in Line 5 of the bullet, "The
responsibility for reporting these 120-day reporting
conditions falls upon the current Potentially
Responsible Party, which typically is the Site
owner"?

MS. ZANKOWSKI: Objection. The document
speaks for itself.

A: I see the written words.

Q: Who was the site owner in 2002?

A: In 2002 it would be Mystic Landing.

Q: Did Mystic Landing in or after April of

---

**Page 102**

2002 report any conditions to the Department of
Environmental Protection?

A: I do not believe so.

Q: If you'd turn over to the bullet on the
next page. Do you see that Modern Continental
Companies, Inc.'s consultant is recommending that it
or the site owner complete the necessary MCP
response actions?

MS. ZANKOWSKI: Objection. The document
speaks for itself.

Q: Do you see that?

A: I can certainly see the words. I'm not
sure of the context that this has been written in,
but I see the words.

Q: Did either Modern or Mystic complete those
response actions?

A: I do not know.

MR. STEVENS: I ask that a cover letter
from Ms. Zankowski to Mr. Kahn, to which are
attached — excuse me — from Mr. Kahn to Ms.
Zankowski, to which a photograph and six sheets of
data are attached, be marked collectively as Mystic
Exhibit 16.

Mystic Landing, LLC  v.
Pharmacia Corporation, et al., etc.
Case 1:04-cv-10180-NMG    Document 66-6    Filed 04/04/2005    Page 29 of 38
Peter M. Grela
Vol. 1, March 14, 2005

Page 103

[1]  (Document marked as Mystic
[2] Exhibit 16 for identification)
[3]  **Q:** Directing your attention to Exhibit 16, Mr.
[4] Grela, has Mystic reported the conditions described
[5] in the exhibit to the Department of Environmental
[6] Protection?
[7]  **A:** I don't know. To clarify, you're asking me
[8] if we've reported the samples —
[9]  **Q:** If you've reported the conditions described
[10] in Exhibit 16 to the Department of Environmental
[11] Protection.
[12]  **A:** I don't know.
[13]  **Q:** Now, what, if any, action has Mystic taken
[14] to remove or treat contaminated soil or groundwater
[15] between June 21, 2001, and the present on the
[16] property?
[17]  **A:** I do not believe we've taken any actions.
[18]  **Q:** What is Mystic's current estimate of the
[19] cost of removing or treating contamination in soil
[20] and groundwater on the site?
[21]  **A:** There's been numbers thrown around, but I
[22] don't know.
[23]  **Q:** Have you made any effort to ascertain the
[24] current estimate of the cost for removing and

Page 104

[1] treating soil and groundwater at the site in
[2] preparation for your deposition?
[3]  **A:** Yes. I talked to one other person in my
[4] office —
[5]  **MR. OTTO:** Can you speak up? I can't hear
[6] you.
[7]  **THE WITNESS:** I'm sorry.
[8]  **A:** I talked to one other person in my office
[9] to ask what their recollection of the cost that was
[10] discussed a few years back was, and I recall $10
[11] million or $16 million. But again, these are just
[12] recollections.
[13]  **Q:** When did you have this conversation?
[14]  **A:** Friday afternoon.
[15]  **Q:** With whom did you have the conversation?
[16]  **A:** Robert Shepard.
[17]  **Q:** Did you attempt to obtain any other
[18] knowledge from Mr. Shepard in preparation for your
[19] deposition?
[20]  **A:** Nothing specific.
[21]  (A telephone interruption)
[22]  (A pause)
[23]  **MS. ZANKOWSKI:** Peter has a meeting at
[24] three o'clock, which I don't think he's going to

Page 105

[1] make, correct?
[2]  **MR. STEVENS:** He might; he might. There's
[3] a chance.
[4]  (A pause)
[5]  **BY MR. STEVENS:**
[6]  **Q:** Could you go back to Exhibit 7, please, Mr.
[7] Grela. Now, as a point of reference, Mr. Grela, the
[8] date on this document is June 19, 2001. If you
[9] could just keep that in mind. And if you could turn
[10] to Page 16, numbered Page 16 of Exhibit 7, please.
[11] Do you see a heading there "8.2, Exposure
[12] Potential"?
[13]  **A:** Yes, I do.
[14]  **Q:** Drawing your attention, sir, to the
[15] statement — since June 19, 2001, has there been any
[16] other analysis of the exposure potential at the
[17] property?
[18]  **A:** Not that I'm aware of.
[19]  **Q:** So to the best of Mystic's knowledge, its
[20] position is still that potential exposure to the
[21] contaminants of concern is anticipated to be low or
[22] minimal given the current uses of the site?
[23]  **A:** It's what the report says.
[24]  **Q:** Now, going over to the next page, do you

Page 106

[1] see "8.3, Future Uses and Remedial Requirements"?
[2]  **A:** I see that.
[3]  **Q:** Do you see that in — who is Mystic's
[4] consultant to the site today?
[5]  **A:** I'm not sure that we have one today.
[6]  **Q:** Is it Rizzo Associates?
[7]  **A:** I believe they certainly were the last one
[8] that was engaged.
[9]  **Q:** To your knowledge, Rizzo hasn't done any
[10] analysis of future uses and remedial requirements
[11] since this study; is that correct, sir?
[12]  **A:** I'm not sure. Not that I'm aware of.
[13]  **Q:** You see in this study it says "either
[14] containment or treatment" — in 8.3, under
[15] "Groundwater" it says, "Either containment or
[16] treatment of the groundwater at the Site would be
[17] required to fill the requirements of the MCP,
[18] regardless of the proposed future uses of the Site
[19] property"? Do you see that, sir?
[20]  **MS. ZANKOWSKI:** Objection. The document
[21] speaks for itself.
[22]  **A:** I see the wording in the document.
[23]  **Q:** Such a statement does not appear under
[24] "Soil," does it?

Page 107

MS. ZANKOWSKI: Objection. The document speaks for itself.

A: If you say so.

Q: Well, you can read, too, can't you, sir?

A: Yeah, I agree.

Q: There hasn't been any subsequent analysis of future uses and remedial requirements to Mystic's knowledge, has there?

MS. ZANKOWSKI: Objection.

A: To my knowledge, no.

MR. STEVENS: I ask that a transmittal letter dated August 27, 2002, from Ms. Zankowski to Mr. Kahn, to which are attached a number of pages of cost estimates, be marked for identification as Mystic Exhibit 17.

(Document marked as Mystic Exhibit 17 for identification)

A: (Witness reviews document)

Q: If you can turn over to Page 2 of the transmittal letter, do you see Ms. Zankowski is telling Mr. Kahn in the third sentence of the first paragraph that begins on Page 2 that "The enclosed estimates are for: A, remediation for development of a major league baseball park; and B, remediation

Page 108

for development of a mixed-use project"? Do you see that statement?

MS. ZANKOWSKI: Objection. The document speaks for itself.

A: I see it.

Q: In fact, if you look over to the cost estimates, you see two scenarios for development of a major league baseball park, Scenario A and Scenario B. Do you see that?

MS. ZANKOWSKI: Objection. The documents speak for themselves.

MR. STEVENS: Ms. Zankowski, I have to draw his attention to these matters in order to...

A: I see that.

Q: And it's correct, is it not, that Mystic is not actively pursuing those plans at the current moment?

A: No, not a baseball ballpark.

Q: The current —

A: There have been discussions about another sporting facility, however.

Q: The current or most recent plan is a mixed-use development, correct?

A: Whose current plan?

Page 109

Q: Who is making plans for development of the property?

A: A lot of people, I guess.

Q: Who?

A: There are numerous outside buyers that are looking.

Q: Who?

A: Well — can I consult with my attorney for a second?

MS. ZANKOWSKI: Answer. Try to answer first.

Can you read back the question.

Q: Which outside developers are looking to acquire the property?

A: Discussions, I know that Steve Karp has looked at the site. That O'Donnell has looked at the site. I've received phone calls from Steve Belkin. I've received numerous inquiries. I know other people have received numerous inquiries over the property. Responding to your question about what the current development plan is, I'm not sure that Modern or Mystic currently has a development plan —

MR. OTTO: I'm sorry, I have this blower in

Page 110

my ear. Can I hear that last part? Can you speak up a little bit?

A: I'm not sure we're actively working on a development plan today.

Q: When did Mr. Karp last —

A: These are all conversations that I've heard over the last 30 days or so, 30 or 60 days.

Q: You haven't had any role with Mystic since 2002; is that correct?

A: Well, no, I don't want to say I haven't had any role.

Q: What have your duties and responsibilities been since 2002 relating to Mystic?

A: To respond to any questions that may or may not have come up in the past in various venues. I haven't been involved with the development, nor am I an officer of that company, nor do I have authority over that company.

Q: So is it correct that a mixed-use plan is not currently under consideration for development by Modern?

MS. ZANKOWSKI: Objection.

Q: Or Mystic?

MS. ZANKOWSKI: Objection.

Page 111

[1] A: It's hard to answer that question. But I
[2] guess I would answer it, it's still being looked at,
[3] but it would be probably sold with the site.
[4] Q: Has anybody else — is anybody else
[5] considering carrying out either a concept similar to
[6] that set forth in Exhibits 13 or 15?
[7] A: I can't speak for anybody else.
[8] Q: Does Mystic know whether — has anyone
[9] advised Mystic that it would consider carrying out
[10] such a development plan?
[11] A: I don't — well, I don't know.
[12] Q: Do you have any reason to believe that
[13] anyone has so advised Mystic?
[14] A: Just discussion. Discussion, comments
[15] people have made.
[16] Q: What comments have they made as to whether
[17] they would carry out a mixed-use development?
[18] A: I have heard numerous discussions about
[19] numerous groups looking at the property. This
[20] property is about to be marketed, it's not a secret,
[21] and it has generated a tremendous amount of
[22] interest.
[23] Q: Is Mystic planning to incur any costs for
[24] remediation of contaminants on the property?

Page 112

[1] A: In what regard?
[2] Q: Are you planning to spend any money on
[3] cleaning up the property?
[4] A: Not currently. To the extent certain
[5] remediation needs to be done on the sale to enhance
[6] the value — to maintain the value of the property,
[7] then maybe we will, but I'm not speaking for Mystic
[8] as of today.
[9] Q: You're not speaking for Mystic?
[10] A: Well, no, I shouldn't say it that way. I
[11] am not currently employed, as of today, by Modern
[12] Continental/ —
[13] Q: Is it —
[14] A: — Mystic. Or Mystic.
[15] Q: You're testifying on behalf of Mystic as to
[16] proposals, plans and preparations for development of
[17] the site. Does Mystic have any intention of
[18] developing the site itself at the present time?
[19] MS. ZANKOWSKI: Objection. Asked and
[20] answered.
[21] A: Present time being today, as I was saying,
[22] I'm here to provide historical perspective and
[23] testimony. I am no longer employed by that company
[24] today.

Page 113

[1] Q: Sir, you've been designated to testify on
[2] their behalf on a number of subjects, including
[3] their proposals, plans and preparations for
[4] development of the site.
[5] A: I terminated my employment with the company
[6] a couple of days ago. I'm just saying, I'm not
[7] their spokesman today.
[8] Q: Yes, you are. You have been so designated.
[9] A: I'm the spokesman today for prior, for
[10] historical items.
[11] MR. STEVENS: So have you designated nobody
[12] to testify to this subject matter?
[13] MS. ZANKOWSKI: Mr. Grela is here as the
[14] 30(b)(6) deponent of Mystic Landing, LLC. He is
[15] here to testify as to what he knows, what he has
[16] inquired about, to the best of his knowledge and
[17] belief. I don't want to put words in his mouth —
[18] don't want to put words in his mouth —
[19] MR. STEVENS: Well, don't say that. You
[20] may say objection.
[21] MS. ZANKOWSKI: He's not employed; it's a
[22] fact. He's just saying he is not employed as of
[23] today.
[24] THE WITNESS: I'm trying to say it; he

Page 114

[1] won't let me say it.
[2] MR. STEVENS: You are entitled, you are
[3] obliged, to appoint someone to testify who acquaints
[4] himself with knowledge available to the corporation,
[5] whether it's Mr. Grela or Charlton Heston, neither
[6] of whom is an employee of the company.
[7] MS. ZANKOWSKI: I don't think Charlton is.
[8] A: On the date that you sent out your
[9] deposition, I was employed by the company.
[10] Q: You were employed by Mystic?
[11] A: I was — no, not by Mystic, employed by
[12] Modern Continental.
[13] Q: You were not employed then; you're not
[14] employed now.
[15] A: Mystic has no employees.
[16] Q: So it had to appoint a nonemployee to
[17] testify on its behalf.
[18] A: And I was that designee.
[19] Q: Good. So does Mystic currently have any
[20] proposals, plans or preparation to develop the site?
[21] MS. ZANKOWSKI: Objection. Asked and
[22] answered.
[23] A: As of today?
[24] Q: Yes.

**Page 115**

[1]   A: I'm not sure.

[2]   Q: It's correct, is it not, sir, that every

[3] estimate of cost for remediation of the site that

[4] has been prepared relates to a specific development

[5] plan?

[6]   A: Well, clearly logic would dictate that a

[7] remediation estimate would be specific to a

[8] proposal, a proposal of the site.

[9]   Q: In fact, that has been the case, has it

[10] been?

[11]   A: I cannot say that a remediation cost has

[12] been prepared for every proposal. I can't say that.

[13] There may have been other proposals or remediation

[14] costs that had not been prepared for.

[15]   Q: But you're not aware of any remediation

[16] cost estimate that was not linked to a particular

[17] development option, are you?

[18]   MS. ZANKOWSKI: Objection.

[19]   A: I'm not sure.

[20]   Q: You're not aware of one, are you?

[21]   A: I'm not aware of one, yeah, I can answer

[22] that.

[23]   MR. STEVENS: I have no further questions

[24] at this time. We believe that Mystic has not

**Page 116**

[1] complied, and I will say this, because I think we

[2] should have this conference, that Mystic has not

[3] complied with its obligations to educate someone as

[4] to information reasonably known or reasonably

[5] available to it. It was evident from the testimony

[6] that Mystic has not done that. So we will seek —

[7]   THE WITNESS: I will —

[8]   MS. ZANKOWSKI: Let him have his speech on

[9] the record.

[10]   MR. STEVENS: We will seek appropriate

[11] consequences as a result of Mystic's failure to do

[12] so.

[13]   MS. ZANKOWSKI: If there are specific

[14] questions that you do not believe you have a

[15] satisfactory answer to, and Mystic has an employee

[16] or a designee, because they do not have employees,

[17] we are certainly within our rights, Mr. Stevens, to

[18] have one or more people designated. At this point

[19] in time Mr. Grela has been the designated

[20] individual. In the event there are specific

[21] questions that you require further information and

[22] answers to, we can certainly look for a second

[23] deponent to fill those issues for you.

[24]   MR. STEVENS: You were entitled to bring

**Page 117**

[1] more people today if the one person you brought was

[2] not going to speak to all of the issues.

[3]   MS. ZANKOWSKI: Not knowing all of your

[4] direct questions, sir, respectfully, we did the best

[5] we could. And if there are specific issues, again,

[6] we are certainly willing to bring in another

[7] 30(b)(6) deponent. One person cannot be expected to

[8] answer every single question that they don't have

[9] knowledge of prior to sitting here.

[10]   MR. OTTO: Let me assert something. I have

[11] some questions. I don't know if this is the end

[12] speech or not, but let me just say something on a

[13] 30(b)(6). Everybody knows the areas of examination

[14] are designed to give you a road map to bring in 16

[15] people or one person. It's your choice: Either the

[16] one person has knowledge over every category or you

[17] bring in 16 to cover four categories. I mean,

[18] that's a basic —

[19]   MS. ZANKOWSKI: You're absolutely right,

[20] but you're making an assumption this entity that has

[21] no employees has such a person. So you're making

[22] some assumption that you have no knowledge to make

[23] that assumption. This is a single-purpose entity.

[24] It owns a piece of land.

**Page 118**

[1]   MR. OTTO: And is a plaintiff in a lawsuit.

[2]   MS. ZANKOWSKI: That is correct.

[3]   MR. OTTO: It has the authority to bring

[4] lawsuits, and it has authority to go after other

[5] people's assets.

[6]   MS. ZANKOWSKI: That is correct.

[7]   MR. OTTO: Okay.

[8]   MS. ZANKOWSKI: To the extent we could

[9] identify someone for today, we didn't have that long

[10] a notice on this — and we did comply with the date

[11] requested, we did not seek an extension — we

[12] brought Mr. Grela forward.

[13]   MR. OTTO: Can I ask a few questions?

[14]   MS. ZANKOWSKI: Sure.

[15]         CROSS EXAMINATION

[16]         BY MR. OTTO:

[17]   Q: Mr. Grela, I represent Boston Edison. I

[18] have some follow-up, and I'm going to jump around a

[19] little bit, based on what I think I've heard today.

[20]   You stopped acting in any sort of

[21] supervisory role with respect to Mystic in 2002 when

[22] your obligations as CFO stopped with Modern; is that

[23] correct?

[24]   A: I guess when I make that statement, what I

Page 119

[1] mean is, I wasn't signatory on bank accounts
[2] anymore, but because I had been involved with the
[3] history of the property since 1996, I was still
[4] involved in other depositions or providing
[5] historical information on the property. But I
[6] wasn't the designated officer on the company.
[7]     Q: We talked earlier about Modern's planned
[8] exit, a company in wind-down, completing the balance
[9] of the projects; you discussed your role as a
[10] comptroller, CFO; and then more or less oversight of
[11] various troubled projects from 2002 onward?
[12]     A: Yes.
[13]     Q: Were any of those troubled projects the
[14] Mystic Landing site?
[15]     A: No.
[16]     Q: So —
[17]     A: Construction.
[18]     Q: Construction-related projects?
[19]     A: Terminal E, a couple of water system
[20] tunnels, power plants. All active construction
[21] projects.
[22]     Q: When you stopped acting in Mystic's behalf
[23] in 2002, who stepped in?
[24]     A: I don't know.

Page 120

[1]     Q: Did anyone step in?
[2]     A: Somebody else would have been probably
[3] authorized. I don't mean to be vague; it's not like
[4] there was somebody specifically assigned to handle
[5] it. All I'm saying is, certain items of authority,
[6] like signatures on checks and bank accounts and
[7] clerk certificates that I had previously handled
[8] because I was in the office, I was no longer doing.
[9] So a lot of things were physically assigned to
[10] somebody else. I'm sure that happened on Mystic
[11] Landing; I just don't know who their person was.
[12]     Q: Can you name everybody at Modern who had
[13] any supervisory or authoritative role with respect
[14] to Mystic since Mystic acquired the property?
[15]     A: When you say "supervisory," are you talking
[16] about onsite supervisory?
[17]     Q: Let me try it again. Can you name everyone
[18] at Modern who had any role whatsoever with the
[19] Mystic Landing site?
[20]     A: I could not name everybody. I could give
[21] you a pretty expensive list.
[22]     Q: Go ahead.
[23]     A: Robert Shepard, Max — currently at Modern?
[24]     Q: Currently or former.

Page 121

[1]     A: Or former. I said Robert Shepard. I said
[2] Max Marino. John Foster, Frank Trubiano, Joe
[3] Toffoloni, Joe Rocha. Then you start getting down
[4] to field personnel, superintendents, foremen.
[5]     Q: Describe for me, if you would, what Mr.
[6] Shepard's role has been with Mystic.
[7]     A: Bob has been more involved in the future
[8] development plans, what the development plans at the
[9] time might have been.
[10]     Q: Mr. Marino?
[11]     A: Mr. Marino has passed away.
[12]     Q: What about Les Marino; was he involved?
[13]     A: Les passed away.
[14]     Q: How about Max Marino? I'm sorry, did you
[15] say Max or Les Marino?
[16]     A: I said Max. Les was the president of
[17] Modern Continental Companies and the owner. He
[18] passed away on November 12, 2004. Max Marino, his
[19] nephew, has taken on a lot of the things that Les
[20] had previously done.
[21]     Q: And his role with the Mystic site is what?
[22]     A: Historically the project that was using —
[23] whether by coincidence or not, but the project that
[24] was using the site as a laydown area was being run

Page 122

[1] by Max Marino as a vice president of the company.
[2] Coincidentally he happened to be involved as the
[3] vice president. So he would have been responsible
[4] for the projects that were using the site,
[5] essentially from 1996 really to the current date.
[6] He now has also taken on a different capacity of CEO
[7] of Modern Continental Companies, is involved in
[8] disposition of assets, future planning.
[9]     Q: So did Mr. Marino — and I refer to Max —
[10] has he had any involvement with the development
[11] plans for the site?
[12]     A: Very little.
[13]     Q: How about Mr. Foster?
[14]     A: Mr. Foster, very little. Future
[15] development plans, it's really more Robert Shepard.
[16]     Q: Is it only Mr. Shepard?
[17]     A: Actually, another name is a gentleman by
[18] the name of Don Kovitz, K-o-v-i-t-z.
[19]     Q: What's his role with the development of
[20] plans for the Mystic site?
[21]     A: Don is a vice president under Bob Shepard.
[22]     Q: Just to close the loop on this, Mr. Foster
[23] and Mr. — is it Traviani?
[24]     A: Toffoloni.

Page 123

Q: Mr. Toffoloni and Mr. Rocha, what have been their roles with respect to development of the site?

A: None.

MS. ZANKOWSKI: Objection. Who's the last one?

MR. OTTO: Rocha.

THE WITNESS: Joe Rocha.

A: None with respect to development; they're on the project. I guess if you're asking me a question of, did this piece of steel arrive on the job site, those would be the guys: the project manager, project superintendent, foremen.

Q: As of Friday, your last day, who on behalf of Mystic was charged with making decisions concerning the planned use of the property? Mr. Shepard?

A: Well, when you say "making decisions," as I said, I don't believe we're actively involved in making decisions to develop that property as Modern Continental or Mystic. Modern Continental, obviously, is involved with a financial problem; it is involved with a wind-down. We currently have financial problems and are not doing future development. To the extent there have been any

Page 124

proposals or anything, that's going to be part of somebody else's future development, not ours.

Q: I'm focusing on the lawsuit, so that's why I asked the question. As of Friday, your last day, March 11th, had Mystic abandoned its intention to develop the property for mixed-use residential?

MS. ZANKOWSKI: Objection.

A: I guess I can't say abandoned.

Q: How would you characterize its intention with respect to the site?

A: The property would probably be marketed for sale — either for sale or you'll have to have some other outside investor come in to facilitate that project going forward.

Q: Who at Modern or Mystic is involved, at least as of Friday, with respect to marketing the property for sale?

A: Robert Shepard has, Max Marino has.

Q: Anyone else?

A: There are third-party consultants.

Q: Who are they?

A: I haven't spoken to them directly on this but — I guess you'd have to list all our creditors to an extent, major creditors.

Page 125

Q: Let me try it this way: Have you engaged a real estate professional to market the property for sale?

A: We have not; however, I believe our creditors have. I don't know the financial arrangement between them —

Q: Has Modern given an assignment for the benefit of creditors?

MS. ZANKOWSKI: Objection. Can you let him finish answering.

MR. OTTO: He —

MS. ZANKOWSKI: He wasn't done. You ran over him.

Q: Were you done?

A: There was a little more to it. I don't know what the financial arrangement is between the creditors and who I believe is going to be marketing the property; however, that entity is a company called Argus, A-r-g-u-s something. The last name of the principal is Ferrari.

Q: Mr. Stevens asked you, Is a mixed-use plan still under consideration? Your response was, It's being looked at and would be sold with the site. What does that mean to you?

Page 126

A: Well, what it means —

MS. ZANKOWSKI: Objection. I think his testimony speaks for itself.

MR. OTTO: I'm not asking him to restate the testimony; I'm asking him what that means to him.

MS. ZANKOWSKI: You're asking him to assume what you say is absolutely what he said earlier. All I'm doing is objecting to that.

MR. OTTO: Let me back up.

Q: Do you recall that testimony?

A: Not the specific words, but I recall the general statement, yes. And what I meant by that was that a number of the people that have been approached on the property, lining up for the potential purchase or potential sale or potential purchase of it, everybody is trying to get their foot in the door a little bit early, so people are coming in and looking at what the development plans were.

I can't name every single one of them; I can just tell you, there's a significant amount of interest in that property. It's a large tract, partially in Boston. It's been a former ballpark

Mystic Landing, LLC v.                                                    Peter M. Grela
Pharmacia Corporation, et al., etc.                            Vol. 1, March 14, 2005

---

Page 127

[1] site. I know the Celtics are looking for a new
[2] site; there have been a few inquiries from them, by
[3] some significant people. People aren't looking at
[4] that as mixed use; everybody is looking at that as
[5] residential, commercial. I'm not a development guy;
[6] this is just discussion, people calling. I'm sure
[7] for your case you can probably hire some
[8] professional development company and verify those
[9] types of facts.
[10]     Q: Well, it's your case. But let me ask you
[11] this: I'm interested in what the words, "and it
[12] would be sold with the site" —
[13]     A: I say sold with the concept. Somebody
[14] might come in —
[15]     Q: Let me be certain about my question. I
[16] know you're answering something; I just want to make
[17] sure this isn't simply semantics.
[18]     Are you saying that you would be selling
[19] some sort of — would you be selling the mixed-use
[20] plan, the marina, residential housing plan with the
[21] site?
[22]     A: No.
[23]     Q: Can you do that?
[24]     A: No.

---

Page 128

[1]     MS. ZANKOWSKI: Objection.
[2]     A: The only thing I meant by that was, anybody
[3] coming in, the question was asked, are you working,
[4] currently working on any of the specific proposals,
[5] and all I'm saying is, to the extent somebody is
[6] going to buy this site, we would probably turn over
[7] any work that we had done on the site, that specific
[8] plan: Here are the architects; here is whatever
[9] they might have done on it. And you turn that over
[10] with the site.
[11]     Q: All right. When have you last spoken to
[12] Mary O'Donnell?
[13]     A: I obviously can't give you an exact date,
[14] but I'd say within the last four months.
[15]     Q: Have you spoken to her about this case?
[16]     A: About this specific litigation?
[17]     Q: This case.
[18]     A: No, no, not this case.
[19]     Q: How about Mr. Guggenheim; have you spoken
[20] to him?
[21]     A: No.
[22]     Q: This is the case (indicating).
[23]     A: Yeah. No.
[24]     MS. ZANKOWSKI: Objection.

---

Page 129

[1]     A: No, I have not spoken to him, not about
[2] this specific case.
[3]     Q: How about the property; have you spoken to
[4] her about the property?
[5]     A: The only thing I spoke to her about was I
[6] happened to run into her at another trial pertaining
[7] to the property but not with us.
[8]     Q: That would be the Rosen case?
[9]     A: Rosen versus Mintz Levin. I happened to
[10] run into her, somebody might have said something,
[11] but there wasn't really a discussion. Prior to that
[12] I seen her at a funeral, no significant discussion.
[13]     Q: I'm sorry, Mr. Guggenheim, do you know him?
[14]     A: I know who he is. It's been quite some
[15] time since I've spoken to Howard, years.
[16]     Q: And you discussed — you testified earlier
[17] about an agreement concerning the use of the
[18] property, and I think you were referring back to the
[19] 2001 time frame?
[20]     MS. ZANKOWSKI: Objection.
[21]     Q: You said further —
[22]     A: Go ahead.
[23]     Q: Just to jog your memory, you said Mystic
[24] Landing would be paid for the use of the property.

---

Page 130

[1] Do you remember that?
[2]     MS. ZANKOWSKI: Objection.
[3]     A: Yeah. What I was referring to was at — I
[4] know as part of our closing with Banknorth on a $10
[5] million loan, I believe, and I'm pretty sure, that
[6] there was a requirement for some formal lease
[7] agreement.
[8]     Q: What interaction have you had with Gator
[9] Development Company concerning Mystic's planned use
[10] for the property?
[11]     A: Going back how far?
[12]     Q: At any point in time.
[13]     A: That's a significant amount of discussions.
[14]     Q: Since Mystic acquired the property in June
[15] of 2001.
[16]     MS. ZANKOWSKI: Objection.
[17]     A: I really have not had any substantial
[18] discussions since that time. Prior to that time I
[19] did.
[20]     Q: Would you characterize the discussions
[21] before that point in time with Gator over possible
[22] planned use for the site?
[23]     A: Yeah. Gator brought numerous proposals,
[24] verbal proposals, brought some companies. They had

---

**Page 131**

[1] brought in some big box users, a Costco, or they had
[2] brought in residential users. They originally came
[3] up with the concept of the ballpark and brought in a
[4] couple of the actual bidders when the actual Red Sox
[5] were being sold, a couple of bidders for the Sox
[6] were looking at teaming up for our parcel as part of
[7] their package. So over time they brought in
[8] numerous proposals, but since 2001 — yeah — since
[9] 2001 I don't believe I've talked to them.
[10]    Q: In response to questions over what
[11] discussions you've been having concerning use of the
[12] property and you referred to discussions with others
[13] concerning a sporting facility, you then mentioned
[14] Steve Karp, Steve Belkin and O'Donnell. Was that
[15] Mary O'Donnell?
[16]    A: No. Joe O'Donnell.
[17]    Q: Joe O'Donnell?
[18]    A: I haven't had discussion with Joe
[19] O'Donnell. I know that — well, I had a discussion
[20] with Steve Belkin and Bob Shepard dealing with Karp.
[21] When I say "dealing with," well I was not mentioning Karp on
[22] the site with him. And I was not mentioning Karp on
[23] a specific proposal for the Celtics.
[24]    Q: When Mr. Stevens asked you about documents

**Page 132**

[1] which might exist in Mystic's files, he asked you,
[2] Have any been destroyed, and you said, I'm sure some
[3] have been destroyed. What does that mean? How are
[4] you sure about that?
[5]    A: A lot of the questions that were being
[6] asked really weren't being asked of Mystic itself;
[7] they were being asked of material that's been
[8] brought to the site, for instance.
[9]    Q: This question referred to files, paper
[10] files.
[11]    A: That's what I'm getting to.
[12]    Q: Okay.
[13]    A: So to the extent that 100 manholes were
[14] shipped to the site, there would be a document, an
[15] invoice or a packing slip from that particular
[16] construction project. If those items showed up
[17] onsite, there's a very good chance those have been
[18] destroyed, because the office — I believe it was 88
[19] Broad Street, which had been running it, was used to
[20] run that project, or the multiple projects that have
[21] been running out of that site — was flooded a
[22] little while ago, and all those types of
[23] documents — I don't want to say all, but a lot of
[24] those types of documents have been destroyed.

**Page 133**

[1]    So it's the Modern Continental,
[2] Modern Continental/Obayashi project office for the
[3] projects that were utilizing that site that had
[4] significant water damage and lost water documents.
[5]    Q: Preparing for today you testified that you
[6] had a conversation, at least one conversation with
[7] Bob Shepard on Friday. Do you recall that?
[8]    A: Yes.
[9]    Q: What did you say to him and what did he say
[10] to you, if you remember?
[11]    A: Well, I don't remember every specific
[12] thing. That's when I received notice of the
[13] deposition, talked to Bob, just kind of quick
[14] comments: What's going on with the site? Anything
[15] active on the site? Looking at the site. Do you
[16] remember what the cost estimates to clean the site
[17] up were? It was not a lot; it was a quick
[18] conversation because we just received notices.
[19]    Q: Did you speak to him today or over the
[20] weekend?
[21]    A: No.
[22]    MR. OTTO: That's all I have. Thank you.
[23]    MR. STEVENS: Just a couple. Do you have
[24] questions?

**Page 134**

[1]    MS. ZANKOWSKI: I was just going to make a
[2] statement on the record that to the extent that Mr.
[3] Grela was unable to answer certain questions here
[4] today that you asked, that I would go back and make
[5] inquiries and get back to you by this Thursday as to
[6] who in the organization could fill in some of those
[7] gaps. And I believe it will probably be Mr.
[8] Shepard. So I wanted to state on the record that as
[9] a continuation of this 30(b)(6), that there would
[10] most likely be another deponent.
[11]                REDIRECT EXAMINATION
[12]                BY MR. STEVENS:
[13]    Q: Mr. Grela, are any of the prospective
[14] purchasers of the property interested in developing
[15] it for industrial uses?
[16]    A: I don't know.
[17]    Q: You don't know of any that are?
[18]    A: Well —
[19]    MS. ZANKOWSKI: Objection to the extent I
[20] believe it's been asked and answered.
[21]    A: No, I'd say I don't know any that are.
[22]    Q: They're all looking, as far as you know, at
[23] residential/commercial mixes or sports venues?
[24]    A: We're a little premature right now, because

Mystic Landing, LLC   v.                                                        Peter M. Grela
Case 1:04-cv-10180-NMG        Document 66-6        Filed 04/04/2005        Page 37 of 38, March 14, 2005
Pharmacia Corporation, et al., etc.

Page 135

[1] the property I don't believe has been listed yet.
[2] So you're asking me to kind of hypothesize.
[3] Probably officially it hasn't been listed yet, but
[4] if you were going to start selling your house next
[5] week, some other people know, they call you up and
[6] they say, "Hey, what are you listing it for?"
[7]     It's the same thing. The property hasn't
[8] been marketed yet, it's about to be marketed, and a
[9] lot of people are making calls.
[10]    MR. STEVENS: Nothing more.
[11]    (Deposition concluded at 2:03 p.m.)
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 136

[1]                    CERTIFICATE
[2]     I, Peter M. Grela, do hereby certify that I have
[3] read the foregoing transcript of my testimony, and
[4] further certify under the pains and penalties of
[5] perjury that said transcript (with/without)
[6] suggested corrections is a true and accurate record
[7] of said testimony.
[8]     Dated at ___, this day of ,
[9] 2005.
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 137

[1]           COMMONWEALTH OF MASSACHUSETTS)
[2] SUFFOLK, SS. )
[3]     I, Anne H. Bohan, Registered Diplomate Reporter
[4] and Notary Public in and for the Commonwealth of
[5] Massachusetts, do hereby certify that there came
[6] before me on the 14th day of March, 2005, at 10:42
[7] a.m., the person hereinbefore named, who was by me
[8] duly sworn to testify to the truth and nothing but
[9] the truth of his knowledge touching and concerning
[10] the matters in controversy in this cause; that he
[11] was thereupon examined upon his oath, and his
[12] examination reduced to typewriting under my
[13] direction; and that the deposition is a true record
[14] of the testimony given by the witness.
[15]     I further certify that I am neither attorney or
[16] counsel for, nor related to or employed by, any
[17] attorney or counsel employed by the parties hereto
[18] or financially interested in the action.
[19]     In witness whereof, I have hereunto set my hand
[20] and affixed my notarial seal this 23rd day of March,
[21] 2005.
[22]
[23]     Notary Public
[24] My commission expires 12/25/09