UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS



MYSTIC LANDING, LLC,
    Plaintiff,
v.

PHARMACIA CORPORATION, SOLUTIA INC.
and MONSANTO COMPANY,
    Defendants.

PHARMACIA CORPORATION and
MONSANTO COMPANY,
    Third-Party Plaintiffs,
v.

MODERN CONTINENTAL CONSTRUCTION
CO., INC.,
    Third-Party Defendant.

PHARMACIA CORPORATION,
    Third-Party Plaintiff,
v.

BOSTON EDISON COMPANY,
    Third-Party Defendant.

BOSTON EDISON COMPANY,
    Fourth-Party Plaintiff,
v.

O'DONNELL SAND & GRAVEL, INC.
and MARY O'DONNELL,
    Fourth-Party Defendant.

CIVIL ACTION No. 04-10180 NMG

**MEMORANDUM IN SUPPORT OF PHARMACIA CORPORATION'S MOTION FOR
<u>PARTIAL SUMMARY JUDGMENT</u>**

In accordance with Fed. R. Civ. P. 56 and Local Rule 56.1, Defendant Pharmacia

Corporation ("Pharmacia") submits this memorandum in support of its Motion for Partial

B3112998.1

Summary Judgment.[1] The Complaint seeks relief arising from environmental contamination of property owned by plaintiff Mystic Landing, LLC ("Mystic") located in Everett and Boston, Massachusetts (the "Property"). The Complaint alleges that the contamination resulted from chemical manufacturing operations conducted on the Property from 1943 to 1983 and on an adjacent property (the "Gateway Property").

It is small wonder that little or none of Mystic's case merits a trial, because the case is little more than a barely disguised attempt to seize a windfall by a landowner who knowingly purchased contaminated property. The only claims for damages straightforwardly set forth in the complaint seek reimbursement for environmental costs Mystic has not incurred and has no intention of incurring. Perhaps realizing that these claims had no factual or legal basis, Mystic is now attempting to maintain an environmental property damage claim that was at most hinted at in the complaint, was not disclosed even during fact discovery and would allow Mystic to recover damages it has not suffered. This claim is so contrary to law and logic that it appears entirely unprecedented. Other than Mystic, no landowner who elected to purchase property it knew to be contaminated has had the effrontery to claim to be entitled to recover something for which it never paid -- the additional amount the property would have been worth had it not been contaminated.

The only claim that should survive summary judgment is the portion of Count I (declaratory judgment) relating to the issue of Pharmacia's liability for a share of future response costs, Pharmacia is entitled to summary judgment on Mystic's claims in Counts I and II under chapter 21E of the Massachusetts General Laws for past response costs and for future property

---

[1] Defendant Monsanto Company ("Monsanto") has separately moved for summary judgment on all counts. To the extent Monsanto's Motion for Summary Judgment is denied, Monsanto joins Pharmacia's Motion for Partial Summary Judgment.

damage because Mystic has not incurred any such response costs and because it purchased the Property with actual knowledge that the Property was contaminated. By stipulation, Mystic has agreed to the dismissal of Counts III, IV, and V, common law claims of negligence, continuing nuisance and continuing trespass.

## FACTS

This action presents claims alleging damages relating to environmental contamination at the Property. Statement of Material Facts ("SOMF") ¶ 1. Mystic owns the Property and rents it to affiliate and Third Party Defendant Modern Continental Construction Co., Inc. ("Modern Continental"). SOMF ¶ 2. Modern Continental uses the Property as a construction laydown and storage yard supporting the construction of the depressed central artery/tunnel project and demolition of the former elevated central artery. SOMF ¶ 3.

Pharmacia is the former owner and operator of the Property. SOMF ¶ 4. Pharmacia is also a former owner and operator of the neighboring Gateway property, which was also used for chemical manufacturing purposes, and which now is an independently owned shopping center known as the Gateway Center. SOMF ¶ 5.

Chemical manufacturing operations ceased on the Property in approximately 1975. SOMF ¶ 6. Thereafter, Pharmacia sought to sell the Property. Third Party Defendant Boston Edison Company ("Boston Edison") ultimately purchased the Property in 1983 for $1.1 million, after retaining an engineering firm, Perkins Jordan, to conduct environmental studies that documented contamination on the Property. SOMF ¶¶ 7-9. The deed conveying the property to Boston Edison contained a use restriction stating that the Property

> "... shall be used solely for industrial and manufacturing purposes and that the property hereby conveyed shall not be used for retail

B3112998.1
- 3 -

>business, for multi or single-family residential purposes, park purposes, recreational uses, food or feed facilities, agricultural or animal uses, even though such uses may otherwise be permitted uses as the above terms are defined respectively in the zoning ordinances of the cities of Boston and Everett, Massachusetts."

SOMF ¶10. This provision appears in the chain of title for the Property. SOMF ¶11.

In 1995, Boston Edison sold the Property to Fourth Party Defendant O'Donnell Sand and Gravel, Inc. ("OSG") for a stated consideration of $2,000,000.00. SOMF ¶ 12. The deed recited a restriction on use similar to that in the prior deed, with the additional statement that the restriction is imposed "because of the nature and condition of the subsurface of the property." SOMF ¶ 13. As with the restriction in the deed to Boston Edison, this provision appears in the chain of title for the Property. SOMF ¶ 14. Concurrent with the deed, OSG executed an agreement with Boston Edison specifically stating that the purchase price for the Property reflected its environmental condition. SOMF ¶ 15. Mary O'Donnell, who was affiliated with OSG, purchased the Property from OSG later in 1995 for $1.00. SOMF ¶ 16.

Shortly after completing the purchase from Boston Edison, OSG, Mary O'Donnell or an affiliate retained an environmental engineering firm, Consulting Engineers and Scientists, Inc. ("CES") that conducted further environmental testing and documented contamination. SOMF ¶ 17. The results of the testing were reported to the Massachusetts Department of Environmental Protection, which issued a Notice of Responsibility to Mary O'Donnell. SOMF ¶¶ 18-20.

In May 1996, affiliates of Modern Continental entered into a series of transactions that culminated in Mystic's acquisition of the Property in 2001. SOMF ¶¶ 21, 23-25, 44, 47-48. During this period, and prior to Mystic's purchase of the Property, Modern Continental and Mystic obtained knowledge from deed records, consultants, and others that the Property was contaminated and that remediation of the Property would be required. Id. SOMF ¶¶22, 26-28, 32-34, 36, 49.

B3112998.1                                    - 4 -

In the spring of 1996, Modern Continental Construction Co., Inc./Obayahsi ("Modern/Obayashi"), an affiliate of Modern Continental, entered into a subcontract with an affiliate of OSG that allowed it to use the Property as an industrial storage and staging facility. SOMF ¶ 21. At about the same time that subcontract was executed, Modern Continental retained an environmental engineering firm, Green Environmental, that again indicated the Property was contaminated. SOMF ¶ 22. Coincident with the execution of the subcontract, Mary O'Donnell and Modern/Obayashi entered into an Option Agreement ("Option Agreement") which, for consideration of $10.00, gave Modern/Obayashi the right to purchase the Property for $300,000, subject to certain adjustments, including the right to reduce the price for the cost of cleanup actions. SOMF ¶¶ 24-25.

After the 1996 transactions, Modern Continental did not conduct any cleanup actions but did periodically conduct additional sampling that confirmed the presence of contamination and had its lawyers consider what rights it might have against Pharmacia for the presence of contamination on the Property, SOMF ¶¶ 26, 27-28. During the late 1990s, Modern Continental or its affiliates retained a real estate development firm, Gator Development Company, Inc., to consider future uses of the Property after it was no longer needed for industrial storage and staging, specifically, the potential reuse of the Property for commercial or residential purposes. SOMF ¶ 30.

In May 2001, Hinckley Allen & Snyder, attorneys for Modern Continental and Mystic, wrote a letter to Solutia Inc. ("Solutia"), a spinoff entity from Pharmacia that is named as a defendant in this action, but was never served. SOMF ¶ 31. The letter stated that the attorneys represented a client who was about to exercise an option to purchase the Property, that the Property was contaminated and that they wanted to discuss the Property and environmental

cleanup responsibilities. Id. At about the same time, another environmental consulting firm, Rizzo Associates Inc. ("Rizzo") completed additional investigation on the Property, which further confirmed the presence of contamination. SOMF ¶¶ 32, 36. Although the initial internal remedial cost estimate prepared by Rizzo in May 2001 was for $810,000, one week later Rizzo produced a second internal estimate, based on the same analytical information, of $17,500,000. SOMF ¶¶ 33-34.[2]

Modern Continental caused Mystic to be organized on June 7, 2001. SOMF ¶ 38. Two weeks later, on June 19, 2001, Modern/Obayashi assigned its interest in the Option Agreement to Mystic. SOMF ¶ 44. On June 21, 2001, having knowledge of existence of contamination and the remediation estimates prepared by Rizzo Associates, Mystic purchased the Property. SOMF ¶¶ 47-49. The deed for the Property recited a consideration of $300,000. SOMF ¶ 48.

Since Mystic's purchase of the Property, Mystic has not conducted any further environmental investigations related to preexisting contamination other than minor sampling in August 2001; nor has it incurred any other costs to "treat or remove contaminated soil or ground water". SOMF ¶¶ 50-53. Mystic is now in the process of selling the Property and has no current intention to "spend any money cleaning up the property" in the future, unless such expenditures are required to maintain or enhance the value of the Property. SOMF ¶¶ 54-55.

## ARGUMENT

I.  **Summary Judgment Standard.**

---

[2] Cost estimates produced subsequently by Mystic include $17,600,000 (August 2001); $17,500,000 (April 2002); $6,835,250 - $9,497,500 (August 2002); $6,100,000 (October and December 2003); and, most recently, $2,265,046 and $8,421,306 (September 2005). SOMF ¶ 35. The variation simply reflects variable-cost estimates, not new analytical information since their purchase of the Property.

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories and affidavits demonstrate that there is no genuine issue of material fact as to a particular issue. Fed. R. Civ. P. 56(f). A genuine issue of material fact exists only where the dispute as to a material fact "is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case, Celotex Corp. v. Catrett, 477 U.S. 317 (1986), and once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted). A fact is material only if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." Id.

II.  **Pharmacia Is Entitled To Partial Summary Judgment On Elements Of Count I (Declaratory Judgment) And The Entirety Of Count II (Contribution) Relating To Past "Response Cost" And "Property Damage."**

   A.  **Because Mystic Has Provided No Evidence That It Has Incurred Any Response Costs To Date, Pharmacia Should Be Awarded Summary Judgment On This Issue Of Such Past Costs.**

Mystic's claims for contribution (Count II) and declaratory judgment (Count I) for "response costs" arise from Massachusetts General Laws c. 21E, §4, which provides in relevant part as follows:

> Any person who undertakes a necessary and appropriate response action regarding the release or threat of release of oil or hazardous material shall be entitled to reimbursement from any other person liable for such release or threat of release for the reasonable costs of such response action. If two or more persons are liable pursuant to section five [of Chapter 21E] for such release or threat of release, each shall be liable to the others for their equitable share of the costs of such response action.

Although Mystic's Complaint variously asserts that it has incurred costs of $6 million and $100,000, SOMF ¶¶ 56-57, the testimony of Mystic's 30(b)(6) witness made clear that Mystic has not spent anything on removal or treatment of contamination on the Site, SOMF ¶ 52; nor did Mystic produce any evidence of other costs or documentation of any additional sampling activities on site in response to repeated discovery requests. SOMF ¶¶ 52, 58-62. The Court must therefore conclude that no costs have been incurred and grant Pharmacia summary judgment on any "past costs." [3]

Dismissal of Count II (contribution) in its entirety is appropriate; a contribution claim under chapter 21E can address only previously incurred response costs. Under c. 21E §4, and controlling case law, Mystic must actually make an expenditure before seeking a monetary judgment for "reimbursement," the relief provided by Section 4. Oliveira v. Pereira, 414 Mass. 66, 74, 605 N.E.2d 287, 291 (1992) ("An action under §4 of G.L. c. 21E is an action for reimbursement…We have defined 'reimbursement' as 'repaying or making good the amount paid out.' Thus, to be reimbursed, the plaintiff must have paid the sum due.") (internal citations omitted); Mailman's Steam Carpet Cleaning Corp. v. Lizotte, 415 Mass. 865, 875, 616 N.E.2d. 85, 91 (1993) (a §4 action is "limited to reimbursement of cleanup costs already paid by the party

---

[3] See, e.g., Calzaturficio S.C.A.R.P.A.s.p.a. v. Fabiano Shoe Company, Inc., 201 F.R.D. 33 (D. Mass. 2001) (noting that, under Fed. R. Civ. P. 30(b)(6), a party is required to provide a witness or witnesses "who can testify so as to bind the corporation"). See also Hyde v. Stanley Tools, 107 F. Supp. 2d 992 (E.D. La. 2000) (noting that submission of an affidavit which contradicts earlier deposition testimony upon which a party moving for summary judgment has relied may be disregarded unless accompanied by a reasonable explanation).

seeking recovery"); Black v. Coastal Oil New Eng., Inc. 45 Mass. App. Ct. 461, 465, 699 N.E.2d. 353, 355 (1998) ("Prior payment is a prerequisite for reimbursement").

The cost estimates of Mystic's expert demonstrate the wisdom of the rule that only response costs actually expended may be recovered. The original estimate, apparently made without regard to prospective litigation , was $810,000, an amount remarkably close to the estimate of Pharmacia's expert. SOMF ¶ 33. Although no new data suggested the situation was more severe, when the prospect that someone other than Mystic might pay the bill was considered, the estimate marginally jumped more than twenty-fold to $17,500,000. SOMF ¶34. Now, Mystic's expert says the costs will be somewhere between $2,265,046 and $8,421,306. SOMF ¶35. In sum, even if the law permitted unexpended response costs to be recovered and Pharmacia did not dispute the views of Mystic's expert, Mystic still could not recover here because it would not have established damages with anything remotely approaching the requisite degree of specificity.

In sum, with respect to Count I, the Court may issue a declaratory judgment pertaining to allocation of "reasonable" costs for "necessary and appropriate" response actions once those costs have been incurred, but it is without authority to award monetary damages for costs that have not yet been incurred.

      **B.**    **Mystic's Late-Asserted Claim For "Property Damage" Is Not Cognizable Because Mystic Voluntarily Purchased The Property With Knowledge Of all Contamination And With Knowledge That The Contamination Could Reduce The Value Of The Property Relative To What It Would Be "Clean."**

M.G.L. c. 21E, § 5 provides as follows:

> [A]ny person who…caused or is legally responsible for a release…of… [a] hazardous material from a…site[] shall be liable, without regard to fault,…to any person for damage to his real or personal property incurred or suffered as a result of such release…

M.G.L. c. 21E, § 5(a)(5)(iii). It appears that Mystic is asserting a claim for damage to the Property under this section. That claim fails as a matter of law, both because it is late asserted, but more importantly because the undisputed facts demonstrate that Mystic has not suffered any injury that constitutes "damage to property" under M.G.L. c. 21E, §5.

      **1.      The Claim For Property Damage Should Be Dismissed Because It Was Not Disclosed During Discovery.**

At the very close of discovery, after apparently determining that it could not obtain a monetary judgment for past or future response costs because neither had been incurred, Mystic devised a new claim in an effort to recover a monetary judgment -- a claim of "property damage." Mystic's September 2005 expert report indicates its intent to present at trial evidence that Mystic should be entitled to recover as damages under Counts I and II, the difference between the value of the Property "clean" and the value of the Property in its current state. SOMF ¶ 64. Under this late-adopted theory, Mystic apparently hopes to be reimbursed for the "cleanup" costs it has not paid and does not intend to pay, plus additional amounts for "market resistance" notwithstanding that, as a purchaser of property it knew to be contaminated, Mystic could have exercised -- rather than been victimized by -- any such market resistance.

The Court should dismiss this last minute attempt to find a theory on which damages could be assessed. The Complaint never mentions the concept of damage to the value of Property; in contrast to paragraphs specifying the anticipated amount of response costs, Mystic's complaint and civil action cover sheet (filed in Massachusetts superior court prior to removal to this Court) and Mystic's original Rule 26 disclosures (both to Defendants and to Third-Party Defendant Boston Edison) contain no reference to damages other than "response costs." SOMF ¶ 63 Failure to plead or disclose this category of damages should, in of itself, preclude plaintiff from recovering them at trial.

### 2. Even If It Had Been Disclosed, The Claim For "Property Damage" In Counts I and II Fails As A Matter Of Law.

The most likely reason why Mystic did not plead a property damage claim when it filed the action is that the claim has absolutely no merit. Mystic's expert's calculation of "property damage" consists of the sum of two values: the remediation costs estimated by Dr. Richard Hughto, another of Mystic's experts (reported in the most recent expert disclosure as a range of $2,265,000 to $8,420,000), plus an additional "10-15%" reduction ($1,078,000 to $2,540,250), which Mystic's experts term a "market resistance discount." SOMF ¶65. Mystic cannot recover for "damages" based on a calculation of the difference in value of the Property "with" and "without" the contamination when, prior to the purchase, Mystic knew the Property to be contaminated, knew that remediation could be required and purchased it nevertheless.

Common law principles governing entitlement to property damage are applicable to claims under chapter 21E, § 5. Guaranty-First Trust Co. v. Textron, Inc., 416 Mass. 332, 333, 622 N.E.2d. 597, 598 (1993) ("[t]he measure of recovery under [§ 5(a)(5)(iii)] is identical to the measure of recovery at common law for damage to real or personal property"). In general, at common law and under Mass. Gen. Laws ch. 21E §5, damages that are not reasonably curable by repairs are measured by the "difference in fair market value of the injured premises before and after the injury." Black v. Coastal Oil New England Inc., 45 Mass. App. Ct. 461, 465-66, 699 N.E.2d. 353, 355-56 (1998), citing Belkus v. Brockton, 282 Mass. 285, 287-288, 184 N.E. 812 (1933).

An "injury" that gives rise to a property damage claim under chapter ch. 21E, §5 could be one of two things. First, it could be a new release of contamination causing damage on property, such that the property is worth less after the release than it was before the release. More commonly, the injury could simply be obtaining knowledge of a historic release of contamination, at which point the market would factor that contamination into valuation decisions. See Taygeta Corp. v. Varian Associates, Inc., 436 Mass. 217, 227, 763 N.E.2d. 1053, 1061 (2002); Lewis v. General Electric Co., 254 F. Supp. 2d 205, 216 (D. Mass. 2003) ("knowledge of the injury was the injury"); Guaranty-First Trust Co. v. Textron, 416 Mass. 332, 333, 622 N.E.2d 597, 598 (1993) (property damage action accrued when plaintiff discovered contamination on property after plaintiff acquired the property without knowledge of the contamination).

The critical flaw in Mystic's claim is that any "injury" to the Property occurred prior to Mystic's purchase of the Property, and was thus never "suffered" by Mystic in the first place. Any adjustment in the fair market value of the Property relating to the presence of contamination occurred well before Mystic purchased it, and if it was "suffered" by anyone, it was suffered by a predecessor in title, not Mystic.[5] Here, there is no dispute as to the material facts concerning the existence, knowledge and extent of contamination. It is established that the Property was contaminated well before Mystic purchased it, that Mystic knew about the contamination prior to its purchase and that its affiliates knew about the contamination before entering into the Option Agreement to purchase the Property. SOMF ¶ ¶22, 26, 28, 32-34, 36, 49 Since Mystic's purchase of the Property in 2001, there has been no new material information about the

---

[5] Indeed, because the contamination was first discovered and disclosed prior to the time Pharmacia sold the property to Boston Edison in 1983, SOMF ¶7-9, any "property damage" inherent in this property was suffered by Pharmacia in 1983 when it sold the Property to Boston Edison, at which point Boston Edison could reduce the price it offered to reflect any diminution in value - as "property damage" attributable to the contamination.

contamination, and Mystic's current estimates of cleanup costs are well within the range identified by its consultant prior to its purchase of the Property. SOMF ¶ 33-35.

Because there is no genuine dispute that the contamination existed and was discovered before Mystic purchased the property, as a matter of law, any "injury" was not suffered by Mystic and is therefore not actionable by Mystic.[6] See Lewis v. General Electric Co., 254 F. Supp. 2d 205, 215 (D. Mass. 2003), citing Larabee v. Potvin Lumber Co., Inc., 390 Mass. 636, 640 459 N.E.2d 93, 95 (1983) (no direct cause of action for property damage when injury occurred and was discovered prior to plaintiff's purchase of property), Harris v. J.C. Erb Construction, Inc., 1996 WL 1185038 (Mass. Super. 1996) (granting summary judgment to defendants when plaintiff sued for injury to property because the damage occurred before the plaintiff owned the property). See also Luna Preservation Society v. Metropolitan District Commission, 2000 WL 420838 (Mass Super. 2000) at *4, *7 (dismissing claim for property damage when the injury to property occurred prior to the vesting of plaintiff's ownership in that property); Wellesley Hills Realty Trust v. Mobil Oil Co., 747 F. Supp. 93, 101 (D. Mass. 1990) (dismissing owner's claim because "the undisputed facts are that an environmental assessment was conducted prior to the sale an that WHRT therefore knew of the contaminated condition of the property when the sale was consummated.") The Lewis court also cited Koehn v. Ayers, 26 F. Supp. 2d. 953, 957 (S.D. Tex. 1998) (cause of action for injury to property belongs to prior owners, not the current owner, where the injury was known to the prior owners before the sale).

---

[6] Although decisions sounding in the common law bar recovery of damages where a plaintiff purchased property with knowledge of its defects, no reported Massachusetts decision specifically addresses the recovery or non-recoverability of property damage claims under ch. 21E §5(a)(iii) where a plaintiff has purchased property with advance knowledge of the contamination. It is not that the law suffers from any lack of clarity on this point, but rather that the law is so obvious that no plaintiff has pursued the matter to the point of obtaining a written decision. See Love v. Pratt, 64 Mass. App. Ct. 454, 833 N.E.2d 674 (2005) ("That the matter is arguably one of first impression is attributable, in our view, not to any particular lack of clarity in applicable law but to the fact that no other individual had the temerity to pursue the matter on appeal.").

The decision that parties in the position of Mystic Landing may not recover for property damage is consistent with other basic common law principles. First, Mystic cannot recover because the damages were completely avoidable. Like all other plaintiffs, plaintiffs in actions under Mass. Gen. Laws ch. 21E have an obligation to minimize their damages. See Hill v. Metropolitan Dist. Comm'n, 439 Mass. 266, 277, 787 N.E.2d 526, 534 (2003) (finding general duty to mitigate damages applicable to claims brought under Mass. Gen. Laws ch. 21E §5, citing Guaranty-First Trust Co. v. Textron, Inc., 416 Mass. 332, 337, 622 N.E.2d 597, 600 (1993)). Mystic could have declined to purchase the Property because of the contamination, or it could have adjusted the price to reflect that contamination. If Mystic has an obligation to mitigate, it must surely have had an obligation to avoid those damages entirely.

Second, Mystic's claims are barred by the doctrine of assumption of risk as it applies to Massachusetts strict liability cases. Traditional assumption of risk bars recovery by a plaintiff who "fully understands a risk of harm to himself or his things caused by the defendant's conduct or by the condition of the defendant's land or chattels, and who nevertheless voluntarily chooses to enter or remain….is not entitled to recover for harm within that risk." Rest. Torts 2d 496C(1). Although Massachusetts no longer recognizes this doctrine in negligence cases, where principles of comparative fault now control, Mass. Gen. Laws c. 231, § 85, it still applies in other cases, including strict liability claims. Rest Torts 2d §523 (and cases cited therein); Amland Property Corp. v. Aluminum Co. of America 711 F. Supp. 784, 802-803. See also Correia v. Firestone Tire & Rubber Co., 388 Mass. 342, 355, 446 N.E.2d 1033, 1040 (1983); Allen v. Chance Manufacturing Co., Inc. 398 Mass. 32, 494 N.E.2d 1324 (1986); Sultis v General Motors Corp., 690 F. Supp. 100, 105 (D. Mass. 1988) (each applying doctrine of assumption of risk to strict

liability "warranty" cases where plaintiff was aware of the risk and made unreasonable use of the product).

All of these precedents rest on sound principles of common sense. Mystic's claim is equivalent to that of a property owner who purchased property knowing it has no legal access to a roadway, yet sued a prior owner for the difference in value between the property as it actually exists -- with no access -- and the value of the property if it did have access. The law does not provide such undeserved windfalls.

Finally, allowing a property damage claim on these facts creates a very significant risk of impermissible multiple recoveries of the same damages against Pharmacia, through both duplicative recoveries of "response costs" disguised as property damage claims, and multiple recoveries of property damages themselves. In terms of response costs, because Mystic has stated its intention not to clean up the property or to incur the response costs that make up a majority of its "property damage claims," a future owner is likely to incur some of the same response costs that Mystic is seeking to recover through its property damage claim, setting up the possibility of multiple recoveries of the same damages. As the court noted in Black v. Coastal Oil New England Inc., 45 Mass. App. Ct. 461, 466, 699 N.E.2d. 353, 356 (1998), future cleanup costs, which are compensable under c. 21E, §4, should not be awarded as "property damage" under c. 21E §5 to "guard against the possibility of duplicative damages, a result traditionally resisted in our law", citing Crowley v. J.C. Ryan Construction Inc., 356 Mass. 31, 36, 247 N.E.2d 714, 717 (1969). See also Mailman's Steam Carpet Cleaning Corp. v. Lizotte, 415 Mass. 865, 870, 616 N.E.2d 85, 89 (1993) (reversing award for future cleanup costs stemming from misrepresentation claims, when jury made similar award for breach of warranty claims, stating "since it is conceivable that Mailman may not expend the $225,000 awarded for breach of

warranty to clean the property, it would be inequitable to allow Mailman to recover the full cost of cleanup as well as the diminution in the market value of the property simply because Mailman has not acted to rehabilitate the property."). Even if "response costs" did not make up any portion of the claimed property damage, allowing parties who purchase with knowledge of contamination to recover for property damage would permit each successive purchaser, without limitation, to subject prior owners like Pharmacia to an unending series of multiple liabilities for the same damages, a result that is an absurdity.

The law is to the contrary. Damage to property from environmental contamination arises when the contamination occurs and is known. One who caused the damage pays once. Here, any damage to the Property attributable to Pharmacia occurred and was known while Pharmacia still owned the Property. Therefore, Pharmacia already has paid. Because Boston Edison knew of the contamination before it purchased the Property, any reduction in the value of the Property attributable to the contamination was reflected in the price Pharmacia received.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Count I to the extent it claims past response costs or property damages and dismiss Count II in its entirety.

By their attorneys,

_____
John M. Stevens (BBO No. 480140)
Adam P. Kahn (BBO No. 561554)
Elisabeth M. DeLisle (BBO No. 658067)
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts  02210
(617) 832-1000
Attorneys for Pharmacia Corporation
 and Monsanto Company

Dated: October 24, 2005

## **CERTIFICATE OF SERVICE**

I hereby certify that I served the above document on October 24, 2005 by having a copy thereof delivered by hand to Doreen M. Zankowski, Hinckley, Allen & Snyder LLP, 28 State Street, Boston, Massachusetts 02109 and to Douglas B. Otto, Morrison Mahoney LLP, 250 Summer Street, Boston, Massachusetts 02210, and a copy by first class mail to Howard G. Guggenheim, P. O. Box 736, Scituate, Massachusetts 02066.

_____
John M. Stevens (BBO No. 480140)