UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 NOV -2 A 11: 15

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| MYSTIC LANDING, LLC,<br>    Plaintiff,<br>v.<br><br>PHARMACIA CORPORATION, SOLUTIA INC.<br>and MONSANTO COMPANY,<br>    Defendants. | |
| PHARMACIA CORPORATION and<br>MONSANTO COMPANY,<br>    Third-Party Plaintiffs,<br>v.<br><br>MODERN CONTINENTAL CONSTRUCTION<br>CO., INC.,<br>    Third-Party Defendant. | CIVIL ACTION No. 04-10180 NMG |
| PHARMACIA CORPORATION,<br>    Third-Party Plaintiff,<br>v.<br><br>BOSTON EDISON COMPANY,<br>    Third-Party Defendant. | |
| BOSTON EDISON COMPANY,<br>    Fourth-Party Plaintiff,<br>v.<br><br>O'DONNELL SAND & GRAVEL, INC.<br>and MARY O'DONNELL,<br>    Fourth-Party Defendant. | |

**PHARMACIA CORPORATION'S STATEMENT OF MATERIAL FACTS AS TO
WHICH THERE IS NO DISPUTE**

B3106504.2

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Defendant Pharmacia Corporation, by and through its undersigned counsel, hereby makes the following statement of material facts not in dispute:

1. The Property that is the subject of this lawsuit is located at Alford Street and Broadway in Everett and Boston, Massachusetts (the "Property" or the "Site"). DeLisle Aff., Exh. 1, Complaint at ¶ 7.

2. Plaintiff Mystic Landing LLC ("Mystic") owns the Property and rents it affiliate and third-party defendant Modern Continental Construction Co., Inc. ("Modern Continental") at a rent of $1,916,640.00 per year for use as "[a] contractors yard and storage of equipment and materials including, without limitation, construction management and any other uses allowed by applicable law." DeLisle Aff., Exh. 2, Mystic Lease.

3. Modern Continental uses the Property as a construction laydown and storage yard for several projects supporting the construction of the depressed central artery/tunnel project and demolition of the former elevated central artery project. DeLisle Aff., Exh. 3, Marino Deposition at 19-32.

4. The Property was owned by Pharmacia until 1983 and, as part of its Chemicals Business, was operated as a chemical manufacturing facility through the late 1970's. DeLisle Aff., Exh. 4, Interrogatory Responses at 14.

5. Pharmacia is also a former owner and operator of the neighboring property, which was also used for chemical manufacturing purposes, DeLisle Aff., Exh. 4, Interrogatory Responses at 14, and which now is an independently owned shopping center known as the Gateway Center (the "Gateway Property".)

**History of the Property until Boston Edison's Purchase of the Property in 1983**

6. The Property was used for chemical manufacturing purposes until approximately 1975. DeLisle Aff., Exh. 4, Interrogatory Responses at p. 14.

7. In 1982, Third-Party Defendant Boston Edison Company ("BECO" or "Boston Edison") commissioned an environmental study and review of the Property, performed by Perkins Jordan Co. DeLisle Aff., Exh. 5, Perkins Jordan Report.

8. The Perkins Jordan report indicated that the Property was contaminated, and that costs would need to be incurred to address that contamination. Id.

9. In 1983, Pharmacia sold the Property to Boston Edison for $1.1 million. DeLisle Aff., Exh. 6, Monsanto to BECO Deed.

10. The deed contained a use restriction stating that the Property

> "... shall be used solely for industrial and manufacturing purposes and that the property hereby conveyed shall not be used for retail business, for multi or single-family residential purposes, park purposes, recreational uses, food or feed facilities, agricultural or animal uses, even though such uses may otherwise be permitted uses as the above terms are defined respectively in the zoning ordinances of the cities of Boston and Everett, Massachusetts."

Id. at Schedule "1", Further Covenants and Conditions, Subsection b.

11. This provision appears in the chain of title for the Property. Id.

**History of the Property between the time Third-Party Defendant Boston Edison Acquired the Property in 1983 and February 1996**

12. On March 6, 1995 Boston Edison sold the Property to Fourth Party Defendant O'Donnell Sand and Gravel, Inc.("OSG") for a stated consideration of $2,000,000.00. DeLisle Aff., Exh. 7, BECO to OSG Deed.

13. The deed from Boston Edison to contained restrictive language similar to that in the deed from Pharmacia to Boston Edison with the additional language that the restriction is imposed "because of the nature and condition of the subsurface of the property". Id. at Schedule 1, Additional Covenants and Releases, Section (1).

14. As with the restriction in the deed to Boston Edison deed, this provision appears in the chain of title for the Property. Id.

15. An Acknowledgment and Release entered into on March 6, 1995 between Boston Edison and OSG notes that the sale price of $2,000,000 "takes into account the environmental condition of the Property and the "As Is" nature of the sale." DeLisle Aff., Exh. 8, OSG Acknowledgment.

16. On September 25, 1995 Mary O'Donnell (sometimes referred to as "O'Donnell"), who was affiliated with OSG, purchased the Property from OSG for $1.00. DeLisle Aff., Exh. 9, OSG to O'Donnell Deed.

17. In August 1995, on behalf of OSG, Mary O'Donnell or an affiliate, Consulting Engineers and Scientists, Inc ("CES") conducted further environmental investigations on the Property and identified contamination, specifically an area of low pH groundwater and an area of lead and arsenic contaminated soils. DeLisle Aff., Exh. 10, CES October 1995 Report.

18. Mary O'Donnell submitted a Release Notification and Notification Retraction Form ("RNF") regarding the Property to the Massachusetts Department of Environmental Protection in ("DEP") January 1996. DeLisle Aff., Exh. 11, O'Donnell RNF. The RNF is a notification to the state that the Property is contaminated.

19. DEP issued a Notice of Responsibility to Mary O'Donnell on February 22, 1996 that required further work on her part to evaluate site conditions. DeLisle Aff., Exh. 12, NOR.

20. On March 26, 1996, CES submitted its October 1995 report to MA DEP. DeLisle Aff., Exh. 15, CES Letter.

**Events Leading to Mystic's Acquisition of the Property, from February 1996 until June 2001.**

21. On April 5, 1996, Modern Continental Construction Co., Inc./Obayahsi ("Modern/Obayashi"), an affiliate of third party defendant Modern Continental Construction Co. ("Modern Continental"), entered into a subcontract with an entity known as Mary O'Donnell Construction Co., Inc. (sometimes referred to as "ODC"), pursuant to which Mary O'Donnell Construction Co., Inc. would, *inter alia*, provide a laydown/staging facility for a project yard located at the Property and operate such project yard. DeLisle Aff., Exh. 14, Subcontract Agreement.

22. On May 1, 1996 Andre J. Bissonette of Green Environmental, Inc. ("Green Environmental") sent a letter to Peter Grela at Modern Continental. Such letter indicated that Green Environmental had been tasked to review existing environmental reports to determine the chemical quality of the soil and groundwater at the Property. Mr. Bissonette, through his letter, informed Modern Continental that the Property was contaminated. DeLisle Aff., Exh. 15, Green Letter.

23. Pursuant to a lease agreement dated May 1, 1996, Mary O'Donnell Construction Co., Inc. leased the property from Mary O'Donnell for an eight-year period ending April 30, 2004 at a rent of $12 per year. DeLisle Aff., Exh. 16, O'Donnell to ODC Lease.

24. Also on May 1, 1996, Mary O'Donnell and Modern/Obayashi entered into an Option Agreement ("Option Agreement") which, for and in consideration of $10.00, gave Modern/Obayashi the option to purchase the Property for $300,000 from Mary O'Donnell, subject to certain adjustments. DeLisle Aff., Exh. 17, Option Agreement at ¶ 7.

25. Among the adjustments to the purchase price, the Option Agreement provided that Modern/Obayashi could reduce the purchase price "in the event that Hazardous Materials are found in, on, or near the Premises in amounts or concentrations which give rise under the

Hazardous Waste Laws to a requirement that the owner of the owner of the premises to take Response Actions". Id. at ¶ 14.

26. After the 1996 transaction, Modern Continental did not conduct any cleanup actions but periodically conducted additional sampling that confirmed the presence of contamination. DeLisle Aff., Exh. 18, Gannett Fleming Sampling Data; DeLisle Aff., Exh. 31, Final Phase II.

27. On March 15, 1999, attorneys at Hinckley Allen Snyder LLP (counsel for both Modern Continental and Mystic) prepared memoranda, subsequently produced by Mystic and Modern, evaluating legal claims that could be brought against Monsanto to recover potential future cleanup costs associated with the Property. DeLisle Aff., Exh. 19, March 9 Pope Memo; DeLisle Aff., Exh. 20, March 15 Pope Memo; DeLisle Aff., Exh. 21, Callam Memo.

28. These memoranda reflected Modern Continental's understanding that the Property was contaminated. Id.

29. Among the conclusions reached in the memos was the conclusion that, "[u]nder the law in Massachusetts . . . a current owner of contaminated property does not have actionable claims for these common law claims [trespass, nuisance, negligence, or conducting an abnormally dangerous activity] against the prior owner of the property." DeLisle Aff., Exh. 21, Callam Memo at HAS-EVE2 00659.

30. During the late 1990's, Modern Continental or its affiliates retained a real estate development firm, Gator Development Company, Inc., to consider future uses of the Property after it was no longer needed for industrial storage and staging, specifically the potential reuse of the Property for commercial or residential purposes. DeLisle Aff., Exh. 22, Gator Proposal.

31. On May 11, 2001, attorneys for Modern Continental and Mystic wrote to Solutia Inc., a spinoff entity from Pharmacia that was originally named in this lawsuit, but was never served,

stating that they represented a client that was about to exercise its option to purchase the Property, that the Property was contaminated, and that they wanted to discuss the Property and environmental cleanup responsibilities. DeLisle Aff., Exh. 23, Petros May 2001 Letter.

32. Rizzo Associates, Inc. ("Rizzo") prepared and submitted to Hinckley Allen & Snyder LLP a draft report dated May 15, 2001 entitled "Phase II Field Investigation Report" which contained information about the condition of the Property, including information that the Property was contaminated. DeLisle Aff. Exh. 24, Draft Phase II.

33. In a draft letter dated May 15, 2001, Richard J. Hughto and William C. Phelps of Rizzo Associates, Inc., ("Rizzo") provided Doreen Zankowski with a document entitled Preliminary Remedial Cost Estimate which estimated the total remedial cost for the Property to be $810,000. DeLisle Aff. Exh. 25, Rizzo May 15, 2001 Estimate at 4.

34. In an updated draft letter dated May 22, 2001, Richard J. Hughto and William C. Phelps of Rizzo Associates, Inc., provided Doreen Zankowski with a revised Preliminary Remedial Cost Estimate which estimated the total remedial cost for the Property to be $17,500,000. DeLisle Aff. Exh. 26, Rizzo May 22, 2001 Estimate at 4.

35. Since prior to the inception of this lawsuit, Mystic has developed a number of additional estimates of the "remedial costs" it will incur in the future, including: $17,600,000, DeLisle Aff., Exh. 27, 4A Demand Letter; $17,500,000, DeLisle Aff., Exh. 28, Zankowski April 2002 Letter; $6,835,250 to $9,497,500, DeLisle Aff., Exh. 29, Zankowski August 2002 Letter; $6,100,000, DeLisle Aff., Exh. 30, Zankowski October 2003 Letter and DeLisle Aff., Exh. 1, Complaint; and, most recently, $2,265,046 and $8,421,306, DeLisle Aff., Exh. 33, Hughto Report at 18.

36. Rizzo finalized its report on June 19, 2001 entitled "Phase II Investigation Report", which contained information about the condition of the Property, including information that the Property was contaminated. DeLisle Aff., Exh. 31, Final Phase II.

37. As of June 2001, Modern owned all the financial interest in the Modern/Obayashi joint venture. DeLisle Aff., Exh. 32, Grela Deposition at 28

38. Plaintiff Mystic Landing LLC ("Mystic") was organized on June 7, 2001. DeLisle Aff., Exh. 34, Mystic Certificate of Organization.

39. Mystic's Certificate of Organization indicates that it is managed by Modern Continental, and lists Lelio Marino, Kenneth Anderson, Charles Madden and Peter Grela as individuals authorized to execute documents on its behalf. DeLisle Aff., Exh. 34, Mystic Certificate of Organization.

40. Plaintiff Mystic filed an Amended and Restated Certificate of Organization on June 14, 2001. DeLisle Aff. Exh. 35, Mystic Amendment.

41. Mystic's Amended and Restated Certificate of Organization indicates that it is managed by Modern Continental Construction Companies, Inc. ("Modern Continental Companies"), and lists Lelio Marino, Kenneth Anderson, Charles Madden and Peter Grela as individuals authorized to execute documents on its behalf. DeLisle Aff., Exh. 35, Mystic Amendment.

42. The corporate filings of Mystic Landing, Modern Continental Construction Companies, Inc. and Modern Continental Construction Co., Inc., indicate that the same individuals served as officers for Modern Continental and Modern Continental Companies at the time Mystic purchased the Property. DeLisle Aff., Exh. 36, Modern Continental Annual Report; DeLisle Aff., Exh. 37, Modern Continental Companies Annual Report.

43. Peter Grela, who simultaneously served as an officer for Modern, Mystic and Modern Continental Companies Inc. in 2001, testified that he represented both Modern and Mystic simultaneously in transactions between them. Delisle Aff., Exh. 32 at 30.

44. On June 19, 2001, Modern/Obayashi assigned its rights in the option agreement to Mystic. DeLisle Aff. Exh. 38, Assignment of Option.

45. Peter M. Grela, executed the Assignment and Assumption of Rights and Obligations on behalf of both the Assignor, Modern/Obayashi, and the Assignee, Mystic Landing. Id. at 3.

46. At his deposition, Mr. Grela testified that he acted on behalf of both Modern and Mystic in negotiating the price for the assignment of the Option Agreement. DeLisle Aff., Exh. 32, Grela Deposition at 29.

47. On June 21, 2001, Modern/Obayashi assigned its rights under the Notice of Option Agreement and the Option Agreement to Mystic. DeLisle Aff., Exh. 39, Assignment of Notice of Option.

48. Mystic purchased the Property from Mary O'Donnell the same day. The Deed recites a consideration of $300,000 for the Property. DeLisle Aff., Exh. 40, O'Donnell to Mystic Deed.

49. In his deposition, Mystic's 30(b)(6) witness Peter Grela confirmed that Mystic knew the property was contaminated prior to their purchase, but stated that contamination was "not relevant" to Mystic's acquisition of the Property because Mystic believed that "the remediation would be paid by Monsanto" and "whatever the cost of cleanup was going to be…Monsanto was going to end up paying for it." DeLisle Aff. Exh. 32, Grela Deposition at 40-41

**Status of the Property Since its Acquisition by Mystic**

50. Minor confirmatory sampling was conducted by Rizzo Associates for Hinckley Allen Snyder LLP in July 2001. DeLisle Aff., Exh. 41, Rizzo August 2001 Report.

51. Aside from this minor sampling, Mystic has produced no evidence that it has conducted any further environmental investigations, related to preexisting contamination on the Property since it purchased the Property in 2001. DeLisle Aff. at ¶ 51.

52. Mystic's 30(b)(6) witness, Peter Grela, testified that Mystic has not incurred any costs to "treat or remove contaminated soil or ground water" since its acquisition of the Property. DeLisle Aff., Exh. 32, Grela Deposition at 103.

53. Mr. Grela testified that Mystic has not conducted any analysis of remedial requirements. Id. at 106-107.

54. Mystic is now in the process of selling the Property. Id. at 108-111; DeLisle Aff., Exh. 42, Offering Brochure.

55. Mystic has no current intention to "spend any money cleaning up the property" in the future, unless such expenditures are required to maintain or enhance the value of the Property. DeLisle Aff., Exh. 32, Grela Deposition, at 111-112.

**Damages Claimed by Mystic**

56. Mystic's Complaint seeks "an equitable share of the response costs incurred by Mystic in the remediation of the Site in an amount in excess of Six Million Dollars ($6,000,000)." DeLisle Aff., Exh. 1, Complaint ¶ 34.

57. Mystic's complaint indicates that it has "incurred in excess of One Hundred Thousand Dollars ($100,000.00) in investigation and analysis costs." DeLisle Aff., Exh. 1, Complaint ¶ 39.

58. Fed. R. Civ. P. 26(a)(1) provides that:

> "a party must, without awaiting a discovery request, provide to other parties: (C) a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other

evidentiary material, not privileged or protected from disclosure, on which such computation is based".

59. Pharmacia and Monsanto requested "all documents constituting, recording, concerning or relating to . . . any investigation of environmental conditions at, beneath, or around the Site" in their first requests for production to Mystic and Modern. DeLisle Aff. Exh. 44, Requests for Production at Request No. 23.

60. In response to Pharmacia and Monsanto's requests for production, Mystic and Modern Continental indicated that "all non-privileged documents responsive to this request which are in [Mystic and Modern's] possession, custody or control will be produced". DeLisle Aff., Exh. 45, Responses to Request for Production at Response to Request No. 23.

61. In the hearing pursuant to which this Court imposed sanctions against Mystic for discovery misconduct, Mystic's counsel made clear that it has withheld nothing on the basis of privilege. DeLisle Aff., Exh. 43, Status Conference Transcript at 7.

62. Mystic has not produced any evidence that it has incurred any costs for investigation, analysis or cleanup related to preexisting contamination. DeLisle Aff. at ¶ 51.

63. Mystic's Complaint and Civil Action cover sheet and Rule 26 disclosures contain no references to damages other than "response costs." DeLisle Aff., Exh. 1, Complaint; DeLisle Aff. Exh. 46, Mystic Initial Disclosure; DeLisle Aff. Exh. 47, Mystic Initial Disclosure to BECO.

64. At the very close of discovery, on September 12, 2005, through its expert report, Mystic indicated an intent to present as evidence at trial that it should be entitled a separate category of damages, namely "property damage." Exh. 48, Bouchard Report.

65. According to Mystic's expert, the extent of the "property damage" includes the remedial costs most recently estimated by Dr. Hughto ($2,265,046 to $8,421,306) plus an

additional "10-15%" reduction ($1,078,000 to $2,540,250) which Mystic's experts termed a "market resistance discount". Id. at 138.

<div style="text-align: right;">

Respectfully submitted,

*[signature]*

John M. Stevens (BBO # 480140)
Adam P. Kahn (BBO # 561554)
Elisabeth M. Delisle (BBO #658067)
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1000

</div>

### Certificate of Service

I hereby certify that I have caused this document to be served by having a copy thereof delivered by hand to:

| | |
|---|---|
| Doreen M. Zankowski, Esquire<br>Hinckley, Allen & Snyder LLP<br>28 State Street<br>Boston, Massachusetts 02109 | Douglas B. Otto, Esquire<br>Jill K. Hauff, Esquire<br>Morrison Mahoney LLP<br>250 Summer Street<br>Boston, Massachusetts 02210 |

and by first-class mail to:

<div style="margin-left: 2em;">

Howard G. Guggenheim, Esquire
P. O. Box 736
Scituate, Massachusetts 02066

*[signature]*

John M. Stevens (BBO No. 480140)

</div>

Dated: