UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MYSTIC LANDING, LLC,<br>    Plaintiff,<br> v.<br>PHARMACIA CORPORATION<br> and MONSANTO COMPANY,<br>    Defendants. | CIVIL ACTION No. 04-10180 NMG |
| PHARMACIA CORPORATION and<br> MONSANTO COMPANY,<br>    Third-Party Plaintiffs,<br> v.<br>MODERN CONTINENTAL CONSTRUCTION<br> CO., INC.,<br>    Third-Party Defendant. | |
| PHARMACIA CORPORATION,<br>    Third-Party Plaintiff,<br> v.<br>BOSTON EDISON COMPANY,<br>    Third-Party Defendant. | |
| BOSTON EDISON COMPANY,<br>    Fourth-Party Plaintiff,<br> v.<br>O'DONNELL SAND & GRAVEL, INC.<br> and MARY O'DONNELL,<br>    Fourth-Party Defendant. | |

**MEMORANDUM OF
PHARMACIA CORPORATION AND MONSANTO COMPANY
<u>IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT ON LIABILITY</u>**

B3117722.1

Defendants Pharmacia Corporation ("Pharmacia") and Monsanto Company ("Monsanto") submit this memorandum in opposition to the Motion of plaintiff Mystic Landing, LLC ("Mystic") and third-party-defendant Modern Continental Construction Co., Inc. ("Modern") for Summary Judgment on Liability. The Court should deny the Motion to the extent (i) Modern seeks any ruling on liability in its favor and (ii) Mystic or Modern seeks a ruling that Monsanto has any liability in this case. A matter of law, these claims are without merit. As to Mystic's claim that Pharmacia should be found to be liable as a matter of law under Chapter 21E of the Massachusetts General Laws ("Chapter 21E") for environmental contamination of the property in Everett, Massachusetts now owned by Mystic that is the subject matter of the action (the "Property"), Pharmacia does not dispute that there was a release of hazardous materials while it owned and operated the Property.

However, any implication in Mystic's motion that Pharmacia should bear all, substantially all or the greater share of whatever costs ultimately are incurred to respond to environmental contamination of the Property is incorrect and disputed. Mystic and Modern also are liable parties under Chapter 21E and should bear a substantial share of those costs for a number of reasons. First, there have been releases of hazardous materials on the Property while it was operated by Modern and owned by Mystic. Second, the cleanup of the contamination on the Property will benefit only the current owner Mystic. Third, Mystic bought the Property with full knowledge of the contamination and at a discount that more than compensated it for any foreseeable response costs; therefore, allowing it to pass on to Pharmacia the greater part of those costs would confer an undeserved windfall on Mystic. Fourth, it would also provide equitable relief to a party with unclean hands for, in contrast to Pharmacia's compliance with the laws

prescribing standards for responding to environmental contamination on neighboring property, Mystic and Modern have ignored, flouted and violated those laws as they apply to the Property.

**SUMMARY STATEMENT OF FACTS**

As alleged in the complaint, Pharmacia owned the Property from at least 1943 until 1983 and operated it as part of a chemical manufacturing plant for a portion of that period. (Statement of Facts in Opposition to Motion for Summary Judgment on Liability ("SOF") at ¶ 1. Most of the manufacturing at the plant, including the manufacturing of all organic chemicals, and almost all on-site disposal activities took place on the part of the plant (the "Gateway Property") separated from the Property by railroad tracks. SOF at ¶ 2.

After Pharmacia consolidated its chemical manufacturing operations on the Gateway Property, it attempted to sell the Property. SOF at ¶ 3. Prior to selling the Property, it examined the condition of the Property, identified evidence of environmental contamination and, pursuant to company policy, took steps to ensure that any prospective purchaser was aware of those conditions. SOF at ¶ 4. Boston Edison Company ("Edison"), the purchaser of the Property from Pharmacia, was allowed to conduct testing on the Property and given access to Pharmacia personnel to acquaint itself with activities carried out on the Property. SOF at ¶ 5. As a result, by early 1983, based on information provided by Pharmacia and its own testing, Edison's consultant identified substantially what is known today about contamination of the subsoil and groundwater on the Property. SOF at ¶ 6. In selling the Property to Edison in June 1983, Pharmacia insisted on a deed restriction permitting only industrial and manufacturing and forbidding residential, commercial and recreational uses. SOF at ¶ 7.

After the sale of the Property, the Commonwealth's Department of Environmental Protection (the "DEP") began to implement Chapter 21E, the Commonwealth's equivalent of the Federal Superfund law, 42 U.S.C. § 9601 et seq. Because Pharmacia was then the owner and operator of the Gateway Property, Pharmacia accepted responsibility for contamination at the Gateway Site and, fulfilled its obligations under Chapter 21E. SOF at ¶ 8. Total expenditures were approximately 30 million dollars. SOF at ¶ 9. The Gateway Property is now a shopping center. SOF at ¶ 10.

DEP also assigned responsibility for responding to contamination on the Property. When Edison sold the Property, its purchaser Mary O'Donnell or an affiliate had a consultant evaluate the Property. SOF at ¶ 11. The consultant informed Mary O'Donnell that the contamination it identified had to be reported to DEP, and in response, DEP gave notice that the current owner and operator was a party responsible for responding to contamination on the Property. SOF at ¶¶ 12-14.

By agreement with a company controlled by Mary O'Donnell, in the 1990s Modern began to use the Property as a laydown and storage area in connection with its performance of construction contracts for parts of the Central Artery/Tunnel Project. SOF at ¶ 15. Among the activities for which Modern and its subcontractors used the Property were storage of new and used structural steel, storage of piles of excavated soil and trash, refueling construction equipment and breaking up the old elevated Central Artery. SOF at ¶ 16. Modern continues to use the Property today. SOF at ¶ 17. In addition to the right to use the Property, Modern acquired an option to purchase the Property. SOF at ¶ 18.

Modern subsequently assigned the option to Mystic, and in June 2001, Mystic exercised the option and acquired the Property. SOF at ¶ 19. At the time it did so, Mystic had full

knowledge of the environmental contamination of the Property.  SOF at ¶ 20.  The purchase price stated in the deed was $300,000.  SOF at ¶ 21.  Mystic contends that the cost of acquiring the option from Modern was $20,000,000, but that purported price was "negotiated" by the same individual on behalf of Mystic and Modern, and no money changed hands.  SOF at ¶ 22.  An appraisal conducted by Mystic at the time of the acquisition indicated that the value of the property, exclusive of contamination, was $17,390,000.  SOF at ¶ 23.  Mystic is now actively attempting to sell the Property; its experts in the litigation have estimated the "clean" value of the Property to be $19,200,000, and in its current condition, $$9,160,000 to $15,240,000.  SOF at ¶ 24.  Bids received for the Property have ranged from $10,200,000 to $34,000,000.  SOF at ¶ 25.

After Mystic acquired the Property, a consultant it retained to perform an environmental and regulatory assessment advised it that, as the site owner, it would be responsible for following the detailed steps mandated by Massachusetts law for responding to the environmental contamination known to exist on the Property.  SOF at ¶ 26.  Despite receiving this advice, Mystic did nothing.  It incurred no costs to treat or remove contaminated soil or groundwater.  SOF at ¶ 27.  It ignored every deadline imposed by Chapter 21E and the Massachusetts Contingency Plan.  SOF at ¶ 28.

During Mystic's ownership, far from being remedied, environmental contamination of the Property became worse as a result of Modern's operations.  Specifically, dumping of contaminated soils and debris on the Property by Modern violated not only chapter 21E but other Massachusetts laws forbidding operation of unpermitted solid waste landfills or transfer stations.  SOF at ¶ 29.  As a result, DEP assessed a fine of $35,000 against Modern and required Modern to implement a series of corrective measures.  SOF at ¶ 30.  Independent from the violations and releases identified by DEP, testing by Pharmacia's consultant also showed that other releases of

hazardous materials and oil from Modern's operations during Mystic's ownership contaminated the Property.  SOF at ¶¶ 31-34.

Monsanto was formed in 2000.  SOF at ¶ 35.  It never owned, operated the Property or had any other connection with the Property.  SOF at ¶ 36.  It is not the successor to the chemical manufacturing business that operated at the Everett site.  SOF at ¶ 37.  Monsanto is an existing corporation, and neither Pharmacia nor anyone else is its successor.

Mystic commenced this action under Chapter 21E in Massachusetts Superior Court in December 2003.  SOF at ¶ 38.  Before doing so, it conducted the pre-litigation procedures that are a prerequisite to seeking response costs under Chapter 21E with Pharmacia but not with Monsanto.  SOF at ¶ 39.  In response to Mystic's complaint, Pharmacia sought contribution in a counterclaim against Mystic and a third-party claim against Modern.  SOF at ¶ 40.  Modern filed no responsive claims against Pharmacia.  SOF at ¶ 41.

**ARGUMENT**

**I.       The Court Should Deny Modern's Motion In Its Entirety.**

The Court should deny Modern's Motion seeking a ruling in its favor that Pharmacia and Monsanto are parties liable under Chapter 21E of the Massachusetts General Laws for contamination of the Property because Modern has not asserted any affirmative claim on which such a ruling could be entered.  Although Modern says it seeks judgment on liability on Counts I and II of the Complaint, Modern is not a plaintiff in this action.  Mystic and Modern Memorandum at 1; Complaint.  It was joined when Pharmacia and Monsanto asserted third-party claims against Modern seeking contribution under chapter 21E from Modern for any liability either of them might have to Mystic for costs of responding to environmental contamination of the Property.  SOF at ¶ 40.  In response, Modern did not plead counterclaim contending that it

had incurred response costs arising from that contamination for which Pharmacia or Monsanto was alleged to be liable under chapter 21E.  SOF at ¶ 41.

Because any such counterclaim would have arisen from the same transaction or occurrence that is the subject matter of the third-party complaints against Modern, it was a compulsory counterclaim.  Fed. R. Civ. Pro. 13(a).  Modern's failure to plead this compulsory counterclaim could not have been inadvertent because, in discovery, it failed to produce any documentation of any response costs it might have incurred.  Nor could Modern have inadvertently neglected to plead a counterclaim for property damage because it can have no such claim in that it never owned the Property.  Accordingly, not only is there no pending claim on which the relief requested by Modern can be granted, but any such claim by Modern is now barred.

## II. The Court Should Enter Summary Judgment For Monsanto On The Motions Seeking Summary Judgment Against It.

The Court should not only deny Modern and Mystic's Motion to the extent it seeks a ruling that Monsanto is a party liable under Chapter 21E for environmental contamination of the Property but should grant summary judgment for Monsanto on that claim.  It is well established "that a district court has the legal power to render 'summary judgment . . . in favor' of the party opposing a summary judgment motion 'even though he has made no formal cross-motion under rule 56,'" so long as "'the original movant . . . has had an adequate opportunity to show that there is a genuine issue and that his opponent is not entitled to judgment as a matter of law.'"  See, e.g., National Expositions, Inc. v. Crowley Maritime Corp., 824 F.2d 131 (1st Cir. 1987) (citing C. Wright & A. Miller, *Federal Practice*); Andrews v. DuBois, 888 F. Supp. 213 (D. Mass. 1995).  Here, entry of judgment in favor of the party opposing the motion is mandated.

Summary judgment in favor of Monsanto is warranted because it is evident from the memorandum filed by Mystic and Modern in support of their Motion that their claim against Monsanto is based upon a mistake. The claim urged in the Motion is that Monsanto and Pharmacia are liable to Mystic and Modern under Chapter 21E by reason of environmental contamination of the Property that occurred in years prior to 1983. The corporation that owned and operated the Property during that period is Pharmacia, which was then named Monsanto Company. It is evident from Modern's and Mystic's memorandum that they sued Monsanto because of the belief that the Monsanto Company which currently exists is the same corporation that owned and operated the Property in the years before 1983. <u>Mystic & Modern Memorandum</u> at 1 & n.1.

As demonstrated in Monsanto's motions for judgment on the pleadings and summary judgment, that belief is mistaken. The Monsanto Company Mystic sued was not incorporated until the year 2000. SOF at ¶ 35. It never owned, operated or had anything to do with the Property. SOF at ¶ 36. Monsanto is entitled to summary judgment that it has no liability to Mystic or Modern under Chapter 21E.[1]

### III. Any Implication In Mystic's And Modern's Motion That Pharmacia Should Bear The Greater Part Of Responding To Contamination At The Property Is Incorrect.

In their Motion, Mystic and Modern argue only that Pharmacia is a party liable under Chapter 21E for contamination at the Property. They do not identify other parties who also are liable or discuss principles governing allocation among liable parties. Rather, by referring only to Pharmacia's operations as a source of contamination of the Property, they seek to create an

---

[1] The claim for response costs under Chapter 21E against Monsanto is also barred because Mystic failed to conduct the pre-litigation procedures with Monsanto that are prerequisite to such a claim. <u>See</u> M.G.L., c. 21E, § 4A. Had Mystic conducted those procedures, it would have learned that it had no Chapter 21E claim against Monsanto.

implication that Pharmacia should bear all, substantially all or at least the greater part of the total liability resulting from that contamination.  Any such implication is false for there are parties other than Pharmacia who are liable for contamination of the Property, and governing equitable principles would result in the allocation of a substantial share of the liability to those other parties.

Section 5(a) of Chapter 21E creates a number of categories of parties who are liable for responding to contamination at a site at which there has been a release or threat of a release of hazardous materials or oil.  They include the current owner or operator of the site (c. 21E, § 5(a)(1)), the owner or operator of the site at a time when hazardous materials or oil were stored there (§ 5(a)(2)) and anyone else who caused or is legally responsible for a release or threatened release of hazardous materials or oil at the site (§ 5(a)(5)).  There is no dispute that there have been releases of hazardous materials or oil at the Property.  Accordingly, anyone falling into any of these categories is liable under Chapter 21E.

Among the parties liable for contamination at the Site are Mystic and Modern.  At the outset, they are both liable under § 5(a)(1) because Mystic is the current owner and Modern, the current operator of the Site.  They are both also liable under § 5(a)(2) because there have been releases of hazardous materials at the Property during Mystic's ownership and Modern's period of operations.

That releases of hazardous materials occurred while Mystic owned and Modern operated the Property has been demonstrated by testing performed by Pharmacia's and Monsanto's consultant.  The consultant, Woodard & Curran, viewed the Property on June 29, 2004 and September 8, 2004 and, in the course of those views, took samples of soils at or near the surface in areas where lead paint was flaking or rusting from stored metal and where the Property was

being used to break up the lead-painted former elevated central artery.  The results of these samples showed concentrations of lead above levels required to be reported to DEP.  SOF at ¶ 32.  The results of these samples showed concentrations of lead above levels required to be reported to DEP in areas where lead paint was flaking or rusting from stored metal and where the Property was being used to break up the lead-painted former elevated central artery.  SOF at ¶ 33.  They also showed concentrations of oil above levels required to be reported to DEP in an unpaved area where petroleum products were stored and apparently used to refuel construction equipment.  Id.  The consultant was able to attribute the contamination to Mystic's period of ownership and Modern's period of operations because the location of the contaminated soil was near the surface and near to ongoing operations likely to give rise to the type of contamination identified.  SOF at ¶ 34.

Not only Pharmacia's consultants but also DEP has concluded that Modern's operations on the Property violated the environmental laws, including Chapter 21E, the basis of Mystic's claim against Pharmacia.  On October 6, 2005, after the close of fact discovery, Mystic and Modern produced an administrative consent order dated August 8, 2005 by which Modern was found to have violated the law by using the Property as a solid waste disposal facility without a permit and fined $35,000.  SOF at ¶ 30.  The consent order and related analyses, the latter not produced by Mystic and Modern but obtained by Pharmacia from DEP, make clear that Modern dumped asbestos-containing soils onto the ground on the Property and that DEP concluded this dumping constituted a release or threat of release of hazardous materials under Chapter 21E.  SOF at ¶ 29.

Thus, this action is between liable parties, and in such actions, the courts apportion liability equitably among the parties.  For example, in Martignetti v. Haigh-Farr, Inc., 425 Mass.

294, 314-315, 680 N.E.2d 1131, 1144-1145 (1997), a case in which the jury assigned a landowner liability for 30 percent of the response costs for contamination caused by a tenant engaged in furniture stripping, while remanding to the superior court on other grounds, the court ruled that the jury was properly instructed to "consider any factors appropriate to balance the equities in the totality of the circumstances."  Courts faced with equitable allocation issues under Section 113 of CERCLA, 42 U.S.C. § 9613,[2] have concluded that they have broad discretion to balance the equities in the interests of justice.  In United States v. R. W. Meyer, Inc., 932 F.2d 568, 572 (6th Cir. 1991), in affirming the district Court's decision finding a lessor liable for 33 percent of response costs related to contamination caused by a lessee's electroplating business, the court noted that the lessor, who had failed to cooperate with state and federal officials, was responsible simply by virtue of being a landowner and stated that "the court may consider the state of mind of the parties, their economic status, any contracts between them bearing on the subject, any traditional equitable defenses as mitigating factors and any other factors deemed appropriate to balance the equities in the totality of the circumstances."  As a result, the court rejected "the [Appellant's] invitation to curb the district court's discretion to consider any equitable factors it deems appropriate."

Among the factors courts have considered in allocating responsibility between parties is the cooperation of the parties with authorities.  In Central Maine Power Co. v. F.J. O'Conner, 838 F. Supp. 641, 646 (D. Me. 1993), for example, the court assigned 41 percent of the liability to a party who had contributed substantially less hazardous material to a landfill than had a party assigned a 46.5 percent share but who had not cooperated with authorities.  The court noted that

---

[2] Massachusetts courts have decided that provisions of M.G.L. c. 21E should be interpreted similarly to their CERCLA counterparts.  See Martignetti, 425 Mass. at n.12 ("CERCLA and G. L. c. 21E have similar objectives and overlap in coverage. To the extent that there are similarities in language and structure, it is desirable to arrive at similar interpretations, to achieve consistency in application and to discourage 'forum shopping.'").

"[t]he degree of cooperation with government officials to prevent any harm to the public health or environment is very important in the contribution analysis."

A discount in the purchase price on account of environmental contamination, or where the owner otherwise purchased with knowledge, will also increase the share of a current owner. For example, in <u>Smith Land & Improvement Corp. v. Celotex Corp.</u>, 851 F.2d 86, 90 (3rd Cir. 1988), the Third Circuit Court of Appeals held that while caveat emptor was not a valid defense to a CERCLA contribution claim, if the purchaser of property had paid a reduced amount in anticipation of future environmental remediation, "the purchaser should not be entitled to double compensation. [T]he amount of the discount…may enter into the allocation of contribution by the district court in its exercise of discretion." In that case the plaintiff landowner's predecessor, a sophisticated company, had purchased a tract of land on which had been deposited a large pile of manufacturing waste containing asbestos. Prior to purchasing the land, the plaintiff's predecessor had inspected the land on several occasions, had known of its past and, as the district court concluded, had paid a price for the land which reflected the possibility of environmental risks. Similarly, in a suit for contribution brought by a current owner of contaminated property against the former owner and operator of a fertilizer plant on the site, in remanding to the district court to decide allocation of response costs, the Court of Appeals for the Fifth Circuit noted that "the circumstances and conditions involved in the property's conveyance, including the price paid and discounts granted, should be weighed in allocating response costs." <u>Amoco Oil Co. v. Borden, Inc</u>., 889 F.2d 664, 673 (5th Cir. 1989).

Another equitable factor given weight by the courts is that, because only the current owner stands to benefit from the cleanup of contamination, allowing a plaintiff landowner a recovery of all cleanup costs might produce an impermissible double recovery and improperly

require the defendant polluter to pay for the same harm twice.  The Court of Appeals for the Ninth Circuit articulated these principles forcefully in <u>Western Properties Service Corp. v. Shell Oil Co.</u>, 358 F.3d 678 (9th Cir. 2004).  There, the plaintiff landowner had purchased the property at issue with full knowledge that the defendant oil companies had dumped large quantities of petroleum wastes into pits on the property.  The District Court held the defendants liable for all of the necessary response costs because there had been no releases of hazardous substances while the plaintiff owned the property.  The Court of Appeals reversed and remanded the case with directions to apportion the liability equitably among the plaintiff and the defendants.  The Court reasoned that it could be presumed, without need for proof, that the purchase price paid by the plaintiff had taken the contamination into account for "[n]o sensible person would pay as much for a property with a known liability as for one without, whether the price expressly discounted for the cleanup or not."  358 F.3d at 691.  Therefore, imposing all of the liability to the defendant could produce a windfall double recovery for the plaintiff, and if the defendant had sold the property to a purchaser who had known of the contamination, it "would have paid for the same harm twice."  <u>Id.</u>  These results, the Court concluded, were to be avoided.

     District Court decisions are to the same effect.  In <u>Bethlehem Iron Works, Inc. v. Lewis Industries</u>, 1996 WL 557592 (E.D. Pa. 1996), the plaintiff purchased at a discount property that had historically been used as a structural steel operation, conducted structural steel operations on the property for a four-year period without taking any action to clean up the site and then, motivated by a desire to sell the property, brought contribution claims under federal and state law against the former owners and operators of the site.  In apportioning contribution among the parties, the court considered numerous factors, among them that the current owner had been given adequate opportunity to inspect the property before purchase, had opted not to undertake

the customary environmental assessment of the property before purchase, had purchased the land at a substantial discount, paying $150,000 for land appraised at $1 million, had conducted operations on the site without taking any action to clean up the site, had exacerbated the contamination of the site by disposing of its own materials onsite during its ownership, alone stood to benefit from the remediation and was motivated to clean up the site to sell the property. Id.  The court did not state what particular weight it placed on any of the factors it considered, but ultimately imposed liability for 65 percent of the response costs on the current owner.  Id.  Similarly, in BCW Associates, Ltd. v. Occidental Chemical Corp., 1988 WL 102641 (E.D. Pa. 1988), the court determined that the defendant former owner, whose tire grinding operations had caused lead contamination in a warehouse owned by plaintiff BCW and leased to plaintiff Knoll, should bear only one-third of the response costs.  Because plaintiff BCW had purchased the warehouse "as is," plaintiff Knoll had been suspicious of the environmental condition of the warehouse and both plaintiffs, unlike the defendant, had received substantial benefits from the clean up, the plaintiffs were apportioned liability for two-thirds of the response costs.  Id. at *22.  See also Diverse Real Estate Holdings Ltd. v. International Mineral and Chemical Corp., 1995 WL 110138 (N.D. Ill. 1995) (noting that, while plaintiff land owner had failed to carry its burden of proving liability of defendant former owner, if equitable allocation had been required, plaintiff would have been allocated the majority of liability because it could have investigated the environmental condition prior to its purchase of the property and, in order to accommodate its development plan, it would have removed the contaminated fill regardless of its environmental condition.)

     Each of these factors favors Pharmacia against Mystic and Modern.  In that regard, Mystic's and Modern's contribution to the contamination of the Property goes not just to the fact

of liability but to the apportionment of liability. Moreover, all of the benefit of the cleanup for which costs are to be allocated will go to the current owner Mystic. And that benefit will be a windfall benefit because the price Mystic has shown it paid for the Property is a small fraction of its appraised value. Finally, Pharmacia has carried out and is continuing to meet its assigned legal obligations under Chapter 21E with respect to its former chemical manufacturing facility, whereas Mystic and Modern ignored all of their obligations to respond to preexisting contamination at the Property, and indeed, Modern committed further violations of the environmental laws by illegally using the Property to store and dispose of solid waste and releasing hazardous materials on the Property, violations for which it has been assessed a substantial fine.

The entire benefit to be derived from cleaning up the site will be received by Mystic and, in light of its status as Mystic's managing director, Modern. Pharmacia has no current interest in the Property and will acquire no such interest as a result of conducting or paying for response actions at the Property. Rather, any enhancement of the value of the Property arising from a cleanup will be realized by the current owner, Mystic.

The benefit Mystic will receive from a cleanup is entirely undeserved for Mystic not only purchased with full knowledge of the actual condition of the Property but also paid a price incorporating a discount more than sufficient to pay any necessary and reasonable response costs. SOF at ¶¶ 20-21. More particularly, the price stated in the deed by which Mystic purchased the Property was $300,000. SOF at ¶ 21. It is a criminal offense in Massachusetts to understate the consideration for the purchase of real property. See M.G.L.. c. 183, § 6; c. 64D, § 7. The claim by Mystic to have paid a multi-million dollar amount -- a price "negotiated" by the same individual on behalf of both purchaser and seller -- for the option to purchase should

have been included in the purchase price if it were anything other than an accounting fiction, and it was not. SOF at ¶ 22. Mystic was reimbursed once for response costs when it purchased the Property; it should not collect twice. Similarly, Pharmacia sold the Property to a purchaser who knew it to be contaminated. SOF at ¶¶ 4-7. That purchaser may be presumed to have taken the contamination into account in the price it paid. Therefore, Pharmacia already has paid once for the contamination; it should not pay twice.

Finally, Pharmacia has cooperated with the regulatory authorities whereas Mystic and Modern have not. DEP named Pharmacia, whose operations and ownership of the Property largely antedated environmental regulation, a responsible party for the Gateway Property. SOF at ¶ 8. Pharmacia took and continues to take the actions necessary to respond to contamination on the Gateway Property as prescribed by law at a cost of approximately $30,000,000. SOF at ¶ 9. The Gateway Property is now a shopping center. SOF at ¶ 10.

In contrast, although the environmental laws have been in effect throughout Modern's operation and Mystic's ownership of the Property, the condition of the Property is worse today than when that operation and ownership began. When Mary O'Donnell's consultants required that the contamination of the Property be reported to DEP, she was designated as the responsible party required to respond to the contamination. SOF at ¶ 14. When Mystic acquired the Property, its consultants made clear that it succeeded to those obligations. SOF at ¶ 26. Yet Mystic did absolutely nothing to carry them out. SOF at ¶¶ 27-28. Rather, during Mystic's ownership, Modern contributed to the contamination of the Property causing releases of hazardous materials and oil and operating an unpermitted solid waste facility on the Property in violation of the environmental laws, including Chapter 21E. SOF at ¶¶ 29-34. In these

circumstances, Modern and Mystic have no valid claim that Pharmacia should bear a majority of the costs of responding to environmental contamination of the Property.

## CONCLUSION

For the foregoing reasons, the Court should (i) deny the Motion to the extent it is brought by Modern, (ii) deny the motion to the extent it is brought against Monsanto, (iii) enter summary judgment in favor of Monsanto, and (iv) if it determines that Pharmacia is a liable party, rule it is to be determined at trial whether there are other liable parties, how liability for response costs should be apportioned among them and that no damages for response costs may be awarded until they are incurred.

Respectfully submitted,

/s/ John M. Stevens
John M. Stevens (BBO # 480140)
Adam P. Kahn (BBO # 561554)
Elisabeth M. DeLisle (BBO #658067)
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts  02210
(617)  832-1000

Dated:   November 7, 2005