UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MYSTIC LANDING, LLC,<br>              Plaintiff,<br>    v.<br><br>PHARMACIA CORPORATION<br> and MONSANTO COMPANY,<br>              Defendants. | |
| PHARMACIA CORPORATION and<br> MONSANTO COMPANY,<br>              Third-Party Plaintiffs,<br>    v.<br><br>MODERN CONTINENTAL CONSTRUCTION<br> CO., INC.,<br>              Third-Party Defendant. | CIVIL ACTION No. 04-10180 NMG |
| PHARMACIA CORPORATION,<br>              Third-Party Plaintiff,<br>    v.<br><br>BOSTON EDISON COMPANY,<br>              Third-Party Defendant. | |
| BOSTON EDISON COMPANY,<br>              Fourth-Party Plaintiff,<br>    v.<br><br>O'DONNELL SAND & GRAVEL, INC.<br> and MARY O'DONNELL,<br>              Fourth-Party Defendant. | |

**PHARMACIA CORPORATION AND MONSANTO COMPANY'S
STATEMENT OF ADDITIONAL RELEVANT FACTS AND
<u>RESPONSE TO MYSTIC'S AND MODERN'S FACTUAL ACCOUNT</u>**

B3119303.1

## ADDITIONAL RELEVANT FACTS

1.      Pharmacia owned the Property from at least 1943 until 1983 and operated it as part of a chemical manufacturing plant for a portion of that period. DeLisle Affidavit in Support of Pharmacia Corporation's Motion for Partial Summary Judgment ("DeLisle Pharmacia Aff."), Exh. 4, Interrogatory Responses at 14.

2.      Most of the manufacturing at the plant, including the manufacturing of all organic chemicals, and almost all on-site disposal activities took place on the part of the plant (the "Gateway Property") separated from the Property by railroad tracks. Plaintiff Mystic Landing, LLC's and Third-Party Defendant Modern Continental Construction Co., Inc.'s Memorandum in Law in Support of their Motion for Summary Judgment on Liability ("Mystic & Modern Memo"), Exh. G, Rinaldi Deposition at 24, 55-58, 65-70, 79.

3.      After Pharmacia consolidated its chemical manufacturing operations on the Gateway Property, it attempted to sell the Property. Mystic & Modern Memo, Exh. G, Rinaldi Deposition at 58, 63-64.

4.      Prior to selling the Property, Pharmacia examined the condition of the Property, identified evidence of environmental contamination and, pursuant to company policy, took steps to ensure that any prospective purchaser was aware of those conditions. Mystic & Modern Memo, Exh. M, July 21, 1980 Memo; Mystic & Modern Memo, Exh. T, August 4, 1980 Memo; Mystic & Modern Memo, Exh. D, January 22, 1982 Letter.

5.      Boston Edison Company ("Edison"), the purchaser of the Property from Pharmacia, was allowed to conduct testing on the Property and given access to Pharmacia

personnel to acquaint itself with activities carried out on the Property.  Mystic & Modern Memo, Exh. D, January 22, 1982 Letter.

6. As a result, by early 1983, based on information provided by Pharmacia and its own testing, Edison's consultant identified substantially what is known today about contamination of the subsoil and groundwater on the Property.  DeLisle Pharmacia Aff., Exh. 5, Perkins Jordan Report.

7. In selling the Property to Edison in June, 1983, Pharmacia insisted on a deed restriction permitting only industrial and manufacturing and forbidding residential, commercial and recreational uses.  DeLisle Pharmacia Aff., Exh. 6, Monsanto to Boston Edison Deed at Schedule "1", Further Covenants and Conditions, Subsection b.

8. Because Pharmacia was the owner and operator of the Gateway Property when the Commonwealth's Department of Environmental Protection ("DEP") began to implement Chapter 21E, Pharmacia accepted responsibility for contamination at the Gateway Site and fulfilled its obligations under Chapter 21E.  Affidavit of Elisabeth M. DeLisle in Support of Pharmacia Corporation and Monsanto Company's Opposition to Motion for Summary Judgment ("DeLisle Opposition Aff."), Exh. 1, Duff Collins Aff. at ¶ 9, and documents cited therein.

9. Total expenditures were approximately thirty million dollars.  Mystic & Modern Memo, Exh. G, Rinaldi Deposition at 53 (12-15).

10. The Gateway Property is now a shopping center.  Mystic & Modern Memo, Exh. G, Rinaldi Deposition at 16 (20-21).

11. After Edison sold the Property, its purchaser Mary O'Donnell or an affiliate had a consultant evaluate the Property.  DeLisle Pharmacia Aff., Exh. 10, CES October 1995 Report.

12. The consultant informed Mary O'Donnell that the contamination it identified had to be reported to DEP. Id. at 2.

13. Mary O'Donnell submitted a Release Notification and Notification Retraction Form ("RNF") regarding the Property to the DEP in January 1996. DeLisle Pharmacia Aff., Exh. 11, O'Donnell RNF. The RNF is a notification to the DEP that the Property is contaminated.

14. In response, DEP gave notice that the current owner and operator was a party responsible for responding to contamination on the Property. DeLisle Pharmacia Aff., Exh. 12, NOR.

15. By agreement with a company controlled by O'Donnell, in the 1990s Modern began to use the Property as a laydown and storage area in connection with its performance of construction contracts for parts of the Central Artery/Tunnel Project. DeLisle Pharmacia Aff., Exh. 14, Subcontract Agreement.

16. Among the activities for which Modern and its subcontractors used the Property were storage of new and used structural steel, storage of piles of excavated soil and trash, refueling construction equipment and breaking up the old elevated Central Artery. DeLisle Pharmacia Aff., Exh. 3, Marino Deposition at 55-63.

17. Modern continues to use the Property today. DeLisle Pharmacia Aff., Exh. 3, Marino Deposition at 25.

18. In addition to the right to use the Property, Modern acquired an option to purchase the Property. DeLisle Pharmacia Aff., Exh. 17, Option Agreement at ¶ 7.

19.  Modern subsequently assigned the option to Mystic, and in June 2001, Mystic exercised the option and acquired the Property. DeLisle Pharmacia Aff. Exh. 38, Assignment of Option; DeLisle Pharmacia Aff., Exh. 40, O'Donnell to Mystic Deed.

20.  At the time it acquired the Property, Mystic had full knowledge of the environmental contamination of the Property. See <u>Pharmacia Corporation's Statement Of Material Facts As To Which There Is No Dispute</u>, filed in support of Defendant Pharmacia Corporation's Motion for Partial Summary Judgment on October 24, 2005, at ¶¶ 22, 26-28, 32-34, 36, 49.

21.  The purchase price stated in the deed was $300,000. DeLisle Pharmacia Aff., Exh. 40, O'Donnell to Mystic Deed.

22.  Mystic contends that the cost of acquiring the option from Modern was $20,000,000, but that purported price was "negotiated" by the same individual on behalf of Mystic and Modern, and no money changed hands. DeLisle Pharmacia Aff., Exh. 32, Grela Deposition at 24-26, 28-29.

23.  An appraisal conducted close to the time of the acquisition indicated that the value of the property, exclusive of contamination, was $17,390,000. DeLisle Opposition Aff., Exh. 2, 2001 Appraisal at 4.

24.  Mystic is now actively attempting to sell the Property; its experts in the litigation have estimated the "clean" value of the Property to be $19,200,000, and in its current condition, $9,160,000 to $15,240,000. DeLisle Pharmacia Aff., Exh. 48, Bouchard Report at 2, 138, 140-141.

25.     Bids received for the Property have ranged from $10,200,000 to $34,000,000. DeLisle Pharmacia Aff., Exh. 42, Offering Brochure at "Summary of Best & Final Offers to Purchase" and "Summary of Initial Offers to Purchase."

26.     After Mystic acquired the Property, a consultant it retained to perform an environmental and regulatory assessment advised it that, as the site owner, it would be responsible for following the detailed steps mandated by Massachusetts law for responding to the environmental contamination known to exist on the Property. DeLisle Opposition Aff., Exh. 3, ESS Report at 13-14.

27.     Despite receiving this advice, Mystic incurred no costs to "treat or remove contaminated soil or ground water". DeLisle Aff., Exh. 32, Grela Deposition at 103.

28.     Mystic failed to meet every deadline imposed by chapter 21E and the Massachusetts Contingency Plan. DeLisle Opposition Aff., Exh. 1, Collins Aff. at ¶ 8 and documents cited therein.

29.     During Mystic's ownership, far from being remedied, environmental contamination at the Property became worse as a result of Modern's operations. Specifically, dumping of contaminated soils and debris on the Property by Modern violated not only Chapter 21E but other Massachusetts laws forbidding operation of unpermitted solid waste landfills or transfer stations. DeLisle Aff., Exh. 1, Collins Aff. at ¶ 7 and documents cited therein; DeLisle Opposition Aff., Exh. 1, Collins Aff., Exh. 1.B., ACOP; DeLisle Opposition Aff., Exh. 1, Collins Aff., Exh. 1.C., February 11, 2003 Letter.

30.     As a result, DEP assessed a fine of $35,000 against Modern and required Modern to implement a series of corrective measures. DeLisle Opposition Aff., Exh. 1, Collins Aff., Exh. 1.B., ACOP.

31.     Independent from the violations and releases identified by DEP, testing by Pharmacia's consultant also showed that other releases of hazardous materials and oil from Modern's operations during Mystic's ownership contaminated the Property. DeLisle Opposition Aff., Exh. 1, Collins Aff. at ¶ 6, and documents cited therein.

32.     Woodard & Curran viewed the Property on June 29, 2004 and September 8, 2004 and, in the course of those views, took samples of soils at or near the surface in areas where lead paint was flaking or rusting from stored metal and where the Property was being used to break up the lead-painted former elevated central artery. The results of these samples showed concentrations of lead above levels required to be reported to DEP. DeLisle Opposition Aff., Exh. 1, Collins Aff., Exh. 1.A. at 9-10.

33.     They also showed concentrations of oil above levels required to be reported to DEP in an unpaved area where petroleum products were stored and apparently used to refuel construction equipment. DeLisle Opposition Aff., Exh. 1, Collins Aff., Exh. 1.A. at 10-11.

34.     The consultant was able to attribute the contamination to Mystic's period of ownership and Modern's period of operations because the location of the contaminated soil was near the surface and near to ongoing operations likely to give rise to the type of contamination identified. DeLisle Opposition Aff., Exh. 1, Collins Aff., Exh. 1.A. at 10-12.

35.     Monsanto was formed in 2000. Affidavit of Elisabeth M. DeLisle in Support of Monsanto Company's Motion to Dismiss ("DeLisle Monsanto Aff."), Exh. B, Interrogatory Responses at 7-9; DeLisle Monsanto Aff., Exhs. I & J.

36.     Monsanto never owned, operated or had any other connection with the Property. DeLisle Monsanto Aff.. Exh. B, Interrogatory Responses at 2.

37. Monsanto is not the successor to the chemical manufacturing business that operated at the Everett site. DeLisle Monsanto Aff., Exh. B., Interrogatory Responses at 7-9.

38. Mystic commenced this action under 21E in Massachusetts Superior Court in December 2003. DeLisle Monsanto Aff., Exh. A.

39. Before doing so, it conducted the pre-litigation procedures that are a prerequisite to seeking response costs under chapter 21E with Pharmacia but not with Monsanto. DeLisle Pharmacia Aff., Exh. 27.

40. In response to Mystic's complaint, Pharmacia sought contribution in a counterclaim against Mystic and a third-party claim against Modern. DeLisle Opposition Aff., Exh. 4, Pharmacia Answer and Counterclaim.

41. Modern filed no responsive claims against Pharmacia. DeLisle Opposition Aff., Exh. 5, Mystic and Modern Answer.

### RESPONSE TO MYSTIC'S AND MODERN'S FACTUAL ACCOUNT

Mystic and Modern violated Local Rule 56.1 by failing to include with their Motion "a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried." That fact is, in itself, grounds for denial of the Motion. The "Facts" section of the Memorandum submitted in support of the Motion is in no sense such a statement but is rather a mix of quotations from documents, factual propositions and argumentative characterizations. Nevertheless, in the spirit of the Local Rule, Pharmacia will respond to those propositions that might qualify as statements of fact had they been included in the required statement. Initial page references are to the page of Mystic's and Modern's Memorandum where the propositions appear.

1.  **Page 1 et seq.** Pharmacia disputes the repeated statements that Monsanto owned the Property, conducted operations on the Property and caused contamination on the Property during the period 1929 through 1975. Monsanto was not incorporated and did not exist until 2000. DeLisle Monsanto Aff., Exh. I.

2   **Page 2; Page 7, ¶ 5.** Even if the word "Pharmacia" is substituted for the word "Monsanto," Pharmacia disputes the statement that the referenced contamination is attributable to operations conducted by Pharmacia between 1929 and 1975. That period was only a portion of the time the Property was used for chemical manufacturing. Mystic's and Modern's consultant has conceded that "[i]t is not possible to discern which operation was the source of the contamination or when the contaminants were released." Mystic & Modern Memo, Ex. I, at 7.

3.  **Page 3.** Even if the word "Pharmacia's" is substituted for the word "Monsanto's," Pharmacia disputes the statement that surface water sediment contamination was attributable to activities during Pharmacia's operations at the Property. The referenced support for the proposition contains no such statement. See Mystic & Modern Memo, Ex. J, at 4. The only sampling of the sediments does not support any such statement. Id., Ex. E, at 33-34.

4.  **Page 4.** Pharmacia disputes the statement that the first two listed items are separate environmental studies of the Property. It is evident on their face that one merely transmits material contained in the other. Compare Mystic & Modern Memo, Ex. E with id. Ex. P.

5.  **Page 5.** Even if the word "Pharmacia" is substituted for the word "Monsanto," Pharmacia disputes the statement that Pharmacia "finds an acceptable alternative to mix the existing sulfur contaminated soil layer with adjacent layers. . ." The referenced document makes

no reference to what Pharmacia currently considers acceptable but merely states that, in 1980, when mixing to reduce concentrations likely was not forbidden by any law, Pharmacia considered mixing "an" alternative, not necessarily an acceptable alternative.  Mystic & Modern Memo, Ex. B.

  6. **Page 7, ¶ 1.**  Pharmacia disputes the statements concerning contamination of the Property by plasticizers.  Mystic & Modern Memo, Ex. L, including tables & plates.

  7. **Page 7, ¶ 2.**  Even if the word "Pharmacia" is substituted for the word "Monsanto," Pharmacia disputes the statement that the document attached to Mystic's and Modern's Memorandum as Exhibit N shows that additional monitoring wells were installed on Pharmacia's neighboring Gateway site.  Mystic & Modern Memo, Ex. N.

          Respectfully submitted,

          /s/ John M. Stevens
          John M. Stevens (BBO # 480140)
          Adam P. Kahn (BBO # 561554)
          Elisabeth M. DeLisle (BBO #658067)
          Foley Hoag LLP
          155 Seaport Boulevard
          Boston, Massachusetts  02210
          (617) 832-1000
          jstevens@foleyhoag.com

Dated:  November 7, 2005