# EXHIBIT 1.A.

## (1 of 2)

# Mystic Landing, LLC
## v.
# Pharmacia Corporation and
# Monsanto Company

### Expert Opinion of
### R. Duff Collins, P.G., LSP



*Prepared by:*
Woodard & Curran
980 Washington Street, S325N
Dedham, Massachusetts 02026

WOODARD & CURRAN

TABLE OF CONTENTS

SECTION                                                          PAGE NO.

1.0    INTRODUCTION ................................................................................. 1

2.0    BACKGROUND INFORMATION ................................................... 4

  2.1 Site Location and Description................................................... 4

  2.2  Site Operations......................................................................... 4

  2.3  Regulatory History................................................................... 4

  2.4  Site Setting............................................................................... 6

3.0    OPINIONS ......................................................................................... 9

  3.1  Opinion 1 .................................................................................. 9

  3.2  Opinion 2 .................................................................................. 13

  3.3  Opinion 3 .................................................................................. 15

  3.3  Opinion 4 .................................................................................. 18

4.0    REFERENCES ................................................................................... 24

APPENDICES

Appendix A:   Curriculum Vitae, R. Duff Collins
Appendix B:   Figure 1, Aerial Photograph of Site
              Figure 2, Site Locus
Appendix C:   Site Photographs
Appendix D:   Figure 3
Appendix E:   MCP Deadline Timeline

# 1.0 INTRODUCTION

I, R. Duff Collins, P.G., LSP of Woodard & Curran, Inc., have been retained by Monsanto Company and Pharmacia Corporation, to evaluate the environmental conditions at the property owned by Mystic Landing, LLC (the Mystic property or the "Site") located at Alford Street and Broadway in Everett and Boston, Massachusetts, and to determine what actions are necessary and reasonable under the Massachusetts Contingency Plan (MCP; 310 CMR 40.0000) to respond to those conditions.

Founded in 1979, Woodard & Curran is an environmental engineering and science firm that conducts a wide array of engineering services including remedial actions for contaminated sites, design and construction of waste management and treatment facilities, and operation of various environmental protection and property cleanup facilities.

Woodard & Curran has been managing sites regulated under the MCP since the inception of the privatized program in 1993. Woodard & Curran has extensive experience in assessing environmental contamination at commercial and industrial sites and at landfills and in developing remedial solutions under the MCP and related regulations for those sites. The Woodard & Curran team has a track record for identifying and developing innovative, yet practical solutions. The result has been environmentally sound, cost-effective site closures that maximize reuse of real property.

I am a Senior Vice President at Woodard & Curran where I have been employed since 1996. With over 20 years in the environmental consulting practice, my experience includes managing and conducting field investigations, feasibility studies, and remediation at a variety of hazardous waste sites. I have been a Licensed Site Professional (LSP) in Massachusetts since the beginning of the privatized state LSP cleanup program in 1993. My expertise includes knowledge of the Massachusetts General Law c. 21E and in particular the Massachusetts Contingency Plan and hazardous material release response action regulations. I have managed, directed, and provided senior technical guidance and regulatory support for a large number and variety of response action projects. In particular, many of these projects include assisting owners of contaminated sites to achieve regulatory closure and property reuse as soon as practicable under the MCP.

I am the current Chair of the Strategic Planning and Steering Committee, and Past President and Director, of the LSP Association (LSPA). I am an active member as well as the past Chairman of both the LSPA Loss Prevention and LSPA Technical Practice Committees, and was LSPA liaison to, and a leading active member of, the Massachusetts Department of Environmental Protection (MADEP) Bureau of Waste Site Cleanup (BWSC) External Audit Workgroup during its lifespan.

I have authored published articles and given presentations on subjects such as the LSP Standard of Practice as assessed via the DEP audit program; transforming environmentally impaired sites to productive new uses; chemistry of urban fill soils including background PAH and metal concentrations in soil; stormwater sampling; privatized risk based decision making in Massachusetts hazardous waste site cleanups; and several others as listed on my Curriculum Vitae (Appendix A)

I hold a Bachelor of Science degree in Geology from Denison University and a Masters of Science degree in Geology from Boston College. My Curriculum Vitae describing my areas of expertise, education, publications, and my testimony and deposition experience is attached to this report as Appendix A.

The hourly rate applicable to my services in this matter is $195 for preparation and $225 for deposition/trial activities.

My assignment was to perform an assessment and evaluation of environmental conditions and regulatory compliance status and future MCP compliance obligations for the Site.

In forming the opinions and conclusions presented in this report, I relied upon the following:

- o  Documents, technical reports, written material, deposition transcripts, maps, correspondence, and other materials produced in this case;

- o  Site visits to the Site and surrounding area in 2004 and 2005;

- o  Conversations with personnel at Monsanto Company;

- o  My education and training;

- o  My personal experience as a project and program manager on MCP response action matters and related hazardous waste investigations and engineering and remediation projects; and

- o  Information contained in textbooks, journals, and government publications pertaining to hazardous waste investigations and remediation and the applicable regulations.

2

I reserve the right to supplement my opinion throughout the discovery period and trial.


R. Duff Collins, P.G., LSP
Senior Vice President

# 2.0  BACKGROUND INFORMATION

## 2.1 Site Location and Description

The Site is located at the intersection of Alford Street/Broadway (State Route 99) and Chemical Lane in Everett and Boston, Massachusetts, adjacent to the Mystic River. The Site is comprised of 35 acres and contains an office trailer complex, garage, storage sheds and containers. The majority of the property is unpaved and undeveloped.

The site is bordered by a Massachusetts Bay Transit Authority (MBTA) facility to the north, MBTA railroad tracks and the Gateway Center Mall to the west, the Mystic River to the south, and undeveloped land and Broadway/Alford Street to the east. The Mystic electric power generating station is located opposite the site just east of Alford Street.

An aerial photograph taken on July 9, 2004, Figure 1, of the Site is provided in Appendix B. A Sanborn aerial photograph (2005) showing the surrounding area is shown as Figure 2.

## 2.2  Site Operations

The Site history documented by Mystic's consultant, Rizzo (Rizzo, 2001), includes ownership by chemical companies from the late 1800s through the early 1980s. Chemical storage and production occurred on the property until 1975, when chemical operations were curtailed on the Site (Perkins Jordan Inc., 1982). The Site was sold to Boston Edison in 1982 and was acquired by O'Donnell Sand & Gravel, Inc. The Site was used to store waste rock resulting from the construction of the Deer Island Outfall project and as a construction yard for Modern Continental, Inc. (Consulting Engineers & Scientists, Inc., 1997). Mystic Landing LLC (Mystic) acquired the Site in June 2001. Modern Continental continues to use the Site as a construction and demolition material and debris storage and staging yard.

## 2.3  Regulatory History

A Release Notification Form (RNF) was submitted to MADEP by O'Donnell Sand & Gravel on January 18, 1996 for a release of arsenic and lead in soil, as well as field measurements of groundwater with a pH of 1.5, indicating an aqueous sample with potentially corrosive properties.

MADEP assigned a Release Tracking Number (RTN) 3-13341 and issued a Notice of Responsibility (NOR) in February 1996 indicting that an immediate assessment was necessary to respond to the low pH in groundwater (MADEP, 1996).

A Phase I Initial Site Investigation Report was submitted to the MADEP on January 15, 1997 (Consulting Engineers & Scientists, Inc., 1997). The report indicated that lead and arsenic were present in soil and groundwater above reportable concentrations, and that the pH was below 2.5 in isolated portions of Site groundwater. The Site was Tier Classified as a Tier II Site.

According to the downloadable MADEP MCP database (July 28, 2005), a Notice in Delay in Meeting the Phase II Deadline was received by the department on February 17, 1999. No other documentation regarding MCP response actions or response action submittals are present in database records available from MADEP.

A Phase II report was prepared by Rizzo Associates in 2001 and was submitted to counsel to Modern Continental. The report stated that, since the Phase I report was submitted in January, 1997, a Phase II – Comprehensive Site Assessment and Phase III – Remedial Action Plan or a Response Action Outcome were due to the MADEP in January 1999, the Phase IV – Remedy Implementation Plan (RIP) was due to the DEP in January 2000, and an RAO or Temporary Solution was due in January 2001 (Rizzo, 2001). Peter M. Grela, the Mystic Landing, LLC designee, in the deposition dated March 14, 2005, stated that he did not know whether Mystic had filed the Phase II Comprehensive Site Assessment, the Phase III Remedial Action Plan or the Phase IV Remedy Implementation Plan (U.S. District Court - Deposition by Peter M. Grela, 2005). Mr. Grela was asked whether Mystic has had any communications with the Department of Environmental Protection since June 2001 to which he responded that he did not know. He did not believe that Mystic Landing had reported any conditions to the Department of Environmental Protection in or after April 2002 (U.S. District Court - Deposition by Peter M. Grela, 2005). Mr. Grela also stated that he did not believe that Mystic took any actions to remove or treat contaminated soil or groundwater between June 21, 2001, and the present on the subject property (U.S. District Court - Deposition by Peter M. Grela, 2005).

## 2.4 Site Setting

A Phase II Field Investigation Report was prepared for counsel to Modern Continental regarding Modern Continental's Everett staging yard by Rizzo Associates dated June 19, 2001. The CES 1997 Phase I Initial Site Investigation report, the Rizzo 2001 report, and various other sources provide information regarding site geology, hydrogeology, and chemical compounds present at the Site.

GEOLOGY

The soils at the Site are comprised of approximately twelve to fifteen feet of artificial fill overlying native peat, sand and marine clay. According to the Bedrock Geology Map of Massachusetts, the Site is underlain by the Cambridge Argillite, a weakly metamorphosed, laminated, late-Proterozoic mudstone. Bedrock was not encountered in the borings by Rizzo or CES and depth to bedrock was not determined. No bedrock outcrops are known to exist at or in the immediate vicinity of the Site (Rizzo, 2001).

The unconsolidated soils that were encountered in the investigative borings can be split into three stratigraphic layers:

- **Surficial fill** (0-7 ft below ground surface (bgs)): During the mid-1990s, the property was used as a storage area for Deer Island glacial till and tunnel muck (excavations) from the construction of the Deer Island Outfall project (Consulting Engineers & Scientists, Inc., 1997). Between CES' initial investigation in 1995 and follow-up investigation in December 1996, a layer of Deer Island fill approximately one to three feet thick was placed on the Site. In mid-1999, the majority of the waste rock/tunnel muck was used as part of the construction of the Gateway Center Mall, to cap the Pharmacia property located across the track from and to the west of the Site. However, a one to seven- foot layer of low permeability waste rock and tunnel muck fill remains at the Site (Rizzo, 2001).

- **Historical fill** (1-15 ft bgs): The fill was observed to contain varying percentages of sand, silt, gravel, ash, cinder, concrete, and metal and wood debris, and the color ranged from brown/ black to maroon and yellow (Rizzo, 2001). From the late 1800s through 1935, fill was placed at the Site to create useable land area in what was marshland associated with the Mystic River (Rizzo, 2001). Records documenting licenses for historical filling events from the late 19th century through 1943 indicate that a large portion of the current property was filled in by the Boston & Maine Railroad, Cochrane Chemical Company, Merrimac Chemical Company and Monsanto Chemical Company.

- **Native soil** (encountered at 10-15 ft bgs): The native soil was observed to consist of black/ grey to green, moist to wet peat, silt, sand and marine clay. The

thickness of this unit was not determined during the subsurface investigations
performed by Rizzo and CES.

## HYDROGEOLOGY

Depth to groundwater was observed to range from approximately 3 to 8 feet bgs (Rizzo,
2001). The saturated zone at the Site was observed to vary from seven to nine ft bgs
(Consulting Engineers & Scientists, Inc., 1997). From the triangulation of groundwater
elevations in the monitoring wells, CES identified the groundwater flow to be southerly
toward the Mystic River (Consulting Engineers & Scientists, Inc., 1997). Groundwater
may discharge to the Mystic River during periods of low tide, but the groundwater flow
direction is likely to be affected by the tidal changes known to influence the Mystic
River. Observations during the development and sampling of wells installed by Rizzo
indicate that the unconsolidated subsurface materials at the Site have a low to moderate
permeability (Rizzo 2001).

The Mystic River abuts the Site to the south and southwest. No other surface water
features were identified at or within 500 ft of the Site.

## CHEMICAL TEST RESULTS

Historical soil and groundwater testing has been conducted at the Site by various
consultants (Dames & Moore, 1980a; Dames & Moore, 1980b; Dames & Moore, 1982;
Perkins Jordan, 1982; Consulting Engineers & Scientists, Inc., 1997; Rizzo, 2001)
Laboratory analysis of soil samples from certain isolated locations within the fill
materials detected volatile organic compounds (VOCs), polycyclic aromatic
hydrocarbons (PAHs), metals and extractable petroleum hydrocarbons (EPH) above MCP
RCS-1 Reportable Concentrations, and arsenic and lead were detected above MCP Upper
Concentration Limits (UCLs). Data generated from previous investigations at the Site
indicate that compounds were typically found in soil samples collected from
approximately 5 to 8 feet bgs. PAHs were found predominantly in the northeastern
portion of the Site, and VOCs, although less widely distributed than PAHs, were also
commonly found in the northeastern portion of the Site (Rizzo, 2001). Metals were
heterogeneously distributed across the Site, with arsenic, lead, chromium and barium
being most commonly detected. Concentrations of arsenic and lead above UCLs were
found in a portion of the central and southeastern areas of the Site. EPH fractional ranges
were most commonly detected in the northeastern and southwestern portions of the Site.

Recent soil analytical results generated from two separate soil sample investigations
conducted by Woodard & Curran in June and September 2004 indicate surface (*i.e.*, 0-6
inches) soil impacts. Lead and petroleum fractions, in particular, have been detected in
surface soils at concentrations above MCP RCS-2 reporting limits. The highest
concentrations of PAHs were present in the northeastern portion of the Site at a

petroleum storage area; concentrations of heavy metals, although variable, were highest in the southeastern and southwestern portions of the Site by stockpile areas.

In the groundwater, VOCs, metals and EPH were detected above MCP RCGW-2 Reportable Concentrations, and arsenic and lead were detected above MCP UCLs at certain locations. Most VOC exceedances were in the immediate vicinity of Monitoring Well RIZ-4. Metals were distributed over much of the Site, with barium and arsenic being most common. Arsenic UCL exceedances were predominantly found in the southern portion of the Site, whereas lead concentrations in groundwater beneath the western portion of the Site (Well MW-4) exceeded the UCL. EPH was distributed over much of the Site. In addition, groundwater with low pH (2.4-2.8 SU) was observed in the southern portion of the Site.

# 3.0 Opinions

## 3.1 Opinion 1

**Modern Continental's operations have created a new release of Oil and Hazardous Material (OHM) at the Site. Modern Continental and Mystic Landing LLC have not complied with the reporting and response action requirements of the Massachusetts Contingency Plan associated with these releases.**

Woodard & Curran completed a site tour at the Site on June 29, 2004. The purpose of the tour was to visually inspect the property and the activities and uses underway at that time. A repeat visit was conducted on September 8, 2004 to inspect an area of the property that was not made available for inspection during the June 29 visit. An aerial photograph taken on July 9, 2004 is provided as Figure 1 in Appendix B. Copies of photographs made by Woodard & Curran staff during the site tour are provided in Appendix C.

These photos show the presence of construction debris, solid waste including trash bags, wood, metals asphalt and concrete rubble, and various dilapidated equipment and structures (photos 1 through 6, Appendix C). During the June 29 site inspection, several large piles of soil and rubble mixtures labeled asbestos containing materials were present, uncovered, and exposed at the site surface (photos 7 through 12, Appendix C).

SITE INSPECTION

Woodard & Curran's initial activity on June 29, 2004, consisted of a site walkover of the accessible portion of the Site to gain a familiarity with the current Site conditions. The Site was observed to be the location of numerous stockpiles of construction debris, including soil, structural steel, asbestos-containing soil, concrete, and piping. Much of the property was observed to be operated both as a construction materials staging and as a construction and demolition waste material solid waste disposal transfer station. Recent activities conducted at the Site were observed to include storage and dismantling of the steel reinforced concrete decking and cutting and crushing of the green steel support beams, both associated with the removal of Boston's I-93 Central Artery upper deck. During the site tour, it was apparent that the potential existed for a release of oil or hazardous material to have occurred as a result of the debris storage and handling operations. Staining of the surface soil was observed in several locations. Surface soil over a portion of the Site appeared to consist of the gravel and soil 'tunnel muck'.

On June 29, 2004, soil sample locations were flagged and photographed. During the soil sampling activities, a total of 32 near surface soil samples were obtained and containerized for off-site laboratory analysis. The soil sample at each sample location was a sample of soil obtained from depths ranging from 0 to 6 inches. The soil samples were obtained using hand trowels and placed in zip-lock plastic bags and labeled S-1

through S-32. The hand trowels were decontaminated using a soap solution and then rinsed with distilled water prior to obtaining each soil sample.

The W&C sampling team subsequently prepared 32 representative soil sample aliquots in glass sample jars. These representative soil samples were then transported in a refrigerated cooler, under a chain of custody, to Alpha Analytical laboratory for analyses. The soil samples were analyzed for Extractable Petroleum Hydrocarbons (EPH) with Target Analytes and Metals by the MADEP Compendium of Analytical Methods (CAM) Methodology.

The northern portion of the Site could not be accessed for inspection or sampling during the June sampling event due to active heavy equipment operations in the area at the time. On September 8, 2004, the site tour of the northern portion of the Site was completed.

Similarly as on June 29th, the initial activity consisted of a site walkover by W&C staff to gain a familiarity with the current Site conditions and identify potential soil sample locations. The soil sample locations were flagged and photographed. During the soil sampling activities, a total of 12 near surface soil samples were obtained and containerized for off-site laboratory analysis. The soil sample at each sample location was a sample of soil obtained from depths ranging from 0 to 6 inches. The soil samples were obtained using hand trowels and placed in labeled zip-lock plastic bags and labeled S-33 through S-44. The hand trowels were decontaminated using a soap solution and then rinsed with distilled water prior to obtaining each soil sample.

The W&C sampling team subsequently prepared 12 representative soil sample aliquots in glass sample jars. The 12 representative soil samples were transported in a refrigerated cooler, under a chain of custody, to Alpha Analytical Laboratory for analyses. The soil samples were analyzed for (EPH) with Target Analytes and Metals by the MADEP CAM Methodology.


**RESULTS OF INVESTIGATION**

**Soil Samples S-28, S-29 and S-30.** Three near surface soil samples were obtained in the vicinity of a stockpile of structural steel that was the result of Modern Continental's Central Artery demolition activities. Photographs 13, 14 and 15 (Appendix C) show the steel stockpile and ground material, located on the property as shown in Figure 3 (Appendix D). Three soil samples were obtained on June 29, 2004, adjacent to the southern face of the stockpile. The soil samples were submitted under chain of custody to Alpha Analytical Laboratory for analysis of heavy metals. The laboratory report documents that the concentration of lead in each of the three soil samples, ranging from 810 to 4,900 milligrams per Kilogram (mg/kg), which is in excess of the RCS-2 Reportable Concentration (600 mg/kg). The lead concentrations in the soil samples were directly attributable to the paint and rust that was flaking off the painted structural steel members onto the soil adjacent to and underneath the stockpile. Mystic/Modern Continental was provided these analytical results on October 13, 2004.

**Soil Sample S-39.**  During the field investigation completed on September 8, 2004, Woodard & Curran observed an area of the Site where Modern Continental was storing petroleum products.  Several drums of transformer fluid were observed in the area and two above ground storage tanks were also observed in the area.  Photographs 16 and 17 show the site conditions observed on September 8, 2004.  Numerous instances of petroleum stained soil were observed in the area and a soil sample, labeled S-39, was obtained in the vicinity of the above ground storage tanks as shown in Photograph 16 (Appendix C).  The soil sample was submitted under chain of custody to Alpha Analytical Laboratory for analysis of EPH by the MADEP EPH Method.  The laboratory report documents that the concentration of petroleum hydrocarbons, specifically both the C19-C36 Aliphatic range (27,500 mg/kg) and the C11-C22 Aromatic range (2,840 mg/kg), exceed the applicable RCS-2 Reportable Concentrations of 5,000 mg/Kg and 2,000 mg/kg, respectively.  Mystic/Modern Continental was informed of these analytical results on October 13, 2004.

**Soil Sample S-42.**  During the field investigation completed on September 8, 2004, Woodard & Curran observed an area of the Site where Modern Continental was stockpiling used reinforcing steel rods (see Photograph 18, Appendix C).  A soil sample was obtained by Woodard & Curran from the near surface soils (see Photograph 19, Appendix C) in the immediate vicinity of the stockpiled steel at the location shown in Figure 2 (Appendix D).  The soil sample, labeled S-42, was submitted under chain of custody to Alpha Analytical Laboratory for analysis of MADEP metals.  The laboratory report documents that the concentration of lead in the soil sample (720 mg/Kg) is in excess of the RCS-2 Reportable Concentration (600 mg/Kg).  The lead concentration in the soil sample appears directly attributable to the material (paint/rust) that was flaking off the steel reinforcing rods onto the soil adjacent to and underneath the stockpile resulting from Modern Continental's site activities of the time.  Mystic/Modern Continental was informed of these analytical results on October 13, 2004.

## FINDINGS

Woodard & Curran's review of available USGS and MASS GIS mapping information indicates that the Site is located at least 500 feet from any residential dwelling, residentially-zoned property, school, playground, recreational area or park.  The Site is also not within the geographical boundaries of a RCGW-1 groundwater resource area.  As such, the MADEP must be notified of any oil and hazardous material (OHM) compound concentration in the Site soils that equals or exceeds the MCP Reporting Category RCS-2 for that compound within 120 days of the owner or operator of the property obtaining such knowledge.

During the investigation, soil samples were obtained from at or very near the surface and analyzed for evidence that OHM had been released to the environment at the Site from recent operations.  As a result of the field investigation performed by Woodard & Curran, multiple instances were documented where the concentrations of OHM in soil samples obtained from the Site by Woodard & Curran exceeded the RCS-2 Reportable

11

Concentration for specific compounds.  The laboratory report confirms that in at least three instances, Modern Continental's operations at the Site have resulted in releases of OHM to the soils on the Site that rise to the level of requiring notification to the MADEP under the reporting requirements of the MCP (310 CMR 40.0300).   It is my opinion and belief that Mystic Landing and/or Modern Continental were required to notify the MADEP under the MCP within 120 days of obtaining knowledge of these conditions at the Site.

### 3.2 Opinion 2

**Mystic Landing LLC is not in compliance with the response action deadlines or other regulatory requirements under MGL c. 21E and the Massachusetts Contingency Plan (MCP; 310 CMR 40.0000) for the reported release of Oil and Hazardous Materials (OHM) at the Alford Street property identified by MADEP as RTN 3-13341 .**

Mystic Landing LLC (Mystic) acquired the Site in June 2001.   It is my understanding and belief that Mystic is the current owner of the Site.

Mary O'Donnell of O'Donnell Sand and Gravel obtained knowledge of the presence of a release of OHM and reported the release to the MADEP via transmittal of a Release Notification Form dated January 18, 1996.  MADEP assigned RTN 3-13341 to the site (CES, 1997).

CES, O'Donnell Sand and Gravel's consultants, performed initial response actions and prepared a Phase I - Initial Site Investigation report in January 1997.  CES assigned a Numerical Ranking System score of 266 points for the Site and Tier Classified the Site as a Tier II Disposal Site (Consulting Engineers & Scientists, Inc., 1997).  Tier II is the lowest scoring level and least stringent of the applicable Tier Classifications and requires the least amount of review/oversight by the DEP.  The initial Tier II Classification was valid for a period of 5 years.  Rizzo Associates reviewed Site conditions and performed supplemental testing in April and May of 2001.  The Rizzo 2001 report identified the RTN and reporting dates and the date of Tier Classification (Rizzo, 2001; p. 3-4).  It is my understanding and belief that the Rizzo assessment was performed on behalf of lawyers for Mystic and Modern Continental in April and May of 2001 prior to Mystic's purchase of the property.

The MCP requires that necessary and appropriate response actions be conducted at disposal sites within a specific set of defined deadlines.   One year after notification of the release to MADEP (or January 18, 1997), an Initial Site Investigation and Tier Classification must be completed (MCP; 310 CMR 40.0404); these were received by MADEP on January 17, 1997.  Within two years after Tier Classification (or by January 18, 1999), a Phase II Comprehensive Site Assessment and Phase III Remedial Action Plan must be completed and submitted to MADEP (MCP; 310 CMR 40.0560).   Within one year after that (January 18, 2000), a Phase IV Remedy Implementation Plan must be prepared and a remedy implemented such that a Permanent Solution and Response Action Outcome may be achieved and submitted within 5 years of the Tier Classification (for this Site, January 18, 2002) (MCP; 310 CMR 40.0560).  In addition, if the person(s) undertaking Response Actions at a Tier II Site changes, a Tier II Transfer Submittal must also be transmitted to the MADEP at least 60 days in advance of the effective date of the change (310 CMR 40.0560(8)(b)(1)).

13

The graphic presented in Appendix E summarizes the general Mystic property deadline timeline adapted from MADEP's 2004 factsheet (MADEP, 2004) and contrasts the Mystic Property RTN 3-13341 schedule of deadlines mandated by the MCP. It is my understanding and belief that the Phase II Comprehensive Site Assessment and Phase III Remedial Action Plan were required to be completed on or before January 1999, the Phase IV Remedy Implementation Plan prepared on or before January 2000, and a Response Action Outcome filed by January 2002. It is my opinion and belief that response actions at RTN 3-13341 are not in compliance with the deadlines of the MCP.

After January 2002, the Tier II Classification expired. Without a valid Tier Classification, the site is in non compliance with the MCP at 310 CMR 40.0560. The MCP specifies that response action activities can not be performed without a valid Tier II Classification extension. It is my understanding and opinion that a valid Tier Classification submittal was filed and no subsequent response actions have been performed at the Site.

In addition, DEP records indicate a notice of delay in compliance with the MCP deadlines was filed in 1999 by prior owners of the Site. The MCP states that "Providing a Notice of Delay in Compliance With Deadlines for Tier II Sites does not forgive an RP's, PRP's, or Other Person's noncompliance with deadlines for response actions in 310 CMR 40.0000" (MCP; 40.0560(5)).

14

### 3.3 Opinion 3

**Based on my review of information describing environmental conditions at the Site, response actions to address low pH conditions in an isolated area of Site groundwater and to treat specific areas of metals concentrations above MCP Upper Concentration Limits combined with a Method 3 Risk Characterization are an appropriate approach to achieve a Class A3 Response Action Outcome, which is a "Permanent Solution" under the MCP. The Method 3 Risk Characterization would rely upon a Notice of Activity and Use Limitation with specific reasonable obligations for future activities and uses at the Site that would allow flexibility for future activities and uses at the Site. These activities can be performed for approximately $750,000 to $850,000.**

Environmental conditions have been assessed at the Everett Staging Yard. I am relying on the facts and information provided in the Phase I Initial Site Investigation Report prepared by CES in 1997 (CES, 1997) and Phase II Field Investigation Report (Rizzo, 2001) prepared by Rizzo. These reports identify elevated levels of lead and arsenic in portions of site soil, as well as localized area of groundwater having a low pH and elevated dissolved lead and arsenic concentrations on the southern and far southwestern portions of the property.

The MCP contains performance standards to achieve a Response Action Outcome (RAO; 310 CMR 40.1000). A condition of No Significant Risk must be demonstrated for any foreseeable period of time (310 MCR 40.0900). To determine that a condition of No Significant Risk exists, a characterization of the potential for risk of harm to human health, public safety, public welfare and the environment must be conducted. MCP Method 3 provides the requirements and guidance to conduct a detailed site-specific analysis of potential for risks. For human health, an analysis of the potential for exposures as a result of both current and reasonably foreseeable activities and uses at the property must be conducted. This analysis is documented and present in a risk characterization report. The MCP specifies that certain levels, called Upper Concentration Limits (UCLs), are levels that categorically pose a risk to public welfare. A comparison of the levels present at each disposal site to the UCLs is required.

It is very common at MCP Disposal Sites, particularly in urban settings, that the potential for risk as a result of exposure that may result from future activities and uses be managed via implementation of one or more Activity and Use Limitations. As of July 2005, over 1000 RAOs with AULs (specifically, Class A3 RAOs) had been filed with DEP. Further, A Class A3 RAO was identified by Rizzo Associates in a May 15, 2001 letter to counsel for Mystic LLC (Rizzo, 2001) to allow closure of this Disposal Site off Alford Street.

Rizzo Associates identified an estimated 1650 cubic yards of soil with certain metals (Pb and As) concentrations in excess of Upper Concentration Limits (Rizzo, 2003; p. 5). Treatment of metals concentrations in these specific subsurface areas would result in the elimination of UCL exceedances and facilitate demonstration of a condition of No Significant Risk to public welfare at the property.

A MCP Method 3 risk characterization of the potential for risk of harm from current activities and uses resulting from potential exposure to soil and groundwater would be performed. The tunnel muck layer of surficial fill at the property has been identified as relatively uncontaminated (Rizzo, 2001) and "the Site is effectively capped by a one to seven foot layer of poorly permeable tunnel muck" (Rizzo, 2001, p 16). As the tunnel muck layer is generally uncontaminated and effectively eliminating exposure to subsurface impacted soils, minimal potential for current exposure exists. An AUL would be placed on the property to place an obligation to manage and/or assess potential future exposures and to require proper management of future excavations of soils. With an AUL, many future property reuse or redevelopment options are available. A future updated Method 3 risk assessment could be completed to identify that a condition of No Significant Risk has been achieved in a manner that is tailored to future Site use, and the Site could maintain the Class A-3 RAO.

Therefore, response actions appropriate to achieve a condition of No Significant Risk and a Permanent Solution under the MCP include:

1. Neutralize low pH groundwater in the southern end of the property;
2. Stabilize or otherwise manage metals concentrations that exceed Upper Concentration Limits (UCLs) in soils.
3. Perform a Method 3 risk characterization for current activities and uses; and
4. Implement an Activity and Use Limitation to manage potential future risks from future activities and uses and apply obligations for proper management of soils if excavated in the future. The AUL would not need to prohibit broad categories of future uses, e.g., multi-tenant residential or commercial use.
5. File appropriate response action documentation with the MA DEP.

It is my opinion that remediation of these areas of elevated arsenic and lead concentration, coupled with pH adjustment of groundwater in to isolated area of low pH and implementation of a Notice of Activity and Use Limitation are reasonable and appropriate response actions to achieve an RAO under the MCP.

Woodard & Curran has evaluated the costs to conduct the above response actions. These MCP response action activities can be performed for a cost of approximately $750,000 to $850,000. In 2001, Rizzo provided a cost estimate of $810,000 to achieve a Class A3 RAO (Rizzo, 2001).

More recent cleanup cost estimates from Rizzo Associates (such as October 10, 2003 letter) include costs for construction/redevelopment that are not based solely on remediation response activities required to achieve a reasonable permanent solution under the MCP but include specific costs associated with and required only because of specific development activity. Rizzo Associates identified an estimated 1650 cubic yards of soil in excess of Upper Concentration Limits. As described above, soil in excess of UCLs would need to be remediated to achieve a Class A-3 RAO. However, Rizzo Associates also identified an additional 25,000 cubic yards of 'contaminated fill' that would need to be displaced and then managed to facilitate a particular hypothetical development but for which treatment or removal is not needed to achieve an RAO.

16

It is my opinion that removal of soils beyond areas of UCL exceedances is not required to achieve a Class A3 RAO at this Site.

Many strategies are used to minimize earthwork associated with site development and other improvements at properties in urban and/or contaminated areas. Tactical choices regarding the location of buildings, surface and subsurface utilities, parking areas, types of foundations, and grading and layout of site features are routinely made in light of the cost-benefit between final developed property use/value and premium costs as a result of the earthwork activities needed to achieve the end use. Reasonable developers find the "best fit" equation for site work and return on development investment made. Impacted fill materials – so-called urban fill- are present throughout the Boston metropolitan area and as such, most development projects and developers have these cost-benefit analyses conducted to facilitate the highest end value for the development project. The earthwork beyond the areas of UCL exceedances does not constitute MCP required cleanup, but an economic model driven development construction choice.

## 3.3 Opinion 4

**Groundwater flow information developed for the Site and both groundwater flow and disposal site boundary information developed for the Gateway Property indicate the presence of impacted soil and groundwater at the Site is not a result of past migration from the Gateway Property. These data also indicate that the Gateway Property is not currently acting as a continuing source of contamination to the Site.**

Woodard & Curran performed a review of environmental reports and related documentation prepared for both the Gateway Property and the Mystic property. These documents included summaries of extensive site investigations, remedial implementation and MCP closure activities for the Gateway Property and site investigations at the Site.

**Gateway Property Summary**

The Gateway Property was occupied by a chemical manufacturing facility from the 19th century until the early 1990s. Historical operations included the production of acids, dyes, lacquers, silica, and plasticizers (GZA 1993). The property is located northeast of the confluence of the Malden and Mystic Rivers. Adjacent to the southwest corner of the property is the Amelia Earhardt Tidal Dam (building constructed in 1966). The remaining portion of the property is bound by the MBTA railroad tracks to the south/southeast and Route 16 to the north/northeast. The property has been effectively redeveloped for use as retail space (Gateway Mall) and the retail buildings are surrounded by paved parking and roadways.

During the environmental investigations performed at the Gateway Property by GZA, ICF Kaiser, O'Reilly, Talbot & Okun Associates, Inc. (OTO), and others, the Gateway property was separated into several areas for focused investigations based on location and historical use. These areas included: the Plasticizer Area (which includes the Therminol Furnace, Plasticizer/ Storm Water Lagoon, Plasticizer Storage Area and 409 Building subareas), the Manufacturing and North Fill Areas, the Fund Land Area, Mystic View, Well 5, Tidal Flats, and the Cape Cod Area. Each of these areas was determined to have been impacted by a release of oil and/or hazardous materials and, with the exception of the Cape Cod Area, subsequently has met the requirements of a Permanent Solution under the MCP. A Class A or B Response Action Outcome (RAO) has been submitted for each area.

### 1) Plasticizer Area

The **Plasticizer Area** (which includes the Therminol Furnace, Plasticizer/ Storm Water Lagoon, Plasticizer Storage Area and 409 Building subareas) consists of the portion of the Gateway property that formerly manufactured, research, developed and stored plasticizer.

During the closure of the Therminol Furnace area, PCB impacted soils were excavated and disposed of off-site. Under MADEP oversight, in 1990, plasticizer and PCB containing sludge and soil were excavated from the bottom of the Plasticizer/ Stormwater Lagoon and

disposed of off-site. The excavated material was backfilled with clean fill and an HDPE cap was installed over the former lagoon area. In addition, PCB and plasticizer impacted sludge was excavated and from a crawl space beneath the former 409 building during its closure in 1992. An impermeable cap was then placed over the remaining impacted soil (OTO 2002).

In 1996, a low permeability slurry wall was installed around the entire impacted area into the underlying clay layer to limit groundwater migration and an engineered cap was placed over the impacted area to prevent vertical infiltration. In addition, four to six feet of soil and asphalt pavement were placed over the engineered cap as part of the redevelopment activities (OTO 2002).

After five years of monitoring, a condition of No Significant Risk for groundwater was attained as concentrations were below UCLs along the interior edge of (and low or non-detect outside) the slurry wall; the data demonstrated that implementation of the slurry wall and cap restricted migration of impacted groundwater. A Class A-4 RAO was submitted in 2002 for the **Plasticizer Area** (under RTN 3-0313), as contaminant levels were not reduced to background, levels in soil beneath the engineered cap still remain above UCLs, an AUL has been implemented and a Permanent Solution has been achieved (OTO 2002).

### 2) **Manufacturing and North Fill Areas**

The **Manufacturing Area** incorporates 40 acres within the central portion of the Gateway property that formerly housed production facilities. Remedial activities completed in this area include excavation and off-site disposal of PCB impacted soil, in-situ stabilization of arsenic, lead, zinc and PAHs in soil, excavation and ex-situ bioremediation of naphthalene impacted soil (with replacement of treated soil into the excavation), and placement of a 3-foot soil barrier over impacted soil (OTO 1997a). During investigation activities, removal and closure of an underground storage tank was performed as part of Immediate Response Actions.

The **North Fill Area** includes the fill area along the northern portion of the Gateway property. Remedial activities completed in this area include excavation and ex-situ bioremediation of naphthalene impacted soil (with replacement of treated soil into excavation), In-situ neutralization of low pH soil and groundwater (increase to 5 SU or greater), and placement of a 3-foot soil barrier over impacted soil (OTO 1997a).

In 1997, a Class A-3 Response Action Outcome was filed for the **Manufacturing and North Fill Area** (under RTN 3-4425) as the remedial actions performed and the implementation of an AUL have achieved a condition of No Significant Risk and a Permanent Solution (OTO 1997a).

### 3) **Fund Land Area**

The **Fund Land Area** is a former tidal flat located adjacent to the Malden River that is present in the western/northwestern portion of the Gateway Property. Between 1917 and 1966, this area was filled with manufacturing by-products and construction debris. Based on

the results of the risk characterization for this area, assuming the land would be accessible to the public, but groundwater use, excavation and development would be restricted, a condition of No Significant Risk was achieved for the Site. This conclusion was based on the implementation of an AUL to provide the necessary restrictions (OTO 1997b).

In 1997, a Class B-2 Response Action Outcome was filed for the **Fund Land Area**, as no remedial actions were required to reach a condition of No Significant Risk; however implementation of an AUL was required to meet the condition of NSR (OTO 1997b).

### 4) Mystic View, Well 5 and Tidal Flat Areas

The **Mystic View** area was formerly marshland, located adjacent to the Malden River. Between the 1930s and 1960s, the area was filled in with manufacturing wastes. Remedial activities performed in this area included in-situ neutralization of low pH soil and groundwater (increase to pH 5 or greater), bioremediation of naphthalene and phthalic anhydride in soil (reduce concentrations below the UCLs), excavation and off-site disposal of buried drums and visibly affected soil, stabilization of arsenic impacted soil (reduction of concentrations below UCL), and placement of a geotextile and soil cover over the entire Mystic View area (OTO 1997c).

The **Well 5** area was formerly used to load product onto railroad cars along the eastern portion of the Gateway property. Separate phase plasticizer product was observed in the subsurface in this area in 1985, however the lateral extent of separate phase product was limited as it was observed in one monitoring well, and not in any surrounding wells (approximately 50 feet away). Product recovery efforts commenced in 1988 and as of 1993, no product was observed in the well. Additional remedial activities implemented include excavation and ex-situ bioremediation of BEHP impacted soil, followed by stabilization of this material to fixate arsenic and zinc, then re-use of the treated material as backfill into the excavation (OTO 1997c).

The **Tidal Flats** area is a tidal mud flat in the southeast corner of the Gateway property where the former NPDES permitted outfall was located. Response actions performed in this area included habitat enhancement by planting salt marsh grass across the upper region to improve ecological conditions and prevent erosion of sediments. Intrusive remedial actions were not performed in this area so as to prevent destroying the ecological communities present (OTO 1997c).

In 1997, a Class A-3 Response Action Outcome was filed for these three areas (under RTN 3-0313) as the remedial actions performed and the implementation of an AUL have achieved a condition of No Significant Risk and a Permanent Solution (OTO, 1997c).

### 5) The Cape Cod Area

The **Cape Cod** area includes the peninsula adjacent to the Malden River along the southern boundary of the property that was historically filled. The primary contaminants in this area are PAHs. Remedial actions performed in this area included excavation and off-site disposal

of impacted soil, installation of H- piles around the perimeter of the impacted area to serve as structural supports for slope stabilization, stabilization of riverbank slopes, placement of a low permeability engineered cap and a geotextile/soil layer over remaining areas, and completion of the area as a low intensity Metropolitan District Commission (MDC) recreational park (O'Reilly, Talbot & Okun Associates, Inc. 1999). This area has not yet achieved a permanent solution.

**Gateway Property – Summary of Geology**
Prior to site re-development in the 1990s, the Gateway property contained fill ranging in thickness from 5 to 15 feet. During redevelopment of the property in the 1990s, an additional 1 to 8 feet of fill was placed across the Site. Beneath the fill at the property are varying layers of organic silt and sand/gravel. With the exception of the 409 Building and Plasticizer Area, underlying the silt and sand/gravel layer and the fill in the remaining portion of the property is a low permeable silty clay unit, ranging in thickness from 2 to 70 feet. Permeability testing of the clay layer prior to the slurry wall construction revealed values between $5.5 \times 10^{-6}$ to $3 \times 10^{-8}$ cm/s. Beneath the clay is, at a minimum, a 5 to 10-foot thick layer of glacial till (ICF Kaiser 1996).

According to GZA's 1994 report, "A bedrock high, formed by a dioritic intrusion, is present from less than 5 to 35 feet bgs in central portions of the site…, and is shallowest in the general vicinity of the former 409 Building and Plasticizer Manufacturing areas….the top of the intrusion is deep enough (i.e. between 25 and 35 feet bgs) such that it is overlain by glacial till and glaciomarine silty clay. In portions of the former 409 Building and Plasticizer areas however, the depth to rock is limited to 5 to 15 feet bgs and the silty clay layer is absent. Depths to bedrock in areas north and south of the intrusion are reported in the range of 70 to 90 feet" (1994b).

**Gateway Property – Groundwater Flow**
Subsurface investigations identified two distinct water bearing units on the Gateway property, separated by a relatively impermeable silt and/or silty-clay layer (GZA 1994b). These layers have been identified as the upper water bearing unit (UWB) and the lower water bearing (LWB) unit. The UWB unit is present across the property within the shallow fill and has a thickness of as much as 10 to 15 feet. The water table within the UWB is located approximately 1 to 10 feet below ground surface (GZA 1994a; 1994b). The LWB unit ranges from 5 to 25 feet in thickness, and consists of outwash sands (southern portion) or glacial till (northern portion) on top of and including the underlying weathered bedrock (GZA 1994b). Groundwater flow within the UWB and LWB zones is generally to the south and southwest towards the Mystic and Malden Rivers, *i.e.,* away from the property owned by Mystic Landing (GZA 1994a; 1994b). GZA reports in 1994 that groundwater flow in the UWB zone was westerly and southerly toward the Malden and Mystic Rivers (away from the property owned by Mystic Landing).

**Mystic Property – Summary of Geology and Groundwater Flow**
The soils at the Mystic property are comprised of approximately twelve to fifteen feet of fill overlying native peat, sand and marine clay. The unconsolidated soils that were encountered in the investigative borings can be split into three stratigraphic layers: (1) a one to seven- foot layer of low permeability waste rock and tunnel muck fill; (2) a layer of fill observed to contain

varying percentages of sand, silt, gravel, ash, cinder, concrete, and metal and wood debris; and (3) native soil was observed to consist of black/ grey to green, moist to wet peat, silt, sand and marine clay (CES 1997; Rizzo 2001a and 2001b).

Depth to groundwater was observed to range from approximately 3 to 8 feet bgs (Rizzo, 2001a). The saturated zone at the Mystic Property was observed to vary from seven to nine ft bgs (CES 1997). From the triangulation of groundwater elevations in the monitoring wells, CES identified the groundwater flow to be southerly toward the Mystic River (CES 1997).

**Opinion**

Based on my review of the various reports and information and briefly summarized above, it is my opinion that soil or groundwater from the Gateway property was not a source of contamination at the Mystic Property, nor is it currently acting as a continuing source of contaminants to the Mystic Property.   The following points illustrate this opinion.

1.  The Mystic Property is located to the east/southeast of the Gateway Property. Groundwater flow at the Gateway Property is to the west/southwest (shallow) and south/southwest (deep) to the adjacent Malden and Mystic Rivers.  Groundwater flow at the Mystic Property is also to the Mystic River, to the south.   Groundwater flow appears to have been in this direction in studies throughout the investigation and remediation time period.  As a result, there is no identified groundwater flow based transport mechanism for contaminants at the Gateway Property to impact the Mystic Property.

2.  Analytical testing has been performed at several locations along the bordering margins of the Gateway and the Mystic Properties.  The MBTA rail presently, and former rail operations have historically, been located between the properties.  Chemical analysis performed by CES and Rizzo at monitoring wells CES-1 and RIZ-5 on the Mystic property, adjacent to the eastern margin of the Gateway property, show results that are consistent with the historical fill placement and operations conducted at the Mystic Property.   Groundwater tests in these Mystic Wells do not indicate the presence of "Gateway type" contaminants (*e.g.* plasticizers).  Contaminant levels in groundwater do not correlate with contaminants previously detected near the eastern margin of the Gateway property such as those measured at well W-5-8.  Further, the nature and extent of impacted soil and groundwater present on the Gateway property has been delineated and managed under the requirements of the MCP.

3.  After several years of groundwater monitoring in the early 1990's, contaminant trends in groundwater at the Gateway property revealed discrete areas of impacted groundwater. Groundwater flow from the most heavily impacted areas (central and western portions) is to the southwest to the Malden River, not towards the Mystic Property.  In addition, areas cross-gradient of the impacted area in the direction of the Mystic property did not reveal contaminant migration.  The Plasticizer area, which exhibited the highest levels of contaminants, has been contained with a slurry wall and is designed to prevent leaching of contaminants through the wall above applicable MCP standards. Monitoring outside the slurry wall, as well as monitoring points within the Gateway property along the

22

southeastern portion of that property (adjacent to the Mystic Property) did not reveal impacted groundwater (GZA 1994b and OTO 2002).

Based on the site investigations performed at the Mystic Property, an area containing low pH (pH less than 5) in groundwater has been documented in the southwestern portion of the Mystic property. Although low pH levels were also observed on the Gateway Property, the areas were discrete and localized, as the areas of low pH on the Gateway property (within Mystic View and North Fill Areas) tended to correspond with the presence of phthalic anhydride process waste in soil. Groundwater from monitoring wells downgradient of the low pH areas (which flow to the Malden River) did not exhibit low pH levels, nor did groundwater in monitoring wells along Gateway's eastern boundary (along the railroad tracks, adjacent to the Mystic Property). This indicates, in my opinion that the area of low pH groundwater on the Mystic Property was not caused by activities at the Gateway property.

Groundwater flow in this area is into the adjacent river, not to the Mystic property. Therefore, this area has not and is not impacting the Mystic property groundwater.

My opinion is supported by the following:

With the exception of the Cape Cod Area, the Gateway property has achieved a Permanent Solution under the MCP. Closure of the numerous impacted areas of the Gateway property would not be feasible if an uncontrolled or continuing source of release was present. Remedial actions performed at the Gateway property have removed, treated or contained the former potential sources.

In summary, groundwater flow and contaminant distribution developed for the Mystic property and groundwater flow, contaminant distribution, and disposal site boundary information developed for the Gateway Property indicate that the presence of impacted soil and groundwater at the Site is not a result of past or continuing soil or groundwater migration from the Gateway property.

# 4.0  REFERENCES

1.  Clark, Michael P., Earth Tech; Observation Report No. 2, June 23, 1995, to Clifford Rose, Rosen Construction Ventures, Inc.; Observation Report No. 9, August 23, 1995, to Clifford Rose, Rosen Construction Ventures, Inc.; Observation Report No. 4, April 8, 1998, to Clifford Rose, Rosen Construction Ventures, Inc.

2.  Complaint for Declaratory Judgment and Compensatory Relief. Mystic Landing, LLC v. Pharmacia Corporation, Solutia, Inc. and Monsanto Company.  Middlesex Superior Court, Department of the Trail Court Civil Action No. 03-4965.

3.  Consulting Engineers & Scientists, Inc. "Phase I, Initial Site Investigation Report, Alford Street, Everett, Massachusetts," January 15, 1997.

4.  Dames & Moore.  "Hydrogeologic Survey, Monsanto Industrial Chemicals Co., Everett, Massachusetts," January 1980.

5.  Dames & Moore.  Letter report "Hydrogeologic Services, Monsanto Industrial Chemicals Co., Everett, Massachusetts," December 23, 1980.

6.  Dames & Moore. "Hydrogeologic Survey for the Eastern Property of Monsanto Industrial Chemicals Co., Everett, Massachusetts," February 12, 1982.

7.  Goldberg-Zoino & Associates. "Monsanto 409 Building, Phase II – Site risk Characterization, Everett, Massachusetts, Volume III," June 1989.

8.  GZA GeoEnvironmental Inc.   "Phase II – Comprehensive Site Assessment, Manufacturing Area, Monsanto Company, Everett Massachusetts, DEP Site No. 3-4425, Volume I of IX," July, 1994.

9.  GZA GeoEnvironmental Inc. "Phase II Comprehensive Site Assessment, Mystic View Area," February 17, 1993.

10. GZA GeoEnvironmental Inc. "Volume 1, 1992 Site-Wide Groundwater Monitoring Rounds, Monsanto Company, Mystic View Road, Everett, Massachusetts," July 13, 1994.

11. GZA GeoEnvironmental Inc. "Volume 1, 1993 Site-Wide Groundwater Monitoring Rounds, Monsanto Company, Mystic View Road, Everett, Massachusetts," October 19, 1994.

12. GZA GeoEnvironmental Inc.. "Phase II - Risk Characterization, Monsanto Company Waterways Area (Volume I of III)," October 1994.

13. GZA GeoEnvironmental Inc.. " Phase II - Comprehensive Site Assessment, Waiver Submittal, Volume 1 of 3," February, 1993.

14. GZA GeoEnvironmental Inc.. "Phase II – Comprehensive Site Assessment, North Fill Area, Volume I of V," July 1994.

15. ICF Kaiser Engineers, Inc.  "Appendix A.4, Plasticizer Remediation Area, Pre-Construction Geotechnical Investigation Report," May 1996.

16. ICF Kaiser Engineers, Inc.  "Volume I, Phase III Remedial Action Plan," November 3, 1995.

17. ICF Kaiser Engineers, Inc.   "Volume I, Phase III Remedial Action Plan, Monsanto Everett, Massachusetts Site, DEP Site Nos. 3-0313, 3-4425," November 3, 1995.

18. ICF Kaiser Engineers, Inc. "Phase IV Remedy Implementation Plan," January 15, 1996.

19. Monsanto Company. "Letter RE: Everett Plant, East Side Assessment," June 3, 1980.

20. Monsanto Company. "Letter RE: Proposed Property Sale to Boston Edison Company," January 22, 1982.

21. O'Reilly, Talbot & Okun Associates, Inc. "Modified Class A-4, Partial Response Action Outcome Statement," September 24, 2002.

22. O'Reilly, Talbot & Okun Associates, Inc. "Partial Response Action Outcome Statement for Plasticizer Subarea," July 1997.

23. O'Reilly, Talbot & Okun Associates, Inc. "Response Action Outcome Statement," July 1997.

24. O'Reilly, Talbot & Okun Associates, Inc. "Response Action Outcome Statement, Monsanto Everett Site, Fund Land Area, DEP Site No. 3-4200," July 1997.

25. O'Reilly, Talbot & Okun Associates, Inc. "Modified Class A-4 Partial Response Action Outcome Statement, Monsanto Everett Remediation Project, Plasticizer Remediation Area, Site No. 3-0313, Everett, Massachusetts," September 24, 2002.

26. O'Reilly, Talbot & Okun Associates, Inc. "Response Action Outcome Statement, Monsanto Everett Site, Mystic View, Wells 5 and Tidal Flats Subareas, DEP Site No. 3-0313.

27. O'Reilly, Talbot & Okun Associates, Inc. "Response Action Outcome Statement, Monsanto Site, Manufacturing and North Fill Subareas, DEP Site No. 3-4425," July 1997a.

28. O'Reilly, Talbot & Okun Associates, Inc. "Response Action Outcome Statement, Monsanto Everett Site, Fund Land Area, DEP Site No. 3-4200," July 1997b.

29. O'Reilly, Talbot & Okun Associates, Inc. "Response Action Outcome Statement, Monsanto Everett Site, Mystic View, Wells 5 and Tidal Flats Subareas, DEP Site No. 3-0313," July 1997c.

30. O'Reilly, Talbot & Okun Associates, Inc. "Response Action Outcome Statement, Monsanto Everett Site, Manufacturing and North Fill Subareas, DEP Site No. 3-4225," July 1997.

31. Perkins Jordan, Inc. "Site Contamination and Liability Audit on Monsanto Property," July 14, 1982.

32. Rizzo Associates, Inc. "Phase II Field Investigation Report, Everett Staging Yard, Alford Street, Everett, Massachusetts, DEP RTN 3-13341," May 15, 2001.

33. Rizzo Associates, Inc. "Phase II Field Investigation Report, Everett Staging Yard, Alford Street, Everett, MA," June 19, 2001.

34. United States District Court, District of Massachusetts - Deposition of Peter Grela. Volume I, Pages 1 to 137, Exhibits 1-17;; Mystic Landing LLC, Plaintiff, vs. Pharmacia Corporation, Solutia Inc. and Monsanto Company, Defendants; and Pharmacia Corporation and Monsanto Company, Third-Party Plaintiffs, vs. Modern Continental Construction Co., Inc., Third-Party Defendant; and Pharmacia Corporation, Third-Party Plaintiff, vs. Boston Edison Company, Third-Party Defendant; and Boston Edison company, Fourth-Party Plaintiff, vs. O'Donnell Sand & Gravel, Inc., and Mary O'Donnell, Fourth-Party Defendant. Civil Action No. 04-10180 NMG.

35. Wehran Engineering Corp. "Phase I Preliminary Assessment and Site Inspection Report," March, 1987.