# EXHIBIT 3

**ESS**

# Preliminary Assessment

## Waterfront Development
## Everett and Boston, Massachusetts



**Prepared For:**

**Modern Continental Companies, Inc.**
**600 Memorial Drive**
**Cambridge, Massachusetts 02139**

**Prepared By:**

**Environmental Science Services, Inc.**
888 Worcester Street, Suite 240
Wellesley, Massachusetts 02482

---

**Preliminary Engineering, Environmental and Regulatory Assessment**

ESS Project Number M268                    April 12, 2002



DEPOSITION EXHIBIT

Mystic 14
3-14-05    AB





HAS-EVE 000646

## INTRODUCTION

This Preliminary Environmental and Regulatory Assessment has been prepared for a Riverfront Mixed Use Development proposed to be located in both Boston and Everett, Massachusetts between the MBTA Commuter Line and Route 99.

The proposed Project includes construction of Mixed Use Development on a 35 acre parcel of land along the Everett and Boston City boundaries. The Project Site also includes an adjacent parcel of land now or formerly owned by the Massachusetts Bay Transportation Authority (MBTA). A portion of the Project Site consists of filled (i.e. formerly flowed) private tidelands of the Mystic River. Most recently the Project Site has been used as a construction staging area to process and distribute excess material from local construction sites.

## 1.0  ZONING REVIEW

At your request the zoning review has not been completed at this time. We did, however, conduct a cursory review of the zoning regulations and note that the proposed project would require relief from the requirements of the underlying zoning districts. In particular, the City of Everett has a maximum building height of six (6) stories. In addition, in the absence of a consolidation of the two lots relief would be required from allowable setbacks.

## 2.0  REGULATORY REVIEW

### 2.1  Federal

#### 2.1.1  U.S. Army Corps of Engineers (USACE)

The proposed project will require a permit from the U.S. Army Corps of Engineers (USACE) pursuant to Section 10 of the Rivers and Harbors Act of 1899, and Section 404 of the Federal Clean Water Act. Activities regulated by USACE include work and structures that are located in, or that affect, navigable waters of the United States; the discharge of dredged or fill material into waters of the United States; and the transportation of dredged material for the purpose of disposal in the ocean.

As indicated in the Programmatic General Permit (PGP) for Massachusetts (effective January 11, 2000 to January 11, 2005), all activities involving dredging in the Navigable Waters of the United States must apply directly to the USACE for review. The PGP issued for Massachusetts provides a streamlined review and

J:\m268-000\preliminary.doc

HAS-EVE 000647

approval process for numerous minor projects subject to USACE jurisdiction. However, given the impacts shown on the project plan (new boating facilities and possibly > 1 acre new fill) we believe, at this time, that the project will require the more involved USACE Individual Permit.

U.S. Fish and Wildlife Service, U. S. Environmental Protection Agency, and National Marine Fishery Service will also review projects under the Federal screening process. The decision to issue a permit will be based on an evaluation of the following:

- Evaluation of probable impacts
- Cumulative impacts
- Public interest
- Relative extent of public and private need
- Alternative locations and methods
- Beneficial vs. detrimental effects

Mitigation is an important aspect of the USACE review process. Mitigation options include avoiding, restoring, reducing or compensating for resources lost. Compensation of those losses may occur on-site or off-site. Mitigation options for the proposed Project include remediation and restoration of currently contaminated wetlands (this is possible on-site and off-site). Marina, water transportation and any pier facilities should be constructed on pile supports where possible to reduce the area of impact.

## 2.2  State

### 2.2.1  Massachusetts Environmental Policy Act (MEPA)

In accordance with the provisions of 301 CMR 11.00 - Executive Office of Environmental Affairs – Massachusetts Environmental Policy Act (MEPA),the Project as contemplated in the various alternative studies prepared by Carl Lynch Sandell would be categorically included for the preparation of an Environmental Notification Form (ENF) and an Environmental Impact Report (EIR)  There is also a failsafe provision that allows the Secretary of Environmental Affairs to, on his/her own initiative, require a project file an EIR regardless of thresholds.

The project is expected to trigger one or more of the following thresholds:

- Direct alteration of 25 or more acres of land (ENF/MEPA Review)

– 2 –

HAS-EVE 000648

- Alteration of one or more acres of salt marsh or bordering vegetated wetlands (ENF/EIR)

- Alteration of ten or more acres of any other wetlands (ENF/EIR)

- New nonwater-dependent use, provided the use or structure occupies one or more acres of waterways or tidelands (ENF/EIR)

- Dredging of 10,000 or more cy of material (ENF/MEPA Review)

- Disposal of 10,000 or more cy of dredged material, unless at designated in-water disposal site (ENF/MEPA Review)

- Generation of 3,000 or more new average daily vehicle trips on roadways providing access to a single location (ENF/EIR) combined with an MHD Access Permit

- Construction of 1,000 or more parking spaces at a single location (ENF/EIR) combined with the need for MHD Access Permit

The MEPA process is basically one of environmental disclosure requiring public notification and subsequent public comment period. Initially, the proponent files an Environmental Notification Form (ENF). If an EIR is required, a scoping document is issued by the Secretary listing the issues and the form, content, and level of detail necessary for inclusion in the EIR. The draft EIR (DEIR) can be submitted in any time frame. The DEIR review process includes public notice, public comment period, and determination of the final scope of the final EIR (FEIR) by the Secretary. The FEIR can again be submitted in any time frame. As with the DEIR, the FEIR review process includes public notice, comment period, public hearing, and internal review.

MEPA review occurs before the state permitting agencies act to ensure that they know the regional environmental consequences of the project. A study of alternatives may be required through the MEPA process as well as studies to develop enforceable mitigation requirements.

## 2.2.2  401 Water Quality Certification

A 401 Water Quality Certification is required under the Federal Clean Water Act for certain activities in wetlands and waters. All projects proposing any activity that results in a discharge of dredged material, dredging, or dredged material disposal greater than 100 cy to waters subject to regulation by the USACE, Federal Energy Regulatory Commission or other Federal agency, must obtain a 401 Water Quality Certification for Dredging Activities.

**HAS-EVE 000649**

J:\m268-000\preliminary.doc

The Project requires dredging of portions of the Mystic River to provide adequate depth for safe navigation by recreational and commercial vessels supporting the proposed marina and water shuttle services. If this dredging consists of 5,000 cy or greater, the project must apply for a Major Dredge Project Certification. A Minor Project Certification includes projects that dredge less than 5,000 cy but more than 100 cy. For those projects involving discharges of dredged or fill material into regulated waters, additional regulations and/or permits may apply.

Additionally, the project is proposing to place fill within the waters of the Mystic River. If the fill results in the loss of 5,000 sq. ft. of bordering vegetated wetland or land under water, a Major Project Certification will be required by the Massachusetts Department of Environmental Protection (DEP) pursuant to the Federal Clean Water Act (33 USC 1341) and the Massachusetts Clean Water Act (MGL Chapter 21, Sections 26-53). If the proposed fill results in the loss of less than 5,000 sq. ft. of bordering vegetated wetland or land under water, a Minor Project Certification will be required.

Under both processes mentioned above, the proposed project is expected to fall under a Major Project Certification.

### 2.2.3  M.G.L Chapter 91 Approval

The Project is subject to the jurisdiction of M.G.L. Chapter 91, the Public Waterfront Act, because portions of the Site are located on filled and flowed tidelands of the Mystic River. Filling activities on the Property commenced in or around 1907 under M.G.L. Chapter 91 Waterways Licenses issued by the Commonwealth of Massachusetts.

Historically, the Site was utilized for industrial purposes by the Monsanto Chemical Company and its predecessors, the Merrimac Chemical Company and Cochrane Chemical Company. The Project Site has never been available for public waterfront uses or access since the early 1900's. There are five basic types of activities subject to Chapter 91 authorization, these activities include:

- Placement or construction of any structure
- Placement of any unconsolidated material that is confirmed or expected to remain in place in a waterway, including materials for beach nourishment, shoreline protection, and disposal of dredge spoils
- Removal of materials (dredging)
- Any change in use

**HAS-EVE 000650**

J:\m268-000\preliminary.doc

- Any change in the dimensions of a structure or fill from the specifications contained in the existing authorization
- Demolition or removal of structures or fill that were not previously authorized

The proposed Project will be authorized under the DEP Waterways License application process because the project includes dredging, placement of fill and work on new and existing structures. A determination of water dependency or non-water dependency will be made by DEP. Water dependent use projects rely upon being in or near the waters, these projects are presumed to have a proper public purpose. Non water-dependent projects are presumed not to serve a proper public purpose. Further, if any portion of a project is considered non water-dependent, the entire project is considered non water-dependent.

Even though there are several facets of the project that are water-dependent, the project will be reviewed by the DEP as a non-water dependent use. Chapter 91 regulations require that non water-dependent projects provide greater benefits than detriments to the public's rights in waterways. Based upon our review of the plans prepared by Carr, Lynch and Sandell, Inc., this goal will be achieved by the project in the following ways:

- Marina – ideally with public access for transients
- Restoration/Revitalization of a former private industrial property
- Water shuttle services to and from the proposed MBTA Commuter Boat Stop at the site to downtown Boston
- Commuter Parking
- Public waterfront walkways with lighting, benches, and viewing areas
- Restaurant and other public facilities

The public's interest in the sites private tidelands will be promoted and enhanced through the provision of new public access and waterfront recreational use benefits where none previously existed. The proposed waterfront walkways and viewing areas will provide passive recreational opportunities to the public. Fishing activities could also be permitted along the seaward edge of pedestrian walkways. The proposed Project represents a unique opportunity to provide an active redevelopment project of a former industrial property.

**HAS-EVE 000651**

J:\m268-000\preliminary.doc

### 2.2.4  Coastal Zone Consistency

The Coastal Zone Management (CZM) Program Plan established the Program Policies identified below.  Recognition of these statements as Massachusetts's coastal policy has been formalized in Memoranda of Understanding between CZM and state environmental agencies. Projects subject to Federal consistency review must be consistent with CZM Program Policies.  MADEP will presume that a project is consistent with CZM Program Policies unless CZM submits a notice of its intent to participate and written comments during the public comment period.

The following categories of policies are those that are applicable to the proposed Mixed Use Development.

- Water Quality
- Habitat
- Protected Areas
- Coastal Hazard
- Ports
- Public Access
- Ocean Resources
- Growth Management Principles

With appropriate attention to site design and occupancy, it appears likely that the project would be eligible for a statement of Coastal Zone Consistencey..

### 2.2.5  Conservation Commission Review - Wetlands Protection Act

Areas subject to jurisdiction under M.G.L. Ch. 131 Section 40, the Wetlands Protection Act (WPA), among others include any freshwater wetland, coastal wetland, beach, dune, flat, marsh or swamp including their associated buffer zones.  Any riverfront area is also subject to protection under the Wetlands Protection Act.  Any activity in one of these areas that will remove, fill, dredge or alter the area requires a filing of a Notice of Intent. An advance filing in the form of an Abbreviated Notice of Resource Area Determination (ANRAD) would help define project constraints that may arise based upon an interpretation of wetland resource areas without significant initial expenditures.

**HAS-EVE 000652**

J:\m268-000\preliminary.doc

The extent of the proposed project requires that design specifications meet performance standards contained in to multiple sections of the WPA regulations (310 CMR 10.00 et seq.). These sections include the following:

- § 10.27, Coastal Beaches
- § 10.55, Bordering Vegetated Wetlands
- § 10.56, Land under the Ocean (nearshore)
- § 10.57, Bordering Land Subject to Flooding
- § 10.58, Riverfront Area

The intent of the WPA is to ensure that development along the coastline is located, designed, built and maintained in a manner that protects the public interests in Massachusetts's coastal resources. Performance standards have been designated for each resource area, in cases where resource areas may overlap; standards for each resource must be met.

Buffer zones include any area extending 100 ft. horizontally outward from the boundary of certain wetland resource areas including; bank, coastal wetlands, beach, dune, flat, etc..

Activities in buffer zones are subject to review prior to construction under the WPA and may also require the filing of a Notice of Intent.

The Project also involves work within the designated riverfront area to the Mystic River. The City of Everett has been designated a densely developed area and, as such, the Riverfront Area is limited to twenty-five feet (25'). The Project would be considered a redevelopment under the provisions of the Wetlands Protection Act. A redevelopment project affords considerable flexibility for proposed development provided that the following standards are fulfilled:

- Proposed work shall result in an improvement over existing conditions
- Stormwater management is provided according to established standards
- Proposed work shall be located outside the riverfront area or toward the riverfront area boundary and away from the river
- The area of proposed work shall not exceed the degraded area
- When restoration of the riverfront area is proposed alteration may be allowed at a ratio in sq. ft. of at least 1:1 of restored area to area of alteration
- When mitigation is proposed at a ratio in sq. ft. of 2:1 of mitigation area to area of alteration

**HAS-EVE 000653**

- 7 -

J:\m268-000\preliminary.doc

### 2.2.6 Ocean Sanctuaries Act (MGL 132A §§ 12A to 16E)

MGL Chapter 132A established five ocean sanctuaries. These sanctuaries are:

- The Cape Cod Ocean Sanctuary
- The Cape Cod Bay Ocean Sanctuary
- The Cape & Islands Ocean Sanctuary
- The North Shore Ocean Sanctuary
- The South Essex Ocean Sanctuary

The Project Site is not located in an ocean sanctuary. GIS mapping and personal communication have confirmed this conclusion.

### 2.2.7 Massachusetts Highway Department Access Permit

The Project includes a new access driveway to the State Highway Layout (SHLO), abuts the SHLO and includes a substantial increase in traffic; therefore, an Access Permit will be required. A comprehensive traffic impact study identifying any needed roadway improvements to mitigate for traffic impacts must be completed as part of the Access Permit requirements. In addition, construction plans and details must be provided for any work necessary within the SHLO for review prior to issuance of the Access Permit.

Immediately following the MEPA review process, the MHD will issue a M.G.L Chapter 30, Section 61 Finding prior to the issuance of an Access Permit. The Section 61 Finding will specify the driveway access and off-site mitigation measures necessary for the initial occupancy of the Project.

### 2.2.8 EOTC Chapter 40 Section 54A

The Secretary of the Executive Office of Transportation and Construction (EOTC) must consent to the issuance of any permit relating to land formerly used as a railroad right-of-way. The Project locus includes a former right-of-way and, therefore, will require the filing with EOTC. Typically, the EOTC mandates public notification, a public hearing and review as part of this process.

HAS-EVE 000654

J:\m268-000\preliminary.doc

### 2.2.9 MADEP Division of Water Pollution Control – Sewer Extension/Connection Permit

In accordance with 314 CMR 5.00 the Project will be subject to the requirement for the filing of a major Sewer Extension/Connection Permit with the Department of Environmental Protection Division of Water Pollution Control. The permit application will include flow generation calculations, sewer profiles for the public portions of the sewer and construction details.

In addition, other relevant documentation such as copies of the intermunicipal agreement with the City of Boston and verification of local sewer allocation may be required for the submittal package. As a procedural matter, the Sewer Extension Permit is issued to the local municipality and must be endorsed by the designated municipal official.

### 2.2.10 MWRA Direct Connection Permit

If it becomes necessary to tie the project sewer discharge directly into the MWRA Interceptor a MWRA Direct Connection Permit must be secured in accordance with 314 CMR 5.00. As noted in the infrastructure section of this preliminary assessment, ESS advises crossing Route 99 and connecting into a local sewer system (if feasible) thereby avoiding the need to utilize a direct connection to the MWRA system. Boston Water and Sewer also recommended this arrangement.

Other local permits are likely to be required and will be identified upon completion of the zoning review referenced in Section 1.0.

## 3.0 MASSACHUSETTS CONTINGENCY PLAN STATUS UPDATE

Based on ESS' review of previous environmental reports[1] completed for property located on Alford Street in Everett, Massachusetts and our knowledge of applicable regulations, the following is a preliminary description of the regulatory status of the Site, specifically as it applies to the Massachusetts Contingency Plan [310 CMR 40.0000 (MCP)].

- A Release Notification Form (RNF) was submitted to the Massachusetts Department of Environmental Protection (MADEP) on January 18, 1996. The RNF reported that a 120-day reporting condition had been identified at the Site, specifically lead and arsenic were detected in soil samples collected/analyzed from the Site at concentrations greater than the applicable Reportable Concentration (i.e., for this case the RCS-2 standards).

- On February 22, 1996, the former property owner (Mary O'Donnell) received a Notice of Responsibility (NOR) from the MADEP, which outlined the regulatory

J:\m268-000\preliminary.doc

HAS-EVE 000655

responsibilities and requirements for the Site, pursuant to the MCP. The MADEP assigned Release Tracking Number (RTN) 3-13341 to the Site.

- The Site is categorically classified as a <u>Tier II disposal site</u>, pursuant to the MCP. This means that the Site contaminants identified in the Phase I Study[1] could not be adequately assessed and/or remediated within a reasonable timeframe (i.e., within one year of the detection of contaminants) and, therefore, a Tier Classification had to be submitted to the MADEP. The <u>Tier Classification Submittal</u> was filed with the MADEP on *January 17, 1997*. In general, a Tier II disposal site allows the Licensed Site Professional (LSP) to make the appropriate decisions with regard to the MCP without extensive MADEP involvement or approval.

- A <u>Phase II - Comprehensive Site Assessment Report and Phase III - Remedial Action Plan (RAP)</u> were due to the MADEP on *January 17, 1999*. Pursuant to 310 CMR 40.0560(1)(b), both these MCP documents are due to the MADEP within two years of the effective tier classification date. According to the MADEP's on-line database for hazardous waste disposal site, these documents have not been submitted.

- A <u>Phase IV – Remedy Implementation Plan (RIP)</u> was due to the MADEP on *January 17, 2000*. Pursuant to 310 CMR 40.0560(1)(c), this MCP document is due to the MADEP within three years of the effective tier classification date. According to the MADEP's on-line database for hazardous waste disposal site, this document has not been submitted.

- A <u>Response Action Outcome (RAO) Statement</u> was due to the MADEP on *January 17, 2002*. Pursuant to 310 CMR 40.0560(1)(d), this MCP document is due to the MADEP within five years of the effective tier classification date. According to the MADEP's on-line database for hazardous waste disposal site, this document has not been submitted.

The above-listed conditions show that several mandated regulatory filings for the Site have not been submitted and therefore, the site is are considered to be in non-compliance with the MCP.

## SUMMARY OF ENVIRONMENTAL CONDITIONS

Based on various subsurface investigations completed on the Site by Consulting Engineers & Scientists, Inc. (CES, 1996), Gannett-Fleming, Inc. (GF, 1998), and ESS (ESS, 1999), the following environmental conditions apply to the Site, specifically those relating to known and/or potential oil and/or hazardous material (OHM) releases and impacts to soil, groundwater, and surface water at or near the Site.

**HAS-EVE 000656**

---

[1] Phase I – Initial Site Investigation Report", prepared by Consulting Engineers & Scientists, Inc., for O'Donnell Sand & Gravel, Inc., dated January 15, 1997

J:\m268-000\preliminary.doc

## Soil Quality Conditions

Lead, arsenic, beryllium, and various polynuclear aromatic hydrocarbons (PAHs) have been detected in subsurface soil samples collected and analyzed from the Site at concentrations exceeding the applicable MCP RCS-2 standards. Further information on these constituents of concern in soil is presented below.

- Arsenic was detected above the RCS-1 standard, which is 30 milligrams per kilogram (mg/kg), in twenty (20) of forty-three (43) total soil samples collected and analyzed from the Site. Arsenic concentrations above the RCS-2 standard ranged from 33 to 1,400 mg/kg. The elevated arsenic concentrations appear to be concentrated in subsurface soil from 3 to $15^+$ feet below the ground surface. Shallow soil samples collected/analyzed from the Site (i.e., ground surface to 1.5-foot depth interval) show substantially lower arsenic concentrations, mostly below the RCS-2 and Method 1, S-2/GW-2 standard.

- Lead was detected above the RCS-1 standard, which is 600 mg/kg, in fourteen (14) of forty-three (43) total soil samples collected and analyzed from the Site. Lead concentrations above the RCS-2 standard ranged from 629 to 11,000 mg/kg. The elevated lead concentrations appear to be concentrated in subsurface soil from 3 to $15^+$ feet below the ground surface. Shallow soil samples collected/analyzed from the Site (i.e., ground surface to 1.5-foot depth interval) show substantially lower arsenic concentrations, mostly below the RCS-2 and Method 1, S-2/GW-2 standard.

- Beryllium was detected above the RCS-1 standard, which is 0.80 mg/kg, in two (2) of twelve (12) total soil samples collected and analyzed from the Site. The beryllium concentrations above the RCS-2 standard ranged from 1.3 to 1.4 mg/kg. The beryllium was detected in two soil samples collected from 4 feet and 10 to 12 feet below the ground surface.

- Various PAHs[2] were detected above the RCS-1 standards, all of which are 0.70 mg/kg, in seven (7) of eighteen (18) total soil samples collected and analyzed from the Site. The PAHs above the RCS-1 standards were randomly detected across the Site and primarily concentrated in the upper 4 to 6 feet of soil beneath the Site.

- It should be noted that various SVOCs, other metals, volatile organic compounds (VOCs), extractable and volatile petroleum hydrocarbons (EPH/VPH), and polychlorinated biphenyls (PCBs) were detected in analyzed soil samples but were at concentrations below the applicable RCS-2 standards.

The investigation work completed to date on the Site appears not to have delineated the full extent of the constituents of concern in soil. Further investigation work (i.e., additional Phase II Study) will be necessary to accomplish this objective.

---

[2] The PAHs include: benzo(a)pyrene, benzo(b)fluoranthene, benzo(a)pyrene, and indeno(1,2,3-cd)pyrene.

- 11 —

J:\m268-000\preliminary.doc

HAS-EVE 000657

The constituents of concern in soil are likely associated with release(s) of the various types of materials/chemicals previously used, stored, and generated when Merrimac Chemical Company occupied the Site. Based on a historic Site plan presented in CES' Report, the following materials were stockpiled and used on the Site: sulfuric acid, sodium bisulfate, ferric sulfate, sulfur, and pyrite cinders.

**<u>Groundwater Quality Conditions</u>**

Dissolved lead, arsenic, cadmium, silver, nickel, and zinc and PCBs have been detected in groundwater samples collected and analyzed from the Site at concentrations exceeding the applicable MCP RCGW-2 standards. Further information on these constituents of concern in groundwater is presented below.

- Dissolved lead was detected above the RCGW-2 standard, which is 0.03 milligrams per liter (mg/l), in eleven (11) of twenty-four (24) total groundwater samples collected and analyzed from the Site. Dissolved lead concentrations above the RCGW-2 standard ranged from 0.05 to 1.5 mg/l. The dissolved arsenic was randomly detected across the Site and is considered a Site-wide condition.

- Dissolved arsenic was detected above the RCGW-2 standard, which is 0.40 mg/l, in eight (8) of twenty-four (24) total groundwater samples collected and analyzed from the Site. Dissolved arsenic above the RCGW-2 standard ranged from 0.70 to 7.85 mg/l. It should be noted that the detection of dissolved arsenic at 7.85 mg/l (in one groundwater sample/location) is above the Method 3 Upper Concentration Limit (UCL). The dissolved arsenic was randomly detected across the Site with the more elevated concentrations being detected along the southwestern portion of the Site (near/abutting the Mystic River).

- Dissolved cadmium was detected above the RCGW-2 standard, which is 0.01 mg/l, in two (2) of fourteen (14) total groundwater samples collected and analyzed from the Site. Dissolved cadmium above the RCGW-2 standard ranged from 0.011 to 0.020 mg/l.

- Dissolved nickel was detected above the RCGW-2 standard, which is 0.08 mg/l, in one (1) of eight (8) total groundwater sample collected and analyzed from the Site. The dissolved nickel concentration was 0.09 mg/l.

- Dissolved silver was detected above the RCGW-2 standard, which is 0.007 mg/l, in two (2) of fourteen (14) total groundwater samples collected and analyzed from the Site. Dissolved silver above the RCGW-2 standard ranged from 0.01 to 0.03 mg/l.

- Dissolved zinc was detected above the RCGW-2 standard, which is 0.90 mg/l, in three (3) of eight (8) total groundwater samples collected and analyzed from the Site. Dissolved zinc above the RCGW-2 standard ranged from 0.99 to 5.0 mg/l.

J:\m268-000\preliminary.doc

HAS-EVE 000658

- PCBs (identified during Gannett-Fleming's investigations, 1998) were identified in one (1) of eleven (11) total groundwater samples collected and analyzed from the Site. PCBs were detected at 0.0021 mg/l, which is above the RCGW-2 standard for PCBs (0.0003 mg/l). It is unknown where this groundwater sample was collected from on the Site.

- Groundwater beneath the Site predominantly flows to the south toward Mystic River. The average depth to groundwater is approximately 5 feet below grade. Additionally, pH was measured at relatively low levels in the groundwater.

- It should be noted that various SVOCs, other metals, VOCs, and EPHs/VPHs were also detected in analyzed groundwater samples but were at concentrations below the applicable RCGW-2 standards.

The investigation work completed to date on the Site appears not to have delineated the full extent of the constituents of concern in groundwater. Therefore, further investigation work (i.e., additional Phase II Study) will be necessary to accomplish this objective.

The constituents of concern in groundwater (primarily metals) are likely associated with release(s) of the various types of materials/chemicals previously used, stored, and generated when Merrimac Chemical Company occupied the Site. Based on a historic Site plan presented in CES' Report, the following materials were stockpiled and used on the Site: sulfuric acid, sodium bisulfate, ferric sulfate, sulfur, and pyrite cinders.

## RECOMMENDED ACTION ITEMS – SHORT TERM

Based on ESS' current knowledge of the known constituents of concern in soil and groundwater at the Site and the regulatory status of the OHM releases, both of which are previously summarized herein, ESS recommends that the following actions be completed:

- Several 120-day reporting conditions identified at the Site have not been reported to the MADEP, including: the detection of beryllium and various PAHs[3] in soil at concentrations greater than the RCS-2 standards and the detection of dissolved cadmium, nickel, silver, zinc, and PCBs in groundwater at concentrations greater than the RCGW-2 standards. The responsibility for reporting these 120-day reporting conditions falls upon the current Potentially Responsible Party (PRP), which typically is the Site owner. These exceedances should be reported the MADEP via submittal of a Release Notification Form(s). The only RC exceedances reported to the MADEP, to date for the Site, were lead and arsenic in soil at concentrations > the RCS-2 standards (via a RNF submittal by Mary O'Donnell on January 18, 1996).

---

[3] The PAHs may not have to be reported to the MADEP if they are determined to be associated with the presence of coal, coal ash, asphalt fragments in the analyzed soil samples.

J:\m268-000\preliminary.doc

HAS-EVF 000650

- Complete the necessary MCP response actions that are required for this Tier II disposal site, including: (a) Phase II - Comprehensive Site Assessment and Report; (a) a Phase III - Remedial Action Study and Plan (RAP); (c) a Phase IV Remedy Implementation Study and Plan (RIP); and (d) a Response Action Outcome (RAO) Statement. All of these MCP studies and associated reports are overdue to the MADEP and should be completed as soon as practically possible.

## POSSIBLE ACTION ITEMS – LONG TERM

After completing the Phase II Study and Phase III RAP, ESS will be able to inform MCE on the most practical remedial response actions for addressing impacted soil and/or groundwater at the Site. It should be noted that the Phase III Study, which evaluates the most cost-effective and technically feasible remedial alternatives for addressing impacted soil and groundwater, will take into consideration the proposed activities and uses at the Site (i.e., residential, commercial, and/or industrial). In general, the types of proposed Site uses and activities will dictate, along with other factors, the level of clean-up that is required to achieve a condition of No Significant Risk[4] at the Site, with respect to constituents of concern in soil and groundwater. Based on ESS' current understanding of the proposed redevelopment plans, which is a combination of residential and commercial use, the following general activities could apply to the Site for remedial response actions.

- Being that soil on the Site is impacted with a variety of constituents (i.e., arsenic, lead, beryllium, and PAHs), at depths ranging from the ground surface to approximately 12 feet bgs, a soil remediation program that conforms to the MCP requirements/guidelines will need to be developed and implemented during redevelopment activities. Based on the type of constituents of concern in soil (primarily heavy metals) a variety of remedial options could apply to the soil remediation program, including soil excavation with off-Site soil disposal/recycling (i.e., in-state landfill, thermal processing, etc.) and in-situ solidification/stabilization with on-Site soil re-use. As previously stated, the outcome of the Phase III Study will identify the most cost-effective and feasible remedial alternatives for addressing impacted soil at the Site.

- In addition to the soil remediation program, the following regulatory and technical action items may apply to impacted soil at the Site: (a) an engineered barrier or isolated layer may be appropriate on some portions of the Site to prevent direct exposure of residual constituents in soil after the soil remediation program is completed; (b) an Activity and Use Limitation (AUL) may need to be placed on certain portions of the Site if the soil remediation program is unable to clean-up soil to acceptable risk-based standards. The need to place an AUL on the Site, or on

---

[4] The MCP defines No Significant Risk as "a level of control of each identified substance of concern at a site or in the surrounding environment such that no such substance of concern shall present a significant risk of harm to health, safety, public welfare or the environment during any foreseeable period of time."

J:\m268-000\preliminary.doc

HAS-EVE 000660

certain portions of the Site, depends upon the results of a Risk Characterization that is performed after the soil remediation program is completed. The Risk Characterization uses soil quality data generated from post-excavation sampling and determines the level of risk posed by residual constituents in soil to future Site occupants, the environment, public welfare, and safety.

- Being that groundwater beneath the Site is impacted with a variety of constituents (i.e., primary dissolved arsenic and lead), the following activities will need to be performed to determine if remediation of groundwater is necessary: (a) perform additional groundwater quality testing to fully delineate the extent of the constituents of concern; (b) perform a Risk Characterization to evaluate the risk of harm posed by the constituents of concern to human health, public welfare, safety, and the environment; and (c) perform a Phase III Study to identify the most cost-effective and feasible remedial alternatives for addressing impacted groundwater beneath the Site. If remedial response actions are determined to be necessary, possible remedial alternatives could include pump-and-treat with chemical extraction, soil flushing, phytoremediation, and/or in-situ vitrification.

- In addition to evaluating the need for groundwater remediation, the following action items may apply to the Site during future redevelopment activities: (a) if dewatering is required during construction of any new subsurface feature(s), impacted groundwater will need to be handled and managed in accordance with applicable local, state, and federal regulations (i.e., the MCP). There are two primary alternatives for handling and managing impacted groundwater during development: (i) treatment and discharge of effluent to a surface water body or municipal connection (i.e., stormwater or sanitary) via the acquisition of the discharge permit (i.e. NPDES or MWRA permit); or (ii) containerizing groundwater and arrange for off-Site disposal/recycling of groundwater.

- If the proposed Site redevelopment plans include developing the abutting waterway for re-use, the following general activities would apply: (a) the proposed waterway re-use and design would have to be reviewed and approved by various local, state, and federal agencies (i.e., MADEP and ACOE); (b) pre-characterization testing of sediment within the waterway for bulk physical and chemical analyses would need to be performed, pursuant to 314 CMR 9.00, if dredging of the waterway is proposed; (c) any sediment generated from a dredging project would have to be properly disposed of and/or re-used. The final deposition of the sediment depends on the results of the chemical and physical analysis and regulatory approval of the selected/preferred disposal alternative.

## 4.0 BASELINE TRAFFIC CONDITIONS REVIEW

This section is devoted to identifying potential transportation related issues associated with the proposed development of the Project Site. As previously discussed, the development includes a Mixed-Use Commercial and Residential development with associated parking and infrastructure on vacant parcels owned by MCC and the MBTA collectively referred to as the waterfront parcel. The project may also include a marina,

J:\m268-000\preliminary.doc

HAS-EVE 000661

To determine the adequacy of study area roads and intersections to provide acceptable operating conditions during peak operating hours, capacity analyses are typically performed. These analyses are commonly based on the 1994 Highway Capacity Manual methodology, which identifies six levels of service related to traffic flow and operations. Level of Service A describes a condition of free flow while Level of Service F is described as forced flow and is characterized by volumes greater than the theoretical roadway capacity. Bruce Campbell & Associates, Inc. stated in their traffic analysis that a Level of Service D is generally acceptable for an urban area such as Everett.

The existing 1996 Level of Service summary included in the Gateway Center Traffic Analysis for the intersections in the vicinity of the waterfront parcel is shown in Table 4.1. The TIS reported the estimated 2001 Gateway Center Build Level of Service Summary for the intersections along Route 99 in the vicinity of the waterfront parcel is shown in Table 4.2. The projected level of service for local intersections should be representative of current conditions, however the Gateway Center is approximately 80% built and operating, with construction ongoing for the remaining buildings. A McDonald's fast food restaurant has recently been built and is currently operating at the intersection of Broadway and Beacham Street, a Boston Honda Motors car dealer has been recently located next to McDonald's and an office complex is under construction north of Sweetser Circle on Broadway.

| Table 4.1 1996 Existing Level of Service Summary | | | | | | | |
|---|---|---|---|---|---|---|---|
| Location | Approach | Weekday AM Peak Hour | | Weekday PM Peak Hour | | Saturday Midday Peak Hour | |
| Signalized | Movement | LOS | Delay | LOS | Delay | LOS | Delay |
| Route 99 (Broadway)/Beacham Street | Overall | B | 9.8 | B | 6.4 | B | 5.6 |
| Route 99 (Alford Street)/Dexter Street | Overall | C | 20.4 | D | 25.8 | B | 11.3 |
| Unsignalized | Movement | LOS | Delay | LOS | Delay | LOS | Delay |
| Route 99(Broadway)/Chemical Lane | EB L | F | >100 | F | >100 | F | >100 |
| | EB R | B | 9.4 | B | 5.6 | B | 5.0 |
| | NB L | E | 33.6 | C | 10.7 | B | 8.3 |
| LOS = Level of Service; delay in second per vehicle. EB = Eastbound, NB = Northbound, L = left turn, R= right turn * = If at least one approach of the intersection operates at a LOS F, the overall intersection results and delays can not be computed. | | | | | | | |

HAS-EVE 000663

J:\m268-000\preliminary.doc

| Table 4.2 2001 Gateway Center Build Level of Service Summary | | | | | | | |
|---|---|---|---|---|---|---|---|
| Location | Approach | Weekday AM Peak Hour | | Weekday PM Peak Hour | | Saturday Midday Peak Hour | |
| Signalized | Movement | LOS | Delay | LOS | Delay | LOS | Delay |
| Route 99 (Broadway)/Beacham Street | Overall | C | 24.2 | * | * | B | 9.1 |
| Route 99 (Alford Street)/Dexter Street | Overall | * | * | * | * | B | 12.1 |
| Unsignalized | Movement | LOS | Delay | LOS | Delay | LOS | Delay |
| Route 99(Broadway)/Chemical Lane | EB L | F | >100 | F | >100 | F | >100 |
| | EB R | C | 10.2 | B | 6.0 | B | 5.3 |
| | NB L | E | 40.9 | C | 12.8 | B | 9.5 |

LOS = Level of Service; delay in second per vehicle.
EB = Eastbound, NB = Northbound, L = left turn, R= right turn
* = If at least one approach of the intersection operates at a LOS F, the overall intersection results and delays can not be computed.

## Proposed Conditions

Each of the proposed development scenarios was evaluated. Table 4.3 illustrates the estimated Vehicle Trip Ends for the various alternatives presented to ESS for the waterfront parcel. It should be noted that the inclusion of Office area within the proposed development has a significant impact on the traffic patterns during both AM and PM peak hours. A 10% - 25% reduction of the total vehicle trips may be taken because of the proximity of the MBTA bus transit routes. A more in depth study regarding the bus routes and the population living and commuting to the property would need to be completed to best determine an accurate estimate of the percentage of transit commuters.

HAS-EVE 000664

J:\m268-000\preliminary.doc

| Table 4.3 Estimated Site Generated Vehicle Trip Generation* | | | | | |
|---|---|---|---|---|---|
| | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E |
| | Office: 974,400 gsf Residential: 450 Units Commuter: 200 spaces | Office: 898,800 gsf Commercial: 23,800 gsf Residential: 450 Units Commuter: 200 spaces | Office: 772,000 gsf Commercial: 23,800 gsf Residential: 450 Units Commuter: 200 spaces | Office: 561,200 gsf Commercial: 9200 gsf Warehouse: 180,000 gsf Office: 16,800 gsf Residential: 450 Units Commuter: 200 spaces | Office: 1,182,500 gsf Commercial: 58,400 gsf Residential: 450 Units Commuter: 200 spaces |
| Total Trips Generated AM | 1,823 vehicles | 1,730 vehicles | 1,532 vehicles | 1,295 vehicles | 2,208 vehicles |
| Entering | 1,487 | 1,398 | 1,224 | 1,015 | 1,810 |
| Exiting | 336 | 332 | 308 | 280 | 398 |
| | | | | | |
| Total Trips Generated PM | 1,931 | 1,725 | 1,536 | 1,284 | 2,277 |
| Entering | 381 | 405 | 373 | 318 | 539 |
| Exiting | 1,368 | 1,320 | 1,163 | 966 | 1,738 |

*Trip generation was calculated using the Institute of Transportation Engineers (ITE) Trip Generation 6th Edition.
Land Use 710 for General Office Building
Land Use 820 for Shopping Center (commercial)
Land Use 150 for Warehouse
Land Use 232 for High-Rise Residential Condominium
Land Use 090 for Park-and-Ride Lot with Bus Service

As you can see, the proposed development scenarios represent significant increases in area wide traffic generation. In fact, the project related trip generation could represent a 50% increase in trips compared to existing conditions. Based on existing and projected traffic volumes, the two intersections (Chemical Lane and Dexter Street) would operate at or below acceptable levels (defined as LOS D or worse) during one or more of the peak periods. Accordingly, additional roadway improvements will be necessary to

HAS-EVE 000665

J:\m268-000\preliminary.doc

mitigate for any adverse impacts and provide an effective means to access the project site.

*Potential Transportation Improvements and Mitigation*

The potential traffic mitigation that could become associated with this development is summarized below:

- The primary site drive should be located at the intersection of Alford Street and Dexter Street to take full advantage of the existing traffic signal. Due to the heavy volume for left turning vehicles entering and exiting the site, Route 99 will need to be widened to accommodate exclusive left turn lane(s). Please note that an easement over the MBTA land will be required to accommodate this driveway location.

- Chemical Lane may be used as a secondary means of access to the site, however, use may be limited to right turn in/right turn out. The feasibility of taking a left turn out of Chemical Lane onto Broadway from this unsignalized intersection appears too difficult as this movement is already classified as Level of Service F with significant delays.

- The timing between the signals at Route 99/Dexter and Route 99/Beacham should be synchronized to allow efficient movement along Route 99 as well as to allow turning movements out of Dexter Street and the proposed development.

- The main site access driveway should include a minimum four-lane section (two lanes entering/two lanes exiting) and possibly an additional dedicated left turn lane.

- The City of Everett has been in contact with MassHighway to repave Broadway. It is anticipated that the entire length of Route 99 within Everett will be repaved over the next five years.

A Transportation Demand Management Plan (TDM Plan) will also be a crucial component of the required transportation mitigation. The planned commuter boat service and commuter parking area are prime examples of Transportation Demand Management that will enhance the project. Other examples of TDM features may include the following:

- Subsidized T passes
- Commuter Information and Marketing
- Bicycle Conveniences
- Pedestrian Accommodations
- Telecommuting
- Ride-matching services
- Association with neighboring companies

**HAS-EVE 000666**

- 20 –

J:\m268-000\preliminary.doc

- Assignment of a Transportation Demand Manager
- Guaranteed Ride Home Program
- Exclusive Parking for Carpools and Vanpools
- Flexible Work Hours
- On-site Services including ATM, fitness, dry cleaners, dining, convenient mart, postal services, etc.

## 5.0 LAND USE CONSTRAINTS ANALYSIS/MASTER PLAN OVERLAYS

As described herein, several physical and regulatory constraints exist that could result in required modifications to the master plans as prepared by Carr, Lynch and Sandell, Inc.. We have depicted these constraints on the attached Constraints Map as well as included an overlay of one Master Plan Alternative. The following development constraints are identified on the Constraints Map:

- Limits of wetland resource areas and associated buffer zones.
- Existing utility easements
- Access easements
- Former railroad limits
- Zoning setback information
- Historic and present limits of Mean High Water and Mean Low Water
- Property ownership
- Flood Plain Limits
- Tidal Limits

## 6.0 INFRASTRUCTURE ASSESSMENT

A preliminary review of the utility infrastructure was performed; based on information obtained on the existing municipal utilities, record plans and discussions with City officials in both communities as well as private utility companies. Intermunicipal agreements between Everett and Boston are likely to be required for to extend services to the site.

*Water*

Plans were obtained from Frank McLaughlin at Boston Water & Sewer, Engineering Department located at 980 Harrison Avenue, in Boston, MA, 1-617-989-7000 as well as Paul Covielle at the City of Everett, Engineering Department located in Everett City Hall, 617-394-2250. Glen Gabati of the Everett Water Department was contacted at 617-394-2387.

HAS-EVE 000667

- 21 –

J:\m268-000\preliminary.doc

The City of Everett owns and services the water for the city. The existing water system in the vicinity of the site consists of the following:

The water system in Alford Street adjacent to the site is a 12-inch ductile iron line installed in 1981, which extends from the Everett City Line and terminates at the Malden Bridge in Boston. A 24-inch line extending along Broadway in Everett feeds the 12-inch line at the Boston/Everett boundary. The 24-inch main in Broadway is owned by the City of Everett and is in excellent condition with ample capacity. There are no known historic problems regarding this 24-inch main.

The Boston Water & Sewer plans indicate that there are two 8-inch water lines located within Chemical Lane. The City of Everett plans indicate that there is a 6-inch water line running up the center of Chemical Lane and a 14-inch line and an 8-inch line located along the northeast edge of Chemical Lane. A 16-inch private water main located in Chemical Lane was recently installed for the Gateway Center.

### Sewer

Plans were obtained from Frank McLaughlin at Boston Water & Sewer, Engineering Department located at 980 Harrison Avenue, in Boston, MA, 1-617-989-7000 as well as Paul Covielli at the City of Everett, Engineering Department located in Everett City Hall, 617-394-2250.

The existing sewer system in the vicinity of the site consists of the following:

The sanitary sewer system in Chemical Lane is a 10-inch gravity line which discharges into the MWRA Interceptor at the intersection of Chemical Lane and Broadway. Boston Water & Sewer own a 12-inch line located within Alford Street approximately 200 feet south of the Dexter Street/Alford Street intersection discharges into the MWRA Interceptor. The 12-inch line has ample capacity and no known problems. Phil Laroque at Boston Water & Sewer Engineering Division should be contacted at 617-989-7000 regarding tying into the 12-inch line.

The MWRA North Metropolitan Trunk Sewer Interceptor extends from the Alford Street Pumping Station at the Malden Bridge in Boston and continues into Everett on Broadway. The interceptor is sewer only, discharging to Deer Island.

### Drainage

Plans were obtained from Frank McLaughlin at Boston Water & Sewer Engineering Department located at 980 Harrison Avenue, in Boston, MA, 1-617-989-7000.

- 22 -

J:\m268-000\preliminary.doc

HAS-EVE 000668

The stormwater system located in Alford Street adjacent to the property begins as a 12-inch line near the intersection of Chemical Lane and Alford Street and extends southbound in Alford Street approximately 1000 feet, at which point the 18-inch drain line turns towards the west approximately 250 feet where it discharges into the Mystic River. The discharge point is near the southeast corner of the site as noted on the Plan of Land prepared by Michael Robert Keegan dated July 14, 2001.

Also noted on the Plan of Land is a 36-inch drain line, which appears to extend from the MBTA Maintenance Yard through an easement on the property discharging into the Mystic River at the existing bulkhead line. ESS has been in contact with the MBTA and a plan of this 36-inch drain line is being sent to ESS.

ESS has spoken to the following individuals at the MBTA regarding the 36-inch drain as well as the possibility of obtaining the MBTA as-built plans for their Everett Maintenance facility to obtain information on the utilities within Chemical Lane.

> John McSweeney:      617-222-4752
> Pete Walworth:       617-222-5467
> John Carthas:        617-222-5285
> Bob McLaughlin:      617-222-4617

If interested in relocating the 36-inch drain line John McSweeney should be contacted. Mr. McSweeney does not anticipate any problems with this possible relocation.

*Natural Gas*

Plans were obtained through Peter Duggan at Keyspan/Boston Gas Company, 201 Rivermoor Street, West Roxbury, MA 02132, telephone is 617-723-5512 ext. 4431.

Gas service is provided to the City of Everett through Keyspan. Alford Street and Chemical lane each have 6-inch intermediate pressure, steel gas service lines, installed in 1937. A 20-foot wide east to west easement through the site beginning near the intersection of Dexter Street and Alford Street and extending to the Boston and Albany Railroad Company property line contains a 6-inch steel high pressure, gas service line. To relocate this gas line and easement the contact at Keyspan Engineering Department is Rich Logue at 617-723-5512 ext. 4257.

ESS has contacted Keyspan to discuss the feasibility of relocating the easement and 6-inch gas line, which travels through the site, however they have not as yet responded.
*Capacity*

J:\m268-000\preliminary.doc

HAS-EVE 000669

*Telephone*

Telephone service is provided to the City of Everett through Verizon. The contact person at Verizon Engineering is Dino Imbergamo, 459 Main Street, Floor 2, Saugus, MA 01906, 781-941-7967.

Per discussions with Dino Imbergamo and a plan supplied by the City of Everett Engineering Department, underground telephone conduits are located within Alford Street and Broadway. Chemical Lane has one old 3-inch wrought iron pipe near the intersection of Broadway, the telephone conduit continues up the second pole in on Chemical Lane and continues overhead until the Boston & Maine Rail Road Company tracks at which point the telephone conduit again goes under ground. There is currently no high-speed Internet service in the vicinity of the parcel. For a large development Verizon would build a fiber optics electronics cabinet on the site within a 25-foot by 25-foot easement. The Gateway Center development has a similar fiber optics cabinet.

*Electric*

Electric service is provided to the City of Everett through Mass Electric. ESS is contacting Mark Camasso at 1-781-388-5317 for formal plans and connection information.

Per a plan supplied by the City of Everett Engineering Department, Alford Street, Broadway, and Chemical Lane appear to have underground electrical service lines. Per a plan supplied by Boston Gas Company, Alford Street and Chemical Lane appear to have underground high voltage lines.

*Cable Television*

Cable television service is provided to the City of Everett through ATT/Broadband. The contact at ATT/Broadband is Jeff Harrington at 617-562-4241.

Currently there are three levels of service along Route 99 up to Mystic Street. High-speed data, video, and telephone service are available at Mystic Street approximately 200 feet north of Chemical Lane, across Broadway. The main concern with bringing the ATT/Broadband service to the waterfront parcel is the need for a state permit to cross Route 99. The permit can take between 6-8 months to obtain and the various utility companies may need to be coordinated to cross at the same time.

**HAS-EVE 000670**

J:\m268-000\preliminary.doc

HAS-EVE 000672



TYPICAL TOWNHOUSE

1/8" = 1'-0

CARR, LYNCH AND SANDELL, INC.
1385 Cambridge Street, Cambridge, Massachusetts 02139

APRIL 10, 2003



HAS-EVE 000671