UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MYSTIC LANDING, LLC,<br>Plaintiff,<br><br>v.<br><br>PHARMACIA CORPORATION,<br>and MONSANTO COMPANY,<br>Defendants.<br><br>PHARMACIA CORPORATION and<br>MONSANTO COMPANY,<br>Third-Party Plaintiffs,<br><br>v.<br><br>MODERN CONTINENTAL CONSTRUCTION<br>CO., INC.,<br>Third-Party Defendant. | CIVIL ACTION NO.<br>04-10180 NMG |
| PHARMACIA CORPORATION<br>Third-Party Plaintiff,<br><br>v.<br><br>BOSTON EDISON COMPANY<br>Third-Party Defendant.<br><br>v.<br><br>BOSTON EDISON COMPANY<br>Fourth-Party Plaintiff,<br><br>v.<br><br>O'DONNELL SAND & GRAVEL, INC.<br>And MARY O'DONNELL<br>    Fourth-Party Defendants. | |

**RULE 56.1 STATEMENT OF PLAINTIFF MYSTIC LANDING, LLC
IN OPPOSITION TO DEFENDANT PHARMACIA CORPORATION'S
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

#553089

Pursuant to Local Rule 56.1, Plaintiff Mystic Landing, LLC submits, in support of its Opposition to the Motion for Partial Summary Judgment filed by Defendant Pharmacia Corporation, the following statement of facts as to which there is a genuine issue to be tried.

1. Plaintiff Mystic Landing LLC ("Mystic") is the owner of a certain parcel of real property located at Alford Street and Broadway, Everett, Middlesex County, Massachusetts (the "Site"). See Excerpts of the transcript of the March 14, 2005 deposition of Peter Grela, true and accurate copies of which are attached as Exhibit 1 to the Affidavit of Doreen M. Zankowski filed herewith ("Zankowski Aff."), at p. 12.

2. Pursuant to a Lease dated June 8, 2001, Mystic leases the Site to Third-party Defendant Modern Continental Construction Co., Inc. for the permitted use as "[a] contractor yard and storage [site] of equipment and materials including, without limitation, construction management and other uses allowed by applicable law." See Excerpts of the transcript of the September 13, 2005 deposition of Massimo A. Marino, true and accurate copies of which are attached as Exhibit 2 to the Zankowski Aff., at p. 26 and Exhibit 4 thereto.

3. Modern uses a certain portion of the Site as a construction laydown and storage yard for several projects, including, *inter alia*, support for the construction of the Central Artery/Tunnel Project. See Zankowski Aff., Exhibit 2 at pp. 23-26 and Exhibit 4 thereto; see also Zankowski Aff., Exhibit 1 at pp. 68-69. Mystic also leases a portion of the Site to Testa Corporation. See Zankowski Aff., Exhibit 2 at pp. 28-29 and Exhibit 5 thereto.

4. From 1929 to 1983, the Site was owned and operated by Monsanto Company (now known as "Pharmacia"). During the time that Pharmacia owned and operated the Site, Pharmacia's operations included the handling and storage of raw materials for chemical manufacturing, and the manufacturing and storage of chemical products and by-products. See

#553089

Pharmacia and Monsanto's Response to Mystic's First Set of Interrogatories, a true and accurate copy of which is attached as Exhibit 2 to the Zankowski Affidavit, at Response to Interrogatory Nos. 6, 7, 14, and 15.

5. Pharmacia also owned and operated a chemical manufacturing plant on the parcel of land that abutted the Site on the northwest property line (the "Gateway Property").

6. During the time that Pharmacia owned and operated the Site and the Gateway Property, Pharmacia's operations included the handling and storage of raw materials for chemical manufacturing, and the manufacturing and storage of chemical products and by-products. See Zankowski Aff., Exhibit 2 at Response to Interrogatory Nos. 6, 7, 14, and 15.

7. In 1982, Third-party Defendant Boston Edison Company ("BECO") commissioned an environmental study and review of the Site, which study was performed by Perkins Jordan, Inc. A copy of the Site Contamination and Liability Audit on Monsanto Property report prepared by Perkins Jordan, Inc. (the "Perkins Report") is attached as Exhibit 5 to Pharmacia's Motion for Partial Summary Judgment.

8. The Perkins Report indicates that the Site was contaminated prior to the time of the sale of the Site to BECO. Id.

9. On or about June 20, 1983, Pharmacia sold the Site to BECO. A copy of the Quitclaim Deed reflecting the sale of the Site by Pharmacia to BECO (the "Pharmacia Quitclaim Deed") is attached as Exhibit 6 to Pharmacia's Motion for Partial Summary Judgment.

10. The Pharmacia Quitclaim Deed contained a use restriction on the Site as follows:

> ...the property hereby conveyed shall be used solely for industrial and manufacturing purposes and that the property hereby conveyed shall not be used for retail business, for multi or single family

#553089

> residential purposes, park purposes, recreational uses, food or feed facilities, agricultural or animal uses, even though such other uses may otherwise be permitted uses as the above terms are defined respectively in the zoning ordinances of the cities of Boston and Everett, Massachusetts.

Id.

11. As is discussed below, the foregoing provision appears in only one subsequent transfer of the Site.

12. On or about March 6, 1995, BECO sold the Site to Fourth-party Defendant O'Donnell Sand and Gravel, Inc. ("ODSG"). A copy of the Quitclaim Deed reflecting the sale of the Site by BECO to ODSG (the "BECO Quitclaim Deed") is attached as Exhibit 7 to Pharmacia's Motion for Partial Summary Judgment.

13. The BECO Quitclaim Deed contained a similar use restriction on the Site as follows:

> …[the Site] shall be used solely for industrial and manufacturing purposes and that the property hereby conveyed shall not be used for retail business, for multi or single family residential purposes, park purposes, recreational uses, food or feed facilities, agricultural or animal uses, even though such other uses may otherwise be permitted uses as the above terms are defined respectively in the zoning ordinances of the cities of Boston and Everett, Massachusetts.

Id.

14. The foregoing use restriction does not appear in any subsequent transfers of the Site.

15. On or about March 6, 2005, BECO and ODSG executed an Acknowledgment and Release relating to the Site, which Acknowledgment and Release speaks for itself. A copy of the Acknowledgment and Release is attached as Exhibit 8 to Pharmacia's Motion for Partial Summary Judgment.

#553089

16.   On or about September 25, 1995, ODSG sold the Site to Mary O'Donnell ("O'Donnell"). A copy of the Quitclaim Deed reflecting the sale of the Site by ODSG to O'Donnell (the "O'Donnell Quitclaim Deed") is attached as Exhibit 9 to Pharmacia's Motion for Partial Summary Judgment. As was discussed above, the aforementioned use restriction does not appear in this transfer of the Site.

17.   On or about August 25, 1995, prior to the sale of the Site by ODSG to O'Donnell, Consulting Engineers, Inc. ("CES"), conducted a limited subsurface investigation of the Site consisting of excavating test pits and collecting soil samples for laboratory analysis. The results of the analysis of the soil samples collected from the test pits indicated the presence of elevated concentrations of certain metals and petroleum hydrocarbons. A copy of the October 2, 1995, letter from CES to ODSG c/o O'Donnell is attached as Exhibit 10 to Pharmacia's Motion for Partial Summary Judgment.

18.   As a result of this investigation, O'Donnell, as owner of ODSG, submitted a Release Notification Form ("RNF") to the Commonwealth of Massachusetts Department of Environmental Protection ("DEP") on January 18, 1996. A copy of the January 18, 1996, RNF is attached as Exhibit 11 to Pharmacia's Motion for Partial Summary Judgment.

19.   On or about February 22, 1996, the DEP issued a Notice of Responsibility "NOR") to O'Donnell, which NOR speaks for itself. A copy of the February 22, 1996, NOR is attached as Exhibit 12 to Pharmacia's Motion for Partial Summary Judgment.

20.   On or about March 27, 1996, CES submitted its October 1995 report to the DEP. A copy of the March 27, 1996, letter from CES to the DEP is attached as Exhibit 13 to Pharmacia's Motion for Partial Summary Judgment.

#553089

22. On or about May 1, 1996, Andre J. Bissonette of Green Environmental, Inc. ("Green Environmental") sent a letter to Peter Grela of Modern, which letter speaks for itself. A copy of the May 1, 1996, letter from Mr. Bissonette to Mr. Grela is attached as Exhibit 15 to Pharmacia's Motion for Partial Summary Judgment.

23. Pursuant to a Lease dated May 1, 1996, O'Donnell leased the Site to Mary O'Donnell Construction Co., Inc. A copy of the May 1, 1996 lease is attached as Exhibit 16 to Pharmacia's Motion for Partial Summary Judgment.

24. On or about May 1, 1996, O'Donnell also entered into an Option Agreement (the "Option Agreement") with Modern Continental Construction Co., Inc./Obayashi, a Joint Venture ("Modern/Obayashi"), which Option Agreement speaks for itself. A copy of the May 1, 1996 Option Agreement is attached as Exhibit 17 to the Pharmacia's Motion for Partial Summary Judgment.

25. The Option Agreement speaks for itself.

26. From the inception of Modern's relationship with the Site, Modern has conducted and/or performed numerous tasks pursuant to the Massachusetts Contingency Plan ("MCP") cleanup protocol, pursuant to 310 CMR 40.0000, including, *inter alia*, investigations of the Site, which investigations included, *inter alia*, the installation of thirty-one (31) shallow soil borings, ten (10) of which were completed as groundwater monitoring wells; the excavation of fifteen (15) test pits; and the collection and laboratory analysis of soil and ground water samples. See, e.g., Expert Report of Richard J. Hughto, Ph.D., P.E., L.S.P., dated September 12, 2005, a copy of which is attached as Exhibit 33 to Pharmacia's Motion for Partial Summary Judgment. The soil analysis revealed elevated concentrations of, *inter alia*, lead, arsenic, mercury, naphthalene,

#553089

and selected polycyclic aromatic hydrocarbons ("PAHs"). Id. The ground water analysis revealed elevated concentrations of, *inter alia*, dissolved lead, arsenic, and cadmium. Id.

27. On or about March 11, 2005, Mystic's counsel inadvertently produced certain memoranda, prepared by Mystic/Modern's counsel, which documents speak for themselves, and which documents Defendants' counsel have conditionally agreed to return to Modern's counsel. See Letter from Adam Kahn, counsel for Defendants, to Doreen Zankowski, counsel for Mystic, dated, a true and accurate copy of which is attached as Exhibit 3 to the Zankowski Aff.

28. The aforementioned memoranda reflect Mystic's counsel's interpretation of the case and statutory law relating to M.G.L. c. 21E liability and indemnification.

29. The aforementioned memoranda speak for themselves.

30. In late 1999, Modern investigated possible development programs for the Site. See, e.g., Letter from Charles F. Madden, Jr., of Gator Development Co., LLC to Massimo Marino, of Modern, dated December 22, 1999, a copy of which is attached as Exhibit 22 to Pharmacia's Motion for Partial Summary Judgment.

31. On or about May 11, 2001, Mystic's counsel sent a letter to Solutia, Inc., Pharmacia's successor-in-interest to the Site, to discuss allocation of responsibility for the necessary environmental remediation of the Site. A copy of the May 11, 2001 letter from Gerald J. Petros, counsel for Modern, to Mary Cody, Assistant General Counsel to Solutia, Inc., is attached as Exhibit 23 to Pharmacia's Motion for Partial Summary Judgment.

32. In April and May of 2001, Rizzo Associates ("Rizzo"), on behalf of Mystic, had conducted additional subsurface investigations of the Site. These investigations included, *inter alia*, the installation of thirty-one (31) shallow soil borings, ten (10) of which were completed as groundwater monitoring wells; the excavation of fifteen (15) test pits; and the collection and

#553089

laboratory analysis of soil and ground water samples. On or about May 15, 2001, Rizzo submitted a draft Phase II Field Investigation Report setting forth its findings relating to the Site. Among other findings, Rizzo concluded that the soil analysis revealed elevated concentrations of, *inter alia*, lead, arsenic, mercury, naphthalene, and selected polycyclic aromatic hydrocarbons ("PAHs"). Id. Rizzo also concluded that the ground water analysis revealed elevated concentrations of, *inter alia*, dissolved lead, arsenic, and cadmium. Id. A copy of the Draft Phase II Field Investigation Report dated May 15, 2001, is attached as Exhibit 24 to Pharmacia's Motion for Partial Summary Judgment.

33.   On or about May 15, 2001, Rizzo also provided Mystic's counsel with a draft letter setting forth a preliminary remedial cost estimate of $810,000. The letter states that "[t]his remedial scenario estimate includes the use of an Activity and Use Limitation (AUL) to limit future uses of the property that may result in unacceptable risks." The analysis, therefore, contemplated a limited end-use of the Site. A copy of the May 15, 2001, letter from Richard J. Hughto, Ph.D., P.E., L.S.P. and William C. Phelps of Rizzo Associates, Inc. to Doreen M. Zankowski, counsel for Modern, is attached as Exhibit 25 to Pharmacia's Motion for Partial Summary Judgment 34 (emphasis added).

34.   On or about May 22, 2001, Rizzo provided Mystic's counsel with a second draft letter setting forth a preliminary remedial cost estimate of $17,500,000. The letter states that "[t]his remedial scenario estimate would not require the imposition of an Activity and Use Limitation (AUL) to maintain a condition of No Significant Risk at the Site." The analysis, therefore, does not contemplate a limited end-use of the Site. A copy of the May 22, 2001, letter from Richard J. Hughto, Ph.D., P.E., L.S.P. and William C. Phelps of Rizzo Associates, Inc. to

#553089

Doreen M. Zankowski, counsel for Modern, is attached as Exhibit 26 to the Pharmacia's Motion for Partial Summary Judgment (emphasis added).

35. As Mystic has investigated and evaluated the possible and/or potential uses of the Site, it has obtained additional estimates of the remedial costs that it would incur to remediate the Site within the requirements of the MCP, from remedial scenarios that would include the use of an Activity and Use Limitation (AUL) to limit future uses of the property that may result in unacceptable risks – e.g., industrial use of the Site – to remedial scenarios that <u>would</u> <u>not</u> <u>require</u> the imposition of an Activity and Use Limitation (AUL) to maintain a condition of No Significant Risk at the Site – e.g., commercial/residential use of the Site. <u>See</u> Exhibits 27-33 to Pharmacia's Motion for Partial Summary Judgment.

36. On or about June 19, 2001, Rizzo submitted its final Phase II Field Investigation Report ("Final Rizzo Report") which Final Rizzo Report stated the following:

> The two primary contaminants of concern are lead and arsenic, which have been identified at varying concentrations in the soil and groundwater at the Site. Although the contaminants were identified in all areas of investigation, the highest concentrations were generally identified on the southern and southwestern portions of the property. In addition to the lead and arsenic, additional soil and groundwater contaminants included mercury, selenium, cadmium, EPH, VPH and PAHs.
>
> The source of the contamination is related to the historic use of the Site and surrounding area for chemical production and the placement of fill to form the present day topography. Historic records document the production and storage of large quantities of acid at the Site by Merrimac and Monsanto. While some areas of soil contamination appear to be randomly located across the Site, and are likely the result of filling operations by the former chemical manufacturers, the groundwater contamination correlates well with the location of the former sulfuric acid production and storage areas on the southern and southwestern portions of the Site property. Furthermore, since similar types and concentrations of contaminants to those identified at the Site have been identified on the westerly abutting property (formerly Monsanto), and the (sic) both properties of the overall Monsanto facility, it is reasonable to conclude that these areas of contamination share a similar source.

#553089

A copy of the Final Rizzo Report is attached as Exhibit 31 to Pharmacia's Motion for Partial Summary Judgment.

37. As of June 21, 2001, Modern owned all of the financial interest in the Modern/Obayashi, while Obayashi retained certain bonding obligations. See Zankowski Aff., Exhibit 1 at pp. 27-28.

38. On or about June 7, 2001, Mystic was organized as a limited liability company pursuant to M.G.L. c. 156C, §§ 1 *et seq.* A copy of Mystic's Certificate of Organization is attached as Exhibit 34 Pharmacia's Motion for Partial Summary Judgment.

39. Mystic's Certificate of Organization speaks for itself.

40. On or about June 14, 2001, Mystic filed an Amended and Restated Certificate of Organization for the purposes of amending Article 7, Article 9, and Article 10. A copy of Mystic's Amended and Restated Certificate of Organization is attached as Exhibit 35 Pharmacia's Motion for Partial Summary Judgment.

41. Mystic's Amended and Restated Certificate of Organization speaks for itself.

42. The Corporate filings of Mystic, Modern Continental Construction Companies, Inc. and Modern Continental Construction Co., Inc., speak for themselves.

43. Peter Grela testified that Mystic was organized in 2001 as a holding company for the acquisition of the Site. See Zankowksi Aff., Exhibit 1 at p. 33, 36-37. As Chief Financial Officer of both Mystic, a holding company, and Modern, Mr. Grela effectuated the Option Agreement. Id.

44. On June 19, 2001, Modern/Obayashi executed an Assignment and Assumption of Rights and Obligations, which transferred Modern/Obayashi's option to purchase the Site to

#553089

Mystic. A copy of the Assignment and Assumption of Rights and Obligations, dated June 19, 2001, is attached as Exhibit 38 to Pharmacia's Motion for Partial Summary Judgment.

45. The Assignment and Assumption of Rights and Obligations speaks for itself.

46. As Chief Financial Officer of Mystic, a holding company, and Modern, Mr. Grela effectuated the Assignment and Assumption of Rights and Obligations. Id.

47. The Assignment and Notice of Option Agreement speaks for itself.

48. On or about June 21, 2001, O'Donnell sold the Site to Mystic. A copy of the Quitclaim Deed reflecting the sale of the Site by O'Donnell to Mystic (the "O'Donnell Quitclaim Deed") is attached as Exhibit 40 to Pharmacia's Motion for Partial Summary Judgment. The deed, while reflecting a consideration of $300,000 for the Site, does not reflect the "lease to own" payments already paid by Modern to O'Donnell pursuant to the Subcontract.

49. There has never been any dispute that the Site is contaminated; Monsanto has produced reams of evidence of the contamination from its own files. See, e.g., Exhibits G – M and Excerpts from the transcript of the September deposition of Gerald Rinaldi, Exhibit E, at pp. 37, 39, 42, 69, 71, 118, 124, 132, 137-138, 141, 154. Mr. Grela testified that "[t]he issue of the contamination ... had been clarified, at least in my mind, earlier on in the process. We didn't know what the contamination was. It was irrelevant, because we always felt the contamination was caused by Monsanto, and it would be remediated by Monsanto, or the remediation would be paid by Monsanto, similar to the site directly adjacent to the property across the tracks." See Zankowski Aff., Exhibit 1 at pp. 40-41.

#553089

**MYSTIC LANDING, LLC**

By its attorneys:

/s/ Doreen M. Zankowski

---
Robert G. Flanders, Jr., Esq. (BBO #170820)
Doreen M. Zankowski, Esq. (BBO #558381)
Kevin M. Plante, Esq. (BBO #630088)
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109-1775
(617) 345-9000

DATED: November 7, 2005

#553089

## CERTIFICATE OF SERVICE

I, Kevin M. Plante, hereby certify that on this 7th day of November 2005, I served a true and accurate copy of the foregoing document by hand to:

John M. Stevens, Esq.
Adam P. Kahn, Esq.
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts 02210

Mark S. Granger, Esq.
Douglas B. Otto, Esq.
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210

Howard G. Guggenheim
P.O. Box 736
Scituate, MA 02066

Signed under the penalties of perjury this 7th day of November 2005.

                                                   /s/ Kevin M. Plante
                                                   Kevin M. Plante