UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MYSTIC LANDING, LLC,<br>Plaintiff,<br><br>v.<br><br>PHARMACIA CORPORATION,<br>and MONSANTO COMPANY,<br>Defendants.<br><br>PHARMACIA CORPORATION and<br>MONSANTO COMPANY,<br>Third-Party Plaintiffs,<br><br>v.<br><br>MODERN CONTINENTAL CONSTRUCTION<br>CO., INC.,<br>Third-Party Defendant.<br><br>PHARMACIA CORPORATION<br>Third-Party Plaintiff,<br><br>v.<br><br>BOSTON EDISON COMPANY<br>Third-Party Defendant.<br><br>v.<br><br>BOSTON EDISON COMPANY<br>Fourth-Party Plaintiff,<br><br>v.<br><br>O'DONNELL SAND & GRAVEL, INC.<br>And MARY O'DONNELL<br>    Fourth-Party Defendants. | **CIVIL ACTION NO.**<br>**04-10180 NMG** |

**PLAINTIFF MYSTIC LANDING, LLC'S AMENDED STATEMENT IN RESPONSE TO
DEFENDANT PHARMACIA CORPORATION'S STATEMENT OF MATERIAL FACTS
AND PLAINTIFF MYSTIC LANDING, LLC'S STATEMENT
OF ADDITIONAL MATERIAL FACTS**

Pursuant to Local Rule 56.1, Plaintiff Mystic Landing, LLC submits, in support of its Opposition to the Motion for Partial Summary Judgment filed by Defendant Pharmacia Corporation, the following statement of facts as to which there is a genuine issue to be tried. Except to the extent that Defendant Pharmacia Corporation's Statement of Material Facts comports with Mystic's statement of material facts as set forth below, Mystic hereby affirmatively controverts Defendant Pharmacia's Statement of Materials Facts as set forth below.

1.  Plaintiff Mystic Landing, LLC ("Mystic") is the owner of a certain parcel of real property located at Alford Street and Broadway, Everett, Middlesex County, Massachusetts (the "Site"). See Excerpts of the transcript of the March 14, 2005 deposition of Peter Grela, true and accurate copies of which are attached as Exhibit 1 to the Affidavit of Doreen M. Zankowski filed herewith ("Zankowski Aff."), at p. 12.

2.  Pursuant to a Lease dated June 8, 2001, Mystic leases the Site to Third-party Defendant Modern Continental Construction Co., Inc. for the permitted use as "[a] contractors yard and storage [site] of equipment and materials including, without limitation, construction management and other uses allowed by applicable laws." See Excerpts of the transcript of the September 13, 2005 deposition of Massimo A. Marino, true and accurate copies of which are attached as Exhibit 2 to the Zankowski Aff., at p. 26 and Exhibit 4 thereto.

3.  Modern uses a certain portion of the Site as a construction laydown and storage yard for several projects, including, *inter alia*, support for the construction of the Central Artery/Tunnel Project. See Zankowski Aff., Exhibit 2 at pp. 23-26 and Exhibit 4 thereto; see also Zankowski Aff., Exhibit 1 at pp. 68-69. Mystic also leases a portion of the Site to Testa Corporation. See Zankowski Aff., Exhibit 2 at pp. 28-29 and Exhibit 5 thereto.

4. From 1929 to 1983, the Site was owned and operated by Monsanto Company (now known as "Pharmacia"). During the time that Pharmacia owned and operated the Site, Pharmacia's operations included the generation, handling and storage of raw materials for chemical manufacturing, and the manufacturing and storage of chemical products and by-products. See Pharmacia and Monsanto's Response to Mystic's First Set of Interrogatories, a true and accurate copy of which is attached as Exhibit 4 to the Zankowski Affidavit, at Response to Interrogatory Nos. 6, 7, 14, and 15.

5. Pharmacia also owned and operated a chemical manufacturing plant on the parcel of land that abutted the Site on the northwest property line (the "Gateway Property").

6. During the time that Pharmacia owned and operated the Site and the Gateway Property, Pharmacia's operations included the generation, handling and storage of raw materials for chemical manufacturing, and the manufacturing and storage of chemical products and by-products. See Zankowski Aff., Exhibit 3 at Response to Interrogatory Nos. 6, 7, 14, and 15.

7. In 1982, Third-party Defendant Boston Edison Company ("BECO") commissioned an environmental study and review of the Site, which study was performed by Perkins Jordan, Inc. A copy of the Site Contamination and Liability Audit on Monsanto Property report prepared by Perkins Jordan, Inc. (the "Perkins Report") is attached as Exhibit 5 to Pharmacia's Motion for Partial Summary Judgment.

8. The Perkins Report indicates that the Site was contaminated prior to the time of the sale of the Site to BECO. Id.

9. On or about June 20, 1983, Pharmacia sold the Site to BECO. A copy of the Quitclaim Deed reflecting the sale of the Site by Pharmacia to BECO (the "Pharmacia Quitclaim Deed") is attached as Exhibit 6 to Pharmacia's Motion for Partial Summary Judgment.

10. The Pharmacia Quitclaim Deed contained a use restriction on the Site as follows:

> …the property hereby conveyed shall be used solely for industrial and manufacturing purposes and that the property hereby conveyed shall not be used for retail business, for multi or single family residential purposes, park purposes, recreational uses, food or feed facilities, agricultural or animal uses, even though such other uses may otherwise be permitted uses as the above terms are defined respectively in the zoning ordinances of the cities of Boston and Everett, Massachusetts.

Id.

11. As is discussed below in ¶14 below, the foregoing provision appears in only one subsequent transfer of the Site.

12. On or about March 6, 1995, BECO sold the Site to Fourth-party Defendant O'Donnell Sand and Gravel, Inc. ("ODSG"). A copy of the Quitclaim Deed reflecting the sale of the Site by BECO to ODSG (the "BECO Quitclaim Deed") is attached as Exhibit 7 to Pharmacia's Motion for Partial Summary Judgment.

13. The BECO Quitclaim Deed contained a similar use restriction on the Site as follows:

> …[the Site] shall be used solely for industrial and manufacturing purposes and that the property hereby conveyed shall not be used for retail business, for multi or single family residential purposes, park purposes, recreational uses, food or feed facilities, agricultural or animal uses, even though such other uses may otherwise be permitted uses as the above terms are defined respectively in the zoning ordinances of the cities of Boston and Everett, Massachusetts.

Id.

14. The foregoing use restriction does not appear in any subsequent transfers of the Site. See, e.g., copy of the Quitclaim Deed reflecting the sale of the Site by ODSG to O'Donnell

#554148

4

(the "O'Donnell Quitclaim Deed") attached as Exhibit 9 to Pharmacia's Motion for Partial Summary Judgment.

15. On or about March 6, 2005, BECO and ODSG executed an Acknowledgment and Release relating to the Site, which Acknowledgment and Release speaks for itself. A copy of the March 6, 2005, Acknowledgment and Release is attached as Exhibit 8 to Pharmacia's Motion for Partial Summary Judgment.

16. On or about September 25, 1995, ODSG sold the Site to Mary O'Donnell ("O'Donnell"). A copy of the Quitclaim Deed reflecting the sale of the Site by ODSG to O'Donnell (the "O'Donnell Quitclaim Deed") is attached as Exhibit 9 to Pharmacia's Motion for Partial Summary Judgment. As was stated in ¶14 above, the aforementioned use restriction does not appear in this transfer of the property.

17. On or about August 25, 1995, prior to the sale of the Site by ODSG to O'Donnell, Consulting Engineers, Inc. ("CES"), conducted a limited subsurface investigation of the Site consisting of excavating test pits and collecting soil samples for laboratory analysis. The results of the analysis of the soil samples collected from the test pits indicated the presence of elevated concentrations of certain metals and petroleum hydrocarbons. A copy of the October 2, 1995, letter from CES to ODSG c/o O'Donnell is attached as Exhibit 10 to Pharmacia's Motion for Partial Summary Judgment.

18. As a result of this investigation, O'Donnell, as owner of ODSG, submitted a Release Notification Form ("RNF") to the Commonwealth of Massachusetts Department of Environmental Protection ("DEP") on January 18, 1996. A copy of the January 18, 1996, RNF is attached as Exhibit 11 to Pharmacia's Motion for Partial Summary Judgment.

19.     On or about February 22, 1996, the DEP issued a Notice of Responsibility "NOR") to O'Donnell, which NOR speaks for itself. A copy of the February 22, 1996, NOR is attached as Exhibit 12 to Pharmacia's Motion for Partial Summary Judgment.

20.     On or about March 27, 1996, CES submitted its October 1995 report to the DEP. A copy of the March 27, 1996, letter from CES to the DEP is attached as Exhibit 13 to Pharmacia's Motion for Partial Summary Judgment.

21.     On or about April 5, 1996, Mary O'Donnell Construction Co., Inc., entered into a subcontract with Modern Continental Construction Co., Inc./Obayashi, a Joint Venture ("Modern/Obayashi"), pursuant to which Mary O'Donnell Construction Co., Inc. agreed to provide, *inter alia*, a laydown/staging facility at the Site for use by Modern/Obayashi in its work on the Central Artery/Tunnel Project. A copy of the April 5, 1996, Subcontract executed by Mary O'Donnell Construction Co., Inc. and Modern/Obayashi is attached as Exhibit 14 to Pharmacia's Motion for Partial Summary Judgment. The parties to the subcontract contemplated a "lease to own" arrangement, whereby Modern/Obayashi would make certain payments under the terms of the Subcontract, including lease payments for use of the Site, with the understanding that Modern/Obayashi would have an option to purchase the Site, and that, in the event that Modern/Obayashi did purchase the Site, it would receive a credit for the lease payments made during the course of the lease period. See Excerpts from the October 28, 1998 deposition of Peter Grela, true and accurate copies of which are attached as Exhibit 4 to the Zankowski Affidavit, at pp. 24-27, 82.

22.     On or about May 1, 1996, Andre J. Bissonette of Green Environmental, Inc. ("Green Environmental") sent a letter to Peter Grela of Modern, which letter speaks for itself. A

copy of the May 1, 1996, letter from Mr. Bissonette to Mr. Grela is attached as Exhibit 15 to Pharmacia's Motion for Partial Summary Judgment.

23.     Pursuant to a Lease dated May 1, 1996, O'Donnell leased the Site to Mary O'Donnell Construction Co., Inc., which lease speaks for itself. A copy of the May 1, 1996, lease is attached as Exhibit 16 to Pharmacia's Motion for Partial Summary Judgment.

24.     On or about May 1, 1996, O'Donnell also entered into an Option Agreement (the "Option Agreement") with Modern Continental Construction Co., Inc./Obayashi, a Joint Venture ("Modern/Obayashi"), which Option Agreement speaks for itself. A copy of the May 1, 1996 Option Agreement is attached as Exhibit 17 to the Pharmacia's Motion for Partial Summary Judgment.

25.     The Option Agreement speaks for itself.

26.     From the inception of Modern's relationship with the Site, Modern has conducted and/or performed certain tasks pursuant to the Massachusetts Contingency Plan ("MCP") cleanup protocol, pursuant to 310 CMR 40.0000, including, *inter alia*, investigations of the Site, which investigations included, *inter alia*, the installation of thirty-one (31) shallow soil borings, ten (10) of which were completed as groundwater monitoring wells; the excavation of fifteen (15) test pits; and the collection and laboratory analysis of soil and ground water samples. See, e.g., Expert Report of Richard J. Hughto, Ph.D., P.E., L.S.P., dated September 12, 2005, a copy of which is attached as Exhibit 33 to Pharmacia's Motion for Partial Summary Judgment. The soil analysis revealed elevated concentrations of, *inter alia*, lead, arsenic, mercury, naphthalene, and selected polycyclic aromatic hydrocarbons ("PAHs"). Id. The ground water analysis revealed elevated concentrations of, *inter alia*, dissolved lead, arsenic, and cadmium. Id.

27. On or about March 11, 2005, Mystic's counsel inadvertently produced certain memoranda, prepared by Mystic/Modern's counsel, which documents speak for themselves, and which documents Defendants' counsel have conditionally agreed to return to Mystic/Modern's counsel. See Letter from Adam Kahn, counsel for Defendants, to Doreen Zankowski, counsel for Mystic, dated November 2, 2005, a true and accurate copy of which is attached as Exhibit 5 to the Zankowski Aff.

28. The aforementioned memoranda reflect Mystic's counsel's preliminary interpretation of the case and statutory law relating to M.G.L. c. 21E liability and indemnification.

29. The aforementioned memoranda speak for themselves.

30. In late 1999, Modern investigated possible development programs for the Site. See, e.g., Letter from Charles F. Madden, Jr. of Gator Development Co., LLC, to Massimo Marino of Modern, dated December 22, 1999, a copy of which is attached as Exhibit 22 to Pharmacia's Motion for Partial Summary Judgment.

31. On or about May 11, 2001, Mystic's counsel sent a letter to Solutia, Inc., Pharmacia's successor-in-interest to the Site, to discuss allocation of responsibility for the necessary environmental remediation of the Site. A copy of the May 11, 2001, letter from Gerald J. Petros, counsel for Mystic/Modern, to Mary Cody, Assistant General Counsel to Solutia, Inc., is attached as Exhibit 23 to Pharmacia's Motion for Partial Summary Judgment.

32. In April and May of 2001, Rizzo Associates ("Rizzo"), on behalf of Mystic, had conducted additional subsurface investigations of the Site. These investigations included, *inter alia*, the installation of thirty-one (31) shallow soil borings, ten (10) of which were completed as groundwater monitoring wells; the excavation of fifteen (15) test pits; and the collection and

laboratory analysis of soil and ground water samples. On or about May 15, 2001, Rizzo submitted a draft Phase II Field Investigation Report setting forth its findings relating to the Site. Among other findings, Rizzo concluded that the soil analysis revealed elevated concentrations of, *inter alia*, lead, arsenic, mercury, naphthalene, and selected polycyclic aromatic hydrocarbons ("PAHs"). Id. Rizzo also concluded that the ground water analysis revealed elevated concentrations of, *inter alia*, dissolved lead, arsenic, and cadmium, all such chemical constituents consistent with Monsanto Company's operations at the Site. Id. A copy of the Draft Phase II Field Investigation Report dated May 15, 2001, is attached as Exhibit 24 to Pharmacia's Motion for Partial Summary Judgment.

33. On or about May 15, 2001, Rizzo also provided Mystic's counsel with a draft letter setting forth a preliminary remedial cost estimate of $810,000, which cost estimate was for "Lending Purposes Only," and was submitted as part of a loan consideration request by Mystic. The letter states that "[t]his remedial scenario estimate <u>includes</u> the use of an Activity and Use Limitation (AUL) to limit future uses of the property that may result in unacceptable risks." The analysis, therefore, contemplates a limited end-use of the Site. A copy of the May 15, 2001, letter from Richard J. Hughto, Ph.D., P.E., L.S.P. and William C. Phelps of Rizzo Associates, Inc. to Doreen M. Zankowski, counsel for Modern, is attached as Exhibit 25 to Pharmacia's Motion for Partial Summary Judgment 34 (emphasis added).

34. On or about May 22, 2001, Rizzo provided Mystic's counsel with a second draft letter setting forth a preliminary remedial cost estimate of $17,500,000. The letter states that "[t]his remedial scenario estimate <u>would not require</u> the imposition of an Activity and Use Limitation (AUL) to maintain a condition of No Significant Risk at the Site." The analysis, therefore, does not contemplate a limited end-use of the Site, and was premised on residential

#554148                                9

development of the property. A copy of the May 22, 2001, letter from Richard J. Hughto, Ph.D., P.E., L.S.P. and William C. Phelps of Rizzo Associates, Inc. to Doreen M. Zankowski, counsel for Modern, is attached as Exhibit 26 to the Pharmacia's Motion for Partial Summary Judgment (emphasis added).

35.  As Mystic has investigated and evaluated the possible and/or potential uses of the Site, it has obtained additional estimates of the remedial costs that it would incur to remediate the Site within the requirements of the MCP, from remedial scenarios that would include the use of an Activity and Use Limitation (AUL) to limit future uses of the property that may result in unacceptable risks – e.g., industrial use of the Site – to remedial scenarios that would not require the imposition of an Activity and Use Limitation (AUL) to maintain a condition of No Significant Risk at the Site – e.g., commercial/residential use of the Site. See Exhibits 27-33 to Pharmacia's Motion for Partial Summary Judgment.

36.  On or about June 19, 2001, Rizzo submitted its final Phase II Field Investigation Report ("Final Rizzo Report") which Final Rizzo Report stated the following:

> The two primary contaminants of concern are lead and arsenic, which have been identified at varying concentrations in the soil and groundwater at the Site. Although the contaminants were identified in all areas of investigation, the highest concentrations were generally identified on the southern and southwestern portions of the property. In addition to the lead and arsenic, additional soil and groundwater contaminants included mercury, selenium, cadmium, EPH, VPH and PAHs.
>
> The source of the contamination is related to the historic use of the Site and surrounding area for chemical production and the placement of fill to form the present day topography. Historic records document the production and storage of large quantities of acid at the Site by Merrimac and Monsanto. While some areas of soil contamination appear to be randomly located across the Site, and are likely the result of filling operations by the former chemical manufacturers, the groundwater contamination correlates well with the location of the former sulfuric acid production and storage areas on the southern and southwestern portions of the Site property. Furthermore, since similar types and concentrations of

#554148

10

> contaminants to those identified at the Site have been identified on the westerly abutting property (formerly Monsanto), and the (sic) both properties of the overall Monsanto facility, it is reasonable to conclude that these areas of contamination share a similar source.

A copy of the Final Rizzo Report is attached as Exhibit 31 to Pharmacia's Motion for Partial Summary Judgment.

37. As of June 21, 2001, Modern owned all of the financial interest in the Modern/Obayashi, while Obayashi retained certain bonding obligations. See Zankowski Aff., Exhibit 1 at pp. 27-28.

38. On or about June 7, 2001, Mystic was organized as a limited liability company pursuant to M.G.L. c. 156C, §§ 1 et seq. A copy of Mystic's Certificate of Organization is attached as Exhibit 34 Pharmacia's Motion for Partial Summary Judgment.

39. Mystic's Certificate of Organization speaks for itself.

40. On or about June 14, 2001, Mystic filed an Amended and Restated Certificate of Organization for the purposes of amending Article 7, Article 9, and Article 10. A copy of Mystic's Amended and Restated Certificate of Organization is attached as Exhibit 35 Pharmacia's Motion for Partial Summary Judgment.

41. Mystic's Amended and Restated Certificate of Organization speaks for itself.

42. The Corporate filings of Mystic, Modern Continental Construction Companies, Inc. and Modern Continental Construction Co., Inc., speak for themselves.

43. Peter Grela testified that Mystic was organized in 2001 as a holding company for the acquisition of the Site. See Zankowksi Aff., Exhibit 1 at p. 33, 36-37. As Chief Financial Officer of both Mystic, a holding company, and Modern, Mr. Grela effectuated the Option Agreement. Id.

44. On June 19, 2001, Modern/Obayashi executed an Assignment and Assumption of Rights and Obligations, which transferred Modern/Obayashi's option to purchase the Site to Mystic. A copy of the June 19, 2001, Assignment and Assumption of Rights and Obligations is attached as Exhibit 38 to Pharmacia's Motion for Partial Summary Judgment.

45. The Assignment and Assumption of Rights and Obligations speaks for itself.

46. As Chief Financial Officer of Mystic, a holding company, and Modern, Mr. Grela effectuated the Assignment and Assumption of Rights and Obligations. Id.

47. The Assignment and Notice of Option Agreement speaks for itself.

48. On or about June 21, 2001, O'Donnell sold the Site to Mystic. A copy of the Quitclaim Deed reflecting the sale of the Site by O'Donnell to Mystic (the "O'Donnell Quitclaim Deed") is attached as Exhibit 40 to Pharmacia's Motion for Partial Summary Judgment. The deed, while reflecting a consideration of $300,000 for the Site, does not reflect the "lease to own" payments already paid by Modern/Obayshi to O'Donnell pursuant to the Subcontract.

49. There has never been any dispute that the Site is contaminated; Monsanto has produced reams of evidence of the contamination from its own files. See, e.g., Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment and Exhibits G – M thereto, and Excerpts from the transcript of the September 8, 2005 deposition of Gerald Rinaldi, Exhibit E, at pp. 37, 39, 42, 69, 71, 118, 124, 132, 137-138, 141, 154. Accordingly, Mr. Grela testified that "[t]he issue of the contamination ... had been clarified, at least in my mind, earlier on in the process. We didn't know what the contamination was. It was irrelevant, because we always felt the contamination was caused by Monsanto, and it would be remediated by Monsanto, or the remediation would be paid by Monsanto, similar to the site directly adjacent to the property across the tracks." See Zankowski Aff., Exhibit 1 at pp. 40-41.

50.  Rizzo conducted additional subsurface investigations of the Site in July 2001, the results of which were published in the Limited Subsurface Investigation Report ("Rizzo Subsurface Report") dated August 10, 2001. A copy of the Rizzo Subsurface Report is attached as Exhibit 41 to Pharmacia's Motion for Partial Summary Judgment.

51.  From the inception of Modern's relationship with the Site, Modern has conducted and/or performed numerous tasks pursuant to the Massachusetts Contingency Plan ("MCP") cleanup protocol, pursuant to 310 CMR 40.0000, including, *inter alia*, investigations of the Site, which investigations included, *inter alia*, the installation of thirty-one (31) shallow soil borings, ten (10) of which were completed as groundwater monitoring wells; the excavation of fifteen (15) test pits; and the collection and laboratory analysis of soil and ground water samples. See, e.g., Expert Report of Richard J. Hughto, Ph.D., P.E., L.S.P., dated September 12, 2005, a copy of which is attached as Exhibit 33 to Pharmacia's Motion for Partial Summary Judgment. Modern also was tasked by the Massachusetts Department of Environmental Protection ("MA DEP"), pursuant to a duly negotiated and executed Administrative Consent Order, with removing certain stock piles of materials from the site (construction debris from the Central Artery/Tunnel "Big Dig" project), and providing the MA DEP with confirmatory sampling results evidencing the removal of the stockpiles and evidence that there is no residual contamination on the Site, which results were produced to the MA DEP. See Analytical results provided by ProScience Analytical Services, Inc., true and accurate copies of which are attached as Exhibit 6 to the Zankowski Aff.

52.  While Mr. Grela testified at his deposition that he "did not believe that [Mystic has] taken any <u>actions</u>" to remove or treat contaminated soil or groundwater between June 21, 2001, and the present on the property, Mystic has, in fact, demonstrated that Mystic/Modern

#554148                                        13

have conducted and/or performed numerous tasks pursuant to the Massachusetts Contingency Plan ("MCP") cleanup protocol, pursuant to 310 CMR 40.0000, including, *inter alia*, investigations of the Site, which investigations included, *inter alia*, the installation of thirty-one (31) shallow soil borings, ten (10) of which were completed as groundwater monitoring wells; the excavation of fifteen (15) test pits; and the collection and laboratory analysis of soil and ground water samples. See, e.g., Expert Report of Richard J. Hughto, Ph.D., P.E., L.S.P., dated September 12, 2005, a copy of which is attached as Exhibit 33 to Pharmacia's Motion for Partial Summary Judgment.

53.  Mr. Grela testified that Rizzo has not conducted any analyses of "future uses and [correlative] requirements" since it prepared the June 19, 2001 Phase II Field Investigation Report." See Zankowski Aff., Exhibit 1, at pp. 106-107. Mystic/Modern, in fact, have continued to investigate and evaluate the possible and/or potential uses of the Site. See Exhibits 27-33 to Pharmacia's Motion for Partial Summary Judgment.

54.  Mystic has considered and continues to consider offers to purchase the Site. See Zankowski Aff., Exhibit 1, at pp. 109.

55.  Mr. Grela testified that that "…we always felt the contamination was caused by Monsanto, and it would be remediated by Monsanto, or the remediation would be paid by Monsanto, similar to the site directly adjacent to the property across the tracks." See Zankowski Aff., Exhibit 1 at pp. 40-41. In addition, Mr. Grela testified that, while he could not address Mystic's intent to remediate the Site as of the date of his deposition, because he was no longer employed by Mystic or Modern (Id. at p. 112) -- and because he had not been designated as Mystic's Rule 30(b)(6) designee for questions relating to Mystic's intentions with regard to remediation of the Site (see Rule 30(b)(6) Designations of Mystic Landing, LLC, a true and

#554148                               14

accurate copy of which is attached as Exhibit 7 to the Zankowski Aff.) -- he anticipated Mystic would take whatever steps were necessary "to maintain the value of the property." See Zankowski Aff., Exhibit 1 at p. 112.

56.     Mystic seeks an equitable share of the response costs incurred by Mystic in the remediation of the Site in an amount in excess of Six Million Dollars ($6,000,000), which sum is supported by the expert opinions of Richard Hughto, Ph.D., P.E., L.S.P. (see Hughto Report at p. 18) and Donald P. Bouchard, MAI and Steven R. Foster, MAI. See Cover letter to the excerpts from the Expert Report prepared by Donald P. Bouchard, MAI, and Steven R. Foster, MAI, of Lincoln Property Company, dated September 12, 2005, a copy of which is attached as Exhibit 48 to Pharmacia's Motion for Partial Summary Judgment, at p. 2.

57.     Mystic has incurred in excess of One Hundred Thousand Dollars ($100,000) in investigation and analysis costs relating to remediation of the Site as evidenced by reports prepared by Rizzo Associates and provided to Defendants, which reports evince sampling, analysis and remediation planning. More specifically, Mystic/Modern has incurred $157,381.58 in costs for work performed by Rizzo relating to the investigation and analysis of the contamination of the Site. See Letter from Doreen M. Zankowski, counsel for Mystic/Modern, to Adam Kahn, counsel for Defendants, dated November 7, 2005, a true and accurate copy of which is attached as Exhibit 8 to the Zankowski Aff., referring to and enclosing invoices relating to the costs incurred by Mystic/Modern.

58.     Federal Rule Civil Procedure 26(a)(1) speaks for itself.

59.     Pharmacia and Monsanto's Request for the Production of Documents speaks for itself.

60. Mystic and Modern's responses to Defendants' Request for the Production of Documents speak for themselves.

61. As of April 4, 2005, Mystic and Modern believed that it had produced all non-privileged documents that were responsive to the Defendants' Request for the Production of Documents, and had not withheld any documents on the grounds of privilege. See Transcript of the April 4, 2005 Status Conference at pp. 6-7. However, after recently learning that certain privileged documents had been mistakenly produced to opposing counsel, Mystic/Modern's counsel realized that the previous statement to the Court during the April 4 conference was incorrect because some confidential documents were indeed withheld from production to opposing counsel on attorney-client and work-product privilege grounds without supplying them with a privilege log. A privilege log identifying these documents is being prepared and will be provided to opposing counsel shortly.

62. Mystic/Modern has produced to the defendants invoices from Rizzo for work performed relating to the investigation and analysis of the contamination of the Site, which invoices reflect that the total amount of Rizzo's services to date is $157,381.58. See Zankowski Aff., Exhibit 8.

63. Mystic's Complaint and Civil Action Cover Sheet and Rule 26 Disclosure include within the ambit of "response costs" those costs incurred for the investigation and analysis -- that is, the "assessment" -- of the contamination of the Site pursuant to M.G.L. c. 21E, §§ 4(a) and 5, and those costs that Mystic reasonably anticipates that it will incur to remediate the Site.

64. Count I for Declaratory Judgment in the Complaint at paragraph 30 clearly states the following:

> As the former owner/operator of the Site at the time of the release of oil and hazardous material to the soil, groundwater, and sediments, *the defendants are responsible for all of*

> *the response costs and other damages related to the contamination of the Site pursuant to Mass. General Laws c. 21E, § 5.*

Count II for Contribution in the Complaint at Paragraph 33 pleads the same allegation of liability and damages under § 5. These claims clearly seek relief for the damages incurred by Mystic associated with the environmental contamination of the Site. The allegedly "separate" category of damages -- that is, the so-called "property damage" -- is merely an element of the damages alleged in the Complaint. See Excerpts from the Expert Report prepared by Donald P. Bouchard, MAI, and Steven R. Foster, MAI, of Lincoln Property Company, dated September 12, 2005, a copy of which is attached as Exhibit 48 to Pharmacia's Motion for Partial Summary Judgment, at p. 135.

65.     The reports of Richard Hughto, Ph.D., P.E., L.S.P., and Donald P. Bouchard, MAI and Steven R. Foster, MAI, speak for themselves, however, the reports demonstrate that, based upon the analysis and findings of the experts, the damages associated with the presence of the identified environmental contamination of the Site by Pharmacia's predecessor-in-interest is approximately $4,000,000 to $10,000,000.

**MYSTIC LANDING, LLC**

By its attorneys:

/s/ Doreen M. Zankowski

---
Robert G. Flanders, Jr., Esq. (BBO #170820)
Doreen M. Zankowski, Esq. (BBO #558381)
Kevin M. Plante, Esq. (BBO #630088)
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA  02109-1775

DATED: November 8th, 2005          (617) 345-9000

#554148                                17

## CERTIFICATE OF SERVICE

    I, Kevin M. Plante, hereby certify that on this 8th day of November 2005, I served a true and accurate copy of the foregoing document by hand to:

John M. Stevens, Esq.
Adam P. Kahn, Esq.
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts 02210

Mark S. Granger, Esq.
Douglas B. Otto, Esq.
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210

Howard G. Guggenheim
P.O. Box 736
Scituate, MA 02066

                                             /s/ Kevin M. Plante
                                             _____
                                             Kevin M. Plante