UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MYSTIC LANDING, LLC,<br>        Plaintiff,<br>  v.<br><br>PHARMACIA CORPORATION,<br>        Defendant.<br><br>PHARMACIA CORPORATION<br>        Third-Party Plaintiff,<br>  v.<br><br>MODERN CONTINENTAL CONSTRUCTION CO., INC.,<br>        Third-Party Defendant.<br><br>PHARMACIA CORPORATION,<br>        Third-Party Plaintiff,<br>  v.<br><br>BOSTON EDISON COMPANY,<br>        Third-Party Defendant.<br><br>BOSTON EDISON COMPANY,<br>        Fourth-Party Plaintiff,<br>  v.<br><br>O'DONNELL SAND & GRAVEL, INC. and MARY O'DONNELL,<br>        Fourth-Party Defendant. | CIVIL ACTION No. 04-10180 NMG |

**JOINT PRETRIAL MEMORANDUM**

### (1)(a)  Concise Summary of the Evidence To Be Offered by Mystic Landing, LLC

The defendant, Pharmacia Corporation ("Pharmacia"), formerly the Monsanto Company ("Monsanto")[1], is liable under the Hazardous Material Release Prevention Act, Chapter 21E ("21E" or "the Act") because it owned, operated, and polluted the site in question (the "Site" or "Property"), which is now owned by the plaintiff, Mystic Landing, LLC ("Mystic"). In particular, Pharmacia's chemical generation, manufacturing, handling, storage, and waste-disposal activities resulted in releases and threats of releases of contaminants causing damage to the Site. This occurred throughout Pharmacia's decades of ownership and operation of the Site as a chemical manufacturing, storage, and disposal facility.

Pharmacia seeks to escape its cleanup responsibilities and the resultant damages it caused to the Property after decades of polluting and contaminating the Site. Under the statutory and regulatory framework of 21E, enforcement actions can be initiated by either the Commonwealth or by the current landowners to recover response costs required to clean up the contaminated properties and property damage. The policies and purposes behind the Act include the cleanup and redevelopment of contaminated properties and empowering current landowners to enforce the provisions of 21E, to recover and obtain funds to clean up the contaminated properties, and to place them back into productive use again. The Act provides for strict liability that is joint and several.

Pharmacia's own documents and environmental assessments conducted on the Property prove that Pharmacia contaminated the 35 acre site for decades, resulting in contaminants in the soil, groundwater, and the adjacent river (including sulphuric acid, lead, arsenic and phthaltes).

---

[1] Pharmacia is the successor in interest of Monsanto as the result of a name change, *inter alia*.

Pharmacia is a liable person in this statutory 21E case, in which Mystic seeks contribution to fund the cleanup of the Site under § 4A, and recovery of property damages under § 5.

Some of Pharmacia's widespread contamination of the Site can be remediated, but some cannot, and it will remain as residual and permanent contamination. Mystic and Modern's experts have estimated the costs to remediate the property, as well as the permanent damage to the Site caused by the contamination. These calculations and estimates comprise the damages that Pharmacia is liable for, based on the applicable provisions and policies of the Act.

1. **LIABILITY**

   a. Liability for Response Costs Under 21E, § 4A

Pharmacia is liable for contribution to the estimated costs of the required response actions at the Site. M.G.L. §4A provides a procedure whereby a party gives notice to a potentially responsible party that the notifying party reasonably believes is liable under § 5 to seek contribution for clean up costs. The party notified need not be adjudicated as liable under § 5 in order for a party to prevail under § 4A.

Chapter 21E, § 4A states:

> Section 4A. (a) Any person...who *has undertaken*, is undertaking, *or intends to undertake* a necessary and appropriate response action or who is or reasonably believes that he might be liable pursuant to section five *may notify any person he reasonably believes is liable pursuant to section five* that the response action has been taken or is being taken or of the notifier's intent to take such response action or to seek *contribution, reimbursement* or equitable share from other persons...

(*emphases added*). On August 27, 2001 Mystic sent notice pursuant to § 4A to Pharmacia that Mystic reasonably believed Pharmacia was liable under § 5 and that Mystic sought contribution from Pharmacia for the cost of the response actions it has undertaken and that it intended to undertake.

When, as here, a plaintiff has complied with these notice provisions, Pharmacia's liability under § 4A is clear. Not only is it liable for property damage under § 5, it is also liable under § 4A for contribution to the response costs that the present owner has undertaken and intends to undertake.

      b.    <u>Liability for Property Damages under 21E, § 5</u>

Pharmacia is liable for its contamination of the Mystic Site during its ownership and operations thereon. The operative statute is M.G.L. c. 21E, § 5(a). Chapter 21E, § 5(a) states, in pertinent part:

> *any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material…, shall be liable, without regard to fault… (iii) to any person for damage to his real or personal property incurred or suffered as a result of such release or threat of release…*

(*emphasis added*). Thus, the elements to prove the liability under § 5 are: 1) Pharmacia is a "person," 2) who owned or operated the Mystic Site, 3) at the time of storage or disposal of hazardous materials on the Site, 4) a release or threat of release of hazardous material occurred, and 5) the property was damaged as a result of the release or threatened release.

Pharmacia is a legal person. The definition of "Person" in M.G.L. c. 21E, § 2 is "any…private corporation…" For thirty-seven years Pharmacia operated the site as a chemical manufacturing operation (from 1929 until 1975). Pharmacia was the owner or operator when generation, manufacturing, storage, and disposal of hazardous materials occurred at the Site.

During the decades of Pharmacia's ownership, until 1975, Pharmacia's operations at the Site included handling and storage of raw materials for chemical manufacturing; manufacture and storage of chemical products and by-products; and production, handling, storage and disposal of wastes and byproducts. The chemical products, raw materials, byproducts and waste are clearly included within the definition of "hazardous material."

Releases or threats of releases of hazardous materials occurred on the Mystic Site during Pharmacia's ownership and operations. Under c. 21E, § 5(a)(2), a person is liable for a release of hazardous material from a site if that person was the owner or operator of such site at the time of the storage or disposal of the hazardous material at or upon the site. Further, the release is not required to occur during the former owner's operation of the site. The undisputed evidence shows that the releases occurred during, and were caused by, Pharmacia's operations at the Site, thereby establishing Pharmacia's liability under § 5(a)(2). Second, liability is established under § 5(a)(5) as well, which requires causation. M.G.L. § 5(a)(5) states: "Persons liable...(5) any person who otherwise *caused* or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site."

**2.    DAMAGES**

    a.    <u>The Response Costs to Clean Up the Property that Pharmacia Must Pay Under § 4A</u>

Section 4A requires a liable person to pay response costs "undertaken" and response costs a party "intends to undertake." Regarding response costs already incurred, Mystic and Modern have engaged environmental consultants to conduct assessments of the Site to determine the extent of the contamination and the likely cleanup scenarios. Under 21E, § 2, the definition of "response action" includes "assess, assessment, contain, containment, remove and removal." The § 4A Notice served on Pharmacia informed the Defendant: "The cost of response actions to date is approximately $90,500." That was the relevant figure in August 2001. The Complaint in this action, at paragraph 39, informed Pharmacia that in excess of $100,000 in "investigation and analysis costs" had been incurred. Mystic and Modern engaged Rizzo Associates to conduct assessments of the Property including site characterization and investigation, sampling of soil

and groundwater, and preparation of cost estimates for remediation.[2] Costs for Rizzo Associates' assessment work to date are $145,449.53. This figure includes the response costs identified in the § 4A Notice and the Complaint; thus, the approximate total for response action costs undertaken is $145,449.53.

Regarding costs estimates for response actions Mystic intends to undertake to clean up the Property, Richard J. Hughto, Ph.D., P.E., LSP, Mystic's environmental consultant, has calculated the costs of response actions necessary to remediate the Site. Relying on his experience and qualifications relating to the remediation of contaminated sites, Dr. Hughto considered unknowns and other variables in his estimates. Thus, there is a range provided for the estimated costs of the clean up. In his expert Report, Dr. Hughto broke down the different components of a cleanup and provided estimates and attachments with detailed cost analyses. The major components of the clean up include soil disposal during construction; remediation of Upper Concentration Limit ("UCL") exceedances in soil; groundwater remediation; sediment remediation; compliance with other requirements of the Massachusetts Contingency Plan ("MCP"); and "additional considerations" described in the Report. The total cost estimate for cleaning up the Property range from a low of $2,265,046 to a high of $8,421,306. Please refer to the Expert Report of Mr. Hughto for the detailed explanation of these estimates.

       b.     <u>The Property Damages that Pharmacia Must Pay Under § 5</u>

Property damages are recoverable under § 5. The property damages are detailed in the Expert Report of Donald P. Bouchard, MAI, and Steven R. Foster, MAI. The "impaired valuation" of the Site due to the contamination was analyzed. Their conclusions are as follows: The market value of the property free of contamination (as of 9/1/05) was $19,200,000. The

---

[2] Rizzo Associates, like all environmental consultants must search for, investigate and analyze relevant documentation relating to a site in order to develop a plan to investigate the cleanup, as well as design the remediation of the contamination.

range of market values with contamination equals $9,160,000 to $15,240,000. The damages to the market value as a result of Pharmacia's contamination of the Property range from $4,000,000 to $10,000,000. Please refer to the Expert Report for a detailed breakdown and explanation of the estimates. Thus, under § 5, the Defendant is liable for property damages in an amount to be determined at trial falling within the range of $4,000,000 to $10,000,000.

### 3. SUMMARY OF DAMAGES
### M.G.L. Chapter 21E

| §4A Response Costs Incurred | §4A Response Costs to be Incurred | §5 Property Damages |
|---|---|---|
| • Reimbursement | • Contribution | • Permanent Diminution in Property Value |
| $145,449.53 | Estimated range: $2,265,046.00 to $8,421,306.00 | Estimated range: $4,000,000.00 to $10,000,000.00 |

**(1)(b) Concise Summary of the Evidence To Be Offered by Pharmacia Corporation**

The property located in Everett and Boston that is the subject matter of the action (the "Property") was owned by Pharmacia Corporation from in or about 1929 to 1983. The Property is bounded on the west by railroad tracks formerly owned by the Boston & Maine Railroad (the "B & M"). A significant portion of the land comprising the Property was formed by the placement of urban fill by the B & M and others prior to 1929.

Until 1975, Pharmacia operated the Property as a portion of a chemical manufacturing facility. The greater portion of this facility was located, and the great majority of the chemical manufacturing operations took place on the portion of the facility located to the west of the railroad tracks from the facility ("West Side"). The operations on the West Side included substantially all manufacture of complex organic chemicals. Virtually all onsite disposal of by-

products of chemical manufacturing operations took place on the West Side. As a result of these practices, the West Side was contaminated by a number of hazardous materials. Pharmacia arranged for this contamination to be investigated, contained and removed in accordance with the governing environmental laws. Approximately, $30 million was expended on these activities. None of the contamination on the West Side migrated to the Property.

In contrast to operations on the West Side, manufacturing operations on the Property during the period 1929 to 1975 were limited to traditional chemicals made from raw materials that could be brought to the facility in bulk by water. The principal products manufactured on the Property at that time were sulfuric acid, nitric acid and acid salts. The only organic substance produced was alcohol. Chemical manufacturing had been carried out on the Property by companies other than Pharmacia for many decades before 1929. Pharmacia's operations on the Property ceased in approximately 1975, before the enactment of Chapter 21E of the Massachusetts General Laws.

Pharmacia placed the Property on the market for sale in the late 1970s. It knew at that time that the soils and groundwater on the Property were contaminated and, pursuant to company policy, made certain that any prospective purchaser was aware of the condition and recent history of the Property and that future use of the Property was limited to industrial and manufacturing uses. In that regard, Pharmacia's purchaser, Boston Edison Company ("Boston Edison") was invited to test the soil and groundwater and interview Monsanto personnel. Tests by Boston Edison's consultant showed that the contamination of concern consisted principally of sulfur, which could reduce the pH of soil and groundwater, and metals, principally lead. Tests by other consultants over the years have confirmed this analysis. It is not possible to identify from the test results the time of the releases that account for particular contamination. No

operation conducted by Pharmacia between 1929 and 1975 accounts for the presence of lead on portions of the Property where it is found.

Every owner subsequent to Pharmacia purchased the Property with knowledge that the Property was contaminated. The deed from Pharmacia to Boston Edison placed a use restriction on the Property. When Boston Edison sold the Property, transactional documents recited that the purchase price took account of environmental contamination. When Mystic's affiliate, Modern Continental Construction Co., Inc. ("Modern") acquired an option to purchase the Property in 1996, the agreement provided for reduction of the option price because of environmental contamination. Even where such a relationship between condition and price is not set forth in the documentation relating to a transfer, from and after the 1990s, purchasers of former industrial property in Massachusetts invariably take account of environmental contamination in setting the price they pay for the property.

Modern assigned the option to Mystic, and Mystic purchased the Property in June 2001 with full knowledge of the contamination of the subsoil and groundwater that is known today. The consideration for the purchase recited in the deed and the amount paid by Mystic was $300,000. At or about the time of the purchase, Mystic had the Property appraised, and its value was stated to be approximately $17,000,000 without any adjustment for the presence of contamination.

Mystic did nothing to carry out the obligations of an owner of contaminated property under chapter 21E and the Massachusetts Contingency Plan until October 6, 2005. It was advised of those obligations by a consultant it hired to advise it with respect to potential development. Nevertheless, Mystic allowed a series of regulatory deadlines to pass without taking any action to investigate, contain or remove the contamination of the Property.

From 1996 until the present, Modern has used the Property for activities involved in the performance of several construction contracts that form a part of the Central Artery/Tunnel Project. These activities include storing piles of debris and trash, storing old lead-painted structural members, refueling construction vehicles in an unpaved area and breaking up the old elevated Central Artery. These activities resulted in releases of lead, oil and asbestos onto the Property during Mystic's ownership and Modern's operation of the Property. The Commonwealth's Department of Environmental Protection determined that Modern had violated chapter 21E and had illegally operated an unpermitted solid waste facility on the Property and fined it $35,000 for those violations.

Purchasers of contaminated property in and around Massachusetts take the contamination into account in identifying permissible development options. Pre-existing use limitations must be taken into account, and developers of contaminated property recognize that additional use limitations may be imposed. These factors and the need to obtain an economic return from all planned expenditures affect the highest and best use of any contaminated property. As to the Property, to the extent relevant to the adjudication of this matter, the evidence will show that reasonable response costs resulting from the application of these principles based on existing information would be between $750,000 and $850,000.

(2) <u>Facts established by pleadings or by stipulation or admissions of counsel</u>

    1.    The Property is an approximately 35 acre parcel of land located on the shore of the Mystic River at State Route 99 and Chemical Lane in Boston and Everett, Massachusetts (the "Property").

    2.    The Property has been owned by Mystic since June 21, 2001.

    3.    The Property was formerly owned and operated by Pharmacia.

4. Pharmacia owned the Property from in or about 1929 to 1983 and operated a chemical manufacturing plant at the Site until in or about 1975.

5. Pharmacia's operations at the Property are described in several documents, including but not limited to:.

- 10/22/73 Monsanto Environmental Assessment of the Site
- 11/19/81 Monsanto Memorandum and attached "Site History and Environmental Status Summary – Sale of Everett Plant East Side Property"
- 6/3/80 Monsanto Memorandum ("Everett Plant, East Side Assessment")
- 8/4/80 Monsanto Memorandum entitled "Sale of Monsanto Land"

6. Releases of oil and/or hazardous materials occurred during the time the Property was owned by Pharmacia.

7. A series of environmental studies of the Property were conducted through the years. Such studies documented contamination at the Property. Such studies include:

- Environmental Assessment Sale of 34 Acres-Everett Plant, 10/22/73 (0004951)
- Dames & Moore, Hydrogeologic Survey, 1/8/80 (000325)
- Monsanto Memo, Everett Plant, East Side Assessment, 6/3/80 (0009975)
- Monsanto Memo, Sale of Monsanto Land, 7/21/80 (0010702)
- Dames & Moore, Report, Hydrogeological Services, 12/23/80 (0000314)
- Monsanto, Site History and Environmental Status Summary, Sale of Everett Plant, East Side Property, 11/19/81 (0006322)
- Monsanto, Proposed Property Sale to Boston Edison Company, 1/22/82 (0006273)
- Perkins Jordan, Site Contamination and Liability Audit on Monsanto Property, 7/16/82 (0005923)
- Consulting Engineers & Scientists, Phase I, Initial Site Investigation Report, 1/15/97 (MONS1 0001554)
- Rizzo Associates, Environmental Studies, 6/19/01 and 8/10/01
- Woodard and Curran, Environmental Study, 10/1/04

8. The deposition of Gerald Rinaldi, current Manager of Remediation at Solutia, Inc. and former employee of Pharmacia was taken on September 8, 2005.

9. Modern has used the Property as a construction laydown and storage yard since in or about 1996.

10. Mystic was formed on June 7, 2001.

- 11 -

11. At the time Mystic purchased the Property, it was aware that the Property was contaminated.

12. Attached as Exhibit 38 to the Affidavit of Elisabeth M. DeLisle In Support of Defendant Pharmacia Corporation's Motion for Partial Summary Judgment is a copy of an Assignment and Assumption of Rights and Obligations, which transferred Modern's option to purchase the Property to Mystic. This document was executed by Peter M. Grela on behalf of both Mystic and Modern.

13. On August 8, 2005, Mystic Landing, LLC and the Massachusetts Department of Environmental Protection entered into an Administrative Consent Order with Penalty and Notice of Noncompliance related to Modern's use of the Property during the period of Mystic's ownership. A copy of the Administrative Consent Order with Penalty and Notice of Noncompliance is attached as Exhibit 1.B. to the Affidavit of Elisabeth M. DeLisle In Support of Pharmacia Corporation and Monsanto Company's Opposition to Motion for Summary Judgment on Liability.

(3) Contested Issues of Fact

1. Whether Mystic purchased the Property at a discount from its fair market value.

2. Whether Mystic has incurred any response costs, as that term is defined in M.G.L. c. 21E.

3. Whether releases of oil and/or hazardous materials occurred during the time the Property was owned by Mystic and/or operated by Modern Continental Construction Co., Inc.

4. Whether Mystic has incurred and/or intends to incur costs for response actions at the Site.

5.  To what extent, if any, there will be permanent damages based on residual contamination that cannot be remediated.

(4) <u>Jurisdictional Questions</u>.  None.

(5) <u>Questions raised by pending motions</u>.

1.  **Motion for Summary Judgment on Liability by Modern Continental Construction Co., Inc. and Mystic Landing, LLC.**

a. Whether Pharmacia is a liable party under M.G.L. c. 21E. (Facts sufficient to show that Pharmacia is a liable party have been established or admitted.)

2.  **Opposition to Motion for Summary Judgment on Liability filed by Pharmacia Corporation.**

a. Whether Modern is a liable party under M.G.L. c. 21E.

b. To what degree Mystic and/or Modern are liable in contribution for the cleanup of the Property.

c. Whether Pharmacia should bear the greater part of damages related to the Property.

d. Whether Modern can join Mystic's Motion for Summary Judgment on Liability.

3.  **Motion for Partial Summary Judgment by Pharmacia Corporation.**

a. Whether a claimant under M.G.L. c. 21E may recover damages for response costs it has not incurred.

  i. Whether Pharmacia is entitled to Partial Summary Judgment on elements of Counts I and II of the Complaint if Mystic provided no evidence of past response costs.

    ii. Whether § 4A provides any substantive right to recovery of response costs.

    iii. Whether the only money damages recoverable under M.G.L. c. 21E are damages for response costs that have already been incurred.

    iii. Whether the Court may award response costs in advance of their being incurred and in advance of a determination that such response costs are reasonable and necessary.

b. Whether a claimant who purchased property with knowledge that the property was contaminated may recover damages under M.G.L. c. 21E for damage to the property caused by that environmental contamination.

    i. Whether a buyer's knowledge of contamination before the purchase of a property means there is no injury to the buyer.

    ii. Whether the doctrines of mitigation of damages and assumption of the risk defeat summary judgment.

c. Whether Mystic's claim for property damages was disclosed during discovery and, if not, whether Mystic is precluded from recovering such damages by such failure to disclose.

d. Whether a property damage award for Mystic is a duplicate recovery.

4. **Opposition to Motion for Partial Summary Judgment by Modern Continental Construction Co., Inc. and Mystic Landing, LLC**

a. Whether Mystic and Modern have identified genuine disputes of material fact sufficient to defeat summary judgment.

b. Whether Pharmacia is entitled to partial Summary Judgment even if the proposed facts are undisputed.

c. Whether §4A allows recovery of response action costs incurred and intended to be incurred?

d. Whether the common law arguments of Pharmacia are applicable to a determination of strict liability under 21E?

5. **Motion of Defendant Pharmacia Corporation to Foreclose Presentation of Evidence on Damages**

a. Whether Mystic should be permitted to introduce as evidence of past Response Costs invoices if they (i) were not produced before the close of discovery (ii) were not addressed to or paid by Mystic and (iii) reflect litigation costs rather than response costs.

(6) Issues of Law

1. The issues set forth in section 5.

2. Whether the measure of property damages is temporary or permanent. *Guaranty-First Trust Co. v. Textron*, 416 Mass. 332 (1993); *Black v. Coastal Oil*, 45 Mass. App. Ct. 461 (1998); *Hill v. Metropolitan District Commission*, 439 Mass. 266, 274 (2003).

3. Whether Mystic is entitled to recover from Pharmacia for property damages, and if so, in what amount. *Guaranty-First Trust Co. v. Textron*, 416 Mass. 332 (1993); *Black v. Coastal Oil*, 45 Mass. App. Ct. 461 (1998); *Hill v. Metropolitan District Commission*, 439 Mass. 266, 274 (2003) *Byrnes v. Massachusetts Port Auth.*, 1994 WL 879644 (Mass. Super. Ct. 1994).

4. Whether Mystic is entitled to recover from Pharmacia for response costs, and if so, in what amount or for what percentage share.

5. Whether Mystic is entitled to recover from Pharmacia response costs or cleanup costs not yet incurred but to be incurred. *Black v. Coastal Oil*, 45 Mass. App. Ct. 461

(1998); *Mailman's Steam Carpet Cleaning Corp.* v. *Lizotte,* 415 Mass. 865 (1993); *Martignetti & others v. Haigh-Farr, Inc.,* 425 Mass. 294 (1997).

  6. The degree to which the recovery in contribution of a claimant for response costs under M.G.L. c. 21E is reduced by its having purchased with knowledge of the contamination required to be remediated. *Western Properties Service Corp. v. Shell Oil Co.,* 358 F.3d 678 (9th Cir. 2004); *BCW Associates, Ltd. v. Occidental Chemical Corp.,* 1988 WL 102641 (E.D. Pa. 1988).

  7. The degree to which the recovery in contribution of such a claimant is reduced by its having received a discount in the purchase price by reason of that contamination. *Smith Land & Improvement Corp. v. Celotex Corp.,* 851 F.2d 86, 90 (3rd Cir. 1988); *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 673 (5th Cir. 1989); *Western Properties Service Corp. v. Shell Oil Co.,* 358 F.3d 678 (9th Cir. 2004); *Bethlehem Iron Works, Inc. v. Lewis Industries,* 1996 WL 557592 (E.D. Pa. 1996).

  8. The degree to which the recovery in contribution of such a claimant is reduced by the property's having been further contaminated while owned by the claimant. *Martignetti v. Haigh-Farr, Inc.,* 425 Mass. 294, 314-315, 680 N.E.2d 1131, 1144-1145 (1997); *United States v. R. W. Meyer, Inc.,* 932 F.2d 568, 572 (6th Cir. 1991); *Bethlehem Iron Works, Inc. v. Lewis Industries,* 1996 WL 557592 (E.D. Pa. 1996).

  9. The degree to which the recovery in contribution of such a claimant is reduced by its having failed to perform the obligations of a property owner to respond to contamination. *Central Maine Power Co. v. F.J. O'Conner,* 838 F. Supp. 641, 646 (D. Me. 1993); *Bethlehem Iron Works, Inc. v. Lewis Industries,* 1996 WL 557592 (E.D. Pa. 1996).

  10. The degree to which the recovery in contribution of such a claimant is reduced by its having allowed the property to be used as an illegal unpermitted solid waste

facility in a manner that violates M.G.L. c. 21E. *Martignetti v. Haigh-Farr, Inc.*, 425 Mass. 294, 314-315, 680 N.E.2d 1131, 1144-1145 (1997); *Central Maine Power Co. v. F.J. O'Conner*, 838 F. Supp. 641, 646 (D. Me. 1993); *Bethlehem Iron Works, Inc. v. Lewis Industries*, 1996 WL 557592 (E.D. Pa. 1996).

11. The appropriate contribution share of liability for response costs under M.G.L. c. 21E of a third-party defendant that released hazardous materials and oil on the property at issue and operated the property as an unpermitted solid waste facility in violation of c. 21E and other laws. *Central Maine Power Co. v. F.J. O'Conner*, 838 F. Supp. 641, 646 (D. Me. 1993); *Bethlehem Iron Works, Inc. v. Lewis Industries*, 1996 WL 557592 (E.D. Pa. 1996).

(7) Requested Amendments to the Pleadings.

(a) By Plaintiff Mystic Landing, LLC

The Plaintiff respectfully requests that the proposed amendment to the complaint, attached hereto, be granted. Amendments to the Complaint include changing the state pleading to a federal pleading; deleting the common law claims of negligence, continuing nuisance and trespass; adding the response costs estimates for response actions intended to be undertaken; and adding the amount of property damages sought.

The parties may move to amend the pleadings to conform to the evidence, once trial of this matter is completed.

(b) By Defendant Pharmacia Corporation

None, other than to note that former Defendant Monsanto Company was dismissed from this action by stipulation, and Plaintiff's Counts 3, 4, and 5 in the existing Complaint have been dismissed as to all parties.

Pharmacia objects to Mystic's proposed amendment to the Complaint. Pharmacia takes the position that permitting Plaintiff Mystic Landing, LLC to amend its Complaint at this late

stage in the proceeding, well after the close of discovery and shortly before trial, would be unfairly prejudicial to Pharmacia. Pharmacia in good faith conducted its discovery, drafted its dispositive motion and opposition to Mystic's dispositive motion, and has been developing its strategy for trial on the basis of the information contained in the Complaint filed by Mystic in the Middlesex Superior Court in December of 2003. Mystic's proposed amendment to the Complaint differs substantially from the original Complaint by, *inter alia,* adding additional counts to the Complaint and seeking relief that Pharmacia believes was not sought in the original Complaint. Mystic should not be permitted to so amend the Complaint at this late stage in the proceeding in order to correct deficiencies pointed out by Pharmacia in its dispositive motion and its opposition to Mystic's dispositive motion. Furthermore, Pharmacia specifically objects to Mystic's proposed amendment seeking reimbursement of $186,304.97 as such amendment would be futile as, as demonstrated in Pharmacia Corporation's Motion to Foreclose Presentation of Evidence on Damages, Mystic should be foreclosed from introducing evidence at trial to demonstrate that it has incurred these costs, and in any event Mystic will not be able to so demonstrate because the unambiguous record documents that Mystic has not incurred these costs.

(8) <u>Additional matters to aid in the disposition of this action</u>. None.

(9) <u>Probable Length of the Trial</u>. The parties estimate that the trial will take approximately 5 full days to try.

By their attorneys,

/s/ Doreen M. Zankowski                           /s/ John M. Stevens

---

Robert G. Flanders, Jr. (BBO No. 170820)         John M. Stevens (BBO No. 480140)
Doreen M. Zankowski (BBO No. 558381)             Adam P. Kahn (BBO No. 561554)
Kevin M. Plante (BBO No.        )                Elisabeth M. DeLisle (BBO No. 658067)
Hinckley, Allen & Snyder LLP                     Foley Hoag LLP
28 State Street                                  155 Seaport Boulevard
Boston, Massachusetts  02109-1775                Boston, Massachusetts  02210
(617) 345-9000                                   (617) 832-1000
 Attorneys for Mystic Landing, LLC and            Attorneys for Pharmacia Corporation
Modern Continental Construction Co., Inc.


Dated:   December 2, 2005