# HINCKLEY, ALLEN & SNYDER LLP

*Attorneys at Law*

28 STATE STREET
BOSTON, MASSACHUSETTS 02109-1775
617 345-9000
FAX: 617 345-8020

August 27, 2001

COPY

VIA FACSIMILE (908) 901-8379
AND CERTIFIED MAIL

Fred Hassan, Chairman and CEO
Pharmacia Corporation
100 Route 206 North
Peapack, NJ 07977

Richard T. Collier, Esquire
Pharmacia Corporation
100 Route 206 North
Peapack, NJ 07977

VIA FACSIMILE (617) 832-7000
AND CERTIFIED MAIL

Adam P. Kahn, Esq.
Foley Hoag, LLP
One Post Office Square
Boston, MA 02109

Re: Mass. Gen. Laws ch. 21E, § 4A Demand Letter
Former Monsanto Site
Alford Street, Everett, Massachusetts
DEP RTN 3-13341

Dear Messrs. Hassan, Collier and Kahn:

On behalf of Mystic Landing, LLC ("Mystic"), this letter constitutes notice, pursuant to Mass. Gen. Laws ch. 21E, § 4A, that Pharmacia Corporation ("Pharmacia") is liable to Mystic for all damages pursuant to Mass. Gen. Laws ch. 21E, § 5, in connection with the release of hazardous material or oil ("OHM") at property located at Alford Street and Broadway, Everett and Boston, Massachusetts (the "Site").

I. <u>Person Giving Notice</u>

Pursuant to Mass. Gen. Laws ch. 21E, § 4A(a)(i), the entity providing this notice is Mystic, a limited liability company organized under the laws of the Commonwealth of Massachusetts. Mystic is the current owner of the Site.

II. <u>Response Actions Taken</u>

Pursuant to Mass. Gen. Laws ch. 21E, § 4A(a)(ii), to follow is a description of the response actions taken and to be taken at the Site, and the nature and amount of the potential liability.

HINCKLEY, ALLEN & SNYDER LLP

Adam Kahn, Esquire
August 27, 2001
Page 2

### A. 1995 – 1996 Limited Subsurface Investigation

A previous Site owner conducted a limited subsurface investigation of the Site in 1995, consisting of excavating test pits and collecting soil samples for laboratory analysis. The results of the analysis of the soil samples collected from the test pits indicated the presence of elevated concentrations of certain metals and petroleum hydrocarbons. As a result, the then owner submitted a Release Notification Form ("RNF") to the Commonwealth of Massachusetts, Department of Environmental Protection ("DEP") on January 18, 1996. The DEP assigned Release Tracking Number ("RTN") 3-13341 to the Site.

An additional subsurface investigation was conducted at the Site in December 1996, and included the installation and sampling of 7 soil borings/monitoring wells. Concentrations of arsenic and lead were identified in the soil samples at concentrations ranging from 33 to 1,400 milligrams per kilogram (mg/kg) and 630 to 11,000 mg/kg, respectively. In four of the wells, dissolved lead and arsenic were detected at concentrations greater than RCGW-2 reportable concentrations. In general, the highest levels of contamination were identified on the southwestern portion of the Site.

Using the data generated during their subsurface investigation, a Phase I – Initial Site Investigation report was prepared for the Site in January 1997.

### B. Rizzo Associates Subsurface Investigation

Rizzo Associates performed additional subsurface investigation at the Site in April and May of 2001. The investigation included the installation of 31 shallow soil borings, 10 of which were completed as groundwater monitoring wells, the excavation of 15 test pits, and the collection and laboratory analysis of soil and groundwater samples.

#### 1. Soil Analysis Results

With respect to the soil at the Site, lead and arsenic were detected at the highest concentrations and with the greatest frequency. Elevated concentrations of mercury, naphthalene, and selected PAHs were identified in selected samples. The following highlights the compounds detected in the soil samples, their general occurrence, and range of detected concentrations.

Arsenic: Total arsenic was detected in all of the 44 soil samples submitted for metals analysis, at concentrations ranging from 3.2 mg/kg to 560 mg/kg. The Massachusetts Contingency Plan ("MCP"), 310 CMR 40.0000, Method 1 S-1/GW-2 cleanup standard for arsenic is 30 mg/kg, and the Upper Concentration Limit ("UCL") for arsenic is 300 mg/kg. The average detected arsenic concentration for the samples collected by Rizzo Associates was 67 mg/kg.

HINCKLEY, ALLEN & SNYDER LLP

Adam Kahn, Esquire
August 27, 2001
Page 3

Lead: Total lead was detected in 42 of the 44 soil samples submitted for analysis, at concentrations ranging from 4.2 mg/kg to 20,000 mg/kg. The MCP Method 1 S-1/GW-2 cleanup standard for lead is 300 mg/kg. The average detected lead concentration for the samples collected by Rizzo Associates was 1,260 mg/kg.

Other Metals: Other metals detected in the soil sample collected during the Rizzo Associates investigation included mercury at concentrations ranging from 0.29 to 61 mg/kg (the MCP S-1/GW-2 standard is 10 mg/kg), and selenium at concentrations ranging from 4.8 to 840 mg/kg (the MCP S-1/GW-2 standard is 400 mg/kg). These metals were detected with less frequency than the lead and arsenic, with mercury identified in 25 of the 44 samples submitted and selenium identified in 9 of the 44 samples submitted. The remaining RCRA 8 metals were detected in other soil samples collected at the Site, however, at concentrations below the MCP standards applicable to the Site.

EPH/ VPH: EPH target carbon compounds were detected in 38 of the 45 soil samples submitted for laboratory analysis by Rizzo Associates. Although the maximum detected total EPH concentration was 43,240 mg/kg, the average total EPH concentration across the Site was 1,896 mg/kg. VPH target carbon compounds were identified in 2 of the 45 soil samples submitted for analysis. The maximum detected VPH concentration was 4,115 mg/kg. Total EPH concentrations in the surficial soil samples ranged from 32 to 414 mg/kg. VPH target carbon compounds were not detected in the surficial soil samples collected at the Site.

Polycyclic Aromatic Hydrocarbons: PAH compounds were identified in 19 of the 45 samples submitted for analysis, with flouranthene being the most frequently detected. Seven of the PAHs were identified at concentrations above their applicable MCP Method 1 S1/GW-2 standards. 2-methylnaphthalene was identified at the highest concentration of all the PAHs (71mg/kg). The PAHs fluoranthene and phenanthrene were detected in one of the surficial soil samples collected at the Site (Boring 18) at concentrations below the MCP S-1/GW-2 standards. No other PAHs were identified in the surficial soils at the Site.

Volatile Organic Compounds: Naphthalene was the most frequently detected VOC at the Site, occurring in 13 of the 38 samples submitted for analysis. None of the VOCs identified in the samples exceeded their respective MCP S-1/GW-2 cleanup standards. VOCs were not identified in the surficial soil samples collected at the Site.

2. Groundwater Analysis Results

With respect to groundwater at the Site, elevated concentrations of dissolved lead, arsenic, and cadmium were identified in the wells located on the southwestern portion of

HINCKLEY, ALLEN & SNYDER LLP

Adam Kahn, Esquire
August 27, 2001
Page 4

the Site. The following highlights the compounds detected in the groundwater samples, their general occurrence, and range of detected concentrations.

<u>Arsenic</u>: Dissolved arsenic was detected in 11 of the 16 groundwater samples collected at the Site by Rizzo Associates. Detected arsenic concentrations ranged from 12 to 50,500 ug/L. The average dissolved arsenic concentration identified in the groundwater samples collected by Rizzo Associates is 548 ug/L; the MCP Method 1 GW-3 standard is 400 ug/L.

<u>Lead:</u> Dissolved lead was identified in 6 of the 16 groundwater samples submitted for analysis, and was detected at concentrations ranging from 13 to 1,420 ug/L. The average dissolved lead concentration identified in the samples collected by Rizzo Associates is 424 ug/L; the MCP Method 1 GW-3 standard for dissolved lead is 30 ug/L

<u>Other Metals</u>: Dissolved cadmium was identified in 4 of the 16 groundwater samples submitted by Rizzo Associates, with detected concentrations ranging from 11 to 114 ug/L. All of the samples contained dissolved cadmium concentrations at levels above the Method 1 GW-3 standard of 10 ug/L.

<u>EPH/VPH</u>: EPH was identified in 5 of the 16 groundwater samples submitted for analysis. The maximum total EPH concentration was 630 ug/L. None of the identified EPH carbon compounds exceeded their respective Method 1 GW-2 or GW-3 standards. VPH was detected in the groundwater sample at concentrations ranging from 80 ug/L to 20,950 ug/L. No other detectable levels of VPH were identified in the remainder of the groundwater samples submitted for analysis.

<u>Volatile Organic Compounds</u>: Low concentrations of petroleum-related VOCs, including benzene, naphthalene, ethylbenzene, toluene, and xylene, in addition to 1,1,1 trichloroethane and carbon disulfide, were identified in a few of the groundwater samples. None of the identified concentrations of these contaminants exceeded their respective Method 1 standards.

<u>pH:</u> Areas of low pH groundwater were identified during our investigation. Identified pH values ranged from 1.9 to 7.0 standard units ("su"). The wells with the lowest pH readings are generally located on the southern and southwestern portions of the Site. Any liquid that exhibits a pH of less than 2.0 su is considered corrosive, and is labeled as a hazardous material by the MCP.

    C.    <u>Future Response Actions</u>

In order to achieve regulatory closure pursuant to the MCP, a Licensed Site Professional ("LSP") must determine that conditions at the Site pose No Significant Risk ("NSR") to public safety, human health, and the environment. In order to determine NSR

HINCKLEY, ALLEN & SNYDER LLP

Adam Kahn, Esquire
August 27, 2001
Page 5

for the Site without the use of an Activity and Use Limitation ("AUL"), concentrations of soil contaminants need to be reduced to levels below the MCP Method 1 S1/GW-2 and S-1/GW-3 cleanup standard. Although groundwater contamination is present at the Site, we have assumed for purposes of future response actions that the excavation of the contaminated soils in conjunction with dewatering activities may effectively remediate the groundwater contamination. Please be advised, however, that if groundwater contamination results in further action, including, but not limited to, pump and treat activities, the costs associated with such groundwater remediation activities would also be included in the Permanent Solution.

Based on the nature and extent of the contamination identified at the Site to date, the following remedial scenario is anticipated to achieve a Permanent Solution at the Site. The major components of the remedial approach include pre-characterization of the soils for disposal, excavation and off-site disposal of impacted soils and associated dewatering, Site restoration, and preparation of all necessary MCP plans, reports and submittals.

- Pre Characterization Investigation: A field investigation program would be implemented to collect pre-characterization soil samples. These samples would be collected from the contaminated fill layer and submitted for laboratory analysis for standard disposal parameters. Based on an area of approximately 900,000 square feet, and an average fill thickness of 6.5 feet, approximately 216,000 cubic yards of the fill material are present at the Site. It is estimated that 125,000 cubic yards will require disposal.

- Remedial Field Program: Once the pre-characterization investigation is completed, and the soil disposal options have been evaluated and implemented, contaminated soils will be excavated from the Site. Approximately 1,700 cubic yards of soil can be excavated and removed from the Site per day. As a result, the excavation of 125,000 cubic yards of material is expected to take approximately 75 days, or 2.5 months.

During excavation, dewatering activities are likely to be required since the expected depth of excavation below the ground surface ("bgs") is approximately 10 feet, while depth to groundwater varies from 3 to 8 feet bgs. Groundwater at the Site is impacted with dissolved metals and petroleum compounds in addition to exhibiting a low pH. These factors serve to complicate the treatment of extracted groundwater at the Site, which will likely include pH adjustment, metals removal and disposal of the resulting metals sludge.

Once the excavation is completed, confirmatory samples are proposed to be collected from the bottom and sidewalls of the excavation. Pending the results of the samples, the excavation would be backfilled.

HINCKLEY, ALLEN & SNYDER LLP

Adam Kahn, Esquire
August 27, 2001
Page 6



- <u>Regulatory Filings</u>: To implement the response actions described above, several submittals to various federal, state, and municipal agencies will be required. With the completion of the Phase II field activities, a Method 3 Risk Characterization could be prepared to fully characterize the site and specify potential risks at the Site. The implementation of the excavation and dewatering activities would require the preparation of a Release Abatement Measure ("RAM") Plan. Additional approvals from the Boston and Everett Conservation Commissions and each City's respective Board's of Health may be required to complete the work. We are currently reviewing the impact of any Chapter 91 license requirements that may become an issue due to the soil and groundwater contamination remediation activities.

Once the remedial activities have been completed at the Site, a Class A-2 Response Actions Outcome ("RAO") statement would be prepared and submitted to the DEP.

D.  <u>Estimated Cost and Schedule</u>

At this time, we have estimated the total remedial cost at $17,600,000. This estimate does not include costs to excavate the tunnel muck layer, which is estimated at approximately $150,000. The estimate does not include any costs for groundwater remediation.

The estimated time to the complete this remedial program is approximately 9 to 11 months, which includes 2 months to obtain the required approvals and perform the pre-characterization investigation, 2 months to develop bid specifications and mobilize site operations and prepare soil transportation documents, and 3 to 4 months to implement the field remedial program, and 2 to 3 months to prepare the RAO. Our time estimates assume State and local cooperation regarding any required permits and approvals and no appeals of any approvals.

This is a preliminary estimate that has been made without complete soil disposal parameter information and general assumptions and estimates about the dewatering requirements and costs. Additionally, groundwater treatment has only been factored into our estimate in a very limited manner. The estimated costs for obtaining a Class A-2 RAO for the Site could vary considerably, and Mystic reserves the right to supplement this estimate. The cost of the response actions to date is approximately $90,500. The total cost of response actions is approximately $17,600,000.

III.  <u>Factual and Legal Basis of Liability</u>

Pharmacia is liable to Mystic for damages as a result of the contamination as the successor entity of Monsanto Company, a former owner/operator of the Site. Pursuant to

HINCKLEY, ALLEN & SNYDER LLP

Adam Kahn, Esquire
August 27, 2001
Page 7

Mass. Gen. Laws. Ch. 21E, §5(a), "any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material . . . shall be liable, without regard to fault . . . to any person for damage to his real or personal property incurred or suffered as a result of such release or threats of release." Pharmacia cannot avoid its liability to Mystic by attempting to convey its liability to another.[1] Nor can Pharmacia avoid liability by attempting to put Solutia in its place.

Monsanto owned and operated the Site at the time the releases of hazardous materials at issue occurred. It is our understanding, based upon documents from the Registry of Deeds of Suffolk and Middlesex, and the Suffolk and Middlesex land court, that Monsanto owned the Site from at least the 1950's to 1983. According to Solutia's documents, on August 18, 1997, Monsanto shareowners approved the spin-off of Monsanto's chemical business as Solutia, Inc., and the new company became independent on September 1, 1997.

It is our understanding that by 1943, the Site had been acquired by the Monsanto Chemical Company. The 1950 Sanborn Insurance Map indicates that large-scale chemical production was taking place over the entire Site. The map indicates that large quantities of sulfur were stored on the southwestern portion of the Site, which was used in the large-scale production of sulfuric acid. Numerous sulfuric acid storage tanks are indicated in the southwestern portion of the Site, adjacent to the railroad tracks. The northern portions of the Site appear to have housed various administration buildings and laboratories for Monsanto.

The source of the metals contamination in the soil is related to the previous use of the Site and the northwesterly abutting property previously owned by Monsanto as a chemical manufacturing facility. The red and green colors observed in the soil at the Site may have been related to the storage of sulfur and the production of sulfuric acid by Monsanto. According to an internal DEP Memorandum regarding the abutting Monsanto property (now the Gateway Center Mall), dated February 5, 1997, DEP staff was told that a material used to dry sulfur for the former sulfuric acid production (most of which appears to have been performed at the Site) contained arsenic and was reportedly used as fill at the Site.

---

[1] Mass. Gen. Laws c. 21E, § 5(f) states that, "No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer liability from the owner or operator of any vessel or site or from any person who may be liable for a release or threat of release of oil or hazardous material under this section, to any other person the liability imposed under this section."

HINCKLEY, ALLEN & SNYDER LLP
  Adam Kahn, Esquire
  August 27, 2001
  Page 8

The petroleum-related contamination identified in the soil samples appears to be the result of a localized release. A review of the Sanborn maps for the Site document the storage of 80,000 gallons of crude oil storage in aboveground tanks. These tanks appear to have fed a boiler house associated with the former Monsanto operations. The source of the elevated areas of PAHs identified at the Site is likely the placement of fill materials containing ash and cinders or residual contamination resulting from the former storage of crude oil at the Site.

The source of the groundwater contamination is related to the historic use of the property as a chemical manufacturing facility and the placement of contaminated fill materials at the Site. Specifically, the areas of highest observed contamination at the Site were areas used to produce sulfuric acid. The Sanborn maps document the storage of in excess of 4 million gallons of acid in aboveground tanks on the central and southwestern portions of the Site through at least as late as 1972. A 5,000-gallon acid storage tank is indicated on the 1972 Sanborn map. This use likely resulted in the areas of low pH groundwater and elevated concentrations of dissolved metals. Elevated metals concentrations correlate with low pH values for groundwater, with the low pH groundwater causing leaching of the metals in the fill and resulting in the high dissolved metals concentrations. In addition, the placement of fill containing tank and still waste bottoms generated during Monsanto's former phthalic anhydride production resulted in low pH groundwater and elevated dissolved metals concentrations at the former Monsanto production area that abuts the Site to the west. Since the Site and the abutting property were once all owned and operated by Monsanto, it is likely that similar wastes have been used as fill at the Site, resulting in the low pH groundwater and dissolved arsenic and lead concentrations observed at the Site.

In general, and more specifically in response to your June 27, 2001 letter, none of the restrictions, covenants, or undertakings (the "Restrictions") in the June 20, 1983 deed from Monsanto to Boston Edison Company ("Edison"), or in the March 6, 1996 deed from Edison to O'Donnell Sand and Gravel, Inc., alters Monsanto's (and thus Solutia's, as Monsanto's corporate successor) liability under applicable environmental laws. Moreover, the Restrictions are irrelevant to the matter at hand, since as a matter of law the Restrictions cannot be enforced by Monsanto, or Solutia, as neither entity presently owns any land that is benefited by the Restrictions.

It is black letter law in Massachusetts that restrictions on land, being restraints on alienation, are highly disfavored. *See Stop & Shop Supermarket Co, v. Urstadt Biddle Properties, Inc.*, 433 Mass 285, 289, 740 N.E.2d 1286, 1289 (2001). This policy is reflected in the several strict requirements that are necessary, under Massachusetts law, for a real covenant, equitable servitude, or other such restriction (hereafter, a "restriction") to be enforceable against a successor to a covenanter's title (i.e., in this case, Mystic is the successor to a covenanter's title, since Mystic is the successor in title

HINCKLEY, ALLEN & SNYDER LLP

Adam Kahn, Esquire
August 27, 2001
Page 9

to Edison and S&G, each of whom covenanted in their respective deeds to adhere to the Restrictions). In the context of this case, chief among these obstacles to the enforceability of a restriction is the doctrine that a restriction for the benefit of a private, non-governmental party will not run with the land if such benefit is "in gross"[2] i.e., the restriction does not benefit (or, to use real property jargon, is not "appurtenant to") a dominant estate owned by the benefited party. *Garland v. Rosenshein*, 420 Mass 319 (1995); *Orenberg v. Horan* (a.k.a. *Orenberg v. Johnston*) 269 Mass 312 (1929); *Lincoln v. Burrage*, 177 Mass 378 (1901); *Inhabitants of Middlefield v. Church Mills Knitting Co.*, 160 Mass 267 (1894).

When Solutia sold the property abutting the Site (the "Abutting Property") to DDRC Gateway LLC ("DDRC") on or before March 5, 1999, Solutia divested itself of the only land to which the Restrictions are even arguably appurtenant. From that moment on, any benefit Monsanto or Solutia might derive from enforcement of the Restrictions was merely a benefit "in gross." Hence, as of the date of such transfer, the burden[3] of the Restrictions ceased to run, at least with respect to enforcement thereof by either Monsanto or Solutia.[4] Thus, the Restrictions, at least with respect to enforcement by Monsanto or Solutia, did not run with the burdened land when Mary O'Donnell (who had bought the Site from S&G in 1995), sold the Site to Mystic on June 21, 2001.

That neither Monsanto nor Solutia may enforce the Restrictions is also clear from an examination of the "touch and concern" requirement. In Massachusetts, "it is essential that both the benefit and the burden of a real covenant 'touch and concern' the affected parcels of land before it will be considered to run" (emphasis added)." *Whittinsville Plaza, Inc. v. Kotseas*, 378 Mass 85, 90 (1979). Even assuming, for the purposes of analysis, that the burden of each of the Restrictions "touches and concerns" the Site, nonetheless, since Solutia's sale of the Abutting Property to DDRC, neither Monsanto nor Solutia has owned any parcel of land that the Restrictions arguably "touch and concern." Thus, as of the date of Solutia's sale of the Abutting Property to DDRC, even if the Restrictions did "touch and concern" on the burdened side, the Restrictions clearly ceased to "touch and concern" on the benefited side, at least with respect to Monsanto and Solutia, whose only benefit from the Restrictions was "in gross." Consequently, due not only to the "in

---

[2] The burden of a restriction also will not run if the benefit is "personal" on the benefited side, which means that the restriction, although benefiting land owned by the covenantee, was not intended by the covenantee to run with that land.

[3] The benefit could not have "run with the land" either, since the benefit as of such date was merely "in gross," as discussed above.

[4] Indeed, it appears that as of such transfer date Monsanto and Solutia lost any right to enforce the Restrictions whatsoever. *See* Wolf, Michael A., *Powell on Real Property*, Volume 9, Section 60.04[3], p. 60-78 ("As to breaches [of restrictions] occurring subsequent to a complete transfer by the original covenantee, the remedy must be sought by the successor as the real party in interest.")

HINCKLEY, ALLEN & SNYDER LLP

Adam Kahn, Esquire
August 27, 2001
Page 10

gross" doctrine discussed above, but also, due to the "touch and concern" doctrine, the Restrictions ceased to run with the burdened land as of the date of Solutia's sale of the Abutting Property to DDRC, at least with respect to enforcement by Monsanto or Solutia.

The "in gross" doctrine and the "touch and concern" doctrine are merely the two most decisive reasons why neither Monsanto nor Solutia can enforce the Restrictions. Other reasons include, without limitation, the following: (a) it is unclear whether there exists the type of cross-easement scheme necessary to satisfy the "Massachusetts privity" requirement (See *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass 85, 90 (1979)); (b) it does not appear that the Restrictions are enforceable under M.G.L.c. 184, Section 30, and, in particular, the portion thereof severely limiting the enforcement of restrictions in situations where the "continuation of the restriction on the parcel against which enforcement is claimed. . . would impede reasonable use of the land for purposes for which it is most suitable, and would tend to impair the growth of the neighborhood or municipality in a manner inconsistent with the public interest or to contribute to deterioration of properties or to result in decadent or substandard areas or blighted open areas"; (c) with respect to the Restriction regarding indemnification (the "Indemnity Restriction"), it does not clearly appear, either from the language of that Restriction, or from the surrounding circumstances, that the parties intended for the burden of that Restriction to run with the land[5]; and (d) with respect to the Indemnity Restriction, there is no evident reason why an exception should be made to the general policy in Massachusetts of disfavoring the running of affirmative obligations. *Orenberg v. Horan* (a.k.a. Orenberg v. Johnston), 269 Mass 312, 315 (1929) ("(I)t never is to be forgotten that under all circumstances it is an anomaly requiring explanation when an active duty is other than personal, and is attached to land", quoting *Lincoln v. Burrage*, 177 Mass 378, 379-380 (1901)).

IV.   Conclusion

As the former owner/operator of the Site at the time of the release of hazardous materials, Pharmacia is responsible for all of the response costs and other damages

---

[5] Whereas other Restriction clauses begin with the preamble "EDISON and its successors in title agree, for the benefit of MONSANTO and its successors in title. . ." the Indemnity Restriction begins "EDISON shall at all times indemnify and uphold MONSANTO harmless . . ." without mentioning "and its successors in title" after either "EDISON" or "MONSANTO." Moreover, it is reasonable to assume that Monsanto was satisfied with the indemnity so long as it had Edison's credit behind that indemnity, without having to seek the additional credit of unknown successors in title. For its part, Edison presumably would not have wanted the Indemnity Restriction to run with the burdened land, since such running would have severely impacted the future marketability of the land. As for the clause in the deed stating "All of the covenants in this deed shall run with the land and bind and be for the benefit of, as appropriate, the parties' successors in title," this language appears to be mere boilerplate, and is belied by the absence, in the Indemnity Restriction, of any mention of "successors in title."

HINCKLEY, ALLEN & SNYDER LLP

Adam Kahn, Esquire
August 27, 2001
Page 11

related to the contamination at the Site. Within forty five days of receipt of this letter, Pharmacia is required by Mass. Gen. Laws ch. 21E, § 4A to (1) indicate whether or not, and if so to what extent, Pharmacia will pay contribution, reimbursement or an equitable share to Mystic, or participate in the performance of the response action or in the discharge of liability pursuant to Chapter 21E, and (2) state with reasonable particularity the legal and factual basis for Pharmacia's response. Chapter 21E further states that within sixty days after Mystic has received Pharmacia's response, Pharmacia and Mystic shall confer in good faith in an effort to resolve all disputes that may exist between them with respect to participation in or funding of the response action or other actual or potential liability in question. Of course, Mystic is certainly willing to expedite this process.

If Pharmacia: (1) fails without a reasonable basis to make a timely response to this notification, (2) does not participate in negotiations or dispute resolution in good faith, or (3) fails without a reasonable basis to enter into or carry out an agreement to perform or participate in the performance of the response action on an equitable basis or pay its equitable share of the costs of such response action or of other liability pursuant to Chapter 21E, Mystic shall be entitled to its litigation costs and attorneys' fees.

This letter constitutes Notice of Liability for Damages pursuant to Mass. Gen. Laws, ch. 21E. Mystic expressly reserves its rights to assert claims based upon other statutory and common law causes of action including, but not limited to CERCLA, negligence and trespass.

We look forward to Solutia's reply.

Very truly yours,

Gerald J. Petros

cc:  Mr. Les Marino
     Mr. Charles Madden
     Mr. Massimo Marino
     Mr. Peter Grela
     Mr. Robert Shepard
     Herman Snyder, Esquire
     Joel Lewin, Esquire
     Doreen M. Zankowski, Esquire
     Alan Gottlieb, Esquire