UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MYSTIC LANDING, LLC,<br>              Plaintiff,<br>     v.<br><br>PHARMACIA CORPORATION<br>              Defendant. | |
| PHARMACIA CORPORATION<br>              Third-Party Plaintiffs,<br>     v.<br><br>MODERN CONTINENTAL CONSTRUCTION<br>  CO., INC.,<br>              Third-Party Defendant. | CIVIL ACTION No. 04-10180 NMG |
| PHARMACIA CORPORATION,<br>              Third-Party Plaintiff,<br>     v.<br><br>BOSTON EDISON COMPANY,<br>              Third-Party Defendant. | |
| BOSTON EDISON COMPANY,<br>              Fourth-Party Plaintiff,<br>     v.<br><br>O'DONNELL SAND & GRAVEL, INC.<br>  and MARY O'DONNELL,<br>              Fourth-Party Defendant. | |

**MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* OF DEFENDANT PHARMACIA CORPORATION TO FORECLOSE PLAINTIFF'S PRESENTATION OF <u>EVIDENCE ON ANTICIPATED FUTURE RESPONSE COSTS</u>**

Defendant Pharmacia Corporation ("Pharmacia") submits this memorandum in support of its motion to exclude plaintiff Mystic Landing, LLC ("Mystic") from presenting evidence at trial regarding Mystic's anticipated future "response costs". Evidence of Mystic's estimates are not probative to any issue in this action. Although the Court can issue a declaration apportioning future response costs, the evidence Mystic would present regarding its predictions as to the amount of those response costs is (i) irrelevant, because costs can be awarded only after they have been incurred and adjudged to have been reasonable and appropriate within the meaning of M.G.L. c. 21E §4, (ii) inadmissible because the claimed future costs are, by Mystic's expert's own admission, entirely speculative, and (iii) with respect to certain claimed costs, are non-recoverable because they are, on their face, not "response costs" at all, but rather costs associated with the construction of hypothetical future development on the Property.

## STATEMENT OF FACTS

The sole source of information about estimated future "response costs", which Mystic claims are recoverable under M.G.L. c. 21E will be the expert testimony of Dr. Richard J. Hughto. Dr. Hughto's expert opinions on this subject were disclosed in his September 12, 2005 expert report ("Hughto Report"), relevant portions of which are appended hereto as Exhibit A. The Hughto Report stated that total "contamination related costs" are estimated to fall in a range between $2,265,046 and $8,421,306. Hughto Report at 19. The basis for this estimate is contained in the Hughto Report at 15-19 and Attachments B-F. Mystic has claimed that this figure represents the future response costs that it seeks to recover from Pharmacia. See Joint Pretrial Memorandum at 7. Mystic's property damage experts have also included this estimate into their estimate of the difference in value of the property "clean" and its value in its present state. Expert Report of Donald Bouchard and Steven Foster at 138 (Exhibit T to Plaintiff Mystic

Landing's Memorandum in Support of is Motion in Opposition to Pharmacia Corporations Motion for Summary Judgment).

**ARGUMENT**

I. **Response costs estimates should be excluded because the Court can equitably apportion shares of future response costs, but it cannot assign specific monetary damages until those costs have actually been incurred and adjudged to be reasonable and necessary**.

At trial, the Court may issue a declaratory judgment pertaining to allocation of "reasonable" costs for "necessary and appropriate" response actions once those costs have been incurred. However, because there is no basis in logic or law for an award or monetary reimbursement for costs that have not yet been incurred, estimates of future response costs are irrelevant and should be excluded from admission as evidence in this trial. As demonstrated in Pharmacia's Memorandum in Support of Its Motion for Partial Summary Judgment a 7-9, Mystic must actually make an expenditure before seeking a monetary judgment for "reimbursement," the relief provided by Section 4. Oliveira v. Pereira, 414 Mass. 66, 74, 605 N.E.2d 287, 291 (1992) ("An action under §4 of G.L. c. 21E is an action for reimbursement…We have defined 'reimbursement' as 'repaying or making good the amount paid out.' Thus, to be reimbursed, the plaintiff must have paid the sum due.") (internal citations omitted); Mailman's Steam Carpet Cleaning Corp. v. Lizotte, 415 Mass. 865, 875, 616 N.E.2d. 85, 91 (1993) (a §4 action is "limited to reimbursement of cleanup costs already paid by the party seeking recovery"); Black v. Coastal Oil New Eng., Inc. 45 Mass. App. Ct. 461, 465, 699 N.E.2d. 353, 355 (1998) ("[p]rior payment is a prerequisite for reimbursement").

In requiring costs to actually be incurred before being awarded, M.G.L. c. 21E §4 is identical to the federal superfund law, or CERCLA, 42 U.S.C. 9607[1].  Under CERCLA, while plaintiffs may obtain a declaratory judgment that defendants are liable for future response costs consistent with the National Contingency Plan, 40 C.F.R. 300 (the "NCP"), they may not recover response costs they have yet to incur.  Laidlaw Waste Systems, Inc. v. Mallinckrodt, Inc., 925 F. Supp. 624, 632 (E.D. Mo. 1996).  Instead, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."  42 U.S.C. § 9613(g)(2).  As with declaratory judgments issued under M.G.L. c. 21E, such a declaration binds the defendant only as to *liability* for future costs and will not prevent the defendant from contesting the appropriateness of the costs at a later date.  U.S. v. Hardage, 982 F.2d 1436, 1445 (10th Cir. 1992); U.S. v. Fairchild, 766 F. Supp. 405, 415 (D. Md. 1991).  By so providing, Congress struck a balance between ensuring that "liability, once established, would not have to be relitigated," and acknowledging that "future costs are somewhat speculative."  See Foster v. U.S., 922 F. Supp. 663, 664-665 (D. D.C. 1996), quoting Kelley v. E.I. DuPont de Nemours & Co., 17 F.3d 836, 844 (6th Cir. 1994).  At the time reimbursement is sought, the defendant may challenge the amount of the response costs and whether the work was consistent with the NCP.  Hardage, 982 F.2d at 1446; Foster, 922 F. Supp. at 665; Fairchild, 766 F. Supp. at 415.  Under Chapter 21E §4, only "reasonable" costs of "necessary and appropriate" response actions are recoverable.  If the Court were to award Mystic's claimed damages now, prior to the costs being incurred, Pharmacia would be

---

[1] Section 107 of CERCLA, 42 U.S.C. 9607(a)(4)(B) obligates liable parties to pay for the "necessary costs of response incurred by any other person consistent with the national contingency plan."  Similarly, Section 4 of Chapter 21E provides that "[a]ny person who undertakes a necessary and appropriate response action. … shall be entitled to reimbursement from any other person liable for such release or threat of release for the reasonable costs of such response action."

denied the statutorily mandated opportunity to challenge the reasonability, appropriateness, or necessity of those costs.

Mystic's November 7, 2005 opposition to Pharmacia's motion for summary judgment mistakenly argues that §4A of Chapter 21E creates a new substantive right to collect response costs in advance of them being incurred. See Memorandum of Mystic Landing in Opposition in support of its motion in opposition to Pharmacia's Motion for Summary Judgment at 20-21. Neither Section 4A, nor Mystic's citation to Black v. Coastal Oil New England, Inc., 699 N.E.2d 353, 45 Mass. App. Ct. 461 (1998) in support of its argument, supports any such interpretation. Section 4A, entitled "notification of response action; procedure; civil action" sets forth certain procedural prerequisites to commencing a suit under Chapter 21E and confirms the right provided elsewhere in Chapter 21E to seek contribution against other liable parties. However, it does not authorize advance recovery of response costs. Black, which was decided on the basis of Chapter 21E as it existed prior to the enactment of Section 4A, 45 Mass. App. Ct. at 462, did state *in dicta* that a person has a right to *seek* contribution prior to incurring costs -- a proposition with which Pharmacia agrees -- but it did not state even *in dicta* that these costs could be awarded before they are incurred.[2] Indeed, more than thirteen years after Section 4A was enacted, there are no reported decisions of any court awarding response costs in advance under Section 4A or otherwise.[3]

---

[2] The specific holding in Black vacated the lower court's award of estimated future response costs in the form of property damage, stating that the estimated future response costs were not recoverable as property damage. Id. at 466. Despite Mystic's reliance on Black, Mystic nonetheless seeks recovery of $2.2 to $8.4 million in anticipated future response costs, twice: once under Section 4 and again as property damage under Section 5. See Joint Pretrial Memorandum at 7.

[3] While a declaration of contribution obligations can be obtained in advance of the costs being paid, the right actually to receive payment in contribution -- as Mystic has requested here -- does not vest until the costs have actually been incurred. In this regard, Chapter 21E contribution is the same as other statutory rights to contribution. See M.G.L. c. 231B §1(b) ("The right of contribution shall exist only in favor of a joint tortfeasor … who has paid more than his pro rata share of the common liability, and his total recovery shall be limited to the amount paid by

**II. Mystic's estimates of damages are inadmissible because they are speculative.**

Even if the estimates of future damages were relevant to any issue before the Court, Mystic's evidence as to the amount those future damages should be excluded as speculative.

> When . . . damages are sought they must be proved and not left, as here, to speculation. 'This is simply a concrete application of the wider principle . . . that the complaining party must establish his claim upon a solid foundation in fact, and cannot recover when any essential element is left to conjecture, surmise or hypothesis.'

Snelling & Snelling of Mass., Inc. v. Wall, 345 Mass. 634, 636 189 N.E.2d 231, 232 (1963), quoting John Hetherington & Sons, Ltd., v. William Firth Co., 210 Mass. 8 95 N.E. 961 (1911). As set forth in Pharmacia's Memorandum in Support of Its Motion for Partial Summary Judgment at 9, Mystic's estimates of future response costs have ranged from $810,000 to $17,500,000. The Hughto Report narrowed the gap somewhat, and Mystic now says that the costs will be somewhere between $2,265,046 and $8,421,306. These totals, and the subsidiary calculations that led to those totals, should be excluded because the plain language of the Hughto Report demonstrates that they are nothing more than rank speculation.

Because black letter law establishes that plaintiffs are not entitled to up front damages for future response costs not yet incurred under either Chapter 21E or CERCLA, it is not surprising that there is no case law addressing when evidence of future response costs is too speculative to be admitted. See Laidlaw Waste Systems, Inc. v. Mallinckrodt, Inc., 925 F. Supp. 624, 632 (E.D. Mo. 1996) and the preceding section of this motion. However, courts frequently address the speculative nature of damages in other contexts. See, e.g., D'Ambra v. U.S., 518 F.2d 275, 278 (1st Cir. 1975) (medical treatment); Hetherington, 210 Mass. at 21-24 (lost profits). For

---

him in excess of his pro rata share." (emphasis added)); The Medical Professional Mutual Ins. Co. v. Breon Labs., Inc., 141 F.3d 372, 374 (1st Cir. 1998) (while the right to contribution between joint tortfeasors may arise at the time of the injury, the actual payment of damages by one joint tortfeasor is "condition subsequent" to enforcing that right.)

- 6 -

example, in Hetherington, the Supreme Judicial Court denied as speculative the plaintiff's claim for lost profits from the breach of a contract to distribute textile machinery because the "vagueness" of the contract, and a series of contingent assumptions, "together with all the circumstances . . . furnish[ed] a basis too insubstantial for [their] ascertainment." Id. More recently, in Hawes Office Systems, Inc. v. Wang Labs., Inc., 580 F. Supp. 812, 820 (E.D.N.Y. 1984), a federal district court applying Massachusetts law denied a claim for lost profits from the breach of a contract to distribute computer equipment because the plaintiff's extrapolation of future profits "assume[d] too much" when plaintiff's projected profits based on events that had not yet occurred, and where the plaintiff could not provide evidence to support its projections. Id.

For similar reasons, the First Circuit rejected a plaintiff's claim for future medical treatment for psychological trauma caused by the defendant's negligence. D'Ambra v. U.S., 518 F.2d at 278. The plaintiff's doctor estimated the length of treatment at two or three years, *or far less, or far longer*. Id. Noting that the plaintiff had rejected treatment in the past, the court concluded that the damages were "too speculative" because it was "highly uncertain whether these expenses would ever be incurred." Id.

Just as other excluded evidence is riddled with "conjecture, surmise [and] hypothesis," Dr. Hughto's speculative opinions about the future expenditures at the Property should also be excluded. Snelling, 345 Mass. at 636. As a general matter, Dr. Hughto states,

> remediation is required under the MCP [Massachusetts Contingency Plan, 310 C.M.R. 40.000, the regulations implementing M.G.L. ch. 21E] for those sites which have been found to cause an adverse risk to public health, safety, welfare or the environment … A site specific risk assessment has not been prepared for the Site to date….As stated above, a site-specific risk assessment is required to identify those contamination conditions that must be remediated.

Hughto Report at 12-13.  Dr. Hughto's failure to conduct a site specific risk assessment resigns him, by his own admission, to mere supposition as to what remediation will in the end actually be necessary.

After hypothesizing what types of remediation might be necessary, Dr. Hughto proceeds to speculate as to the cost of that remediation.  Hughto Report at 15-18.  By their very range and breadth, the estimates in the Hughto Report document that Dr. Hughto can do no more than guess what future costs will be.  For example, as a significant component of overall damages, Dr. Hughto estimates the cost of soil removal incident to development of the Property will range anywhere between $81,846 and $2,588,906, depending in large part on the type of future construction that may occur on the Property (as well as on a series of assumptions about what might actually be found in the soil).  In other words, according to Dr. Hughto, soil excavation could cost about $82,000, or it could cost up to *thirty-one times* that.  Hughto Report at 16 and Attachment B.  Astonishingly, that is not his least precise estimate.  With regard to sediments in the Mystic River that Dr. Hughto alleges may have been affected by operations at the Property, Dr. Hughto flatly states "it is not known at this time if remediation will be needed…. Since the sediments have not been assessed in detail to date, I cannot opine on whether additional remediation of the sediments will be required to address adverse risks."  Hughto Report at 17. Despite that candid admission, the Hughto Report proceeds to assign a range of $0 to $2,538,000 to address sediment-related costs.  Id.  Although Dr. Hughto does not attempt to opine that these costs will be incurred, Mystic itself has demanded these costs.  See Joint Pretrial Memorandum at 7.  Dr. Hughto also includes additional costs of $0 to $500,000 for costs enigmatically attributed to "encountering conditions not discovered to date."  Id.  It is hard to imagine how the Court's resolution of this matter could be aided by admitting evidence that a completely

undefined cost may be incurred to respond to completely undiscovered contamination. Dr. Hughto also factors in contingencies such as additional requirements imposed by the Massachusetts Department of Environmental Protection staff "as they review the information submitted to them and become apprised of conditions discovered during remediation," $25,000 to $300,000 (a variance factor of 12). Hughto Report at 18. To emphasize, Pharmacia does not object to a declaration now allocating future response costs after they have been incurred and adjudged to be reasonable, appropriate, and necessary, but there is absolutely no probative value in allowing Dr. Hughto to testify that the total costs associated with these three elements alone may be anywhere between $81,846 and $5,626,906, a variance factor of more than 60.

While damages "need not be susceptible of calculation with mathematical exactness," neither may they be "remote, speculative, hypothetical [nor] within the realm of reasonable certainty." Lowrie v. Castle, 225 Mass. 37, 51, 113 N.E. 206, 210 (1916). If the plaintiff in Hetherington could not recover lost profits because they were based on vague contract terms, surely Mr. Hughto's estimates, which, on their face, are based on no determination at all as to the method of site remediation, must be excluded. See 210 Mass. at 22, 24. In addition, Dr. Hughto's estimates suffer from far worse reliance on unknown contingencies (is the area in question even contaminated?; if it is contaminated, will it need to be remediated?; what might be built in the future at this property?; will there be conditions discovered that have not yet been encountered?) than the rejected claims for lost profits in Hetherington and Hawes. See Hawes, 580 F. Supp. at 820; Hetherington, 210 Mass. at 22. Finally, the extraordinarily wide range in Dr. Hughto's estimates warrant far less credence than the doctor's estimated length of treatment in D'Ambra, 518 F.2d at 278; see also Thermo Electron Corp. v. Schiavone Const. Co., 958 F.2d

1158, 1166 (1st Cir. 1992) (noting district court's dismissal of profit projections of $12 to $40 million over twenty years as too speculative).

Courts also reject damages opinions lacking a sufficient foundation in facts relevant to the particular case.  In Van Brode Group, Inc. v. Bowditch & Dewey, 36 Mass. App. Ct. 509, 519-520, 633 N.E.2d 424, 429-430 (1994), the Supreme Judicial Court upheld the exclusion of an expert appraisal of a corporation because it was based "too much on industry-wide projections and not enough on factors peculiar to [the corporation]."  Here, because "no site-specific risk assessment has . . . been prepared for the Site to date," Hughto Report at 13, and because much of the future costs depend on the nature of future development that has not yet been selected ("the property is for sale," id.), Dr. Hughto's opinion is not based on a clear understanding of the particular circumstances of the Property.

The variability of Dr. Hughto's cost estimates demonstrate the wisdom of the rule that only response costs actually expended may be recovered.  However, even if the law permitted unexpended response costs to be recovered, Mystic still could not recover here because it would not have established damages with anything remotely approaching the requisite degree of specificity.

**III.   Even if the costs presented by Dr. Hughto were not completely speculative, the majority of the costs should be excluded because, on their face, they do not represent "response costs", which are recoverable under Chapter 21E, but rather, the costs of development, which are not.**

Dr. Hughto's report contained estimates for costs that, even if they were not speculative, on their face cannot be "response costs"[4] and, therefore, cannot be recovered by Mystic.  Under M.G.L. c. 21E §4:

> Any person who undertakes a *necessary* and *appropriate response action* regarding the release or threat of release or oil or hazardous material shall be entitled to reimbursement from any other person liable for such release or threat of release for the *reasonable costs of such response action.*  If two or more persons are liable pursuant to section five for such release or threat or release, each shall be liable to the others for their equitable share of the costs of such response action.

(emphasis added).

In cases arising under CERCLA, numerous courts have held that current owners cannot turn the problem of contamination into an opportunity to improve their property and recover the costs of doing so from a former owner.  These decisions construing CERCLA are persuasive here.[5]  As one court put it:

> The statutory limitation [in CERCLA] to "necessary" costs of cleaning up is important. Without it there would be no check on the temptation to improve one's

---

[4] Chapter 21E §2 defines "Respond" or "Response" or "Response action", or "assess, assessment, contain, containment, remove and removal."  "Remove" or "Removal", in turn is defined as,

> the cleanup or removal of released oil or hazardous materials from the environment, such actions as may be necessarily taken in the event of the threat of release of oil or hazardous materials into the environment, the disposal of removed oil or hazardous material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health, safety, welfare or the environment, which may result from a release or threat of release.

[5] The Supreme Judicial Court has held that "CERCLA and G.L. c. 21E have similar objectives and overlap in coverage.  To the extent that there are similarities in language and structure, it is desirable to arrive at similar interpretations, to achieve consistency in application and to discourage 'forum shopping.'" Martignetti v. Haigh-Farr, Inc., 425 Mass. 294, 301 (1997).  Since the inquiry into whether costs are "necessary and appropriate" under Chapter 21E is similar to the inquiry as to whether costs are "necessary" under CERCLA, courts interpreting Chapter 21E should look to federal decisions under CERCLA for guidance.

> property and charge the expense of improvement to someone else. Suppose a building that was being used to warehouse heavy industrial equipment were found to have very low levels of contamination by some hazardous substance and only a small expenditure would be necessary to remove enough of the substance to make the building safe for its current use. Thinking this a perfect opportunity to upgrade that use, the owners decide to incur enormous costs to eliminate the contamination utterly, charge those costs to whoever was responsible for the current very low level of contamination, and then convert the building to a hospital, day care center, or dairy products plant. The limitation to "necessary" response costs would deter them from carrying out this scheme.

G.J. Leasing Co., Inc. v. Union Elec. Co., 54 F.3d 379, 386 (7th Cir. 1995).

Many other federal courts have also concluded that a "necessary" cleanup for purposes of CERCLA is one that is undertaken to protect human health and the environment rather than to improve the economic value of the property. In Southfund Partners III v. Sears, Roebuck and Co., 57 F. Supp. 2d 1369 (N.D. Ga. 1999), the court determined that actions taken to remediate groundwater and soil that was sufficiently capped with asphalt were not necessary to protect human health and the environment, so the cost incurred by these actions were not "necessary" response costs. In Yellow Freight System, Inc. v. ACF Industries, Inc., 909 F. Supp. 1290, 1299 (E.D. Mo. 1995), the court held that actions taken to investigate and remediate asbestos and PCB contamination were not "necessary" response costs where they had been undertaken to make the property more suited for business operations ("To the extent Yellow Freight's actions were taken for purposes other than responding to a public health threat, it cannot establish that its costs expended were necessary under CERCLA."). In Carson Harbor Village, Ltd. v. Unocal Corp., et al., 990 F. Supp. 1188 (C.D. Ca. 1997), the court denied recovery of costs associated with removal of contaminated tar and slag materials incident to a refinancing of property because the plaintiff did not show that the removal was a necessary response to an actual threat to human health or the environment; instead, the court found that had the plaintiff not voluntarily proposed the excavation, it would not have been ordered by the government to remove it. Id. at 1193. In

City of Detroit v. Simon, 247 F.3d 619 (6th Cir. 2001), the circuit court excluded recovery of costs that would be necessary to allow a property with a long industrial history to be used for higher purposes.  As the court stated, "[t]o require former occupants to assume liability for cleanup costs going beyond the level necessary to make the property safe for industrial use would be to provide an unwarranted windfall to the beneficiary of the cleanup." Id. at 630. Accord M.R. (Vega Alta), Inc. v. Caribe General Electric Products, Inc., 31 F. Supp. 2d 226, 233 (D. Puerto Rico 1998) ("CERCLA does not recognize a claim to recover costs beyond those needed to make the Site safe for its current use.  We have no jurisdiction over Plaintiffs' claim to the extent that it seeks to recover costs beyond those that are presently 'necessary' within the meaning of the Act.") (citations omitted).

The U.S. District Court, District of Connecticut, has similarly described this requirement as what is "necessary" in a CERCLA cleanup:

> [Plaintiff] seeks to recover its costs for demolishing the Winchester Building, as a necessary cost of its remediation and/or its site investigation. Defendants challenge the recoverability of any demolition costs on the grounds that [Plaintiff's] decision to demolish the Winchester Building was motivated by business interests … rather than necessary to the remediation. Defendants argue that [Plaintiff] is improperly using CERCLA as a device for requiring defendants to share the expense of improving, not remediating, its property. Such a potential abuse of CERCLA was identified in G.J. Leasing Co., Inc. v. Union Elec. Co., … [T]here is ample evidence suggesting that [Plaintiff's] decision to demolish was driven by its efforts to sell the Winchester Site.…As a result, [Plaintiff] may not recover costs incurred in the demolition of the Winchester Building…

 (emphasis added).  Sealy Connecticut, Inc. v. Litton Industries, Inc., 93 F. Supp. 2d 177, 187-189 (D. Conn. 2000).  See also Miami-Dade County, Fla. v. U.S., 345 F. Supp. 2d 1319 (S.D. Fla. 2004) (the party seeking to recover costs must demonstrate both that the costs were incurred in response to a threat to human health or the environment that existed prior to the onset of the response action and that the costs were necessary to address that threat).

- 13 -

Applying this analysis to the similar term in Chapter 21E, to the damages claimed in the Hughto Report, it is clear that many of costs claimed by Mystic on the basis of the report are not "necessary and appropriate" "response costs" at all, but rather, expenditures to improve the Property at Pharmacia's expense.

The clearest example of this is the estimated $81,846 to $2,588,906 that Dr. Hughto provides as a range for "soil management for the contaminated soils excavated as a result of Site development" Hughto Report at 16. Dr. Hughto's cost estimates include a narrow range of $82,846 to $84,404 related to building construction; the remainder ($1,668,467 to $2,504,502) is attributable to the potential construction of underground parking to support high rise residential use on the Property. Hughto Report at Attachment B.  Similarly, Dr. Hughto's estimate of $0 to $2,538,000 to address sediments is documented in an attachment (Attachment E) entitled "Cost Estimate for the Remediation of Mystic River Sediments for the Construction of the Specified Site Development." (emphasis added).  The contemplated site development includes a marina (see Attachment A), and the upper estimate consisted of the costs for the excavation of a trench in the water 850 feet long, 100 feet wide, and 4 feet deep (Attachment E).  Dr. Hughto did not disclose any opinion  that such excavation is required for environmental purposes; it must be concluded that it is required to allow the improvement of the Property as a marina. Other costs are also manifestly arise from future development, for example, the "potential necessity for using OSHA-certified construction crews for all site work; $100,000";  and "additional time that will be required to perform…Site construction work…; $25,000-$100,000" Hughto Report at 15.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion and rule that Mystic is foreclosed from presenting any evidence of future response costs at trial.

                              Respectfully submitted,

                              /s/ John M. Stevens
                              John M. Stevens (BBO # 480140)
                              Adam P. Kahn (BBO # 561554)
                              Elisabeth M. DeLisle (BBO #658067)
                              Foley Hoag LLP
                              155 Seaport Boulevard
                              Boston, Massachusetts  02210
                              tel: (617) 832-1000
                              fax: (617) 832-7000
                              jstevens@foleyhoag.com

Dated:   January 3, 2006