UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MYSTIC LANDING, LLC,<br>　　　　　　　　Plaintiff,<br>　　　v.<br><br>PHARMACIA CORPORATION<br>　and MONSANTO COMPANY,<br>　　　　　　　　Defendants.<br>───────────────────<br>PHARMACIA CORPORATION and<br>　MONSANTO COMPANY,<br>　　　　　　　　Third-Party Plaintiffs,<br>　　　v.<br><br>MODERN CONTINENTAL CONSTRUCTION<br>　CO., INC.,<br>　　　　　　　　Third-Party Defendant.<br>───────────────────<br>PHARMACIA CORPORATION,<br>　　　　　　　　Third-Party Plaintiff,<br>　　　v.<br><br>BOSTON EDISON COMPANY,<br>　　　　　　　　Third-Party Defendant.<br>───────────────────<br>BOSTON EDISON COMPANY,<br>　　　　　　　　Fourth-Party Plaintiff,<br>　　　v.<br><br>O'DONNELL SAND & GRAVEL, INC.<br>　and MARY O'DONNELL,<br>　　　　　　　　Fourth-Party Defendant. | CIVIL ACTION No. 04-10180 NMG |

**REQUESTED FINDINGS OF FACT AND
CONCLUSIONS OF LAW OF
DEFENDANT PHARMACIA CORPORATION**

**FINDINGS OF FACT**

1.      The property at issue in the action (the "Property") is a 35-acre parcel located in Everett and Boston, Massachusetts.  Approximately 12 of those acres are partially or entirely submerged at high tide.

2.      The property is bordered on the north by a Massachusetts Bay Transportation Authority (the "MBTA") facility, on the west by railroad tracks owned now by the MBTA and formerly by the Boston and Maine Railroad Company (the "B & M"), on the south by the Mystic River (the "River") and on the east by Alford Street/Broadway (State Route 99).

3.      During the late 19th Century and the early 20th Century, the B & M and others placed fill on Property in connection with constructing or rebuilding railroad bridges over the Mystic River.

4.      The Property began to be used for the manufacture of chemicals at some time in the 19th Century.

5.      Then, the Property was, or it later became, a part of a larger chemical manufacturing plant, the greater portion of which was located to the west of the railroad tracks (the "West Side"), which separated the two parts of the facility.

6.      Defendant Pharmacia Corporation ("Pharmacia"), then known as the Monsanto Company, began operations on the West Side and the Property in or about 1929.

7.      Operations on the West Side included manufacture of complex organic chemicals and included on-site disposal of by-products of chemical manufacturing.

8.      As a result of these practices, the West Side became heavily contaminated by a number of hazardous materials.

9.    Pharmacia arranged for the contamination on the West Side to be investigated, contained and removed in accordance with the governing environmental laws.

10.    Approximately $30 million was expended responding to the contamination on the West Side.

11.    None of the contamination on the West Side migrated to the Property.

12.    In contrast to operations on the West Side, manufacturing operations on the Property during the period 1929 to 1975 were limited to traditional chemicals made from raw materials that could be brought to the facility in bulk by water.

13.    The principal products manufactured on the Property were sulfuric acid, nitric acid and acid salts; the only organic substance manufactured was alcohol.

14.    Pharmacia's operations on the Property ceased in or about 1975.

15.    Chapter 21E of the Massachusetts General Laws was enacted in 1983.

16.    Pharmacia placed the Property on the market for sale in the late 1970s.

17.    At the time Pharmacia attempted to sell the Property, it knew that the soils and groundwater were contaminated.

18.    When Pharmacia placed the Property on the market, company policy required that any prospective purchaser be made aware of the condition and use of the Property and there be appropriate limitations on future uses.

19.    Pursuant to company policy, Boston Edison Company ("Boston Edison"), the company that purchased the Property from Pharmacia, was provided information regarding activities and testing on the Property and was invited to test the soil and groundwater and interview Pharmacia personnel.

20.    Tests and interviews conducted by Boston Edison's consultant showed that the contamination of concern consisted principally of sulfur, which could reduce the pH of soil and groundwater and metals, principally lead.

21.    Tests by other consultants over the years have confirmed the analysis of Boston Edison's consultant.

22.    It is not possible to determine the date of the releases that account for particular contamination.

23.    There is no evidence of contamination of sediments associated with operations conducted between 1929 and 1975.

24.    Pharmacia sold the Property to Boston Edison on or about June 20, 1983.

25.    The deed from Pharmacia to Boston Edison placed a use restriction on the Property, limiting future uses to industrial and manufacturing uses and prohibiting future commercial, residential and recreational uses.

26.    Boston Edison sold the Property to O'Donnell Sand and Gravel, Inc. by deed dated March 6, 1995.

27.    Transactional documents relating to the sale by Boston Edison to O'Donnell Sand and Gravel, Inc. recited that the purchase price took account of environmental contamination of the Property and contained a modified version of the deed restriction limiting future uses to industrial and manufacturing purposes, and specifically mentioned the condition of the Property as the reason for the restriction.

28.    By deed dated September 5, 1995, O'Donnell Sand and Gravel, Inc. sold the Property to Mary O'Donnell.

29.    By agreement dated May 1, 1996, Mary O'Donnell leased the Property to Mary

O'Donnell Construction Co., Inc., for an eight-year period ending April 30, 2004 at a rent of $12

per year.

30.    Also as of May 1, 1996, Mary O'Donnell granted to Modern Continental

Construction Company, Inc./Obayashi an option to purchase the Property at a price subject to

adjustment to take account of environmental contamination of the Property.

31.    The option was amended on or about March 17, 1999 to provide for an exercise

price of $300,000 in June 2001.

32.    On June 7, 2001, plaintiff Mystic Landing LLC ("Mystic") was formed as a

Massachusetts limited liability company with Modern to act as its managing member.

33.    By agreement dated June 19, 2001, Modern/Obayashi assigned the option to

plaintiff Mystic for a stated price of $20,000,000 with the price to be discounted to $7,500,000 if

the Property was not used as a sports stadium.  The same individual acted on behalf of Modern

and Mystic in this transaction.  Mystic paid no part of either stated price.

34.    On June 21, 2001, Mystic purchased the Property from Mary O'Donnell; the total

purchase price recited in the deed was $300,000.

35.    At or about the time of the purchase, Mystic had the Property appraised, and its

value was stated to be approximately $17,000,000 without any adjustment for the presence of

contamination.

36.    At the time Mystic purchased the Property, it was aware of the environmental

contamination of the Property.

37.    On or about October 2, 1995, more than five years before the purchase by Mystic,

a consultant who had dug test pits on the Property on behalf of Mary O'Donnell, advised her of

the results and of her legal obligation to notify the Massachusetts Department of Environmental Protection (the "DEP") of the contamination of the Property.

38.    Mary O'Donnell provided the required notification by sending DEP a release notification form dated January 18, 1996.

39.    DEP issued a notice of responsibility to Mary O'Donnell requiring that she take phased steps to respond to the contamination of the Property.

40.    On or about January 15, 1997, a consultant for a company affiliated with Mary O'Donnell submitted a Phase I Initial Site Investigation.

41.    As a result of the January 1997 submission, DEP classified the Property as a Tier II Disposal Site, the least stringent of the applicable classifications.  This classification required submission of a Phase II Comprehensive Site Assessment by January 1999, submission of a Phase III Remedial Action Plan by January 2000 and completion of response actions by January 2002.

42.    The notice, notification, Phase I assessment and classification are all public records available at DEP's offices for inspection by anyone interested in the Property.

43.    Mary O'Donnell did not take any of the response actions required by DEP's classification while she owned the Property.

44.    Before Mystic acquired the Property, Mystic and Modern's consultant submitted a report to counsel for Mystic and Modern in June 2001 advising them of the obligation to perform phased response actions at the Property; thereafter, other consultants advised Mystic that it had succeeded to the obligations of Mary O'Donnell.

45.     No new information regarding preexisting contamination at the Property was contained in the June 2001 report, and no new admissible information about historic contamination has been discovered during Mystic's ownership.

46.     Mystic has not submitted a Phase II Comprehensive Site Assessment; it took no action to begin to prepare such an assessment until a week after Pharmacia's consultant issued a report in September 2005 stating that Mystic was not in compliance with M.G.L. c. 21E and regulations promulgated thereunder as a result of its inaction.

47.     Mystic has not incurred any response costs under Chapter 21E.

48.     Modern has not asserted a claim for past response costs.

49.     On or about April 5, 1996, Modern/Obayashi entered into a subcontract agreement with Mary O'Donnell Construction Co, Inc. ("O'Donnell Construction"), pursuant to which O'Donnell Construction was to perform certain services and make the Property available for use by Modern/Obayashi for a period of years.

50.     Modern/Obayashi used the subcontract with O'Donnell Construction to satisfy a requirement of a public contract on which it was the general contractor that at least a specified percentage of the contract work be performed by a company or companies owned and operated by members of minority groups or women.

51.     The subcontract between Modern/Obayashi does not state that any amounts to be paid thereunder are for purchase of the Property.

52.     By an instrument dated June 8, 2001, Mystic leased the Property to Modern for a period of years.

53.     Pursuant to the subcontract with O'Donnell Construction and, after the acquisition of the Property by Mystic, its lease from Mystic, Modern used the Property from 1996 until the

present for activities involved in the performance of several construction contracts that form a part of the Central Artery/Tunnel Project.

54.    Modern's activities on the Property included placing large quantities of fill, some of which it observed to be contaminated, across substantial portions of the Property; placing stockpiles of excavated soil, piles of construction and demolition debris, some of it containing asbestos, and trash directly on the soil; storing used structural members with flaking lead paint; refueling construction vehicles in an unpaved area; and having a subcontractor break up the lead painted steel that made up the old elevated Central Artery.

55.    Modern's activities on the Property both before and during Mystic's ownership of the Property resulted in releases of oil and hazardous materials, including lead and oil, onto the Property.

56.    DEP commenced an investigation of Modern's activities on the Property in or about 2002.

57.    DEP's investigation concluded with entry of an administrative consent order dated August 8, 2005.  The order contained findings by DEP that Modern had violated chapter 21E and regulations prohibiting the operation of an unpermitted solid waste facility, directed Modern to cease using the Property to transfer or dispose of regulated solid waste, required removal of stockpiled material and disposal in the manner required by law and imposed a fine of $35,000 to be paid within 30 days.

58.    Modern failed to pay the fine imposed by the administrative consent order or to take certain other actions required by that order within the time specified.

59.    A Notice of Non-compliance was issued to Modern for its failure to comply with the administrative consent order.

60.    In August 2001, Mystic sent a demand letter under §4A of Chapter 21E to Pharmacia estimating future response costs of $17,600,000.

61.    Mystic has produced multiple estimates of future response costs ranging from $810,000 to $17 million.

62.    Mystic's estimates of future response costs are based on various development scenarios, many of which provide for underground parking.

63.    Purchasers of contaminated property in and around Massachusetts take the contamination into account both in determining what they will pay and in identifying development options.

64.    Developers of contaminated property take preexisting use limitations into account and also recognize that additional use limitations may be imposed.

65.    Mystic has placed the Property on the market for sale and received offers of up to $34 million.

66.    There is no market resistance to the Property.  Awarding Mystic property damage in any amount by reason of environmental damage it knew to exist when it purchased the property would be an undeserved windfall.

67.    Assigning Mystic less than a one-third share of all necessary and appropriate response costs to be incurred in connection with the Property would grant it an undeserved windfall and would reward a failure to perform the obligations imposed on the property owner by DEP to cleanup the Property by January 2002.

68.    Assigning Modern less than a one-third share of all necessary and appropriate response costs to be incurred in connection with the Property would reward flagrant violations of existing environmental laws and, as Mystic's managing member, grant it an undeserved windfall.

69.    Mystic has advanced a claim for past alleged response costs.  Mystic's attorneys concede that the documents accounting for the great majority of alleged response costs inexplicably were not produced during the discovery period, despite Pharmacia's efforts to put Mystic on notice of their failure to do so.  The invoices were in counsel's possession from on or about the time they were generated.  Pharmacia's fact discovery, expert reports and dispositive motions, all prepared at significant expense, relied on the absence of any documented past response costs.

70.    Mystic's ongoing disregard of its discovery obligations and a Court order presents exactly the type of behavior that courts have found warrants the sanction of exclusion.

71.    Mystic failed to produce documents claimed to evidence response costs until well after the deadlines for the completion of fact discovery, the service of expert reports and the filing of dispositive motions, even after this Court ordered Mystic to produce all responsive materials and, in accordance with Fed.R.Civ.P. 37(b)(2)(B) and Fed.R.Civ.P. 37(c)(1).

72.    The invoices Mystic belatedly included in a filing in response to Pharmacia's motion for partial summary judgment are not material to a claim to recover response costs incurred by Mystic because they do not show response costs or any other costs incurred by Mystic.

73.    The original affidavits of both the expert who submitted the invoices and Modern's president say they were paid by Modern and not by Mystic.

74.    A later affidavit of Modern's president contradicted his earlier sworn statement by stating that Mystic had paid "[m]ore than $16,674.00" of the costs and, while stating that back-charging was a common practice, did not state that back-charging, in fact, had occurred, and

neither Mystic nor Modern produced any document showing any back-charge or payment by Mystic of any cost alleged to be a response cost.

75.    Pharmacia made a timely response to the notification filed by Mystic Landing pursuant to M.G.L. c. 21E §4A, participated in negotiations in good faith, and had a reasonable basis, in light of actions and excessive demands of Mystic, for not entering into an agreement to participate in the performance of response action in the manner and to the extent demanded by Mystic or to pay for the costs demanded by Mystic.

76.    In light of Mystic's excessive demands, evasive discovery tactics, and overly aggressive settlement positions, Mystic did not participate in negotiations in good faith and maintained an unreasonable position with respect to the amount of the defendant's liability.

## CONCLUSIONS OF LAW

### I.    Recovery of "Property Damage"

1.    Mystic seeks recovery for property damage pursuant to M.G.L. c. 21E, § 5, which provides:

> [A]ny person who…caused or is legally responsible for a release…of… [a] hazardous material from a…site[] shall be liable, without regard to fault,…to any person for damage to his real or personal property incurred or suffered as a result of such release…

M.G.L. c. 21E, § 5(a)(5)(iii).

2.    Mystic failed to plead with sufficient clarity a claim for property damages in its Complaint, and Mystic failed to make reference to property damage in its initial disclosures required pursuant to Fed. R. Civ. P. 26.

3.    On December 2, 2005, Mystic sought leave to amend the Complaint to, *inter alia*, state a claim for property damage.

4.      Mystic is not entitled to amend the Complaint to state a claim for property damages because it failed to exercise due diligence and engaged in unseemly delay prejudicial to Pharmacia in seeking leave to amend.  *Quaker State Oil Refining Corp. v. Garrity Oil Co., Inc.*, 884 F.2d 1510, 1517 (1st Cir. 1989).  *See also Hayes v. New England Millwork Distributors, Inc.*, 602 F.2d 15, 19-20 (1st Cir. 1979).  *Correa-Martinez v. Arrgillaga-Belendez*, 903 F.2d 49, 59 (1st Cir. 1990).

5.      Common law principles governing entitlement to property damage are applicable to claims under M.G.L c. 21E § 5.  *Guaranty-First Trust Co. v. Textron, Inc*., 416 Mass. 332, 333, 622 N.E.2d. 597, 598 (1993) ("[t]he measure of recovery under [§ 5(a)(5)(iii)] is identical to the measure of recovery at common law for damage to real or personal property").

6.      Courts have found that a party incurs an "injury" that gives rise to a property damage claim under M.G.L. c. 21E §5 in one of two circumstances:  (1) when a new release of contamination causes damage to property, such that the property is worth less after the release than it was before the release; or (2) when a party obtains knowledge of a historic release of contamination, which is the point at which the market factors that contamination into valuation decisions.  *See, e.g., Guaranty-First Trust Co. v. Textron*, 416 Mass. 332, 333, 622 N.E.2d 597, 598 (1993) (property damage action accrued when plaintiff discovered contamination on property after plaintiff acquired the property without knowledge of the contamination); *Taygeta Corp. v. Varian Associates*, Inc., 436 Mass. 217, 227, 763 N.E.2d. 1053, 1061 (2002); *Lewis v. General Electric Co.*, 254 F. Supp. 2d 205, 216 (D. Mass. 2003).

7.      At common law, where an injury to property occurred prior to a plaintiff's purchase of the property and the plaintiff had knowledge of that injury prior to its purchase, the plaintiff is not entitled to recover on a property damage claim because the plaintiff has suffered

no "injury".  *See Lewis v. General Electric Co.*, 254 F. Supp. 2d 205, 215 (D. Mass. 2003), *citing Larabee v. Potvin Lumber Co., Inc.*, 390 Mass. 636, 640 459 N.E.2d. 93, 95 (1983) (no direct cause of action for property damage when injury occurred and was discovered prior to plaintiff's purchase of property).  *See also Luna Preservation Society v. Metropolitan District Commission*, 2000 WL 420838 (Mass Super. 2000) at *4, *7; *Wellesley Hills Realty Trust v. Mobil Oil Co.*, 747 F. Supp. 93, 101 (D. Mass. 1990) (dismissing owner's claim because "the undisputed facts are that an environmental assessment was conducted prior to the sale and that WHRT therefore knew of the contaminated condition of the property when the sale was consummated."); *Koehn v. Ayers*, 26 F. Supp. 2d. 953, 957 (S.D. Tex. 1998) (cause of action for injury to property belongs to prior owner, not current owner, where injury was known to prior owners before sale).

8.      No plaintiff has been permitted to recover on a claim for property damage under M.G.L. c. 21E § 5(a)(iii) where the plaintiff purchased the property with knowledge of the contamination.

9.      Because the Property was contaminated before Mystic purchased it and Mystic and its affiliates made the decision to purchase the Property with knowledge of the contamination, Mystic has not suffered an "injury" which would entitle it to recover on a claim for property damage.

10.     Because plaintiffs in actions brought under M.G.L. c. 21E have an obligation to mitigate damages, Mystic's failure to mitigate damages also precludes recovery for property damage.  *See Hill v. Metropolitan Dist. Comm'n*, 439 Mass. 266, 277, 787 N.E.2d. 526, 534 (2003) (citing *Guaranty-First Trust* in finding general duty to mitigate damages applicable to claims brought under M.G.L. c. 21E §5).

11.     Even where a cause of action is based on strict liability, the doctrine of assumption of risk bars recovery by a plaintiff who "fully understands a risk of harm to himself or his things caused by the defendant's conduct or by the condition of the defendant's land or chattels, and who nevertheless voluntarily chooses to enter or remain". *Rest. Torts 2d 496C(1)* . *See also Allen v. Chance Manufacturing Co., Inc.* 398 Mass. 32, 494 N.E.2d 1324 (1986); *Sultis v General Motors Corp.*, 690 F. Supp. 100, 105 (D. Mass. 1988).

12.     Because Mystic understood the contaminated condition of the Property and nevertheless chose to purchase it, it is barred from recovering on its property damage claim by the doctrine of assumption of risk. *Rest. Torts 2d 496C(1)* . *See also Allen v. Chance Manufacturing Co., Inc.* 398 Mass. 32, 494 N.E.2d 1324 (1986); *Sultis v General Motors Corp.*, 690 F. Supp. 100, 105 (D. Mass. 1988).

13.     An award of future cleanup costs, compensable under M.G.L. c. 21E, §4, as "property damage" under M.G.L. c. 21E §5 is inappropriate because such would allow for "the possibility of duplicative damages, a result traditionally resisted in our law." *Black*, 45 Mass. App. Ct. 461, 466, 699 N.E.2d 353, 356.

## II.      Recovery of Future Response Costs

14.     "An action under § 4 of M.G.L. c. 21E is an action for reimbursement," and "to be reimbursed, the plaintiff must have paid the sum due." *Oliveira v. Pereira*, 414 Mass. 66, 74, 605 N.E.2d 287, 291 (1992). *See also Mailman's Steam Carpet Cleaning Corp. v. Lizotte*, 415 Mass. 865, 875, 616 N.E.2d 85, 91 (1993); *Black v. Coastal Oil New. Eng., Inc.*, 45 Mass. App. Ct. 461, 465, 699 N.E.2d 353, 355 (1998).

15.     Under the analogous federal CERCLA statute, 42 U.S.C. §§ 9607 *et seq.*, while plaintiffs may obtain a declaratory judgment that defendants are liable for future response costs

that are consistent with the National Contingency Plan, 40 C.F.R. 300 *et seq.*, they may not

recover response costs they have yet to incur. *Laidlaw Waste Systems, Inc. v. Mallinckrodt, Inc.*,

925 F. Supp. 624, 632 (E.D. Mo. 1996). *Foster v. U.S.*, 922 F. Supp. 663, 664-665 (D. D.C.

1996).

16.     Section 4A of M.G.L. c. 21E does not create a new substantive right to collect

response costs in advance of their being incurred.

17.     When damages are sought they must be proved and not left to speculation. *See*

*Snelling & Snelling of Mass., Inc. v. Wall*, 345 Mass. 634, 636 189 N.E.2d 231, 232 (1963) ("the

complaining party must establish his claim upon a solid foundation in fact, and cannot recover

when any essential element is left to conjecture, surmise or hypothesis").

18.     Even if Mystic's evidence of estimated future response costs were relevant,

opinions about the future expenditures at the Property are speculative and should be excluded.

*See Snelling & Snelling of Mass., Inc. v. Wall*, 345 Mass. 634, 636 189 N.E.2d 231, 232 (1963).

19.     Under M.G.L. c. 21E §4:

> Any person who undertakes a *necessary* and *appropriate response action* regarding the
> release or threat of release or oil or hazardous material shall be entitled to reimbursement
> from any other person liable for such release or threat of release for the *reasonable costs*
> *of such response action.* If two or more persons are liable pursuant to section five for
> such release or threat or release, each shall be liable to the others for their equitable share
> of the costs of such response action. (emphasis added).

20.     Decisions construing the federal CERCLA statute, which are persuasive in

interpreting Chapter 21E, *see Martingetti*, have held that current owners cannot turn the problem

of contamination into an opportunity to improve their property and recover the costs of doing so

from a former owner. *See, e.g., G.J. Leasing Co., Inc. v. Union Elec. Co.*, 54 F.3d 379, 386 (7th

Cir. 1995).

21.    A "necessary" cleanup for purposes of CERCLA is one that is undertaken to protect human health and the environment rather than to improve the economic value of the property.  *See, e.g., City of Detroit v. Simon*, 247 F.3d 619, 630 (6th Cir. 2001), ("[t]o require former occupants to assume liability for cleanup costs going beyond the level necessary to make the property safe for industrial use would be to provide an unwarranted windfall to the beneficiary of the cleanup."); *M.R. (Vega Alta), Inc. v. Caribe General Electric Products, Inc.*, 31 F. Supp. 2d 226, 233 (D. Puerto Rico 1998) ("CERCLA does not recognize a claim to recover costs beyond those needed to make the Site safe for its current use.  We have no jurisdiction over Plaintiffs' claim to the extent that it seeks to recover costs beyond those that are presently 'necessary' within the meaning of the Act.").  *See also Southfund Partners III v. Sears, Roebuck and Co.*, 57 F. Supp. 2d 1369 (N.D. Ga. 1999); *Yellow Freight System, Inc. v. ACF Industries, Inc.*, 909 F. Supp. 1290, 1299 (E.D. Mo. 1995).

22.    Many of the costs claimed by Mystic as future response costs are not "necessary and appropriate" "response costs" at all, but planned expenditures to improve the Property and may not be recovered under M.G.L. c. 21E § 4.  Mystic may only recover Pharmacia's equitable share of response costs once they have been incurred and adjudged to be "necessary and appropriate."

**III.    Recovery of Past Response Costs**

23.    Where a party fails to obey an order to provide or permit discovery, a court may make such orders in regard to the failure as are just, including the following:

> "(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;
>
> (C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party."

Fed. R. Civ. P. 37(b)(2).

24.     "[T]he most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639 (1976).

25.     Belated compliance with a discovery order does nothing to cure a party's violation. *See, e.g., Cine Forty-Second Street Theatre Corp. v. Allied Artists Picture Corp.*, 602 F.2d 1062, 1068 (1979).

26.     Even where there has not been a violation of a court order, Fed. R. Civ. P. 37(c)(1) provides that, "[a] party that without substantial justification fails to disclose information required by Rule 26(a), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any . . . information not so disclosed."

27.     Fed. R. Civ. P. 26(a)(1)(A) requires a party to provide to other parties:

> a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of the injuries suffered.

Pursuant to this Rule, Mystic was required to disclose all non-privileged documents on which its damage calculations were based.

28.     The sanction provided for in Fed. R. Civ. 37(c)(1) is automatic and, in ordinary cases, mandates preclusion of evidence not properly produced. *See Klonoski v. Mahlab*, 156 F.3d 255 ("the new rule clearly contemplates stricter adherence to discovery requirements, and

harsher sanctions for breaches of this rule, and the required sanction in the ordinary case is mandatory preclusion.").

29.     Exclusion is warranted in this case because Mystic continued to disregard its discovery obligations even after being sanctioned for its earlier failure and warned that the Court would not tolerate this kind of conduct when it comes to discovery.

30.     Irrelevant evidence should excluded from presentation as evidence at trial.  Fed. R. Evid. 402.

31.     Mystic is the only party to have asserted a claim against Pharmacia for recovery of past response costs.  Third-party Defendant Modern's disclosures specifically state, "Modern currently claims no damages against any party in this lawsuit."  *Initial Disclosures of Third-Party Defendant Modern Continental Construction Co., Inc.* at 2.

32.     The past costs Mystic seeks to recover as response costs also cannot be recovered because they were not incurred by Mystic.

33.     Precedent under the federal CERCLA statute, which is persuasive here, holds that a party is not entitled to recover as response costs consultant fees that are incurred in connection with litigation services.  *See Gossack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 92 (2nd Cir. 2000) (CERCLA requires that consultant fees "be incurred not merely in preparation for litigation, but as a necessary cost of remediating a site" ); *Black Horse Lane Assoc. v. Dow Chem. Corp.*, 228 F.3d 275, 292-299 (3rd Cir. 2000)(consultant fees in connection with litigation services are not recoverable response costs); *City of Bangor v. Citizens Comm. Comp.*, 2004 WL 483202, *6 (D.Me. 2004) (consultant costs incurred in connection with pending litigation not recoverable response costs).

34.     The invoices eventually produced by Mystic indicate, with few exceptions, that they are bills for litigation expenses, not response costs and, therefore, cannot be recovered as response costs.

35.     The costs Mystic's consultant charged for reviewing documents for litigation purposes, developing unnecessary damage estimates and writing his expert report, do not properly constitute "response costs" and accordingly, invoices evidencing such costs will be excluded from evidence.

IV.     **Mystic and Modern Continental Construction Co., Inc.'s Liability**

36.     Section 5(a) of Chapter 21E creates a number of categories of parties who are liable for responding to contamination at a site at which there has been a release or threat of a release of hazardous materials or oil.  They include the current owner or operator of the site (M.G.L. c. 21E, § 5(a)(1)), the owner or operator of the site at a time when hazardous materials or oil were stored there (M.G.L. c. 21E § 5(a)(2)) and anyone else who caused or is legally responsible for a release or threatened release of hazardous materials or oil at the site (M.G.L. c. 21E § 5(a)(5)).

37.     Among the parties liable for contamination at the Site are Mystic and Modern. They are both liable under § 5(a)(1) because Mystic is the current owner and Modern, the current operator of the Site.

38.     They are both also liable under § 5(a)(2) because there have been releases of hazardous materials at the Property during Mystic's ownership and Modern's period of operations.

39.     The contamination resulting during Modern's operation and Mystic's ownership at the Property is not separable from other contamination at the Property.

40.    In an action for contribution among liable parties, courts apportion liability equitably among the parties.  *See Martignetti v. Haigh-Farr, Inc.*, 425 Mass. 294, 314-315, 680 N.E.2d 1131, 1144-1145 (1997) (in contribution case, jury was properly instructed to "consider any factors appropriate to balance the equities in the totality of the circumstances.").

41.    Courts faced with equitable allocation issues under Section 113 of CERCLA, 42 U.S.C. § 9613, have concluded that they have broad discretion to balance the equities in the interests of justice.  *United States v. R. W. Meyer, Inc.,* 932 F.2d 568, 572 (6th Cir. 1991)

42.    Provisions of M.G.L. c. 21E should be interpreted similarly to their CERCLA counterparts.  *See Martignetti*, 425 Mass. at n.12 ("CERCLA and M.G. L. c. 21E have similar objectives and overlap in coverage.  To the extent that there are similarities in language and structure, it is desirable to arrive at similar interpretations, to achieve consistency in application and to discourage 'forum shopping.'").

43.    Among the factors courts have considered in allocating responsibility between parties are:  (1) whether the parties have cooperated with authorities, *Central Maine Power Co. v. F.J. O'Conner*, 838 F. Supp. 641, 646 (D. Me. 1993); (2) whether a party paid a reduced purchase price on account of environmental contamination, or otherwise purchased the Property with knowledge, *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 90 (3rd Cir. 1988), *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 673 (5th Cir. 1989); (3) whether allowing recovery of all cleanup costs might produce an impermissible double recovery and improperly require the defendant polluter to pay for the same harm twice, *Western Properties Service Corp. v. Shell Oil Co.*, 358 F.3d 678 (9th Cir. 2004); (4) whether the plaintiff exacerbated the contamination by disposing of its own materials on the property during its ownership, *Bethlehem Iron Works, Inc. v. Lewis Industries*, 1996 WL 557592 (E.D. Pa. 1996); and, (5) whether one

party will receive substantial benefits from the clean up, *BCW Associates, Ltd. v. Occidental Chemical Corp.*, 1988 WL 102641 (E.D. Pa. 1988).

44.    A consideration of these factors mandates that Pharmacia be assigned only a small share of the response costs in this case as the benefit Mystic will receive from a cleanup is entirely undeserved as Mystic purchased the Property with full knowledge of its condition, paid a price incorporating a discount more than sufficient to pay any necessary and reasonable response costs, failed to cooperate with authorities and, indeed, despite the fact that environmental laws have been in effect throughout Modern's operation and Mystic's ownership of the Property have worsened the condition of the Property.  Accordingly, Pharmacia, which expended substantial sums remediating contamination on the West Side, is liable for 33% of the reasonable, appropriate and necessary response costs at the Property.  Mystic and Modern are liable for 33% each.

**V.    Attorney's Fees**

45.    Mystic is not entitled to recovery of its attorneys' fees under M.G.L. c. 21E §4A.

By its attorneys,

/s/ John M. Stevens
John M. Stevens (BBO # 480140)
Adam P. Kahn (BBO # 561554)
Elisabeth M. DeLisle (BBO #658067)
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts   02210
Tel:  (617)  832-1000
Fax:  (617)  832-7000
jstevens@foleyhoag.com

Dated:    January 9, 2006