## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

MYSTIC LANDING, LLC,
Plaintiff,

v.

PHARMACIA CORPORATION,
and MONSANTO COMPANY,
Defendants.

PHARMACIA CORPORATION and
MONSANTO COMPANY,
Third-Party Plaintiffs,

v.

MODERN CONTINENTAL CONSTRUCTION
CO., INC.,
Third-Party Defendant.

PHARMACIA CORPORATION
Third-Party Plaintiff,

v.

BOSTON EDISON COMPANY
Third-Party Defendant.

v.

BOSTON EDISON COMPANY
Fourth-Party Plaintiff,

v.

O'DONNELL SAND & GRAVEL, INC.
And MARY O'DONNELL
Fourth-Party Defendants.

**CIVIL ACTION NO.
04-10180 NMG**

## PLAINTIFF MYSTIC LANDING, LLC AND THIRD-PARTY DEFENDANT MODERN CONTINENTAL CONSTRUCTION CO., INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION IN OPPOSITION TO DEFENDANT PHARMACIA CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT

552481

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................1

FACTS ...................................................................................................3

ARGUMENT ..........................................................................................8

I.   THE STANDARD OF REVIEW ON SUMMARY JUDGMENT .........................8

II.  BECAUSE GENUINE DISPUTES EXIST ABOUT MATERIAL FACTS,
     THE COURT SHOULD DENY PHARMACIA'S PARTIAL SUMMARY
     JUDGMENT MOTION...........................................................................9

     A.   Examples of Proposed Material Facts that are in Dispute............................9

          1.   Mystic and Modern Intend to Clean Up the Site; Pharmacia's
               Contention That They Do Not is Disputed .........................................9

          2.   A Genuine Dispute Exists Over the Various Response Cost
               Estimates..........................................................................11

          3.   A Genuine Dispute Exists About Whether Mystic and Modern
               Have Provided Evidence of Response Costs Incurred...................13

          4.   A Genuine Dispute Exists Over Pharmacia's Proposed Facts
               Concerning Certain Privileged Documents, Work Product, and
               Otherwise Protected Materials Used by Pharmacia in its
               Memorandum, Statement, and Affidavit of Elisabeth M.
               DeLisle..............................................................................15

     B.   Even If There Were No Actual Facts in Dispute, Pharmacia is Not
          Entitled to a Partial Summary Judgment..........................................16

III. PHARMACIA IS NOT ENTITLED TO PARTIAL SUMMARY
     JUDGMENT; ON THE CONTRARY, PHARMACIA IS LIABLE UNDER
     THE OIL AND HAZARDOUS MATERIAL RELEASE PREVENTION
     ACT, M.G.L. C. 21E ..........................................................................16

     A.   Pharmacia is Liable Under 21E, § 5 ...............................................17

     B.   Pharmacia is Liable Under 21E, § 4A .............................................19

     C.   § 4A Allows "Reimbursement" of Response Costs Incurred and
          Recovery Of Response Costs A Party "Intends To Undertake".................20

i

D.     Mystic and Modern's Claim for Property Damages under Chapter 21E, § 5 is Not a "late-adopted theory;" Rather, the Claim Was Presented in the Complaint and Remains an Integral Part of this Litigation.........................................................................................................21

E.     The Measure of Damages Under 21E § 5 is Identical to the Measure of Property Damages at Common Law; But Pharmacia's Attempt to Support Its "Knowledge" and "Injury" Arguments Is Irrelevant to Statutory Liability Under 21E § 5 ..............................................................22

CONCLUSION ...................................................................................................26

## TABLE OF AUTHORITIES

CASES

Magee v. United States, 121 F.3d 1 (1st Cir.1997)

Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1121 (1st Cir. 1995)

Oliver v. Digital Equip. Corp., 846 F.2d 103,105 (1st Cir. 1988)

Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922 (1st Cir. 1983)

Byrnes v. Massachusetts Port Auth., 1994 WL 879644 (Mass. Super. Ct. 1994)

Guaranty-First Trust Co. v. Textron, Inc., 416 Mass. 332 (1993)

Black v. Coastal Oil New England, Inc., 45 Mass. App. Ct. 461 (1998)

Belkus v. Brockton, 282 Mass. 285 (1933)

Taygeta Corporation v. Varian, 436 Mass. 217 (2002)

Lewis v. Potvin Lumber Company, Inc., 390 Mass. 636 (1983)

Harris v. T.C. Erb Construction, Inc., 1996 WC 1185038 (Mass.Super.Ct. 1996)

Luna Preservation Society v. Metropolitan District Commission et al., 2000 WL 420838 (Mass.Super.Ct. 2000)

Wellesley Hills Realty Trust v. Mobil Oil Corporation; 747 F.Supp. 93 (1990)

Koehn v. Ayers, 26 F.Supp.2d 953 (1998)


STATUTES AND REGULATIONS

M.G.L. c. 21E

M.G.L. § 21E, § 2

M.G.L. C. 21E, § 4

M.G.L. C. 21E, § 4A

M.G.L. C. 21E, § 5

M.G.L. c. 21E, § 5(a)

M.G.L. c. 21E, § 5(a)(2)

M.G.L. c. 21E § 5(a)(3)

310 C.M.R. 40.0000

310 C.M.R. 40.0000, Subpart P

42 U.S.C. § 9601(14)

## PRELIMINARY STATEMENT

Plaintiff Mystic Landing, LLC ("Mystic") and Third-Party Defendant Modern Continental Construction Co., Inc. ("Modern") submit this Memorandum of Law in Support of its Motion in Opposition to Defendant Pharmacia Corporation's Motion for Partial Summary Judgment. In addition, Mystic and Modern submit a separate Rule 56.1 Statement of Plaintiff Mystic Landing, LLC in Opposition To Defendant Pharmacia Corporation's Motion For Partial Summary Judgment. The Defendant Pharmacia Corporation ("Pharmacia"), formerly the Monsanto Company ("Monsanto"), is liable under M.G.L. c. 21E ("the Act") because Pharmacia's chemical manufacturing, handling, storage, and waste-disposal activities caused contamination of Mystic's property during Pharmacia's thirty-seven years of owning and operating the site at issue as a chemical manufacturing and storage facility (the "Site" or "Property").

This Memorandum explains why Pharmacia's Motion for Partial Summary Judgment ("Memorandum") fails to undermine the legal validity of Mystic and Modern's claims under Massachusetts General Laws, Chapter 21E, for a Declaratory Judgment and for damages based on Pharmacia's wide-ranging contamination of the Site. Simply put, Pharmacia now seeks to walk away from their cleanup responsibilities and the resultant damages they caused to the property after years of polluting and contaminating the Site. Under the statutory and regulatory framework of Chapter 21E, enforcement actions can be initiated by either the Commonwealth or the current landowners to recover response costs required to remediate the contaminated properties. The policies and purposes behind the far-reaching Oil and Hazardous Material Release Prevention Act, Chapter 21E are, inter alia, to encourage redevelopment of contaminated properties and to empower

1

current landowners to act as private attorneys general to enforce the provisions of 21E, including compelling previous owners such as Pharmacia who have contaminated the properties to fund intended cleanup measures. The Act provides for strict liability that is joint and several. Even current owners who did nothing to pollute their property are liable. Although Pharmacia disputes the public policy embodied in 21E, clearly misunderstands its provisions, and largely ignores the controlling law in its Memorandum, Pharmacia is not above this law and is clearly liable under the Act.

Pharmacia has characterized Plaintiffs' claims as "little more than a barely disguised attempt to seize a windfall by a landowner who knowingly purchased contaminated property." Memorandum at 2. Pharmacia suggests that the claims are "contrary to law and logic" and "entirely unprecedented." *Id.* It even posits that no parties in the history of our jurisprudence have had the "effrontery" to make such claims. Given that the claims in question constitute core 21E litigation, the only "effrontery" in this case is Pharmacia's disingenuous arguments that it is not liable under Chapter 21E. Having polluted and contaminated a 35 acre site for decades with dangerous, toxic chemicals that have left a toxic brew of contaminants in the soil, groundwater, and the adjacent river (including sulphuric acid, lead, arsenic and phthaltes), it ill lies in Pharmacia's mouth to argue that the only party that has suffered damages in this case is Pharmacia. Memorandum at 16. Pharmacia is the major polluter of this property; a mere name change from its former Monsanto moniker is insufficient to insulate it from liability. As such, it is the quintessentially liable defendant in a 21E case such as this one, which seeks contribution to fund the cleanup of the Site and to recover the other damages attributable to its pollution of this area.

2

**Summary of the Reasons why Pharmacia's Summary Judgment Motion Should be Denied:**

1. Pharmacia's Memorandum shows that there are materials facts in dispute; but even if there were no such disputes, the issues Pharmacia presents do not support the granting of a partial summary judgment in its favor.

2. Mystic and Modern have every intention of cleaning up the Site using funds from a judgment against Pharmacia to do so.

3. Mystic and Modern have provided evidence of response costs incurred in assessing the contamination to be remediated at the Site.

4. Pharmacia fundamentally misunderstands the difference between § 4 and § 4A of Chapter 21E; Pharmacia is Clearly Liable Under § 4A for the response costs that Mystic and Modern have undertaken and *intend to undertake*.

5. A claim for property damages under Chapter 21E, § 5 is set forth in Plaintiffs' Complaint and it has remained an integral part of this litigation.

6. Under the strict liability provisions of 21E, a previous owner such as Pharmacia, that has contaminated a site like this one is liable to a current owner, despite the current owner's knowledge of the contamination when it acquired the site; Pharmacia's common-law arguments regarding knowledge and injury are irrelevant to the strict statutory imposed liability under 21E.

As explained below, and in the Rule 56.1 Statement of Plaintiff Mystic Landing, LLC in Opposition To Defendant Pharmacia Corporation's Motion For Partial Summary Judgment, there are genuine disputes over the materials facts proposed by Pharmacia in 1) Pharmacia Corporation's Statement of Material Facts as To Which There Is No Dispute, 2) Pharmacia Corporation's Motion for Partial Summary Judgment, and 3) the Affidavit of Elisabeth M. DeLisle.

## FACTS

Mystic and Modern rely on the facts presented in its previously filed Memorandum of Law in Support of Their Motion for Summary Judgment on Liability and Exhibits thereto (see Exhibit A). In particular, Mystic and Modern rely, and refer this

Court to, the Expert Report and Affidavit of Richard J. Hughto, Ph.D., P.E. LSP (see Exhibits B and C).

Although we rely on the documents referenced above and on the facts therein referenced, which we incorporate herein by reference, the following salient facts are provided for the benefit of the Court:

During the decades of Pharmacia's ownership and operation of the Site, its activities there included the handling and storage of raw materials for chemical manufacturing; the manufacture and storage of chemical products and by-products; and the production, handling, and disposal of wastes and by-products. MONS2 0000586-0000595 (see Exhibit D); Deposition of Gerald Rinaldi ("Rinaldi Deposition"), September 8, 2005, (see Exhibit E).

The existing contamination at the Mystic Site is indisputable, as it is both admitted by Pharmacia and well-documented. Hughto Report, at 5, and documents cited therein. The contamination consists of the residuals from Pharmacia's chemical manufacturing processes, storage, release, spills and related waste-disposal activities that took place on the Site during the decades that Pharmacia owned and operated the Site. *Id;* Hughto Affidavit at Exhibit F. The Hughto Affidavit states that he personally reviewed and relied on all the documents cited and attached to the Memorandum of Law in Support of Mystic and Modern's Motion for Summary Judgment on Liability, and further states that all of the documents attached to that Memorandum of Law are of a type reasonably relied upon by experts in his field in forming expert opinions. *See* Hughto Affidavit at 4. Contamination of the soil, groundwater, surface water, and surface water sediments has occurred because of the storage, use, releases, spills, and chemical

disposals that occurred during Pharmacia's various chemical-related operations at the Site. *Id.*

Pharmacia's own documents show that it knew that the contamination occurred and that it remained on the Site due to its operations. For example:

1.  A Monsanto 10/22/73 Monsanto Environmental Assessment of the Site states that sodium bisulfate effluents "run out onto the ground" and end up in the Mystic river. 00004952 (see Exhibit G). In addition, it states that there is "waste" leaking from sewer pipes from the bisulfate plant onto the Site reaching groundwater and the river. Also, leaks in the heat exchangers in the bisulfate plant caused a stream of acid that is "in violation of effluent regulations." Finally, the Assessment documents that there are "spills from tanks in the $SO_2$ or the bisulfite plant reaching the river."

2.  A 1/8/80 Dames & Moore Hydrogeologic Survey installed a monitoring well on the Site and the results were the highest concentrations of contamination found in the Survey. 0000325 (see Exhibit H). Contaminants discovered in the groundwater included lead, arsenic, phthalates (Bis2-ethyl-phthalate, Dibutyl phthalate and Butyl Benzl Phthalate), and plasticizer compounds (hazardous materials known to be handled on the adjacent Monsanto site).

3.  A Monsanto 11/19/81 Memorandum and attached "Site History and Environmental Status Summary – Sale of Everett Plant East Side Property" states: "The land surface is contaminated with some of the raw materials which were stored on site. Soil samples taken from the upper 4 feet of the site indicate the presence of sulfur, bauxite, iron ore, and other inorganic metal salts." 00006322 (see Exhibit I).

5

4.       A 6/3/80 Monsanto Memorandum, "Everett Site, East Side Assessment" estimated that "between 30 and 120 tons of sulfur is spread over an area of up to 60,000 sq. ft." on the Site. 0009975 (see Exhibit J). The memorandum explains the cause referring to "large areas on the east side [Mystic Site] used for raw material storage piles of several thousand tons each of sulfur..."

5.       A 1/22/82 letter captioned "Proposed Property Sale to Boston Edison Company" from Monsanto to Boston Edison regarding the potential purchase made certain disclosures including: "Waste materials disposed of on the tract include alum mud (aluminum sulfate)." 00006274 (see Exhibit K).

6.       During his 9/8/05 deposition, Pharmacia's witness, Gerald Rinaldi, **repeatedly** acknowledged contamination on the site caused by Monsanto's chemical operations. *See e.g.* Rinaldi Deposition, at 37, 39, 42, 69, 71, 118, 124, 132, 137-138, 141, 154 (see Exhibit E).

7.       A 7/16/82 Perkins Jordan Site Contamination and Liability Audit found contaminants that were signatures of the chemicals used and handled on the Site: sulfate, lead, arsenic, aluminum, and phthalates (Bis2-ethyl-phthalate and Dibutyl phthalate). 0005923 (see Exhibit L).

8.       For a 1/15/97 Phase I Environmental Assessment, Consulting Engineers & Scientists collected soil and groundwater samples and detected arsenic and lead in soil, and low pH, arsenic and lead in groundwater. MONS1 0001554 (see Exhibit M). Sulfuric acid manufacturing waste product caused the arsenic contamination. Iron ore for sulfuric acid manufacturing caused the lead contamination. *Id.* Sulfuric acid manufacturing and leaks caused the low pH in the groundwater.     Environmental studies

were conducted on the Site to define the degree and extent of contamination and the need for remediation. *See* Hughto Report, at 7, and documents cited therein. As detailed in the documents referenced above, Pharmacia itself possessed the results of numerous environmental studies of the Site, which prove the existence of contamination on the Site caused by the storage, disposal, and other handling of chemicals during its ownership and operation of the Site.[1]

Other assessments confirmed these findings. During their assessments of the Property, Rizzo Associates conducted soil and groundwater sampling at the Site, the results of which are presented in Environmental Studies dated 6/19/01 and 8/10/01 (see Exhibits N and O respectively, text only); Hughto Report, at 9. Their findings include further delineation of the low pH found in groundwater, and detailed the areas contaminated with arsenic, lead, petroleum compounds and polyaromatic hydrocarbons ("PAHs") in the soil. *Id.* The area of low pH in the groundwater also contains heavy metal contamination in the groundwater. *Id.* All contamination was directly attributable to Pharmacia's ownership and operation of the Site.

---

[1] The environmental studies include:
- Environmental Assessment Sale of 34 Acres-Everett Plant, 10/22/73 (0004951)
- Dames & Moore, Hydrogeologic Survey, 1/8/80 (000325)
- Monsanto Memo, Everett Plant, East Side Assessment, 6/3/80 (0009975)
- Monsanto Memo, Sale of Monsanto Land, 7/21/80 (0010702)
- Dames & Moore, Report, Hydrogeological Services, 12/23/80 (0000314)
- Monsanto, Site History and Environmental Status Summary, Sale of Everett Plant, East Side Property, 11/19/81 (0006322)
- Monsanto, Proposed Property Sale to Boston Edison Company, 1/22/82 (0006273)
- Perkins Jordan, Site Contamination and Liability Audit on Monsanto Property, 7/16/82 (0005923)
- Boston Edison, 10/17/85
- Consulting Engineers & Scientists, Phase I, Initial Site Investigation Report, 1/15/97 (MONS1 0001554)
- Rizzo Associates, Environmental Studies, 6/19/01 and 8/10/01
- Woodward and Curran, Environmental Study, 10/1/04

Hughto Report, at 7-11, and documents cited therein.

7

### ARGUMENT

Chapter 21E was enacted to hold polluters like Pharmacia liable, and to force them to pay for cleanup of the properties and for other related damages. Yet, Pharmacia maintains that "these claims ha[ve] no factual or legal basis..." Memorandum at 2. In an attempt to evade liability under 21E, it relies on supposed "facts" that are genuinely disputed; it argues novel and irrelevant theories of common law to avoid liability under a strict liability statute; and it protests against a claim not made in the Complaint. Significantly, Pharmacia fails to cite a single 21E case in support of its position.

## I.  THE STANDARD OF REVIEW ON SUMMARY JUDGMENT

In accord with Fed.R.Civ.P. 56(c), summary judgment must be granted if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." *See* Fed.R.Civ.P. 56(c); *Magee v. United States,* 121 F.3d 1, 3 (1st Cir.1997). Summary judgment is appropriately rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; see Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1121 (1st Cir. 1995). In ruling on a motion for summary judgment, the court must view the record in the light most favorable to the party opposing the motion and indulge all inferences favorable to that party. Oliver v. Digital Equip. Corp., 846 F.2d 103,105 (1st Cir. 1988); Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 928 (1st Cir. 1983) (citing Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975), cert. denied, 425 U.S. 904 (1976)).

## II.   BECAUSE GENUINE DISPUTES EXIST ABOUT MATERIAL FACTS, THE COURT SHOULD DENY PHARMACIA'S PARTIAL SUMMARY JUDGMENT MOTION

Pharmacia's Statement of Material Facts as To Which There Is No Dispute ("Statement"), and the voluminous exhibits referenced therein, do not support the arguments in its Memorandum. Virtually every deed and purchase agreement transferring the Property is included. Although the chain of title may be correctly stated, the more relevant "facts" it proposes show the existence of genuine issues of material fact. Therefore, their Motion for Partial Summary Judgment should be denied.

In any event, the "facts" Pharmacia proposes for which there is no dispute, taken as a whole, do not entitle Pharmacia to a partial summary judgment.

### A.    Examples of Proposed Material Facts That are in Dispute

For Mystic and Modern's response to each material fact alleged by Pharmacia please see Rule 56.1 Statement of Plaintiff Mystic Landing, LLC in Opposition to Defendant Pharmacia Corporation's Motion for Partial Summary Judgment. Certain material facts for which there is a genuine dispute are covered more extensively below.

#### 1.   Mystic and Modern Intend to Clean Up the Site; Pharmacia's Contention That They Do Not is Disputed

Pharmacia's Statement proposes the following as "material facts not in dispute." Statement at 2.

> Mystic has no current intention to 'spend any money cleaning up the property' in the future, unless such expenditures are required to maintain or enhance the value of the property. DeLisle Aff. Ex. 32, Grela Deposition, at 111-112.

Statement at paragraph 55. Pharmacia also avers that Mystic has no intention of cleaning up the Property throughout its Memorandum. *See* e.g., Memorandum at 2, 6, 15.

9

Mystic and Modern have a genuine dispute over this material fact. First, Mystic

and Modern do intend to remediate the Site. See Affidavit of John Pastore ("Pastore

Affidavit") at Exhibit P. Indeed, they intend to conduct the appropriate remediation of

the Site with funds obtained from the polluter, Pharmacia. Second, the testimony cited in

Pharmacia's Statement at paragraph 55 should be clarified. Pharmacia quotes its own

attorney in the statement. The deponent, Mr. Grela, who was no longer employed by

Mystic or Modern at the time of his deposition, testified in pertinent part as follows:

> Q:  Are you planning on spending any money on cleaning up the property?
> A:  Not currently. To the extent certain remediation needs to be done on the
>      sale to enhance the value – to maintain the value of the property, then
>      maybe we will, but I'm not speaking for Mystic as of today.
>      ...I am not currently employed, as of today, by Modern Continental...
>      ,..or Mystic...
>      ...I'm here to provide historical perspective and testimony.[2]

Affidavit of Elisabeth M. DeLisle at Exhibit 32 (Deposition of Peter M. Grela, 3/14/05, at

112). First, he admitted that he was not testifying regarding the "present" intentions of

the two companies he did not work for, only to provide "his historical perspective and

testimony." Second, "currently" Plaintiffs do intend to clean up the Property with any

funds received from Pharmacia to do so. Third, remediation does need to be performed to

enhance and maintain the value of the property, a possibility to which Mr. Grela alluded

in his testimony.

The obvious public policy behind Chapter 21E is to encourage parties, such as

Mystic, to buy contaminated sites and then to remediate them. Chapter 21E allows such

a party to recover the estimated response costs from the prior owners who are responsible

---

[2] Mr. Grela was addressing the situation, as he understood it, that existed at the time of his deposition. He
was not addressing what the intentions of Mystic and Modern were if they were able to recover funds from
Pharmacia to clean up the property. In any event, he expressly acknowledged that Mystic and Modern
might be spending money on cleaning up the property "[t]o the extent certain remediation needs to be done
on the sale to enhance the value" – exactly the situation that Plaintiffs now face.

for the pollution before any required remediation occurs, thereby ensuring that the remediation will be financially supportable. The claims in this case invoke that policy and advance the purpose behind Chapter 21E. Under § 4A, a party is allowed to recover costs for response actions it has already undertaken and intends to undertake at the contaminated site. Mystic sent a § 4A Notice pursuant to 21E to Pharmacia and pled a § 4A cause of action in its Complaint. Mystic and Modern intend to use any funds awarded as Pharmacia's contribution toward the cleanup of the Site.

In any event, Plaintiffs dispute the asserted "fact" that they do not intend to clean up the Site. Given that the court must view the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party, Oliver v. Digital Equip. Corp., 846 F.2d 103,105 (1st Cir. 1988); Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 928 (1st Cir. 1983) (citing Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975), cert. denied, 425 U.S. 904 (1976)), Pharmacia's motion should be denied for this reason alone.

### 2. A Genuine Dispute Exists Over the Various Response Cost Estimates

Pharmacia refers to a draft letter from Mystic and Modern's experts with a remedial cost estimate of $810,000[3]. Statement at paragraph 33. Pharmacia juxtaposes this letter with a later letter from Mystic and Modern's experts containing a remedial cost estimate of $17,500,000. Statement at paragraph 34. Paragraph 34 characterizes the second letter as "an updated draft" of the previous letter, with "a revised Preliminary Remedial Cost Estimate..." Further, Pharmacia sets forth as fact that the second letter was "based on the same analytical information." Memorandum, Facts section at 6.

---

[3] Estimate for financing purposes only.

11

The mere existence of different cost estimates for the Site's prospective cleanup scarcely establishes the existence of undisputed facts, Moreover, the disparate cost estimates were not "based on the same analytic information." The second letter used different assumptions and contamination scenarios, which naturally produced a different cost estimate. Thus, it is untrue to suggest that the letters are based on the same data and that they are similar in all respects except the differing cost estimates.

The May 15, 2001 Letter was prepared to ascertain what the costs might be for a *de minimis* remediation effort. The May 22, 2001 Letter was prepared based on a potential residential redevelopment scenario, requiring a higher degree of remediation that drove the estimated cleanup costs substantially higher.

The May 15, 2001 Letter presented a cost estimate for a remediation that would allow closure under the Massachusetts Contingency Plan ("MCP"), 310 C.M.R. 40.0000, with the filing of a Class A-3 Response Action Outcome ("RAO"). In addition, the remedial scenario used to prepare the cost estimate included an Activity and Use Limitation ("AUL") to be placed on the title to the Property. In stark comparison, the May 22, 2001 Letter addressed a completely different remedial scenario in which closure would be achieved with the filing of a Class A-2 RAO. Moreover, the second remedial scenario and cost estimate did not involve the imposition of an AUL on the Property. Thus, the remediation in the May 15, 2001 Letter would be much less extensive and much less expensive. An A-3 RAO requires less remediation than a Class A-2 RAO. Moreover, the imposition of an AUL limiting future uses of the property – i.e., to only industrial uses, with no residential uses allowed – obviated the need for more extensive and expensive remediation. But the remediation addressed in the May 22, 2001 Letter

12

assumed closure under the more stringent Class A-2 RAO and presented a remedial plan and cost estimate based on a plan without an AUL. Under this scenario, the Property would need to be cleaned to a much higher level: i.e., suitable for residential use. Thus, the estimated remediation in the May 22, 2001 Letter bore no comparison to the remediation addressed in the May 15, 2001 Letter. The scope of the latter remediation was, to borrow a phrase, at least "twenty-fold" larger.

Pharmacia opines that "the original estimate, apparently made without regard to prospective litigation, was $810,000...[but] when the prospect that someone other than Mystic might pay the bill was considered, the estimate marginally jumped more than twenty-fold to $17,500,000." Memorandum at 9 (citing Statement at paragraph 34). The implication that Mystic and Modern inappropriately changed the number for litigation purposes is baseless. The cost estimates were premised on different remedial scenarios and prepared for different purposes.

Needless to say, Mystic and Modern dispute Pharmacia's proposed material facts as stated in Pharmacia's Statement at paragraph 34, and in Pharmacia's Memorandum at 6 and 9.

### 3. A Genuine Dispute Exists About Whether Mystic and Modern Provided Evidence of Response Costs Incurred

Pharmacia contends that "Mystic has not produced any evidence that it has incurred any costs for investigation, analysis, or cleanup related to preexisting contamination." Statement at paragraphs 51 and 62; Pharmacia's Memorandum at 3, 8, and 9; Affidavit of Elisabeth M. DeLisle at paragraph 51.

But the supposedly undisputed material fact that Pharmacia proposes is false. The Plaintiffs served Pharmacia with the § 4A Notice dated August 27, 2001, informing

Pharmacia of its liability for response costs incurred. The Notice specifically stated: "The cost of response actions to date is approximately $90,500." § 4A Notice at 6 (see Exhibit Q). That was the relevant figure in August 2001. The Complaint in this action stated that "Mystic has incurred in excess of One Hundred Thousand Dollars ($100,000) in investigation and analysis costs..." Complaint at paragraph 39. Thereafter, Plaintiffs incurred additional response action costs, and evidence of same has been provided to Pharmacia, as explained below. The definition of "Response action" in 21E, § 2 includes "assess, assessment, contain, containment, remove and removal." Although Pharmacia alleges that "Mystic has not spent anything on removal or treatment of contamination on the Site...," Mystic and Modern have incurred response costs on Site "assessment" and to "assess" the widespread contamination that Pharmacia caused at the Site. Memorandum at 8.

Specifically, Mystic and Modern have retained and paid for Rizzo Associates to undertake a major assessment of the Property, including site characterization, sampling of soil and groundwater, and preparation of cost estimates for remediation based on different assumptions and scenarios. Parts of Rizzo Associates' work culminated in two reports: 1) the Phase II Field Investigation Report dated June 19, 2001, and 2) the Limited Subsurface Investigation dated August 10, 2001 (see Exhibits N and O). The Reports were provided to Pharmacia during discovery and have otherwise been a subject of discovery and discussions in this case. Rizzo Associates then invoiced Plaintiffs for the substantial Site work and for the Reports generated about the Site. See the Affidavit of Richard J. Hughto, Ph.D, P.E., LSP attached at Exhibit F for specific costs related to Rizzo Associates' work, which constitute response costs that Plaintiffs have already

incurred. Moreover, please see Exhibit R, which are copies of Rizzo Associates' invoices paid by Mystic and Modern.

In short, Mystic and Modern take issue with Pharmacia's proposed material fact that Mystic has not produced any evidence showing that it has incurred any costs for investigation, analysis, or cleanup related to preexisting contamination. Statement at paragraph 62; Memorandum at 3, 8, and 9; Affidavit of Elisabeth M. DeLisle at paragraph 51 and 62; 8/27/01 § 4A Notice at Exhibit Q; Rizzo Environmental Studies at Exhibits N and O; Affidavit of Richard J. Hughto, Ph.D, P.E., LSP at Exhibit F; Rizzo Invoices at Exhibit R.

### 4. A Genuine Dispute Exists Over Pharmacia's Proposed Facts Concerning Certain Privileged Documents, Work Product, and Otherwise Protected Materials Used by Pharmacia in its Memorandum, Statement, and Affidavit of Elisabeth M. DeLisle

It appears that three internal legal research memoranda prepared by Plaintiffs' attorneys were inadvertently disclosed to Pharmacia's counsel, despite the document review that occurred before these and other documents were produced during discovery. Pharmacia chose to use these privileged documents, work product, and otherwise protected materials in their Memorandum, Statement and Affidavit of Elisabeth M. DeLisle. Memorandum at 5; Statement at paragraphs 27, 28, 29; Affidavit of Elisabeth M. DeLisle at 21-23. Their inadvertent disclosure, however, did not waive any privileges. *See U.S. v. Billmyer*, 57 F.3d 31 (1st Cir. 1995) (attorney-client privilege, work-product privilege); *Prudential Ins. Co. v. Turner & Newall*, PLC, 137 F.R.D. 178 (D. Mass. 1991) (attorney-client privilege, work-product privilege) (alternate basis); *Fleet Nat. Bank v. Tonneson & Co.*, 150 F.R.D. 10, 27 Fed. R. Serv. 3d (LCP) 489 (D. Mass. 1993) (work-product privilege); *City of Worcester v. HCA Management Co., Inc.*, 839 F.

Supp. 86, 28 Fed. R. Serv. 3d (LCP) 154 (D. Mass. 1993) (attorney-client privilege, work- product privilege); *Milford Power Ltd. Partnership by Milford Power Associates, Inc. v. New England Power Co.*, 896 F. Supp. 53 (D. Mass. 1995) (work-product privilege). Mystic and Modern have a genuine dispute over both the use of these materials and the material facts proposed that are based on the materials.[4] Memorandum at 5; Statement at paragraphs 27, 28, 29; Affidavit of Elisabeth M. DeLisle at 21-23.

### B. Even If There Were No Actual Facts in Dispute, Pharmacia is Not Entitled to a Partial Summary Judgment

Even if there were no genuine disputes of material facts and Pharmacia's Statement were accepted as true, the totality of those facts, as a matter of law, do not entitle Pharmacia to summary judgment on any claim or issue in this case. Even if the proposed "facts" were all true – and they are not – the legal arguments based on those "facts" are unsupported by applicable law, as explained below.

### III. PHARMACIA IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT; ON THE CONTRARY, PHARMACIA IS LIABLE UNDER THE OIL AND HAZARDOUS MATERIAL RELEASE PREVENTION ACT, M.G.L. C. 21E

Pharmacia's legal arguments are based on a common-law analysis that is simply inapplicable to these statutory 21E claims. Indeed, Pharmacia does not rely upon a single 21E case in its arguments. As explained below, its common-law arguments are legally irrelevant. First, however, it is important to establish Pharmacia's clear liability under 21E, §§ 4A and 5, and then to understand why Pharmacia's arguments fail to change their status as a liable party under 21E.

---

[4] Pharmacia's attorneys have agreed to return these documents to Plaintiffs upon the production of a privilege log and the provision of certain other documents that Pharmacia has requested. The Plaintiffs have agreed to do so, to the extent the requested documents exist and can be located and produced to Pharmacia's attorneys.

### A.    Pharmacia is Liable Under 21E, § 5

Pharmacia is liable for its contamination of the Mystic Site during its ownership.

and operations thereon.  The operative statute is M.G.L. c. 21E, § 5(a).

Chapter 21E, § 5(a) states, in pertinent part:

> § 5. Persons liable (a)…(2) *any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material*…and (5) any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site, *shall be liable, without regard to fault*… (iii) to any person for damage to his real or personal property incurred or suffered as a result of such release or threat of release…

*(emphasis added)*.  Thus, the elements to prove the liability under § 5 are:

1.    Pharmacia is a "person"

2.    who owned or operated the Mystic Site

3.    at the time of storage or disposal of hazardous materials on the Site

4.    a release or threat of release of hazardous material occurred, and

5.    the property was damaged as a result of the release or threatened release.

Pharmacia is a legal person. The definition of "Person" in M.G.L. c. 21E, § 2 is

"any…private corporation…"

For thirty-seven years Pharmacia operated the site as a chemical manufacturing

operation (from 1929 until 1975).  MONS2 0000586-0000595; 0006273 (see Exhibits D

and K).  Monsanto purchased the Site in 1929 by purchasing Merrimac Chemical

Company.  MONS2 0000589.  Monsanto sold the Site to Boston Edison Company on

June 20, 1983. 0005427.

Pharmacia was the owner or operator when disposal of hazardous materials were

stored on and disposed of at the Site.  During the forty-six years of Pharmacia's

17

ownership, until 1975, Pharmacia's operations at the site included handling and storage of raw materials for chemical manufacturing; manufacture and storage of chemical products and by-products; production, handling, storage and disposal of wastes and byproducts. MONS2 0000586-0000595 (see Exhibit D); 00006273 (see Exhibit K); Rinaldi Deposition Exhibits 29(a)-29(f) (see Exhibit S). The chemical products, raw materials, byproducts and waste are clearly included within the definition of "hazardous material." M.G.L. § 21E, § 2; 42 U.S.C. § 9601(14); 310 C.M.R. 40.0000, Subpart P.

Releases or threats of release of hazardous materials occurred on the Mystic Site during Pharmacia's ownership and operations there. Under c. 21E, § 5(a)(2), a person is liable for a release of hazardous material from a site if that person was the owner or operator of such site at the time of the storage or disposal of the hazardous material at or upon the site. A person who was the owner or operator of a site at the time of storage or disposal of hazardous material may be held liable for a release, even if the release occurred *after* that person ceased to be an owner or operator of the site. *Byrnes v. Massachusetts Port Auth.*, 1994 WL 879644 (Mass. Super. Ct. 1994). The Court in Byrnes stated: "The statute [§ 5(a)(2)] easily could have been written to provide that a prior owner is liable if it owned the site *during* a release or threat of release." *Id.* at *5 (*emphasis added*). Temporally, the release is not required to occur during the former owner's operation of the site. The undisputed evidence shows that the releases occurred during, and were caused by, Pharmacia's operations at the Site. The implications are twofold. One, Mystic and Modern have proof far beyond the quantum of proof required by 21E and the courts to establish Pharmacia's liability under § 5(a)(2). Second, liability is established under § 5(a)(5) as well, which requires causation. M.G.L. § 5(a)(5) states:

18

"Persons liable...(5) any person who otherwise *caused* or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site." (*emphasis added*). See the short summary of examples of indisputable releases of hazardous materials caused by Pharmacia in the Facts section above.

### B.    Pharmacia is Liable Under 21E, § 4A

Pharmacia is liable for contribution to the required response actions at the Site. M.G.L. §4A provides a procedure whereby a party gives notice to a potentially responsible party that the notifying party reasonably believes is liable under § 5 to seek contribution for clean up costs. The party notified need not be adjudicated as liable under § 5 in order for a party to prevail under § 4A.

Chapter 21E, § 4A states:

> Section 4A. (a) Any person...who *has undertaken*, is undertaking, *or intends to undertake* a necessary and appropriate response action or who is or reasonably believes that he might be liable pursuant to section five *may notify any person he reasonably believes is liable pursuant to section five* that the response action has been taken or is being taken or of the notifier's intent to take such response action or to seek *contribution, reimbursement* or equitable share from other persons...

(*emphasis added*). On August 27, 2001 Mystic sent notice pursuant to § 4A to Pharmacia that Mystic reasonably believed it was liable under § 5 and that Mystic sought contribution from Pharmacia for the cost of the response actions it has undertaken and it intends to undertake. Please see a copy of the August 27, 2001 §4A Notice at Exhibit Q.

When, as here, Plaintiffs have complied with these notice provisions, Pharmacia's liability under § 4A is inescapable. Not only is it liable for property damage under § 5, it is also liable under § 4A for contribution to the response costs that the present owner has undertaken and intends to undertake.

19

C.    § 4A Allows "Reimbursement" of Response Costs and Recovery Of Response Costs A Party "Intends To Undertake"

Pharmacia is liable for response costs as discussed above. Costs estimates for remediation of the Site have been prepared by Dr. Richard J. Hughto, Ph.D., P.E., LSP and presented in his Expert Report at Exhibit B.

Pharmacia argues "the rule [is] that only response costs actually expended may be recovered." Memorandum at 9. But this represents a fundamental misunderstanding of § 4A. Under §4A, liability extends to "any person...who...has *undertaken...or intends to undertake"* a response action. The Massachusetts appeals court in *Black v. Coastal Oil New England, Inc.* explained a key difference between §§ 5 and 4A. The Court stated "that a 'person liable for cleanup under § 5 can sue other liable parties under § 4 for reimbursement of cleanup costs already paid, but cannot sue under § 5(a)(5)(III) to recover costs not yet incurred." *Black,* 45 Mass.App.Ct. at 464 (*citations omitted*). The court continued: "Prior payment is a prerequisite for reimbursement. *Id. (citations omitted).* The Court explained that "[o]nly after the addition of G.L. c. 21E, § 4A...has a private party who is liable under § 5 been able to seek contribution toward future response costs before commencing cleanup..." *Id.* When Pharmacia states that this Court "is without authority to award monetary damages for costs that have not yet been incurred," it displays a misunderstanding of the statute under which it is liable. Memorandum at 9.

Pharmacia further shows its misunderstanding of the law and adds a new element when it states: "In sum, even if the law permitted unexpended response costs to be recovered...Mystic still could not recover here because it would not have established damages with anything remotely approaching the requisite degree of specificity." First,

20

the law permits unexpended response costs to be recovered under § 4A. Second,

Pharmacia offers no legal support for its assertion that Plaintiffs are unable to prove those

costs with the "requisite degree of specificity." The cost estimates for these response

actions have been prepared by an expert. To be sure, Pharmacia disputes the cost

estimates. But that is exactly why a trial on damages is necessary – to determine the

amount of "necessary and appropriate" response costs and the damages to be recovered,

with whatever specificity may be reasonably required to estimate such costs.

> **D.    Mystic and Modern's Claim for Property Damages under Chapter 21E, § 5 is Not a "late-adopted theory;" Rather, the Claim Was Presented in the Complaint and Remains an Integral Part of this Litigation**

Count I for Declaratory Judgment in the Complaint at paragraph 30 clearly states

the following:

> As the former owner/operator of the Site at the time of the release of oil and hazardous material to the soil, groundwater, and sediments, *the defendants are responsible for all of the response costs and other damages related to the contamination of the Site pursuant to Mass. General Laws c. 21E, § 5.*

Count II for Contribution in the Complaint at Paragraph 33 pleads the same

allegation of liability and damages under § 5.

Count VI for Attorneys' Fees and Costs in the Complaint at paragraph 51 contains

the same claim of liability and damages under § 5.

The Complaint was served on Pharmacia in December 2003. The claims are not

"late-adopted" or "late-asserted." Memorandum at 10. They are more than "hinted at in

the complaint." Memorandum at 2. Pharmacia speculated: "At the very close of

discovery, after apparently determining that it could not obtain a monetary judgment for

past or future costs because neither had been incurred, Mystic devised a new claim in an

effort to recover a monetary judgment – a claim of 'property damage.'" Memorandum at

10. Pharmacia's speculation is unfounded. It is hard to understand how Pharmacia could

assert that the § 5 claim for property damages pled in the Complaint almost two years

ago, could be a "new claim." Yet Pharmacia asks this Court to "dismiss this last minute

attempt to find a theory on which damages could be assessed." Memorandum at 10. But

there is nothing "last minute" about a claim pled almost two years ago, that has been an

integral part of discovery and discussions on damages throughout this case, and for which

Pharmacia is clearly liable.[5]

   An issue in dispute, necessitating a trial on damages, is which measure of § 5

property damages applies in this case, temporary or permanent, and what is the amount of

those damages.

   E.    **The Measure of Damages Under 21E § 5 is Identical to the Measure of
          Property Damages at Common Law; But Pharmacia's Attempt to
          Support Its "Knowledge" and "Injury" Arguments Is Irrelevant to
          Statutory Liability Under 21E, § 5**

   "[T]he measure of recovery under 21E, § 5 is identical to the measure of recovery

at common law for damage to real and personal property." *Guaranty First Trust*

*Company v. Textron, Inc.*, 416 Mass. 332, 333 (1993); *Black v. Coastal Oil New*

*England, Inc.*, 45 Mass. App. Ct. 461 (1998). At common law, the appropriate measure

depends on whether the property damages are permanent or temporary. *Id.* When the

injury is permanent, the appropriate measure of damages is diminution of value

determined by "the difference in the fair market value of the injured premises before and

after the injury." *Black*, 45 Mass. App. Ct. at 466; *Belkus v. Brockton*, 282 Mass. 285,

---

[5] Pharmacia also refers to the state court civil action cover sheet in an attempt to make a compelling argument; however, the cover sheet sufficiently states Plaintiff seeks relief pursuant to § 4A which necessarily implicates liability under § 5. One must be a liable party under § 5 to be subject to § 4A damages. Note also that we are in federal court now, not state court.

288 (1933). The injury is temporary if it is "reasonably curable by repairs." *Id*. The

injury is reasonably curable by repairs if the expense of the repairs is less than the

diminished market value. *Id.*; *see Textron*, 416 Mass. at 337. When the injury is

temporary "the measure of recovery is the reasonable expense of repairing the injury plus

the intervening loss of rental value for the period reasonably needed to repair the injury."

*Textron*, 416 Mass. at 337; *Belkus*, 282 Mass. at 288. These rules of law present issues in

our case necessitating a trial on damages.[6]

Pharmacia digresses into common law arguments concerning "injury," "duty to

mitigate damages," and even "assumption of risk." Memorandum at 12-14.[7] The rule of

law under 21E is presented above. Only the measure of *damages* under 21E is identical

to the measure in common law. There is no wholesale adoption of all common law

principles, such as duty to mitigate damage or assumption of the risk, by the operative

statute, 21E. Liability under this statute is "without regard to fault." No 21E cases go

beyond the common law distinction between temporary versus permanent damages,

much less do they delve into common-law areas such as those Pharmacia invokes. In any

event, the cases Pharmacia cites neither support its arguments regarding "knowledge" of

contamination prior to purchase, nor their "injury" argument.[8]  But it largely avoids

---

[6] Property damages, including permanent damages, have occurred as a result of the contamination. For example, permanent stigma and market resistance damages are discussed in the Expert Report of Donald P. Bouchard, MAI and Steven R. Foster, MAI dated September 12, 2005 (the relevant portions of which are submitted herewith as Exhibit T).

[7] Pharmacia argues that "Mystic's claims are barred by the doctrine of assumption of the risk as it applies to Massachusetts strict liability cases." But there is no common law strict liability claim in this case, in which liability exists "without regard to fault.."

[8] Pharmacia cites to the following inapplicable cases to support their "knowledge" and "injury" arguments: *Taygeta Corporation v. Varian*, 436 Mass. 217, 223 (2002)(dealing with *adjacent* property owners and analyzing common law as it applies to the *statute of limitations*); *Lewis v. Potvin Lumber Company, Inc.*, 390 Mass. 636 (1983)(dealing with *adjacent* lumber company cutting timber on their property and analyzing *purchase and sale agreement and assignment of claim* to determine liability); *Textron, Inc.* 416 Mass 332 (analyzing *damages* and *not* when the "property damage action accrued" as represented by Pharmacia in its Memorandum at 12); *Harris v. T.C. Erb Construction, Inc.*, 1996 WC 1185038

cases discussing the only statute that applies in this situation: The Oil and Hazardous

Material Release Prevention Act, Chapter 21E. The statute that applies provides defenses,

and it is no defense that the current owner seeking contribution had prior knowledge of

the contamination. The statute provides that

> there shall be no liability...for a person otherwise liable who can establish by a
> preponderance of the evidence, (A) that the release or threat of release of oil or
> hazardous material and the damages resulting therefrom were caused by:
>
> (1) an act of God;
>
> (2) an act of war;
>
> (3) an act or omission of a third party...whose act or omission occurs in
> connection with a contractual relationship
>
> (4) any combination of the foregoing paragraphs...21E, § 5.

Mystic and Modern's cause of action against Pharmacia is created by 21E, § 5;

the common-law theories that Pharmacia cites are simply inapplicable to this statutory

claim. The evident policy behind 21E is to encourage developers to buy contaminated

properties, to clean them up using funds recovered from polluters and from other

responsible parties, and to redevelop them for productive use. *See Textron*, 416 Mass. at

335. In *Taygeta v. Varian*, the Court expounds on the important policies behind 21E.

The Court states: "Simply put, G.L. c. 21E was drafted in a comprehensive fashion to

compel the prompt and efficient cleanup of hazardous material and to ensure that costs

---

(Mass.Super.Ct. 1996)(dealing with destruction of a retaining wall and analyzing *risk of loss* during
executory period of a *real estate contract*); *Luna Preservation Society v. Metropolitan District Commission
et al.*, 2000 WL 420838 (Mass.Super.Ct. 2000)(dealing with a *tug boat* and analyzing *maritime law* and
*standing*); *Wellesley Hills Realty Trust v. Mobil Oil Corporation*; 747 F.Supp. 93 (1990) (analyzing
common law *negligence* claim and common law *duty of vendee* to disclose defects); *Koehn v. Ayers*, 26
F.Supp.2d 953 (1998)(a federal *Texas* case dealing with alleged *personal injuries* due to exposure to toxic
substance).

and damages are borne by the appropriate responsible parties." *Taygeta*, 436 Mass. at

223. Moreover, the court stated that the primary purpose of 21E is

> to respond to environmental contamination and to recover response costs from persons responsible for the contamination...A second significant purpose of 21E is to enable private persons 'to obtain a certain measure of compensation for loss resulting from environmental damage.'

*Id.* (*citing Textron*, 416 Mass. at 335). Pharmacia argues that, under the common law,

they should not be liable because Mystic and Modern's damages "were completely

avoidable." Memorandum at 14. Pharmacia argues that "Mystic could have declined to

purchase the Property because of the contamination." *Id.* But that argument flies in the

face of the important policies and purposes of 21E to encourage buyers such as Plaintiffs

to purchase contaminated properties, clean them up with the financial help of the

responsible polluters, and reintroduce them into the market again as productive

properties. In doing so, the Legislature sought to eliminate the dangers of allowing toxic

substances to contaminate the properties for years on end, in favor of requiring the

responsible polluters to pay for the damages. A finding of liability against Pharmacia,

and a trial on damages to fund the cleanup of the Mystic Site, fulfills the purposes and

policies behind the Oil and Hazardous Material Release Prevention Act, Chapter 21E.

### CONCLUSION

For the reasons and upon the authorities set forth above, Plaintiff Mystic Landing,

LLC and Third Party Defendant Modern Continental Construction Co. respectfully

request that the Court deny Pharmacia's Motion for Partial Summary Judgment.

MYSTIC LANDING, LLC AND MODERN
CONTINENTAL CONSTRUCTION CO.

By its attorneys:

Robert G. Flanders, Jr., Esq. (BBO #170820)
Doreen M. Zankowski, Esq. (BBO #558381)
Kevin M. Plante, Esq. (BBO #630088)
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA  02109-1775
(617) 345-9000

DATED: November 7, 2005

## CERTIFICATE OF SERVICE

I, Kevin M. Plante, hereby certify that on this ____ day of November 2005, I served a true and accurate copy of the foregoing document by hand to:

John M. Stevens, Esq.
Adam P. Kahn, Esq.
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts 02210

Mark S. Granger, Esq.
Douglas B. Otto, Esq.
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210

Howard G. Guggenheim
P.O. Box 736
Scituate, MA 02066

Kevin M. Plante

Signed under the penalties of perjury this 7th day of November 2005.

# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MYSTIC LANDING, LLC
        Plaintiff,

v.                                                CIVIL ACTION

PHARMACIA CORP., SOLUTIA INC.,                    No. 04-10180 NMG
And MONSANTO CO.
        Defendants,

PHARMACIA CORP., and MONSANTO CO.,

        Third-Party Plaintiffs,
                v.
MODERN CONTINENTAL CONSTR. CO., INC.
        Third-Party Defendants.

PHARMACIA CORPORATION,

        Third-Party Plaintiff,
                v.
BOSTON EDISON COMPANY,
        Third-Party Defendant.

BOSTON EDISON COMPANY,

        Fourth-Party Plaintiff,
                v.
O'DONNELL SAND & GRAVEL, INC., and
MARY O'DONNELL,

        Fourth-Party Defendant.
                                        /

**CONDENSED**

Book your
next depo online
at depobook.com

Deposition of Gerard Rinaldi

# DEPOBOOK
## reporting services
(800) 830.8885
www.depobook.com
Professional Reporting Services Nationwide!

Deposition of Gerard Rinaldi / September 8, 2005

---

**Page 2**

```
 1        DEPOSITION OF GERARD RINALDI
 2   TAKEN BY ROBERT G. FLANDERS, JR., ESQ.
          ON BEHALF OF THE PLAINTIFFS
 3            SEPTEMBER 8, 2005
 4
 5
          REPORTED BY DEBRA M. MUSIELAK
 6           Certified Shorthand Reporter
           Registered Diplomate Reporter
 7           Certified Realtime Reporter
                  MO CCR #681
 8            IL CSR #084-001684
 9
10
11       DEPOSITION OF GERARD RINALDI, produced, sworn and
12   examined on September 8, 2005, at the Hilton St. Louis
13   Frontenac, 1335 S. Lindbergh Boulevard, in the City of
14   Frontenac, State of Missouri, before Debra M. Musielak,
15   Certified Shorthand Reporter within and for the States of
16   Missouri and Illinois, in a certain cause now pending in
17   the United States District Court for the District of
18   Massachusetts.
19
20
21
22
23
24
25
```

---

**Page 4**

```
 1            INDEX OF EXHIBITS
 2   Plaintiffs' Exhibit:
 3    1  Notice of Deposition re Pharmacia   11
      2  Notice of Deposition re Monsanto     12
 4    3  MONS2 0002539 - 2550                 30
      4  EVE 1037004                          30
 5    5  EVE 1826881-81                       31
      6  MONS1 0001488-94                     31
 6    7  MCD 6290714-46                       32
      8  MCD 6016172-76                       33
 7    9  MCD 6016059-151                      40
     10  MONS1 0001514-38                     46
 8   11  MONS1 0001554-1644                   46
     12  10-15-04 Letter from Kahn to        46
 9       Zankowski and attached tables
     13  Exploration Location Plan            49
10   14  MCD 6291106-8 and MCD 6291144       50
     15  0000904-30                           57
11   16  MONS1 0002539-43                     57
     17  MONS1 0002653-77/MONS1 0002532      59
12   18  EVE 1614769                          60
     19  EVE 1614994-96                       60
13   20  EVE 1614768                          62
     21  0001790-1838                         65
14   22  MONS2 0000586-95                     72
     23  MONS2 0001193-96                     76
15   24  MONS1 0000001-29                     82
     25  MONS1 0000030-42                     82
16   26  MONS1 0000043-64                     82
     27  MONS2 0000580-65                     86
17   28  0004586-4728                         96
     28A EVE 1614879-84                      106
18   29B EVE 1614885-87                      105
     29C EVE 1614904-08                      105
19   29J EVE 1614909-18                      105
     29L EVE 1614934-36                      106
20   29F EVE 1614942-47                      106
     30  EVE 1630674                         134
21   31  MONS1 0000691-695                   135
     32  MONS2 0002582-94                    159
22   33  EVE 1644857-59                      159
     34  MCD 0436084-86                      170
23   35  MCD 0436438                         174
     36  MCD 0436483-88                      178
24
25   (Exhibits attached.)
```

---

**Page 3**

```
 1            A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4       HINKLEY ALLEN SNYDER, LLP
         Robert G. Flanders, Jr., Esq.
 5       Doreen Zankowski, Esq.
         28 State Street
 6       Boston, MA  02109
 7
     ON BEHALF OF MONSANTO and PHARMACIA:
 8
 9       FOLEY HOAG, LLP
         John M. Stevens, Esq.
         155 Seaport Boulevard
10       Boston, MA  02210-2600
11
12   ON BEHALF OF BOSTON EDISON:
13       MORRISON MAHONEY, LLP
         Douglas B. Otto, Esq.
14       250 Summer Street
         Boston, MA  02210-1181
15
16
17
18        INDEX OF EXAMINATION
19   Direct Examination by Mr. Flanders    6
     Examination by Mr. Stevens          185
20   Redirect Examination by Mr. Flanders 178
21
22
23
24
25
```

---

**Page 5**

```
 1            S T I P U L A T I O N
 2   IT IS HEREBY STIPULATED AND AGREED by and between counsel
 3   for the parties that this deposition may be taken in
 4   shorthand by Debra M. Musielak, CSR, RDR, CRR, and
 5   afterwards transcribed into printing, and signature by
 6   the witness is not waived.
 7
 8   DEPOSITION CONVENED AT 8:17 a.m.
 9        MR. STEVENS:  Do you want to have any
10   stipulations?
11        MR. FLANDERS:  I assume the witness will
12   want to read and sign the transcript?
13        MR. STEVENS:  Correct.
14        MR. FLANDERS:  And that we're going to
15   waive notarization and filing of the transcript.
16        MR. STEVENS:  So stipulated.
17        MR. OTTO:  That's fine.
18        MR. FLANDERS:  I guess the other
19   preliminary matter is will this witness be testifying in
20   response to both of the deposition notices?
21        MR. STEVENS:  He will be testifying on
22   behalf of both Pharmacia and Monsanto as to topics 1 and
23   6 through 23.
24        MR. FLANDERS:  All right.  And I guess the
25   other stipulations — I suppose we should agree that all
```

2 (Pages 2 to 5)

Deposition of Gerard Rinaldi / September 8, 2005

1   objections except as to form are reserved until the time
2   of trial?
3        MR. STEVENS: And motions to strike.
4   That's provided in the rules, but that's fine.
5
6            GERARD RINALDI
7   of lawful age, being first duly sworn to tell the truth,
8   the whole truth and nothing but the truth, deposes and
9   says as follows:
10           DIRECT EXAMINATION
11  BY MR. FLANDERS:
12   Q.  Okay. Would you please identify yourself?
13   A.  My name is Gerald Michael Rinaldi.
14   Q.  And what is your position now?
15   A.  I'm Manager of Remediation for Solutia,
16  Incorporated.
17   Q.  And how long have you held that position?
18   A.  Since Solutia was spun from the former Monsanto
19  Company, September 1st, 1997.
20   Q.  Where do you live, Mr. Rinaldi? What's your
21  address?
22   A.  150 Chippenham Lane, Clarkson Valley, Missouri,
23  63005.
24   Q.  And in your capacity as the Manager of
25  Remediation for Solutia, where do you work? Where is

Page 6

1   A.  I started work for the former Monsanto Company,
2   now known as Pharmacia Corporation, in the summer of 1974
3   as a summer intern at a location in Dayton, Ohio. After
4   graduating college I began permanent employment at that
5   same location beginning in 1978.
6    Q.  Where was that?
7    A.  In Dayton, Ohio. Monsanto Research Corporation
8   was the name of the facility at the time. I worked there
9   until the end of 1981, and in 1982 I transferred to the
10  then-Monsanto Company location in Texas City, Texas.
11  That was a manufacturing facility on the Gulf Coast near
12  Houston. I worked there until 1984.
13       I transferred to the then-Monsanto Company
14  facility in Greenwood, South Carolina where I worked
15  until 1987.
16       I transferred from Greenwood to Monsanto, now
17  Pharmacia Manufacturing Facility, in Pensacola, Florida.
18  I worked there until 1990, and I've worked here in St.
19  Louis since 1990.
20       From 1990 to 1993 as a Manager of Environmental
21  Auditing and from 1993 to the present, first for former
22  Monsanto, now for Solutia, in the capacity I described to
23  you earlier as Manager of Remediation.
24   Q.  Okay. And for all these years that you've
25  described working for Monsanto or one of its affiliates

Page 8

1   your place of business?
2    A.  I work at Solutia's World Headquarters here in
3   St. Louis at 575 Maryville Center, St. Louis, 63141.
4    Q.  In that position, Manager of Remediation for
5   Solutia, what do you do in that job?
6    A.  I'm responsible for projects at both
7   Solutia-owned and -operated plant sites and what are
8   known as Superfund sites for the identification and
9   remediation of soil and groundwater impacts to the
10  properties.
11   Q.  And when you say remediation, what are you
12  referring to?
13   A.  Cleaning up, treating, removing, otherwise
14  addressing those soil and groundwater impacts.
15   Q.  Are these impacts from operations?
16   A.  Yes.
17   Q.  And when you say impacts do you mean that these
18  are contaminated in some way?
19   A.  Yes.
20   Q.  And so your job is to in one way or another
21  deal with or address that contamination?
22   A.  Yes.
23   Q.  Before you took on this job can you give us
24  some indication of what your background was job-wise?
25  What else were you doing?

Page 7

1   have you always been in the environmental area?
2    A.  Yes.
3    Q.  And can you just tell us what titles you've
4   held in that area?
5    A.  Yes. Sorry I didn't do that as I was going
6   along earlier.
7    Q.  That's all right.
8    A.  Beginning in Dayton, Ohio, I held a variety of
9   titles beginning with Research Engineer up to Senior
10  Research Engineer. At Texas City, Texas, my title was
11  Senior Environmental Engineer. At Greenwood, South
12  Carolina, my title was Supervisor of Environmental
13  Control. At Pensacola, Florida, my title was Senior
14  Environmental Specialist. And, as I think I mentioned
15  earlier, my titles here in St. Louis have been first
16  Manager of Environmental Auditing and more recently
17  Manager of Remediation.
18   Q.  And do you -- what is your level of education?
19   A.  I have a Bachelor's Degree in chemical
20  engineering from Massachusetts Institute of Technology
21  and a Master of Science in chemical engineering practice
22  from Massachusetts Institute of Technology.
23   Q.  Any other educational degrees other than what
24  you've just mentioned?
25   A.  No.

Page 9

3 (Pages 6 to 9)

Deposition of Gerard Rinaldi / September 8, 2005

1  Q. Do you hold any certifications or licenses in
2  your field?
3  A. Yes. I'm a registered professional engineer in
4  the state of Texas.
5  Q. Is that a particular type of engineer?
6  A. It's not specified, but it was in my capacity
7  then as environmental engineer.
8  Q. Okay. Now, have you ever been deposed before
9  or testified as a witness before?
10  A. Yes.
11  Q. Okay. In what cases or proceedings?
12  A. My recollection is not great. I think —
13  Q. Have there been many of them?
14  A. Two or three, I would say.
15  Q. Okay.
16  A. One concerning a matter between — well, I
17  can't remember the parties. It was in Texas and it
18  related to the Brio Superfund site in the Houston area.
19  That's the one I recall. There was another matter
20  between Monsanto — then-Monsanto, excuse me — and I
21  will probably say that many times during the course of
22  the day because I'm so used to Monsanto, which is now
23  known as Pharmacia. So I apologize in advance for that.
24  There was another matter between then-Monsanto
25  and I think Burroughs Wellcome or GlaxoWellcome in North

Page 10

1  Carolina. I believe I was deposed in that. There may
2  have been one or two others that I honestly don't have
3  clear recollections of the matters, of the dates or
4  anything else.
5  Q. Did you testify in any litigation or give
6  testimony in a deposition in a case involving a party by
7  the name of Rosen in Massachusetts?
8  A. I know a person by that name. I don't
9  remember — maybe I did. Maybe I was deposed in such a
10  matter. Now that you refresh me it does sound more
11  familiar.
12  Q. Okay. Did that case have to do with the site
13  in Massachusetts formerly owned by the Monsanto Company?
14  A. That's how I would have come to be in contact
15  with Mr. Rosen, yes. I don't remember the details of the
16  case, if it was concerning the site or some other matter
17  that he was dealing with.
18  Q. Now, you are here pursuant to a deposition
19  notice that — actually two deposition notices that I'm
20  going to ask be marked as Exhibits 1 and 2. The first
21  one, 1, is the deposition notice for Pharmacia
22  Corporation, and the second one is a deposition notice
23  for Monsanto Corporation.
24  (Plaintiff's Exhibit Nos. 1 and 2
25  marked for identification.)

Page 11

1  Q. (By Mr. Flanders) Showing you and your counsel
2  these deposition notices that we've marked as Exhibits 1
3  and 2, are you the witness that has been designated under
4  Rule 30(b)(6) to testify to certain of the matters that
5  are referenced in the schedules to these deposition
6  notices?
7  A. That's my understanding from my discussion with
8  counsel.
9  Q. All right. So you are here both on behalf of
10  Pharmacia Corporation and on behalf of Monsanto Company
11  Corporation; is that correct?
12  A. That's my understanding.
13  Q. Okay. Now, I just want to be clear as to which
14  of these matters that are defined here in the Schedule A
15  you're going to be testifying to. If you just look at
16  the one for Exhibit 1 for Pharmacia —
17  MR. STEVENS: And they are substantively
18  identical, are they not?
19  MR. FLANDERS: They are.
20  Q. (By Mr. Flanders) My understanding is you're
21  going to be testifying to only certain of these numbered
22  paragraphs on Schedule A; is that correct?
23  A. Yes.
24  Q. And can you identify which ones you are going
25  to be talking about?

Page 12

1  A. Item number 1 and item numbers 6 through 23.
2  Q. Okay. And that would be for both Monsanto and
3  Pharmacia; correct?
4  A. Yes.
5  Q. Now, did you do anything to prepare to testify
6  today?
7  A. Yes.
8  Q. Can you generally describe what you did?
9  A. I've reviewed a number of file boxes currently
10  held at Monsanto Company, some of which I understand were
11  produced by my current employer, Solutia, Incorporated,
12  and others produced by current Monsanto Company. I spent
13  two full days reviewing those boxes approaching perhaps
14  100 in number.
15  I've also reviewed two binders that I've
16  brought with me today to the deposition that were
17  prepared for me by counsel for Monsanto and Pharmacia
18  relative to the matters in this notice of deposition.
19  I've spoken, of course, to counsel, Mr.
20  Stevens, over the course of the last couple of days. I
21  have spoken to a current employee of Monsanto Company, a
22  long-time colleague of mine — despite the various
23  company name changes and so forth — Jeffrey Waldheser,
24  whose name appears on some of the documents which I
25  reviewed during the course of these earlier activities.

Page 13

4 (Pages 10 to 13)

Deposition of Gerard Rinaldi / September 8, 2005

1  And I also spoke to another current Monsanto Company
2  employee, Jeffrey Kileve.
3      Q.    And what was the purpose of these consultations
4  with these two colleagues?
5      A.    Mr. Waldbeser's name appears, as I indicate, on
6  several items of correspondence between then-Monsanto
7  Company — or perhaps internal to Monsanto Company —
8  internal communications and as well communications
9  between Monsanto Company and Boston Edison, if I recall
10 correctly.
11     Q.    Okay. And the other individual?
12     A.    Mr. Kileve — I received information from him
13 yesterday. I've had passing contact with him over the
14 course of my having been apprised I'd be involved in this
15 matter since back in April or so of this year.
16     Q.    Okay. Where was Mr. Kileve now?
17     A.    He works here in St. Louis for Monsanto
18 Company. I'm not certain of his exact title. It might
19 be very similar to mine; Manager of Remediation.
20     Q.    But for a different company?
21     A.    For the current Monsanto Company.
22     Q.    And Mr. Kileve, where is he?
23     A.    He works for the current Monsanto Company as
24 well here in St. Louis as their Director of Environmental
25 Affairs. Mr. Waldbeser reports to Mr. Kileve.

Page 14

1  other matters you described, did you do anything else to
2  prepare other than what you've already told us?
3      A.    I suppose the one other thing that would fit
4  the description is during the course of my work as
5  Manager of Remediation I was responsible or involved in
6  such work at the Everett, Massachusetts location that's
7  referred to in this matter, again, as the Gateway Center
8  in the time frame from 1994 to 1997 particularly, and to
9  a lesser degree since.
10     Q.    During that '94 to '97 time frame, what were
11 your responsibilities in the position that you had?
12     A.    I was the manager of remediation or remedial
13 projects for then-Monsanto Company up to September 1st,
14 1997, as I earlier described. And I was responsible as
15 the project manager for the investigation and remediation
16 of that property referred to in this matter as the
17 Gateway Center.
18     Q.    Okay. Now; the Gateway Center is presently
19 what? What's its use?
20     A.    It's a shopping mall, I guess, to put it in a
21 nutshell.
22     Q.    And am I correct that that area that is now
23 used as a shopping mall and is referred to as the Gateway
24 Center is a portion, but only a portion of the area that
25 was formerly used as a chemical manufacturing facility by

Page 16

1      Q.    Now, you referenced binders that you reviewed
2  that had been assembled for you, I think you said, by
3  counsel; is that right?
4      A.    Yes.
5      Q.    Generally what kinds of documents are there?
6      A.    There are a variety of documents. The binders
7  are organized with tabs that relate to the numbered items
8  in the notice of deposition. They include internal
9  memoranda of Pharmacia, then-Monsanto correspondence from
10 Pharmacia to outside parties, agencies and vice versa,
11 consultants' reports or excerpts of those reports,
12 information about operations, waste handling practices,
13 et cetera, at the property and the Gateway Center as
14 those terms are defined in the notice of deposition.
15         That's I think a general description of what
16 the binders contain.
17     Q.    Were these documents all documents that were
18 generated in the course of normal operations at these
19 companies or were they prepared by counsel for this case?
20     A.    I don't believe any of them were prepared for
21 this case. They are historical documents, if I could
22 call them that —
23     Q.    Okay.
24     A.    — as a layman.
25     Q.    Now, other than viewing these documents and the

Page 15

1  Monsanto?
2      A.    That's correct.
3      Q.    The remaining area —
4      A.    Excuse me, I guess I would, if I may —
5      Q.    Sure.
6      A.    Then-Monsanto, I guess.
7      Q.    Yes, absolutely.
8      A.    We may both make that mistake.
9      Q.    Yeah. I'll refer to it as "then-Monsanto." If
10 I slip and forget to do so, please correct me.
11         How large a parcel of property roughly is that
12 Gateway property?
13     A.    Approximately 85 acres.
14     Q.    And is there another area of land that was also
15 formerly used by then-Monsanto for chemical
16 manufacturing?
17     A.    Yes.
18     Q.    And describe that area for me, if you will.
19     A.    That area is generally east of the property
20 we're discussing as Gateway Center on the opposite side
21 of some railroad tracks. Much smaller in size. If I
22 recall the numbers correctly, it's approximately 37
23 acres.
24     Q.    Uh-huh. And is this easterly portion of the
25 property the area of land that's now, to your knowledge,

Page 17

Deposition of Gerard Rinaldi / September 8, 2005

1  owned by Mystic Landing, LLC?
2  A.  Yes.
3  Q.  One of the plaintiffs in this case?
4  A.  Yes. That's my understanding.
5  Q.  Now, were both of these areas used by
6  then-Monsanto for chemical manufacturing and related
7  operations?
8  A.  Yes.
9  Q.  And for approximately how long did that go on?
10     MR. STEVENS:  Objection. The notice of
11  deposition asks Mr. -- asks the parties to acquaint
12  themselves as to operations for only the period 1943 to
13  1983. So he may answer as to when during that period
14  operations of then-Monsanto went on on both properties.
15     MR. FLANDERS:  Fine.
16  Q.  (By Mr. Flanders) As corrected can you answer
17  that?
18  A.  I'll answer for the two parties -- two
19  properties, excuse me, separately. For the Gateway
20  Center property, to my knowledge, operations continued
21  throughout the entire period Mr. Stevens mentioned, 1943
22  to 1983. For the eastern parcel referred to as the
23  property in this notice, operations there would have
24  continued from 1943 to approximately 1975, active
25  manufacturing operations. Monsanto retained ownership of

Page 18

1  the property until it sold it in 1983 to Boston Edison.
2  Q.  Now, with respect to the Gateway property, you
3  mentioned that operations there ceased in 1983. Do you
4  know why?
5  A.  No.
6  Q.  Did I get that wrong?
7     MR. STEVENS:  He said that as to the period
8  in which he was required to acquaint himself. It
9  continued throughout that entire period. He did not say
10  they stopped in 1983.
11  Q.  Okay.
12     MR. STEVENS:  Merely that he's only been
13  deputed to talk as to that period. You may answer to
14  whether they stopped then.
15  A.  Operations continued on what we're referring to
16  as Gateway Center beyond 1983.
17  Q.  Okay. Do you know when they ceased
18  approximately?
19     MR. STEVENS:  If you know, you may answer.
20  Not -- we'll permit this one, but you're not testifying
21  on behalf of the companies here.
22  A.  Approximately 1992.
23  Q.  Okay. Now, when operations cease at a
24  property, such as they did in both the Gateway and let's
25  call it the Mystic site properties, was there any

Page 19

1  corporate policy for assessing any -- the existence of
2  any potential contamination at the site?
3  A.  Yes.
4  Q.  What was that policy?
5  A.  I'm going to look in one of my binders to
6  refresh myself, if I may, on what --
7  Q.  Sure.
8  A.  -- I think I'd call a responsive document. If
9  I may refer to an internal Monsanto memo from R.E.
10  Cummings dated July 21st, 1980. Sale of Monsanto Land is
11  the subject. It's noted with two stamps, I see.
12  EVE 1029938 and MONS 20002539. Those are the stamps on
13  the first page of several pages. And in that document it
14  refers to a corporate policy regarding the sale or
15  transfer of ownership of Monsanto-owned land. Quoting as
16  quoted in the document, "Retain ownership of all company
17  known lands -- of all company land known to contain waste
18  of such composition and quantity which have the potential
19  for injury to health and the environment except as where
20  otherwise approved by the environmental policy
21  committee.".
22  Q.  May I see that document, please?
23     MR. OTTO:  Can you repeat the Bates
24  numbers?
25     MR. FLANDERS:  Yes. It's MONS 20002539 and

Page 20

1  it's also EVE 1029938.
2  Q.  (By Mr. Flanders) The numbering that I just
3  referenced, the MONS-2, the number after it, does that
4  indicate that this was a document that Monsanto produced
5  in this lawsuit, do you know?
6     MR. STEVENS:  One or the other of those two
7  Bate stampings indicate it was produced in this lawsuit.
8  The other probably indicates that it was produced
9  somewhere else.
10     MR. FLANDERS:  Okay. But do you know which
11  of the numbers indicates it was produced in this lawsuit
12  by Monsanto?
13     MR. STEVENS:  Off the record.
14     (Off-the-record discussion held.)
15     MR. FLANDERS:  In any event, these
16  documents were produced in this lawsuit to your
17  knowledge?
18     MR. STEVENS:  Yes, Mr. Rinaldi did not
19  make the production, Pharmacia did.
20  A.  It's my knowledge all of these have been.
21  Q.  (By Mr. Flanders) Now, this document is an
22  internal communication within the then-Monsanto Company?
23  A.  Yes.
24  Q.  Do you know who the author of it is?
25  A.  Robert Cummings was the plant manager of the

Page 21

6 (Pages 18 to 21)

Deposition of Gerard Rinaldi / September 8, 2005

1    Everett site at the time of this letter, is my
2    understanding.
3         Q.   And it's referring in the first paragraph to
4    the fact — I'm quoting now, "Monsanto is offering for
5    sale .35 acres of land in Everett." And then in the
6    second paragraph it goes on to say, "One question to be
7    answered regarding this proposed sale is are we
8    consistent with our corporate environmental policy
9    regarding the sale or transfer of ownership of
10   Monsanto-owned land?" And then there is a quote that is
11   set off underneath that.  Is that quote what the policy
12   is in this regard of the company?
13        A.   That's my understanding from the reading of
14   this document. That's why I read that into the record in
15   response to your earlier question.
16        Q.   And the policy that's being quoted here says,
17   "retain ownership of all company land known to contain
18   waste of such composition and quantity which have the
19   potential for injury to health or the environment except
20   where otherwise approved by the environmental policy
21   committee."
22        To your knowledge, does that accurately set
23   forth then Monsanto's policy?
24        MR. STEVENS:  As of the time it was —
25        MR. FLANDERS:  Yes.

Page 22

1    to it from Mr. Waldbeser who I mentioned earlier.
2         Q.   Okay.  Can you direct me to what in this
3    document leads you to that conclusion?
4         A.   Just excuse me for a moment while I acquaint
5    myself again.
6         Q.   Absolutely.
7         A.   I'll read several items from the letter, if I
8    may, from this internal memo from Mr. Cummings. "There
9    was no prima facie environmental information that said
10   the land should not be sold."
11        Again from this same letter, "There is neither
12   knowledge nor evidence of chemical waste disposal on this
13   land or its perimeter with the exception of alum mud.
14   This was prior to 1932 when this site was designed and
15   built upon."
16        And at the closing of this letter quoting, "It
17   appears these findings indicate the sale question can be
18   answered in the affirmative and the sale can proceed well
19   within the spirit and intent of our environmental policy.
20   Would you please review and confirm this course of
21   action?".
22        And if I may, as I referred, that review and
23   confirmation as was requested took the form of a letter
24   in response — internal memorandum again, excuse me, from
25   Mr. Waldbeser dated August 4th, 1980, again subject, Sale

Page 24

1         A.   Yes.
2         Q.   (By Mr. Flanders)  Why, if you know, was this
3    question being raised about the property that's now owned
4    by Mystic?
5         A.   My understanding from the reading of this
6    document was that that question would be raised prior to
7    the sale of any property at the Mystic site as you
8    described it in this case or any other property owned by
9    the company.  This policy was to apply universally, I
10   would assume.
11        Q.   When you say it was to apply universally, was
12   the Mystic property known to Monsanto to contain wastes
13   of the kind that have potential injury for health or to
14   the environment?
15        A.   I would answer no based on the remainder of
16   that document and an attached document — my recollection
17   of that, from my review of that over the course of my
18   preparation for today.
19        Q.   So at the time this document was prepared, your
20   understanding is that Monsanto had no knowledge of —
21   that there were any ways there of any such composition
22   and quantity which had the potential to cause injury to
23   health or the environment?
24        A.   That's my understanding of the conclusions
25   drawn by that letter and the attached letter in response

Page 23

1    of Monsanto Land, to Mr. Cummings. This document has —
2    this page has on it the stamp EVE 1030084.  And Mr.
3    Waldbeser's memo states, "None of the identified
4    environmental impacts are considered to be of such a high
5    concern or of such an overriding nature that would
6    preclude the sale of the 35-acre tract. In part this is
7    due to the fact that no aquifers exist in this area and
8    the materials in the ground are not particularly
9    hazardous if properly managed."
10        He goes on, "Therefore, we agree with your
11   conclusion that the sale of the 35-acre tract can proceed
12   within the spirit and the intent of Monsanto's
13   environmental policy. However, we do recommend that the
14   sale meet the following criteria." Item number one,
15   "Preferably the land should be sold to a person—"
16   Paraphrasing for brevity, for industrial development.
17   Certain types of commercial development may also be
18   considered on a case-by-case basis. The land should not
19   be sold for residential, recreational or other purposes
20   which would involve public access.
21        Item number two, "The buyer should be fully
22   apprised and made aware of not only the history and past
23   usage of the site but the present environmental status of
24   the land and groundwater.  All information in your study
25   (subject memo) and the Dames & Moore report pertaining to

Page 25

7 (Pages 22 to 25)

Deposition of Gerard Rinaldi / September 8, 2005

```
 1        (Plaintiff's Exhibit Nos. 3 and 4
 2     marked for identification.)
 3    Q.   So is it your testimony, Mr. Rinaldi, that it
 4  was the practice of their Monsanto to undertake a site
 5  assessment of properties such as the Mystic property at
 6  or about the time when chemical manufacturing operations
 7  ceased at the site?
 8    A.   Yes. And I have other documents which I could
 9  refer to that evidence that testimony.
10    Q.   Okay. And was there in fact a site assessment
11  done by Monsanto for the Mystic site?
12    A.   Yes.
13    Q.   And when was that done? And please refer to
14  any document that will help you.
15    A.   Excuse me. I have four documents here that I
16  would like to refer to from approximately the same time
17  period as those you were just discussing from 1980 to
18  1982. I'll describe them briefly and then we can discuss
19  as you wish.
20        The first is titled Hydrogeologic Survey,
21  Monsanto Industrial Chemicals Company, Everett,
22  Massachusetts, prepared by Dames & Moore. That is the
23  Dames & Moore study mentioned in those other
24  correspondence by the way. It is dated January 1980.
25  And it has a stamp on it beginning with the number --
                                                  Page 30
```

```
 1  letter EVE 1626615.
 2    Q.   Okay. May we have that marked as well? This
 3  will be Exhibit 5.
 4        (Plaintiff's Exhibit No. 5
 5     marked for identification.)
 6    A.   There's a follow-up to that item which I just
 7  described from Dames & Moore again dated December 23rd,
 8  1980. A letter report to Monsanto Industrial Chemical
 9  Company, Boston, Massachusetts. It is stamped -- I think
10  the stamping from this matter I'll refer to, MONS1
11  0001488, is the beginning. I'll mention for
12  completeness, the other stamp appears on this first page
13  is MCO 6016190.
14    Q.   Could we have that marked as Exhibit 6?
15        (Plaintiff's Exhibit No. 6
16     marked for identification.)
17    A.   May I continue?
18    Q.   (By Mr. Flanders) Please. I'm sorry.
19    A.   This is yet another Dames & Moore report that
20  the stamp on the first page is MCO 6290714. It is dated
21  February 12th, 1982. And its title is Report
22  Hydrogeologic Survey for the Eastern Property of Monsanto
23  Industrial Chemicals Company.
24        MR. STEVENS:   Off the record.
25        (Off-the-record discussion held.)
                                                  Page 31
```

```
 1    Q.   (By Mr. Flanders) May we have this last
 2  document marked as Exhibit 7?
 3        (Plaintiff's Exhibit No. 7
 4     marked for identification.)
 5    A.   I have one more, if I may.
 6    Q.   (By Mr. Flanders) Please.
 7    A.   The last -- although there may be others, these
 8  are the ones that I felt were responsive to the question.
 9  This is a letter from Monsanto Company to Boston Edison
10  Company dated January 22nd, 1982, beginning with the
11  stamp MCO 6016172. And if I may, if I recall back to
12  your question which prompted me to suggest these
13  documents, I'll just note that this letter describes -- I
14  won't read it, but it describes the use of the property
15  for chemical manufacturing, what chemicals may have been
16  manufactured, spilled or disposed on the property. Makes
17  reference to a soil survey for which there is a related
18  attachment, all of this being provided to Boston Edison,
19  and concludes with a statement that, "Boston Edison
20  should recognize that the tract had been used for many
21  years for manufacture/storage and research of chemicals,
22  many of which may be toxic or hazardous. That chemicals
23  and waste materials may have been spilled onto or
24  disposed of or on the tract. The chemicals and waste
25  materials may remain in or upon the tract and that any
                                                  Page 32
```

```
 1  future use of the tract should be undertaken only after
 2  consideration of its possible contamination. And,
 3  finally, if Boston Edison would like to undertake
 4  additional investigation of the tract in order to satisfy
 5  itself more fully as to the suitability of the site,
 6  please let us know so that the necessary arrangements may
 7  be made."
 8        Your question concerned documents by Monsanto
 9  or studies by Monsanto. That's why I refer to these. I
10  know relative to that last statement that there are
11  subsequent studies done at the request of Boston Edison.
12    Q.   Okay. Let's just take this one and mark this
13  as Exhibit 8, please. The last document. Did you read
14  the numbers?
15    A.   Yes, I did.
16    Q.   Okay.
17        (Plaintiff's Exhibit No. 8
18     marked for identification.)
19    Q.   (By Mr. Flanders) All right. So these
20  documents that you just identified for us and that we've
21  had marked are documents that you understand were
22  prepared either by or at the instance of then-Monsanto?
23    A.   Yes.
24    Q.   And they were documents that were prepared in
25  connection with assessing the existence of any
                                                  Page 33
```

9 (Pages 30 to 33)

Deposition of Gerard Rinaldi / September 8, 2005

1  contamination at the site at the time they were prepared?
2  A.  Yes.
3  Q.  Okay. To your knowledge, were there any
4  conclusions reached as a result of these studies about
5  the existence of any contamination at the site? And if
6  there were, would you please direct us to those?
7  A.  If I may.
8  Q.  Sure. I'm sorry. ..
9  A.  The earlier documents which we identified as
10  Exhibits Rinaldi 3 and 4 had such conclusions — I think
11  we both may have read them — with regard to sulfate,
12  lead, zinc, et cetera.
13       With regard to Exhibits 5 through 8, I guess
14  it's most concisely described by my reading from Exhibit
15  8 earlier about the long use of the site for chemical
16  manufacturing, the fact that chemicals and waste
17  materials may have been spilled onto or disposed of on
18  the tract, reference to the cursory soil survey which
19  Monsanto performed, and then the summary statement,
20  "Boston Edison should recognize that the tract had been
21  used for many years for manufacture, storage and
22  research. That chemicals and waste materials may have
23  been spilled onto or disposed of on the tract. That
24  chemicals and waste materials may remain in or upon the
25  tract." And I take those to be conclusions in response

Page 34

1  to your question.
2  Q.  The words that you were just referring to from
3  Exhibit 8 is a — appears to be a letter from Mr. Feeney
4  at then-Monsanto to Boston Edison Company, and it refers
5  to a number of things. But the material you quoted
6  says — refers to the fact that — how Boston Edison
7  should recognize that the tract had been used for many
8  years to manufacture, store and research chemicals, many
9  of which may be toxic or hazardous.
10      As you sit here today, do you have any
11  knowledge as to whether or not any of those chemicals
12  that were being referenced here were in fact toxic or
13  hazardous?
14  A.  Those terms are defined differently by
15  different regulations at different points in time, but we
16  have mentioned lead, sulfate, and I believe there are
17  associations of one or both of those with toxic —
18  toxicity or hazard.
19  Q.  Okay. And they were in fact among the
20  chemicals that were manufactured and stored at the
21  site — the Mystic site?
22  A.  Not per se.
23  Q.  What do you mean?
24  A.  Lead was not manufactured or stored at the
25  site. There were sulfate compounds manufactured at the

Page 35

1  site but not lead.
2  Q.  Okay. Were those sulfate compounds toxic or
3  hazardous?
4  A.  Again, the response to the question relates to
5  the definition of toxicity or hazard, I guess. That's a
6  possibility.
7  Q.  Okay. And it says that chemicals and waste
8  materials may have been spilled onto or disposed of on
9  the tract. To your knowledge, were chemicals and waste
10  materials in fact spilled onto and disposed of onto the
11  Mystic site?
12  A.  Concerning --
13  Q.  During the then Monsanto's use of it?
14      MR. STEVENS:  19 — well, I guess your
15  question --
16      MR. FLANDERS:  During the period we're
17  covering.
18      MR. STEVENS:  Your question as to spills
19  or — let me just make certain. The topic as to spills,
20  leaks, releases or discharges of any petroleum products,
21  hazardous substance or chemicals at or upon the property
22  is not limited as to time, so you may testify as to any
23  information you have obtained in your familiarizing
24  yourself with the information available to the
25  corporations as to any period in time.

Page 36

1  Q.  (By Mr. Flanders) With that qualification.
2  A.  There was, I think from one of the items I
3  already read, an alum mud pond on the site, as it was
4  described in one of those items, which was closed in
5  1932, if I again recall correctly. I am aware, based on
6  interviews of retired former Monsanto Company employees
7  that had been shared with me by counsel for Pharmacia and
8  Monsanto that there were small leaks of sulfuric acid
9  which was a product produced at the site. Those leaks
10  being addressed as and when they occurred.
11      I'm also aware of the possibility of leaching
12  of sulfur and/or lead, that you just referred to in your
13  earlier question, from raw material storage at the site
14  during the period of then-Monsanto Company's operation.
15      And lastly, more recently I'm aware, again from
16  information provided to me by counsel for Pharmacia and
17  Monsanto, about releases of lead and petroleum
18  hydrocarbons, oil, from operations currently on the site,
19  storage and handling of construction, demolition
20  materials by Modern Continental, I guess, which is Mystic
21  Landing's tenant, if I understand.
22  Q.  Okay. Again, I'm just trying to refer now back
23  to the period in January of 1982. I realize that the
24  question may have been broader than that. So let me see
25  if I can focus this as of that period of time when this

Page 37

10 (Pages 34 to 37)

Deposition of Gerard Rinaldi / September 8, 2005

1  Exhibit 8 was prepared, which was at or about the
2  transfer to Boston Edison.
3          MR. OTTO: Objection.
4      Q.   (By Mr. Flanders) My question is in reference
5  to the statement here which says that, "chemicals and
6  waste materials may have been spilled onto or disposed of
7  on the tract," referring to the property that's now owned
8  by Mystic but was at that point in time owned by
9  then-Monsanto. And my question to you is, as you sit
10 here today, do you have any knowledge that as of this
11 point in time, January 21, 1982, there were in fact
12 chemicals and waste materials that were indeed spilled
13 onto or disposed of on the tract?
14     A.   Yes.
15     Q.   And what were those?
16          MR. STEVENS: I think he just answered the
17 question.
18     Q.   (By Mr. Flanders) Okay. Except for the part
19 about the reference to the oil contamination, have you --
20 is the rest of your answer that you previously gave me
21 applicable to the question I just put to you?
22     A.   Yes.
23     Q.   Okay. So I won't make you repeat that. Mr.
24 Feeney goes on in this Exhibit 8 to say that, "Chemicals
25 and waste materials may remain in or upon the tract."

                                              Page 38

1      A.   Yes.
2      Q.   And have you fully described already what the
3  nature of that contamination is as you understand it to
4  be?
5      A.   By reference to the contents of these Dames &
6  Moore studies, and my earlier discussion of the possible,
7  you know, leaching from the raw material piles and the
8  alum pond, et cetera, yes.
9      Q.   Is there any other contamination at the site
10 you're aware of now that existed then that you haven't
11 discussed already or alluded to?
12     A.   There are studies that were done subsequent to
13 January 1982 that evidenced that as well.
14     Q.   Okay. And what are those studies?
15     A.   The one that comes first and foremost to my
16 mind is a document entitled Site Contamination and
17 Liability Audit on Monsanto Property conducted for Boston
18 Edison Company dated July 14th, 1982, prepared by Perkins
19 Jordan, Incorporated. Transmitted by letter dated July
20 16th, 1982 to Dr. Lillian Morgenstern. And that letter
21 has a stamp which the rest of the document numbers
22 follow, MCO 6016060.
23     Q.   All right. May we have that letter and its
24 attachment marked as Exhibit 9, please?
25

                                              Page 40

1  What I'm referring to is the Mystic site. Do you have
2  knowledge that chemicals and waste materials did in fact
3  remain in and upon the tract as of 1982 -- January of
4  1982?
5      A.   Yes. That would be in reference to the soil
6  survey that's referred to in that same letter and the
7  other exhibits that I mentioned and we discussed leading
8  up to that at that time.
9      Q.   The site assessment exhibits?
10     A.   Yes, the Dames & Moore studies, for example.
11     Q.   By the way, were any chemicals and waste
12 materials noted with respect to the water situation at
13 the tract -- the site?
14     A.   There is mention in these documents to --
15 assessment of groundwater. The hydrogeologic survey
16 indicates a study of groundwater. That is the title of
17 several of the Dames & Moore reports. So I would say
18 yes.
19     Q.   Okay. And Mr. Feeney goes on in this letter
20 that I'm quoting from, Exhibit 8, to say that, "any
21 future use of the tract," referring to the Mystic site,
22 "should be undertaken only after consideration of its
23 possible contamination." To your knowledge, as of this
24 point in time, January 21, 1982, was there in fact
25 contamination of some sort at the site?

                                              Page 39

1          (Plaintiff's Exhibit No. 9
2           marked for identification.)
3      Q.   (By Mr. Flanders) Now, what is Exhibit 9?
4      A.   The title and the letter both describe it as an
5  engineering report covering a site contamination
6  assessment and liability audit for the Monsanto property.
7  What we were discussing as -- you've called it the Mystic
8  site. And that's what it is in a nutshell.
9      Q.   And who requested, if you know, that that study
10 be done?
11     A.   My understanding is this study was requested to
12 be done by Perkins Jordan. The request was made by
13 Boston Edison to Perkins Jordan that it be done, I
14 believe, in response to the statement at the end of
15 Monsanto Company's letter, Exhibit 8, to Boston Edison
16 with the suggestion if Boston Edison would like to
17 undertake additional investigation of the tract, et
18 cetera. That this Perkins Jordan report, as I may refer
19 to it, Exhibit 9, was pursuant to that earlier Monsanto
20 Boston Edison communication.
21     Q.   Okay. And who is Perkins Jordan? What type of
22 firm is that?
23     A.   The letterhead indicates they are consulting
24 engineers in Reading, Massachusetts, or were at the time.
25     Q.   Okay. Do you have any familiarity with them?

                                              Page 41

                                   11 (Pages 38 to 41)

Deposition of Gerard Rinaldi / September 8, 2005

1   A.   I do not personally. I'm familiar with this
2   document, but I have no other familiarity with that firm.
3       Q.   And what, in a nutshell, does this document
4   conclude about the existence of any contamination at the
5   site?
6       MR. STEVENS: Objection. The document says
7   what it says. As an introductory question, you may --
8       Q.   Just -- if you would just short circuit us a
9   little bit here and help us to locate what the
10  conclusions are in the document.
11      A.   It is a lengthy document, over 40 pages. It
12  has nearly a 20-page section on contamination assessment
13  and subsequent assessment and recommendation sections. I
14  don't know that it can be summarized in a nutshell.
15      Q.   Did the Perkins study conclude that there was
16  contamination at the site?
17      A.   Yes.
18      Q.   And do you know what the nature of that
19  contamination was that they found?
20      A.   Not other, again, than by reference to and
21  reading from the document, which I would have to do. I
22  don't have a quick summary from memory at this moment.
23      Q.   Do you know if it was any different from the
24  conclusions that were reached in the site assessments
25  that then-Monsanto either performed or asked others to

Page 42

1   perform?
2       A.   As to different, I would perhaps characterize
3   this assessment as more extensive in terms of the number
4   of samples, constituents that were analyzed by the -- or
5   on behalf of the buyer in the course of their doing their
6   then what we would call due diligence. So that
7   conclusion --
8       Q.   Did they find more contamination there than
9   Monsanto had found doing its site assessment?
10      A.   It's hard for me to define more relative. This
11  assessment found what it found. I see there are figures
12  that show locations of samples and what was identified in
13  those samples. Tables of the results of those analyses.
14  I guess this report stands on its own. Draws its own
15  conclusions. I don't think there was any attempt to
16  compare it at the time to what Monsanto had previously
17  done. It was meant to be an independent investigation.
18      Q.   But to your knowledge did it find other types
19  of contamination than the ones that had been previously
20  identified?
21      A.   Looking at this document in some of its figures
22  I know it references to sulfur, which we already
23  discussed. And I see reference to aluminum and iron,
24  which we did not previously discuss. So that would be
25  more or different, to use your terms. Again, there is

Page 43

1   sulfate which we discussed previously. Lead, which we
2   discussed previously and which Monsanto identified. So
3   quickly scanning, I saw those references to aluminum and
4   iron that we hadn't otherwise maybe made mention.
5       Q.   Okay. In addition to this Boston Edison study,
6   were there other subsequent site assessments that you're
7   aware of addressing contamination at the Mystic site?
8       A.   Yes.
9       Q.   All right. And would you identify those for
10  us, please?
11      A.   Bear with me. I'll speak generally and we can
12  discuss in whatever detail you choose.
13      Q.   Sure.
14      A.   In the time frame from 1995 to 1996 or 1997,
15  there was work done by Consulting Engineers & Scientists
16  for the then-owner of the property, as I understand it,
17  Mary O'Donnell. I understand -- have seen previously but
18  don't have with me today any copies of any such
19  documents, but there have been studies done of the
20  property by Rizzo Associates for your client, I believe,
21  Mr. Flanders, Rizzo Associates 2001 and since.
22          There's one more item that I'm seeking that I
23  wanted to refer to. This was studies done in 2004 for
24  Pharmacia and Monsanto Company by consultant Woodard &
25  Curran, which were provided by Adam Kahn or Foley Hoag to

Page 44

1   Ms. Zankowski in a letter dated October 13th, 2004.
2   There is a previous stamp on this particular item I'm
3   looking at that says Deposition Exhibit Mystic 16,
4   3-14-05. And I can identify the others.
5           Those are the studies subsequent to the early
6   '80s which I'm aware of relative to what we're
7   discussing.
8       Q.   Can we mark these studies that you just
9   referenced as exhibits?
10      A.   Okay.
11      MR. STEVENS: He said he doesn't have one
12  of them.
13      Q.   (By Mr. Flanders) Understood. But the ones
14  you do have.
15      A.   The notebooks are a shambles. Okay. Several
16  of those documents have multiple items within them. They
17  are stapled together because they relay transmittals and
18  so on and so forth.
19      Q.   Okay. The first one I think that you
20  referenced was the study that was prepared by Consulting
21  Engineers & Scientists for O'Donnell Sand and Gravel?
22      A.   That one, if I may. This is a letter one.
23      Q.   I'm sorry.
24      A.   October 2nd, 1995 is the earliest.
25      Q.   This is a document that has several letters and

Page 45

12 (Pages 42 to 45)

Deposition of Gerard Rinaldi / September 8, 2005

1  tables and other exhibits attached to it. It's — the
2  first page is Monsanto 10001514 and it's dated March
3  27th, 1996. That's a letter from a person — the
4  president of Consulting Engineering & Scientists, Inc. to
5  the Massachusetts Department of Environmental Protection,
6  Ms. Lilla Dick, D-i-c-k. And I'd like that marked as
7  Exhibit 10.
8          (Plaintiff's Exhibit No. 10
9          marked for identification.)
10  Q.  (By Mr. Flanders)  Then there's a further study
11  by Consulting Engineers & Scientists that's dated January
12  15th, 1997, with the Bates stamp beginning Monsanto
13  10001554 through 1644. I'll have that marked as Exhibit
14  11.
15          (Plaintiff's Exhibit No. 11
16          marked for identification.)
17  Q.  (By Mr. Flanders)  The final document that the
18  witness referred to is a document dated October 13th,
19  2004, from attorney Adam Kahn to attorney Doreen
20  Zankowski enclosing laboratory sampling results obtained
21  by Woodward & Curran from the Mystic Landing site. That
22  would be Exhibit 12.
23          (Plaintiff's Exhibit No. 12
24          marked for identification.)
25  A.  And if I may repeat again, as Mr. Stevens

Page 46

1  A.  I want to make reference to the materials I
2  brought with me today. Let me speak generally.
3  Q.  (By Mr. Flanders)  Please.
4  A.  I will refer to some documents and then we can
5  go into, again, more detail. There were lots of studies
6  and investigations of that property referred to today as
7  the Gateway Center. One item that I do have with me
8  today as an indicator of the extent of those studies
9  prior to 1994, which is when I personally became
10  involved, is a drawing titled Exploration Location Plan
11  in part dated April 8th, 1994 compiled for then-Monsanto
12  Company by a consultant referred to in short-hand as GZA.
13  I do not see any stamps on this at the bottom. This is a
14  plan of the 85-acre Gateway Center parcel with a legend
15  running up and down the entire right-hand side showing
16  what I'd conservatively estimate to be hundreds of soil
17  and groundwater sampling locations by a number of studies
18  by others, not just GZA, but others prior to GZA. Those
19  being summarized on this. So I refer to this drawing as
20  a snapshot of the state of knowledge or of investigation
21  of the Gateway Center property as of 1994.
22  Q.  Okay.
23  A.  I'd like to refer to something next for what
24  followed this.
25  Q.  Fine.

Page 48

1  indicated, I mentioned those other studies from Rizzo
2  Associates 2001, which I have no copies of anything with
3  me today.
4  Q.  (By Mr. Flanders)  Right. Now, were there also
5  studies — site assessment studies done with regard to
6  the Gateway site that is, as I understand, immediately
7  adjacent to the Mystic site?
8  A.  Yes.
9  Q.  Are you generally familiar with those?
10  A.  Yes.
11  Q.  And were any of those studies done by
12  Monsanto — then-Monsanto?
13  A.  Yes.
14  Q.  And did any of those studies conclude that
15  there was any contamination at that site from Monsanto's
16  period of operations there?
17  A.  Yes.
18  Q.  And did Monsanto — then-Monsanto make a
19  decision to attempt to remediate that contamination?
20  A.  Yes.
21  Q.  And how did it do so?  Off the record.
22          (Off-the-record discussion held.)
23  A.  That's a long story.
24      MR. STEVENS:  Answer the question. Answer
25  the question.

Page 47

1  A.  I'm happy to —
2  Q.  Maybe we should mark that as the next exhibit,
3  13, I believe.
4          (Plaintiff's Exhibit No. 13
5          marked for identification.)
6  Q.  (By Mr. Flanders)  This is the map that's
7  Monsanto 10001496, the witness has just been referring
8  to.
9  A.  Again, if I'm recalling your question it
10  concerns investigation subsequent —
11      MR. STEVENS:  What you did to clean it up.
12  A.  What we did to clean it up. Okay.
13      MR. STEVENS:  Maybe we should have the
14  question — it may have been broader to respond to the
15  contamination.
16      MR. OTTO:  My notes say what led to the
17  decision to remediate.
18      MR. FLANDERS:  Can I hear that again?
19      MR. OTTO:  What lead to the decision to
20  remediate?
21      MR. STEVENS:  Then it is the
22  investigations. You're right. It is the investigations.
23  A.  If I may continue again along those lines. So
24  I'm referring to investigation sampling activities, et
25  cetera, that occurred on the property which is item

Page 49

13 (Pages 46 to 49)

Deposition of Gerard Rinaldi / September 8, 2005

1  number 20 of the deposition notice. That's what I'm
2  taking your question to concern.
3          MR. STEVENS: On the Gateway Center, not on
4  the property.
5      A.  On the Gateway Center.
6      Q.  (By Mr. Flanders) Right.
7      A.  The next item which I would like to offer on
8  that is a three-page table, and one figure has as a short
9  title Initial Site Evaluation. It has a stamp on the
10  first page MCO 6291106 and it describes in alphabetical
11  order of what it calls "Site Designation" a number of
12  areas on the site which were investigated or to be
13  investigated, and the figure shows the locations of those
14  areas.
15     Q.  Who prepared that document, if you know?
16     A.  The — there's no clear indication of who it
17  was prepared by. I note in very fine print on the
18  attached drawing a reference to BCM, which is a
19  consultant, Betz, Converse, Murdock. But I don't know
20  whether or not they were responsible for the preparation
21  of this three-page table. Nor does it have a date on it
22  that I would note.
23     Q.  Have this marked as Exhibit 14.
24          (Plaintiff's Exhibit No. 14
25          marked for identification.)

Page 50

1      Q.  (By Mr. Flanders) So what —
2      A.  I have one more item. I'm sorry, please.
3      Q.  Just before we leave this, what do you
4  understand Exhibit 14 to be then?
5      A.  Again, as its title indicates, Initial Site
6  Evaluation, it's designating what looks to be nearly A
7  through Z — what's that — 26 different areas on the 85
8  acres of the property we're referring to as the Gateway
9  Center as areas where there was possible manufacturing
10  activities and/or disposal activities. Describing
11  information here I see from the headings that are — from
12  initial site visits, under information — a column headed
13  Information Source it refers to interviews, records,
14  process reviews. I see a reference to Perkins Jordam.
15  References to some letters. And there's a column finally
16  labeled Suggested Analytical Parameters or Contamination
17  describing what might be present, what had been
18  investigated, or what was to be investigated.
19     Q.  All right.
20     A.  And I have one more item which I have with me
21  today that I think is responsive to your question. This
22  is — it has stamps 0000904 through 921, and my
23  recollection and understanding of this is it basically
24  serves as an index. It lists — at the top of each page
25  you'll note cabinet number and shelf number. At the

Page 51

1  Everett site, the Gateway Center site documents that had
2  been prepared for then-Monsanto Company concerning its
3  investigation were stored in a room — a library, if you
4  will; and these 16, however many, 17 pages are an
5  inventory of that library as of sometime in the mid to
6  late '90s. I see a note in handwriting which I recognize
7  to be my own on the next-to-last page indicating 2-12,
8  1996. Again, this describes groundwater treatability
9  study, groundwater sampling, release abatement measure,
10  conceptual remediation action plans, Building 409
11  closure, Phase II site investigation, biodegradation
12  studies, risk characterizations, chemical analysis
13  results. There's hundreds of documents on these 20-some
14  pages indicating the extent of contamination and extent
15  of investigation on what we're referring to as the
16  Gateway Center today.
17     Q.  If we could have this last document marked as
18  Exhibit 15.
19          (Plaintiff's Exhibit No. 15
20          marked for identification.)
21     A.  Those are the three items I felt most
22  responsive to the question of what led Monsanto to the
23  decision to remediate the property, if I remember the
24  question roughly.
25     Q.  Right. And did then-Monsanto in fact undertake

Page 52

1  efforts to remediate the Gateway property?
2      A.  Yes.
3      Q.  And by remediate, that's a term we use to clean
4  up the contamination in some way?
5      A.  Yes.
6      Q.  And how extensive was that effort and how
7  expensive?
8      A.  In a word, very. And as to expensive,
9  likewise, very.
10     Q.  Do you know what the number was — the total
11  cost of that remediation effort?
12     A.  Approaching $30 million. That's the project
13  which I was responsible for, which I mentioned earlier,
14  during my tenure as manager of remediation for the time
15  period 1994 to 1996 or 1997.
16     Q.  So you were the person chiefly responsible for
17  that effort?
18     A.  As the project manager. There's many people
19  involved to undertake such an effort.
20     Q.  But were you the leader of that project within
21  the company or — was there someone else that had more
22  direct responsibility than you for it?
23     A.  In addition to myself as the project manager
24  dealing with others in Monsanto Company, dealing with the
25  agency, dealing with our consultants, there was an

Page 53

14 (Pages 50 to 53)

Deposition of Gerard Rinaldi / September 8, 2005

**Page 54**

1  on-site manager who dealt with the day-to-day activities,
2  if you will. I don't remember his exact title. The
3  gentleman's name was Eugene Stecker. In addition, the
4  consultants had lead managers of their own. This is a
5  major undertaking with at times dozens, if not
6  approaching a hundred people involved.
7  Q. And why, if you know, did then-Monsanto decide
8  to undertake such an extensive and expensive remediation
9  effort for the Gateway property?
10  A. I would say as evidenced by these last three
11  exhibits, we were -- I think, three -- discussing by the
12  extensive nature of the contamination known at that site
13  due to the extensive nature of the historical
14  manufacturing activities at that site.
15  Q. Do you have knowledge as to the nature of the
16  historical manufacturing operations at both the Mystic
17  site and the Gateway site?
18  A. Yes.
19      MR. STEVENS: During the period '43 to '83
20  is what you asked for operations?
21      MR. FLANDERS: Yes.
22  A. Yes, I do.
23  Q. (By Mr. Flanders) Was there any difference?
24  A. Yes.
25  Q. Can you generally describe what that difference

**Page 55**

1  would be?
2  A. Again, I'm having to remind myself of what can
3  help me be most responsive here. Could I ask for a
4  repeat of the question by you or the reporter?
5  Q. Let me just restate it. I asked you if you had
6  any knowledge as to whether there were any differences
7  between the manufacturing operations that existed at the
8  Gateway site as compared to the Mystic site?
9  A. Let me begin by referring to the operations at
10  the Mystic site.
11  Q. Please.
12  A. And I'll refer back to one of the items which
13  we previously labeled as Exhibit No. 3. This is
14  referencing the Mystic site. And it talks about the
15  chemicals that had been produced or were being handled at
16  that location, including sulfuric and nitric acid and
17  acid salts being the predominant materials that were
18  produced there. This memo says -- it has an attachment
19  appended to that exhibit that says, "Everett Plant, East
20  Side Production and Resale Facilities" and describes
21  again sulfuric and nitric acid, alum, which I made
22  references to earlier.
23  Q. Are these all contaminants?
24  A. I'm providing this information as to the
25  production operations at the two sites. I believe that's

**Page 56**

1  what you had asked.
2  Q. Right. But do those materials constitute
3  contaminants if they are found at the site?
4      MR. STEVENS: Found how? In a storage
5  tank? In a box to be shipped to the customer?
6  Q. (By Mr. Flanders) In the soil or in the water.
7  A. I would say if they were unintentionally
8  released to the soil with the groundwater they would be
9  categorized as contaminants, yes.
10  Q. I suppose they would equally be characterized
11  as such if they were intentionally released; right?
12  A. Yes, sir.
13  Q. Obviously.
14  A. So if I may continue?
15  Q. Certainly.
16  A. That was discussing in brief the operations on
17  the East Side or Mystic property. Acids, acid salts,
18  carbon dioxide, dry ice, which was a byproduct of one of
19  the operations. There was also some pilot plant
20  operations there on the site, a laboratory and one
21  organic chemical, if you will, referred to by
22  abbreviation DCHP, which was ground on the site so it
23  could be packaged and sold.
24      So that's a brief response to the first part of
25  the question, if I may, concerning the operations on the

**Page 57**

1  Mystic site. With respect to --
2      MR. OTTO: Excuse me. That was in
3  reference to -- what's the exhibit number?
4      THE WITNESS: 3."
5  A. With respect to then Gateway site, which is
6  item number 13 in the deposition notice, is how I'm
7  hearing your question, Mr. Flanders. In the materials I
8  have with me, there's a couple of items. The first I
9  refer to is labeled Inventory of Hazardous Materials. It
10  has on its first page two stamp numbers, Everett 02024
11  and MONS1 0002539. As I say, it's an inventory of
12  hazardous materials. It lists a number of chemicals,
13  their department and some other information.
14  Q. Is this a document that then-Monsanto prepared?
15  A. That would be my belief, just by my looking at
16  the document.
17  Q. Can we have that marked, please, as Exhibit 16?
18      (Plaintiff's Exhibit No. 16
19      marked for identification.)
20  Q. Before -- just on Exhibit 16, is this an
21  inventory of hazardous materials at the Gateway site?
22  A. Yes, it is. And I say that because of the
23  column indicated here as department, which indicates, for
24  instance, Dequest, Polymeric, Monomeric, CYA, Stymer,
25  et cetera, which I know to be products manufactured on

15 (Pages 54 to 57)

Deposition of Gerard Rinaldi / September 8, 2005

1 the Gateway site and which I'll refer to in other
2 documents so you can see the basis of my understanding.
3    Q.   Okay.   Were those products manufactured also on
4 the Mystic site?
5    A.   No, they were not.   The point here, if I may,
6 is to describe the — or differentiate the limited amount
7 of manufacturing operation on the Mystic site versus the
8 much more extensive diverse nature of such operations on
9 the Gateway site.   So that was Exhibit 16.
10    Q.   Is that a matter of historical accident or was
11 there some reason for that?
12    A.   I can only infer for one the Gateway site is
13 vastly larger in physical size, if nothing else.
14    Q.   Yes.
15    A.   So that presents the opportunity to have more
16 operations.   There was, I know, from my review of
17 documents in preparation for this deposition an
18 intentional effort to consolidate operations onto the
19 property as we're referring to as the Gateway Center
20 today.   That's why in part operations on what we're
21 referring to as the Mystic site were shut down in the
22 1907s roughly.   But operations continued on the Gateway
23 Center site until the 1990s.   Just using the land as
24 efficiently as possible.   So that what you just marked
25 Exhibit No. 16 was one document I thought was responsive

Page 58

1 to your question.
2        The other one I have here is labeled Industrial
3 Hygiene Materials List, Everett Plant.   It begins with
4 stamps Everett 02018 and MONS1 0002533.   It's seven pages
5 in length and I can make out from one of the pages it
6 appears to be in this case dated as of March 1997.   And,
7 again, similar to Exhibit 16 it has a listing of
8 materials and departments.   Just as an indicator of —
9 this one is specific by department.   For instance, page 1
10 are all the materials in what was referred to as the
11 Stymer Department.   Page 2 is all the materials in the
12 Dequest Department.   Page 3, the Monomeric.   Monomeric
13 plasticizers that would be.   Page 4, polymeric
14 plasticizers.   Page 5, Contact.   That being sulfuric
15 acid.   And CYA, another product as to our — combined in
16 the same page.
17    Q.   Some of these that you mentioned were in fact
18 manufactured at the Mystic site as well?
19    A.   Everything I just mentioned, the only one which
20 was also manufactured at the Mystic site would be
21 sulfuric acid.   All the others were only produced and
22 handled on the Gateway site.   So I'll present that to
23 you.   And then I have one last item.
24    Q.   We'd mark that as the next exhibit.
25

Page 59

1        (Plaintiff's Exhibit No. 17
2        marked for identification.)
3    A.   I lastly have two figures that I'd like to
4 refer to.   They support my understanding of, as you were
5 asking, which of these processes were conducted on the
6 Mystic Center side versus which were conducted on the
7 Gateway Center side.   The first is a drawing with stamp
8 number — I'll refer to 161 — excuse me, EVE 1614769.
9 It's a Monsanto Company — then-Monsanto Company drawing
10 dated — the earliest date is November 26th, 1965.   And,
11 as you'll see, it shows both parcels in total.   I would
12 accompany it with an internal Monsanto memorandum dated
13 January 18th, 1989 stamped EVE 1614994.
14        And reading from that memorandum it says,
15 "Enclosed is the identification of the buildings shown on
16 drawing," so and so "dated 11-26-65."   That is the
17 drawing which I just noted.
18    Q.   All right.   If we could mark these two
19 documents as Exhibits 18 and 19 respectively starting
20 with the schematic or map and then the January 18th, '89
21 document that we just identified.
22    A.   And then I have one last.
23        (Plaintiff's Exhibit No. 18 and 19
24        marked for identification.)
25    A.   If I may, the last item I was going to refer to

Page 60

1 was a drawing stamped number EVE 1614768.   It has as a
2 title Plant Layout in short, dated 11-3, 1977.   This
3 being 12 years after the earlier drawing which I showed
4 you.
5    Q.   Exhibit 18.
6    A.   Exhibit 18.   Thank you.   And it shows as of
7 this time, 1977, the extent of operations on the Gateway
8 Center property and the fact that the Mystic site, as
9 you've referred to it — I'm going to use that, it's
10 handy — was as of that time essentially all operations
11 were ceased.   And we know that because by looking at this
12 drawing you'll see drawings — buildings, excuse me, with
13 a solid outline indicating that building still was in
14 existence, that operation still underway.   Other
15 buildings in dashed outline indicating the former
16 location.   And as you'll see, all the buildings on the
17 Mystic side of this drawing are dashed, but on the
18 Gateway side there are a number of operations.   Again, as
19 I indicated earlier, operations there continued.   This
20 drawing is 1977.   Continued to the early 1990s.
21    Q.   Does the dash indicate merely that the
22 operation ceased or does it indicate the building has
23 ceased to be there?
24    A.   My understanding is that the building ceased to
25 be there.   For instance, the buildings on the then — or

Page 61

Deposition of Gerard Rinaldi / September 8, 2005

1  what we're referring to as the Mystic site, the
2  operations ceased circa 1975, and that the buildings were
3  razed or demolished shortly thereafter, 1976.
4    Q.  Can we mark this last map as Exhibit 20?
5       (Plaintiff's Exhibit No. 20
6       marked for identification.)
7    Q.  (By Mr. Flanders)  Now, looking at Exhibit 20,
8  is it your understanding that some of the operations that
9  were formerly being performed on the Mystic site
10  then transferred to the Gateway site?
11   A.  I mentioned the DCHP here that appears on the
12  Mystic site.  The actual production of that chemical took
13  place on the Gateway site.  I don't see it at the moment,
14  so I don't remember that -- if it was still being
15  produced as of the date of this drawing.  With respect to
16  the other item, being the sulfuric acid production, I see
17  on this drawing -- Exhibit 20 is it?
18   Q.  Yes.
19   A.  -- a sulfuric acid unit in the middle of the
20  Gateway Center property.  Sulfuric acid formerly having
21  been a product produced on the Mystic site.  So that's
22  the most obvious example from a quick inspection.
23   Q.  So as of the date of Exhibit 20, which I think
24  you said was 1977 or so --
25   A.  Yes.

Page 62

1    Q.  Were they then referred to as separate areas?
2    A.  I would say yes, because some of the documents
3  that I have read and referred to with you this morning
4  have a clear reference to East Side, for example, and
5  that would be the part we're referring to as the Mystic
6  site because it's east of the railroad tracks which
7  bisected the overall property.
8    Q.  So the railroad tracks historically formed a
9  boundary, if you will, between what we've been referring
10  to as the Mystic and Gateway sites?
11   A.  Yes.
12   Q.  Were they legally separated sites, do you know?
13  That is, were they separate legal parcels?
14   A.  I don't believe so.
15   Q.  They were just one integrated parcel as far as
16  the ownership was concerned?
17   A.  I know that real estate in Massachusetts is a
18  complicated matter with registered and unregistered land
19  and parcels and so forth, so I probably can't say any
20  more positively.
21   Q.  Other than the distinctions that you've
22  described for us in terms of the kinds of operations and
23  products that were manufactured and stored on the two
24  sites, were there other differences that you're aware of
25  in the two sites in terms of --

Page 64

1    Q.  Is it your understanding that all of the
2  operations and buildings that had been formerly located
3  on the Mystic site were no longer there as of that time?
4    A.  That's my understanding.
5    Q.  And some of them, as you've described, some of
6  those operations were then performed at the Gateway site
7  thereafter?
8    A.  That's my belief by inspection of that drawing.
9    Q.  Why, if you know, was the decision made by
10  then-Monsanto to cease operations at the Mystic site, but
11  continue them at the Gateway site?
12   A.  I don't have clear knowledge of that.
13   Q.  Okay.  Do you have any knowledge of it?  You
14  mentioned consolidation was one reason why a decision was
15  made to do that, but are there others?
16   A.  Thank you for reminding me of that term.  I do
17  vaguely recall having seen in the documents that I
18  reviewed in preparation for today an internal memoranda
19  concerning that very concept of consolidation, but why
20  consolidation was being considered, I just don't recall
21  that detail.
22   Q.  At the time Exhibit 20 was prepared,
23  then-Monsanto owned both of these areas that we've been
24  talking about, correct?
25   A.  Yes.

Page 63

1    A.  Yes.
2    Q.  Go ahead.  What were they?
3    A.  I have information, again, with me today.
4  Again, that's Exhibit 20, is it?  That indicates, if I
5  may, that by contrast to the limited disposal, et cetera,
6  on the Mystic site, there was much more extensive on the
7  Gateway site.  And that's evidenced by yet another
8  document I have with me today, if I may.
9    Q.  Please.
10   A.  Hard to keep it all in your head, let alone
11  where it is on paper.
12   Q.  Take your time.
13   A.  The item I have in mind is stamped on this
14  first page 00001790.  It's titled Material and Waste
15  Handling From Discussions With Employees, Monsanto
16  Company, Everett Plant, prepared for Monsanto Company by
17  GZA dated July 1992.
18   Q.  Can we mark that as Exhibit 21, please?
19   A.  And after the reporter marks it I'll go on to
20  describe why I felt it responsive.
21   Q.  Okay.
22       (Plaintiff's Exhibit No. 21
23       marked for identification.)
24   A.  As per a transmittal letter from GZA to
25  Monsanto Company in this Exhibit 21, it documents

Page 65

17 (Pages 62 to 65)

Deposition of Gerard Rinaldi / September 8, 2005

1  information from discussions with current and former
2  employees of Monsanto Company's Everett, Massachusetts
3  facility. The discussions focus on the past use and
4  disposal of materials at the Everett plant.
5  Q.   Is that referring -- what is that referring to?
6  A.   It's --
7  Q.   Both sites or just one site?
8  A.   By the divisions in the document it's clear to
9  me from my knowledge, and there may be a figure in
10  here -- if I can find it I'll certainly refer you to it.
11  Yes, it's specific to the Gateway Center property. I
12  refer to this figure Division of Site For Discussions.
13  Q.   Okay. What's the marking -- the number marking
14  that document?
15  A.   This began with 00001790.
16  Q.   And the specific reference you're making now?
17  A.   The drawing was 00001987. So in total this
18  document which I'm referring to is approximately 50 pages
19  in length. To try and keep it at a high level, it
20  describes information about manufacturing operations with
21  subheadings being Phthalic Anhydride, ACL, Styrene Maleic
22  Co-polymer and Silica Products, all of which I know, and
23  from this document, were on the Gateway Center property
24  only. And then a separate subsection titled Waste
25  Disposal with subsections below it which correspond to

Page 66

1  back. That was the sentence -- the sentence immediately
2  prior: "Employees reported that for at least part of the
3  manufacturing period a partially buried pipe ran from the
4  inside of the building to a disposal area to the north
5  such that liquid waste could be disposed without
6  personnel leaving the process area."
7  So that's intentional on-site disposal on the
8  Gateway Center side, and there are a number of other
9  examples similar to that throughout the remainder of this
10  50-page document.
11  Q.   All right. When you refer to disposal on a
12  site, what is that referencing?
13  A.   I would describe it as placement for -- with no
14  intent of further use. It's a common-sense definition.
15  Disposal. Not to be used any further. Off-specification
16  is referred to. Not suitable for sale as a product.
17  Q.   So it's not being stored, it's simply -- the
18  intent is to dispose of it?
19  A.   Yes.
20  Q.   And is it just simply left at the site in
21  various ways? In other words --
22  A.   As you put the question I would say yes.
23  Q.   Are there different types of disposal?
24  A.   Yes.
25  Q.   Can you just, by way of example, give us some

Page 68

1  what I would refer to as remedial areas that this
2  subsequent $30 million remediation that we referred to
3  were intended to address; Cape Cod Area, Mystic View
4  Area, Fund Land, North Fill, Well 5 Area.
5  Q.   Are these all areas on the so-called Gateway
6  site?
7  A.   Yes, they are. As again indicated by this
8  figure which I referred to.
9  Q.   Okay. So was this report that we're now
10  talking about limited to the Gateway site?
11  A.   Yes, it is.
12  Q.   Okay. Yet if I remember correctly you were
13  distinguishing the Gateway site from the Mystic site, and
14  one of the ways you were distinguishing it was the extent
15  and level of the disposal that occurred?
16  A.   Yes. That's what led me to refer to this
17  document. This document includes, based on employee
18  interviews, information about waste disposal activities.
19  By example, I just turned to one of the pages, last four
20  numbers 1796. This is from the discussion about phthalic
21  anhydride manufacturing on site -- on the Gateway site.
22  "A black, tarry waste from the A-9 process was deposited
23  in the field north of the building. This material was
24  probably either off-spec materials and/or distillation
25  bottoms from phthalic anhydride production. I should go

Page 67

1  of those?
2  A.   Well, I just mentioned the one where a tarry
3  waste was piped to an open area to the north.
4  Q.   On the site?
5  A.   Yes. On the site.
6  MR. STEVENS: Referring to the Gateway
7  Center?
8  A.   Referring to the Gateway Center site. That
9  area to the north is referred to in these documents as
10  the North Fill.
11  I'm just looking for other examples here, just
12  to see if I can quickly identify something. The Cape Cod
13  area -- I'll read from the document -- "One main fill
14  area approximately five acres of land along the western
15  coastline was identified as the primary plant disposal
16  area for the period from the late 1930s to the early
17  1960s. This area known as Cape Cod due to its shape was
18  for disposal of general plant trash, off-specification
19  materials, waste chemical products and old equipment."
20  Q.   Okay. Now, to your knowledge, were there such
21  disposal areas on the Mystic site as well?
22  A.   The only exception, as I referred to earlier,
23  was the so-called alum mud pond which ceased operation
24  and was closed in 1932, I believe I testified earlier.
25  Q.   Other than the alum pond, were there other

Page 69

18 (Pages 66 to 69)

Deposition of Gerard Rinaldi / September 8, 2005

1  disposal sites at the Mystic area?
2     A.  Not to my knowledge.
3        MR. STEVENS:  Not to the knowledge of the
4  two corporations.
5     A.  I'm sorry.  That's what that should mean for
6  today, yes.
7     Q.  (By Mr. Flanders)  So one of the — what I'm
8  hearing is that there were much more extensive disposal
9  areas on the Gateway site as compared to the Mystic site?
10    A.  By orders of magnitude.
11    Q.  Okay.  And that increased the cost of the
12 cleanup effort?
13    A.  Yes, it did.
14    Q.  Was any cleanup effort or remediation done with
15 respect to the Mystic site by then-Monsanto?
16    A.  My only knowledge of cleanup in a broader sense
17 of the word would just be the demolition and removal of
18 the buildings.  There was otherwise not anything per,
19 again, the exhibits we were discussing earlier that
20 Monsanto itself felt the need for a cleanup or
21 remediation, soil or groundwater.
22    Q.  So whatever the level of contamination was at
23 the site as you've described it, that was not remediated
24 or cleaned up by then-Monsanto?
25       MR. STEVENS:  Referring to the Mystic site

Page 70

1  again?
2        MR. FLANDERS:  Only the Mystic site.
3     A.  At the time of its sale from then-Monsanto to
4  Boston Edison, no, that would be generally how I would
5  describe the circumstances of the transfer.
6     Q.  All right.  And to your knowledge was there any
7  remediation of that site by then-Monsanto at any other
8  time?
9     A.  Again, only in the broadest possible
10 interpretation of that term.  As I described earlier, if
11 there had been small leaks of sulfuric acid, I referred
12 to that those were remediated, addressed at the time by
13 neutralizing them with soda ash, I believe.
14    Q.  But there was no comprehensive effort such as
15 apparently was made with the Gateway site —
16    A.  No, there was not.
17    Q.  — on the Mystic site?
18    A.  That's correct.
19    Q.  Do you know why that was so?
20    A.  Because of, I would submit, the relative degree
21 of contamination of the two sites as I attempted to
22 explain by my reference to these various exhibits.
23    Q.  Other than that one site was apparently
24 substantially more contaminated than another, was there
25 any other reason why Monsanto didn't make an effort to

Page 71

1  remediate or clean up the Mystic site?
2     A.  My knowledge, again, is that the sale was made
3  eventually to Boston Edison with a full disclosure,
4  having encouraged Boston Edison to conduct their own
5  investigation as we referred to earlier, that so-called
6  Perkins Jordan study.  I don't recall the exhibit number
7  this morning.  And I remember perhaps this was typical at
8  the time, and certainly characterized this transaction;
9  it was an as-is, where-is transaction.  I distinctly
10 remember that term having been used in earlier
11 discussions I've had over the years with regard to what
12 we're describing as the Mystic site.
13    Q.  Other than the circumstances surrounding the
14 transfer to Boston Edison, were there any other reasons
15 why then-Monsanto did not clean up or remediate the
16 Mystic site?
17    A.  I don't have knowledge on behalf of the two
18 companies of any such.
19    Q.  Thank you.  Why don't we take a break here.
20 We've been going a couple of hours.  Why don't we take a
21 10- or 15-minute break.
22       THE WITNESS:  Okay.
23       (Whereupon a break was taken at 10:21 a.m.
24       Proceedings resumed at 10:36 a.m.)
25

Page 72

1        (Plaintiff's Exhibit No. 22
2        marked for identification.)
3     Q.  Showing you a document that's marked as Exhibit
4  22.  It's dated December 13th, 1971, and it's marked
5  Monsanto 52 586 through 595 and EVE 161510O through 5109.
6  Can you identify that document?
7     A.  I don't recall having seen this particular
8  document before.  I just read that it is indicated, "To:
9  Monsanto Magazine."  The date you indicated, December
10 13th, 1971, titled The Everett Plant, Press Release No.
11 1.  And a cursory review seems to indicate it being a
12 history of the Everett plant up to what it was then doing
13 as of the time of this publication, December 1971, and
14 what products it was then producing, et cetera.
15    Q.  Have you ever heard of Monsanto Magazine?
16    A.  I'm —
17       MR. STEVENS:  You may answer.
18    A.  I'm not immediately familiar with that term.
19    Q.  Okay.  Is there some internal publication
20 within the company or was there some publication known as
21 Monsanto Magazine?
22    A.  I would only take it from this document there
23 must have been, but I do not recall such.  Not that I
24 didn't ever see it, I just don't recall.
25    Q.  Okay.  As of 1971, when this document was

Page 73

19 (Pages 70 to 73)

Deposition of Gerard Rinaldi / September 8, 2005

1  created with reference to the Everett plant, would that
2  have embraced both the Mystic site and the operations
3  that were going on there as well as the Gateway site?
4        MR. STEVENS: You're asking him to
5  speculate whether it would have or whether it did?
6        MR. FLANDERS: No.
7    Q.   (By Mr. Flanders) At that point, as of 1971,
8  was the Everett plant composed of both the Mystic
9  operations and the operations that were going on at what
10  we've been referring to as the Gateway site, recognizing
11  that neither one of those terms was in use then?
12    A.   I would say yes.
13    Q.   The Everett plant was one operation, one
14  unified operation with many buildings and things going on
15  there, but it was all one operation?
16    A.   Yes.
17    Q.   Other than at the time when the Gateway site —
18  I'm sorry, when the Mystic site was sold to Boston
19  Edison, was there some point in time when the Everett
20  plant was differentiated between the area that we now
21  call the Mystic site and the area that we now call the
22  Gateway site?
23        MR. STEVENS: Objection. Differentiated in
24  what way?
25    Q.   (By Mr. Flanders) Within the company. Was it

Page 74

1  considered in any way different from or distinct from
2  each other part of the plant?
3    A.   My knowledge would be that a reference at that
4  time, 1971, to the Everett plant would have comprised
5  both what we're referring to as Gateway and Mystic sites
6  today.
7    Q.   Okay.
8    A.   It was a single plant, in other words.
9    Q.   At that time were separate types of operations
10  going on at the two sites we've been talking about
11  though?
12    A.   To be clear, meaning 1971?
13    Q.   Yes.
14    A.   Yes.
15    Q.   So even though it was all part of one Everett
16  plant, different things were happening at one site as
17  compared to the other site?
18    A.   Yes.
19    Q.   Meaning Mystic versus Gateway?
20    A.   Yes.
21    Q.   If you look at Page 8 and 9 of this document
22  there's a reference to "Monsanto Today" and then the
23  second paragraph there's a statement here that, "In the
24  late 1960s nearby Everett residents complained that the
25  Monsanto plant was to blame for the killing of home-grown

Page 75

1  tomato crops. Investigation proved this to be true. In
2  response, Monsanto paid these residents for the cost of
3  their crops, and in 1969 installed air pollution
4  abatement equipment on a new sulfuric acid plant."
5        Do you know anything about that situation
6  that's referenced there?
7    A.   I do not.
8    Q.   Can I have this document marked as Exhibit 23,
9  please?
10        (Plaintiff's Exhibit No. 23
11        marked for identification.)
12    Q.   Showing you a document we've marked as Exhibit
13  23. This is dated July 6th, 1992. It is a document that
14  is numbered Monsanto2 0001193 through 1.195, and it was
15  produced to us by Monsanto in this case.
16        First of all, have you ever seen this document
17  before?
18    A.   I don't recognize this.
19    Q.   Okay. Do you know who some of the people are,
20  or any of the people who are referenced here are?
21    A.   Yes, I do.
22    Q.   Who is this — Mr. Brimer, is it?
23    A.   Brimer.
24    Q.   Brimer?
25    A.   Eric Brimer. He was also, like myself, I'll

Page 76

1  just generally say an environmental specialist for the
2  company. He may have been the Everett site environmental
3  supervisor, if you will, as of the time of the writing of
4  this letter. But I can't be certain of that. I also
5  recognize the carbon copy Mark Welsh. He was an
6  environmental engineer at the Everett site. I worked
7  with him personally. And another carbon copy S.J.
8  Henderson. Steve Henderson. I want to say he may have
9  been the plant manager at the time, or a Monsanto
10  manufacturing manager, if not at the plant — he would be
11  at the plant I can tell from the designations following
12  the individuals' names.
13    Q.   Are any of these individuals people that you
14  worked with personally?
15    A.   I worked personally with Mark Welsh. I know
16  Eric Brimer by name, but I don't recall working with him
17  personally.
18    Q.   Now, the memorandum references something called
19  an Everett site remediation steering team. What — are
20  you familiar with that?
21    A.   I don't recognize that term per se.
22    Q.   You were not a team member or one of the people
23  who was part of that effort?
24    A.   I was not. This document dated 1992 preceded
25  my involvement with Everett personally.

Page 77

20 (Pages 74 to 77)

Deposition of Gerard Rinaldi / September 8, 2005

1  Q. All right. Have you seen this document before
2  or not?
3  A. No, I have not.
4  Q. Can you tell by looking at it what it refers
5  to? What site it's referring to?
6  A. Yes. It refers to the Everett site, of course,
7  because of the Everett site remediation steering team
8  reference that you made. I also know that the numbers
9  following each individual's name, number 1410 is an
10  internal mail code to Monsanto Company indicating the
11  Monsanto site in Everett. That's how I determined that
12  Mr. Henderson was located at that site at the time,
13  because his mail code was 1410.
14  Q. Now, as of this time that would have been
15  referring to the Gateway property, is that right, only,
16  as opposed to the Mystic site?
17  A. Yes. Because the Mystic site had been sold
18  nine years prior.
19  Q. Okay. And there's a list here of basic
20  assumptions, referring to the Gateway site, I assume.
21  Looking at these assumptions that are listed here, have
22  you encountered these in your work with respect to the
23  Gateway site?
24  A. No. I've not seen these assumptions other than
25  this morning.

Page 78

1  Q. One of the assumptions is that, as stated here,
2  the site cannot as a whole be simply left fenced and
3  idle. In your involvement with the site was that an
4  assumption that you made?
5  A. I would agree with that assumption, yes.
6  Q. All right. And why is that?
7  A. I would — I'll refer back to one of our
8  exhibits from this morning, this Exhibit 13, Exploration
9  Location Map from 1994 evidencing the area as requiring
10  identified contamination over the area as requiring
11  remediation. And that's why I would concur that it was
12  not an option to leave the property fenced and idle. It
13  needed to be remediated to comply with regulations as of
14  the 1990s.
15  Q. By the way, was such a map or study as is
16  depicted in Exhibit 13 done for the Mystic site, that
17  level of detail?
18  A. I would say yes, there were just vastly fewer
19  investigations of the Mystic site.
20  Q. Why were there vastly fewer investigations?
21  A. One, because of its smaller area. Two, because
22  of the fewer manufacturing operations. Three, because of
23  the known information about the possible extent of
24  contamination or waste disposal.
25  Q. But to some extent there were things done that

Page 79

1  are similar to what's depicted in Exhibit 13, but not to
2  that extent?
3  A. I don't recall a summary compilation, if you
4  will, like this of a single drawing that shows all soil
5  borings, groundwater wells, et cetera, that would have
6  been installed on what we were referring to as the Mystic
7  site. Whether the — whether the Perkins Jordan study,
8  Exhibit 9 — it did not include such. That was the one
9  document I thought might. But I do not see that it had
10  anything as of that time, 1982.
11  Q. But, to your knowledge, then-Monsanto did not
12  commission any such study for the Mystic site as is
13  depicted in Exhibit 13?
14  A. Not in that form. But we did do — we —
15  then-Monsanto Company did do studies of the Mystic site,
16  the various Dames & Moore studies I referred to this
17  morning. I don't have the exhibit numbers, but ...
18  Q. But we have no, to your knowledge, similar work
19  product as is shown in Exhibit 13 for the Mystic site?
20  MR. STEVENS: Objection.
21  A. That's the case, to my knowledge.
22  Q. (By Mr. Flanders) Going back to this July 1992
23  memorandum that you have in front of you, another one of
24  the basic assumptions that's referenced here is that the
25  site cannot be used for uses that may involve digging,

Page 80

1  parks and playgrounds, on an ongoing basis. Is that one
2  of the assumptions that you also entertained with respect
3  to this Gateway site?
4  A. Yes. Not only entertained but pursued to its
5  conclusion under the Massachusetts regulatory process.
6  Q. Meaning what?
7  A. If I may refer to one of my documents?
8  Q. Certainly.
9  A. At the conclusion of the project, the field
10  work of remediation, our licensed site professional,
11  O'Reilly, Talbot & Okun Associates, prepared a number of
12  documents referred to as Response Action Outcome
13  Statements. I have at least three such here with me this
14  morning. I'd just describe generally that within those
15  documents they include what's referred to in
16  Massachusetts regulatory-speak as activity and use
17  limitations, and those include — for instance, I'm
18  looking at one right now for the so-called Mystic View
19  Area. "Activities and uses which without the written
20  approval of Monsanto and LSP are prohibited are as
21  follows:" And it goes on to describe, "commercial,
22  industrial, residential or agricultural use, or use as a
23  school or child daycare center, playing fields or
24  playgrounds," which I believe is the term in the exhibit
25  you were referring me to. So that's what comes to mind

Page 81

21 (Pages 78 to 81)

Deposition of Gerard Rinaldi / September 8, 2005

1 as having been pursued through the completion of the
2 remediation.
3    Q.   Can we have those marked, please, as the next
4 exhibits?
5         (Plaintiff's Exhibit Nos. 24, 25 and 26
6         marked for identification.)
7    Q.   (By Mr. Flanders) These three documents,
8 Exhibits 24, 25 and 26, which we are referring to as
9 Response Action Outcome Statements for the Monsanto
10 Everett site, these refer to the Gateway site?
11    A.   Yes, they do.
12    Q.   Were there any similar documents or statements
13 generated for the Mystic site?
14    A.   No. Because as of my understanding and as of
15 the time of the sale to Boston Edison, the Massachusetts
16 contingency plan, which these were prepared in response
17 to for the Gateway site, was not yet in existence to
18 describe or define the course of investigations and
19 remediations.
20    Q.   So the Mystic site was transferred out of
21 Monsanto's — then Monsanto's hands before this protocol,
22 if you will, came into effect?
23    A.   That's my recollection and understanding,
24 again, of the history of that set of regulations referred
25 to as the Massachusetts Contingency Plan.

Page 82

1 the cost of remediation. So that's why I'm asking about
2 it.
3         MR. STEVENS: He's told you what the cost
4 is.
5    Q.   (By Mr. Flanders) Do you have any knowledge
6 about this subject? If not, I'll move on.
7         MR. STEVENS: If he does, I'll decide
8 whether he can testify in behalf of the corporation as to
9 it.
10    A.   I have personal knowledge as to the sale of the
11 property subsequent to the remediation.
12    Q.   Namely that in fact it was sold?
13    A.   Yes.
14    Q.   And there was in fact remediation performed
15 there?
16    A.   Yes.
17    Q.   Were you aware of any predisposition within
18 then-Monsanto not to go ahead with selling the property
19 referring to the Gateway site?
20    A.   No. In fact, to the contrary. My
21 understanding was the intent was to remediate it in order
22 that it could be sold.
23    Q.   And there was no — to your knowledge, there
24 was no predisposition within some quarters of
25 then-Monsanto not to sell the property because there was

Page 84

1    Q.   If we can go back to the July memo, which is —
2    A.   Number 23.
3    Q.   Exhibit 23. And refer you to basic assumption
4 number 9. It says, "The market will not support the cost
5 of the remediation so any sale simply reduces without
6 offsetting our cost."
7         Am I correct in understanding from your
8 testimony that the Gateway site was in fact remediated?
9 This is the $30 million project that you referenced?
10    A.   Yes.
11    Q.   Yet there's an indication here that at least as
12 of 1992 the author didn't think that the market would
13 support whatever the cost of the remediation of that site
14 would be. Do you know whether that ever changed?
15    A.   The sale — says sale simply reduces without
16 offsetting our cost.
17         MR. STEVENS: What designated topic does
18 this question relate to?
19         MR. FLANDERS: Just a site there.
20         MR. STEVENS: Well, it's not a designated
21 topic. You designated what environmental cleanup
22 activities were performed, but not any market questions
23 or value of property, and the witness has not been
24 designated on those issues.
25         MR. FLANDERS: Okay. This has to do with

Page 83

1 concern that it might end up like a Love Canal situation?
2         MR. STEVENS: You're referring to the
3 Gateway Center?
4         MR. FLANDERS: Yes.
5    A.   I don't know if there would have been
6 individuals who held that opinion or not, but on a
7 corporate level it was remediated and subsequently sold.
8 So that's why I said no as to corporate predisposition.
9    Q.   You weren't aware of any?
10    A.   I don't know if there were or were not
11 individuals who subscribed to that predisposition.
12    Q.   Okay. The reason I'm asking is if you look at
13 No. 15 on the second page, it says, and I'm quoting,
14 "There is a predisposition in some quarters of Monsanto
15 against sale, considering Love Canal, Brio, etc."
16         Do I understand correctly that if there was
17 such a predisposition against the sale within Monsanto,
18 you were unaware of it?
19    A.   Yes, I was unaware of it.
20    Q.   Were you aware of any reference within the
21 company to the possibility of the Gateway site being
22 considered a Love Canal-type situation?
23    A.   Absolutely not.
24    Q.   Another number says, "This is a closely-watched
25 site as far as our management are concerned, more so,

Page 85

22 (Pages 82 to 85)

Deposition of Gerard Rinaldi / September 8, 2005

Page 86

1  than, say than Columbia or Kearny." Are those other
2  sites that Monsanto owned?
3     A.  Yes.
4     Q.  To your knowledge was this a closely-watched
5  site as far as then Monsanto's management was concerned?
6     A.  I would say yes. Any site for which you were
7  considering expenditure of tens of millions of dollars
8  for remediation would get management's attention.
9     Q.  Okay.
10        (Plaintiff's Exhibit No. 27
11         marked for identification.)
12     Q.  Showing you a document we've marked as Exhibit
13  27, which is — bears the Monsanto's numbers of 580 through
14  585, and EVE numbers 1615094 through 5099. Have you —
15        MR. STEVENS:  He hasn't had a chance to
16  look at it.
17     Q.  (By Mr. Flanders)  I want to put a question so
18  he has that in mind when he looks at it. Can you
19  identify this document for us?
20     A.  The first page has typed Everett Plant History
21  at the top and then it is a chronology. Although that's
22  crossed out and said Everett Plant Site, and then a word
23  I cannot read. The second page appears to be a
24  handwritten version of the same material as typed on the
25  first, and then the remainder appears to be a handwritten

Page 87

1  listing by chemical — hard to say. Maybe it says
2  facilities. And appears to be a description of products
3  made at the Everett site and the periods of their
4  production, would be my inference.
5     Q.  Okay. Now, have you seen this document before?
6     A.  I think I have seen the first page of this
7  document. Maybe in one of my two binders. I do not
8  recognize the listing by chemical facilities, handwritten
9  last four pages, at all.
10     Q.  Does that appear to be a listing of the
11  chemical products that were manufactured at the Everett
12  plant during the periods indicated?
13        MR. STEVENS:  You may testify as to the
14  1943 to 1983 period as to what you've been desig — asked
15  to testify.
16     A.  Yes.
17     Q.  (By Mr. Flanders)  Okay. On the third page of
18  this document there's a reference to strong acids, and
19  the statement is, "Hazardous material due to low pH and
20  corrosivity as defined under RCRA," and a listing of
21  various kinds of acids and such.
22        During the period from 1943 through 1983 were
23  these acids that are listed there manufactured at the
24  Everett plant?
25     A.  Yes. And with regard to sulfuric acid, nitric

Page 88

1  acid, chlorosulfonic acid, I don't recall from my
2  preparation for the deposition today referencing to
3  hydrochloric acid and acetic acid, but I have no reason
4  to doubt the information in this document.
5     Q.  And were these not only manufactured but stored
6  at the site?
7     A.  Yes.
8     Q.  And to your knowledge were these acids
9  manufactured at the — in the area that we're now
10  referring to as the Mystic site?
11     A.  Sulfuric acid specifically, yes. Nitric acid,
12  yes. I do not recall with respect to the others.
13     Q.  Okay. And were they stored at the Mystic site
14  area as well?
15     A.  I don't remember. I'm going to look at one
16  document for a moment.
17     Q.  Just please indicate for the record what
18  document you refer to, if one does refresh your
19  recollection.
20     A.  Yes. In response to the question, were they
21  stored at the Mystic site, if I recall correctly?
22     Q.  Yes.
23     A.  I'm referring to Exhibit No. 20 which is the
24  plant layout dated November 3, 1977. I see a number of
25  circles on the drawing which indicate tanks, storage,

Page 89

1  whether raw material or product, on the Gateway Center
2  side of the property.
3     Q.  Uh-huh.
4     A.  But not such on the Mystic side of the property
5  with only three exceptions on the Mystic side, three such
6  circles, three such tanks. Two adjoining the dashed
7  outline for alcohol building, which I recall from my
8  preparation as being molasses storage tanks — molasses
9  being the raw material for that process. I don't
10  remember or have any information as to the third. So I
11  conclude from that information only that these acids may
12  not have been stored on the Mystic site.
13     Q.  With those exceptions?
14     A.  Well, there are no exceptions, because what I
15  mentioned here is not an acid, that was molasses, as I
16  said.
17     Q.  And that would not involve any of these acids?
18     A.  No. No.
19     Q.  Now, is that only as of 1977 that you're
20  speaking, or what about the period preceding that from
21  1943 on?
22     A.  The other exhibit which I looked at in order to
23  attempt to answer your question was Exhibit No. 18, which
24  is the 1965 plot plan, and it does not show on either
25  property, the Gateway Center or the Mystic site, any what

Deposition of Gerard Rinaldi / September 8, 2005

1   I will call in general terms, tank farms. So I can't
2   deduce from that either. I was just hopeful that one of
3   those would help, but I don't have any other source of
4   information to answer the question.
5       Q.  All right. So from your review of the
6   documents and your knowledge, your conclusion is that
7   while these strong acids so-called as identified in the
8   document we've been looking at were manufactured at the
9   Mystic site, they were not stored there?
10      MR. STEVENS:  The company has no
11  information that they were stored there.
12      MR. FLANDERS:  Exactly.
13      A.  Yeah. I can't conclude whether they were or
14  they were not. The documents that I have with me don't
15  provide a clear indication.
16      Q.  As to storage?
17      A.  As to storage.
18      Q.  But they were manufactured?
19      A.  Yes, as I described earlier.
20      Q.  All right. Now, the document that we've been
21  looking at that's talking about the listing of — by
22  chemical, on the next page after strong acids refers to
23  something called — and please correct my
24  pronunciation — maleic anhydride. Have I said that
25  right?

Page 90

1       A.  Maleic anhydride.
2       Q.  Okay. As a toxic material. Is it a toxic
3   material?
4       A.  I note on the document a parenthetical after
5   toxic material, U 147, which I recognize as a listing in
6   the RCRA regulations for chemicals. And that listing
7   would be specific to maleic anhydride would be my
8   inference.
9       Q.  And similarly — is it phthalic anhydride?
10      A.  Yes.
11      Q.  Is that also a hazardous material under RCRA?
12      A.  As indicated here, more clearly listed as
13  hazardous under RCRA, again with the parenthetical U 190.
14      Q.  Okay. And then at the — towards the bottom
15  there's another reference to a hazardous material called,
16  I think, phenol. Do you see that?
17      A.  Yes, I do.
18      Q.  Says it's not manufactured. Distillation and
19  storage only. Water soluble during the period indicated.
20  To your knowledge, were these three items that I just
21  mentioned items that were manufactured at the Everett
22  plant with the exception of phenol, which apparently was
23  only distilled and stored?
24      A.  I know phthalic anhydride was certainly. I
25  don't recall with regard to maleic anhydride.

Page 91

1       Q.  And what —
2       A.  I know phthalic anhydride was.
3       Q.  What about phenol? Was that something that was
4   distilled and stored at the Everett plant?
5       A.  I have no knowledge beyond that. It says such on
6   this document.
7       Q.  Okay. Do you have any knowledge as to whether
8   any of these materials were manufactured or distilled and
9   stored on the Mystic site?
10      A.  Any of which materials?
11      Q.  The maleic anhydride, phthalic anhydride or
12  phenol?
13      A.  No. I've seen no indication that any of those
14  were produced or stored on the Mystic site.
15      Q.  On the next page there's a reference to ethyl
16  alcohol, saying it's hazardous to the flammability and
17  indicating that it was manufactured from 1933 to 1954.
18  Do you have any knowledge of that particular product?
19      A.  Yes.
20      Q.  Was that manufactured during the period
21  indicated?
22      MR. STEVENS:  From '43 to '54?
23      MR. FLANDERS:  Yes.
24      A.  I defer to the author of this document. I know
25  that chemical was manufactured on the Mystic site. It

Page 92

1   was the alcohol produced from molasses on the exhibit I
2   was referring to earlier in attempting to answer your
3   question about tanks.
4       Q.  So this product was in fact produced on the
5   Mystic site?
6       A.  Yes.
7       Q.  Was it stored there as well?
8       A.  I don't have information or knowledge of that.
9   I could infer that it would be typical to store where you
10  manufacture, but ...
11      Q.  You did refer us to the storage tanks from the
12  molasses. Would that necessarily involve any storage of
13  ethyl alcohol or not?
14      A.  Not those two tanks.
15      Q.  If you typically have molasses being stored,
16  would you also have ethyl alcohol since that's a
17  byproduct of the operations that take place with respect
18  to molasses?
19      A.  Certainly that's a possibility.
20      Q.  Would you assume that to be so?
21      MR. STEVENS:  Objection. You're here to
22  testify as to the knowledge that you've been able, and
23  not to speculate or make assumptions.
24      Q.  (By Mr. Flanders)  So you don't know one way or
25  the other?

Page 93

24 (Pages 90 to 93)

Deposition of Gerard Rinaldi / September 8, 2005

1    A.  I don't know for certain. I don't have a
2    document that gives me unequivocal evidence of that.
3    Q.  Down further on the page the document speaks to
4    plasticizers. If you would, just tell us what those are,
5    plasticizers, and what they are used for?
6    A.  As this document itself indicates, plasticizers
7    are used with resins to provide plastic materials
8    different physical properties. Plasticizers keep what we
9    commonly refer to as plastics pliable, flexible, not
10   rigid. They make plastic plastic. That's the meaning of
11   the word plasticizer.
12   Q.  The document goes on to refer to that -- the
13   fact that of the many phthalate plasticizers produced two
14   ere listed as hazardous under RCRA due to possible
15   effects on aquatic life and toxicity to -- is that rats?
16   A.  That would be my reading, yes.
17   Q.  Okay. But they are not acutely toxic to man.
18   But nonetheless, they were apparently listed under RCRA
19   as toxic materials. Again, to your knowledge, during the
20   period that you have been asked to look at, were
21   phthalate plasticizers produced at the Everett plant?
22   A.  Yes.
23   Q.  Okay. And are you familiar with the fact that
24   two of them are listed as hazardous under RCRA?
25   A.  I know there are listings of phthalates under

Page 94

1    RCRA, but whether it's two or more or which I'm not
2    certain.
3    Q.  Do you know whether any of the phthalates in
4    plasticizers that were produced at the Everett site were
5    hazardous under RCRA?
6    A.  I don't recall. I don't recall.
7    Q.  Do you know whether any of them that were
8    produced were produced on the Mystic site?
9    A.  They were not.
10   Q.  You do know that?
11   A.  Yes.
12   Q.  And then on the last page there's a reference
13   at the bottom to acetic acid esters, indicating that
14   these materials would be considered hazardous under RCRA
15   to the flash points. And there's a reference to ethyl
16   acetate and butyl acetate?
17   A.  Butyl.
18   Q.  Thank you. Were these acetic acid esters
19   manufactured at the plant during the period that you have
20   prepared to testify about?
21   A.  I can only say that based on the review of this
22   document, which indicates that they were produced 1868 to
23   1950, they were not produced on the Mystic site based on
24   all I know from my preparation for today.
25   Q.  Okay. Do you know that they were otherwise,

Page 95

1    though, produced at the site -- at the Everett plant
2    site?
3    A.  Only from this document.
4    Q.  Not from --
5    A.  I don't recall that otherwise. Not that there
6    isn't a document that indicates that, it just doesn't
7    come to mind.
8    Q.  With respect to the Mystic site -- can I see
9    the document, the GZA study, if you can find that one?
10   A.  This or the map? There were two GZA documents.
11   Q.  There's two of them?
12   A.  There's that GZA document and I also referred
13   to the map.
14   Q.  There's a July '94 GZA document.
15   A.  There's this April '94 GZA document.
16   Q.  Let's mark this as Exhibit 28.
17       (Plaintiff's Exhibit No. 28
18       marked for identification.)
19   Q.  I'm going to show you Exhibit 28, which
20   purports to be a GZA Phase II - Comprehensive Site
21   Assessment for Monsanto Company. Have you seen this
22   document before?
23   A.  Yes.
24   Q.  And was this one of the documents you reviewed
25   in preparation for your testimony today?

Page 96

1    A.  Not specifically. I saw this at the time of my
2    work on the remediation. I believe it's one of the
3    documents that appeared in that index that I referred to
4    earlier, you recall, from the library on the site.
5    Q.  So what is this document, if you can put it in
6    context for us?
7    A.  This document by its title says Phase II -
8    Comprehensive Site Assessment. Phase II being one of
9    five steps in the Massachusetts Contingency Plan process
10   for the investigation and remediation of a site. It
11   further says manufacturing area, which again we could
12   refer back to one of my exhibits, that the Gateway Center
13   site was divided into various areas, the manufacturing
14   area being one of those exclusively on the Gateway Center
15   side of the property.
16       And then I notice that in its title it says
17   Volume II of IX. These were extensive documents, and I
18   know from the attached table of contents that Volume I
19   would be what we would generally categorize as the text.
20   And Volume II was, and is, a number of tables from
21   that -- from that assessment, Tables 1 through 61.
22   Q.  Okay. Was this part of the remediation work
23   that then-Monsanto was doing with respect to the Gateway
24   site?
25   A.  Yes.

Page 97

Deposition of Gerard Rinaldi / September 8, 2005

1  Q.  Okay.  If I could direct you to one of the
2  tabbed pages there, which is — which has been
3  Bates-numbered 0004605.
4  A.  Okay.
5  Q.  This is referred to at the top as Table 2,
6  Summary of Historical Site Products, Manufacturing Area:
7  Monsanto.  What is this table, as you understand it,
8  depicting?
9  A.  I note from the footnote on the following page,
10  4606, "Information stated above gathered during
11  discussions with current and former employees of the
12  Monsanto Company's Everett, Massachusetts facility."
13  Therefore, I take this table per its title where it says
14  Summary of Historical Site Products to be a summary of
15  the information that was compiled by GZA in Exhibit 21.
16  Q.  Okay.  And does that refer to the products that
17  were manufactured in the manufacturing area of the
18  Gateway site and the approximate years that the
19  manufacturing took place?
20  A.  I would not interpret this table that way.
21  Q.  How do you interpret it?
22  A.  I would interpret it as more inclusive.  That
23  he referenced the manufacturing area Phase II study is
24  just meant to be an indication of a document in which
25  this table appeared.  I say that because I see reference

Page 98

1  A.  Refer back to one of my other documents.
2  Q.  Sure.
3  A.  I'm referring back to my Exhibit No. 3, the
4  July 21st, 1980 internal memo by Bob Cummings which had
5  the attachment detailing East Side production and resale
6  facilities.  Besides the ones we were just referring to,
7  this document, page number MONS2 0002541, refers to alum,
8  ironfree alum, sodium bisulfate, bisulfite with an "L,"
9  ferric sulfate, ferric nitrate, alcohol, carbon dioxide.
10  In other words, those being materials produced on the
11  East Side or Mystic site that do not appear on Table 2 in
12  Exhibit 28.
13  Q.  Can I have that document, please?  With
14  reference to the products you just identified from
15  Exhibit 3 as having been made at the Mystic site, in
16  addition to these products were there other raw materials
17  or products used in their manufacture that you're aware
18  of?
19  A.  Yes.
20  Q.  Can you detail those for us?
21  A.  I'll refer to another exhibit.  I'm referring
22  to Exhibit 9, which I refer to as the Perkins Jordan
23  study from 1982.  It has a section titled Chemical
24  Process Review and it's describing the products made at
25  or on the East Side, the Mystic site, and they are raw

Page 100

1  to, for instance, some of the products that were produced
2  not only on a Gateway Center property, that so-called
3  manufacturing area, but also the Mystic site, referring
4  to sulfuric acid.
5  Q.  That's what I wanted to you do.  If you could
6  just go down this list and off the top of your head
7  indicate to us which of these products here would have
8  been the product of operations on the Mystic site.
9  A.  On Page 4606, as we previously noted, nitric
10  acid, sodium bisulfate, sulfuric acid.  Those are the
11  only ones that I clearly associated with what we were
12  calling the Mystic site.
13  Q.  So none of the products that are listed, for
14  example, on 4605, to your knowledge, would have been
15  produced at the Mystic site?
16  A.  I have a question in my mind with respect to
17  Glauber's salt also, sodium sulfate.  That's the only
18  one.  The others I associate with the Gateway Center
19  site.
20  Q.  Uh-huh.  Other than the ones — products you've
21  just identified as having been made at the Mystic site,
22  are there others that aren't listed here that were made
23  there, to your knowledge?
24  A.  Yes.
25  Q.  And what were those?

Page 99

1  materials.  Alum, which I just mentioned from the other
2  exhibit, produced from bauxite ore and sulfuric acid as
3  raw materials.  Alcohol, produced by fermentation of
4  molasses or grain.  Sulfuric acid, produced by burning of
5  either pyrite or a raw material.  Sodium
6  bisulfate, produced by reacting sulfur dioxide with
7  sodium carbonate as raw materials.  Nitric acid, produced
8  by oxidation of ammonia as a raw material.  Ferric salts,
9  produced by reacting ferric oxide from the pyrite-burning
10  operation for sulfuric acid production with the
11  appropriate acid to form the desired salt.  And I
12  mentioned earlier, and is noted in this same Exhibit 9
13  which I'm referring to, the plasticizer DCHP which was
14  not formulated, but solidified, granulated and packaged
15  on the East Side, as this exhibit indicates.
16  Q.  How do all these materials that you've
17  described for us arrive at the site?
18  A.  I think I can safely infer by truck, rail or
19  barge.
20  Q.  Okay.
21  A.  Or some waterborne transportation.
22  Q.  Was there any pipe — material piped into the
23  site?  Again, I'm referring to the Mystic site.
24  A.  I don't know.
25  Q.  Is there piping at the site, or was there

Page 101

26 (Pages 98 to 101)

Deposition of Gerard Rinaldi / September 8, 2005

1   piping at the site?
2   A.   Yes.
3   Q.   What was that used for?  Was it used for any
4   raw materials transfer or movement?
5   A.   Yes.  I would assume so.
6   Q.   And do you know anything about that, what types
7   of raw materials were moved and in what piping area?
8   A.   I don't have knowledge at that level of detail
9   what materials and what pipes and what area versus other
10  means of handling.
11  Q.   Was there any piping going back and forth that
12  would connect the Gateway area to the Mystic area?
13  A.   I believe I've seen reference to steam piping
14  for utilities purposes.
15  Q.   Is there any piping that connected the two
16  areas for purposes of moving any raw materials?
17  A.   I don't recall.
18  Q.   How were these -- once these raw materials
19  arrived on the site, how were they stored or handled?
20  A.   And we're referring to the Mystic site?
21  Q.   Always, yes, I'm sorry.  Thank you for asking.
22  A.   Again, I'll refer back to Exhibit 9 that has
23  this chemical process review that is specific to this
24  Mystic site.  Seems to be the most concise source for
25  alum raw materials when you're talking about storage and

Page 102

1   handling.  For alum, the raw materials, bauxite stored in
2   large piles on the ground, sulfuric acid stored in large
3   steel tanks, the product alum says, "sometimes stored as
4   solution in tanks for bulk shipment."  So that's with
5   regard to one East Side product.  With regard to alcohol,
6   raw material molasses brought in by ship from the
7   Caribbean and stored in tanks.  Wheat brought in by
8   hopper cars and stored in silos.  Enzymes and yeasts
9   shipped in drums and bags.  The product ethanol stored in
10  tanks.  Sulfuric acid is another product on the East or
11  Mystic side.  Iron pyrite ore and sulfur were delivered
12  by bulk shipment and stored on the ground.  This is all
13  again from Exhibit 9.
14       Sulfuric acid stored in large steel tanks.
15  Sodium bisulfite, another product.  Sodium carbonate, one
16  of the raw materials, was delivered in bulk and stored in
17  silos.  The product sodium bisulfite was ultimately
18  bagged.  Nitric acid -- the raw material ammonia was
19  purchased and stored in bulk tankage, this indicates.
20  The product acid was stored in stainless steel or lined
21  tanks.  The product ferric sulfides as a category,
22  sulfuric acid, piped from sulfuric operation or stored in
23  carboys.  Nitric acid piped from nitric operation or
24  stored in carboys.  Hydraulic -- excuse me.  Hydrochloric
25  acid stored in carboys.

Page 103

1        And then with respect to the products, the
2   various ferric salts all handled in glass carboys.
3        So that's a brief description of the storage
4   and receipt of the raw materials and products from the
5   East Side.
6   Q.   And how were these raw materials handled and
7   used at the Mystic site?  You told us how they were
8   stored.  Were they handled and used in the manufacturing
9   process?
10  A.   Well, from --
11  Q.   From storage to manufacturing?
12  A.   From storage to manufacturing?  Bear with me.
13  I have brought with me a series of detailed process
14  descriptions.  I'll describe them in general and then you
15  can stamp and discuss in detail.  One for alcohol, one
16  for commercial alum, one for muriatic acid or
17  hydrochloric acid, bisulfate, which is sodium bisulfate,
18  nitric acid, sodium bisulfite, sulfuric acid.  So I have
19  six documents.  They have -- I won't read all the numbers
20  for the moment.  They have previous stamps EVE and then a
21  number indicating Everett.  And these documents -- they
22  are several pages each, including a figure, a process
23  flow diagram, and they were all compiled in or about 1950
24  by a Monsanto research librarian.  ENW is what's listed
25  on here, and I remember that being Wescott perhaps.

Page 104

1   That's, again, a description of -- process description of
2   what happened to the materials from storage through
3   production.
4   Q.   If we could have these each marked as the next
5   exhibit, and just if we could -- just separate them by
6   letter designation.
7        (Plaintiff's Exhibit Nos. 29 a-f
8        marked for identification.)
9   Q.   (By Mr. Flanders)  We've marked the documents
10  as Exhibit 29 with various letters for each of the
11  separate documents you've identified.  Are these all
12  documents that the then-Monsanto Company prepared in the
13  ordinary course of its business?
14  A.   Yes.  As I indicated I know that the notation
15  at the end of each document, ENW, stands for -- again, I
16  believe the name was Emory Wescott, research librarian.
17  I saw that on another document.  It doesn't appear on any
18  of those, but I saw that somewhere.
19  Q.   And do you know why these documents were
20  created?
21  A.   I don't know with regard to these specific
22  documents.
23  Q.   But they --
24  A.   I can infer based on my experience with the
25  then-Monsanto Company otherwise that it's not unusual to

Page 105

27 (Pages 102 to 105)

Deposition of Gerard Rinaldi / September 8, 2005

1   have process descriptions available for the benefit of
2   new employees or otherwise.
3       Q.   And your understanding is these documents
4   describe accurately, I presume, how the raw materials at
5   the Everett plant site were processed and used?
6       A.   Yes.
7       Q.   Okay. Did any of that change over time, to
8   your knowledge?
9       A.   Yes.
10      Q.   Can you enlighten us as to how that is so?
11      A.   What I have in mind specifically is with
12  respect to sulfuric acid as noted in the Perkins Jordan
13  report -- excuse me for not remembering the exhibit
14  number -- but it describes the fact that there were two
15  different raw materials used over time; one was iron
16  pyrite ores and the other was raw sulfur. I note that
17  this process description dated 1950 refers only to the
18  raw sulfur, because my information is that the earlier
19  process using pyrite ores as the raw material was
20  discontinued in 1930 -- early 1930s roughly.
21      Q.   Uh-huh.
22      A.   So that's one change that stands out in my mind
23  in terms of process.
24      Q.   After the products were manufactured where were
25  they stored at the Mystic site?

Page 106

1       A.   As I was reading, again, from the Perkins
2   Jordan study, it clearly indicated storage in tanks for
3   several of the products. Others in bags. And I know
4   there are references on some of the figures or plans we
5   referred to to tanks, warehouses. But unfortunately, as
6   indicated earlier, I don't have specific information
7   available to me as to my knowledge as to which products,
8   which tanks, which warehouses.
9       Q.   Were all of the products that were manufactured
10  at the Mystic site to your knowledge stored there for
11  some period?
12      A.   I don't know that one way or the other.
13      Q.   You know there was some storage of certain of
14  the products, but you just don't know whether all of them
15  were stored there for various periods?
16      A.   Right.
17      Q.   Which ones do you know were stored there?
18      A.   Let me see if I can refer to a document again
19  that will help me to respond to that question.
20      Q.   Sure.
21      A.   The last document I was looking at was a series
22  we just discussed, 29 a through f. I was just seeing if
23  at the end of it it describes the location or method of
24  storage. And the figures refer to tanks, cisterns,
25  hoppers, et cetera, but they don't specify the location.

Page 107

1   I can't determine where the storage would have been
2   precisely.
3       Q.   So is it the case that there was some storage
4   at the Mystic property of certain materials, but you just
5   don't know which materials were stored there?
6       A.   I know with certainty, one. Just happens to be
7   this alcohol department. I mentioned the molasses. It
8   says here stored in three large tanks. When I referred
9   to the one drawing earlier--
10      Q.   All right.
11      A.   I saw one of the drawings with three tanks and
12  one of the figures I just looked at a moment ago, but I
13  can't put my hands on. Again, it had three circles and
14  inside each circle it says molasses. So those three
15  tanks on the Mystic site were storage of molasses, the
16  raw material for alcohol production. That's the only
17  thing I can say with absolute certainty.
18      Q.   But you do know that there were other materials
19  that were stored there, you just don't know which ones?
20      A.   Well, we -- stored there meaning on the Mystic
21  site?
22      Q.   Yes.
23      A.   I don't know that. I know from those brief
24  descriptions from the Perkins Jordan study, for instance,
25  it says stored in tanks or bagged, et cetera. I don't

Page 108

1   know if any, all or none of those were stored on the
2   Mystic site versus whether transferred to the Gateway
3   site for storage.
4       Q.   Were there any materials, products, that
5   originated at the Gateway site but were stored at the
6   Mystic site?
7       A.   I would infer one that I referred to earlier,
8   DCHP, which we know was manufactured, produced on the
9   Gateway site, but transferred to the Mystic site for
10  what's referred to as finishing, solidification,
11  granulation and packaging. Once you package, you store,
12  and that would typically be in proximity, but I don't
13  know for certain in this case. But that's the one
14  example I know of transferring material from Gateway to
15  Mystic.
16      Q.   Were there other transfers of materials or
17  products between the two sites?
18      A.   It's possible, but I don't have a specific
19  knowledge as to whether products and raw materials from
20  one site were used on the other site or not. No
21  immediate examples come to mind.
22      Q.   How were the products that were manufactured at
23  the Mystic site removed from the Mystic site?
24      A.   I'm sorry, repeat.
25      Q.   How were they taken away after the

Page 109

28 (Pages 106 to 109)

Deposition of Gerard Rinaldi / September 8, 2005

1  manufacturing process?
2     A.  I would only, as I did earlier about the
3  receipt of raw materials, infer that the products went
4  out the same way raw materials came in, rail, truck or
5  waterborne transportation.
6     Q.  Did all three of those have operations at the
7  site, those three methods of transportation? That is did
8  the rail come to and from the site?
9     A.  Yes.
10     Q.  Did water come to and from the site?
11     A.  Yes.
12     Q.  And were there trucks that would come to and
13  from the site to take away finished product?
14     A.  That's my belief, yes.
15     Q.  Again, I come back to the subject of pipes.
16  Were there any -- was there any transport to or from the
17  site of finished product through piping?
18        MR. STEVENS:  By site what are you --
19     Q.  (By Mr. Flanders)  Finished product taken off
20  site through pipes of any kind.
21     A.  I'm not aware of any.
22     Q.  What about raw material? Was raw material
23  either taken off or transported to the site through
24  pipes?
25     A.  I would say yes. I mean there was reference

Page 110

1  here again just to the alcohol department and the receipt
2  of molasses as raw material in tanks, steamships from
3  Puerto Rico and Cuba. It would have to get off the ship
4  and onto the site in some way, and so piping is the
5  logical way that that transfer would occur from the ship
6  to the storage tanks which are noted here, and that we've
7  noted on the earlier drawings.
8     Q.  Piping from the port area to the site?
9     A.  Yes.
10     Q.  So, to your knowledge, there were in fact pipes
11  that ran to and from the site to other areas such as
12  ports located off site?
13     A.  Not -- not -- when you say ports located off
14  site --
15     Q.  You said ships from Puerto Rico would come in
16  to some other place and then --
17     A.  To this site.
18     Q.  Oh, to the site itself.
19     A.  To the site. And then offload from the -- it
20  says it's received in steamships from Puerto Rico and
21  Cuba, so I presume that was to this site.
22     Q.  Was it received at the Mystic site?
23     A.  Yes.
24     Q.  So the steamships from Puerto Rico in this
25  example would actually land, so to speak, at the Mystic

Page 111

1  site and then offload material?
2     A.  That's my reading of this description from
3  1950.
4     Q.  And your belief is that at least part of that
5  effort involved the use of some sort of piping to offload
6  this material?
7     A.  Yes.
8     Q.  Were there other materials that came by boat or
9  barge that were offloaded in a similar fashion?
10     A.  Referring to the next of these process
11  descriptions, this is Exhibit 29b for commercial alum.
12  "Bauxite ore from British Guiana is brought to the plant
13  in large ships," it begins.
14     Q.  Again, this would have been brought to the
15  plant at the Mystic site?
16     A.  Yes. At the unloading dock the ore is
17  transferred by crane into freight cars which are then
18  weighed and dumped at the bauxite storage pile.
19     Q.  Is the bauxite storage pile on the Mystic side?
20     A.  Yes.
21     Q.  Would there have been materials transported to
22  the Everett plant site in general that were for use at
23  the Gateway site but landed, so to speak, at the Mystic
24  site and then were taken from there across over to the
25  Gateway site?

Page 112

1     A.  I don't have knowledge or information really
2  available to say yes or no.
3     Q.  In other words, was there only one area where
4  boats and barges offloaded at the site?
5     A.  That's my understanding.
6     Q.  And that was on the Mystic side?
7     A.  Yes. At the southeast corner of the overall
8  property -- combined properties, and that adjoins the
9  Mystic site.
10     Q.  That would be the Mystic River that's
11  immediately adjacent to the site?
12     A.  Mystic or Malden. I always get them confused
13  because I know they are together right there.
14     Q.  One of the rivers. And that's the only
15  offloading from a water site that exists, the only place
16  where raw materials or product was either delivered or
17  taken away by boat or barge?
18     A.  That's all I'm aware of at the moment.
19     Q.  And are you aware that any of that was being
20  used not just at the Mystic site but also at the Gateway
21  site, either going to it or coming from it?
22     A.  I don't know about the receipt of raw materials
23  or shipment of products from the Gateway site by ship or
24  other waterborne transportation. I don't have
25  information about that.

Page 113

29 (Pages 110 to 113)

Deposition of Gerard Rinaldi / September 8, 2005

1  Q.   Okay. But you do know that from the Mystic
2  site they were both receiving raw materials and shipping
3  product from the area where the barges and boats land?
4  A.   I only have information with respect to receipt
5  of materials, not outgoing shipment. I don't see
6  reference to that. I don't have knowledge otherwise of
7  shipment by water of product.
8  Q.   Okay. Were any wastes generated from the
9  manufacture of the various products at the Mystic site?
10  A.   Yes.
11  Q.   What kind of wastes?
12  A.   Again, refer to one of my documents that we've
13  already entered this morning. This is Exhibit 9, again,
14  the Parkins Jordan study. And, again, it describes for
15  each of the products we've been reviewing that were
16  produced on the Mystic or East Side their wastes. So for
17  alum --
18  Q.   Okay. It's your testimony that whatever you
19  know is in that document about what sort of wastes were
20  generated?
21  A.   That's one convenient source that I remember.
22  There may be other information, but I have to refer to
23  these documents in order to answer questions at this
24  level of detail.
25  Q.   Absolutely.

Page 114

1  others. But as I said, the Perkins Jordan study, Exhibit
2  No. 9, indicates some of the processes did not have
3  wastes. The byproducts in that case or the processes were
4  used as raw materials for other processes.
5  Q.   But to the extent that there were wastes, does
6  the Perkins Jordan study detail those?
7  A.   It has a brief description for each of the East
8  Side processes as it did for the raw materials and the
9  products, yes.
10  Q.   Are there other documents which address or
11  detail which operations created wastes and what those
12  wastes were?
13  A.   These process descriptions would include that
14  Perkins Jordan study. No other documents come to mind at
15  the moment.
16  Q.   Do they address what the volumes of the waste
17  were?
18  A.   Neither of the Perkins Jordan studies, 9 or
19  this series of Exhibits 29, speaks to volumes.
20  Q.   Do you know of any documents or other sources
21  that do?
22  A.   I was just checking on a couple of these
23  earlier exhibits, 16 and 17, but they do not have volume
24  information for waste. I'm not aware -- don't recall
25  information otherwise about volumes of wastes specific to

Page 116

1  A.   Okay.
2  Q.   What types of operations generated these
3  wastes?
4  A.   Generally the manufacturing operations.
5  There's waste descriptions for some but not all of the
6  products that are described here in this report. So by
7  way of example, what type of operation would generate
8  waste and what would be the nature of the waste.
9  Actually, now that I think of it, the document
10  or the series of documents, these process descriptions --
11  Q.   That we've marked as exhibits --
12  A.   29 a through f include these flow diagrams
13  which show waste. In this example for alcohol, EVE
14  1614884, there's a stream labeled water to sewer. That's
15  a waste.
16  Q.   Meaning that some waste was put into the water
17  and then it was discharged into a sewer?
18  A.   No. It was an aqueous waste, a watery waste
19  that was sent to sewer.
20  Q.   The sewer being the way it was disposed of?
21  A.   Yes.
22  Q.   And there's a similar notation of a waste
23  stream to sewer on the alum process flow sheet EVE
24  1614887.
25  A.   I don't note any examples readily on the

Page 115

1  the production processes on the East Side.
2  Q.   East Side being the --
3  A.   Mystic side, excuse me.
4  Q.   What about the chemical constituents of these
5  wastes? Is there anything that details what those would
6  be, or were?
7  A.   There is some discussion of that, I remember,
8  in Exhibit 9, the Perkins Jordan study. Without seeing
9  details, I happen to see the word "impurities" in some of
10  these process descriptions, 29 a through f, which would
11  probably make their way to waste eventually. But I don't
12  see any specific chemicals or tabulations. No document
13  comes to mind on that question.
14  Q.   How were these wastes stored generally? I
15  should ask first, were they stored?
16  A.   Not necessarily. Wastes -- for instance, I
17  alluded to a couple earlier, water aqueous waste that
18  could be continuously generated as the process operated
19  continuously and disposed in a sewer.
20  Q.   Just down the sewer?
21  A.   Yes.
22  Q.   Were there any wastes, though, that were
23  stored --
24  A.   We referred --
25  Q.   -- on the Mystic site?

Page 117

30 (Pages 114 to 117)

Deposition of Gerard Rinaldi / September 8, 2005

1    A.   Yes. Yes. We referred during the course of
2    today's discussion to this alum mud pond which is where
3    there was a settling of impurities.
4        Q.   Was that a storage site, though, or was that
5    just simply a disposal area?
6        A.   I guess you could — to choose between one or
7    the other I guess you might call it disposal in that
8    case. It wasn't removed from there, if that's how you
9    take storage to mean, something you would put in or take
10   back out.
11       Q.   Yeah. It's there temporarily as opposed to
12   being permanently disposed of. Were there areas on the
13   Mystic-side where wastes were temporarily stored or
14   stored for some period of time, and if so, what were
15   they?
16       A.   In this sulfuric acid process description in
17   the Perkins Jordan study, No. 9, there's a description of
18   the slag from burning of pyrites as a waste, containing
19   ferric oxide with some ferric sulfate, when not used for
20   ferric salt conversions, that is using that material not
21   as a waste but as a byproduct. This document says, "The
22   slag was usually dumped on the site or disposed of off
23   site." But I have no information beyond what this
24   document says or what the source of that particular
25   statement is in here.

Page 118

1    already read to you piping a waste out to the north part
2    of the plant. I don't have any information about such
3    on-site disposal on the Mystic site.
4        Q.   The reference there that you had to the dumping
5    that occurred, was that at the Mystic site?
6        A.   In the Perkins Jordan Exhibit No. 9, yes, it
7    said dumped on the site, but it didn't elaborate any more
8    than that, so ...
9        Q.   Did you understand that to be referring to the
10   Mystic site?
11       A.   That's how I would read this.
12       Q.   That's what the Perkins study was about, wasn't
13   it?
14       A.   It was an assessment of the site condition,
15   yes.
16       Q.   The site conditions at the Mystic site?
17       A.   Yes. Yes.
18       Q.   Were there other wastes that were simply dumped
19   at the site — the Mystic site?
20       A.   Not that I note from that — that document or
21   that I otherwise have knowledge of.
22       Q.   As to those that were taken and disposed of off
23   site, how were they removed?
24       A.   I may not be able to put my hands on this
25   document, but the one I'm recalling is in the 1970s

Page 120

1        Q.   Again, that would suggest disposal rather than
2    storage, wouldn't it?
3        A.   "When not used for ferric salt conversions the
4    slag was usually dumped on the site or disposed of off
5    site." So disposed of clearly off site. Dumped on the
6    site. Whether that could mean subsequently when it was
7    used for ferric salt conversions it was recovered.
8        Q.   Okay.
9        A.   I have heard that myself. That's all I can
10   think of that's responsive to the general line.
11       Q.   So there were certain wastes that were created
12   by the manufacturing processes?
13       A.   Yes.
14       Q.   And so the question I'm putting to you in the
15   broadest way is what happened to it? What happened to
16   those wastes?
17       A.   And, again, in broad terms we know some were
18   aqueous and therefore disposed by sewer to the river.
19   Some, in the example I was just noting, were disposed of
20   off site. There's no —
21       Q.   Some were just dumped on the site?
22       A.   Well, we don't have information of waste
23   disposal on the Mystic site as we do, and as I alluded to
24   from this exhibit which remains out, No. 21, about
25   clearly piping a waste from that one process. I recall I

Page 119

1    perhaps. There was a survey referred to as the Eckhard
2    survey. Congressman Eckhard initiated some process where
3    industry has to describe the handling of its wastes,
4    where it went and so forth; and I know I've seen in the
5    files the Eckhard survey for the Everett site in total,
6    and that would perhaps answer the question with regard to
7    the means of transport. I don't recall if it went to
8    that level of detail or not, but that's the one source of
9    information I was thinking about.
10       Q.   Okay. Again, broadly speaking, do you know
11   which types of wastes were disposed of down the sewer, so
12   to speak, and which types were disposed of by dumping on
13   the site and which ones were disposed of off site?
14       A.   Only, again, by what I would read. For
15   instance, from that one Perkins Jordan study, Exhibit No.
16   9, I can't generally from memory say which were handled
17   by which means. Although I would say again, with respect
18   to dumping on the site with the possible exception of
19   that one reference in the Perkins Jordan study, I don't
20   have any information of on-site disposal within the
21   balance of the Mystic site, unlike the Gateway Center
22   site, where there are numerous examples in that Exhibit
23   21.
24       Q.   Did any of this waste disposal that we've been
25   discussing change over time at the Mystic site?

Page 121

31 (Pages 118 to 121)

Deposition of Gerard Rinaldi / September 8, 2005

1    A.   I don't have knowledge that it did or did not.
2    Q.   Okay. Why don't we stop here;
3         MR. STEVENS: Okay. It's one o'clock.
4    (Whereupon a lunch break was taken at
5         12:12 p.m. Proceedings resumed at 1:10 p.m.)
6    Q.   (By Mr. Flanders) Going back to Exhibit 28,
7    which is the 1994 GZA study that was prepared for
8    Monsanto with regard to the Gateway site, there is a
9    Table 3 that's right after the summary of historical site
10   products that we're looking at that I'd like to draw your
11   attention to. That is a document entitled Spill and
12   Incident Summary. Can you tell us what you understand
13   this to represent?
14   A.   Again, besides the clear meaning of the title
15   Spill and Incident Summary, I note from a footnote, "This
16   list was developed from a review of the Everett spills
17   file at the DEP office in Woburn and DEP Spills Database
18   updated through 4/1/94."
19        I also note one of the columns being date, the
20   earliest apparent date in that column being a 1983 entry.
21   With that one exception all the others would postdate the
22   sale of the Mystic site to Boston Edison. So the
23   remainder of this must concern only the Gateway Center
24   property as we describe it.
25   Q.   Okay. Are these spills and incidents that

Page 122

1    tabulating information about any spills over there. In
2    fact, even that 1983 entry I'll take to be related to the
3    Gateway Center site because of the discontinuation of
4    operations at the Mystic site long before the sale to
5    Boston Edison.
6    Q.   Okay. Where to your knowledge, though, were
7    there spills and incidents of releases of contaminants at
8    the Mystic site as well over the course of then
9    Monsanto's operation of it?
10        MR. STEVENS: Objection. Asked and
11   answered, but go ahead.
12   A.   My earlier testimony, I believe, indicated an
13   occasional small leak, spill, release, whatever term you
14   choose, of sulfuric acid on the Mystic site, as we're now
15   calling it, which were addressed at the time they
16   occurred by neutralization with soda ash. No other
17   episodic spills such as tabulated in this Table 3.
18   Q.   Okay. Were any of the releases of contaminants
19   at the Gateway site – did they have any possible
20   ramifications for the Mystic site?
21   A.   None of this information indicates that would
22   be the case, no.
23   Q.   Again, apart from whether this information
24   indicates it, to your knowledge, were any of the
25   contaminated materials that were found on the Gateway

Page 124

1    occurred historically at the Gateway site?
2    A.   That's my understanding in reading this table,
3    yes.
4    Q.   And do you know how this was compiled?
5    A.   Again, per the footnote I take it GZA is the
6    consultant's review of those files and database noted
7    there.
8    Q.   Okay. What do you understand a spill or an
9    incident to be?
10   A.   A spill would be an unintentional release of
11   material. Incident – likewise, I don't see anything
12   that would distinguish between the two necessarily. Just
13   seem to be synonymous terms in this instance.
14   Q.   But you understand it to refer to releases of
15   various kinds of materials into the site?
16   A.   Into the Gateway Center site, yes.
17   Q.   And would these materials be contaminants?
18   A.   Yes.
19   Q.   And would all of these incidents relate solely
20   to the Gateway site?
21   A.   The only possible exception and, therefore, I
22   presume it not to be an exception, would be the one
23   entry. The second line dated 4-10-83, since all the
24   other dates postdate the sale of what we're referring to
25   as the Mystic site to Boston Edison, and we wouldn't be

Page 123

1    site, which you participated in the remediation – did
2    any of those have any effect to your knowledge on the
3    Mystic site?
4    A.   No.
5    Q.   Was there any study done to see whether there
6    was any leaching or other migration of contaminated
7    materials from the Gateway site to the Mystic site?
8    A.   Not as you describe in your question, no.
9    Q.   So you don't know whether that may have
10   occurred?
11   A.   The numerous studies that were done with
12   respect to the Gateway Center site addressed groundwater.
13   For example, I think you mentioned groundwater,
14   hydrogeologic surveys as I mentioned earlier, and they
15   established directions of groundwater flow; and direction
16   of groundwater flow was such that there would not be, to
17   my recollection, migration from the Gateway Center site
18   to the Mystic site, but rather directly to the rivers,
19   not across the property division between the two sites
20   we're discussing today.
21   Q.   When you say to the rivers, the rivers do run
22   across and abut the Mystic site, don't they?
23   A.   Yes.
24   Q.   So to the extent the rivers are contaminated,
25   that could affect the Mystic site?

Page 125

32 (Pages 122 to 125)

Deposition of Gerard Rinaldi / September 8, 2005

**Page 126**

1    A.   I've not made any statement as to the
2  contamination of the rivers, however, so --
3    Q.   Well, but I'm just saying -- my question was,
4  was there any known migration of any contaminant material
5  from the Gateway site to the Mystic site. And one way it
6  could get there would be through the river; right?
7    A.   I would not agree with that characterization.
8    Q.   Material can't be dumped into a river and then
9  pollute a site downstream from the river?
10   A.   It's possible.
11        MR. STEVENS:  The witness is not here to
12  give expert opinions on transport of contaminants. He's
13  here to talk about the knowledge of Monsanto and
14  Pharmacia.
15   Q.   (By Mr. Flanders)  Do you have any knowledge
16  through your position here of any such contamination at
17  the Mystic site that originated from contamination at the
18  Gateway site?
19   A.   No.
20   Q.   Was any study done to ascertain whether any
21  such contamination occurred?
22        MR. STEVENS:  Other than what he's
23  testified to?
24        MR. FLANDERS:  Yeah.
25   A.   No.

**Page 127**

1    Q.   (By Mr. Flanders)  I see on this Table 3 that
2  we've been looking at that there was an oil/water
3  separator-caused sheen along the Mystic River. You see
4  that?
5    A.   Yes.
6    Q.   Did the Mystic River run along both of the
7  sites?
8    A.   Yes.
9    Q.   So it abutted -- the Mystic River abutted both
10  the Gateway site and the Mystic site?
11   A.   Yes.
12   Q.   And did the river flow one way or the other?
13   A.   As of -- I'm referring to Exhibit 13, one of
14  the drawings, just to remind myself of the location of
15  the Amelia Earhart Dam with respect to the two sites.
16  The river would flow in a south-southeasterly direction,
17  but its flow since the installation of that dam in the
18  1960s was controlled by the operation of that dam.
19   Q.   Okay. And where was the dam? If you could
20  show that to me relative to the sites we're talking
21  about.
22   A.   Here's the dam.
23   Q.   The dam is on the far left --
24   A.   It's on --
25   Q.   -- of the map?

**Page 128**

1    A.   Yes. And it abuts to the south, the Gateway
2  Center site, the Mystic site, not being detailed on this
3  drawing, but being to the east and downstream of the dam.
4  The Mystic site being here.
5    Q.   Where was the river flowing?
6    A.   This way.
7    Q.   So the river --
8    A.   River flows, as I said, south-southeast.
9    Q.   It would flow --
10   A.   From the Gateway Center toward the Mystic site,
11  in that sense.
12   Q.   But there's a dam?
13   A.   As controlled by the dam.
14   Q.   And in what way does the dam control the flow
15  of the river? Does it totally block it or does it simply
16  limit the flow in some way?
17   A.   I'm not familiar with the details of the
18  operation of the dam.
19   Q.   Uh-huh. Does it filter in any way, to your
20  knowledge, the river?
21   A.   I'm not familiar with how it affects the river
22  and its flow.
23   Q.   So, for example, if there was a sheen caused by
24  a spill or incident along the Mystic River as it abuts
25  the Gateway site, and as it flowed -- then flowed towards

**Page 129**

1  the Mystic site, would the dam eliminate the sheen?
2        MR. STEVENS:  Objection. You are asking
3  for an expert opinion. You're asking him to form an
4  opinion. He's not here to do that. He's here to testify
5  as to information available to Monsanto and Pharmacia as
6  to designated subjects.
7    Q.   Okay. Do you have any knowledge of whether
8  this same sort of description of a spill might have
9  affected the Mystic River as it borders the Mystic site?
10        MR. STEVENS:  Object. You should not
11  speculate as to what might have happened. You may
12  testify as to what you know as to whether something did
13  happen. You can answer that.
14   A.   I don't have any information about releases to
15  the Mystic River abutting the Mystic site.
16   Q.   Other than the releases at the Mystic site that
17  you've already told us about, do you have any other
18  knowledge about releases at the Mystic site or spills of
19  contaminated material?
20   A.   No.
21   Q.   Is there a so-called bulkhead area on the
22  Mystic site, or was there?
23   A.   Yes. I've seen reference to a bulkhead on
24  drawings.
25   Q.   And where was that, just descriptively,

33 (Pages 126 to 129)

Deposition of Gerard Rinaldi / September 8, 2005

1   without—
2      A.   It would be at the southern limit of the Mystic
3   site abutting the water.
4      Q.   Is this the area where barges and boats would
5   load and offload?
6      A.   It would be in the vicinity of the shore.
7   Whether at or near that bulkhead, I don't have more
8   detailed knowledge than that.
9      Q.   And what was the — what sort of operations
10  were conducted in that area?
11     A.   As we discussed earlier, the offloading from
12  the ships. I think that might have been in exhibits 29a
13  through f that I was referring to that it talked about
14  incoming raw materials being offloaded from ships.
15  Storage on the Mystic site land immediately adjacent. I
16  think I made reference to storage piles of sulfur and/or
17  pyrite ores earlier.
18     Q.   And were any of those materials, to your
19  knowledge, that were offloaded and stored there used on
20  the Gateway project?
21     A.   None of the information I have indicates that
22  they would have been, no.
23     Q.   Do you know of any material that was offloaded
24  at the bulkhead area that would have been used at the
25  Gateway site?

Page 130

1      A.   I don't have any information that that would
2   have been the case, no.
3      Q.   So you just don't know one way or the other?
4      A.   I guess I would say I — none of the
5   information I have tells me that materials were offloaded
6   from waterborne transportation at the Mystic site for use
7   on the Gateway Center. No information I have suggests
8   that to me.
9      Q.   Going back to the waste that we were talking
10  about before we broke for lunch, were any types of
11  treatment employed with respect to any of the wastes that
12  were generated at the Mystic site?
13     A.   The example that comes immediately to mind,
14  again, as I've made reference to small leaks of sulfuric
15  acid which were neutralized by applying soda ash. I
16  would categorize that as, quote unquote, treatment.
17     Q.   Other than that are there any other treatments
18  to any of the waste materials?
19     A.   In reference to this Perkins Jordan study,
20  Exhibit No. 9, with respect to the alum process and the
21  wastes from that, it describes insoluble metal sulfates
22  were filtered out prior to crystallization and disposed
23  of into the river. That filtration, I guess, would fall
24  under the category of treatment. That's the only other
25  example that I'm prompted by reference to this document.

Page 131

1      Q.   You indicated they were disposed of into the
2   river. Is that the Mystic River?
3      A.   Yes.
4      Q.   Were there other wastes or byproducts of waste
5   treatment that were disposed of into the river at the
6   Mystic site?
7      A.   Again, from the same document, Exhibit No. 9,
8   and as I think I indicated earlier, from the alcohol
9   production process there's a reference to waste from that
10  being sewered to the river, quote unquote. That's the
11  only other example in reference to the river in this
12  document, in this section that I see.
13       Oh, pardon me, one last — with respect to
14  ferric salts and wastes, again, similar to the
15  description for alum, I believe it was, insolubles were
16  filtered from product and discharged to river, under the
17  description of waste for ferric salts. I don't have
18  knowledge of the details of that handling beyond what I
19  read in this document, however.
20     Q.   So is it the case that there were sewers, sewer
21  pipes or sewer ducts that existed at the Mystic site that
22  discharged into the river?
23     A.   That would be my inference from reading this
24  Exhibit 9.
25     Q.   Other than the materials and processes that

Page 132

1   you've already talked about, were there any others — any
2   other wastes or other materials that were discharged into
3   the river that you know of, either through the sewers or
4   directly?
5      A.   No other information that I have or that I'm
6   aware of indicates such.
7      Q.   Were there any permits or government
8   notifications in connection with any of the treatments
9   that you referenced?
10     A.   I don't know.
11     Q.   Was there any government correspondence or
12  regulatory oversight of any kind of any of this treatment
13  activity at the Mystic site?
14     A.   I don't recall seeing any such references or
15  having any knowledge of such myself. Again, for the
16  Mystic site.
17     Q.   Was there any correspondence from the
18  government indicating that they believed there were any
19  hazardous wastes disposed of at the Mystic site?
20     A.   Let me look at one document — one document
21  that's responsive to that question, I believe. They have
22  been mentioned previously. This is stamped 00009583 and
23  EVE 1630674. It's a letter from the Massachusetts
24  Department of Environmental Quality Engineering dated
25  June 26th, 1985 to Boston Edison Company. Written in

Page 133

34 (Pages 130 to 133)

Deposition of Gerard Rinaldi / September 8, 2005

1   regard to the property in Everett which Boston Edison
2   purchased from Monsanto Industrial Chemical Company in
3   1983, quoting the document. Going on to quote, "The
4   department has reason to believe that chemical plant
5   operations in the area since the late 1800s has resulted
6   in environmental conditions today—" That would be 1985.
7   "—which may be considered a release subject to 21(E)."
8   It goes on to say, "It is our understanding that Boston
9   Edison conducted a site assessment of the property before
10  purchasing it. At this time the department requests a
11  copy of the site assessment report in order to better
12  evaluate the environmental conditions in the Monsanto
13  area."
14        I'll give you this document and just add that
15  it's my understanding that the document that the
16  government was requesting was what we were referring to
17  here today as Exhibit 9, the Perkins Jordan study.
18  Q.   Okay. If we could mark this June 26th, 1985
19  letter that Mr. Rinaldi has been describing as the next
20  exhibit, please.
21             (Plaintiff's Exhibit No. 30
22             marked for identification.)
23  Q.   (By Mr. Flanders) Now this, of course, was
24  written at a time after then-Monsanto had transferred
25  title to Boston Edison?

Page 134

1   Louis.) There's reference to low pH in groundwater on
2   pages 3 and 4. Will (anonymously) obtain a copy of the
3   1-18-96 'RNF' noted on Page 1 for more detail. Our
4   strategy on this is to let O'Donnell deal with Boston
5   Edison and we'll keep 'hands off' until Boston Edison
6   contacts us. Let me know if you feel otherwise." Signed
7   Jerry.
8   Q.   And who is – Jerry is you?
9   A.   Yes.
10  Q.   I'm sorry. Who was Mike Foresman?
11  A.   He was my supervisor at the time.
12  Q.   Who did Foresman work for at the time?
13  A.   Then-Monsanto Company, now known as Pharmacia.
14  Q.   So this was a memo from you as a Monsanto
15  employee to another Monsanto – your supervisor or boss?
16  A.   Yes.
17  Q.   How did you get ahold of this document? Was
18  this a document that was sent to you?
19  A.   As described in the handwritten note I just
20  read, Mary O'Donnell, the recipient of the letter dated
21  February 22nd, 1996 from DEP provided it to Rosen, who
22  was Cliff Rosen, the developer or proposed developer of
23  the Gateway Center site. In turn to Marcia, who was
24  Marcia McCleary, who was one of the people working with
25  me at the time with respect to the Gateway Center site

Page 136

1   A.   Yes.
2   Q.   Do you know whatever became of the inquiry that
3   this letter refers to?
4   A.   Unfortunately, I do not have information on
5   that.
6   Q.   Okay.
7             (Plaintiff's Exhibit No. 31
8             marked for identification.)
9   Q.   (By Mr. Flanders) I'm giving you a
10  four-page – five-page document, the first page of which
11  is marked MONS 000691 through 695. Ask you if you can
12  identify that document and its attachment.
13  A.   The first page is a handwritten note by myself
14  dated March 4th, 1996. And the subsequent pages – the
15  last four pages are a document which I know to be among
16  those I have with me and I think were provided to you as
17  one of the earlier exhibits today, the February 22nd,
18  1996 letter from Massachusetts Department of
19  Environmental Protection to Mary O'Donnell providing
20  notice of responsibility with respect to the site we are
21  referring to today as the Mystic site.
22  Q.   Okay. Would you read into the record what your
23  handwritten note says.
24  A.   "To: Mike Foresman. FYI re Everett. We
25  received this 3-1, (O'Donnell to Rosen to Marcia to St.

Page 135

1   investigation and remediation, and Marcia in turn
2   provided it to me. Or it says to St. Louis. I take that
3   to mean me. I was in St. Louis at the time.
4   Q.   Now, there's a reference in your note to
5   something about low pH. What does that refer to? What
6   is low pH in the groundwater?
7   A.   I'm quoting in my handwritten note from Page 3
8   of DEP's letter to Mary O'Donnell – let me see. Pardon
9   me. It says, "An immediate assessment is necessary at
10  the subject site to respond to the low pH level in the
11  groundwater."
12        And on page 4, again, per my handwritten note,
13  but page 4 of the DEP letter, "You" meaning O'Donnell,
14  "should respond to the department regarding your
15  investigatory response actions relative to the low pH
16  level in the groundwater."
17        So my note is referencing both of those quotes
18  in the DEP letter to O'Donnell.
19  Q.   Now, at any time when then-Monsanto owned the
20  Mystic site was there a low pH in the groundwater
21  condition present at that site?
22  A.   I think I'd like to refer back to the Dames &
23  Moore studies to see if that was identified.
24  Q.   Sure. While you're doing that, is low pH in
25  the groundwater a type of contamination?

Page 137

35 (Pages 134 to 137)

Deposition of Gerard Rinaldi / September 8, 2005

1    A.   It could be characterized as such, yes.
2    Q.   Is that, you know, why the Massachusetts
3 environmental authorities are writing to Mary O'Donnell
4 about it?
5    A.   Yes. And that they are asking for her
6 investigatory response actions relative to the low pH
7 level.
8    Q.   Why is low pH in the groundwater a concern as
9 far as contamination goes?
10    MR. STEVENS:   Objection. You're not —
11 well, answer that.
12    A.   Depending on the intended use of groundwater,
13 low pH might preclude such use.
14    Q.   Why? Is that a bad thing in and of itself?
15 What is it about low pH that makes it a type of
16 contamination? And what is pH? Is that acidic quality
17 of the water?
18    A.   It's the indication of a hydrogen-iron
19 concentration in water. It indicates whether the water
20 is neutral, basic or caustic on one end or acidic on the
21 other end.
22    Q.   And if it has low pH is it neutral, caustic or
23 acidic?
24    A.   Acidic.
25    Q.   So it's water that has too much acid in it?

Page 138

1    And I don't know without inspection of those documents if
2 the Dames & Moore studies do that beyond the summary that
3 I just was reading from Exhibit 3.
4    Q.   Apart from the Dames & Moore study do you have
5 any knowledge in the capacity that you're testifying here
6 that in fact such a low pH condition existed from the
7 water at the Mystic site when the then-Monsanto owned it?
8    A.   I'm referring — the other study I wanted to
9 reacquaint myself with Exhibit 9, the Perkins Jordan
10 study done for Boston Edison, to see if I found reference
11 in it to pH in groundwater, because I don't recall and I
12 don't see that upon quick inspection. Not that it's not
13 here.
14    Q.   Okay. Is what you know about this subject, the
15 extent you know, have any knowledge about it derived from
16 these studies as opposed to some other source of
17 knowledge?
18    A.   Again, just so I'm clear, the subject being the
19 condition —
20    Q.   The existence of pH at the site — low pH
21 condition.
22    A.   My knowledge would also include the consulting
23 engineering services reports done for Mary O'Donnell in
24 the 1995 -96 time frame, which are part of the exhibits
25 from today. I don't recall what they say, but they must

Page 140

1    A.   It's the acid side of neutral, yes.
2    Q.   And at a certain point if it's low enough it's
3 a potential concern from a contamination standpoint?
4    A.   Yes.
5    Q.   Because it has a negative effect on the water
6 quality?
7    A.   Yes.
8    Q.   And limits the uses that can be made of the
9 water?
10    A.   Yes.
11    Q.   So, again, I'm sorry, I interrupted you when
12 you were looking in response to my question, which was,
13 at any time that then-Monsanto owned the property, was
14 this low pH condition present at the Mystic site?
15    A.   The Exhibit No. 3, internal memo from Bob
16 Cummings dated July 21st, 1980 concerning sale of
17 Monsanto land which I referred to earlier, has some
18 relevant summary statements. It speaks to the
19 hydrogeologic survey by Dames & Moore, which we've also
20 spoken of, and indicates analysis of water samples
21 indicate the absence of organic materials known to be
22 used in plant operations and the presence of sulfates
23 reflecting the sulfuric acid operation.
24    Doesn't speak specifically to the question of
25 pH. It's what I was looking for, if it did or did not.

Page 139

1 speak to this subject because I believe they are what
2 this exhibit we're now referring to, Exhibit 31 from
3 Department of Environmental Protection, is in response
4 to.
5    Q.   Right. But does that address the question of
6 whether this condition existed when then-Monsanto owned
7 the Mystic site?
8    A.   No, it would not.
9    Q.   So, I mean, what do you know about that issue
10 other than whatever you may have read in one of these
11 reports that you briefly looked at on this occasion? I
12 don't mean you didn't just briefly look at it earlier.
13    A.   None of the information that I can recall
14 speaks to the question of pH in groundwater at the Mystic
15 site during the period of ownership by then-Monsanto.
16    Q.   Do you have any knowledge as to what causes
17 that condition?
18    A.   Yes. And what I have on that is a reference
19 from the Perkins Jordan study from 1982. That's Exhibit
20 9, page 25, specifically stamped MCO 6016086. This
21 speaks to what I alluded to earlier as to possible
22 leaching from the sulfur storage piles on the site, and
23 I'll read one paragraph.
24    "The oxidation of the sulfur in a moist
25 environment can produce sulfurous acid which may be

Page 141

Deposition of Gerard Rinaldi / September 8, 2005

1    oxidized to sulfuric acid. The presence of these acids
2    may influence the soil and groundwater pH and
3    consequently increase the dilution rate of metals from
4    soil and waste. However, the anticipated low rate of
5    sulfur oxidation is not expected to result in release of
6    significant levels of metals from the site."
7        Q.    So if I'm hearing that correctly, it's caused,
8    at least as you've described it there, from releases from
9    material that was stored at the Mystic site?
10       A.    That's a possible explanation as described by
11   Perkins Jordan here, yes.
12       Q.    And what was that material that was stored at
13   the Mystic site?
14       A.    Sulfur.
15       Q.    Was that stored when then-Monsanto owned it?
16       A.    Yes.
17       Q.    Throughout the time that Monsanto owned it?
18   Again, for the period you're here to testify about.
19       A.    Much of it. I don't remember the overall
20   duration, but sulfuric acid manufacture was a principal
21   operation on that site.
22       Q.    To your knowledge was there anything done when
23   then-Monsanto owned it to counter the leaching of that
24   material into the groundwater?
25       A.    None of the information that I have speaks to

Page 142

1    Services and Rizzo Associates, et cetera.
2        Q.    But other than that you're not aware of it?
3        A.    And I should mention the Dames & Moore studies
4    earlier by Monsanto for completeness. But no, no, I'm
5    not.
6        Q.    How was storm water collected and disposed of
7    at the Mystic site?
8        A.    I don't recall having been asked to prepare
9    myself to discuss that particular question.
10       Q.    Okay. So you're not aware of any permits or
11   any practices that may have occurred with respect to
12   storm water at the Mystic site?
13       A.    With respect to permits, repeating my answer
14   from just a moment ago, no. I'm not aware there were
15   ever any such specific to the Mystic site.
16           With regard to practices I may have information
17   about that, but I don't have anything in my memory that I
18   can immediately reply.
19       Q.    To your knowledge, did -- was storm water
20   runoff responsible for any contamination that was found
21   at the Gateway site?
22       A.    I don't recall that any contamination was
23   attributed to storm water runoff per se.
24       Q.    Was there ever any consideration given by
25   then-Monsanto to conducting the kind of comprehensive

Page 144

1    any such measures.
2        Q.    I want to ask you about waste disposal permits.
3    Were there any waste disposal permits that then-Monsanto
4    obtained or possessed with respect to the Mystic site?
5        A.    I'm not immediately aware of any such. Nor am
6    I aware of there having been a requirement as of that
7    time to having gotten such.
8        Q.    That may be so. I'm just asking if you're
9    aware of any. No NPDES or other discharge permits that
10   you're aware of?
11       A.    I'm not aware of any such specifics to the
12   Mystic site.
13       Q.    To your knowledge has there been any state or
14   federal government sampling or inspection of any -- of
15   the waste disposal that occurred at the Mystic site?
16       A.    State or federal government sampling was your
17   question?
18       Q.    Yes.
19       A.    No, not to my knowledge.
20       Q.    Do you know of any records relating to any
21   analyses of any waste discharges from the facility, or
22   other discharges?
23       A.    Not other than those we've been discussing
24   today, if they in fact fit that classification, the
25   studies by Perkins Jordan and Consulting Engineering

Page 143

1    site assessment that took place at the Gateway parcel, at
2    the Mystic parcel?
3            MR. STEVENS:  Objection. Asked and
4    answered.
5        A.    As I indicated earlier, that was not the case.
6    Different time, different regulatory requirements, I
7    think, being one of the reasons for such.
8        Q.    (By Mr. Flanders)  Did then-Monsanto ever
9    estimate the potential costs for doing such an
10   assessment?
11       A.    I don't think that's applicable or relevant
12   because I think I've testified that they didn't consider
13   doing such an assessment, so by extension they wouldn't
14   consider evaluating the cost of it. So ...
15       Q.    They might have considered the cost and said
16   forget it. Did they ever estimate, to your knowledge,
17   what it might cost to remediate the property from the
18   contamination that you indicated existed there?
19       A.    I recall having seen a document in the course
20   of my preparation for today, without being able to now
21   identify specifically which document or where it is,
22   about removal of residual sulfur that may have remained
23   on the site and costs associated with that. I don't
24   remember beyond that the cost or in what document I saw
25   such.

Page 145

37 (Pages 142 to 145)

Deposition of Gerard Rinaldi / September 8, 2005

1    Q.   Could you just take a moment to take a look at
2  that just briefly?
3    A.   I was looking to see if in these binders there
4  was a tab specific to notice of deposition item number
5  ten about response, removal remediation or other cleanup
6  activities specific to the Mystic site wherein I might
7  find such a document and there is no tab with that number
8  indicated on it. So it may not have been in these
9  binders I have today. It might have been something I saw
10  during my review of those 100-plus boxes I mentioned
11  earlier, too.
12    Q.   Okay. Did then-Monsanto collect any soil or
13  groundwater samples from the site -- the Mystic site?
14    A.   Yes.
15    Q.   What were the results of those?
16    A.   I again return to Exhibit No. 3, which is Mr.
17  Cummings' internal memo of July 21, 1982 -- 1980, excuse
18  me, which postdated the Dames & Moore studies. I just
19  indicated a little while ago about what the analysis of
20  water samples indicated. There's reference to --
21    Q.   Is that the low pH reference?
22    A.   No, it did not have any indication of low pH.
23  It said that "Analysis indicated the absence of organic
24  material known to be used in plant operations and the
25  presence of sulfates reflecting the sulfuric acid

                                              Page 146

1  operation." The other thing I --
2    Q.   Isn't that the same characteristic, though,
3  that would occur if in fact there was low pH?
4    A.   The latter, the presence of sulfates, those two
5  are potentially interrelated.
6    Q.   As I understood your answer earlier, the
7  leaching of sulfates into the groundwater is one of the
8  causes for low pH?
9    A.   The leaching of sulfur in oxidation to produce
10  acids which would then produce sulfates, yes.
11       The other thing, again, about Monsanto --
12  here's a letter from Monsanto to Boston Edison from
13  January of 1982, which again summarized their knowledge,
14  and I wanted you to see what it said. This is Exhibit
15  No. 8. As I may have quoted before, "We recently
16  conducted a cursory soil survey of the tract. Where
17  visual observation showed anything unusual, samples were
18  taken. Results are shown in attachments."
19    Q.   Are the attachments there?
20    A.   Yes, they are.
21    Q.   Do those results indicate the presence of any
22  contaminants in the soil or water samples that were
23  taken?
24    A.   The attachment is limited to soil and it's
25  qualitative in that, as the memo indicates, it describes

                                              Page 147

1  only visual observations of East Side survey holes,
2  making reference to presence of fill, bricks, concrete or
3  unusual colors, but it doesn't present any analytical
4  information.
5    Q.   In the Dames & Moore investigation isn't there
6  further indication of the presence of contaminants in the
7  soil and groundwater samples that they took?
8    A.   I was going to look at that earlier. I don't
9  think -- I've got to reacquaint myself with it, the last
10  of the Dames & Moore studies from February 1982, Exhibit
11  No. 7 for today. Just from its cover letter I note in
12  the summary statement, "Comparisons of groundwater
13  quality between October 1979 and November 1980 reflect
14  little variation in concentration levels." Goes on to
15  say, "The proximity of marine water adjacent to the
16  property and the nature of local subsurface geologic
17  conditions do not facilitate any significant groundwater
18  usage at this site."
19       What it may say further with respect to
20  analyses and so forth, I just have to review the rest of
21  the document and the earlier ones. I don't see any
22  summary beyond what I just read to you.
23    Q.   Were there -- did they find high concentrations
24  of so-called phthalates, if I'm pronouncing that right?
25    A.   In that document, Table 4, Concentration of

                                              Page 148

1  Dissolved Organic Compounds in Groundwater on October
2  19th, 1979, the page stamped MCO 6290733, two groundwater
3  wells were analyzed for a number of constituents
4  including several phthalates -- one, two, three, four
5  different phthalates, all of which were not detected, as
6  is also summarized in the document on its page 9 stamped
7  number MCO 6290725. "None of the 12 organic compounds
8  for which the groundwater samples were analyzed (table
9  4)," which I was just reading from, "were detected in the
10  groundwater collected from the eastern property."
11    Q.   Do you have a Dames & Moore January 8, 1980
12  report there?
13    A.   I have one dated January 1980. It's our
14  Exhibit 5 for the day.
15    Q.   Okay. Is there a reference in there to
16  phthalate concentrations on the subject parcel, so-called
17  MW7?
18    A.   I find on page 14 of that Exhibit 5, stamp
19  number EVE 1626630 -- well, MW7 contains all five of the
20  compounds. I'm not sure what those are without reading
21  back. "And has the highest average total of detected
22  phthalates of the groundwater samples." And it refers to
23  plate 7. So, yes, that must be what you're referring to.
24    Q.   Were those contaminants found to exist on the
25  Mystic site?

                                              Page 149

Deposition of Gerard Rinaldi / September 8, 2005

1    A.   I'm looking at the drawings, including the --
2    no. I thought the one that was just referred to, the
3    plate 7 -- unfortunately, the quality is such that I
4    can't identify the location of well MW7, if it's on the
5    Mystic side or Gateway Center side of the site.
6    Q.   Well, isn't that study solely limited to the
7    Mystic site?
8    A.   No, it is not. It's concerning the entire
9    property.
10   Q. · Okay. So --
11   A.   Both properties.
12   Q.   So you don't know where the MW7 --
13   A.   I was looking for something in this document
14   that would tell me that, but -- there's a reference to
15   well number MW7 as well as MW1 and 2 being near the river
16   · in the text from the page I was just reading a moment
17   ago. But that still doesn't allow me to identify if it's
18   on what we're referring to today as the Gateway site or
19   the Mystic site.
20   Q.   And what sort of operations produce those high
21   phthalate concentrations?
22   A.   I'm sorry, what high phthalate concentrations?
23   Q.   What type of operations by Monsanto would
24   produce those high phthalate concentrations?
25           MR. STEVENS: Which high phthalate

Page 150

1    within what we're referring to today as the Mystic site,
2    but somewhere within the Gateway site. I just could not ·
3    determine that from the quality of the drawings, and so
4    forth.
5    Q.   Okay. All right. At the time that Boston
6    Edison was doing this inspection work with respect to the
7    Mystic site, was then-Monsanto aware of that work as it
8    was being undertaken?
9    A.   I feel certain they would because it was still
10   Monsanto property, and Boston Edison would have had to
11   obtain then-Monsanto Company permission to access its
12   site in order to conduct those activities.
13   Q.   Okay. Did that have any impact, to your
14   knowledge, on any decisions that then-Monsanto made with
15   · respect to the Mystic site?
16   A.   I'm sorry, "did that" meaning ...
17   Q.   The investigatory work that you just said that
18   you felt comfortable concluding Monsanto was aware that
19   Boston Edison was doing. My question was, did that have
20   any impact on any of the decisions that Monsanto was
21   making with respect to the Mystic site?
22   A.   I would say no. And I say that because we
23   were -- then-Monsanto -- in discussion with Boston Edison
24   about selling the property to them, which we ultimately
25   concluded, so that's why I would say no.

Page 152

1    concentrations, he asked you?
2           MR. FLANDERS: I thought he just told us
3    that the report documented that there were high phthalate
4    concentrations.
5           MR. STEVENS: Higher than something else.
6    Not objectively high.
7    A.   And without knowing the location of the well
8    where they were detected I can't associate them with an
9    operation. Obviously it has something to do with
10   phthalates, which were a product of the site, but without
11   knowing the location of that well, I can't draw a
12   connection.
13   Q.   But phthalates were one of the properties that
14   were being manufactured there, correct?
15           MR. STEVENS: Where is there?
16   Q.   (By Mr. Flanders) At the site -- at the Mystic
17   site.
18   A.   Oh, no. No.
19   Q.   I'm sorry?
20   A.   At the Gateway site.
21   Q.   They weren't being manufactured at the Mystic
22   site?
23   A.   Never.
24   Q.   Okay.
25   A.   Never. And that's why I suspect MW7 is not

Page 151

1    Q. ·  During the period for which you've been asked
2    to prepare today, did then-Monsanto have a policy of
3    documenting spills and releases and reporting them to any
4    government agencies?
5    A.   To the extent any such reporting would be
6    required by law, my recollection was that we,
7    then-Monsanto, would have done so, yes.
8    Q.   Okay. With respect to the Mystic site who
9    would have had that responsibility?
10   A.   Again, Mystic not being distinguished from
11   Gateway Center for such purposes, site environmental
12   supervisor and/or plant manager would have been
13   responsible for making required reporting to government
14   agencies.
15   Q.   Uh-huh. Do you know of any known releases at
16   the Gateway and Mystic site at the Everett plant that
17   were not documented or reported to be the appropriate
18   regulatory agency?
19           MR. STEVENS: Assuming by your question
20   that there was a required reporting -- reporting
21   requirement that was not met?
22           MR. FLANDERS: Right.
23           MR. STEVENS: Okay.
24   A.   No.
25   Q.   (By Mr. Flanders) To your knowledge, what were

Page 153

39 (Pages 150 to 153)

Deposition of Gerard Rinaldi / September 8, 2005

1  the various mechanisms or means by which releases and
2  spills occurred at the site?
3          MR. STEVENS: Which site?
4          MR. FLANDERS: The Mystic site.
5          MR. STEVENS: Objection. Asked and
6  answered.
7      A.  The only information I have about spills at the
8  Mystic site are instances of leaks of sulfuric acid which
9  were addressed by neutralization. I don't have
10 information as to what the specific source of those leaks
11 were, only that they were small, less-than-a-bucket kind
12 of things.
13     Q.  (By Mr. Flanders) But you don't know how they
14 occurred?
15     A.  No, I don't have that information.
16     Q.  Do you know how many of them there were?
17     A.  No, I don't.
18     Q.  Do you know whether there was more than one?
19     A.  The information from the former employee was in
20 the plural, so yes, I would say yes.
21     Q.  Was it your understanding that this happened
22 from time to time?
23     A.  In that it happened more than once, yes.
24     Q.  Is it your understanding that it happened
25 regularly?

Page 154

1  river and so forth. I take it you were not referring to
2  those when I asked you about intentional waste disposal?
3      A.  I was excluding those, I guess, yes.
4      Q.  That was happening intentionally, wasn't it?
5      A.  That would be my understanding from I guess
6  what I was reading on that from Exhibit 9, the Perkins
7  Jordan study, which referred to things being sewered to
8  the river. That sewering to the river would be
9  intentional, yes.
10     Q.  But you're unaware of any disposal of drums of
11 material on the Mystic site when then-Monsanto owned it?
12     A.  That's my knowledge. I'm not aware of drum
13 disposal on that portion of the property, the Mystic
14 side.
15     Q.  Were there any consent orders that Monsanto
16 then got into with either respect to the Gateway or
17 Mystic site?
18     A.  During what period of time? Maybe for either,
19 if we can break the questions down, they will be easier.
20     Q.  Again, from the period that you were prepared
21 to testify to, from 1943 —
22     A.  To '83?
23     Q.  Yeah.
24     A.  There may have been, but I don't recall
25 specific. I know there were some subsequent to 1983, I

Page 156

1  A.  The information I have doesn't suggest that.
2  Q.  Do you have any knowledge as to whether any of
3  those releases were reported then to any governmental
4  authority?
5      A.  No, I don't. They — I don't have any
6  information that they were reported, nor required to be.
7      Q.  Uh-huh. Other than that one kind of release at
8  the Mystic site were there any others that you were aware
9  of that occurred?
10         MR. STEVENS: Objection. Asked and
11 answered.
12     A.  No.
13     Q.  (By Mr. Flanders) Was there any intentional
14 waste disposal that went on there at the Mystic site?
15     A.  No. If I may add, unlike the Gateway Center
16 site, from some of the descriptions I was reading earlier
17 from that one GZA document, which clearly indicates such
18 by comparison.
19     Q.  For example, did you learn of any burial of
20 barrels of material at the Mystic site?
21     A.  No.
22     Q.  Did that happen at the Gateway site?
23     A.  Yes, I believe I have seen reference to that at
24 the north end of the Gateway Center property.
25     Q.  Now, you did testify about discharges into the

Page 155

1  believe, but I don't remember any during that period of
2  time.
3      Q.  Do you remember any penalties that the company
4  had to pay for any consent orders?
5      A.  Not during that period of time, 1943 to 1983, I
6  don't recall any such.
7      Q.  Are you aware of any so-called spill control
8  plans that were prepared for the Mystic or Gateway site?
9      A.  Generally I would expect there to have been
10 such for the sites.
11     Q.  And what do you understand that to be?
12     A.  My general understanding from — again,
13 understanding of regulations about the handling of oil
14 and hazardous materials or substances is that there's a
15 requirement for the preparation of so-called SPCC plans,
16 Spill Prevention Control and Countermeasure plans, to
17 dictate the proper response to spills.
18     Q.  And it's your understanding that such plans
19 were prepared for both sides?
20     A.  There would not be separate plans, remembering
21 this was, as far as then-Monsanto Company was concerned,
22 one site. We had artificially divided it into two for
23 this purpose. It was one site. To the extent there was,
24 for instance, required by law, as I just described by
25 example SPCC plans, I'm certain then-Monsanto Company

Page 157

40 (Pages 154 to 157)

Deposition of Gerard Rinaldi / September 8, 2005

**Page 158**

1 would have had such prepared and adhered to.
2 Q. But do you know of any such that were prepared?
3 A. I don't have a specific copy with me or having
4 seen such. And I must now add that I don't remember when
5 the requirement under the federal regulations for the
6 particular type of plant I've just been describing came
7 into effect -- if it might have followed 1983, for
8 example.
9 Q. Okay. But is it your recollection that such a
10 document was prepared and you just don't know when?
11 A. I'm saying that if such a document was required
12 by regulation in some way applicable to the then-Monsanto
13 site, Monsanto would have prepared such.
14 Q. And this type of document is -- needs to be
15 prepared for what reason?
16 A. In order to properly respond to spills and
17 releases of oil and/or hazardous materials.
18 Q. And were there in fact historically spills and
19 releases at the Everett plant site?
20 A. Yes.
21 Q. That would have prompted the preparation of
22 such a document?
23 A. Yes. If I may?
24 Q. Sure. Absolutely. Please refer to --
25 A. It's been brought to my attention that one of

**Page 159**

1 the documents that's have available to me concerning
2 spills is a document titled Hazardous Spill Prevention
3 and Cleanup Plan last dated January 2nd, 1975, beginning
4 with a stamp number EVE 1644857.
5 Q. Okay. Could you mark that, please?
6 A. And if I may also, I see a September 28th, 1988
7 document procedure E-124 update. Procedure E-124 being
8 the first item I've just referred to.
9 The second document having two stamps, MONS1
10 0002582 and Everett 02533.
11 Q. If we could mark these separately, please, as
12 the next two exhibits.
13 (Plaintiff's Exhibit Nos. 32 and 33
14 marked for identification.)
15 A. Obviously I did not recall those documents nor
16 do I know their contents in detail without review.
17 Q. Okay. But having looked at these -- I'd just
18 ask you to do that and see if that refreshes your
19 recollection as to whether then-Monsanto did in fact
20 prepare one or more so-called spill control plans?
21 A. Yes.
22 Q. Again, having specific documents, one of which
23 is in the 1970s and the other is late 1980s, what caused
24 then-Monsanto to prepare these documents?
25 A. There's no indication of the nexus for the

**Page 160**

1 first -- the 1975 document Exhibit No. 33, other than as
2 we've discussed earlier, Monsanto on its own initiative
3 established policies on various issues concerning the
4 environment.
5 I see in the second item -- Item No. 32 by the
6 exhibit numbers we've assigned today -- a reference that
7 the policy -- the update at that time was reflective
8 of -- and I'm quoting -- "our current understanding of
9 the newly promulgated Massachusetts notification
10 regulations 310 CMR 40.30." So that newly promulgated
11 regulation in part must have precipitated this 1988
12 update to the 1975 document.
13 Q. With respect to the first document that was
14 prepared in the 1970s, Exhibit 33, was that a document
15 that the then-Monsanto was required to prepare or was it
16 a voluntary document, if you know?
17 A. I see no evidence of requirement in the sense
18 of there being no citation of regulation as there was in
19 the other. So it would appear on its face the potential
20 for it to be a voluntary plan.
21 Q. Does that respond to the fact that there were
22 historically up to that point in time the various releases
23 and spills that had occurred at the site?
24 A. Would you repeat that question?
25 (Question read by the reporter.)

**Page 161**

1 A. In the sense that it says its purpose is to
2 prevent the discharge of hazardous chemicals into the
3 river and provide guidelines for cleanup of spills, I
4 would say yes. It also -- I should now add in reading
5 it, in that same purpose section it says, "to define the
6 proper procedure for reporting such a spill to the
7 regulatory authorities," but there's no other reference
8 to which agency or under which regulations. I just now
9 saw that reference to regulatory authorities.
10 Q. Were the releases and spills that had occurred
11 part of the site operations that occurred in that area?
12 MR. STEVENS: What area?
13 MR. FLANDERS: The area that this is
14 responding to, the Mystic site.
15 MR. STEVENS: This isn't talking about --
16 Q. (By Mr. Flanders) I'm sorry, the Everett plant
17 site.
18 A. This would relate to both sites. And if I'm
19 sorry, we're coming to the end of a long day, what was
20 the question again?
21 (Question read by the reporter.)
22 MR. STEVENS: Object.
23 Q. (By Mr. Flanders) Again, referring to both the
24 Mystic and the Gateway sites which at that time were
25 unified?

41 (Pages 158 to 161)

Deposition of Gerard Rinaldi / September 8, 2005

1   A.  I guess it's almost by definition this plan
2  would concern the site operations and, therefore,
3  releases from site operations.
4   Q.  Did then-Monsanto make any changes in the way
5  it handled any of the raw materials or products or
6  storage at the site as a result of these releases and
7  spills that occurred?
8   MR. STEVENS: Objection.
9   A.  With respect to the Mystic site, again, the
10  only releases and spills that occurred were these small
11  sulfuric acid leaks. I don't have any information that
12  those prompted changes in procedures or whatever you just
13  asked about. With respect to the Gateway Center site,
14  that's possible following a spill if there was assessment
15  of what happened and why it happened, what could be done
16  to prevent it from happening again would be a typical
17  part of Monsanto's -- then Monsanto's response.
18   Q.  Were there any sources of releases and spills
19  of contaminants at the Mystic site that were the same as,
20  or similar to, the sources of releases and spills at the
21  Gateway site?
22   MR. STEVENS: Objection.
23   A.  Can't say because, as I've indicated, the only
24  releases I'm aware of at the Mystic site are those small
25  leaks of sulfuric acid. And I earlier testified I didn't

Page 162

1  the Mystic site.
2   Q.  Was there pH in the groundwater at the Gateway
3  site?
4   MR. STEVENS: Objection.
5   Q.  (By Mr. Flanders) Low pH?
6   A.  Yes.
7   Q.  And that's a form of contamination, isn't it?
8   A.  Yes.
9   Q.  And you're saying that you have no knowledge of
10  that form of contamination being found at the Mystic
11  site?
12   A.  No. Other than if it exists in one of these
13  reports which I have not been able to see every table and
14  figure in.
15   Q.  Okay.
16   A.  Pardon me. I do know from the discussion we
17  had just a little while ago about the communication
18  between the Department of Environmental Protection and
19  Mary O'Donnell, that there was low pH in groundwater as
20  of the 1996 time frame. So, yes, there was low pH in
21  groundwater at what we're calling the Mystic site as of
22  1996. That we know.
23   Q.  Okay. But other than that you have no
24  knowledge of it?
25   A.  No.

Page 164

1  know the precise nature of those leaks, so I can't say
2  did the same thing happen on both parts of the property.
3   Q.  Was there contamination of that same kind found
4  at the Gateway site?
5   MR. STEVENS: Objection to the term of
6  contamination. He hasn't described contamination.
7   Q.  (By Mr. Flanders) Wasn't there contamination
8  from the sulfur releases?
9   MR. STEVENS: The sulfuric acid leaks?
10   MR. FLANDERS: Yeah.
11   A.  I don't think I have information that there
12  was, no. I don't believe I've testified to that effect.
13   Q.  (By Mr. Flanders) Okay. Was there any at the
14  Gateway site?
15   MR. STEVENS: From what?
16   Q.  (By Mr. Flanders) From sulfuric acid being
17  released.
18   A.  I'm sorry, was there any --
19   Q.  -- contamination from the release of sulfuric
20  acid at the Gateway site?
21   A.  None of the information I have indicates that.
22  We were talking earlier about whether there was
23  information about the pH in the groundwater, and I may
24  have already forgotten but I don't remember that I was
25  able to locate any information about pH in groundwater at

Page 163

1   Q.  Did Monsanto conduct studies to assess the
2  degree and extent of any river sediment contamination at
3  the Everett plant site?
4   A.  Yes.
5   Q.  When was that done?
6   A.  I'm going to refer for a minute here to Exhibit
7  24 regarding an area referred to as the tidal flats. I
8  note from looking at this that the tidal flats were
9  within the bounds of what we're calling the Gateway
10  Center site for today's discussion. Given that, shall I
11  continue?
12   Q.  What was the year of that?
13   A.  The document that I'm referring to is from 1997
14  and it's describing -- makes reference to an initial risk
15  characterization by GZA in 1994 with respect to these
16  tidal flats.
17   Q.  And the tidal flats are where on the Mystic
18  River?
19   A.  Reading from this document, "The tidal flats
20  sub-area is the tidal mud flats located at the southeast
21  corner of the Monsanto property." My reference to the
22  figure, if I may?
23   Q.  Sure.
24   A.  Figure 2 in Exhibit -- wow, MONS1 0000001.
25  First page. Are located there, as the text said, the

Page 165

42 (Pages 162 to 165)