Deposition of Gerard Rinaldi / September 8, 2005

1  extreme southeast corner of the Gateway Center portion of
2  the property as we described it in. Mystic site being
3  that way to the east. This would be tidal flats
4  southeast corner of the Gateway Center site, as we're
5  describing it today.
6  Q.  That would be on the Mystic River?
7  A.  Yes, it would be on the Mystic River, yes. Not
8  on the Mystic site.
9  Q.  What sort of contaminants were found there?
10  A.  Quoting from the document, "Copper, lead and
11  zinc were most frequently detected in tidal flat
12  sediments at concentrations above background levels. In
13  addition to metals, organic chemicals including phthalate
14  esters, principally BEHP and PCB, were found in
15  sediments."
16  Q.  And was there any determination as to the
17  sources of the contaminants that were found in these
18  tidal flats?
19  A.  The preceding paragraph refers to the placement
20  of fill, including slurried waste from the chemical
21  plant, principally aluminum sulfate, during the 1950s and
22  60s, and also makes reference to an NPDS-permitted
23  outfall. Those discharge activities having been
24  discontinued as of the time of this writing in 1997.
25  Q.  Is that referring to then Monsanto's operations

Page 166

1  A.  I can't immediately respond from a quick review
2  of this document.
3  Q.  (By Mr. Flanders) Other than the operations of
4  then-Monsanto, is there any other source of the
5  contamination of the sediments?
6  MR. STEVENS: Where?
7  Q.  (By Mr. Flanders) At the extreme southeastern
8  portion of the site that we've been talking about on the
9  Mystic River, immediately adjacent to the Mystic site.
10  A.  There is reference in this same document on
11  page 0000009, filling from the railroad bridge embankment
12  east of the island led to the merging of these two
13  features. So there was a filling activity that could
14  have contributed as well.
15  Q.  And who engaged in that filling activity?
16  A.  This document doesn't say and I don't otherwise
17  have knowledge.
18  Q.  And filling is another way of saying that
19  materials were dumped into the site?
20  A.  Placed.
21  Q.  And is the place where the filling occurred,
22  was that owned by then-Monsanto?
23  A.  I'm not aware and I can't determine from this
24  description.
25  Q.  With respect to the contamination that is

Page 168

1  at the site?
2  A.  Yes.
3  MR. STEVENS: At the Gateway site?
4  MR. FLANDERS: Yes.
5  A.  Yes.
6  Q.  (By Mr. Flanders) And this area that was found
7  to be contaminated in the extreme southeastern corner of
8  the Gateway site -- is that right?
9  A.  Yes.
10  Q.  Is that an area that's immediately adjacent to
11  the Mystic site?
12  A.  Yes.
13  Q.  Is there any reason to believe that
14  contamination stopped at the border of the properties?
15  MR. STEVENS: Objection. You're not here
16  to offer expert opinions. Do not testify as to that.
17  Q.  (By Mr. Flanders) Do you know whether that
18  contamination stopped at the border of the property?
19  A.  I guess per advice of counsel I won't answer
20  that.
21  MR. STEVENS: Well, if you know -- if
22  you've seen information in the possession of the
23  company -- possession of the companies, you may answer.
24  You may not form your own opinion as to whether it would
25  or would not.

Page 167

1  recorded in those tidal flat areas, would sediment
2  remediation be possible there?
3  MR. STEVENS: Objection: You're not to
4  offer expert opinions.
5  A.  May I repeat opinion from this document?
6  Q.  Well, let me put it another way.
7  A.  Okay.
8  Q.  You were the remediation manager for a period
9  of time at this property, correct?
10  A.  Yes.
11  Q.  And did your remediation responsibilities
12  extend to the sedimentation that was contaminated as a
13  result of the processes that are referenced in that
14  report?
15  A.  Yes.
16  Q.  And my question to you is, that contaminated
17  sediment, was that -- was that part of your remediation
18  efforts at the site?
19  A.  Yes.
20  Q.  What efforts were made to remediate that?
21  A.  Quoting from the document at page 6 stamped
22  MONS1 0000012, "The licensed site professional for the
23  project has used technical justification, capital T,
24  capital J, in accordance with 310 CMR 40.0193 to conclude
25  that further response actions are not appropriate for the

Page 169

43 (Pages 166 to 169)

Deposition of Gerard Rinaldi / September 8, 2005

1  tidal flats." It goes on to describe, "No remedial
2  response action has been taken at the tidal flats."
3  Q.  Why was that?
4  A.  I can't speak to the requirements of that cited
5  part of the Massachusetts code and the specifics of
6  technical justification. I'm not a licensed site
7  professional.
8  Q.  Okay. But the bottom line is that there was no
9  remediation undertaken with respect to those —
10  A.  There was no remediation, that's correct,
11  because it was not required. This document goes on to
12  describe an enhancement of the wetland habitat by
13  planting of salt marsh grasses, et cetera. That being
14  the only response action.
15  Q.  So whatever contamination existed there as
16  you've described it has not been remediated?
17  A.  Did not require remediation.
18  Q.  Therefore was not remediated?
19  A.  That's correct.
20  Q.  Let's take a very short break if we can.
21  A.  Okay. Thank you.
22      (Whereupon a break was taken at 2:44 p.m.,
23      Proceedings continued at 2:54 p.m.)
24      (Plaintiff's Exhibit No. 34
25      marked for identification.)

Page 170

1  A.  Yes.
2  Q.  Is that the same area we've been discussing,
3  the tidal flat area?
4  A.  Yes.
5  Q.  It says here, "Because of its location and the
6  nature of contamination the tidal flats area poses the
7  most immediate means of exposure to human and aquatic
8  life. The remediation of this area is overdue and its
9  considered by the department as the highest priority
10  among the list of identified areas."
11  Did you — what is your understanding about the
12  nature of the contamination there that caused the
13  department to make these statements?
14  A.  I, quite frankly, can't understand why the
15  department made these statements in light of the
16  subsequent position taken, as we were discussing earlier,
17  by Monsanto Company's licensed site professional no
18  remediation was required. No remediation, therefore, was
19  done and that course of action was accepted by the
20  department as of 1997.
21  Q.  This letter here, which is much earlier as of
22  1989, said that Monsanto had informally suggested that a
23  bioremediation treatment methodology might be a feasible
24  approach to abating contamination in this area." And
25  then — was such a bioremediation treatment methodology

Page 172

1  Q.  (By Mr. Randers) Showing you what's been
2  marked as Exhibit 34, which is a copy of a communication
3  from the Department of Environmental Quality of
4  Massachusetts to Monsanto dated May 4th, 1989, have you
5  looked at this document before now?
6  A.  Possibly, but I can't say for certain. I've
7  seen a lot of documents from the state to Monsanto.
8  Q.  Okay. There's reference here to a meeting that
9  was held between Monsanto GZA personnel and governmental
10  personnel to discuss the scheduling of necessary remedial
11  investigations and actions to be performed at the
12  Monsanto Everett facility. Now, at this time is this
13  referring solely to the Gateway facility — Gateway site,
14  1989?
15  A.  That would be my expectation because of the
16  date. That's the only property Monsanto then owned —
17  then Monsanto.
18  Q.  There is a reference in the bottom paragraph
19  saying, "Additionally, the abutting Boston Edison
20  property formerly owned by Monsanto Chemical Company will
21  require further environmental investigations."
22  A.  I see that.
23  Q.  And then on page 2 there is a reference in the
24  second paragraph to these — to the tidal flats area that
25  we've been discussing.

Page 171

1  ever pursued by Monsanto with respect to that area?
2  A.  No.
3  Q.  And then it said that, "The department's
4  understanding was that Monsanto would submit a tentative
5  schedule for performing remediation in tidal flats." And
6  yet am I correct that based on your testimony no such
7  remediation ever occurred with respect to those tidal
8  flats? Is that right?
9  A.  That's correct.
10  Q.  So whatever contamination was there still
11  remains there?
12  A.  I don't think either one of us can assume that
13  without current characterization. We know what condition
14  it was in as of 1997. Can't say what its current
15  condition is.
16  Q.  Do we have — do you have any reason to believe
17  that it's changed?
18  A.  I can't say without further investigation.
19  Q.  Okay. Now, we talked earlier about an Everett
20  plant site assessment study that then-Monsanto undertook,
21  and I'm talking now about the mid-1980s. Even though it
22  didn't own the Mystic site any longer, having transferred
23  it to Boston Edison in the early 1980s, was there any
24  consideration given by then-Monsanto to including that
25  property within whatever site assessment study it was

Page 173

44 (Pages 170 to 173)

Deposition of Gerard Rinaldi / September 8, 2005

1  doing for the property that it owned at the Gateway site?
2  A.  I can say from personal and firsthand
3  involvement certainly not as of 1994 and forward. Prior
4  to 1994 I don't recall having seen any information that
5  suggested Monsanto was considering that after the sale to
6  Boston Edison.
7  Q.  Okay. Do you know of any position that the
8  company took not to include that Mystic site as part of
9  its environmental -- its Everett plant site assessment?
10  A.  In the sense that as I described when we
11  conducted the investigation and remediation beginning
12  with when my involvement began in 1994, we did not
13  include that, so that position had been taken prior to
14  that.
15  Q.  Okay. I'll show you this document here. Let
16  me mark it first. Sorry.
17      (Plaintiff's Exhibit No. 35
18      marked for identification.)
19  Q.  (By Mr. Flanders) Showing you Exhibit 35 which
20  is a May 13th, 1986 communication by Monsanto to certain
21  Monsanto individuals that are mentioned here, the
22  document begins by indicating that, "As you're aware we
23  have taken a position of not being willing to include the
24  land previously owned by Monsanto as part of the Everett
25  plant site assessment study. This includes two parcels,

Page 174

1  the 30 acres sold to Boston Edison and the land taken by
2  eminent domain by the MDC when they constructed the
3  Amelia Earhart dam." We referred to that earlier;
4  correct?
5  A.  That dam, yes.
6  Q.  Okay. And the 30 acres sold to Boston Edison
7  is, of course, what we've been calling the Mystic site?
8  A.  Yes.
9  Q.  There wrote is a man by the name of J.P.
10  Duschne. Do you know who he was or is?
11  A.  He was one of the plant managers at the Everett
12  site.
13  Q.  Okay. He is saying here that he's
14  acknowledging the disposition of not including the Mystic
15  site, so-called, within this Everett plant site
16  assessment study. And then he's saying, and I'm
17  referring to the third paragraph, "I'm also unclear
18  whether we can legally or realistically stand firm on our
19  current position." "It is my understanding," and I'm
20  quoting now, "I admittedly profess ignorance of the legal
21  issues, that the State's chapter 21(E) law and some other
22  statute states that prior owners of land involving
23  suspected or real hazardous waste contamination can and
24  will be held responsible . It is also my understanding
25  that in selling the parcel of land to Boston Edison that

Page 175

1  the agreements essentially void Monsanto from any future
2  responsibilities or liabilities. If both statements are
3  true, which one applies? Also, how does 21(E) relate to
4  land taken by eminent domain. I appreciate your comments
5  concerning the above so that we're sure we're taking the
6  right approach here and avoid a future surprise." Who is
7  Mr. Duschne writing to? Is this this Mr. Allen?
8  A.  Yes.
9  Q.  Or Ms. Allen. R.T. Allen. Who is that?
10  A.  Ronnie Allen was one of then-Monsanto Company's
11  in-house environmental counsel.
12  Q.  Oh. So this is --
13  A.  Attorney-client privilege.
14  Q.  Attorney-client communication. Probably never
15  should have been produced to us. But it's hard to tell
16  from the document.
17  A.  I know Ronnie Allen personally.
18  Q.  Okay. And just looking at -- have you seen
19  this document before?
20  A.  I do not recall having seen it before; no.
21  Q.  And there's a handwritten portion in here next
22  to the area that says, "that prior owners of land
23  involving suspected or real hazardous waste contamination
24  can and will be held responsible." If I'm reading that
25  right it says correct. Is that your understanding as

Page 176

1  well?
2      MR. STEVENS: Objection. He's not here to
3  give legal opinions.
4  A.  Yeah, I'm not an attorney.
5  Q.  (By Mr. Flanders) Okay.
6  A.  Nor an LSP.
7  Q.  Without giving me the substance of any
8  response, do you know if there was any response to this?
9  A.  I do not know if there was. I would presume
10  there was, but I'm not privy to it.
11  Q.  Do you know whether the position as described
12  here ever changed, that is, of not being willing to
13  include the land that we've been talking about as the
14  Mystic site within any environmental plan -- the Everett
15  plan site assessment study?
16      MR. STEVENS: Objection. Your question
17  assumes the DEQE continued to exist.
18      MR. FLANDERS: No, I'm not talking about
19  the DEQE.
20      MR. STEVENS: Well, you have to be --
21      MR. FLANDERS: When I say "we" -- when the
22  memo refers to "we," I assume that means we at Monsanto.
23      MR. STEVENS: But it's a question of not
24  being willing if somebody else is suggesting that you do
25  it.

Page 177

45 (Pages 174 to 177)

Deposition of Gerard Rinaldi / September 8, 2005

1       MR. FLANDERS: Well, that may be.
2       Q.    (By Mr. Flanders) All I'm saying is the memo
3    here says "we," meaning we at Monsanto have taken a
4    position of not being willing to include the land
5    previously owned by Monsanto as part of the Everett plan
6    site assessment study. Now, whether that was done as a
7    result of communications with the government or whether
8    it was done on Monsanto's own, that seemed to be the
9    position that they took; correct?
10      A.    As of the time of this letter apparently.
11      Q.    And my question to you was, did that position
12   ever change?
13      A.    My answer would be based on subsequent events
14   and the fact we never did include that land in site
15   assessment studies, no, the position didn't change.
16          (Plaintiff's Exhibit No. 36
17          marked for identification.)
18      Q.    Showing you Exhibit 36, which is a multipage
19   document that starts with the numbers 749 and ends with
20   754, also has an MCO number, I think, 0436483 through
21   488.
22      A.    Mr. Flanders, if I may interject?
23      Q.    Sure.
24      A.    I note to Mr. Stevens that this first page,
25   although hard to read, indicates to Ron Allen, that same

Page 178

1       Q.    Who is he?
2       A.    He was an employee of whatever the state agency
3    was then, DEP or DEQE.
4       Q.    Okay. So somehow this document came into then
5    Monsanto's hands?
6       A.    Yes. I note in the cover sheet it says the
7    memo was obtained from the Massachusetts DEQE file on
8    Everett.
9       Q.    Okay. There's a reference here to a barrel
10   removal operation and a grass fire. Are you familiar
11   with the subject of this memorandum?
12      A.    Vaguely. I made reference earlier in my
13   testimony to my knowledge of the existence of drums on
14   what we're referring to today as the Gateway Center
15   property which this concerns.
16      Q.    And does this in fact refer to drums, some 50
17   to 60 55-gallon drums that were found on the Gateway
18   property?
19      A.    Yes. You're reading from the second paragraph?
20      Q.    This liquid that was in the drums, this
21   melamine resin, was that one of the byproducts or
22   products that was manufactured at the Everett plant by
23   Monsanto?
24      A.    Again, according to this letter, it says that
25   melamine formaldehyde ester production, according to a

Page 180

1    attorney in the matter -- item we were just referring to.
2    I just want to bring that to your attention before we
3    proceed.
4       Q.    Okay. Again, I couldn't read that, so I didn't
5    know who that was to.
6       A.    And I also will note just for your information
7    the mail code you see, G3W4B, is as appears on this
8    clearer document.
9       Q.    Yeah. Thank you. So, I mean, the part that's
10   to Mr. Allen is the cover page; is that correct?
11      A.    Yes.
12      Q.    And there's a cover note asking him to review
13   and discuss how best to handle. But what I want to ask
14   you about is the attachment which is the memo that
15   apparently was sent on to Mr. Allen dated May 28th, 1985
16   from Mr. Chapman, who's a senior sanitary engineer, and
17   to a Mr. Chalpin, acting regional environmental engineer.
18          This memorandum -- well, let me ask you -- do
19   you know who prepared this memorandum? Is this a
20   Monsanto document or is this a document --
21      A.    This is a Massachusetts Department of
22   Environmental Protection, or then Department of
23   Environmental Quality Engineering. That's who those
24   people were. Mr. Chalpin I recognize by name
25   specifically.

Page 179

1    letter from Monsanto to the city, occurred at the Everett
2    facility. What this letter says is the extent of my
3    knowledge on that.
4       Q.    On Page 2 of the document reference to this
5    fire that occurred and the fact that the burning drum
6    contents produced smoke, and then it says that, "On the
7    morning of May 3rd, Monsanto personnel with a crane, a
8    front end loader and Bobcat moved approximately 30 drums
9    of the landfill to a location within the company's fenced
10   area." Again, is this referring to the Everett plant
11   site?
12      A.    Yes. That would be my understanding.
13      Q.    Okay. And, again, your understanding is this
14   is on the Gateway area?
15      A.    Absolutely.
16      Q.    Okay. And there's a reference to the fact that
17   there was -- there wasn't notification to the department
18   about this incident and that the material -- that
19   Monsanto in a letter took the position that the material
20   did not meet the criteria for hazardous waste as defined
21   under the EPA regulations. Now, this material that we're
22   talking about is this melamine roofing tar-type
23   substance; is that right?
24      A.    No. Those are two completely different and
25   unrelated substances. Melamine and roofing tar are

Page 181

46 (Pages 178 to 181)

Deposition of Gerard Rinaldi / September 8, 2005

---

1  unrelated.
2    Q.  Oh, okay.  Are we talking about melamine or
3  roofing tar?
4    A.  I don't know without reading the letter in its
5  flow and entirety here.
6    Q.  Do you have any knowledge about this incident
7  other than what's referred to in this letter?
8    A.  I had knowledge prior to today of responses to
9  incidents on the Gateway Center property involving drums
10  on one or more occasions, and this may have been one of
11  them, but I can't specifically recall.
12    Q.  On the next-to-last page of this letter, the
13  last paragraph of that on page 753, the writer says that,
14  "Monsanto violated department policy in removing waste
15  from the landfill area to within the plant fence without
16  an emergency cleanup contractor license.  The department
17  requires the use of a licensed cleanup contractor for
18  removal operations."
19    And the next page goes on to make certain
20  conclusions and recommendations.
21    Do you know what the upshot of this incident
22  was as far as Monsanto was concerned?  Was it fine?  Was
23  there any disposition?  How was this resolved, this
24  dispute?
25    A.  I do not know.

Page 182

---

1    Q.  Was this an incident of intentional burial of
2  waste at the Everett plant site?
3    A.  I can't say just from the review of this
4  document.  Monsanto could have paid a transporter to haul
5  this to a licensed off-site waste disposal facility.  He
6  got outside the gate and dropped it off the side of the
7  road.  It's just not possible to say from this document
8  alone how those drums came to be where they were found.
9    Q.  You think it might have been accidental?
10    A.  I can't say.  I mean they found drums but
11  there's no information as to how those drums came to be
12  located there.  It's outside the fence of the property
13  certainly.  Clearly states that, I remember, from
14  something you read.
15    Q.  Is there something called the Monsanto
16  Biohazards Committee?
17    A.  There was.
18    Q.  Okay.  What was that?
19    A.  I'm just trying to remember in the course of my
20  personal experience.  I'm familiar with the terminology.
21  I want to say that a woman by the name of Roj Meniere
22  might have been on that committee at one point.
23    Q.  What was its function?
24    A.  I can't clearly remember.  I remember its
25  existence, but I don't remember its charter.

Page 183

---

1    Q.  Was it an official committee of Monsanto —
2  then-Monsanto?
3    A.  I don't know what you mean by official.
4    Q.  I mean was it one the company authorized to
5  exist?
6    A.  Yes.
7    Q.  So was it some official committee of the
8  company?
9    A.  Yes.
10    Q.  Was there ever any official designation of any
11  part of the Everett plant as a hazardous waste site by
12  any governmental entity?
13    A.  I'll make reference to one document, although
14  it's not necessary for these purposes, I don't believe.
15  The Department of Environmental Protection assigned at
16  least three release tracking notification numbers, RTN
17  numbers, to the site, that being one of the means the
18  state designated waste sites or sites for investigation.
19  Those are numbers that are, for instance, referred to in
20  the response action outcome statements that I provided
21  earlier.  I know at least three case numbers, 3-0313,
22  3-4200, 3-0 — excuse me, 4425 from memory on those three
23  numbers.  That's one way I would respond to that question
24  as there being a government designation.  I happen to be
25  looking at one letter which is a Notice of Responsibility

Page 184

---

1  from the Massachusetts Department of Environmental
2  Protection to Monsanto Company from 1991.  Notice of
3  Responsibility with regard to case number 3-0313.
4    Q.  And is that — was that designation part of the
5  reason that Monsanto undertook a $30 million cleanup
6  effort?
7    A.  Yes.
8    Q.  That's all.
9      MR. OTTO:  I have no questions.
10
11        EXAMINATION
12  BY MR. STEVENS:
13    Q.  Let me ask one.  Are Monsanto and Pharmacia
14  aware of any action or operation on what we've been
15  calling the Mystic sites between the years 1943 and 1983
16  that would account for the presence of elevated levels of
17  lead on the property?
18    A.  Possible leaching from the pyrite ore storage.
19  None otherwise.
20    Q.  Do Monsanto and Pharmacia have knowledge that
21  pyrite ore was present on the property during the years
22  1943 to 1983?
23    A.  Actually most likely not because, as I think I
24  testified earlier, the use of pyrite ore as a raw
25  material for sulfuric acid production likely ceased in

Page 185

---

47 (Pages 182 to 185)

Deposition of Gerard Rinaldi / September 8, 2005

1   the 1930s, and raw sulfur became the raw material.
2       MR. STEVENS: Okay. Nothing else.
3
4
5               REDIRECT EXAMINATION
6   BY MR. FLANDERS:
7       Q.   Do you have any knowledge as to where that came
8   from, that lead?
9       A.   As I just indicated, from the possible leaching
10  from that pyritic ore storage prior to the period of 1943
11  to 1983.
12      Q.   That was on the Everett site?
13      A.   Yes.
14      Q.   So that might be -- what is -- strike that.
15  What is pyritic ore used for? Why would that be on the
16  site?
17      A.   Pyrite is the name for the chemical iron
18  sulfide. By burning or roasting iron sulfide they
19  produce sulfur dioxide, in turn used to produce sulfuric
20  acid, one of the products at the site.
21      Q.   To your knowledge did Monsanto ever engage in
22  any such operation?
23      MR. STEVENS: During the period 1943 to
24  1983?
25      MR. FLANDERS: Now we're going beyond that.

Page 186

1       Q.   But because you are only here to talk about
2   1943 on, you're not really prepared to tell us --
3       MR. STEVENS: He's not going to talk about
4   operations before that. Hasn't been asked to.
5       A.   Right.
6       Q.   (By Mr. Flanders) And that relates solely to
7   lead contamination?
8       MR. STEVENS: What relates -- my question
9   related solely to lead contamination.
10      Q.   (By Mr. Flanders) Right. This source of this
11  lead contamination that you identified, all we're talking
12  about is what could be the possible cause of this lead
13  contamination; is that right?
14      A.   That's what I understood your earlier question
15  to be, yes.
16      Q.   All right. And what you told your lawyer was
17  that to your knowledge there were no operations that
18  occurred between 1943 and 1983 that would have produced
19  that lead contamination?
20      A.   That's correct.
21      Q.   And you further answered that your belief was
22  that the source of that lead contamination occurred
23  before 1943, is that right?
24      MR. STEVENS: You're not -- you should not
25  answer as to your prior testimony. It is what it is.

Page 188

1       MR. STEVENS: I asked him solely about that
2   period.
3       MR. FLANDERS: I thought he answered it
4   might have been there before that period.
5       MR. STEVENS: But I'm not going to --
6       MR. FLANDERS: Seems like you've opened the
7   door.
8       MR. STEVENS: I asked him only about that
9   period. If he's answered one question, it wasn't my
10  question, so I haven't opened a door. I asked him only
11  about that period.
12      Q.   (By Mr. Flanders) Well, I mean, Monsanto owned
13  this plant from the 1860s; right?
14      A.   No.
15      Q.   Or its predecessors? Chemical operations took
16  place here from the mid-1800s?
17      MR. STEVENS: Objection. He's not been
18  designated to testify on any operations on the property
19  before 1943.
20      Q.   (By Mr. Flanders) If I understand what you're
21  saying, there's a source of contamination at the Everett
22  plant site that you've been asked about that occurred as
23  a result of some operations that took place before 1943
24  at the site. Is that right?
25      A.   Yes.

Page 187

1       MR. FLANDERS: Yeah, again, the -- I point
2   out that the witness was being asked to talk about any
3   spills, leaks, releases or discharges, or any petroleum
4   products, hazard substances or chemicals at or upon
5   property in number nine without reference to any time
6   limitation.
7       MR. STEVENS: You may ask him if he is
8   aware of any sources of lead. Not the operations that
9   may have lead to it, but any sources of release or
10  discharge as to any period.
11      Q.   (By Mr. Flanders) Okay. With that, are you
12  aware of any sources of this lead release at any period?
13  If it didn't occur in '43 to '83, are you aware of any
14  sources of it at any other time?
15      A.   Yes.
16      Q.   What is your knowledge on that subject?
17      A.   The one which I've just mentioned prior to
18  1943.
19      Q.   Which is what again?
20      A.   The possible leaching from pyrite ore storage
21  piles on the Mystic site. And then the other post-1983
22  would be Modern Continental's recent operations and
23  characterization of those by the consultant Woodard &
24  Curran which showed the elevated surficial levels of lead
25  in the soil also.

Page 189

48 (Pages 186 to 189)

Deposition of Gerard Rinaldi / September 8, 2005

1    Q.   This pyrite ore storage that you referenced,
2   was that on the site when then-Monsanto owned it from
3   1943 to — at any point from 1943 to 1983?
4    A.   No.
5    Q.   Okay. But you're aware that there was pyrite
6   ore being stored at the site before 1943?
7    A.   Yes.
8    Q.   Was that in connection with any operations that
9   then-Monsanto was conducting?
10       MR. STEVENS: You are not to answer as to
11   operations prior to 1943.
12   Q.   (By Mr. Flanders) Is pyrite ore used in
13   connection with any chemical manufacturing operations?
14       MR. STEVENS: Is?
15   Q.   (By Mr. Flanders) Is it or can it — has it
16   been?
17   A.   Yes.
18   Q.   And at some point do you have any knowledge
19   whether there were any spills, leaks, releases or
20   discharges of any contaminants related to pyrite ore by
21   Monsanto?
22   A.   There were no such.
23   Q.   Again, I'm not limiting it to 1943 to 1983.
24   You told us that the source of lead here was pyrite ore
25   leaching?

Page 190

1       MR. STEVENS: No. He told you that is the
2   only source that he is aware of other than Modern
3   Continental.
4    A.   And further, I guess, I think I qualified to
5   say possible source, not known.
6    Q.   (By Mr. Flanders) All right. My question is,
7   would that have been — does pyrite ore leaching occur in
8   connection with chemical storages — chemical operations
9   storage?
10   A.   That is possible.
11   Q.   What is the source of your knowledge about this
12   pyrite ore?
13   A.   It's referred to in Exhibit 9, the Perkins
14   Jordan study, as a raw material. That's the one document
15   I know it's referred to.
16   Q.   Is that the only source of your knowledge about
17   this?
18   A.   There may be other documents about historical
19   operations that refer to it as well, I suspect. There
20   are, I just can't immediately identify any such.
21   Q.   And where is the lead contamination found at
22   the Mystic site?
23   A.   That's an interesting question, because the
24   location of the contamination which I recall from the
25   Perkins Jordan study, which I'm looking for as we speak,

Page 191

1   does not — repeat — does not coincide with the pyrite
2   ore storage location.
3    Q.   Where was the pyrite ore storage?
4    A.   I'm looking for the figure that — referring to
5   Figure 8 in Exhibit 9, the Perkins Jordan study. This
6   figure shows high concentrations of EP soluble lead
7   compounds in soil. The highest being indicated by this
8   darkest shading in the north-northwest portion of the
9   site. Pyrite ore storage having been in the
10   south-southeast portion of the site.
11   Q.   What's the date of that study?
12   A.   This is the 1982 study by Perkins Jordan.
13   Q.   Okay. So that would have been before Boston
14   Edison even had used or owned the site?
15   A.   That's correct.
16   Q.   Certainly before Modern or Mystic or Mary
17   O'Donnell or anybody else had had anything to do with the
18   site?
19   A.   Yes.
20   Q.   So to the extent that the — this Perkins —
21   A.   Excuse me, if I may. I shouldn't say anybody
22   else. There were people that had something to do with
23   the site prior to Monsanto's ownership of it. As you
24   indicated, Monsanto's ownership doesn't date back to the
25   beginning of this site's operation.

Page 192

1    Q.   At least as of the 1982 date of the study, the
2   lead contamination that's referenced there occurred at a
3   time when Monsanto owned the property?
4       MR. STEVENS: Objection. That's not what
5   he said.
6    A.   No. The lead contamination existed at the time
7   of this investigation. When it occurred I don't know.
8    Q.   But, I mean, it occurred obviously at some
9   point when Monsanto owned the property?
10      MR. STEVENS: Objection.
11   A.   Could have occurred in the 1800s.
12   Q.   (By Mr. Flanders) Oh, okay. But it certainly
13   existed there when Monsanto owned the property?
14   A.   Yes.
15   Q.   And if your supposition is correct, that is
16   that it occurred sometime before Monsanto owned the
17   property, it existed for the entire time unremediated
18   while Monsanto owned the property; is that right?
19   A.   I think that's too much speculation for me to
20   enter into. Repeat the question.
21   Q.   Well, if you're correct that it occurred —
22   that is the first release of this material occurred
23   sometime before Monsanto owned the property, and it
24   existed here in 1982, isn't it a fair inference that the
25   entire time that Monsanto owned it the property was

Page 193

49 (Pages 190 to 193)

Deposition of Gerard Rinaldi / September 8, 2005

---

1  contaminated with this lead?

2  **A. You can make that inference.**

3  Q. It's inescapable, isn't it?

4  **A. If it was there when Monsanto owned it and**

5  **there then, yeah, I guess so.**

6  Q. When you say "if," that's your testimony, you

7  believe it to be so?

8  **A. No. That was a conjecture as to whether it was**

9  **there before Monsanto owned the property or not.**

10  Q. Well, it was either there before or when they

11  owned it; correct?

12  **A. It was there as of 1982. When it came to be**

13  **there, that's not known.**

14  Q. Okay. That's all. Thank you.

15

16       DEPOSITION ADJOURNED AT 3:37 p.m.

17

18

19

20

21

22

23

24

25

Page 194

---

1             CERTIFICATION

2

3       I, Debra M. Musielak, Certified Court Reporter

4  within and for the States of Missouri and Illinois, DO

5  HEREBY CERTIFY that pursuant to agreement between the

6  parties, the aforementioned witness came before me at the

7  time and place hereinbefore mentioned, and having been

8  duly sworn to tell the whole truth was examined, and the

9  examination was taken in shorthand and later reduced to

10  printing; that signature by the witness is not waived.

11       IN WITNESS WHEREOF, I have hereunto subscribed my

12  name this 12th day of September, 2005.

13

14

15

16

17

18       _____

              Debra M. Musielak, RDR, CRR

19

20

21

22

23

24

25

Page 196

---

1  STATE OF _____ )

2                            )

3  COUNTY OF _____ )

4

5

6       I, GERARD RINALDI, do hereby state that the

7  foregoing statements are true and correct to the best of

8  my knowledge and belief.

9

10

11

12

13       _____

14

15

16       Subscribed and sworn to before me this _____ day

17  of _____, 2005.

18

19

20

21

22       _____

                    NOTARY PUBLIC

23

My Commission expires:

24

25

Page 195

---

50 (Pages 194 to 196)

# EXHIBIT G

PROTECTED MATERIAL:    MONSANTO INSURANCE COVERAGE LITIGATION

FROM (NAME & LOCATION)    P. B. Hodges/B. W. Eley/A. F. Pier - General Offices

DATE         October 24, 1973                 CC        E. S. Robson
                                                        C. P. Cunningham
SUBJECT      ENVIRONMENTAL ASSESSMENT -                 W. L. Merman
             SALE OF 34 ACRES - EVERETT PLANT           L. W. Gilbert
REFERENCE                                               R. J. Kozacka
                                                        R. M. Kountz
TO     :     F. J. Holzapfel - B3NA                     D. B. Hosmer
                                                        P. F. Cunningham

An environmental assessment of the planned sale of the 34 acre
tract east of the railroad tracks at the Everett Plant was con-
ducted on October 22, 1973 by Bruce Eley (Corporate Medical),
Art Pier (CED) and Paul Hodges (MICC Environmental Protection).
At Everett, Les Gilbert (TSD Supt.) assisted and participated
in the survey.   Studied in the survey were such possible environ-
mental considerations as:

(1)  Condition of ground in the sale tract - history of burial of
     toxic wastes, ground water contamination - all of the
     recognizable possible causes of environmental or safety
     problems for subsequent users of this site.

(2)  Contents of buildings which might cause later chemical
     safety or environmental problems.

(3)  Maintenance of a 500 ft. buffer zone around periphery of
     the reduced-size plant wherein operations which might
     cause environmental problems such as noise or air pollution
     would not be located.

(4)  Probabilities of noise or air pollution problems in the
     sales tract as caused by remaining plant operations.

(5)  Character of neighborhood as it might affect uses of the
     property by subsequent owners.

The U. S. G. S. Matrix Form "Proposed Actions Which May Cause
Environmental Problems" as specified in CED Procedure #162 -
Environmental Impact Statements was completed (copy attached).

MCU   0335974

MCD   8084419

0004949

PROTECTED MATERIAL:   MONSANTO INSURANCE COVERAGE LITIGATION

-2-

## Summary and Recommendations

(1)  No serious environmental problems are expected for prospective
     industrial or commercial purchasers by our past operations
     or present remaining operations.  Any residential use of the
     property is highly unlikely.

(2)  For the foreseeable future, no added environmental capital
     cost or operating expense will be incurred by the plant due
     solely to the sale of the property.

(3)  The 500 ft. buffer zone concept will be violated by the powerhouse
     (which burns only gas or low sulfur oil) and by the CYA Purifi-
     cation facilities (future of this operation is questionable).
     Neither of these operations cause environmental problems in
     the sales tract with normal operations.  Occasional accidental
     releases of CYA dust can create minor nuisance problems -
     extra care to avoid accidental emissions will be needed if CYA
     is still operating after buyers commence using the sales tract.

(4)  Recommendations (environmental considerations only) - Sell the
     site after razing the sodium bisulfite and DCHP finishing oper-
     ations.

Details of the survey follow.

Bruce W. Eley

Arthur F. Pier

Paul B. Hodges

/ms

encs.

MCD  0335475

MCD  8084420

0004950

PROTECTED MATERIAL:    MONSANTO INSURANCE COVERAGE LITIGATION

DETAILS SECTION

ENVIRONMENTAL ASSESSMENT

SALE OF 34 ACRES - EVERETT PLANT

OCTOBER 22, 1973

---

History of Tract - Chemical operations have been conducted at the Everett
site since 1868.  No early records were available as to products but apparently
heavy inorganic chemicals such as muriatic, sulfuric, and nitric acids, alum,
ferric chloride, etc. were the principal products made in the east side during
the past 50 years.  One major exception was alcohol from molasses, starting
in 1933 and ending in 1954.  There is no record or memory of burial of
chemicals in the east side tract other than rubble from razing of east side
operations.  We found no evidence of highly toxic organic or inorganic chemicals
having ever been made on the sales tract site.

Present Operations and Structures - East Side

The only two chemical operations presently conducted are sodium bisulfite
(planned to cease by 1/1/74) and DCHP finishing (planned to be moved to the
west plant).  No major problems are foreseen from dismantling and razing of
these operations other than normal safety problems.

Buildings to be left intact include:

(1)  Present office building.

(2)  Old MRC building, leased for past several years to American
Hospital Supply Co. - now vacant.

(3)  Dispensary, locker room, cafeteria.

(4)  Laboratory with a storage area in one end.  The laboratory
and storage area should be carefully cleaned of chemicals.

The salt water pumping station and the main plant transformer will be left in
place and in use if satisfactory agreements with prospective purchasers can
be arranged.

Character of Neighborhood

The sales tract is bounded on the south by the Mystic River below the dam.
Recreational use of the river at this point is unlikely.

MCL  0335476

MCD  8084421

PROTECTED MATERIAL:  MONSANTO INSURANCE COVERAGE LITIGATION

-2-

On the east to Broadway and to the north, the tract is bounded by MBTA property including bus storage and shops.

The land directly east of Broadway is industrial including a large power plant (which was emitting a high opacity plume from its test $SO_2$ removal system).

The nearest residential area is houses on the east side of Broadway, commencing about 500 ft. north of the extreme northern tip of the sales tract - about 1,000 ft. from the nearest point on the property line of the tract. The houses are old but reasonably well maintained.  No housing development on the sales tract or any nearer than as mentioned above is likely.

Condition of Ground and Ground Water

24 acres (not including the 10 acres of tidal flats) have been filled to a depth of 3-4 feet with dirt and rubble.  The only chemical noticeable in the rubble was sulfur-widespread and in considerable concentration.  However, it was doubtful that the sulfur could create serious problems - it was not so wide-spread as to cause a serious fire if ignited.

No doubt, the ground water in the area is contaminated by inorganic dissolved solids.  Seepage at the edge of the Mystic River at mid-tide appeared colored and contaminated.  However, the ground water is naturally brackish and the chemical contamination is not considered to be of importance.  The sodium bisulfite operations have been operating during the past two years on the basis of no process discharges to the cooling water.  Any effluents, therefore, have run out onto the ground and will gradually percolate through the dirt and rubble and will eventually enter the Mystic River.  This should not be a problem.

Potential Exposure To Noise

The only nearby significant noise source in the west plant was from venting steam at the powerhouse.  The measured noise level at the plant boundary was 72 dBA. This is within probable regulatory limits for industrial zones.  No such limits on noise have yet been promulgated for Massachusetts.

Potential Exposure To Air Pollution

The prevailing wind direction is from east to west so that air pollutants from the west plant are not likely to affect the sales tract.

Major potential air pollution sources from the west plant which could affect the east plant are:

MCO 0335977

MCO 8084422

0004952

PROTECTED MATERIAL:    MONSANTO INSURANCE COVERAGE LITIGATION

-3-

(1) Powerhouse - when burning oil (#6, desulfurized) malfunction can cause smoke and/or soot. Also, occasional problems are encountered with soot blowing. However, the powerhouse is so close to the sales tract that serious ground level problems would normally occur outside of the boundaries of the sales tract.

(2) $H_2SO_4$ contact unit - this is a modern, well-maintained unit with a clear stack and low $SO_2$ concentration ( $< 2000$ ppm $SO_2$). The 190 ft. stack is tall enough that, with malfunction of the unit but with normal meteorological conditions, ground level concentration of $SO_2$ or $SO_3$ would be low in the east sales tract. A massive ground level spill of oleum with the wind blowing abnormally from west to east would, of course, create problems in the sales tract but such an occurrence is not likely.

(3) Odors of ethyl alcohol and from monomerics and polymerics operations were noted. However, they are on the west side of the west plant and were not of sufficient intensity to have created a problem in the east tract, even if the wind were blowing abnormally in that direction.

(4) CYA Purification - located within 200 ft. from the west boundary of the sales tract - normally no fumes and little dust. Occasional malfunction can cause discharge of dust in the air. Prevailing winds would usually blow such dust over the west plant. CYA dust is not objectionable except as a nuisance. No highly significant environmental impact.

Maintenance of 500 ft. Buffer Zone

By policy, we will not normally sell property which would cause loss of a 500 ft. buffer zone around operations which could create environmental problems such as noise or air pollution. Exempt from this policy are offices, shops, warehouses, etc.

Sale of the east plant property would destroy the 500 ft. buffer zone for the powerhouse and CYA purification facilities. Remaining operations in the 500 ft. strip are in the exempt classification.

The powerhouse situation has been described previously and its presence close to the sales tract does not present a significant environmental threat.

CYA dust emissions from malfunction is a somewhat more serious potential problem. The dust is not considered objectionable except as a nuisance. However, since it is a chemical, new neighbors might object strenuously to emissions blowing in their direction. CYA operations will have to be quite careful to avoid emissions and prompt corrective actions will be necessary to avoid repetition. Beyond these precautions, no action appears necessary.

MCU 0333970

MCO 8084423

0004953

PROTECTED MATERIAL:    MONSANTO INSURANCE COVERAGE LITIGATION

## U. S. G. S. MATRIX

### ANALYSIS

A detailed environmental impact assessment was made using the matrix and instructions issued by the U. S. Dept. of the Interior (USGS). Actions which were judged to have any significant effect are rated on magnitude and importance on a scale of 1 to 10 on the attached matrix as discussed below:

### Land Form (I.A.1.d)

Rubble from the razing of $SO_2$ burner building, the bisulfite building, and the DCHP finishing building will be discarded to landfill either in the north area of the plant or in a commercial landfill. Both the magnitude and the importance have been rated 1, since the in-plant landfill area is already contaminated with waste gypsum, and the quantity would be small for a commercial landfill operation.

### Water Quality (I.A.2.d)

Intermittent process waste from bisulfite manufacture is discharged on the ground in the area of the manufacturing building and appears to percolate through the ground and into the Mystic River. When the tide is ebbing, there is a visible discolored seepage along the water line.

In addition there is a visible discharge from a "plugged" process sewer from the bisulfite plant. Apparently, either the plug is leaking and allowing some waste to reach the river directly or leaking joints in the sewer pipe are allowing infiltration of ground water.

These discharges appear to be small and are expected to stop or decline when the bisulfite plant is shut down. Therefore, a rating of plus 2/2 has been selected.

A small stream of cooling water is discharged from the bisulfite plant to the river. Because of occasional leaks in the heat exchangers, this stream becomes acid and is then in violation of effluent regulations. In addition, the acidic material reaches the nearby salt water inlet and causes accelerated corrosion in the salt water system throughout the plant. Since the problems will disappear after the bisulfite shutdown, a rating of plus 2/2 has been selected.

There is also at present a minor hazard of spills from tanks in the $SO_2$ or the bisulfite plant reaching the river. (Rating + 1/1)

MCO  0335474

MCO  8084424

0004954

PROTECTED MATERIAL:   MONSANTO INSURANCE COVERAGE LITIGATION

-2-

## Air Quality (I. A. 3. a)

There are periodic emissions of $SO_2$ from the bisulfite process, which will be eliminated. This bisulfite will be partially offset by a narrower "buffer zone" on the east side of the plant. The change appears to be a net gain, and a rating of plus 2/2 has been selected.

## Residential, Commercial & Industrial Land Use (I. C. 1. f, g, h)

The maximum property line noise level was 72 dBA measured east of the power-house. This level will be satisfactory if the east property is used for industrial or commercial installations. There is little risk that the property will be used for residences. Therefore, all 3 items have been rated 1/1.

## Health and Safety (I. C. 4. b)

Concentrations of $SO_2$ in the bisulfite building exceed OSHA standards at times. This problem will be eliminated, and the impact (Chemical Industry, II. D. h) has been rated at 2/2.

At present, most automobiles and trucks enter and exit the plant via Broadway Avenue, a busy city street. There have been a number of accidents at the plant exit. In addition, trucks passing from the east property to the plant use a grade crossing over the main line of a railroad. After the sale of the east property, access to the plant and to the new office will be on a lightly travelled street west of the plant, which exits on a traffic circle on the Revere Parkway. Use of the railway grade crossing will be eliminated. The impact of these changes in automobile and truck traffic have been rated plus 2/2.

## Employment (I. C. 4. c)

Discontinuing operations on the east property will result in a decrease of 30 to 35 employees at the plant. The magnitude and importance of this decrease has been rated 2/2.

## Transportation Network (I. C. 5. b)

As noted under safety and health, access of truck and automobile traffic to the plant and the office will be improved, and a rating of plus 2/2 has been selected.

## Appearance Of Plant

The $SO_2$ plant and the bisulfite building are old and decrepit and can only be described as eyesores. Their removal will improve the appearance of the plant and enhance Monsanto's image.

MCO  0335960

MCO  8084425

0004955

# EXHIBIT H

HYDROGEOLOGIC SURVEY
MONSANTO INDUSTRIAL CHEMICALS CO.
EVERETT, MASSACHUSETTS

DOC 7
0000325
(2.7)



CONFIDENTIAL

Prepared by:

DAMES & MOORE

January 1980

1111-126-10
6 of 8

MCO   7682637

DAMES & MOORE

January 8, 1980

Monsanto Industrial Chemicals Co.
Everett Station
Boston, Massachusetts 02149

Re:  Final Report
Hydrogeologic Survey
Monsanto Industrial Chemicals Co.
Dames & Moore Job No. 1111-126-10

Gentlemen:

We are pleased to submit herewith three (3) copies of our final report entitled, Hydrogeologic Survey, Monsanto Industrial Chemicals Co., Everett, Massachusetts. In this report, we describe the hydrogeology and recent surface and ground water quality encountered at the plant site with specific regard to the subsurface conditions around the plastic containment lagoon, and provide recommendations for a Phase II site-specific ground water contamination program. Our survey includes the 72-acre plant site, the 39-acre portion of Monsanto property east of the Boston & Maine Railroad, and the 16-acre property held in preservation by the Monsanto Fund west of Mystic View Road.

In general, our investigation indicates the presence of a thick (40 to 60 feet) clay and silt sequence of unconsolidated deposits covered by 5 to 15 feet of surficial man-made fill. A permeable sand unit occurs below the silt/clay sequence.

The natural direction of ground water flow in shallow deposits above the relatively impermeable clay lenses that exist are northward. Contoured water level elevations from observation wells in the sand unit indicate a slight water table ridge plunging generally southward away from the plastics lagoon area. Ground water flow west of this ridge, which underlies about two-thirds of the site, is toward the Mystic River.

Elevated concentrations of certain chemicals and chemical compounds were detected in several ground water samples, a surface water sample from the Mystic River, and a subsurface soil sample. Initial sampling detected elevated levels of arsenic, lead, zinc, sulphates, phthalate plasticizer compounds (proposed as priority pollutants by EPA), Di-Octyl Adipate, and an unidentifiable compound(s) possibly associated with Nonanol.

MCO   7682638

Monsanto Industrial Chemicals Co.
January 8, 1980
Page 2

One of the main sources of these elevated concentration levels presently appears to be leaching ground water from the plastics containment lagoon area and an adjacent, marshland area to the north. Other potential source areas, such as the dumping area behind the CYA building, the acetic residue site, and the alum process dumping areas warrant additional investigation and were not considered in this report due to the extent of baseline data available.

We have recommended a second phase program to further evaluate the nature and extent of ground water contamination at the plant and the interrelationships between ground water degradation, plastics containment lagoon, and surface water contamination in the Mystic River.

We are considering some preliminary alternative recommendations to remedy the potential contamination problem in the plastic containment lagoon area, however, the effectiveness of such remedial measures will be enhanced by additional confirming data from a site-specific second phase program. We suggest that these information gaps be filled in and evaluated as described in this report before implementation of remedial measures providing cost-effective mitigation, and, in so doing, providing a site-specific assessment of facility sources which could include regulatory compliance/non-compliance considerations, etc.

It has been a pleasure to serve the Monsanto Industrial Chemicals Co. on this project and we would look forward to working with you again. If you have any questions, please feel free to call.

Respectfully submitted,

DAMES & MOORE

James V. Poto, P.E.
Partner

Charles A. Rich
Project Manager
Senior Hydrogeologist

JVT:CAR:rar
Enclosures

MCO 76B2639

TABLE OF CONTENTS

1.0   Introduction                                                                    1

      1.1   General                                                                    1
      1.2   Scope of Services                                                          2

2.0   General Hydrogeological Conditions                                              4

      2.1   Regional Hydrogeology                                                      4

            2.1.1   Regional Geologic History                                          4
            2.1.2   Regional Ground Water Hydrology                                     5

      2.2   Hydrogeology of the Monsanto Everett, Masssachusetts, Site                 5

            2.2.1   Topography                                                          5
            2.2.2   Bedrock Geology                                                     5
            2.2.3   Description of Unconsolidated Deposits                              5
            2.2.4   Hydrology                                                           7

                    2.2.4.1   General                                                  7
                    2.2.4.2   Hydrologic Description                                    8

3.0   Surface Water, Ground Water and Soil Chemistry                                 11

      3.1   General                                                                   11
      3.2   Soil Chemistry                                                            12
      3.3   Surface Water Chemistry                                                   12

            3.3.1   Inorganic Parameters                                              12
            3.3.2   Organic Compounds                                                 12

      3.4   Ground Water Chemistry                                                    13

            3.4.1   Inorganic Parameters                                              13
            3.4.2   Organic Compounds                                                 13

4.0   General Findings                                                               16

5.0   Conclusions and Recommendations                                               19

References                                                                          22

Appendix A - Field Procedures
Appendix B - Penn Environmental Lab Report

DEMBR...

MCD   7682640

0000328

LIST OF TABLES

Table

1   Monitoring Well Construction Details

2   Ground-Water Levels of Monitoring Wells

3   Concentrations of Dissolved Inorganic Compounds in
    Ground-Water and Surface Water on October 19, 1979
    (in milligrams/liter, ppm)

4   Concentrations of Dissolved Organic Compounds in
    Ground-Water, Surface Water and Soil, October 19, 1979
    (in micrograms/liter, ppb)

LIST OF PLATES

Plate

1       Vicinity Map

2       Plot Plan

3A-3D   Boring Log and Monitoring Well Details

4       Generalized Geological Cross Sections

5       Water Table Contour Map

6       Sulfate Concentration Contour Map

7       Phthalate Concentration Map

8       Recommended Phase II Monitoring Well and Sampling Location

MCD    7682641

D-S-KISS D P.-S.

## 1.0 INTRODUCTION



### 1.1 General

On July 2, 1979, Dames & Moore was retained by Mr. Irving Newcomer of Monsanto Industrial Chemicals Company, Everett, Massachusetts to provide a preliminary hydrogeologic site evaluation regarding existing surface water degradation and potential ground water contamination that may or may not exist at Monsanto's Everett Station Plant Site. The plant site is located just north of Boston, Massachusetts, near the confluence of the Mystic and Malden Rivers (Refer to Plate 1).

The objective of the investigation is to perform a thorough preliminary survey of the site to evaluate local subsurface hydrogeological conditions. Of particular emphasis during this study are the water quality relationships between surface and ground water flow regimes, the ground water discharge area, and the potential for any subsurface contaminant transport on or offsite.

The hydrogeologic survey included a literature review of available ground water and geologic information, pertinent site documents, regulatory requirements, an evaluation of flow regimes including: identification of perched water table conditions if present, and installation of eight small-diameter test wells.

Based on Monsanto objectives and the existance of considerable geologic data such as site foundation borehole logs and locations of historical dump sites, which were made available to us, we initially decided that it was unnecessary during this preliminary phase to perform a detailed test drilling program to define site geology and provide a comprehensive plant-wide data base. In the event of proven or suspected on-site contamination, the preliminary hydrogeologic survey provides sufficient background information permitting the development of a data base which is deemed adequate to properly locate and construct monitoring wells as part of a second phase program. The monitoring wells in a second phase program would be used to monitor ground water quality and contamination versus Mystic River water quality and contamination, originating on the Everett Plant Site including any potential ground water contamination originating from off site sources. The results of the monitoring program would be used by Monsanto for preparing an overall site plan for ground water protection.

1

DAMES & MOORE

MCO   7682642

0000330

The general scope of services was described in Dames & Moore's proposal of May 14, 1979 which was accepted by Monsanto on July 2, 1979 as Service Agreement No. 0376817 4983.

### 1.2    Scope of Services

In satisfying the aforementioned objectives of the hydrogeologic survey, Dames & Moore performed five separate tasks. They are:

Task 1    Task 1 included the gathering and review of available geologic and hydrologic information in our files and from other sources such as the Massachusetts State Geological Society, the Water Resources Division of the U.S. Geological Survey, the Boston Metropolitan District Commission and the Massachusetts Water Resources Commission – Division of Water Pollution Control.

Task 2    Task 2 involved site visits, field reconnaissance of the Everett Station Plant Site and discussion with Monsanto personnel regarding the sources and chemical character of potential contaminants and approximate locations of abandoned dump sites.

Task 3    While a general picture of regional hydrogeologic conditions was developed from the literature and existing data base, obtaining site specific information necessitated the drilling of some exploratory test borings/wells. Nine borings were drilled of which eight were screened and cased as test/monitoring wells in the soil overburden. The ninth boring (#8) encountered mostly impermeable clays. Originally, bedrock was anticipated to be relatively near surface. However, its greater depth necessitated constructing the test/monitoring wells in the soil overburden to assess whether any contamination had infiltrated below the thick clayey layers underlying the site. Each exploratory boring/well was drilled and sampled as discussed in Appendix A. These wells were then used to measure depth to the ground water table and obtain ground water samples from the saturated zone beneath the water table.

MCO    7682643

2

Task 4    Task 4 involved the collection and chemical analysis of ground water
samples from each of the eight test/monitoring wells, surface water
sampling of Mystic River, and collection and analysis of a soil sample 40
feet below ground surface from Boring 6A. The program of chemical
analysis and summary of the results is presented in Tables 3 and 4. The
ground water sample collection procedures are discussed in Appendix A.

Task 5    Task 5 involved data reduction, analysis of data and preparation of
the following report.

MCD   7682644

3

## 2.0 GENERAL HYDROGEOLOGICAL CONDITIONS

### 2.1 Regional Hydrogeology

#### 2.1.1 Regional Geologic History

The bedrock underlying the study region was originally deposited as sands and clays in a lake or marine embayment probably during the Cambrian Period, 500 to 600 million years ago (J.W. Skehan, 1979). This lake or embayment was located within the northern portion of a large depositional basin called the Boston Basin. These sediments have since lithified (become compacted and hardened) and are now known as the Cambridge Argillite (Slate) of the Boston Bay Group. The region has had a complex history of deformation including faulting, folding, volcanic activity and intrusion of previously molten rock. Bedrock is at a considerable depth in the site region due to the general northeast plunge of the original Basin. Much of the region underlain by the Cambridge Argillite is relatively flat and low in elevation today and is thus termed the Boston Lowlands.

Due to erosion and/or nondeposition, the deposits directly overlying the Cambridge Argillite are apparently of Pleistocene Age (1 to 2 million years old). These unconsolidated sediments were deposited during glacial times. The number of ice sheets to have covered the region is unknown because the most recent one (Wisconsin) seems to have removed any deposits of older ice sheets, if they existed. The moderately hard blue clay with occasional lenses of sand and silt which overlies much of the bedrock in the Boston Lowlands may be of pre-Wisconsin age. The lack of fossils creates a problem in determining a more specific age. This clay ranges in altitude from 40 feet above sea level to an unknown distance below (L. LaForge, 1932). The clay was then overriden by the Wisconsin age glacier. Deposits of glacial drift are thin or lacking in the Boston Lowland area. These sediments when present are in turn overlain by Recent tidal-marsh deposits of silt, muck, and peat (present over much of the Lowland) and/or alluvial (stream or river deposits) silty sands to clayey silts deposited by the Mystic and Malden Rivers. Presently large areas of these deposits in the Charles and Mystic River Estuaries have been reclaimed for building by covering with varying amounts of fill.

MCO  7682645

DAMES & MO....

4

### 2.1.2 Regional Ground-Water Hydrology

Municipal water supplies of much of the region are derived from outside the area, for example the reservoirs to the west. The unconsolidated sediments in the area are composed of considerable amounts of relatively impermeable clay and silty materials which do not generally produce much water. Surface water quality seems to be poor probably due in some part to relatively high density urban development and associated waste loading. This water, recharges the ground water reservoirs (aquifers) in certain areas. The bedrock underlying unconsolidated sediment in the immediate vicinity of Everett is not an aquifer, however, some manufacturing plants nearby draw water supplies from wells constructed in the bedrock (L. LaForge, 1932).

### 2.2 Hydrogeology of the Monsanto Everett, Plant Site

#### 2.2.1 Topography

The Monsanto Everett Plant Site is located within the Mystic River estuary near the confluence to the Mystic and Malden Rivers (Plate 1). The elevation varies from sea level to about 20 feet above sea level. Hilly topography north and south of this estuary ranges from about 50 to 250 feet above sea level. All elevations in this report are with respect to the Monsanto Datum which is 5.306 feet below mean sea level (MSL) as indicated by Harry R. Feldman, Inc. (land surveyors) of Boston, Massachusetts. The site topography is relatively level, ranging from about 14 to 18 feet above the Monsanto Datum (MD).

#### 2.2.2 Bedrock Geology

Bedrock is not exposed on the Monsanto Site and was not encountered in any of our borings. According to published general logs of two previously drilled borings (W-1 and W-5 in Boston Society of Civil Engineers, 1961) bedrock was encountered approximately 145 and 100 feet, respectively, below ground surface. Boring W-1 was located generally between our wells MW-2 and MW-5, and boring W-5 was south of MW-4. The rock is described as "gray black shale" (Cambridge Argillite).

#### 2.2.3 Description of Unconsolidated Deposits

MCO 7682646

About 40 to 84 feet of unconsolidated sediments including man-made fill underlain by interfingering lenses of glacial, marine marsh and riverine deposits were

5

DAMES D N···

penetrated by our borings. The oldest natural sediments encountered by our borings is a 5 to 12 - foot thick layer of generally gray sand and silty sand with occasional lenses of gravel. Refer to the Generalized Geological Cross Sections (Plate 4). This may represent pre-Wisconsin glacial outwash (riverine) sediments or merely a layer or lense within the overlying blue to gray highly plastic clay. Since this unit was not completely penetrated by any of our borings, a final interpretation can not be made. Overlying this generally sandy unit in the central, western and northern portions of the Site is a blue to gray highly plastic clay which averages about 15 to 20 feet thick. This unit gradually thickens to about 30 feet at boring MW-5, and rapidly to about 47 feet at boring B-8, indicating a possible buried stream channel. This highly plastic clay is located similar stratigraphically to the "Blue Clay" listed in published logs of previously drilled borings (Boston Society of Civil Engineers, 1961). The "Blue Clay" is reported by LaForge (1932) to underlie much of the Boston Lowland, and generally is the first unconsolidated deposit above bedrock.

Horizontal variations of this clay unit were encountered along the southwestern side of the Site. Refer to Cross Sections A-A' and B-B'. At MW-1 this unit is represented by a gray silty, slightly sandy, deposit which may be riverine sediments deposited historically by the Mystic and Malden Rivers. This facies grades upward to a silty clay/clayey sandy silt unit, ranging from about 5 to 10 feet thick, which appears to overlie the gray to blue clay unit to the north. Again these materials may have been deposited by the Mystic and Malden Rivers. In the central, western and northern portion of the Site this potentially riverine deposit appears to be directly overlain by about 4 to 7 feet of man-made fill. However, in the southwestern portion, closer to the Mystic River (MW-1 and MW-2), the upper portion of the potentially riverine deposit is replaced by a sequence of dark brown to black organic silt with occasional lenses of peat and shell fragments. The depositional environment of the organic silt was probably in relatively recent marine tidal marshes. The thickness ranges from about 14 feet at MW-2 to about 20 feet at MW-1. Directly overlying this organic silt sequence is fill probably placed during reclaiming of the wetlands by man.

The unconsolidated sediments southeast of the railroad tracks appear to differ somewhat from those northwest of the tracks. Boring MW-3 encountered a more sandy sequence with no organic silts or plastic clay. It may represent material dumped there during reclamation of the wetland for construction of the now demolished buildings or as a base for the nearby railroad bridge. However, at MW-4 the presence of a sequence similar to that encountered at MW-1 (including organic

6

MCO  7682647

silt), may indicate that perhaps at least a portion of the materials in this area were deposited naturally.

Overall, nearly the entire Site appears to be covered by about 5 to 15 feet of man-made fill according to logs of old foundation borings drilled previously on the site. Based on our borings, this is directly underlain by dark brown to black organic silt and peat tidal-marsh deposits or gray clayey silt to silty sand riverine deposits. In the central, northern and western portions of the Site a thick gray to blue highly plastic clay is present in place of the lower and middle portion of the silty riverine deposits. Supplemental, very generalized, data based on old foundation boring logs (Monsanto drawing E-64-762), indicate that 5 to 10 feet of potentially relatively permeable natural material may be present between the surficial fill and the clay sequence. It should be noted that the soils described in these logs were classified for engineering bearing load purposes rather than for their geologic or hydrologic characteristics. A geologist was probably not present. This material seems to be present in an arc shaped area, southeast of Mystic View Road in the vicinity of MW-1, MW-6A, MW-7 and B-8 to about 400 feet west of the plastics containment lagoon. Unfortunately the data stops near the property line. We encountered relatively permeable materials at this interval only in boring No.-8 (refer to Plate 3D). The log of old foundation boring W-223 in the area southwest of the polymeric warehouse indicates the possible presence of potentially permeable material to a depth of about 40 feet below ground surface (bgs) with clay present only between 10 to 15 feet (bgs). This would appear to be the only location beneath the site where the relatively thick clay sequence is considerably thinner (perhaps less than 5 feet).

### 2.2.4 Hydrology

#### 2.2.4.1    General

The earlier portions of Section 2.0 have set the geologic framework for the Boston/Mystic River estuary vicinity and Monsanto Everett, Plant in particular. The general lithologic character of the bedrock and a more detailed discussion of the unconsolidated (soil) surficial deposits overlying the bedrock as well as vertical and lateral variations in distribution has been presented. Utilizing this geologic framework we will, in this section, describe the unconsolidated (soil) deposits encountered as well

MCO  7682648

0000336

as their general relationship to surface water, ground water, ground water elevations, fluctuations and flow-direction, and a general discussion of perched water conditions.

2.2.4.2    Hydrologic Description

       The upper portion of the permeable sand unit directly below the thick sequence of relatively impermeable clays, silts and silty clays has been evaluated by seven test/monitoring wells. Construction details of the seven test/monitoring wells plus an additional test/monitoring well screened in shallower deposits (MW-6B) is given in Table 1. Geologic logs, construction schematics, and other details are given in Plates 3A through 3D. This sand unit is permeable but is not considered an aquifer since it is not currently being developed for water supply purposes and its proximity to saline water in the bay would normally preclude such use. The upper surface of this sand unit which has been penetrated 7 to 12 feet ranges from about 34 (MW-4) to 47 (MW-7) feet below ground surface. This deposit may represent pre-Wisconsin glacial outwash, and ranges from a gray sand with minor gravel and silt to gray silty sand with occasional gravel.

       Ground-water elevations were measured in each of the test/monitoring wells and are presented in Table 2. The data indicate that the sand unit appears to show artesian conditions where overlain by the thick clay and silt sequence. The water level in Well MW-6B appears to be abnormally high. However, this well is screened in the fill above the thick clay sequence and indicates a locally perched water table condition. The source of this perched water is probably precipitation that infiltrates the surficial fill. These ground water elevations have been contoured (lines of equal elevation), and the estimated general direction of flow perpendicular to the contour lines is presented on Plate 5. The ground water flow pattern is fairly simple with a ridge or high beginning in the vicinity of the plastics containment lagoon and slowly plunging to the south. The ridge or high may be the natural configuration of the water table at the time of water level measurements; or may indicate an artificially induced "mounding effect" near a potential source of recharge such as the lagoon. Much of the ground water encountered beneath the Site appears to flow south to southwest toward the Mystic River at an estimated hydraulic gradient ranging from about 7 feet per mile (0.13%) to about 13 feet per mile (0.25%). A small amount of the ground water in the vicinity of Well MW-5 flows southwest at a similar range in hydraulic gradient.

8

D.A.1485 C iv Di ' '

MCD    7682649

The presence of varying amounts of silt within the sand unit directly effects the amount of water that can be produced. During well development, ground water yield ranged from a high of over 15 gallons per minute (gpm) from the relatively silt-free sand in well MW-3 and MW-4 to a low of negligible production from the relatively "tight" silty sand in Well MW-2. The remaining yields from the upper portions of the sand unit are about $5^+$ gpm from MW-1, 3 gpm from MW-6A and 1.5 gpm each from MW-5 and MW-7. Ground water is stored in and transmitted through the primary voids (intergranular voids) in unconsolidated deposits. Thus, the more silt that is present, the smaller and fewer the interconnected voids, and finally the slower the rate of flow. The rate of flow is also dependent upon the hydraulic gradient which, as discussed previously, shows a fairly low slope.

The Mystic and Malden Rivers border the Monsanto Site on two sides (Plate 2). The depth to ground water in the wells near these rivers appear to be similar to the river surface water level, indicating at least partial hydraulic communication between ground water and surface water. Based on the ground water contours shown on Plate 5, there appears to be a slight recharge of the rivers by much of the ground water beneath the site. Tidal fluctuations below the Amelia Erhardt Dam may cause a flushing or at least a mixing of the ground water in the apparently more permeable facies of the unconsolidated materials present in the vicinity of Wells MW-3 and MW-4. These deposits appear to be recharged generally from the north. Although as discussed previously in Section 2.2.3, the area just southwest of the polymeric warehouse may consist of a locally thicker, more permeable, facies underlain by a thinner clay sequence. This may possibly be a second local minor on-site recharge area, but cannot be confirmed by existing data.

As noted previously the ground water elevation in shallow Well MW-6B, indicates a perched water condition. Based on Geologic Cross Section A-A' (Plate 4), this perched water would appear to flow generally to the north along the sloping upper surface of the clay sequence. The flow is toward a marsh which generally drains into the Malden River just upstream of the Monsanto Site. The plastics lagoon is located just north of Well MW-6B and is apparently at least partially effected by this perched water. According to Mr. Newcomer (Monsanto) during a phone conversation on December 10, 1979, below a certain point, water levels inside the lagoon appear to remain stabilized during pump-out by a constant inflow of ground water. Although storm water runoff from the plant is gravity fed into this lagoon, it apparently never

9

MCO 7682650

0000338

## 3.0 SURFACE WATER, GROUND WATER, AND SOIL CHEMISTRY

### 3.1 General

In this section we present the results of the chemical analysis of the soil sample, surface water sample and ground water samples from the Monsanto Everett, Plant. The chemical constituents for which the samples were analyzed and a summary of the analytical results are presented in Tables 3 and 4. The method of ground water sampling is described in Appendix A. The original reports from Penn Environmental Labs are attached as Appendix B.

The Mystic River water above the Amelia Erhardt Dam is classified by the State of Massachusetts under proposed regulations as

B:  "Waters assigned to this class are designated for the uses of protection and propagation of fish, other aquatic life and wildlife; and for primary and secondary contact recreation."

The Marine water below the Dam is classified as

SC:  "Waters assigned to this class are designated for the protection and propagation of fish, other aquatic life and wildlife; and for secondary contact recreation."
(Source: Metropolitan District Commission, 1979)

The proposed Federal EPA water quality limits, if established, are shown on Table 3 for reference and comparison. These proposed limits were published in the December 18, 1978, issue of the Federal Register. No water quality limits have been proposed or established for any of the organic compounds of concern to this study. However, bis phthalate, butyl benzyl phthalate, di-n-butyl phthalate, di-n-octyl phthalate, and Aroclor 1248 are in the proposed list of "Selected Priority Pollutants" also published by the EPA in the aforementioned issue of the Federal Register. The proposed Federal human health limitations for some of the phthlate compounds (particularly di-n-butyl and dimethyl phthalate) as described in the Federal Register of 3/15/79 and 7/25/79 are considerably higher by several orders of magnitude than those chemical concentrations detected from the sampling program of October 19, 1979.

11

MCO  7682652

overflows; which indicates a leak and probable hydraulic connection with the perched
water table, immediately adjacent to the facility.

MCD   7682651

MW-2, MW-6B and MW-7), indicating probable hydraulic communication between the
ground water beneath the Monsanto Site and the Mystic River.

Another source direction for the phthalates in the River is from a possible
leak in the plastics containment lagoon into the shallow perched water table; flow
northward to the marsh; then draining into the Malden River and finally the Mystic
River (previously discussed at the end of Section 2.2.4.2).

## 3.4    Ground-Water Chemistry

### 3.4.1 Inorganic Parameters

Ten of the eleven inorganic parameters were identified in one or more of
the ground water samples from the eight test/monitoring wells. Mercury was not
detected in any of the samples, while nitrate and chromium were detected but at
levels below the proposed EPA water quality limits. No limits have been established
by the Federal EPA or Massachusetts for the detected concentrations of total
phosphates, antimony, cyanide and nickel. However, for a reference, the detected
levels of cyanide and nickel are well below the limits established by the neighboring
State of New York. Of the remaining four inorganic parameters: arsenic is detected
in samples from MW-6A and MW-6B, exceeding the proposed EPA limits only at MW-
6B (shallow well next to the plastics lagoon); zinc (detected in all samples) exceeds the
proposed EPA limit in samples from MW-3, MW-5, MW-6B (considerably), and MW-7;
lead (detected in all samples) exceeds the proposed EPA limit in all samples except
from MW-2 and MW-6A; finally sulfate (also detected in all samples) exceeds the
proposed EPA limit in all samples except from MW-2. Of these four inorganic
parameters which occasionally exceed EPA established water quality limits, only the
sulfate concentrations provide an overall pattern which appears to point to one main
source northeast and east of the plastics lagoon (see Plate 6).

### 3.4.2 Organic Compounds

Of the 12 organic compounds for which the ground water samples were
analyzed (Table 4), only 5 were identified, of which the first two, non-volatile, are
most prevalent: bis phthalate, butyl benzyl phthalate, di-N-butyl phthalate, di-N-octyl
phthalate, and di-octyl adapate. However, as stated previously in Section 3.1, all four

13

MCD   7682654

## 3.2  Soil Chemistry

Only one sample of the soil was chemically analyzed and only for the organic compounds. It was obtained from Boring 6B at a depth of about 40 feet below ground surface. The sample has an aromatic odor similar to strawberries. Only one of the organic compounds (bis phthalate) was identified in this sample at a concentration of 18 parts per billion (ppb), the smallest amount detected in any of the samples.

## 3.3  Surface Water Chemistry

### 3.3.1  Inorganic Parameters

Chemical analysis of the Mystic River water sample indicates that none of the eleven inorganic parameters, for which it was analyzed exceed the proposed EPA water quality limits. The Mystic River water sample analysis results are generally in concentrations that are equal to (not detected) or less than the concentrations indicated for the ground water samples, except for nitrates and total phosphate. These concentrations are very nearly the same between the ground water sample from MW-1 and the Mystic River water sample. Reported nitrate concentrations detected in the ground water samples are all less than that found in the Mystic River water sample. One half of the ground water samples (MW-1, MW-3, MW-4 and MW-6A) contain higher concentrations of total phosphate than the Mystic River sample, the remaining half are less than the river sample. It appears that most of the inorganic parameters of concern to this study are nonexistent in the Mystic River or possibly diluted enroute from the ground water to the Mystic River. Sources that could contribute nitrate and phosphate to the surface water (i.e. municipal landfills, septic tanks, poor waste disposal practice, etc.) exist upstream of Monsanto. The source(s) of the nitrate appears not to be Monsanto, however nitrate is generally a good indicator of contamination particularly from common sources such as sewage outflow.

### 3.3.2  Organic Compounds

Only two of the twelve organic compounds were identified in the Mystic River water sample: bis phthalate and butyl benzyl phthalate. However, the concentrations are very similar to those detected in the ground water samples (MW-1,

MCO    7682653

12

0000341

of the phthalates are proposed as "priority pollutants" by the EPA. There are currently no Federal EPA or Massachusetts water quality limits for any of these compounds. Two or more of these compounds have been detected in samples from wells near the river (MW-1, MW-2, and MW-7) and wells near the plastics containment lagoon (MW-6A and MW-6B) and in the Mystic River water sample. Well MW-7 contains all five of the compounds and has the highest average total of detected phthalates of the ground water samples (see Plate 7). While the Mystic River water sample has the highest overall average total of detected phthalates. Well MW-6A has the lowest average total of detected phthalates, perhaps indicating that they are moving away from the plastics lagoon before reaching the sand unit below the thick clayey sequence.

Aroclor 1248 was not found in any appreciable concentrations at either MW-6A or MW-6B. PCB's although relatively immobile in soils that are leached with aqueous solvents may become highly mobile in those soils that are leached with organic solvents and we do not suggest dismissing the possible presence of PCB's based on a single assessment of ground water quality. It is possible that any lower-chlorinated isomers have fractionated over time or "disappeared" through alternative attenuation mechanisms.

The main source for the phthalates may be the plastics containment lagoon which, because of its high hydraulic head relative to the regional water table, would serve to induce a downward vertical component of flow. Liquid is frequently pumped into the lagoon but it never seems to overflow. This leakage is probably northward to the marsh which then drains into the Malden River (refer to discussion at the end of Section 2.2.4.2). According to Mr. Newcomer (Monsanto), phthalates have not been dumped in this lagoon since 1970. However, storm water runoff is discharged into the lagoon and it may contain phthalate compounds collected from other parts of the plant. Storm water runoff has been documented elsewhere as a mechanism for contaminant transport and, in addition, as one of several principal sources of general ground water contamination.

Movement of the phthalates from ground surface through the thick, relatively impermeable, clay sequence to the sand unit below appears unlikely. However, the large number of foundation engineering boreholes at the plant may have provided channels for vertical movement of the phthalates through the thick clay

14

MCO 7682655

0000343

sequence, especially if they were backfilled with more permeable material. Also, as discussed previously near the end of Section 2.2.3, the area just southwest of the polymeric warehouse appears to consist of thicker sandy materials underlain by a thinner clay sequence, especially in the vicinity of old test boring W-223. This area may provide a zone of easier downward movement for the phthalates; particularly during storm events when compounds in the upper unsaturated zone could be flushed downward with percolating rainfall.

None of the 12 organic compounds were detected in ground water samples from Wells MW-3, MW-4, and MW-5. At Wells MW-3 and MW-4 this may be due to "flushing" or dilution potential from Mystic River tidal fluctuations in the relatively more permeable facies of the aquifer. There may be no direct connection between the apparent contamination and Well MW-5.

15

MCO    7682656

0000344

## 4.0 GENERAL FINDINGS 

Based on our review of the literature and our preliminary field and laboratory investigations, the general findings of this Phase I - Hydrogeological Survey are as follows:

1. The unconsolidated deposits underlying the Monsanto site as encountered by this study range from thick, relatively impermeable silts and clays to more permeable sand and gravel lenses which are all covered generally by 5 to 15 feet of surficial man-made fill. The thick (40 to 60 feet) clay and silt sequence is by far the prevalent material underlying the site with the more permeable materials generally present as lenses or comparatively thin layers above (0 to 15 feet thick) or below (7 to 12 feet) the clayey sequence. Logs of old foundation borings on site appear to indicate the possible presence of 5 to 10 feet of relatively permeable materials between the fill and the thick silt/clay sequence. These materials appear to be present in the area from Well MW-1 to B-8 to at least 400 feet west of the plastics containment lagoon, but were encountered by us only at B-8. The location where these relatively permeable materials appears to be the thickest, about 40 feet with only 5 feet of clay, is just southwest of the polymeric warehouse.

2. A permeable sand unit occurs below the thick silt/clay sequence, and as encountered by our study, shows artesian conditions and is composed of sand with occasional gravel and varying amounts of silt. Generally, the sand unit is not a good producer of water, ranging from a yield of over 15 gallons per minute (gpm) from more silt-free material at MW-3 and MW-4 to a negligible amount from the silty sand at MW-2.

3. Based on the higher water level elevation in Well MW-6B (screened in the man-made fill) and the inflow of water into the plastics containment lagoon when the liquid level is pumped below a certain level, there appears to be a perched water table above the thick clay/silt sequence.

4. The ground water flow directions are fairly simple. The perched water appears to flow north along the apparently gentle slope of the upper

MCD  7682657

0000345

surface of the thick clay/silt sequence (Geological Cross Section A-A'). Contouring of water level elevations obtained from wells screened in the sand unit below the thick clay/silt sequence, indicate that the flow is divided by a slight high or ridge trending, and slowly plunging generally to the south from the vicinity of the plastics lagoon. This may indicate perched water table mounding under the lagoon. Water flow west of this ridge, which underlies about 2/3 of the site, is toward the Mystic River at a hydraulic gradient ranging from an estimated 7 to 13 feet per mile. The ground water flow east of this ridge is at a similar gradient.

5.  Recharge of the perched water table is probably precipitation. Recharge of the sand unit appears to be from the north with at least partial discharge of the ground water within the permeable saturated zones beneath the site into the Mystic River toward the west and southwest.

6.  Some chemical contamination was detected in a surface water sample from the Mystic River, a soil sample at a depth of 40 feet below ground surface from MW-6A, and in several of the ground water samples. Concentrations exceeding the proposed EPA water quality limits for sulfate, arsenic, lead, and zinc were detected in some of the ground water samples, while corresponding concentrations detected in the surface water sample from the Mystic River were lower (below the EPA proposed water limits where established for all analyzed inorganic parameters). Plasticizer compounds, particularly Phthalates which are esters, prepared from phthalic anhydride, were detected in ground water samples from Well MW-1, MW-2, MW-6A, MW-6B, and MW-7 and at very similar concentrations in the water sample from the Mystic River. Although no water quality limits have been established or proposed for phthalates, they are proposed as "priority pollutants" by the Federal EPA.

7.  One of the main sources of contamination appears to be the plastics containment lagoon which is constructed in relatively permeable materials allowing leakage of the contained liquids through the sides and/or floor.

17

MCO  7682658

0000346

8.  Old foundation bore holes (over 200 of them) could forseeably provide pathways for vertical movement of contaminants down through the thick relatively impermeable clay sequence that underlies a considerable portion of the property.

9.  Another apparent source of ground water contamination in addition to the plastics containment lagoon is the marshland area in the north and northwest corner of the plant. Sulphate chemical concentration contours mapped from the ground water quality analyses of October 19, 1979, increase rapidly in the direction of the marshland area (see Plate 6). We understand that approximately 66,000 tons of calcium sulphate was piped out into this area as discharge from the H-Acid Building and that the slurry had not been buried, lined, or covered. We suspect that leaching of the compound in the subsurface is continuing to take place.

10.  Based on our results to date, we have identified two current problem areas at the Everett Plant site; 1) the plastics containment lagoon (phthalates), and 2) the marshland area to the north (sulphates). We understand that other problem areas may exist such as the land dumping area behind the CYA building, the acetic residue site between the MDC easement and plant warehouses, and possibly by-products from the Alum process (aluminum sulphate) dumping area toward the southern end of the plant. An expanded chemical analysis program would be required to investigate these areas and would include Biological Oxygen Demand, Total Organic Carbon, Aluminum, etc. in accordance with Monsanto's objectives. However, these materials are fairly soluble and any long term repetitive "flushing" activity such as tidal fluctuations and river stage changes would be expected to substantially reduce ground water concentrations.

MCD   7682659

0000347

CONFIDENTIAL

## 5.0  CONCLUSIONS AND RECOMMENDATIONS

Organic and inorganic contamination is present in the ground water beneath the site. Only organic (phthalate) contamination is apparent (based on analysis of our sample) in the Mystic River, but at concentrations very similar to those detected in the ground water samples.

We recommend implementation of a Phase II program to include a second sampling and analysis program with additional sampling points from surface water and ground water sources. Such a program will serve to expand the existing water quality data base and to further confirm the elevated chemical concentration of levels of certain compounds as listed in Tables 3 and 4. The overall purpose of additional monitoring points is to now install a system of strategically placed wells to more accurately define the nature and extent of contamination in the vicinity of the containment lagoon and to monitor ground water quality on a plant-wide basis in response to results developed from this report. We suggest adding the constituents napthalene and phthalic acid to the analytical program during a second round of sampling since there is a possibility that some may remain in the ground from past disposal operations at the old plant dump site, located under what is presently the existing Service Building and the MDC access road which leads to the dam. Both materials are considered hazardous waste.

As shown on Plate 8, Additional Phase II Monitoring Well & Sampling Locations, we recommend installation of four (4) monitoring wells identified as MW-8, MW-9A, MW-10A, and MW-11A and seven (7) shallow manually-installed well points identified as MW-9B, MW-10B, MW-11B, MW-12, MW-14, MW-15, and MW-16.

At these locations; MW-9, MW-10, and MW-11, the shallow wells would be installed adjacent to the deeper wells forming a well cluster similar to the existing cluster at MW-6. Ground water samples collected from the cluster wells assess the vertical extent of contamination as well as its lateral extent by effectively screening a different zone of the saturated unconsolidated deposits above and below the clay unit thus providing a three-dimensional view into the subsurface. This concept also provides important hydraulic gradient data in a permanent ground water monitoring program.

19

MCO 7682660

0000348

The wells are to be designed and located (see Plate 8) in positions which are likely to intercept contamination from potential source areas. Shallow well points along Mystic View Road will provide ground water quality adjacent to the lagoon and potential contaminant flow direction away from the lagoon above the clay and will identify the hydraulic interrelationships between the lagoon and Mystic River. The deeper wells, as shown, will fill in data gaps and provide needed hydrogeologic data regarding the extent of the clay unit between the overlying fill and the permeable sand unit below. Cluster location MW-10 will assess the possible presence of a potentially thick sequence of relatively permeable sediments which may be creating a localized recharge zone southwest of the polymerics warehouse. In overview, the additional wells as planned, will provide more conclusive results regarding potential ground water/surface water contamination in certain areas at the Everett Plant site.

We recommend the placement of a staff with surveyed elevations in the Mystic River near MW-1 which would assist greatly in comparing the river water level with ground water levels and also in the plastics containment lagoon to compare hydraulic head relationships between water within the lagoon and ground water via water level measurements in monitoring wells around and adjacent to the impound-ment.

The installation of continuously recording tide gauges in the Mystic River below the Amelia Erhardt Dam and in Well MW-4 would provide quantitative data to assess the effect of tidal fluctuations on ground water. The gauge placed in Well MW-4 could be moved to other wells if fluctuations are present, to assess the extent of tidal effects inland from the river. In place of the installation of two continuous water level recorders, we would recommend manually recording water level fluctua-tions in all of the monitoring wells nearest Mystic River through one complete tidal cycle.

Once the additional monitoring wells, as described above, are installed, a complete round of water level measurements through one complete tidal cycle should then be taken in order to verify the water table configuration and general direction of ground water flow in response to the cyclic tidal and stage fluctuations in the bay and river adjacent to the plant.

MCD  7682661

0000349

These recommendations are based on our understanding of subsurface conditions at the site, and we cannot too strongly stress the need to properly identify the pollution problem and the boundaries of the pollution problem. Collection of this additional data will provide sufficient evaluation for implementation of an appropriate engineering program designed to mitigate any existing contamination and prevent future contamination from the containment lagoon area including responsive design considerations with regard to the existing impoundment, abandonment, and or the potential installation of a new facility in compliance with impending RCRA-related legislation.

21

MCO    7682662

0000350

# EXHIBIT I

Monsanto

*Dave W Cooper / L.C.*
*Please have a meeting*
*please more prove it together*

FROM
(NAME—LOCATION—PHONE)   J. H. Waldbeser — General Offices A25A (4-2029)

DATE          : November 19, 1981          *for review as discussing — later on ...*
                                                M. J. Feeney — G5EF
SUBJECT       : Sale of Everett property to NVCA,    V. T. Matteucci — B2SC
                Boston Edison                        R. S. Nelson — A25A
REFERENCE     : Memo from RAS to RGC dated 11/13/81   R. A. Stohr — B3NJ

TO            : R. G. Cooper — E2NE

    As per the referenced memo and your telephone request, attached
    is a draft site history and environmental status summary for
    the Everett Plant property which is up for sale.  I could
    have been much more specific and included more detail (raw
    groundwater data, listings of materials handled at pilot
    plant, etc.), or I could have been more general in drafting
    the attached summary.

    Please comment as to your needs.  I also am requesting that
    the carbonees comment on the attached and any appropriate
    additions or deletions.

                        Jeff Waldbeser
                        J. H. Waldbeser

    /dkr
    Attachment

EVE   1632680

V. 10 (REV. 8 '77)

0006321

## SITE HISTORY AND ENVIRONMENTAL STATUS SUMMARY
## SALE OF EVERETT PLANT EAST SIDE PROPERTY

Monsanto's involvement with the 35 acres of land in Everett Massachusetts, which is being offered for sale, began in 1929. During the period from 1929 until the present, the site was used for the manufacture of chemicals, as a research pilot plant, and for storage of raw materials. Chemicals which were manufactured at the site include sulfuric and nitric acids, aluminum sulfate, ferric sulfate, ferric nitrate, other acid salts, sodium bisulfite, and ethyl alcohol. Raw materials which were stored on the site include sulfur, iron ore (sulfides and oxides), bauxite, pyrites cinder, and salt. Alum mud (aluminum sulfate) was a waste material disposed of on the site. The research facility/pilot plant handled numerous organic and inorganic materials. It is possible that as a result of any or all of the above past operations, the site may contain detectable quantities of the various raw materials, products, wastes, and intermediates. Considerations for future use of the site should recognize the potential presence of these materials and should be compatible with their potential impact.

Following is a summary of the environmental status of the site based upon all existing data. The upper 5 to 10 feet of the site is composed of surficial man-made fill. A clay and silt sequence of unconsolidated deposits is underlying this fill and is 40 to 60 feet thick. A permeable sand unit occurs below this silt/clay sequence. Bedrock is at least 50 feet below the ground surface (probably 100 to 150 feet). There are no aquifers under this site.

The land surface is contaminated with some of the raw materials which were stored on site. Soil samples taken from the upper 4 feet of the site indicate the presence of sulfur, bauxite, iron ore, and other inorganic metal salts. In addition, the site is covered with man-made fill which includes brick, concrete, decaying wood, steel structural members, and pipe.

Three groundwater monitoring wells were installed on the site. Groundwater samples from the wells were analyzed for metals, priority pollutants, certain other organics, and other parameters such as phosphate, sulfate, nitrate, cyanide, phenol, chloride, specific conductance, total organic carbon, and pH. The analysis did not indicate the presence of any of the organic compounds, including the organic priority pollutants, at or above detectable levels. Concentration levels of total

EVE  1632681

Page 2

organic carbon, chloride, specific conductance, sodium, zinc, sulfate
and lead were somewhat higher than would be expected for ambient
groundwater in some of the samples. The source of these
materials could have been the past operations on the site, the
naturally occurring deposits, the man-made fill prevalent in
the area, and/or saltwater intrusion. All other parameters
were found at levels which are considered to be normal back-
ground for groundwater in the area.

EVE  1632682

0006323

# EXHIBIT J

onsanto

TO
NAME—LOCATION—PHONE:    Irving A. Newcomer, Everett

FROM  :  June 3, 1980    cc: J. I. Doyle
                              J. D. Garrison
SUBJECT  :  Everett Plant, East Side    T. P. Hanley
            Assessment                   M. A. Wade
                                         D. - Woo
REFERENCE :

>  :  R. E. Cummings

Chemical materials have been produced on the East Side property of
the Everett Plant, Monsanto Company, since 1868. Acids, Sulfuric
and Nitric, and acid salts being the predominant materials produced
from that time through the mid 1970's when all operations on the east
side property were discontinued and buildings dismantled. A list of
all materials produced and a print showing the location of production
facilities is attached. An Everett Plant chronology is also included.

There is no evidence of dumping or the disposal of chemical waste
materials on or at the perimeter of the east side site with the excep-
tion of a pond where alum mud was discharged from settlers. This
pond, used prior to 1932, was filled in and used for building expan-
sion of the alum production facilities at that time.

There were large areas on the east side used for raw material stor-
age piles of several thousand tons each of Sulfur, Bauxite, Iron ore
(Sulfide and Oxide), and salt. Location of these storage areas are
shown on an attached print. Of these, the only area of possible con-
cern is the sulfur storage area which contains some residual sulfur
which, for the most part, has been covered by fill in the years follow-
ing 1952 when the use of bulk solid sulfur was discontinued.

We estimate that between 30 and 120 tons of sulfur is spread over an
area of up to 60,000 sq. ft. To remove this sulfur contaminated soil
could cost up to $600,000.00 since, of two local Massachusetts land
fills, neither expressed a willingness to accept the material and it
would have to be shipped to CECOS in western New York. A sheet
detailing the cost estimates is attached.

We do not believe it would be economically or environmentally sound
to remove the sulfur contaminated soil. An alternative would be to
mix the existing sulfur contaminated soil layer with adjacent layers
to reduce the sulfur concentrations to acceptable levels. The esti-
mated cost for this alternative would be 10 to 15 thousand dollars.

— EVE  1630078

-2-

Based on a hydrogeologic survey conducted in 1979 by Dames and Moore, consultants in the environmental and applied earth sciences, the east side property is primarily man filled land for the upper five to ten feet over a bed of various grades of gravel, sand and silt with no bed rock down to a level of at least forty feet below the surface. Other surveys conducted in the area indicate bed rock at levels of approximately 100 feet. A plant boring record with existing building foundations as of May, 1949 is attached.

As part of the survey, two ground water monitoring wells were established in the area. The locations of the wells are shown on the print with the material storage areas to show possible relationships. The water samples taken from the wells did not indicate the presence of any organic materials known to have been involved in the chemical manufacturing on or near the well sites.

Of the inorganic materials suspected to be present, elevated sulfate levels were found at both wells reflecting the past sulfuric acid production facilities nearby. Some sulfur and iron oxides were found near the southerly well, reflecting past outside storage locations and operations conducted in the area. A sketch showing the soils encountered in the well drilling operation and the monitoring well water analyses are attached.

In summary, we have no appreciable concern over the sale of the east side property to a prospective developer provided much of the information included in this memo is made available.


                                        Irving A. Newcomer



bf
attachments

Everett Plant, East Side Production and Resale Facilities

| | |
|---|---|
| Sulfuric Acid | 58°Be', 66° Be', Monohydrate, 30% oleum and 65% oleum. Lead chamber and contact process. |

Nitric Acid

Mixed Acids        (Nitric and Sulfuric to order)

Alum, Aluminum Sulfate

Iron Free Alum

Sodium Bisulfite, Liquid and Dry

Ferric Sulfate

Ferrisul, Anhydrous Ferric Sulfate

Ferric Nitrate

Alcohol, Ethyl from grain and/or molasses

Carbon Dioxide, Liquid and Block

Pyrites cinder, $Fe_2S$ and contaminants

Sulfur

Information sources: W. L. Emmons, L. S. Allen, J. DiTommaso, D. P. Crescenci, C. E. McCoy and I. A. Newcomer.

Laboratory Specification notebook dated back to 1923
Merrimac Chemical Co. catalogs and information books - 3 and 4 editions
    issued during 1929 and 1932
Monsanto Chemicals and Plastics - 27th edition
Everett Plant History by Robert O'Brien
Monsanto Current Events - 1929, 1930, 1931 and 1932.
History of Monsanto Chemical. Author unknown.

5/29/80 IAN

## EVERETT PLANT HISTORY

1847   Cochrane Chemical Company (Malden, MA.)

1868   Cochrane Chemical Company purchased the New England
       Chemical Company on the Everett Plant site.

1894   Cochrane Chemical Company consolidated all operations
       on the Everett Plant site.

1917   Cochrane Chemical Company purchased by the Merrimac
       Chemical Company.

1924   Merrimac Chemical Company purchased the Anderson
       Chemical Company of New Jersey.

1927   Merrimac Transportation Company founded.

1929   Merrimac Chemical Company purchased by the Monsanto
       Chemical Works, retaining the name Merrimac Chemical
       Company as part of the "Monsanto Group."

1930   Work began to consolidate Woburn operations at the
       Everett Plant site - completed late 1931.

1933   Monsanto and Central Aquirre Associates jointly formed
       the New England Alcohol Company on the Everett Plant
       site.

1937   Merrimac Chemical Company became the Merrimac Division
       of the Monsanto Chemical Company.

1951   Lacquer plant and operations sold to Raffi and Swanson.

1954   New England Alcohol Company liquidated.

1954   Merrimac Division became a part of the Inorganic
       Chemicals Division of the Monsanto Chemical Company.

1971   The Organic and Inorganic Division operations at the
       Everett Plant became a part of MICC.

IAN 9/26/79

EVE  1630081

0009978

Everett Plant, Pilot Plant Operations

Materials produced in the East Side facilities.

Di hydroxy di phenyl sulfone

Mersize (Rosin & Maleic anhydride)

Syton, Silica suspension in water

Santocel, Silica gel

Furfural

Lamp black

Calcium Nitrate

ACL Products (chlorinated cyanurates)

Cyanuric Acid

Styrene Maleic Anhydride

Alkyl Phosphates - using eight different alcohols

Trisodium Phosphate

Detergents

Nitro Styrene

Scripsets (Stymer) Styrene Maleic co-polymer

Styrene polymer emulsions

Theo glycolic acid

Reslooms, (water soluble methylol melamine)

Melamine; melamine formaldehyde resins

Quaternary ammonia compounds

Sulfonated organic compounds

Thyamine analog

Choline chloride

Tanning agents

EVE  1630082

0009979

Information sources: W. L. Emmons, C. E. McCoy, L. S. Allen and
L. A. Newcomer

5/29/80 IAN

EVE  1630083



EVE  1630084

Sulfur Removal and Disposal Cost Estimates for
East Side Sulfur Storage Area.

The cost estimates were prepared with the aid of Mr. Stephen
Demeter of Bond Bros. The clean up operation would consist
of removing the top layer of uncontaminated fill, scraping up
the sulfur bearing soil based on visual determination and
loading for disposal shipment. The uncontaminated fill would
then be replaced.

We are estimating an area of 60,000 sq. ft. with an average
of one foot deep of soil to be disposed of; ca. 2200 yd$^3$ to be
disposed of.

Clean up $15.00 per yd$^3$ x 2200 yds$^3$ =   $ 33,000

Disposal $150.00 per yd$^3$, CECOS   =   330,000

Transportation $88/yd$^3$ - Bond Bros.=   194,000

Loading Costs $5/yd$^3$   - Bond Bros.=    11,000

                    Total Estimate   =  $568,000

bf

EVE  1630085

0009982



EVE  1630086

0009983

# EXHIBIT K

MdF's file 5045

# Monsanto

REGISTERED MAIL
RETURN RECEIPT REQUESTED

Monsanto Company
800 N. Lindbergh Boulevard
St. Louis, Missouri 83166
Phone: (314) 694-1000

January 22, 1982

Boston Edison Company
800 Boylston Street
Boston, Mass.  02199

Attention:  Mr. J. W. Cox          Re:  Proposed Property Sale
            Manager, Real Estate &        to Boston Edison Company
            Property Tax Department

Gentlemen:

Our firms have been discussing the proposed purchase by Boston
Edison Company from Monsanto Company of a tract consisting of
approximately 35 acres located near Boston Edison's power plant
and adjacent to Monsanto's chemical manufacturing facility
located in Everett, Massachusetts.

In order to assist Boston Edison in its evaluation of the tract
and its suitability for purchase, we are providing the follow-
ing information regarding prior uses of the tract and the
results of a soil survey which Monsanto recently conducted.  In
addition, we will be providing Boston Edison information com-
piled by Dames & Moore with respect to water samples taken from
three groundwater wells installed on the tract.  While reasonable
efforts have been made in the compilation of this data, Boston
Edison should understand that Monsanto and Dames & Moore assume
no responsibility or liability for its accuracy or completeness
and that Boston Edison is solely responsible for making whatever
investigations are required for it to assure the tract is fit
and suitable for contemplated and future uses.

Prior to 1929, the tract was used for chemical manufacturing
by others including Cochrane Chemical Company and Merrimac
Chemical Company.  Monsanto's involvement with the tract began
in 1929.  From 1929 until approximately 1975 the tract was used
for the manufacture, storage and research of chemicals.  During
these periods (and thereafter) chemicals and waste materials
may have spilled onto or were disposed of on the tract.  Our
records do not reflect these applications nor the chemicals
and materials involved and therefore we are unable to provide
a comprehensive description.  However, we do believe that the
following chemicals were among those manufactured on the tract:
sulfuric and nitric acids, aluminum sulfate, ferric sulfate,
ferric nitrate, other acid salts, sodium bisulfite and ethyl
alcohol.  We also believe that the following chemicals were among

EVE  1632550

0006273

Boston Edison Company·        ~2~            January 21, 1982

those stored on the tract: sulfur, iron ore (sulfides and
oxides), bauxite, pyrites cinder and salt. Waste materials
disposed of on the tract include alum mud (aluminum sulfate).
Research chemicals included numerous organic and inorganic
materials among which are those shown on Attachment 1.

We recently conducted a cursory soil survey of the tract con-
sisting of 31 randomly selected survey holes, 28 of which were
excavated with a backhoe to approximately five feet deep. Where
visual observations showed anything unusual, samples were taken
and analyzed. Results of these visual observations and analysis
are shown on Attachment 2. A map showing approximate locations
of the survey holes is Attachment 3.

In summary, Boston Edison should recognize that the tract had
been used for many years for the manufacture, storage and
research of chemicals, many of which may be toxic or hazardous;
that chemicals and waste materials may have been spilled onto
or disposed of on the tract; that chemicals and waste materials
may remain in or upon the tract; and that any future use of the
tract should be undertaken only after consideration of its
possible contamination. If Boston Edison would like to undertake
additional investigation of the tract in order to satisfy itself
more fully as to the suitability of the site, please let us
know so that the necessary arrangements may be made.

Very truly yours,

M. James Feeney
Manager, Domestic Financial
Analysis/Real Estate

/ch

Attachments

bcc:  R. G. Cooper - E2NE
      M. J. Feeney - G5EF
      V. T. Matteucci - B2SC
      P. S. Park - G3WB
      R. A. Stohr - B3NJ
      J. H. Waldbeser - A2SA
      Joseph L. Serafini, Rockemann, Sawyer & Brewster
                28 State Street, Boston, Mass. 02109
      Frank M. O'Neill, Leggot, McCall & Werner
                60 State Street, Boston, Mass. 02109

EVE  1632551

0006274

Attachment 1

## Research Chemicals

### East Side Facilities at Everett

Di hydroxy di phenyl sulfone

Natural rosin plus sodium salt of maleic anhydride

Silicon dioxide suspensions and solids

Furfural (2-furancarboxaldehyde)

Lampblack

Calcium nitrate

Chlorinated cyanurates

Cyanuric acid

Styrene/maleic anhydride copolymers

Alkyl phosphates (phosphate esters made from different alcohols)

Trisodium phosphate

Surfactants (sulfonated aromatic and aliphatic compounds)

Nitro styrene

Styrene polymer emulsions

Thio glycolic acid (mercaptoacetic acid)

Water soluble methylol melamine (dicyanodiamide – formaldehyde resin)

Melamine (dicyanodiamide – formaldehyde resins – solid)

Quaternary ammonia compounds (substituted amines)

Sulfonated organic compounds – detergents, tanning agents and
    wetting agents

Methionine analog

Choline chloride

Inorganic chromium salt solutions

EVE   1632552

0006275

Attachment 2

## EAST SIDE SURVEY HOLES: VISUAL OBSERVATION AND SOIL SAMPLE ANALYSES

Hole No.

1. Clear earth.  Sea shells.

2. Not dug - obstructions.

3. Clear earth.

4. Clear earth, sand.

5. Clear earth and fill.

6. Clear earth - clay.

7. Clear earth and fill.

8. Clear.

9. Clear, some yellow color.

10. Clear, slight yellow coloring about 1½ feet down.

11. Clear earth and fill.  Dark red/brown color.  Iron ore storage area.

12. Fill, brick, concrete, pipe.

13. Clear earth and fill, bricks and concrete.

14. Clear earth.  Yellow stain on rocks and gravel about 1 ft. down.

15. Clear earth with white and yellow material 2 to 3 feet down.

16. Fill over clay.

17. Not dug - obstructions.

18. Three to four feet of material appearing to be crude sulfur. Material analyzed as nearly 100% sulfur.

19. Earth and fill.  Yellow sand about 2 ft. down.  A white material also at this location.  Laboratory analysis shows the white material is not salt.  Material appears to be iron sulfide or iron sulfate.

20. Clear earth, red brown color of iron ore.

21. A 6" vein of sulfur/sand about 2 feet down.  Sample nearly all sulfur.

22. Clear earth with a yellow colored vein 2 to 3" thick 3½ to 4 feet down.  Not sulfur.

23. Clear earth.

EVE  1632553

0006276

24. Some yellow color 2 ft. down. Black material below. Black material is organic being mainly wood in various states of decomposition.

25. Yellow material again 3 feet down in a 6" vein. Not believed to be sulfur.

26. Fill, cement, and reinforcing rods.

27. Not dug, obstruction.

28. Clear earth.

29. A foot or more of bauxite.

30. Clear earth and fill containing considerable wood.

31. Clear earth. Broken foundations and gravel.

EVE 1632554

0006277

EAST SIDE SURVEY HOLES; VISUAL OBSERVATION AND
SOIL SAMPLE ANALYSES

Hole No.

1. Clear earth.  Sea shells.

2. Not dug - obstructions.

3. Clear earth.

4. Clear earth, sand.

5. Clear earth and fill.

6. Clear earth - clay.

7. Clear earth and fill.

8. Clear.

9. Clear, some yellow color.

10. Clear, slight yellow coloring about 1½ feet down.

11. Clear earth and fill.  Dark red/brown color.  Iron ore storage area.

12. Fill, brick, concrete, pipe.

13. Clear earth and fill, bricks and concrete.

14. Clear earth.  Yellow stain on rocks and gravel about 1 ft. down.

15. Clear earth with white and yellow material 2 to 3 feet down.

16. Fill over clay.

17. Not dug - obstructions.

18. Three to four feet of material appearing to be crude sulfur. Material analyzed as nearly 100% sulfur.

19. Earth and fill.  Yellow sand about 2 ft. down.  A white material also at this location.  Laboratory analysis shows the white material is not salt.  Material appears to be iron sulfide or iron sulfate.

20. Clear earth, red brown color of iron ore.

21. A 6" vein of sulfur/sand about 2 feet down.  Sample nearly all sulfur.

22. Clear earth with a yellow colored vein 2 to 3" thick 3½ to 4 feet down.  Not sulfur.

23. Clear earth.

EVE  1632555

0006278





0006280

# EXHIBIT L

# BOSTON EDISON COMPANY
## BOSTON, MASSACHUSETTS

## SITE CONTAMINATION
## AND LIABILITY AUDIT
## ON MONSANTO PROPERTY



**PERKINS JORDAN, INC.**
READING, MASSACHUSETTS

MCO . 5307506

0005923

# PERKINS JORDAN, INC. CONSULTING ENGINEERS

July 16, 1982

Dr. Lillian N. Morgenstern
Boston Edison Company
800 Boylston Street
Boston, Massachusetts  02199

Subject:  Site Contamination - Liability Audit
          Monsanto Property

Dear Dr. Morgenstern:

Perkins Jordan, Inc. is pleased to submit our engineering report covering a
site contamination assessment and liability audit for the Monsanto property.
This report includes changes made as a result of our meeting on June 29,
1982.

One change of particular importance is the estimated cost associated with the
disposal of non-hazardous soil.  Based on data received on July 14, 1982, this
cost could be over $6 million.  This cost is disucssed in detail in the
report.

We have enjoyed this opportunity to provide services to Boston Edison Co. and
want to express our appreciation for your assistance.

Sincerely yours,

PERKINS JORDAN, INC.

James S. Atwell, P.E.

JSA/sp

Enclosure

MCD 5307507

125 MAIN STREET • READING, MASSACHUSETTS 01867 • (617) 944-3112

0005924

SITE CONTAMINATION

AND

LIABILITY AUDIT

OF THE

MONSANTO PROPERTY

CONDUCTED FOR

BOSTON EDISON COMPANY

July 14, 1982

PERKINS JORDAN INC.

MCD  5307508

TABLE OF CONTENTS

| Section | Title | Page No. |
|---|---|---|
| I. | INTRODUCTION . . . . . . . . . . . . . . . . . . . | 4 |
| | A. Background . . . . . . . . . . . . . . . . . | 4 |
| | B. Objectives . . . . . . . . . . . . . . . . . | 4 |
| | C. Approach . . . . . . . . . . . . . . . . . . | 6 |
| II. | SITE HISTORY . . . . . . . . . . . . . . . . . . | 12 |
| | A. Corporate . . . . . . . . . . . . . . . . . | 12 |
| | B. Chemical Processes . . . . . . . . . . . . . | 13 |
| | C. Current Use . . . . . . . . . . . . . . . . . | 17 |
| III. | SITE INVESTIGATION . . . . . . . . . . . . . . . | 19 |
| | A. General Observations/Physiographic Setting. . . . | 19 |
| | B. Test Pit Program . . . . . . . . . . . . . . | 20 |
| | C. Chemical Assays . . . . . . . . . . . . . . . | 23 |
| IV. | CONTAMINATION ASSESSMENT. . . . . . . . . . . . . | 24 |
| | A. General . . . . . . . . . . . . . . . . . . | 24 |
| | B. Soils . . . . . . . . . . . . . . . . . . . | 25 |
| | C. Tidal Flats . . . . . . . . . . . . . . . . | 33 |
| | D. Groundwater . . . . . . . . . . . . . . . . | 36 |
| | E. Air . . . . . . . . . . . . . . . . . . . . | 37 |
| | F. Additional Analyses . . . . . . . . . . . . | 37 |
| | G. Summary . . . . . . . . . . . . . . . . . . | 38 |
| V. | LIABILITY ASSESSMENT. . . . . . . . . . . . . . . | 40 |
| VI. | RECOMMENDATIONS . . . . . . . . . . . . . . . . . | 42 |

APPENDICES

1. References
2. Test Pit and Tidal Flat Logs
3. Chemical Assays
4. Toxic/Lethal Definitions

MCD, 5307509.

1.

## TABLE OF TABLES

| Table | Title | Page No. |
|-------|-------|----------|
| 1 | Field Analysis of Soil . . . . . . . . . . . . . . . . . | 7&8 |
| 2 | Analytical Results . . . . . . . . . . . . . . . . . . . | 9,10&11 |
| 3 | NIOSH Toxicity Data. . . . . . . . . . . . . . . . . . | 34 |
| 4 | Tidal Flats Samples - Analytical Results . . . . . . . . | 35 |
| 5 | Selected Samples Analyzed for Total Lead . . . . . . . . | 38 |

MCO 53075.10

3

0005927

## TABLE OF FIGURES

| Figure | Title | Page No. |
|--------|-------|----------|
| 1 | Site Location . . . . . . . . . . . . . . . . . . . | 7 |
| 2 | Former Process Building Locations . . . . . . . . . . | 9 |
| 3 | Existing Site Plan. . . . . . . . . . . . . . . . . . | 18 |
| 4 | Test Pit And Title Flat Sample Locations. . . . . . . | 21 |
| 5 | High Sulfur Concentrations in Soils . . . . . . . . . | 27 |
| 6 | High Aluminum and Iron Concentrations in Soil . . . . . | 28 |
| 7 | High Sulfate Concentrations in Soils. . . . . . . . . | 29 |
| 8 | High Concentrations of EP Soluble Lead Compounds in Soils . . . . . . . . . . . . . . | 30 |
| 9 | Proposed Hazardous Waste Excavations. . . . . . . . . | 44 |

MCO 5307511

0005928

## I.   INTRODUCTION

### A.   Background

.Boston Edison Company is considering the purchase of a parcel of land in Everett, Massachusetts now owned by the Monsanto Industrial Chemicals Company. This parcel of land (Figure 1) has been used as a chemical manufacturing, storage, and research facility since 1847 by several companies including Monsanto.  In 1975 the last operation was discontinued and all remaining buildings were demolished.  Boston Edison is concerned about the extent of chemical residues left on the parcel of land by the previous owners and the liability that Boston Edison may assume.  This report presents the findings of the site subsurface investigation, interprets the findings with respect to potential liability and presents recommendations regarding purchase and any remedial action which may be warranted.  Perkins Jordan Inc. has been hired by Boston Edison to determine the extent of the chemical contamination of the soils on this parcel of land and what Boston Edison's potential liability might be if the property is acquired.

### B.   Objectives

The objectives of this audit are; 1) to review information provided by Monsanto regarding site conditions and past activities which occurred on the site; 2) to make a reconnaissance of the site to identify visual signs of chemical contamination; 3) to obtain soil samples focusing on areas where chemical contamination is suspect; 4) to analyze samples to determine the type and level of the contamination; 5) to determine what potential liabilities might be incurred by Boston Edison; and 6) to make recommendations regarding remedial action, if necessary.

MCO , 5307512

4



STUDY AREA
(MONSANTO PROPERTY)

SCALE

ADAPTED FROM:
U.S.G.S. TOPOGRAPHIC MAP
BOSTON NORTH, MASSACHUSETTS 1971
PHOTOREVISED 1979, 7 1/2 MINUTE



MCD : 5307513

FIGURE 1
SITE LOCATION
SITE CONTAMINATION AND LIABILITY AUDIT—MONSANTO PROPERTY
BOSTON EDISON COMPANY

PERKINS JORDAN, INC.