```
                                       1

                              Volume I
                              Pages 1 to 137
                              Exhibits 1-17

          UNITED STATES DISTRICT COURT
          DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                                   :
MYSTIC LANDING, LLC,               :
   Plaintiff,                      :
                                   :
       vs.                         :   Civil Action No.
                                   :   04-10180 NMG
PHARMACIA CORPORATION,             :
SOLUTIA INC. and MONSANTO          :
COMPANY,                           :
   Defendants.                     :
- - - - - - - - - - - - - - - - - -:
PHARMACIA CORPORATION and          :
MONSANTO COMPANY,                  :
   Third-Party Plaintiffs,         :
                                   :
       vs.                         :
                                   :
MODERN CONTINENTAL                 :
CONSTRUCTION CO., INC.,            :
   Third-Party Defendant.          :
- - - - - - - - - - - - - - - - - -:
PHARMACIA CORPORATION,             :
   Third-Party Plaintiff,          :
                                   :
       vs.                         :
                                   :
BOSTON EDISON COMPANY,             :
   Third-Party Defendant.          :
- - - - - - - - - - - - - - - - - -:
BOSTON EDISON COMPANY,             :
   Fourth-Party Plaintiff,         :
                                   :
       vs.                         :
                                   :
O'DONNELL SAND & GRAVEL,           :
INC., and MARY O'DONNELL,          :
   Fourth-Party Defendant.         :
                                   :
- - - - - - - - - - - - - - - - - -x
```

DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 ~ Fax (617) 482-7813

2

DEPOSITION OF MYSTIC LANDING, LLC, by its designee PETER M. GRELA, a witness called on behalf of the Defendants and Third-Party Plaintiffs Pharmacia Corporation and Monsanto Company, taken pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, before Anne H. Bohan, Registered Diplomate Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Foley Hoag LLP, Seaport World Trade Center West, 155 Seaport Boulevard, Boston, Massachusetts, on Monday, March 14, 2005, commencing at 10:42 a.m.

PRESENT:

    Hinckley Allen Synder LLP
        (by Doreen M. Zankowski, Esq.)
        28 State Street, Boston, MA 02109-1775,
        for the Plaintiff, Third-Party Defendant
        and the Deponent.

    Foley Hoag LLP
        (by John M. Stevens, Esq. and
        Elisabeth DeLisle, Esq.)
        Seaport World Trade Center West,
        155 Seaport Boulevard, Boston, MA
        02210-2600, for the Defendants and
        Third-Party Plaintiffs Pharmacia
        Corporation and Monsanto Company.

    Morrison Mahoney LLP
        (by Douglas B. Otto, Esq.)
        250 Summer Street, Boston, MA 02210-1181,
        for the Third-Party Defendant and
        Fourth-Party Plaintiff Boston Edison
        Company.

* * * * *

1     A.    Yes, okay, I spoke with counsel.
2     Q.    Now, do you understand that this -- that
3  the lawsuit in which Mystic's deposition is being
4  taken involves property located on Alford Street and
5  Broadway in Everett, Massachusetts?
6     A.    Yes.
7     Q.    Who owns that property?
8     A.    Mystic Landing, LLC.
9     Q.    When was Mystic Landing formed?
10    A.    I couldn't tell you the exact date but -- I
11 couldn't tell you the exact date.
12    Q.    Mystic Landing certainly knows when it was
13 formed, does it not?
14    A.    Yes.
15         MR. STEVENS:  I ask that a one-page
16 printout that summarizes filings by Mystic Landing
17 with the Massachusetts Secretary of State be marked
18 for identification as Mystic Exhibit 2.
19              (Document marked as Mystic
20              Exhibit 2 for identification)
21    Q.    Directing your attention to the document
22 that's been marked as Mystic 2, Mr. Grela, does it
23 inform you that Mystic was organized on June the
24 7th, 2001?

27

1  A. No, Obayashi is not.
2  Q. And they're one of the two debtors, are
3  they not, as one of the two Joint Venturers?
4  A. No, that's not the case.
5  Q. Does Obayashi have no interest in this
6  portion of the Joint Venture?
7  A. That's correct.
8  Q. What interest did Obayashi have in the
9  Joint Venture in June of 2001?
10  MS. ZANKOWSKI: Objection. He's here to
11  answer for Mystic, right?
12  Q. If Mystic knows.
13  A. Can you repeat the question.
14  Q. What interest in the Joint Venture did
15  Obayashi have in June of 2001?
16  A. Obayashi had some obligations to the Joint
17  Venture, but the interest was bought out by Modern
18  Continental Construction.
19  Q. So is it correct it was no longer a Joint
20  Venture in 2001?
21  A. No, it was still a Joint Venture. However,
22  originally it was a 60/40 Joint Venture. Modern was
23  60; Obayashi was 40. Sometime after that Joint
24  Venture was formed in '96 -- sometime after the

28

1  Joint Venture was formed, Modern purchased
2  Obayashi's 40 percent financial interest out,
3  thereby essentially giving Modern 100 percent of the
4  financial interest in the Joint Venture.  And I say
5  financial interest, because Obayashi still had some
6  potential surety -- well, bond obligation under the
7  Joint Venture.
8      Q.  So as of June 2001, Modern Continental
9  owned all of the financial interest in the Joint
10 Venture?
11     A.  Yes.
12     Q.  Have you now told us everything that you
13 know concerning Mystic's payment to Mary O'Donnell
14 or to the Joint Venture in connection with the
15 acquisition of the property?
16         MS. ZANKOWSKI:  Objection.
17     A.  That's a very difficult question to answer.
18 I answered the questions that you've asked.  To the
19 extent you've asked me every -- I don't know, I
20 can't answer that question.
21     Q.  Has any portion of the consideration for
22 the Option Agreement been refunded to Mystic?
23     A.  I am not aware.
24     Q.  In negotiating the Assignment and Option

                                                                33

1   Phase II Field Investigation Report.
2       A.   (Witness reviews documents)  It would
3   appear that is correct.
4       Q.   Now, the date Exhibit 7 bears is June 19,
5   2001; is that correct?
6       A.   That is correct.
7       Q.   Who represented Mystic Landing in the
8   purchase from Mary O'Donnell, what law firm?
9       A.   There really was not a law firm that
10  represented us in the purchase.  I represented
11  Modern Continental, Modern Continental/Obayashi,
12  Mystic Landing.  To the extent that I asked Hinckley
13  Allen to prepare documents, they prepared the
14  documents.  They didn't represent us in
15  negotiations; all that work was done in-house.
16      Q.   Did Mystic Landing have a lawyer in June
17  2001?
18      A.   Did it have a lawyer?  What do you mean by
19  that?
20      Q.   Was it represented by a lawyer?
21      A.   Mystic Landing is simply a holding company.
22  It doesn't have employees; it's a holding company.
23      Q.   Modern Continental was the managing agent
24  of Mystic Landing, was it not?

36

1  attorneys.
2     Q.   And was Hinckley Allen among the law firms
3  that represented Modern Continental Construction
4  Co., Inc., in June 2001?
5     A.   Yes.
6     Q.   And information that was known to Modern
7  Continental Construction Company was, because of the
8  overlap in officers, known to Modern Continental
9  Companies, Inc.; isn't that correct, sir?
10        MS. ZANKOWSKI:  Objection.
11    A.   I can't answer the question.  Your line of
12 questioning is so confusing, it's very difficult to
13 answer these questions.  If you'd just ask me what
14 you want to know, explain it in simple terms, I'll
15 be happy to tell you, but trying to trap me into
16 something is very difficult to respond to.
17    Q.   Mystic Landing knew what was in Exhibit 7
18 before it bought the property, didn't it?
19        MS. ZANKOWSKI:  Objection.
20    A.   What is Exhibit 7?
21    Q.   It's right in front of you.
22    A.   Oh, I'm sorry, Exhibit 7.  (Witness reviews
23 document)  Mystic Landing is a holding company.
24    Q.   Mystic Landing was aware of the information

37

```
 1   in Exhibit 7 before June 21, 2001, was it not?
 2        A.   You speak of Mystic Landing as a human
 3   being.  Mystic Landing was a holding company set up
 4   to acquire a piece of property.
 5        Q.   Mystic Landing is an entity; it has
 6   knowledge.
 7        A.   That's debatable, in my mind, my simple
 8   mind anyway.  Ask me what you want.  Ask me a simple
 9   -- ask me a question that you want an answer to, but
10   don't try and trick me into answering something
11   wrongful.
12        Q.   Sir, the information in Exhibit 7 was
13   available to Mystic Landing before June 21, 2001,
14   was it not?
15        A.   To be honest with you, it may have been.
16        Q.   Sir, you have been designated to testify as
17   to information available to Mystic Landing
18   concerning certain designated subjects.  You
19   understand that, don't you?
20        A.   Yes, I do.
21        Q.   And one of those subjects is knowledge of
22   environmental contamination before Mystic acquired
23   the property.  You understand that?
24        A.   Yes, I do.
```

40

1   testing done in 1996 that shows contamination, does
2   it not?
3           MS. ZANKOWSKI:  Objection.  The document
4   speaks for itself.
5       A.  I am not a PE or an environmental engineer,
6   so I prefer not to respond to that question.
7       Q.  Do you have any reason to believe that
8   Mystic Landing did not have this exhibit, the
9   document marked as Exhibit 7, on June 21, 2001?
10      A.  I guess I don't know.  I can only say that
11  it wasn't relevant to their acquisition of the
12  property.  Since I acted on their behalf, it wasn't
13  relevant to me, so I have to conclude that it wasn't
14  relevant to them.
15      Q.  Whether the property was contaminated or
16  not was not relevant to Mystic's acquisition of the
17  property?
18      A.  No.
19          MS. ZANKOWSKI:  Objection.
20      A.  No, no.
21          MS. ZANKOWSKI:  Is there a question there?
22      A.  The issue of the contamination, whether it
23  was assigned to Mystic Landing or anybody else, had
24  been clarified, at least in my mind, earlier on in

41

1   the process.  We didn't know what the contamination
2   was.  It was irrelevant, because we always felt the
3   contamination was caused by Monsanto, and it would
4   be remediated by Monsanto, or the remediation would
5   be paid by Monsanto, similar to the site directly
6   adjacent to the property across the tracks.
7           So when you ask me these questions, and why
8   they're relevant and why they're not, that's why it
9   wasn't relevant.  Because whatever was there was
10  there, it was clearly caused by Monsanto.  It wasn't
11  important to get to the bottom of it at that point
12  in time, because we weren't using it for anything
13  but a laydown area at that point in time.  And
14  whatever the cost of cleanup was going to be, I
15  always felt Monsanto was going to end up paying for
16  it.
17          MR. STEVENS:  Move to strike.
18     Q.   Mystic knew the property was contaminated
19  on June 21, 2001, didn't it?
20     A.   Yes.  We knew there was some contamination.
21     Q.   Now, when Mystic landing acquired the
22  property on June 21, 2001, what use was being made
23  of it?
24     A.   The property was serving as a laydown

68

1  don't --
2      Q.   Does Mystic know whether she or one of her
3  companies was taking actions on the property during
4  its period of ownership?
5      A.   No, Mystic doesn't know.
6      Q.   What was Testa doing on the property during
7  Mystic Landing's period of ownership?
8      A.   Scope of services for one of the Central
9  Artery projects.
10     Q.   What was its scope of services?
11     A.   Various scopes. The largest scope was
12 taking down the elevated Central Artery, to the
13 extent they used our storage laydown facility as
14 part of that.
15     Q.   During what period of time was Testa using
16 the property for that purpose?
17     A.   2002, 2003, 2004. Probably using it today.
18     Q.   Is Testa performing that work pursuant to a
19 written contract with the Joint Venture?
20     A.   Actually, the Testa contract is not with
21 the Joint Venture. The Joint Venture was originally
22 the one that got involved with the property, there
23 was a specific project. Currently it's a different
24 group of projects that are utilizing the yard.

69

1    Q.    Is Testa performing the Central Artery work
2  pursuant to a written contract with someone?
3    A.    With Modern, yes.  With Modern Continental
4  Construction Co., Inc.
5    Q.    Do you know whether that contract has been
6  produced in response to Modern and Monsanto and
7  Pharmacia's first request for production of
8  documents?
9    A.    I don't know.
10   Q.    Are there other written subcontracts
11 applicable to the work of other subcontractors who
12 are performing activities on the property?
13   A.    To the extent that a specific
14 subcontractor working on a Modern Continental or
15 Modern Continental/Obayashi project happens to be
16 on that site, there would be a subcontract
17 agreement.  Certainly not with Mystic Landing.
18        MR. STEVENS:  I ask that a photograph
19 showing various plastic bags of what appears to be
20 garbage and various waste materials be marked for
21 identification as Mystic Exhibit 12.
22             (Photograph marked as Mystic
23             Exhibit 12 for identification)
24   Q.    Showing you the document that's been marked

106

1   see "8.3, Future Uses and Remedial Requirements"?
2        A.   I see that.
3        Q.   Do you see that in -- who is Mystic's
4   consultant to the site today?
5        A.   I'm not sure that we have one today.
6        Q.   Is it Rizzo Associates?
7        A.   I believe they certainly were the last one
8   that was engaged.
9        Q.   To your knowledge, Rizzo hasn't done any
10  analysis of future uses and remedial requirements
11  since this study; is that correct, sir?
12       A.   I'm not sure.  Not that I'm aware of.
13       Q.   You see in this study it says "either
14  containment or treatment" -- in 8.3, under
15  "Groundwater" it says, "Either containment or
16  treatment of the groundwater at the Site would be
17  required to fill the requirements of the MCP,
18  regardless of the proposed future uses of the Site
19  property"?  Do you see that, sir?
20            MS. ZANKOWSKI:  Objection.  The document
21  speaks for itself.
22       A.   I see the wording in the document.
23       Q.   Such a statement does not appear under
24  "Soil," does it?

                                                                 107

1           MS. ZANKOWSKI:  Objection.  The document
2    speaks for itself.
3       A.   If you say so.
4       Q.   Well, you can read, too, can't you, sir?
5       A.   Yeah, I agree.
6       Q.   There hasn't been any subsequent analysis
7    of future uses and remedial requirements to Mystic's
8    knowledge, has there?
9           MS. ZANKOWSKI:  Objection.
10      A.   To my knowledge, no.
11          MR. STEVENS:  I ask that a transmittal
12   letter dated August 27, 2002, from Ms. Zankowski to
13   Mr. Kahn, to which are attached a number of pages of
14   cost estimates, be marked for identification as
15   Mystic Exhibit 17.
16               (Document marked as Mystic
17               Exhibit 17 for identification)
18      A.   (Witness reviews document)
19      Q.   If you can turn over to Page 2 of the
20   transmittal letter, do you see Ms. Zankowski is
21   telling Mr. Kahn in the third sentence of the first
22   paragraph that begins on Page 2 that "The enclosed
23   estimates are for:  A, remediation for development
24   of a major league baseball park; and B, remediation

112

1    A.   In what regard?
2    Q.   Are you planning to spend any money on
3    cleaning up the property?
4    A.   Not currently.  To the extent certain
5    remediation needs to be done on the sale to enhance
6    the value -- to maintain the value of the property,
7    then maybe we will, but I'm not speaking for Mystic
8    as of today.
9    Q.   You're not speaking for Mystic?
10   A.   Well, no, I shouldn't say it that way.  I
11   am not currently employed, as of today, by Modern
12   Continental/ --
13   Q.   Is it --
14   A.   -- Mystic.  Or Mystic.
15   Q.   You're testifying on behalf of Mystic as to
16   proposals, plans and preparations for development of
17   the site.  Does Mystic have any intention of
18   developing the site itself at the present time?
19        MS. ZANKOWSKI:  Objection.  Asked and
20   answered.
21   A.   Present time being today, as I was saying,
22   I'm here to provide historical perspective and
23   testimony.  I am no longer employed by that company
24   today.