# EXHIBIT B

# EXPERT REPORT OF
## RICHARD J. HUGHTO, Ph.D., P.E., LSP

### In the Matter:
### Mystic Landing LLC
### v.
### Pharmacia Corp., et al.
### Civil Action No.: 04-10180 NMG

### United States District Court for the
### District of Massachusetts

### Prepared For:
### Hinckley, Allen & Snyder LLP
### As counsel to Mystic Landing, LLC and
### Modern Continental Construction Co., Inc.

### Prepared By:
### Richard J. Hughto, Ph.D., P.E., LSP

### September 12, 2005

Richard J. Hughto, Ph.D., P.E.

9/12/05

Date

# Table of Contents

1.0 Introduction                                                          1

2.0 Background                                                            2

3.0 Environmental Contamination and its Fate and Transport               5

4.0 Site Contamination                                                   7

5.0 Contaminant Sources                                                 11

6.0 Site Remediation                                                    12

7.0 Opinions                                                            15

8.0 Conclusions                                                         18

## LIST OF TABLES

Table 1 Primary East Parcel Products Manufactured, Raw Materials, and Waste Products  4

Table 2 Summary of Soil and Groundwater Contaminants and their Sources          11

Table 3 Summary of Estimated Remediation Costs                                  18

## LIST OF FIGURES

Figure 1 Merrimac Chemical Company 1931 Aerial Photograph

Figure 2 Aerial Photograph 1952

Figure 3 Historic Monsanto Waste Disposal Locations

Figure 4 Aerial Photograph 1997

Figure 5 Site Plan with Rizzo Associates Sampling Locations

Figure 6 Historic Site Contamination Quantified Prior to 2000

Figure 7 Site Plan UCL Soil Exceedance Areas

Figure 8 Area of Low pH Groundwater

Figure 9 Locations of Waste Disposal and Observed Contamination

## ATTACHMENTS

Attachment A Sketches of Alternative Development Scenarios

Attachment B Cost Estimate for Management of Contaminated Soil Encountered During Construction

Attachment C Cost Estimate for Remediation of Soil in Excess of UCL Concentrations

Attachment D Cost Estimate for Remediation of Low pH Groundwater in Northwest Portion of the Site

Attachment E Cost Estimate for Remediation of Mystic River Sediments for the Construction of the Specified Site Development

Attachment F Cost Estimate for Additional MCP Requirements

Attachment G Photographic Evidence of Woodard & Curran Sampling Protocols

Attachment H List of Cases Testified in as Expert in Past Four Years

Attachment I List of Documents Relied Upon

Attachment J Curriculum Vitae

Attachment K Figures, Photos, and Plans that May Be Used at Trial

## *1.0 INTRODUCTION*

My name is Richard J. Hughto. I am an environmental consultant, and have been involved with the study of contaminant impacts on and remediation of surface water, groundwater, and soil systems since the early 1970s. I hold B.E. and M.E. degrees in Civil and Environmental Engineering from Manhattan College and a Ph.D. in Water Resource Engineering from Cornell University. A more complete summary of my experience is in Attachment J. I have been compensated at a rate of $175-200 per hour for my services in this case. My current rate for this case is $200 per hour. My rate for testimony in this case currently is $200 per hour. It is subject to change depending on the date of the testimony, as I adjust my rates annually.

My experience includes government, academic, and private sector consulting. I was an employee of the U.S. Environmental Protection Agency (EPA) in the early 1970s concentrating on the assessment of impacts of contaminants on natural water bodies. While at Cornell University I developed simulation and management models for the evaluation of contaminant impacts on water bodies. In addition, I served as an Instructor, teaching Hydrology courses. Since 1979 I have been in private consulting with a primary emphasis in the assessment and remediation of contamination sites. My experience includes dozens of National Priorities List (NPL) sites throughout the country, working for government and for private sector clients. I also have extensive experience working with developers and lending institutions on the development of contaminated sites, particularly in the Greater Boston area.

During the early and mid 1980s, while working at Camp Dresser & McKee (CDM), I served as a Project Manager and Regional Manager for investigations at NPL sites for the EPA. I managed remedial investigation (RI), feasibility study (FS), remedial design (RD), and remedial action (RA) projects. In addition, I managed CDM's EPA contracts in New England.

In 1986 I joined Rizzo Associates, an environmental consulting firm, where I was responsible for the firm's practice in assessment and remediation of contaminated sites. In addition, I served as the Chief Operating Officer for the company.

I am currently an independent environmental consultant specializing in the assessment and remediation of contaminated sites, providing advice related to environmental aspects of property and corporate transactions, regulatory representation, and litigation support.

My work has included a wide variety of types of contamination, including PCBs, pesticides, heavy metals, petroleum products, and solvents, as well as numerous types of remediation for the different types of contaminants in a variety of environments. I have been qualified as and testified as an expert witness in numerous State and Federal courts. I have testified on the topics of fate and transport of environmental contaminants, nature of contaminant sources, timing of contaminant sources, establishing the need for remediation, costs of response actions, and appropriate types of remediation, as well as the standard of care in the industry for conducting such investigations. Attachment H is a list of the cases in which I have testified as an expert over the past four years.

1

I have been retained by Hinckley, Allen & Snyder LLP, attorneys for Mystic Landing, LLC and Modern Continental Construction Co., Inc., to render opinions relative to the sources and timing, fate and transport, and necessary remediation of chemical contaminants at the Mystic Landing site off of Chemical Lane in Everett, Massachusetts. I expect to testify, if asked to do so, in conformance with this report, as supplemented. Further, I may testify with respect to unanticipated evidence introduced, and/or unexpected issues which are raised, at trial of this action, and/or in rebuttal opinions offered by other parties' witnesses.

The Defendants are still in the process of making documents available, and I am in the process of reviewing those documents. I intend to supplement this report, if necessary, as I develop additional opinions or as appropriate based on my review of those additional documents. I anticipate potentially preparing a Rebuttal Report at some time in the future after review of opinions produced for the Defendants.

I have reviewed documents related to contamination conditions, historical ownership and operations, and physical conditions of the sites and the area. The documents include technical reports, historical summaries, maps, correspondence, testimony, deposition transcripts, aerial photographs, and other documents. Attachment I is a list of the principal documents I have relied upon or reviewed in preparing my opinions. I have also reviewed additional documents in the dozens of boxes of documents produced by Monsanto and Solutia in two different locations in this case, many very recently. I also relied on the observations I made during my visits to the site. In addition to the documents listed herein, I have relied on my education and experience in the field.

There are several figures included in this report. In addition, I have relied on aerial photographs, maps, plans, and figures from the reports in the documents I reviewed. I anticipate that I will utilize some of the figures, maps, photographs, and plans as demonstrative exhibits at the time of trial. Attachment K is a set of documents from which I will likely select demonstratives.

## 2.0 BACKGROUND

The property that is the subject of this report is the former Monsanto chemical manufacturing complex in Everett, Massachusetts. It is located on the eastern shore of the Mystic River between State Route 99 and Mystic View Avenue (the Site). The Site is naturally divided into eastern and western parcels by MBTA commuter rail tracks. While some of the issues addressed in this report relate to the western parcel, it is the eastern parcel that is the focus of the case and most of the discussion in this report. It is the eastern parcel that is referred to as the Site in this Report. In many ways, the western and eastern parcels are intrinsically and physically connected - by contaminants, historical use, underground piping, and other associated infrastructure ties.

Chemical manufacturing on the Everett Site began in 1868 by the Cochrane Chemical Company. It operated under different names after a series of mergers and acquisitions

2

until Monsanto's involvement initiated in 1929 when Monsanto merged with Merrimac Chemical Company. At the time of the 1929 merger they manufactured more than 50 acids and numerous other technical and intermediate chemicals at the Everett facility (MONS2 0000590). Figure 1 is a 1931 oblique aerial photograph (MCO6271309) showing the chemical manufacturing site at that time. Both the east and west parcels are shown. The railroad tracks dividing the two parcels are shown in the figure. Figure 2 is a 1952 aerial photograph which shows the manufacturing buildings and tanks in existence at that time. Despite the poor quality of the figure (due to a poor quality original), the storage tanks and chemical manufacturing buildings are apparent on the photo.

The eastern parcel contained an alum pond and raw material storage areas for sulfur, bauxite, iron ore, and salt. The manufacturing processes included the following (0009977):

- Sulfuric acid

- Nitric acid

- Mixed acids

- Alum (aluminum sulfate)

- Iron free alum

- Sodium bisulfite

- Ferric sulfate

- Ferric nitrate

- Alcohol

- Pyrites (iron sulfide)

- Sulfur

In addition to the manufacturing of these products, research and pilot testing facilities were located on the eastern parcel. The inventory of raw materials, formulated products, and waste materials from those operations was not available in the documents I reviewed. Table 1 is a list of the primary products manufactured on the eastern parcel with the raw materials used and the primary waste products generated from those operations. There are numerous other raw materials, finished products, and waste products that were present on the Site over time and could have contributed to Site contamination.

3

Table 1

Primary Eastern Parcel Products Manufactured, Raw Materials, and Waste Products

| Product | Raw Materials | Waste Products |
| --- | --- | --- |
| Nitric acid | Sodium nitrate, sulfuric acid | Sodium bisulfite |
| Sulfuric acid | Sulfur, pyrite ore | Arsenic, platinum catalyst |
| Alum | Aluminum, sulfuric acid | Alum mud (aluminum and potassium sulfate) |
| Sodium bisulfate | Sodium chloride and sulfuric acid | |
| Sulfur | Raw material | None |

The manufactured products, raw materials, and waste products were all present on the Site and handled in ways that could have led to their being released to the environment. Monsanto acknowledged that there were such releases of wastes in their October 22, 1973 Assessment Summary (0004951), that there was contamination from raw materials and past operations in a November 19, 1981 memo (0006321), and that there were likely releases of chemicals and waste products in their January 22, 1982 letter to Boston Edison (0006273). Monsanto employees acknowledged that site waste materials were disposed of on the Site (GZA 7/92, 0001790). Drums and other wastes were discovered buried on the Site (DEQE Memo, 5/28/85, 0000749; GZA, 9/24/91, 0002589; and GZA, 2/93, 0004284) Figure 3 is a plan that indicates the locations of the manufacturing buildings and waste disposal areas on the eastern parcel, as depicted in a Monsanto document (0006808). These are areas identified by Monsanto as waste disposal locations during the period of their operations on the Site. Further, Monsanto employees have acknowledged that underground piping (sewer lines and connection piping) ran under the Site carrying various chemicals. Recent testimony was provided by Mr. Gerald Rinaldi that chemical wastes were discharged into the sewer lines and piped into the River (Rinaldi deposition 9/8/05). I am of the opinion that the sewer lines, as well as the connection piping between the holding tanks and other facilities leaked into the soil and groundwater at the property.

The chemical manufacturing ceased on the eastern parcel in the early 1970s, all Site operations were moved to the western parcel, and the property was put up for sale. Boston Edison acquired the property in 1983 (0005427), but conducted limited operations on the Site and did not develop it. The eastern parcel was conveyed to Mary O'Donnell and her corporate entities in March 1996. O'Donnell used the Site as a storage location for over 1 million cubic yards of tunnel muck excavated during the construction of the treated wastewater discharge tunnel under Boston Harbor by Jay Cashman Construction.

4

The muck consisted of glacial till and tunnel rock. It was placed on the Site in 1995 and 1996. The material was clean, as it was excavated from far below the bottom of Boston Harbor. The storage of the muck created a large mound of very low permeability material over the ground surface that existed when Monsanto operated on the property. Figure 4 is a 1997 aerial photograph showing the location of the tunnel muck at that time. The quality of this figure is also poor, but the mound of muck is clearly shown over the extent of the Site. Much of the muck was ultimately removed from the eastern parcel and utilized on the western parcel in the latter 1990s for fill and capping when that parcel was being developed as a retail center, now known as the Gateway Center Mall. At the conclusion of the construction a layer of the muck was left on the surface of the east parcel. This created a cap that prevented most water infiltration and generally isolated the Monsanto era surface soils from those that existed after and since the muck was placed on the Site. The recent borings by CES and Rizzo Associates all encountered the muck at the ground surface.

The eastern parcel was conveyed to the Joint Venture of Modern Continental/Obayashi in June 2001. The Joint Venture and Modern Continental used the parcel as a construction laydown yard. It was the location of storage of construction materials (e.g. pipes, reinforcing steel bars, concrete blocks, manholes, etc.), construction equipment, offices, and construction residuals. The Site has been found to be covered by the tunnel muck (CES 1997 and Rizzo Associates 2001). The parcel continues to be used as a laydown facility today. The easternmost portion of the parcel was used to cut the steel generated by the tearing down of the old, aboveground Central Artery during 2004.

## 3.0 ENVIRONMENTAL CONTAMINATION AND ITS FATE AND TRANSPORT

The contaminant and waste releases at the Monsanto site are the residuals from the chemical formulating processes and related waste disposal. Soil, groundwater, surface water, and surface water sediment contamination has resulted from releases that occurred during Monsanto's Site operations and as a result of intentional and unintentional disposal and releases.

The primary contaminants at the Site are heavy metals, acids, plasticizers, and polynuclear aromatic hydrocarbons (PAHs). Other contaminants, most manufactured products, by-products, or wastes, have also been quantified. These constituents are very stable and relatively immobile in the environment. They tend to adhere to soil and remain in that state in the immediate vicinity of their release for extended periods of time. The characterization data from the Site indicate that much of the contamination remained in the vicinity of its first release to the environment until encapsulation or remediation. Due to the high concentrations in the environment there has been some migration, which explains some of the groundwater and surface water contamination.

Once in the environment, migration of these constituents can and does take place for some of the mass that has been released. The methods of migration include diffusion,

5

dissolved phase transport, colloidal transport, and surface drainage. In addition, other mechanisms, such as biodegradation and chemical reactions alter the state of the contaminant constituents and their concentrations in the environment.

Diffusion is a molecular level natural spreading of contaminants from areas of higher concentration to areas of lower concentration. It occurs with relatively insoluble substances, such as those at the Site, but is not a major transport mechanism.

Dissolved phase transport is migration of the contaminants dissolved in water that migrates from the ground surface through the contaminated soil to the groundwater and subsequently with the groundwater. Since the contaminants at the Site are soluble to some extent, there will be some dissolving into water and migrating into and with the water. As stated above, the constituents of interest at the Site are relatively immobile, meaning that they are not highly soluble in water. As a result, the dissolved phase transport, while occurring at the Site, has not moved major fractions of the contaminants released to soil. Dissolved contaminants that migrate in the groundwater can discharge to surface water bodies, as groundwater is a source of many surface water features. This occurs at the Site where the groundwater discharges to the Mystic River.

Colloidal transport is a process by which very small soil particles with contaminants attached migrate through the pore spaces in the soil. This is a migration phenomenon that has been demonstrated to occur in the environment. It is most significant for compounds, like pesticides, that are relatively insoluble. It is significant for these types of compounds as they are not highly soluble and, as a result, the colloidal transport takes on a greater relative significance. While recognized in the literature as a phenomenon that occurs, the documentation has largely occurred in the laboratory. As a result, the applicability of such literature for this case is limited.

Surface drainage is the process by which water flowing over the surface of the land becomes contaminated by dissolving contaminants it comes into contact with or by mobilizing contaminated soil. The contaminants can be moved to and deposited at other land locations, infiltrate and migrate vertically into the soil, or migrate to a surface water body. Contaminated runoff that enters surface water bodies can also serve as a source of sediment contamination when the contaminated soils settle out.

The Site was the location of acid formulation. As a result, acids and residuals from the processes were released to the environment. Many of the heavy metals present, either naturally as part of the native soil and bedrock, or as a result of the manufacturing processes, are more soluble at lower pH. The acid releases caused more dissolution of those heavy metals with resulting transport to and within the groundwater and potentially to the surface water.

The migration mechanisms described are continuous processes. They occur throughout the time period the contaminant constituents are in the environment. As a result, the contaminants released earlier in time would have had the opportunity to migrate longer and farther in the environment. Due to the relatively insoluble nature of the contaminant compounds, much of the contaminant mass remained in the shallow soils throughout the

6

observation period. This creates a buildup, of sorts, of contaminants in the shallow soil. The concentrations increase, but the actual sources or timing of the releases resulting in the soil contamination are indistinguishable from each other. It is not possible to discern which operation was the source of the contamination or when the contaminants were released.

## 4.0 SITE CONTAMINATION

Monsanto's historical use of the Site resulted in its becoming contaminated as a result of the storage of raw materials, the creation of chemical products, and the management/handling of wastes and byproducts. The Site contaminants were primarily raw materials, manufactured products, and waste materials. The Site documentation shows that the Monsanto operations resulted in the disposal of drums and other waste materials, as well as raw materials and manufactured products.

Monsanto acknowledged in a January 22, 1982 letter (0006273) that contamination may have occurred during the 1929-1975 period of their operations on the eastern parcel and thereafter. They go on to say that the chemicals could be toxic and that Boston Edison, the proposed purchaser of the property at the time, should consider that in their development plans.

A series of studies was conducted on the eastern parcel to define the degree and extent of contamination and the need for remediation. The studies I have had access to begin in 1973 when the manufacturing operations were limited or no longer active on the Site and final office and laboratory functions were being moved to the western parcel. Arrangements were being made to put the property on the market. The environmental studies supplemented the marketing process. The following studies were conducted.

**Details Section Environmental Assessment Sale of 34 Acres-Everett Plant, 10/22/73 (0004951):** During this assessment, which was conducted by Monsanto staff, it was established that 10 acres of former tidal flats were filled with debris and rubble, including high concentrations of sulfur. It was also concluded that there was no doubt that the groundwater was contaminated and that contaminated groundwater discharged to the Mystic River, as the groundwater discharges to the River were observed to be colored and contaminated. Wastes, including from the bisulfite process, were released to the ground surface making them available to percolate to the groundwater. Discharges offshore through plugged sewer pipes were also observed. This was found to be the result of contaminated groundwater entering the pipes through cracks and breaks.

**Dames & Moore, 1/8/80 (0000325):** Dames & Moore conducted an environmental assessment focused primarily on the western parcel. As part of the assessment, a single monitoring well, MW-7, was installed on the eastern parcel. MW-7 contained the highest concentrations of contaminants in groundwater, most notably plasticizer compounds, of all of the wells installed for this study. This was another early demonstration to Monsanto that their operations had contaminated the Site.

7

**Monsanto Memo, 6/3/80 (0009975):** This internal memo identified storage of raw material sulfur, alum, bauxite, iron ore, and salt as environmental issues. An estimate of $600,000 to remove sulfur-contaminated soil is provided. The contamination of the Site groundwater with sulfate is acknowledged.

**Monsanto Memo, 7/21/80 (0010702):** Excavations for the collection of soil samples in 29 locations were cited. Bauxite, sulfur, and iron ore were found in the Site soil.

**Dames & Moore, 12/23/80 (0000314):** Additional monitoring wells were installed, including one on the eastern parcel, which showed groundwater contamination.

**Monsanto, 11/19/81, (0006321):** In this memo Monsanto is summarizing the history of the Site as part of the sale to Boston Edison. They disclose that

> *"The land surface is contaminated with some of the raw materials which were stored on site....presence of sulfur, bauxite, iron ore, and other inorganic metal salts."*

The memo goes on to disclose groundwater contaminant levels

> *"…higher than would be expected for ambient groundwater…"*.

The memo further identifies lead as a contaminant at the Site.

**Monsanto, 1/22/82 (0006273):** In this letter to Boston Edison Monsanto relates that

> *"…chemicals and waste materials may have spilled onto or were disposed of on the tract."*

In the letter Monsanto goes on to advise Boston Edison, to whom they are selling the parcel

> *"…any future use of the tract should be undertaken only after consideration of its possible contamination."*

**Perkins Jordan, 7/16/82 (0005923):** This was a due diligence assessment performed for Boston Edison, at the time a prospective purchaser of the east parcel. Elevated concentrations of sulfate, lead, aluminum, phthalates, volatile organic compounds (VOCs), and semi-volatile organic compounds (SVOCs) were quantified in the Site soils. Some of the Site soils were identified as potentially qualifying as a hazardous waste if taken off-site for disposal. The disposal cost for the soil was estimated at $900,000. Several of the contaminants, some signature contaminants for this Site, were also found in the adjacent tidal flats. VOCs were quantified in the Site groundwater. The soil observations indicated 4 to over 12 feet of tunnel muck fill at the ground surface. A total environmental liability of $7.65 million was estimated for Boston Edison to consider.

**Boston Edison, 10/17/85:** This correspondence includes the results of assessment work performed on the eastern parcel by Perkins Jordan prior to the Boston Edison acquisition

8

of the parcel. Soil contamination with sulfate, phthalates, lead, and VOCs was quantified. In addition, five tidal flat samples were collected on the shoreline adjacent to the Site. Some contaminants consistent with the history and operations on the Site were quantified in those samples.

**Consulting Engineers & Scientists, 1/15/97:** On behalf of O'Donnell CES collected soil and groundwater samples and detected elevated concentrations of arsenic and lead in soil, as well as low pH and elevated arsenic and lead in groundwater. CES observed a minimum of one foot of tunnel muck over the entire property. The contamination observed was found to be below the tunnel muck layer.

**Rizzo Associates, 6/19/01, 8/10/01:** On behalf of Mystic Landing LLC Rizzo Associates conducted soil and groundwater sampling at the Site. The findings include further delineation of areas of low pH soil and groundwater, as well as areas of elevated concentrations of arsenic, lead, petroleum compounds, and PAHs in the soil. The area of low pH groundwater also showed elevated heavy metals in the groundwater near the shoreline, which is a potential source of contamination to the Mystic River and its sediments. The upland soil contamination was quantified in the soils present below the tunnel muck, but not in the tunnel muck. This is documentation that the contamination was present prior to the placement of the muck. Rizzo Associates also evaluated the influence of the Mystic River tides on Site groundwater elevation, as well as pH and lead and arsenic concentrations. The tide was found to have minimal, if any, impact.

**Woodard and Curran (W&C), 10/1/04:** During two visits to the eastern parcel in 2004 W&C, on behalf of counsel for Monsanto and Pharmacia, collected surficial soil samples from 43 locations for laboratory analysis. Contamination was detected in many of the samples, although many of those detections were likely either background or naturally occurring. Only 10 of the samples contained concentrations from the laboratory analyses that were in excess of DEP's published Reportable Concentrations (RCs). Those were only marginally in excess of the RCs. It is likely that the contamination observed by W&C will not have to be remediated as part of the development anticipated for the Site. Further, there were significant issues with the sampling techniques employed by W&C during each of the visits, and such flawed sampling techniques were witnessed by me. The issues were related primarily to the potential for cross-contamination.

- The sampling equipment was not cleaned before each use, including before the first time it was used on the property, which could have resulted in introducing contamination from another location.

- The sampling equipment was cleaned in the same water each time it was cleaned on a given day, which could lead to contamination of the equipment from the dirty water.

- The sampling equipment was dragged on the ground between sampling locations. Any contamination found with this equipment could have come from a location different from where the sample was collected.

9

- The sampling equipment was left on the ground when not in use without decontamination prior to its next use. The ramifications are the same as those for dragging the equipment on the ground.

As a result of these violations of acceptable sampling protocols it is not possible to conclude that any of the laboratory results from the W&C work represent actual contaminant concentrations at any specific location, or even that the contaminants observed came from the Site. Attachment G is photographic documentation of some of the violations personally observed.

Monsanto has not commissioned assessment or remediation studies of the eastern parcel, despite knowing that it was contaminated for over 30 years. In a March 22, 1985 letter (0006560) the Massachusetts Department of Environmental Quality Engineering (DEQE), the precursor of today's Department of Environmental Protection (DEP) stated that the further assessment of the western parcel must include the Boston Edison parcel (the eastern parcel), relating that the responsibility was clearly delineated. The eastern parcel was not added by Monsanto. April 22, 1986 correspondence from DEQE (0000800) related that the assessment on the western parcel to date was not sufficiently thorough and noted again that the Boston Edison parcel was not included. In a May 13, 1986 memo (0000737) Monsanto stated that they were not going to assess the Boston Edison parcel, but did not know whether they could legally or realistically take that stance. The State again pointed out the need for additional assessment at the Boston Edison parcel in a May 4, 1989 letter (0000787).

Monsanto, through a variety of consultants and contractors, completed assessment and remediation studies on the western parcel in preparation for its re-development as a retail center. The Site was divided into several areas, by production use, and studied and remediated to allow the retail use. The contaminants found were consistent with the chemical manufacturing processes that occurred on the parcel with plasticizers, heavy metals, acids, polynuclear aromatic hydrocarbons (PAHs), and polychlorinated biphenyls (PCBs) being the primary contaminants of concern. To the extent they are comparable, the results of the assessment studies of the eastern and western parcels were similar, showing residuals of the manufacturing processes conducted in the different areas. Many of the contaminants were the same on the two parcels, including the heavy metals, plasticizers, and sulfate. This is further indication that the source of the contamination was the Monsanto manufacturing operations.

While I did not receive a complete summary of the remediation costs for the western parcel, I did review a number of documents that provided costs and cost estimates for different phases of the assessment and remediation. The documents I reviewed showed tens of millions of dollars in expenditures. In a 6/18/92 memo and its attachments Monsanto provides a projection for future costs for environmental remediation of the western parcel of $31.7 million in 1992 dollars.

The tidal flats adjacent to the western parcel were studied in depth and remediated to prevent adverse risk to public health and the environment. The contamination had its primary sources in stormwater drainage, waste discharges, surface drainage, and

10

groundwater discharge from the adjacent Monsanto site. Similar tidal flats exist adjacent to the eastern parcel. They also received the same types of discharges from the Monsanto operations. Contaminated discharges via pipes and groundwater have been observed in those tidal flats. It is likely that contamination similar to that adjacent to the western parcel has occurred and that remediation is a potential requirement in the future. The need for remediation will be determined after the tidal flats have been assessed.

## 5.0 CONTAMINANT SOURCES

The contamination quantified on the east parcel from the assessments in the early 1970s to the most recent have documented contamination of the soils and groundwater below the tunnel muck layer with constituents that are related to the historical operations on the Site by Monsanto. The contaminants and their likely sources are summarized in Table 2.

**Table 2**

**Summary of Primary Soil and Groundwater Contaminants and their Sources**

| Contaminant | Source |
|---|---|
| Low pH | Acid manufacturing |
| Sulfate | Sulfuric acid, nitric acid, alum, sodium bisulfate manufacturing |
| Lead | Iron ore for sulfuric acid manufacturing |
| Arsenic | Sulfuric acid manufacturing waste product |
| Aluminum | Bauxite storage and use |
| SVOCs | Common urban area contaminants |
| Phthalates | Plasticizer manufacturing |

Figure 5 is a depiction of the eastern parcel identifying the sampling locations during the Rizzo Associates investigations. Figure 6 shows the historical sulfur, aluminum, sulfate, and lead contamination quantified by Monsanto on the eastern parcel during the Monsanto ownership of the parcel (0005952-0005955). These are areas of contamination that were quantified prior to the investigations by CES and Rizzo Associates. The contamination is residual from the Monsanto operating period. Figures 7 and 8 show the two primary types of contamination quantified by Rizzo Associates, the areas where the

11

soil contamination concentrations exceed Upper Concentration Limits (UCLs), as defined in the Massachusetts Contingency Plan (MCP), and the areas where there is very low pH and elevated heavy metals in the groundwater. The MCP is the set of State regulations defining the process for the assessment and remediation of contaminated sites in Massachusetts. These are the contamination conditions that will likely require remediation to realize the development potential of the Site. This contamination was quantified below the tunnel muck layer, which were the shallow, surface soils at the time Monsanto was operating on the Site.

There is a correlation between the types of operations and the contamination demonstrating that the Monsanto operations are the source of the contamination quantified. The area of low pH where sulfuric acid was once produced is a prime example of the correlation between the Monsanto operations and the observed contamination. The UCL exceedance areas are in the former Monsanto manufacturing and waste handling areas.

Figure 9 shows the areas of contamination from Figures 6 through 8 superimposed on the former plant schematic. It shows that the contamination that exists today is in the locations where there was waste disposal and chemical manufacturing operations during the Monsanto operations. This is just another clear demonstration that the contamination had its source in the Monsanto operations. The contaminants are consistent with the operations that were undertaken and the contaminants are present below the tunnel muck, at the elevation that was the surface soil at the time of the Monsanto operations.

In its January 29, 1993 NPDES Permit Application (0001405) Monsanto established discharge limits for arsenic, lead, PAHs, and phthalates. These are all among the primary contaminants at the Site. Their inclusion in the NPDES is documentation that they are constituents of the wastes generated on the Site, which is a likely explanation of why they are contaminants in the soil and groundwater on the Site.

As shown from the correspondence cited above, Monsanto was aware of the contamination and their responsibility for it by the early 1970s. Prior to the 1970s Monsanto and its predecessor chemical manufacturers were the only users of the Site that I have seen documentation for. The data show that the locations of the contamination are where those contaminants were handled by Monsanto as part of their operations. Therefore, it is clear that the Monsanto operations were the source of the contamination described in this report on the eastern parcel.

## 6.0 SITE REMEDIATION

Remediation is required under the MCP for those sites which have been found to cause an adverse risk to public health, safety, welfare, or the environment. The methods for determining whether an adverse risk exists are defined in the MCP. The proposed use of the site is central to the analysis. It is feasible to mitigate those conditions that will result in an adverse risk under foreseeable use conditions. In addition, during the course of

12

development of a site, it is common to excavate or encounter contamination that must be mitigated to facilitate the related construction. Examples include the excavation of contaminated soil and dewatering contaminated groundwater. Such contamination conditions can significantly impact the cost of a construction project.

For the subject Site the most likely use will be retail and/or mixed use development. The documented Site contamination conditions that can cause adverse public health risks under such a development include:

- Direct contact with the contaminated soil, groundwater, surface water, and/or surface water sediments

- Ingestion of the contaminated soil, groundwater, surface water, and/or surface water sediments

- Inhalation of volatile contaminants

In addition, DEP has established Upper Concentration Limits (UCLs) in the MCP. UCLs are concentrations that have been designated by DEP to represent an adverse risk to public welfare when present in the environment. Several UCL exceedances have been observed in individual soil concentrations in several areas of the Site. If the exposure point concentrations for identified exposures exceed any UCL, that condition must be mitigated to obtain a Permanent Solution for that site. A site-specific risk assessment has not been prepared for the Site to date. However, due to the elevated soil contamination levels in multiple areas of the Site, I have assumed that those conditions will be remediated in order to obtain a Permanent Solution. In my experience a Permanent Solution is important and critical to the successful sales of properties, obtaining purchasing and construction financing for properties, and leasing of developed sites.

The Site contamination conditions are also a potential environmental risk threat. Contaminants from the Site have been released to the Mystic River and its sediments via waste discharges, surface runoff, stormwater discharges, and groundwater discharge. The groundwater contaminated with heavy metals in the northwest portion of the Site represents a particular threat of causing an environmental risk if those heavy metals are discharged to the Mystic River. It is my opinion that some sort of neutralization of the soil and/or groundwater, similar to that implemented on the MDC portion of the western parcel to address similar conditions, will be required to mitigate risk.

As stated above, a site-specific risk assessment is required to identify those contamination conditions that must be remediated. It is helpful, but not necessary, if the future use of the Site is known to evaluate the risk. The risk has not been established to date, as the Site development plans have not been finalized. The property is for sale, and the future owners will determine the specific use of the property and the locations and types of buildings that will be included in the new Site use scheme. Once development plans are known, or particular assumptions made with regard to future use, the potential risk can be assessed, the need for remediation established, the method of remediation selected, and the remediation can be implemented as part of the Site development. This is

13

the most efficient and effective method for approaching remediation of a development site such as the subject Site. It protects the future users of the Site and the environment, while only addressing those contamination conditions that potentially cause an adverse risk under the Site use conditions that will be realized.

For the purposes of this report I have assumed a remedial approach that will be implemented at the Site as part of the Site development process. I have assumed that development of the Site for retail and/or mixed use will be implemented and that the retail buildings will be constructed as slabs on grade. For the retail building construction I have assumed that the only excavation will be for the building foundations and the utilities that will service the Site. The retail buildings will not have subsurface levels, and no subgrade parking will be provided for the retail development that I have assumed.

Residential use has been identified as a viable future use on the Site as part of a mixed use plan, particularly on the northwestern portion of the Site. In order to maximize the potential with residential use, sub-grade parking is an attractive attribute of a development plan, as it provides for protection for inhabitants' vehicles and additional space for development. However, the portion of the site identified as the most suitable for residential use is also a portion that has been shown to have elevated contaminant levels in the soil and groundwater. As a result, in order to realize the maximum residential component of the development, significant soil excavation will be required and contaminated soil will have to be managed.

I have further assumed that the Mystic River and its sediments will not be disturbed during the development. Estimates for the costs of the various elements of the assumed development have been prepared and are discussed later in this Report. Additional Site characterization sampling will occur at the Site. This sampling could result in the identification of additional areas of contamination or contamination with constituents that have not been identified to date. If such conditions are discovered, they will impact the remedial approach and the costs of remediation. Those impacts will be quantified as additional characterization and remediation work is undertaken.

The remedial action elements I have assumed at this time include:

- Management of the contaminated soils that are excavated during the course of the Site development construction;

- Treatment and/or removal of the soil areas with contaminant concentrations in excess of UCLs;

- Remediation of the groundwater with low pH and elevated heavy metals;

- Preparation of those studies and reports required to satisfy the provisions of the MCP; and

- Remediation, as needed, for the mitigation of risks related to the contamination detected in the Mystic River sediments.

14

In addition to these remedial program elements, when further characterization of the upland and sediment portions of the Site are completed and the potential risks to public health and the environment are estimated, it is possible that conditions of significant risk will be encountered that have not been identified to date. This could include new areas of contamination, higher concentrations of contaminants than previously encountered, or contaminant constituents not identified previously. If this occurs, additional remediation or the implementation of additional remedial action technologies may be necessary to mitigate the risk conditions.

The assessment of the contamination of the Mystic River sediments has not been conducted, but such assessment is required to comply with the MCP. The studies to date have shown indications of sediment contamination, as referenced above. Buried waste material on the shore, observation of contaminated groundwater discharges, and the available tidal flat data all indicate that the sediments may be contaminated. The extent of contamination and the necessity for remediation will be determined based on the results of the assessment that will be performed.

Substantial soil sampling has been conducted at the Site. Sample results indicate that some of the soils may have sufficiently high contaminant concentrations to be considered a hazardous waste if they are removed from the ground. If such soils are removed from the ground, they will have to be treated or disposed of at an appropriate off-site facility. No such licensed facility exists in Massachusetts, which results in the need to transport the soils to licensed facilities out of State. This condition is considered in the estimation of the cost for management of soil during the construction process.

## 7.0 OPINIONS

As a result of my review of the documents, my observations at the Site, and my education and experience I have developed a series of opinions related to this case. I am continuing to review documents as they become available. Each of the opinions presented below is subject to my continuing review and evaluation of documents and the ongoing discovery.

1. Manufactured products, by-products, and wastes were released to the environment at the Site as a result of the routine operations involved in the formulating of chemicals, handling of raw materials for the processes, and handling and disposal of by-products and wastes from the inception of the chemical operations in the mid 1800s until the chemical manufacturing operations ceased in 1974. Releases to the ground surface and to the subsurface occurred, and wastes and by-products were intentionally disposed in multiple locations.

2. Monsanto was aware of the contamination on the eastern parcel and its relationship to their former operations at least by the early 1970s and well in advance of their selling the property to Boston Edison in 1983. Monsanto made the conscious decision not to assess or remediate the parcel, despite their

15

knowledge of the contamination conditions and the State's requiring them to do so on multiple occasions.

3. The tunnel muck served as a low permeability cap that isolated the surface soils from the Monsanto manufacturing era from the surface soils during and after the period of the tunnel muck storage up to the current time.

4. The contamination at the Site is primarily in the soil and groundwater below the elevation of the tunnel muck cap. Therefore, it was released to the environment prior to the placement of the tunnel muck. These contaminants were released to the environment during the operations of Monsanto on the Site.

5. The contamination quantified in the tunnel muck or at the surface has not been shown to be of sufficient quantity or to cause a significant enough risk to require remediation.

6. Contamination requiring remediation would have first occurred soon after the chemical operations began at the Site.

7. The releases during the Monsanto operating period would have occurred throughout the operating period and as a result of the various different chemical formulation processes for the different products that have been manufactured.

8. In order to realize the highest and best and highest use of the property construction of buildings on the Site will be required. To the extent that the construction will encounter the contaminated soil below the tunnel muck additional costs to manage those soils are likely. Four preliminary Site development plans have been developed, consistent with the highest and best and highest use of the property, by CSS. Preliminary sketches of those scenarios are contained in Attachment A. Residential use has been identified as a viable future use on the Site and sub-grade parking is necessary to maximize the residential potential for the Site. As a result, the large volumes of soil to be excavated will contain some that are highly contaminated and likely a significant amount of soil that will be classified as a hazardous waste. The current estimate for soil management for the contaminated soils excavated as a result of that Site development is $81,846 to $2,588,906. The details of the cost estimate are provided in Attachment B.

9. Soils with concentrations in excess of DEP established Upper Concentration Limits (UCLs) have been encountered during the assessment of the Site. Some or all of these soils may have to be treated or removed in order to achieve a Permanent Solution under the MCP. The current estimate for remediation of the soils in excess of UCLs to the point that a Permanent Solution can be achieved is $1,317,200. The details of the cost estimate are provided in Attachment C.

10. The releases of acids and residuals from the acid formulation process have led to low pH soils and groundwater. Low pH conditions have resulted in the dissolution of heavy metals, most notably lead and arsenic, into the groundwater. There is the

16

potential for migration of these heavy metals via the groundwater to the adjacent Mystic River, where they could represent an adverse ecological risk. Mitigation of the low pH conditions would limit the dissolution of the heavy metals and the potential for off-site migration and ecological risk. I have assumed that the low pH conditions can be neutralized by the application of a strong base to the groundwater through a subsurface injection system. The current estimate for remediation to mitigate the low pH conditions is $546,000. Attachment D contains the details of the cost estimate.

11. Waste disposal, stormwater drainage, and overland flow have contributed to contamination in the sediments of the Mystic River, particularly off of the southern boundary of the Site. In order to comply with the MCP, sediment sampling and a risk assessment have to be completed to define the degree and extent of the contamination and the need for remediation. It is not known at this time if remediation will be needed. Knowing that the types of contamination present at the Site could cause adverse environmental risk, I have estimated at this time that the remediation to comply with the applicable provisions of the MCP could cost $0 to $2,538,000. The details of this cost estimate are provided in Attachment E. Since the sediments have not been assessed in detail to date, I cannot opine on whether additional remediation of the sediments will be required to address any adverse risks.

12. The MCP requires a series of studies and submittals during the course of the assessment of the parcel. It is estimated at this time that it will cost $120,000 to $331,200 to complete those requirements. Those are in addition to those requirements listed above. It includes additional soil and groundwater testing, the sediment quality assessment, the required human health and environmental risk assessments, and a series of reports required to complete the MCP process. The specific requirements and the estimated costs are listed in Attachment F.

13. There are additional costs related to the Monsanto contamination that may be realized by a Site developer. These elements and estimates of their cost impacts are as follows:

- The potential necessity for using OSHA-certified construction crews for all site work; $100,000.

- The potential for encountering residual groundwater contamination in the northwestern portion of the Site, even after the completion of the groundwater remediation; $50,000-$100,000.

- Additional time that will be required to perform excavation, dewatering, and other Site construction work as a result of planning for and mitigating the potential impacts of Site contamination; $25,000-$100,000.

- Encountering conditions not discovered to date when constructing on a site that was a chemical manufacturing and research facility; $0-$500,000.

17

- Additional DEP requirements as they review the information submitted to them and become apprised of conditions discovered during remediation and Site development; $25,000-$300,000.

The previous five opinions have included cost estimates for the different elements of the remediation, as assumed for this Report. The total estimated costs for these elements are in Table 3.

### Table 3

**Summary of Estimated Remediation Costs**

| Category | Low Range Cost | High Range Cost |
|---|---|---|
| Soil disposal during construction | $81,846 | $2,588,906 |
| UCL exceeding soil remediation | $1,317,200 | $1,317,200 |
| Groundwater remediation | $546,000 | $546,000 |
| Sediment remediation | 0 | $2,538,000 |
| Other MCP requirements | $120,000 | $331,200 |
| Additional considerations | $200,000 | $1,100,000 |
| **TOTAL** | **$2,265,046** | **$8,421,306** |

## 8.0 CONCLUSIONS

Monsanto and its predecessors operated a chemical manufacturing facility on the subject parcel in Everett, Massachusetts from the mid 1800s through the early 1970s. Many dozens of chemicals were manufactured for use as commercial and intermediate products. During the course of developing its manufacturing and waste management procedures and practices Monsanto made certain decisions related to the handling of the raw materials, the manufactured products, and the waste and by-product materials.

Monsanto's manufacturing processes and materials handling procedures led to contamination of the soil and groundwater from the inception of the operations. That contamination grew in mass and/or geographic extent until the remediation was conducted in areas where there has been remediation. While left unattended in the ground, the contamination migrated from the medium where it was first released (for

18

example, soil or surface water) to other media, including groundwater, surface water, and sediment, as well as within the medium in which it was released.

This Report is about the eastern parcel of the Everett facility. Monsanto acknowledged the presence of potentially toxic contamination on the eastern parcel and its potential limitation of future land use when it was preparing to sell the eastern parcel in 1973. Monsanto refused to assess and remediate the eastern parcel, despite State regulatory agency requirements to do so and their own uncertainty relative to the legality of that stance.

The eastern parcel has been found to be contaminated with the raw materials, manufactured products, and waste products handled by Monsanto on the property. The locations of the contaminants have been isolated below the tunnel muck stored on the property in the 1980s and 1990s.

In order to develop the Site and to realize the full potential of the highest and best use, remediation will be required. In addition to the remediation required to ensure that public health and environmental risks are within established regulatory limits, additional costs will be realized as a result of the handling of contaminated soil and groundwater during the course of the Site development.

Many of the contamination-related costs that will be incurred by the Site developer in the buildout for the highest and best use could have been avoided had Monsanto assessed and remediated the property pursuant to the governing regulations at the time of the applicability of the regulations. The contamination has made the sale and development more complicated and more expensive for the current owners.

Using the assumption of a retail development with slab on grade construction with the potential for a mixed use that includes a residential component, as conceived by land use planners for Mystic Landing, and evaluating the likely need for remediation from the contamination identified to date, I have estimated remediation costs that are required as a result of the Monsanto contamination. The costs are identified by component in the above opinions. The total cost estimate range is $2,265,046 to $8,421,306.

19