# EXHIBIT A

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MYSTIC LANDING, LLC, <br>     Plaintiff, <br><br> v. <br><br> PHARMACIA CORPORATION, <br> and MONSANTO COMPANY, <br>     Defendants. <br><br> PHARMACIA CORPORATION and <br> MONSANTO COMPANY, <br>     Third-Party Plaintiffs, <br><br> v. <br><br> MODERN CONTINENTAL CONSTRUCTION <br> CO., INC., <br>     Third-Party Defendant. | CIVIL ACTION NO. <br> 04-10180 NMG |
| PHARMACIA CORPORATION <br>     Third-Party Plaintiff, <br><br> v. <br><br> BOSTON EDISON COMPANY <br>     Third-Party Defendant. <br><br> v. <br><br> BOSTON EDISON COMPANY <br>     Fourth-Party Plaintiff, <br><br> v. <br><br> O'DONNELL SAND & GRAVEL, INC. <br> And MARY O'DONNELL <br>     Fourth-Party Defendants. | |

## PLAINTIFF MYSTIC LANDING, LLC'S AND THIRD-PARTY DEFENDANT MODERN CONTINENTAL CONSTRUCTION CO., INC.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON LIABILITY

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................

FACTS ............................................................................................................................

I.    PARTIES AND THE SITE..........................................................................................

II.   CHEMICAL MANUFACTURING AND SITE OPERATIONS .................................

III.  SITE CONTAMINATION .........................................................................................

A.    Monsanto Documents and Testimony....................................................................

B.    Environmental Studies............................................................................................

ARGUMENT .................................................................................................................

I.    THE STANDARD OF REVIEW ON SUMMARY JUDGMENT .............................

II.   THE DEFENDANTS ARE LIABLE UNDER THE OIL AND HAZARDOUS
      MATERIAL RELEASE PREVENTION ACT, M.G.L. C. 21E, § 5...........................

A.    The Defendants are Legal Persons.........................................................................

B.    Monsanto Owned or Operated the Mystic Site from 1929 Until 1983.............................

C.    Monsanto was the Owner or Operator at the Time of Storage or Disposal of
      Hazardous Materials on the Site .............................................................................

D.    Releases or Threats of Releases of Hazardous Materials Occurred on the
      Mystic Site During Monsanto's Ownership or Operation of the Site .............................

III.  THE DEFENDANTS ARE LIABLE UNDER M.G.L. C. 21E, § 4A FOR
      CONTRIBUTION BECAUSE LIABILITY IS ESTABLISHED UNDER § 5 .........................

CONCLUSION..............................................................................................................

## TABLE OF AUTHORITIES

<u>CASES</u>

*Magee v. United States,* 121 F.3d 1 (1st Cir.1997)................................................................

*Parrilla-Burgos v. Hernandez-Rivera,* 108 F.3d 445 (1st Cir.1997).....................................

*Matos v. Davila,* 135 F.3d 182 (1st Cir.1998).......................................................................

*Coyne v. Taber Partners I,* 53 F.3d 454 (1st Cir.1995).........................................................

*John S. Boyd Co. v. Boston Gas Co.,* 992 F.2d 401 (1st Cir. 1994) ........................................

*Pirovano v. Gould, Inc.,* Civ. Action No. 91-13304, (D.Mass., 1994)...................................

*Guaranty-First Trust Co. v. Textron, Inc.,* 416 Mass. 332 (1993) .........................................

*Child v. Boston and Fairhaven Iron Works & Others,* 137 Mass. 516 (1884)......................

*Griffith v. New England Tel. & Tel. Co.,* 420 Mass. 365 (1995).............................................

*Martignetti & others v. Haigh-Farr, Inc.,* 425 Mass. 294 (1997) ...........................................

*Byrnes v. Massachusetts Port Auth.,* 1994 WL 879644 (Mass. Super. Ct. 1994) ...................

<u>STATUTES AND REGULATIONS</u>

M.G.L. c. 21E................................................................................................................................

M.G.L. § 21E, § 2.........................................................................................................................

M.G.L. C. 21E, § 4 .......................................................................................................................

M.G.L. C. 21E, § 4A .....................................................................................................................

M.G.L. c. 21E, § 5(a)....................................................................................................................

M.G.L. c. 21E, § 5(a)(2)...............................................................................................................

M.G.L. c. 21E § 5(a)(5).................................................................................................................

310 C.M.R. 40.0000 .....................................................................................................................

310 C.M.R. 40.0000, Subpart P....................................................................................................

42 U.S.C. § 9601(14).....................................................................................................................

## PRELIMINARY STATEMENT

Plaintiff Mystic Landing, LLC ("Mystic") and Third-Party Defendant Modern Continental Construction Co., Inc. ("Modern") submit this Memorandum of Law in Support of Their Motion for Summary Judgment on Liability, pursuant to Fed.R.Civ.P. 56. The Defendant Monsanto Company ("Monsanto"), and its corporate successor, Pharmacia Corporation (collectively, the "Defendants"),[1] are liable under M.G.L. c. 21E because Monsanto's chemical manufacturing, handling, storage and waste disposal activities caused contamination on Mystic's property during Monsanto's former ownership and operation of the site at issue. There is no genuine issue as to any material fact regarding liability in this case. Monsanto's contamination of the property and clear liability under Chapter 21E obviates the need for a trial on liability. Mystic and Modern are entitled to a judgment as a matter of law on Count I of Plaintiff's Complaint for Declaratory Judgment, and Count II for Contribution.

## FACTS

### I.     PARTIES AND THE SITE

Mystic is a subsidiary of Modern. Mystic currently owns a 35 acre parcel of land located on the eastern shore of the Mystic River between State Route 99 and Mystic View Avenue in Everett, Massachusetts (the "Site").[2] Monsanto is a Missouri corporation and a former owner and operator of the Site. References to Monsanto, as the owner of the Site during the time it was contaminated, shall also refer to Pharmacia, the current successor corporation to Monsanto.

---

[1]  Defendant Pharmacia Corporation ("Pharmacia") is a Missouri corporation and is the corporate successor to Monsanto Company. *See John S. Boyd Co. v. Boston Gas Co.*, 992 F.2d 401 (1st Cir. 1993)(stating that successor corporations are included among persons liable under M.G.L. c. 21E and CERCLA (the comprehensive Environmental Response Compensation and Liability Act)).

[2] The Site is sometimes referred to in the documents as the "east side" property. This is because Monsanto owned two adjacent sites, both industrial chemical operations. The Site currently owned by Mystic is on the east side of railroad tracks, and a larger parcel, now known as "Gateway," on the west side.

1

Monsanto purchased the site in 1929 by purchasing Merrimac Chemical Company. MONS2 0000589 (see Exhibit A).[3] Merrimac became part of the "Monsanto Group" which included Monsanto Chemical Works, Monsanto Chemical Works, Ltd. and Rubber Service Laboratories. *Id.* Monsanto went through various corporate changes over the years, however, it remained the owner or operator of the Site. *Id.*; 0009978 (see Exhibit B); Monsanto 2004 Annual Report at 8-9 (see Exhibit C). Monsanto ceased chemical manufacturing operations on the Site in 1975 and subsequently demolished all buildings and structures on the Site. 0006273 (see Exhibit D); 0005929 (see Exhibit E). Monsanto sold the Site to Boston Edison Company on June 20, 1983. 0005427 (see Exhibit F).

During the decades of Monsanto's ownership and operation of the Site, Monsanto operations on the Site included handling and storage of raw materials for chemical manufacturing; manufacture and storage of chemical products and by-products; production, handling and disposal of wastes and by-products. MONS2 0000586-0000595 (see Exhibit A); Deposition of Gerald Rinaldi ("Rinaldi Deposition"), September 8, 2005, (see Exhibit G); Rinaldi Deposition Exhibits 29(a)-29(f) (see Exhibit H).

## II.    CHEMICAL MANUFACTURING AND SITE OPERATIONS

Monsanto's historic chemical manufacturing processes included the following:

Sulfuric Acid
Nitric Acid
Mixed Acids
Alum (Aluminum Sulfate)
Iron Free Alum
Sodium Bisulfite
Ferric Sulfate
Alcohol
Pyrites (iron sulfide)
Sulfur

---

[3] As a result of the purchase of Merrimac Chemical Company, Monsanto then manufactured over 50 acids and numerous other technical and intermediate chemicals at the Everett facility. MONS2 0000590 (see Exhibit A); Hughto Report, at 3, and documents cited therein.

0009977 (see Exhibit B); *see also* 0006275 (see Exhibit D). In addition, the Site contained an

alum pond or lagoon for disposal, and raw material storage areas for:

> Sulfur
> Bauxite
> Iron Ore
> Salt

0009977 (see Exhibit B); Expert Report of Richard J. Hughto, Ph.D., P.E., LSP, dated 9/12/05

("Hughto Report"), at 3, and documents cited therein (see Exhibit I, text and figures); Rinaldi

Deposition, page 40, lines 2-8. Wastes produced from chemical manufacturing processes at the

Site included:

> Sodium Bisulfite
> Arsenic
> Platinum Catylyst
> Alum Mud (Aluminum and Potassium Sulfate)

Hughto Report, at 4, and documents cited therein. In addition, research and pilot testing facilities

that used a vast array of chemicals were located on the Site. *Id.*; 00009979 (see Exhibit B).[4]

### III.    SITE CONTAMINATION

Contamination has been discovered and documented at the Mystic Site. Hughto Report,

at 5, and documents cited therein. The contamination consists of the residuals from the chemical

manufacturing processes, storage, release, spills and related waste disposal activities that took

place on the Site during the decades that Monsanto owned and operated the Site. *Id;* see Affidavit

of Richard J. Hughto, Ph.D., P.E., LSP ("Hughto Affidavit")(see Exhibit J). The Hughto Affidavit

states that he personally reviewed and relied on all the documents cited and attached to this

Memorandum of Law, and further states that all of the documents attached to this Memorandum

of Law are of a type reasonably relied upon by experts in his field in forming expert opinions. *See*

---

[4] Materials produced in pilot plant operations included: Di hydroxy di phenyl sulfone; Mersize (Rosin & Maleic anhydride);Syton, Silica suspension in water; Santocel, Silica gel; Furfural; Lamp black; Calcium Nitrate; ACL Products (chlorinated cyanurates); Cyanuric Acid; Styrene Maleic Anhydride; Alkyl Phosphates – using eight different alcohols; Trisodium Phosphate; Detergents; Nitro Styrene; Scripsets (Stymer); Styrene Maleic co-polymer; Styrene polymer emulsions; Theo glycolic acid; Reslooms, (water soluble methylol melamine); Melamine, melamine formaldehyde resins; Quaternary ammonia compounds Thyamine analog; Choline Chloride; Tanning agents.

Hughto Affidavit at 4. Soil, groundwater, surface water and surface water sediment

contamination has resulted from the releases, spills and disposal that occurred during Monsanto's

operations at the Site. *Id.*

A series of environmental studies of the Site were conducted through the years to define

the degree and extent of contamination, and need for remediation. Hughto Report, at 7, and

documents cited therein. Certain studies were conducted after chemical operations ceased and all

buildings were destroyed by Monsanto. *Id.* Studies prepared prior to 1983 were conducted in

anticipation of putting the property on the market. *Id.* Environmental studies conducted on the

Site include the following:

- Environmental Assessment Sale of 34 Acres-Everett Plant, 10/22/73 (0004951) (see Exhibit K)
- Dames & Moore, Hydrogeologic Survey, 1/8/80 (000325) (see Exhibit L, text)
- Monsanto Memo, Everett Plant, East Side Assessment, 6/3/80 (0009975) (see Exhibit B)
- Monsanto Memo, Sale of Monsanto Land, 7/21/80 (0010702) (see Exhibit M)
- Dames & Moore, Report, Hydrogeological Services, 12/23/80 (0000314) (see Exhibit N, text)
- Monsanto, Site History and Environmental Status Summary, Sale of Everett Plant, East Side Property, 11/19/81 (0006322) (see Exhibit O)
- Monsanto, Proposed Property Sale to Boston Edison Company, 1/22/82 (0006273) (see Exhibit D)
- Perkins Jordan, Site Contamination and Liability Audit on Monsanto Property, 7/16/82 (0005923) (see Exhibit E)
- Boston Edison, 10/17/85 (see Exhibit P)
- Consulting Engineers & Scientists, Phase I, Initial Site Investigation Report, 1/15/97 (MONS1 0001554) (see Exhibit Q, text and appendices A-B)
- Rizzo Associates, Environmental Studies, 6/19/01 and 8/10/01 (see Exhibits R and S respectively, text)
- Woodward and Curran, Environmental Study, 10/1/04

Hughto Report, at 7-11, and documents cited therein.

### A.    Monsanto Documents and Testimony

Monsanto possessed evidence that contamination occurred and existed on the Site due to

Monsanto operations. Examples are as follows.

4

1.    In a 10/22/73 Environmental Assessment of the Site conducted by Monsanto

during Monsanto's ownership and operation of the Site, under a Monsanto cover memorandum

between several Monsanto personnel, Monsanto acknowledges:

> Condition of Ground and Groundwater...The only chemical noticeable in the rubble was
> sulfur – widespread and in considerable concentration...No doubt, the groundwater in the
> area is contaminated by inorganic dissolved solids. Seepage at the edge of the Mystic
> River at mid-tide appeared colored and contaminated...
>
> The sodium bisulfite operations have been operating the past two years...[a]ny effluents,
> therefore, have run out onto the ground and will gradually percolate through the dirt and
> rubble and will eventually enter the Mystic River. This should not be a problem.

0004952 (see Exhibit K). The Assessment discloses in another section entitled "Water Quality:"

> Intermittent process waste from bisulfite manufacture is discharged on the ground in the
> area of the manufacturing building and appears to percolate through the ground and into
> the Mystic River. When the tide is ebbing, there is a visible discolored seepage along the
> water line.
>
> In addition there is a visible discharge from a "plugged" process sewer from the bisulfite
> plant. Apparently, either the plug is leaking and allowing some waste to reach the river
> directly or leaking joints in the sewer pipe are allowing infiltration of groundwater.
>
> A small stream of cooling water is discharged from the bisulfite plant to the river.
> Because of occasional leaks in the heat exchangers, this stream becomes acid and is then
> in violation of effluent regulations. In addition, the acidic material reaches the nearby
> salt water inlet and causes accelerated corrosion in the salt water system throughout the
> plant.
>
> There is also at present a minor hazard of spills from tanks in the $SO_2$ or the bisulfite
> plant reaching the river.

2.    Attached to an 11/19/81 Monsanto Memorandum between various Monsanto

personal is a "Site History and Environmental Status Summary – Sale of Everett Plant East Side

Property" ("Summary"). 00006321-22 (see Exhibit O). The Summary lists "[c]hemicals which

were manufactured," "[r]aw materials which were stored," and "waste material disposed of on the

site." The Summary states:

> The land surface is contaminated with some of the raw materials which were stored on
> site. Soil samples taken from the upper 4 feet of the site indicate the presence of sulfur,
> bauxite, iron ore, and other inorganic metal salts.

5

3.    A 6/30/80 Monsanto Memorandum (Everett Plant, East Side Assessment)

prepared during Monsanto's ownership and operation of the site, between several Monsanto

personnel, states:

> We estimate that between 30 and 120 tons of sulfur is spread over an area of up to 60,000 sq. ft. To remove this sulfur contaminated soil could cost up to $600,000...
>
> We do not believe it would be economically or environmentally sound to remove the sulfur contaminated soil. An alternative would be to mix the existing sulfur contaminated soil layer with adjacent layers to reduce the sulfur concentrations to acceptable levels. The estimated cost for this alternative would be 10 to 15 thousand dollars.

0009975 (see Exhibit B). Thus, according to Monsanto's findings, between 30 and 120 tons of

sulfur contaminated soil on the Mystic Site. Monsanto finds an acceptable alternative is to mix

sulfur-contaminated soil with clean soil, for an estimated cost of $10-15,000, instead of removing

the contamination from the Site, at an estimated cost of $600,000.

4.    During a 9/8/05 deposition, Gerald Rinaldi, current Manager of Remediation at

Solutia, Inc., and formerly of similar position at Monsanto, recognized that the Mystic Site was

found to be contaminated during Monsanto's ownership and operation of the Site. Referring to

Exhibit 4 of his Deposition, an internal Monsanto Memorandum between Monsanto personnel

regarding "Sale of Monsanto Land," Mr. Rinaldi testified at pages 26 and 27 as follows.

Q:    Now, this last document, the August 4th, 1980 document you just quoted from, does indicate that there were several areas of environmental impact identified on the property that's now owned by Mystic, is that right?

A.    May I? Yes. It says, "several areas of environmental impact were identified in analyzing your study in the Dames & Moore hydrogeological report."

Q.    By environmental impact does that mean there were certain portions of the property that are in fact showing evidence of contamination?

A.    There's two items in this letter that would indicate such, yes.

Q.    And what are those two items?

A.    The areas of impact which were considered to be significant include – and item number one is, "Sulfate, zinc and lead levels in the groundwater samples from the two monitoring wells *exceeded EPA's human health water quality criteria*." Item number two concerns groundwater flow. It's not responsive. Item number

6

three, "The upper layer two to four feet of ground fill material deposits, et cetera, are *contaminated with materials known to have been stored in the area* in the past." And then that's where it picks up as I was indicating earlier. "None of the identified environmental impacts are considered to be of high concern," et cetera.

(*emphasis added*) (see Exhibit T (Exhibit 4 from Rinaldi Deposition)). Contamination was

discovered on the Mystic Site, in levels exceeding EPA regulatory criteria protecting "human

health," and the constituents were "materials known to have been stored" on the Site by

Monsanto. Note that Monsanto opines that these environmental impacts were not "considered to

be of high concern."

For a visual depiction of some of the contaminated areas described in the evidence

presented above, please see Figure 3 in the Hughto Report, indicating the locations of the

chemical manufacturing buildings and waste disposal areas on the site, with areas of

contamination corresponding to the operations and disposal areas, as similarly depicted on a

Monsanto map entitled "Closed Disposal Areas." 0006808 (see Exhibit U).

**B.    Environmental Studies**

Environmental studies were conducted on the Site to define the degree and extent of

contamination and need for remediation. *See* Hughto Report, at 7, and documents cited therein;

see list of environmental studies above in § III. Site Contamination. Evidence Monsanto

possessed, detailed in documents presented above, reflects what we already know from the results

of environmental studies of the Site. Study results prove the existence of contamination on the

Site caused by storage, disposal and other handling of chemicals during Monsanto's ownership

and operation of the Site. Examples include:

1.    A 1/8/80 Hydrogeologic Survey was conducted by Dames & Moore on

Monsanto's adjacent, highly contaminated site, "Gateway." 0000325 (see Exhibit L). As part of

the assessment, a monitoring well was installed on the Mystic Site. 0000325; Hughto Report, at 7.

This monitoring well, MW-7, contained the highest concentrations of contaminants in

groundwater of all the wells in the Survey. *Id*. Contaminants found in the well included

7

plasticizer compounds which were known to be handled on the Gateway site. *Id.* These groundwater results were found while Monsanto owned and operated the Site.

2.      As detailed in a 12/23/80 Hydrogeological Services Report prepared by Dames & Moore, additional monitoring wells were installed on Monsanto's neighboring Gateway site. A monitoring well installed on the Mystic Site showed additional groundwater contamination. 0000314 (see Exhibit N); Hughto Report, at 8.

3.      A 7/16/82 Site Contamination and Liability Audit of the Mystic Site was performed by the environmental consulting firm of Perkins Jordan. 0005923 *et seq.* (see Exhibit E). Perkins Jordan conducted a due diligence assessment for Boston Edison, a prospective purchaser of the property. Hughto Report, at 8; 0005923 *et seq.* Results were that soils were contaminated with sulfate, lead, aluminum, phthalates, arsenic, volatile organic compounds ("VOCs"), and semi-volatile organic compounds ("SVOCs"). *Id.* Several contaminants were also discovered in the tidal flats. *Id.* VOC's were found in the Site's groundwater. *Id.*

4.      For a 1/15/97 Phase I Site Assessment, Consulting Engineers & Scientists collected soil and groundwater samples to determine historical contamination on the Site. MONS1 0001554 (see Exhibit Q); Hughto Report, at 9. The assessment was performed on behalf of O'Donnell, the owner of the Site subsequent to Boston Edison. *Id.* Sample results detected concentrations of arsenic and lead in soil, and low pH, arsenic and lead in groundwater. *Id.* Low pH, an acidic condition, was found in the areas where Monsanto's historical sulphuric acid operations once were. *Id.*; Rinaldi Deposition, page 30, lines 11-14, and page 186, lines 14-20.

5.      On behalf of the Plaintiff Rizzo Associates conducted soil and groundwater sampling at the Site, the results of which are presented in Environmental Studies dated 6/19/01 and 8/10/01 (see Exhibits R and S respectively); Hughto Report, at 9. Findings included further delineation of the low pH found in groundwater, and the areas contaminated with arsenic, lead, petroleum compounds and polyaromatic hydrocarbons ("PAHs") in the soil. *Id.* The area of low pH in the groundwater also revealed heavy metal contamination in the groundwater. *Id.* All

8

contamination was found to be historical, from Monsanto's ownership and operation of the Site, due to the fact that the contamination was found under the low permeability layer or cap of "tunnel muck" placed over the Site after Monsanto sold the Site, and before Mystic purchased the Site. *Id.* Soil contamination exceeding Upper Concentration Limits ("UCLs"), regulatory limits set forth in the 21E regulations, was discovered at depths below the layer of muck. *Id.*; Hughto Report, at 5.

## ARGUMENT

Summary judgment should be granted against the Defendants. The documentary and testimonial evidence presented in this Memorandum of Law demonstrates that the elements for liability under c. 21E are met in spades. Monsanto's chemical manufacturing, handling, storage and disposal activities caused contamination on the Mystic Site during Monsanto's ownership and operation of the Site. The contamination is well documented as presented in Monsanto's own documents and environmental assessments. There is no genuine issue as to any material fact regarding liability in this case. There is no fact Monsanto will be able to point to that clears the threshold of materiality. Nor will Monsanto be able to point to a fact for which there is a genuine dispute necessitating a trial. Monsanto may dispute some specific allegation of contamination or the cause of it, however, even if only one of the many examples of contamination in violation of 21E passes the test for summary judgment, then a trial on liability is avoided. The overwhelming evidence of contamination caused by Monsanto at the Mystic Site obviates the need for a trial on liability. Mystic and Modern are entitled to a judgment as a matter of law.

## I.     THE STANDARD OF REVIEW ON SUMMARY JUDGMENT

In accord with Fed.R.Civ.P. 56(c), summary judgment must be granted if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." *See* Fed.R.Civ.P. 56(c); *Magee v. United States,* 121 F.3d 1, 3 (1st Cir.1997). A genuine issue is one which a reasonable fact finder could resolve in favor of the nonmoving party. *Id.* Not

9

every genuine factual conflict, however, necessitates a trial. "It is only when a disputed fact has

the potential to change the outcome of the suit under the governing law if found favorably to the

nonmovant that the materiality hurdle is cleared." *Parrilla-Burgos v. Hernandez-Rivera,* 108 F.3d

445, 448 (1st Cir.1997) (internal quotations omitted). Once the moving party has demonstrated

that no genuine issue of material fact exists, the burden of production shifts to the nonmovant to

contradict the demonstration by coming "forward with specific provable facts which establish that

there is a triable issue." *Matos v. Davila,* 135 F.3d 182, 185 (1st Cir.1998). The role of a summary

judgment motion in general "is to pierce the boilerplate of the pleadings and assay the parties'

proof in order to determine whether trial is actually required." *Coyne v. Taber Partners I,* 53 F.3d

454, 457 (1st Cir.1995).

## II.    THE DEFENDANTS ARE LIABLE UNDER THE OIL AND HAZARDOUS MATERIAL RELEASE PREVENTION ACT, M.G.L. C. 21E, § 5

Monsanto, and its corporate successors, are liable for storage, disposal and contamination

of the Mystic Site during Monsanto's ownership and operation of the Site. The operative statute is

M.G.L. c. 21E, § 5(a).

Chapter 21E, § 5(a) states, in part:

§ 5. Persons liable (a)...(2) *any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material...*and (5) any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site, *shall be liable, without regard to fault...* (iii) to any person for damage to his real or personal property incurred or suffered as a result of such release or threat of release...

*(emphasis added).*

Thus, the elements to prove the liability under § 5 are:

1.     Monsanto is a "person"
2.     who owned or operated the Mysitc Site
3.     at the time of storage or disposal of hazardous materials on the Site, and
4.     there was a release or threat of release of hazardous material.

10

21E is a strict liability statute. M.G.L. c. 21E, § 5 (stating that liable persons "shall be liable, without regard to fault"); *see Guaranty-First Trust Co. v. Textron, Inc.,* 416 Mass. 332 (1993)(stating: "General Laws c. 21E, § 5(*a* )(iii), provides a property owner with a strict liability claim against certain classes of persons for "damage to his real or personal property incurred or suffered as a result of [a] release or threat of release" of hazardous materials").

### A.    The Defendants are Legal Persons

The definition of "Person" in M.G.L. c. 21E, § 2 is "any...private corporation..." It is well established in our jurisprudence that corporations are legal "persons" who can sue and be sued. *Child v. Boston and Fairhaven Iron Works & Others*, 137 Mass. 516 (1884).

### B.    Monsanto Owned or Operated the Mystic Site from 1929 Until 1983

Monsanto purchased the Site in 1929 by purchasing Merrimac Chemical Company. MONS2 0000589. Monsanto sold the Site to Boston Edison Company on June 20, 1983. 0005427. Monsanto operated the site as a chemical manufacturing operation from 1929 until 1975. MONS2 0000586-0000595; 0006273.

### C.    Monsanto was the Owner or Operator at the Time of Storage or Disposal of Hazardous Materials on the Site

During the decades of Monsanto's ownership, until 1975, Monsanto operations at the site included handling and storage of raw materials for chemical manufacturing; manufacture and storage of chemical products and by-products; production, handling, storage and disposal of wastes and byproducts. MONS2 0000586-0000595; 00006273; Rinaldi Deposition Exhibits 29(a)-29(f).

The chemical products, raw materials, byproducts and waste are clearly included within the definition of "hazardous material." Chemicals listed in the FACTS section, discussed in documents, testified to by Mr. Rinaldi, and further documented, are hazardous under applicable law. M.G.L. § 21E, § 2; 42 U.S.C. § 9601(14); 310 C.M.R. 40.0000, Subpart P.

11

In his Expert Report, Richard J. Hughto, Ph.D., P.E., LSP summarized documented soil and groundwater contamination, as discussed above, and paired that contamination with its respective source. Hughto Report, at 11. Thus, based on the evidence, particularly, the numerous environmental assessments discussed above, Mr. Hughto was able to summarize which Monsanto chemical operation caused which area of contamination on the Site. Certain Monsanto operations and resultant contamination are as follows.

1.    Sulfuric acid manufacturing and handling caused low pH in the groundwater.

2.    Sulfuric acid, nitric acid, alum, sodium bisulfate manufacturing and handling caused sulfate contamination.

3.    Iron ore for sulfuric acid manufacturing and handling caused lead contamination.

4.    Sulfuric acid manufacturing waste product and handling caused arsenic contamination.

5.    Bauxite storage, and handling caused aluminum contamination.

6.    Plasticizer manufacturing and handling caused phthalate contamination.

Hughto Report, at 11. Mr. Hughto explains the correlations further in his Expert Report:

> There is a correlation between the types of operations and the contamination demonstrating that the Monsanto operations are the source of the contamination quantified. The area of low pH where sulphuric acid was once produced is a prime example of the correlation between the Monsanto operations and the observed contamination. The UCL [regulatory "Upper Concentration Limit"] exceedance areas are in the former Monsanto manufacturing and waste handling areas.
>
> Figure 9...shows that the contamination that exists today is in the locations where there was waste disposal and chemical manufacturing operations during the Monsanto operations. This is just another clear demonstration that the contamination had its source in the Monsanto operations.

Hughto Report, at 12.[5] Please see Figure 9 of the Hughto Report, a plant schematic showing current contaminated areas where former Monsanto storage, waste disposal and chemical manufacturing operations once were during Monsanto's ownership and operation of the Site.

---

[5] Regarding the releases of sulphuric acid on the Site, Mr. Rinaldi also admitted to spills of sulphuric acid in his 9/8/05 deposition at page 124:

Using contaminants from above as examples, it is clear that there were releases of "hazardous materials" under 21E and the regulations promulgated thereunder, found in 310 C.M.R. 40.0000. The regulations in Subpart P provide a comprehensive list of those chemicals and contaminants that are specifically designated as "hazardous." For example, upon review of 310 CMR 40.0000, Subpart P, the following are specifically listed as hazardous:

| CONTAMINANT | CAS NUMBER[6] |
|---|---|
| Sulphuric acid | CAS# 08014-95-7 |
| Lead | CAS# 00743-92-1 |
| Arsenic | CAS# 07440-38-2 |
| Bis2-ethyl-phthalate | CAS# 00117-81-1 |
| Dibutyl phthalate | CAS# 00084-74-2 |
| Butyl Benzl Phthalate | CAS# 00085-68-7 |

Please see Exhibit V, a summary chart prepared by Expert Hughto, showing 1) these particular hazardous materials, 2) their CAS Numbers, 3) each environmental study, from 1980 to 2001, in which the contamination was found, and 4) whether the contaminants were discovered in groundwater, soil or both on the Site.

**D.    Releases or Threats of Release of Hazardous Materials Occurred on the Mystic Site During Monsanto's Ownership or Operation of the Site**

Under c. 21E, § 5(a)(2), a person is liable for a release of hazardous material from a site if that person was the owner or operator of such site at the time of the storage or disposal of the hazardous material at or upon the site. A person who was the owner or operator of a site at the time of storage or disposal of hazardous material may be held liable for a release, even if the release occurred *after* that person ceased to be an owner or operator of the site. *Byrnes v.*

---

Q.    Okay. Where to your knowledge, though, were there spills and incidents of releases of contaminants at the Mystic site as well over the course of then Monsanto's operation of it?

MR. STEVENS: Objection. Asked and answered, but go ahead.

A.    My earlier testimony, I believe, indicated an occasional small leak, spill, release, whatever term you choose, of sulfuric acid on the Mystic site, as we're now calling it, which were addressed at the time they occurred by neutralization with soda ash. No other episodic spills such as tabulated in this Table 3.

[6] Chemical Abstracts Service Number assigned to hazardous materials specifically designated under c. 21E and 310 CMR 40.000.

13

*Massachusetts Port Auth.*, 1994 WL 879644 (Mass. Super. Ct. 1994). The Court in Byrnes stated: "The statute [§ 5(a)(2)] easily could have been written to provide that a prior owner is liable if it owned the site *during* a release or threat of release." *Id.* at *5 (*emphasis added*). Temporally, the release is not required to occur during the former owner's operation of the site. The Court stated:

> The trigger to liability remains ownership (or operation) of a facility at the time of disposal, not culpability or responsibility for the contamination. Put simply, notions of fault, such as negligence, knowledge, or foreseeability, do not come into play because ownership at the time of 'disposal' is a concept quite distinct from causation.

> In sum, to trigger liability under c. 21E, § 5(a)(2), there must be some activity, albeit not necessarily activity initiated or directed or undertaken or known by the prior owner, pursuant to which hazardous waste is introduced on or into the property when the prior owner owned the site.

*Id.* at *8. In *Byrnes*, the plaintiff failed to allege that hazardous material was "stored or disposed of" on the site, and therefore the Defendant's motion for summary judgment was granted in part. *Id.* at *9.

In *Pirovano v. Gould, Inc.*, Civ. Action No. 91-13304, (D.Mass., 1994) (Mazzone, J.), the Court granted plaintiff's motion for summary judgment on liability against defendant under c. 21E, § 4 where the plaintiff alleged that the defendant fell within the category other person  liable in § 5(a)(2). *Id.* The Court stated: "Subsection 5(a)(2) imposes imposes strict liability upon former owners of contaminated sites who stored hazardous material at the site, irrespective of when the 'release' occurred." *Id.* at 14. Judge Mazzone stated that the defendant's argument "that a former owner of contaminated property is not liable under the statute unless the contamination occurred during the former owner's period of ownership," was a faulty interpretation of § 5(a)(2) and stated: "I find no support for the Defendant's position in either the language or purpose of the statute; therefore, I reject it." *Id.* Judge Mazzone recognized that the drafters of c. 21E "knew how to demand a concurrence of ownership and action" referring to a release during ownership. *Id.* at 12. However, he states, "the language of the statute requires only proof that 'there is or has been' a release without regard to when the release took place in relation to the defendant's period of ownership." *Id.* Judge Mazzone noted that "this construction of subsection 5(a)(2) comports with

14

federal courts' interpretation of the analogous CERCLA provision." *Id.* at 14 (*citing John S. Boyd Co. v. Boston Gas Co.*, 992 F.2d 401 (1st Cir. 1993)(stating "Massachusetts courts construe it [21E] in line with Federal decisions [on CERCLA]...").

The Defendants in our case will find no cases holding to the contrary.

In this Memorandum, however, facts are presented and arguments are made, that the releases occurred during, and were caused by, Monsanto's operations at the Site. The implications are twofold. One, Mystic and Modern achieve proof far beyond the quantum of proof required by 21E and the courts to prove liability under § 5(a)(2), thus summary judgment should be granted.

Second, liability is established under § 5(a)(5) as well, which does require causation. M.G.L. § 5(a)(5) states: "Persons liable...(5) any person who otherwise *caused* or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site." (*emphasis added*); *see Griffith v. New England Tel. & Tel. Co.*, 420 Mass. 365, 369 (1995)(stating "To impose liability under § 5(a)(5), a plaintiff must establish both the defendant caused the release and that the release caused the contamination").

From 1929 until 1975, releases of hazardous materials occurred on the Site as a result of Monsanto's chemical manufacturing operations. The constituents of the contaminated areas bear the signature of the raw materials, products and wastes that Monsanto used, created, stored, spilled and disposed of during its ownership and operation of the Site. Monsanto's own personnel and documents reflect the inescapable conclusion that contamination caused by Monsanto continued for years.

A layer of low permeability "tunnel muck" from Boston Harbor was layered over portions of the Site in varying thickness in 1995, after Monsanto's ownership and operation of the Site. *See* Rizzo Environmental Studies at Exhibits R and S; Hughto Report, at 5. The contamination resulting from storage, disposal and other handling of chemicals during Monsanto's tenure was discovered, among other locations, below the layer of muck. *Id.* For example, the Rizzo Associates Environmental Studies discovered soil contamination exceeding

15

regulatory UCL's at depths of 5-7 feet (in soil borings RIZ-6, BOR-7 and BOR-4). The layer of muck exists close to the surface at 1.5-3 feet.

A summary of indisputable examples of releases[7] of hazardous materials caused by Monsanto are as follows.

1.    **00004952**: A Monsanto 10/22/73 Monsanto Environmental Assessment of the Site states that sodium bisulfate effluents "run out onto the ground" and end up in the Mystic river. In addition, it states that there is "waste" leaking from sewer pipes from the bisulfate plant onto the Site reaching groundwater and the river. Also, leaks in the heat exchangers in the bisulfate plant result cause a stream of acid that is "in violation of effluent regulations." Finally, the Assessment documents that there are "spills from tanks in the $SO_2$ or the bisulfite plant reaching the river."

2.    **0000325**: A 1/8/80 Dames & Moore Hydrogeologic Survey installed a monitoring well on the Site and the results were the highest concentrations of contamination found in the Survey. Contaminants discovered in the groundwater included lead, arsenic, phthalates (Bis2-ethyl-phthalate, Dibutyl phthalate and Butyl Benzl Phthalate), and plasticizer compounds (hazardous materials known to be handled on the adjacent Monsanto site).

3.    **00006322**: A Monsanto 11/19/81 Memorandum and attached "Site History and Environmental Status Summary – Sale of Everett Plant East Side Property" states: "The land surface is contaminated with some of the raw materials which were stored on site. Soil samples taken from the upper 4 feet of the site indicate the presence of sulfur, bauxite, iron ore, and other inorganic metal salts."

4.    **0009975**: A 6/3/80 Monsanto Memorandum, "Everett Site, East Side Assessment" estimated that "between 30 and 120 tons of sulfur is spread over an area of up to

---

[7] The definition of "Release" in M.G.L. 21E, § 2 is "any spilling , leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment..." Various of these terms describe how the contaminants discovered on the Site came to be present in the soil and groundwater.

16

60,000 sq. ft." on the Site. The memorandum explains the cause referring to "large areas on the east side [Mystic Site] used for raw material storage piles of several thousand tons each of sulfur..."

    5.      00006274: A 1/22/82 letter captioned "Proposed Property Sale to Boston Edison Company" from Monsanto to Boston Edison regarding the potential purchase made certain disclosures including: "Waste materials disposed of on the tract include alum mud (aluminum sulfate)."

    6.    **Gerald Rinaldi:** Rinaldi acknowledged contamination existing during, and caused by, Monsanto's chemical operations in his 9/8/05 deposition several times. *See e.g.* Rinaldi Deposition, at 37, 39, 42, 69, 71, 118, 124, 132, 137-138, 141, 154.

    7.    0005923: A 7/16/82 Perkins Jordan Site Contamination and Liability Audit found contaminants that were signatures of the chemicals used and handled on the Site: sulfate, lead, arsenic, aluminum, and phthalates (Bis2-ethyl-phthalate and Dibutyl phthalate).

    8.    **MONS1 0001554:** For a 1/15/97 Phase I Environmental Assessment, Consulting Engineers & Scientists collected soil and groundwater samples and detected arsenic and lead in soil, and low pH, arsenic and lead in groundwater. Sulfuric acid manufacturing waste product caused the arsenic contamination. Iron ore for sulfuric acid manufacturing caused the lead contamination. *Id.* Sulfuric acid manufacturing and leaks caused the low pH in the groundwater.

    9.    **Rizzo Associates:** Rizzo Associates conducted soil and groundwater sampling on the Site as part of two Environmental Studies dated 6/19/01 and 8/10/01. They further delineated the low pH, arsenic and lead in groundwater, and the arsenic and lead in the soil.

**III.**    **THE DEFENDANTS ARE LIABLE UNDER M.G.L. C. 21E, § 4A FOR CONTRIBUTION BECAUSE LIABILITY IS ESTABLISHED UNDER § 5.**

    Monsanto is liable for contribution for response actions at the Site. M.G.L. §4A provides a procedure whereby a party gives notice to a party that he reasonably believes is liable under § 5 to seek contribution for clean up costs. The party notified need not be adjudicated as liable under

17

§ 5 in order for a party to prevail under § 4A. In this case, however, where liability under § 5 is clear, and should be adjudicated as such as a matter of law, liability under § 4A attaches without question.

> Chapter 21E, § 4A states:

> Section 4A. (a) Any person…who has undertaken, is undertaking, *or intends to undertake* a necessary and appropriate response action or who is or reasonably believes that he might be liable pursuant to section five *may notify any person he reasonably believes is liable pursuant to section five* that the response action has been taken or is being taken or of the notifier's intent to take such response action or to seek contribution, reimbursement or equitable share from other persons...

*(emphasis added)*. The difference between § 4 and § 4A of c. 21E is that, under § 4, one can only recover response costs already incurred, while under § 4A, one can be awarded costs to conduct a response action that he *intends to undertake*, that is, before clean up.

On August 27, 2001 Mystic sent notice pursuant to § 4A to Defendant Pharmacia, corporate successor to Defendant Monsanto, that Mystic reasonably believes the Defendant is liable under § 5 and that Mystic seeks contribution from the Defendant. Please see a copy of the August 27, 2001 §4A Notice at Exhibit W.

In *Martignetti & others v. Haigh-Farr, Inc.*, 425 Mass. 294 (1997), the Court specifically explained the "Interaction of G.L. c. 21E, §§ 4 and 5." 425 Mass. at 297. In the case, summary judgment was granted to the defendants on the plaintiff's claims for property damages under § 5 as barred by statute of limitations. 425 Mass. at 296. However, summary judgment was denied for the plaintiff's claim under § 4, and the case proceeded to trial on that claim. *Id.* The Defendant argued that he must prevail on the claim for reimbursement brought under § 4, because, he contended, "liability under § 4 is predicated on a showing of liability under § 5, a determination that was never made." The Supreme Judicial Court rejected the argument.

The Supreme Judicial Court held that "it is clear that a plaintiff is not required to establish liability under a § 5 claim in order to succeed on a § 4 claim." 425 Mass. at 297)(stating

18

also that the Defendant's argument "is not a correct interpretation of the interaction between the two sections). If a § 4 or §4A claim were to proceed without a § 5 claim, the issue of whether the defendant falls into one of the categories of persons liable would be addressed in those proceedings. *See Id.* at 298.

Where, as here, liability under § 5 is clear, as presented in Section II. of this Memorandum, the Defendants' liability under § 4A for contribution is inescapable. Not only are the Defendants liable for property damage under § 5, they are liable for contribution under § 4A.

**CONCLUSION**

For the reasons and upon the authorities set forth above, Plaintiff Mystic Landing, LLC and Third Party Defendant Modern Continental Construction Co. respectfully request that this Court enter summary judgment on liability.

MYSTIC LANDING, LLC AND MODERN
CONTINENTAL CONSTRUCTION CO.

By its attorneys:

Robert G. Flanders, Esq. (BBO #170820)
Doreen M. Zankowski, Esq. (BBO #558381)
Kevin M. Plante, Esq. (BBO #630088)
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109-1775
(617) 345-9000

DATED: November 10, 2005

19

## CERTIFICATE OF SERVICE

I, Kevin M. Plante, hereby certify that on this 10th day of November 2005, I served a true and accurate copy of the foregoing document by hand to:

John M. Stevens, Esq.
Adam P. Kahn, Esq.
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts 02210

Mark S. Granger, Esq.
Douglas B. Otto, Esq.
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210

Howard G. Guggenheim
P.O. Box 736
Scituate, MA 02066

Kevin M. Plante

SIGNED UNDER THE PENALTIES OF PERJURY THIS 10th DAY OF NOVEMBER 2005.

20