UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MYSTIC LANDING, LLC,<br>Plaintiff,<br><br>v.<br><br>PHARMACIA CORPORATION,<br>Defendant.<br><br>PHARMACIA CORPORATION,<br>Third-Party Plaintiff,<br><br>v.<br><br>MODERN CONTINENTAL CONSTRUCTION<br>CO., INC.,<br>Third-Party Defendant. | **CIVIL ACTION NO.<br>04-10180 NMG** |
| PHARMACIA CORPORATION,<br>Third-Party Plaintiff,<br><br>v.<br><br>BOSTON EDISON COMPANY,<br>Third-Party Defendant.<br><br>v.<br><br>BOSTON EDISON COMPANY,<br>Fourth-Party Plaintiff,<br><br>v.<br><br>O'DONNELL SAND & GRAVEL, INC.<br>And MARY O'DONNELL,<br>    Fourth-Party Defendants. | |

**PLAINTIFF, MYSTIC LANDING, LLC AND THIRD-PARTY DEFENDANT MODERN
CONTINTENTAL CONSTRUCTION CO., INC.'S
POST-TRIAL MEMORANDUM AND SUMMARY OF ARGUMENT**

As directed by the Court, J. Gorton, on Tuesday, April 18, 2006, Mystic Landing, LLC ("Mystic") and third-party Defendant, Modern Continental Construction Co., Inc., ("Modern") hereby submit their Post-Trial Memorandum and Summary of Argument.

## INTRODUCTION

Plaintiff, Mystic Landing, LLC ("Mystic"), has proven its case for declaratory relief. The defendant, Pharmacia Corporation ("Pharmacia"), is strictly liable under M.G.L. c. 21E, §§ 4A and 5 for its releases, contamination, and pollution of the property on which it (and its predecessors in interest) have operated chemical manufacturing facilities since the Civil War. The strict liability provisions of M.G.L. 21E hold a previous owner who contaminated the site – in this case, Pharmacia and its predecessors in interest, Monsanto Company and Merrimack Chemical Co. (referred to herein collectively as "Pharmacia") – liable for the cleanup of the contamination they caused.

A unique physical phenomenon exists at the Property: a clay cap of so-called tunnel muck separates the historical contamination of the soils and groundwater by Pharmacia from any subsequent surface operations by Mystic, Modern Continental Construction Co., Inc. ("Modern"), and its lessees. Because of this physical demarcation and barrier between the parties' respective activities on the property, this Court can and should apportion liability for the costs of future response actions in accordance with the clear statutory mandate of strict responsibility for contribution to contamination on a release-specific basis. Thus, Mystic and Modern bear responsibility for remediating their operations in and above the clay cap of tunnel muck and Pharmacia bears the responsibility for the necessary and appropriate response costs that will be required to clean up the pollution to the soils and groundwater below the cap, as well as any such costs that may be required to clean up the nearby sediments that are contaminated as

a result of the seepage and leaching of the polluted groundwater from the below-the-cap soils at the site.

As testified to by Mystic and Modern's expert, Dr. Richard Hughto, the signature contaminants of the soils and groundwater below the clay cap (arsenic, sulfur, acids, alum, and lead) are consistent with the many decades of chemical operations, manufacturing, storage, and on-site disposal activities of Pharmacia. Pharmacia failed to refute this fact (indeed, it has not attempted to do so), as its consultant, Mr. Collins, failed to sample, investigate, or analyze the soils or groundwater found below the top few inches of the property. Similarly, the testimony and evidence received by the Court indicate that, to the extent the sediments in the river adjacent to the site are contaminated and may require future remediation, the low pH groundwater in the below-the cap soil has dissolved, and continues to dissolve Pharmacia's contaminants in the soils and has carried them to the adjacent river and tidal flats. There, the groundwater seeps and leaches from the site and deposits the contaminants, namely heavy metals, such as arsenic and lead, into the sediments. The concentration of sediment contamination is way above any background contamination in the river or on the surface of the Property, but is consistent with the elevated levels of contaminants in the contaminated under-the-cap soils and groundwater at the Property.

Pharmacia's attempt to invoke an equitable allocation of these costs to remediate its contaminating, below-the-cap releases based on Modern's surface activities lacks any support in the applicable case law or statutory provisions. Thus, it should not deter this Court from holding Pharmacia strictly liable for its contamination of the below-the-cap soils, groundwater, and adjacent sediments.

Before Mystic purchased the site in 2001, Modern entered into an agreement with O'Donnell Construction, wherein, as part of a subcontract between Modern and O'Donnell, Modern agreed to use the property (in practical effect, this amounted to a lease-to-own the property) and to make payments thereon, culminating in a purchase thereof in 2001. Modern and Mystic presented testimony and trial exhibits showing that the total consideration paid for the use and purchase of the property was in excess of $7 million dollars. Without authority in the statute, regulations, or case law, Pharmacia seeks to have this Court reduce its liability for response costs because of Mystic and Modern's alleged technical non-compliance with various filing and timing provisions of the Massachusetts Contingency Plan ("MCP") for the remediation of the surface of the property. But no such right or remedy exists under the applicable law. In any event, Pharmacia has shown no resultant prejudice and it has failed to counter Mystic and Modern's evidence concerning the impracticability and other difficulties of attempting to remediate the property while Modern was performing an essential part of the Central Artery/Tunnel project. Moreover, it ill lies in Pharmacia's mouth to complain about a delayed clean up after Pharmacia failed to remediate the Property before selling it in 1983 and after it failed to respond to Mystic's 2001 request for help with the clean up of the site.

M.G.L. c. 21E, § 4A permits this Court to award declaratory relief and to find that Pharmacia is liable for the cost of remediating the contamination in the soils, in the groundwater below the tunnel muck cap, and in the adjacent sediments (resulting from the groundwater seeping from below the tunnel muck cap). MGL 21E, § 4A allows for such declaratory relief and for a finding of liability against the party that caused the release or threat of release of contaminants; it also imposes liability for the past and future response costs with respect to such releases.

Chapter 21E, 4A states: "Any person...who has *undertaken, is undertaking, or intends to undertake* a necessary and appropriate response action or who is or reasonably believes that he might be liable pursuant to section five that the response action has been taken or is being taken or of the notifier's intent to take such response action *or to seek contribution*, reimbursement or equitable share from other persons..." 21E is first and foremost a "contribution" statute, and in the event contribution cannot be determined, then, and only then, should a court determine liability based on the theories of equitable allocation.

I.  **Pharmacia is Strictly Liable and Modern and Mystic are "Innocent Landowners" under 21E, Sec. 5(b) for Under the Cap Contaminants**

Because of its 80+ years of chemical operations, Pharmacia is strictly liable under M.G.L. c. 21E, § 5(a):

> § 5. Persons liable (a) . . . (2) any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material . . . and (5) any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site, shall be liable, without regard to fault . . . .

Under § 5 of c. 21E, all that must be established to prove liability is that Pharmacia was an owner or operator on the Property at the time of a release of hazardous material or that Pharmacia caused a release of hazardous material. Pharmacia has done nothing to disprove Dr. Hughto's conclusion that the under-the-cap contaminants are all from the chemical operations, manufacturing, storage, and disposal activities of Pharmacia's predecessors in interest, Monsanto and Merrimack. Pharmacia's own expert, Mr. Collins, its manager of remediation, Mr. Rinaldi, and its own internal documents all confirm this extensive contamination, willfully left in place for future generations and owners to remediate.

As Dr. Hughto has testified, and as Mr. Collins has confirmed, the clean up of contaminated soils and groundwater below-the-cap are required because of the release of acids,

arsenic, lead, alum, and sulfur – all chemicals used by Pharmacia, or generated by Pharmacia in its operations. Mr. Collins has conceded that the UCL soil exceedance areas below the cap must be removed as a matter of law. Mr. Collins also concurred with Dr. Hughto that the groundwater must be remediated. Further, Dr. Hughto opined convincingly that the groundwater in the area – not in the form of plume, but as a result of the widespread sulfuric acid, sulfur, and sodium bisulfate spread throughout the soils below the clay cap – must be remediated; and Mr. Collins agreed. Pharmacia and its consultant focused only on the limited release of contaminants above the cap, in the first 2-3" of soils, from the few soil samples taken by Mr. Collins, under non-conforming quality controls, even though such contamination is not at issue here and even though it was expressly stipulated to be the responsibility of Mystic and Modern.

Pharmacia, formerly known as Monsanto, operated the site since 1929, and admittedly was the successor in interest to a company or companies that owned the site since the Civil War. Pharmacia has admitted that releases and threats of releases of oil and hazardous materials occurred during Pharmacia's many years of ownership and operations at the Property. See Ex. 234.

"The plaintiff is not required to pinpoint each cost which is attributable to a particular defendant's release, but instead is only required to prove that the defendant's release resulted in some response costs. <u>Once the plaintiff establishes that the release caused by the defendant resulted in response costs then the burden shifts to the defendant to prove what portion of the plaintiff's response costs are attributable to the release which the defendant caused.</u>" See <u>Jean Beaudette, Inc. v. J.P. Noonan Transp., Inc.</u>, 419 Mass. 311, 314-15, 644 N.E.2d 218, 220 (1995) (emphasis added). Although in Section 5(b) cases, a party that is otherwise jointly and severally liable can limit its liability to the owner to the "portion" of damages <u>attributable to its activities,</u>

it can do so only if it can carry the burden of proving what that portion is. <u>Olin Corp. v. Fisons PLC</u>, 1995 WL 811961 at *13 (D. Mass. 1995).

In contrast to its "as is" sale of this Property, Pharmacia engaged in extensive remediation and clean-up of the adjoining west parcel of its former chemical plant at a cost in excess of $33 million (in 1980 and 1990 dollar value). Pharmacia has admitted, however, that the east parcel, the property at issue in this case, was not remediated. Rather, Pharmacia conveyed the property "as is" with a contractual indemnification for any environmental liability it may incur, in the hope that Boston Edison Company would thereby insulate Pharmacia from liability. However, M.G.L. 21E operates to place liability on the party actually responsible for the contamination. Boston Edison Company and Pharmacia may have a contractual "equitable sharing of liability"; but, as between Mystic and Pharmacia, the issue is ***contribution***, based on ***responsibility*** for the contaminating releases. In this case, Pharmacia is clearly liable for its below-the-cap releases and its contamination of the sediments adjacent to the Property.

### A. <u>Mystic Cannot be Held Liable for Pharmacia's Contamination under Sec. 5(b).</u>

As a matter of law, Mystic and Modern cannot be held liable to Pharmacia under § 5(b) for the response costs attributable to the contaminants Pharmacia released to the Property under the tunnel muck cap. The second paragraph of §5 (b) provides:

> No person who is <u>liable</u> solely [because they are a subsequent owner or operator of the site] and who did not own or operate the site <u>at the time of the release or threat of release in question</u> and did not cause or contribute to such release or threat of release shall be liable to any person who is <u>liable</u> [under any other provision of Section 5, because of some culpability relative to the release of contamination], except that any such [party who is liable solely due to their status as a subsequent owner or operator of the property] shall be <u>liable</u> to the commonwealth . . . . (Emphases added.)

Modern and Mystic did not cause or contribute to the releases under the clay cap. The basis for any claim seeking reimbursement, contribution, or an equitable share of any incurred or future response costs is addressed in the third paragraph of Section 4, which states:

> Any person who undertakes a necessary and appropriate response action regarding the release or threat of release of oil or hazardous material shall be entitled to reimbursement from any other person liable for such release or threat of release for the reasonable costs of such response action. If two or more persons are <u>liable pursuant to section five</u> for such release or threat of release, each shall be <u>liable</u> to the others for their equitable share of the costs of such response action. All claims and actions for contribution, reimbursement or equitable share by persons other than the commonwealth pursuant to this paragraph, except those pending in court on the effective date of section four A shall be subject to, and brought in accordance with, the procedures set forth in section four A. (Emphasis added.)

Section 4, therefore, establishes a remedy by which two or more persons who are "liable" to the Commonwealth pursuant to § 5 for releases of hazardous material may bring an action for reimbursement, contribution, or equitable share, against another party or parties who are also "liable" pursuant to § 5 for <u>such</u> releases.[1] In this case, however, neither Mystic nor Modern is liable under § 5(b) to Pharmacia for Pharmacia's under-the-cap releases. Section 5 makes a key distinction with respect to parties, such as Mystic and Modern, who are entirely blameless with respect to such under-the-cap pollution.

When interpreting a statute, "it is apodictic that [the Court's] first recourse must be to the statute's text and structure." <u>United Technologies v. Browning-Ferris Ind.</u>, 33 F.3d 96, 99 (1st Cir. 1994). Reading these quoted provisions from Section 4 and Section 5 together, a liable party under § 5(a) cannot bring a claim or <u>counter-claim</u> for reimbursement, contribution, or equitable share against a party who is liable to the Commonwealth for past releases of

---

[1] In <u>Braber v. Perlman</u>, 1993 WL 818642 (Mass.Super.1993), the Court noted that Section 5 is relevant to a suit under Section 4 for purposes of defining who is a "person liable" that may be sued for reimbursement, contribution, or equitable share under Section 4.

#578605v1                                7

contaminants at the site solely by virtue of its status as a subsequent owner or operator of the site. Although such a landowner will be deemed an "innocent party" and apportioned no liability for response costs under §5(b) with respect to contamination-causing releases for which it is not responsible, it will be required to cover response costs for other areas in which it had some responsibility. Sanitoy, Inc. v. Ilco Unican Corp., 413 Mass. 627, 630 (1992); Martignetti v. Haigh-Farr, Inc., 425 Mass. 294, 320 (1997).

Thus, a party can be a "person liable" to the Commonwealth under Section 5(a) of 21E, and yet not be a "responsible" party, in the sense of being responsible to share with other parties in cleanup costs (unless the cost recovery suit is brought by the Commonwealth). Martignetti v. Haigh-Farr Inc., 425 Mass. 294, at n. 29 (1997). The language of M.G.L. c. 21E, § 5(b) explicitly provides that a "person liable" to the Commonwealth because of their status as an owner or operator of the site is not necessarily a party who is "responsible" to a polluter for cleanup costs at that site. To permit Pharmacia to assert claims or defenses of equitable allocation against Mystic and Modern with respect to its sole liability for its past contaminating activities would, in essence, render Mystic and Modern liable to Pharmacia and render Pharmacia liable for only part of the response costs for the pollution it caused, all of which would be contrary to the language and intent of § 5(b).

## II. Pharmacia's Request For Equitable Allocation is Unsupported and Improper

### A. No Windfall Exists if Pharmacia is Ordered to Pay for the Remediation of its own Contaminants

There is a clear delineation between the parties' releases of contaminants on the property: namely, the clay cap or the so-called layer of tunnel muck. Under 21E, a Court should not engage in a balancing of equitable factors when a party that is liable only by virtue of ownership of contaminated land sues a polluter such as Pharmacia. The liability is premised on who caused

the release – if such can be determined. It is clear here that Pharmacia caused the releases under the cap. Thus, equitable factors should not be weighed with respect to who is responsible for the response costs attributable to such releases.

M.G.L. c. 21E assigns liability without regard to fault for those who owned or operated the property at the time of the release or who are legally responsible for the release. No provisions in 21E, the MCP, or in the applicable case law permits the Court to allocate liability and responsibility based upon the purchase price of the property, the buyer's knowledge of contamination, or the ultimate cost of the remediation and response actions. Equitable factors, such as Mystic's knowing purchase of contaminated property at a price reflective of such contamination, do not provide a legal basis to reduce Pharmacia's liability in this action. To do so would turn the public policy of strict liability underlying M.G.L. c. 21E on its head. "Simply put, G.L. c. 21E was drafted in a comprehensive fashion to compel the prompt and efficient cleanup of hazardous material and to ensure that costs and damages are borne by the appropriate responsible parties." Taygeta v. Varian, 436 Mass. 217, 223 (2002).

Notwithstanding Mystic's position that equitable factors need not be considered, the evidence shows that the equities simply do not favor Pharmacia. Mystic did not purchase the property at the purported bargain of $300,000 as Pharmacia wishes the court to believe; Mystic and Modern paid in excess of $7.0 million for their previous use and ownership of the Property. This is not a case in which Mystic is seeking full recovery of a purchase price from the seller after signing a contract in which it required a "discount" for the property equal to the cost of remediation, thereby giving the plaintiff a duplicative damages award. [2] When the owner of a

---

[2] See e.g. Smith Land & Improvement Corporation v. Celotex Corporation, 851 F.2d 86, 90 (3rd Cir. 1988); Allegheny International, Inc. et. al. v. Allegheny International, Inc., 158 BR 361, 381-384 (1993)

contaminated property in a cost recovery suit is several steps back in the chain of title, even courts considering federal statutory claims will not consider equitable apportionment due to a buyer's knowledge of contamination and discounted purchase price for such contamination. Al Tech Specialty Steel Corporation v. Allegheny International Credit Corp., 104 F.3d 601, 607-608 (3rd Cir. 1997).

If the Court was to allow a known and admitted polluter to absolve itself from or reduce its strict liability for cleanup costs arising from its own actions, then a true windfall would result to that polluter. Here, Pharmacia already has realized a windfall when it conveyed any environmental liability it may have to Boston Edison Company through a contractual risk transfer – thus, leaving Boston Edison Company to possibly share in the response costs caused by Pharmacia's pollution.

21E was drafted in a comprehensive fashion to compel the cleanup of hazardous material and to ensure that costs and damages are borne by the appropriate responsible parties. See Taygeta v. Varian, 436 Mass at 223. As the Taygeta court stated, the purpose of 21E was "to respond to environmental contamination and to recover response costs from persons responsible for the contamination…A second significant purpose of 21E is to enable private persons 'to obtain a certain measure of compensation for loss resulting from environmental damage." The overall purpose of 21E is to "force parties who are responsible for environmentally hazardous conditions, rather than the taxpayers, to bear the costs of cleanup." Commonwealth v. Boston Edison Co., 444 Mass. 324, 335 (2005). "Costs and damages are [to be] borne by the appropriate responsible parties." Id. (citations omitted)

This cleanup is in the public's best interests. Mystic and Modern, which are in a wind-down state after incurring financial difficulties, need financial help to clean up the site.

Although Mystic and Modern are committed to remediating any contamination due to their activities in and above the clay cap, financially, they need Pharmacia to bear the response costs for the below-the-cap remediation. There will be no windfall here. When reviewing the relative financial position of the parties, the ability of parties to absorb substantial cleanup expenses should be weighed. Central Maine Power Co. v. F.J. O'Connor Co., 838 F. Supp. 641, 647 (D. Me 1993).

### B. Equitable Apportionment is Unwarranted

Under M.G.L. 21E, a Court should not engage in a balancing of equitable factors when a party is liable only by virtue of ownership of contaminated land, such that the Plaintiff is not responsible for the contamination at issue. See M.G.L. c. 21E, § 5(b). The defendant has not offered any credible evidence that Modern's or Mystic's operations at the site have contaminated soils or groundwater below the clay tunnel muck cap or that Mystic and Modern caused run-off into the sediments of the Mystic River, where such contamination is primarily from arsenic – the main constituent of the contaminated groundwater seeping out from below the clay cap. Pharmacia's surface "intermingling" evidence in one isolated location failed to demonstrate that the clay clap was ineffective, permeable, or irrelevant to the Court's ability to determine responsibility for contribution. Assigning responsibility for response costs to parties that are strictly liable under M.G.L. 21E must be done on a release-specific, case-by-case basis. Martignetti v. Haigh-Farr, Inc., 425 Mass. 294, 314 (1997). This case is unique because of this physical barrier between Pharmacia's historical contamination and Mystic and Modern's current operations.

When a party is solely responsible for the contaminating releases at issue, no equities need be considered. See Mailman's Steam Carpet Cleaning Corp. v. Lizotte, 415 Mass. 865, 874-75

#578605v1                                11

(1993). On the other hand, when two parties are found negligent and responsible for the contaminating releases at issue, allocation is appropriate with the parties each paying their share in proportion to their relative degree of contribution to the release at issue. Cantwell v. Haffner's Service Stations, Inc., 62 Mass.App.Ct. 1117 (2004)(release of home heating oil to be allocated between service company and homeowners). In this case, however, based upon the evidence presented, the Court can clearly assign responsibility for the contaminating releases in question by referring to those in and above the clay tunnel muck cap and to those below and flowing from it.

Chapter 21E is a release-specific, responsibility-based statute, and the strict liability imposed upon all owners and operators, current and past, does not mean that all parties share responsibility for the costs of remediation. Sanitoy, Inc. v. Ilco Unican Corp., 413 Mass. 627, 630 (1992)(reimbursement of response costs from other liable –parties is to be "in proportion to their relative degrees of contribution to the contamination as a function of total response costs"). A party found liable under M.G.L. c. 21E, § 5 will be apportioned liability according to the contamination for which it was found wholly liable. Sanitoy, Inc. v. Ilco Unican Corp., 413 Mass. 627, 632 (1992); Martignetti v. Haigh-Farr, Inc., 425 Mass. 294, 319-20 (1997).

"The statute [M.G.L. c. 21E, § 5(b)] does not, however, provide any criteria for this division of liability, other than general causation language regarding losses "attributable to" a particular release which has led to the particular PRP's inclusion." 1 State Environmental Law, § 9.20 (2005). Accordingly, to give appropriate meaning to all sections of M.G.L. 21E, a court should not engage in a balancing of equitable factors when a party that is liable only by virtue of ownership of contaminated land sues a polluter such as Pharmacia. See M.G.L. c. 21E, § 5(b).

M.G.L. c. 21E differs significantly from CERCLA, 42 U.S.C., § 9613(f), in that CERCLA expressly provides that ". . . In resolving contribution claims, the court may allocate

response costs among liable parties using such equitable factors as the court deems appropriate." In contrast, M.G.L. c. 21E, § 4A focuses on release-specific responsibility rather than equitable allocation, requiring that ". . . the court shall award contribution, reimbursement or the equitable share of liability for which one or more parties is found to be responsible, if any." Thus, § 4A suggests an equitable allocation only when contribution or reimbursement based on responsibility cannot be delineated. Moreover, this Court is "not bound to follow holdings in CERCLA cases when interpreting c. 21E, and there are provisions in the two statutes that do not mirror each other as closely as do the provisions of operator status." Martignetti v. Haigh-Farr, 425 Mass. 294, 302 n.12 (1997).

Even in cases based on federal environmental statutes, a court will not hold that a party that purchased property with knowledge of its contamination should also bear a portion of the clean up cost –even if the purchaser received a discount in the purchase price due to the contamination – when the buyer in the cost recovery suit is several steps back in the chain of title. See, e.g., Al Tech Specialty Steel Corporation v. Allegheny International Credit Corp., 104 F.3d 601, 607-608 (3rd Cir. 1997). Here, such apportionment is unwarranted because Massachusetts differs significantly from CERCLA in that 21E is based upon responsibility for contaminating releases, with equities to be considered only when such responsibility cannot be clearly determined.

### III. Asserted Past Non-Compliance with the Massachusetts Contingency Plan is not a Defense to Pharmacia's Liability for Response Costs

Any alleged past non-compliance by Mystic or Modern with the MCP is a matter solely between them and the DEP. Pharmacia lacks any legal standing to raise such a claim or defense with respect to an action to recover response costs. Most importantly, nothing in the statute or the MCP prevents an owner or operator of contaminated property from recovering the cost of

necessary and appropriate response actions from the responsible polluter merely because of the owner/operator's alleged non-compliance with certain filing and timing provisions of the MCP. Indeed, nothing in Chapter 21E or in the MCP itself provides polluters like Pharmacia with such a defense to a claim for responses costs. In any event, the DEP has not declared the response actions in question to be unqualified for cost recovery merely because of the asserted non-compliance, must less does the MCP or 21E provide polluters with any such right, remedy, or defense for such asserted non-compliance.

In short, Pharmacia's attempt to parlay Mystic and Modern's asserted past non-compliance with various filing, timing, and other provisions of the MCP into a forfeiture of their ability to recover necessary and appropriate response costs attributable to Pharmacia's releases of contaminants at the Property enjoys no statutory, regulatory, or other legal support and therefore should be rejected as meritless.

Here, Pharmacia refused Mystic's 2001 request for help to remediate the site. Mystic's use of the site for "Big Dig" work related to substantial construction contracts – with tight time schedules and liquidated damages provisions for delays – also prevented remediation from occurring immediately after it acquired ownership.

In sum, there is no authority the proposition that an owner or operator's asserted non-compliance with the MCP prevents it from recovering response costs under M.G.L. c. 21E, § 4A. Analogous case law under CERCLA and the National Contingency Plan ("NCP") provides that

> "The site evaluation does not have to comply strictly with the letter of the NCP, but only must be consistent with its requirements… It is not necessary that every factor mentioned by the NCP be dealt with explicitly."

Gen Elec. v. Litton Indus. Automation, 920 F.2d 1415, 1418 (8th Cir. 1990), citing NL Indus. Inc., v. Kaplan, 792 F.2d 896, 898-99 (9th Cir. 1986). Thus, a party seeking response costs under CERCLA must show only substantial, rather than strict, compliance with the NCP. Artesian Water Co v. New Castle County, 659 F.Supp. 1269, 1292 (D.Del 1987), aff'd 851 F.2d 643 (3rd Cir. 1988), see also Hatco Crop. v. W.R. Grace & Co.-Conn., 801 F.Supp. 1309, 1322-23 (D N.J. 1992).

## IV.  The Court Should Issue a Declaratory Judgment in this Matter

Mystic and Modern respectfully request the Court to enter a declaratory judgment, finding Pharmacia liable for the remediation and cleanup of the contaminants in the soil and groundwater below the cap, as well as for any required remediation of the contaminants in the adjacent sediments, if the DEP requires such remediation as a result of the risk analysis currently being performed by Menza Curie. In addition, the Court should enter judgment against Pharmacia requiring it to pay to Mystic the response costs that it has incurred to date in the amount of $223,861.20 (Exhibit 233).

>                               Respectfully submitted,
>                               **MYSTIC LANDING, LLC and**
>                               **MODERN CONTINENTAL CONSTRUCTION CO.,**
>                               **INC.**
>                               By its attorneys:
>
>
>                               /s/ Doreen M. Zankowski
>                               Robert G. Flanders, Jr., (BBO #170820)
>                               Doreen M. Zankowski (BBO #558381)
>                               Jeremy Blackowicz (BBO #650945)
>                               Hinckley, Allen & Snyder LLP
>                               28 State Street
>                               Boston, MA  02109-1775
>                               (617) 345-9000
>                               (617) 345-9020 (facsimile)

DATED: April 20, 2006

## CERTIFICATE OF SERVICE

I, Doreen M. Zankowski, hereby certify that on this 20th day of April 2006, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

John M. Stevens, Esq.
Adam P. Kahn, Esq.
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA  02210

Mark S. Granger, Esq.
Douglas B. Otto, Esq.
Morrison Mahoney LLP
250 Summer Street
Boston, MA  02210

Howard G. Guggenheim
P.O. Box 736
Scituate, MA  02066

/s/ Doreen M. Zankowski