UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MYSTIC LANDING, LLC,
                    Plaintiff,
          v.

PHARMACIA CORPORATION,

                    Defendant.

CIVIL ACTION No. 04-10180 NMG

PHARMACIA CORPORATION ,
                    Third-Party Plaintiff,
          v.

MODERN CONTINENTAL CONSTRUCTION
  CO., INC.,
                    Third-Party Defendant.

PHARMACIA CORPORATION,
                    Third-Party Plaintiff,
          v.

BOSTON EDISON COMPANY,
                    Third-Party Defendant.

BOSTON EDISON COMPANY,
                    Fourth-Party Plaintiff,
          v.

O'DONNELL SAND & GRAVEL, INC.
  and MARY O'DONNELL,
                    Fourth-Party Defendant.

**DEFENDANT PHARMACIA CORPORATION'S PROPOSED FINDINGS OF FACT**

I.   **Claims and Proceedings**

1.   In December 2003, Mystic Landing, LLC ("Mystic") filed a Complaint against Pharmacia Corporation ("Pharmacia"), Monsanto Company ("Monsanto") and Solutia Inc. ("Solutia") asserting claims for property damage, contribution, negligence, continuing nuisance, trespass and attorney's fees related to contamination at a 35-acre parcel of land owned by Mystic.

2.   In January 2004, the action was removed to the United States District Court for the District of Massachusetts.  Docket No. 1.

3.   On February 17, 2004, Solutia filed a suggestion of bankruptcy.  Docket No. 6.  Solutia was not served and has not participated further in this lawsuit.

4.   Defendants Pharmacia and Monsanto asserted a counterclaim against Mystic and a third-party complaint against its affiliate Modern Continental Construction Co., Inc. ("Modern"), on the grounds that Mystic and Modern were both themselves liable for contributing to the contamination at the Property.  Docket No. 5.

5.   Modern asserted no counterclaim against Pharmacia in its answer to the third-party complaint.  Docket No. 10; Docket No. 162.

6.   Mystic's claims for negligence, continuing nuisance and trespass were dismissed by stipulation dated October 24, 2005.  Docket No. 96.

7.   Monsanto was dismissed as a defendant by stipulation dated November 8, 2005.  Docket No. 103.

8.   On January 22, 2006 Pharmacia's Motion for Partial Summary Judgment was granted in part, resulting in the dismissal of Mystic's property damage claim.  Docket No. 154.

9.   The parties agreed at the pretrial conference held on April 6, 2006, that any trial on the issue of attorneys' fees should be deferred until after a decision on the relative degree of liability of each of the parties.

10. Trial was held on April 10, 11, and 18, 2006.


## II.    History of the Property

11. The property at issue in the action (the "Property") is a 35-acre parcel located in Everett and Boston, Massachusetts.  Exh. D-124 at 1.  Approximately 12 of those acres are partially or entirely submerged at high tide.

12. The property is bordered on the north by a Massachusetts Bay Transportation Authority (the "MBTA") facility, on the west by railroad tracks owned now by the MBTA and formerly by the Boston and Maine Railroad Company (the "B & M"), on the south by the Mystic River (the "River") and on the east by Alford Street/Broadway (State Route 99).  Exh. D-124 at 1.

13. The Property began to be used for industrial activities, including the manufacture of chemicals, in the 1860's.  Trial Tr. at 1-152, lines 12-18.

14. The Property was, or it later became, a part of a larger chemical manufacturing plant, which was divided into an east parcel (the "Property") and a west parcel (the "West Side").  Trial Tr. at 1-39, lines 7-14.

15. Defendant Pharmacia (then known as the Monsanto Company) acquired  the Property in 1929.  Amended Complaint at ¶ 7; Trial Tr. at 1-42, lines 6-8.

16. Operations on the West Side included the manufacture of complex organic chemicals and on-site disposal of by-products of chemical manufacturing.  Trial Tr. at 2-88, line 18 - 2-89, line 11; 3-20, line 16 - 3-21, line 13; Exh. 156; Exh. 234A at 65, lines 3-8, 66, line 19 - 67, line 17. In contrast to operations on the West Side, manufacturing operations on the Property during the period 1929 to 1975 were limited to traditional inorganic chemicals made from raw materials that could be brought to the facility in bulk by water, and on-site disposal was limited to the disposal of alum mud.  Trial Tr. at 3-20, line 16 - 3-21, line 13; Exh. 234A at 69, line 20 - 70, line 10.

17. The principal products manufactured on the Property during the period 1929 to 1975 were inorganic products including sulfuric acid, nitric acid and acid salts. Trial Tr. at 1-156, lines 5-9, lines 18-23; Exh. 234A at 55, lines 12-22, 56, lines 16-23.

18. Pharmacia's operations on the Property ceased in or about 1975, and all buildings were demolished prior to that time or shortly thereafter.  Trial Tr. at 2-94, lines 21-23; Exh. 234A at 61, line 24 - 62, line 3.

19. In 1983 Pharmacia sold the Property to Boston Edison.  Trial Tr. at 1-56, lines 1-10; Exh. 68.

20. Prior to the sale from Pharmacia to Boston Edison, the Property was appraised at $1,250,000.

21. O'Donnell Sand and Gravel, Inc., acquired the Property from Boston Edison in 1995.  Exh. 69.

22. Ownership of the Property was shortly thereafter transferred to Mary O'Donnell.  Exh. 70.

23. In 1996 Modern Continental began to use the Property for heavy industrial use in connection with the Central Artery/Tunnel Project. Trial Tr. at 2-68, lines 19-21.

24. At some time during Mary O'Donnell's ownership of the Property, rock fragments excavated during construction of the new outfall tunnel for the Massachusetts Water Resources Authority's new wastewater treatment facilities was brought to the Property, and some amount of this material, referred to by Plaintiff as "tunnel muck," was spread in varying thicknesses across some portion of the Property. Trial Tr. at 1-57, line 8 - 1-60, line 1.

### III.    Current Condition of the Property and Need for Environmental Remediation

25. Soils at the Property have been found to contain elevated levels of lead, arsenic, PAHs, oil (petroleum hydrocarbons). Exhs. 1, 39.

26. The contaminants located at and near to the surface of the Property are the same types of contaminants located in the so-called "fill" layer. Trial Tr. at 2-30, lines 15-21.

27. Groundwater at the Property has been found to have a low pH and to contain elevated levels of lead and arsenic. Exhs. 1, 39.

28. Sediments in the embayment at the Property adjacent to the Mystic River have been found to contain lead, arsenic and PAHs. Exhs. 39, 219.

29. The nature and extent of the remediation necessary at the Property has not yet been finally determined, but it is likely that remediation of lead, arsenic and petroleum hydrocarbons in the soils, both at and below the surface, and treatment of groundwater to address the metals and low pH condition will be necessary. Trial Tr. at 1-96, lines 5-16, 3-17, line 17 - 3-18, line 2.

30. It has not yet been determined whether treatment of sediments at the Property will be necessary, and, based on the information presented at trial, it is not possible to attribute any remediation that may be necessary to any particular contaminant.  Trial Tr.. 1-89, line 18 - 1-91, line 3; 1-96, lines 5-15, 3-40, lines 7-21.

## IV.    Findings of Fact Regarding Sources of Contamination at the Property

### A.    Contribution to Soil and Groundwater Contamination by Entities Not Parties to this Lawsuit

31. The Property was originally composed mostly of marshland or the Mystic River.  During the late 19th Century and the early 20th Century, prior to 1929, the B & M Railroad, individual landowners and others filled the marshland on the Property with "urban fill", which typically consists of a mixture of soil and anthropogenically created materials such as ash and construction materials.  Exhs. D-169 - D-172; Trial Tr. at 1-162, line 21 - 1-163, line 19, 3-8, line 11 - 3-9, line 9.

32. Both lead and arsenic are naturally occurring in the environment and are commonly found in urban fill.  Trial Tr. at 1-116, lines 16-20, 3-8, line 11 - 3-9, line 9.

33. PAHs, or polynuclear aromatic compounds are also found in urban fill; the principal source of these compounds is ash from the burning of fossil fuels.  Trial Tr. at 1-164, lines 8-14.

34. The placement of urban fill on the Property is a likely source of the arsenic, lead and PAH's of the Property.  Trial Tr. at 3-8, line 11, 3-9, line 9.

35. The Property abuts the Mystic River, which has for centuries been a location where industrial chemicals and contaminants have been deposited through industrial activity.  Trial Tr. at 3-34, line 4, 3-36, line 13.

36. Historically, there were a number manufactured gas plants throughout the Mystic River Basin, including one immediately across the river from the Property.  Trial Tr. at 1-163, line 21 - 1-164, line 6, 3-35, line 7, 3-36, line 10; Exh. D-274.

37. Manufactured gas plant residuals have been used as fill in certain places. Trial Tr. at 1-164, lines 5-6.

38. Industrial activities carried on in the Mystic River Basin but off the Property are a source of contamination of sediments on the Property..  Trial Tr. at 3-36, line 14 - 3-37, line 19.

**B.    Contribution to Soil and Groundwater Contamination on the Property by Pharmacia**

39. Chemical manufacturing operations were conducted on the site by Pharmacia from 1929 until approximately 1975.  Complaint ¶ 7; Exh. 234A at 61, line 24 - 62, line 3.

40. During the period 1929 to 1975, small spills of sulfuric acid occurred.  Trial Tr. at 2-97, lines 9-16; Exh. 234A at 124, line 6-17.  There is no persuasive evidence of the occurrence of any other release of hazardous materials during this period.

41. The timing of the releases resulting in the contamination of the Property from pre-1983 activities cannot be determined.  Trial Tr. at 1-153, lines 11-22; Exh. 1 at 7. ("the actual sources and timing of releases resulting in soil contamination are industinguishable from each other and it is not possible to discern which operation was the source of the contamination or when the contaminants were released").

42. It is not possible to discern which operation was the source of the contamination observed on the Property.  Trial Tr. at 1-153, line 23 - 1-154, line 6; Exh. 1 at 7.

43. Mystic has not demonstrated that Pharmacia's operations on the Property from 1929 to 1975 caused the contamination that has been observed in the soils and groundwater on the Property.  Trial Tr. at 1-153, lines 11-22.

44. Contamination  of the Property identified as existing prior to 1982 is attributable to the filling of the Property or to operations at the Property prior to 1929. Trial Tr. at 1-152, lines 7-18, 1-162, line 16, 1-164, line 14.

45. Mystic and Modern's expert Dr. Hughto did not demonstrate that lead was a waste product attributable to Pharmacia's operations at the Property.  Trial Tr. 1-156, lines 10-12; Exh. 7.

46. With the exception of his testimony pertaining to "alum mud", Dr. Hughto's testimony that waste materials were disposed of on the Property during the period of 1929 to 1975 was not credible.  Indeed, the bulk of his testimony from historic documentation related to disposal activities that, if they occurred at all, occurred on the West Side, not the Property. Trial Tr. at 1-157 - 1-173.

47. Alum mud ceased being disposed of on the Property prior to 1932.  Exh. 234A at 24, lines 11-15.

48. Aluminum is not likely to require remediation of the Property.  Trial Tr. at 1-162, lines 12-14; Trial Tr. at 1-185, line 25 - 186, line 5.

49. Dr. Hughto's testimony that phthalates or plasticizers have been located in the groundwater at the Property was not credible, and in any event, no remediation of such

compounds is expected.  Trial Tr. at 1-167 - 1-170.In general, Dr. Hughto's testimony concerning the occurrence and attribution of contamination at the Property was not credible because, in recent years his professional activities have concentrated on serving as an expert witness rather than assessing and remediating contaminated sites and because his attribution of disposal activities and contamination associated with Pharmacia's former manufacturing facility to the Property were consistently shown to have been erroneous.  Trial Tr. at 1-126, line 15 - 1-128, line 15, 1-157 - 1-173.

**C.      Modern and Mystic's Contribution to Soil and Groundwater Contamination**

50. Since 1996, Modern has conducted heavy industrial activity on the Property. Trial Tr. at 2-68, lines 19-21.

51. Specifically, Modern used the Property pursuant to a subcontract with O'Donnell Construction from 1996 until the purchase of the Property by Mystic for activities involved in the performance of several construction contracts that form a part of the Central Artery/Tunnel Project.  Exhs. 75, 76.

52. After Mystic's purchase of the Property, Modern continued to use the Property  for activities involved in the performance of several construction contracts that form a part of the Central Artery/Tunnel Project.  Exh. D-45.

53. Modern's activities on the Property included transporting to and placing large stockpiles of excavated soil, piles of construction and demolition debris, some of it containing asbestos and other contaminants, and trash directly on the soil across substantial portions of the Property; storing used structural members with flaking lead paint; storing vehicles and storing and using oil on an unpaved area; and having a

subcontractor break up the lead painted steel that made up the old elevated Central Artery.  Trial Tr. at 2-115, line 3, 2-117, line 19; Exh. D-45, D-76 - D-85, D-120, D-116.

54. Sampling of surficial soils identified concentrations of lead, PAHs, petroleum hydrocarbons and arsenic attributable to Modern's operations during Modern's ownership of the Site in excess of concentrations requiring reporting under the Massachusetts Contingency Plan ("MCP"), 310 CMR 40.000).  Trial Tr. at 2-123, line 12 - 2-125, line 8; Exh. 29s, 147, D-252 at 9-12.  The MCP is the set of cleanup regulations that implement M.G.L. c. 21E.   In several locations, lead and petroleum hydrocarbons released as a result of Modern's operations were identified in concentrations that exceed the "upper concentration limits" (UCLs) established under the MCP.  Trial Tr. at 2-22, line 9 - 2-25, line 1, 2-125, line 21 - 2-126, line 2.  This contamination reflects the disposal and release of hazardous materials on the Property by Modern.  Trial Tr. at 2-113, line 16 - 2-114, line 1, 2-123, line 12 - 2-125, line 8.

55. Contamination in excess of UCLs will require remediation and thus will result in the incurrence of response costs.  Trial Tr. at 1-95, line 15 - 1-96, line 7, 1-105, lines 7-15, 2-36, lines 14-23, 3-80, line 22 - 3-81, line 7.


56. Stockpiles of excavated soil, piles of construction and demolition debris Modern placed directly on the soil at the Property contained concentrations of asbestos and other contaminants in excess of reportable standards.  Trial Tr. at 3-4, line 18 - 3-6, line 9; Exhs. 56, 57, D-116, D-120.  This placement constituted the disposal and release of hazardous substances. Trial Tr. at 3-4, line 24 - 3-6, line 9.

57. The tunnel fill layer referred to by Mystic and Modern as the "tunnel muck" layer has not isolated the contamination caused by Modern from contamination that may have been released on the Property earlier in time.  Trial Tr. at 3-10, lines 9-21.

58. The tunnel fill layer, which is absent or thin in some areas, is not a "clay cap" designed or functioning to isolate the surface but rather is a permeable layer that would not serve to isolate the contamination caused by Modern from the underlying soils.  Trial Tr. 3-11, line 14 - 3-12, line 24.

59. Mystic and Modern's own sampling shows that contamination extends through whatever tunnel fill layer might exist in several locations of the Property.  Trial Tr. at 1-76, line 22 - 1-77, line 6, 2-36, line 24 - 2-38, line 17, 3-15, line 5 - 3-16, line 11; Exhs. 26, 43 (RIZ 6B 0-4' (PAHs); CES 02-A 0-4' (lead);  CES 02-D 0-4' (lead and arsenic)), 211 (BOR 110 (arsenic)), D-124 ((BOR 11, 03' (lead); BOR, 0-3' (arsenic and lead); BOR 19, 0-03' (arsenic)).


60. There are areas on the Property where the tunnel fill layer either is not present or is only inches thick and that Modern's use of heavy equipment and other of its activities on the Property, including the demolition and cutting of of steel and concrete from Boston's former elevated Central Artery  have resulted in disturbances to, and the penetration of, the tunnel fill layer.  Trial Tr. at 3-12, lines 22 - 3-14, line 17, 3-78, Lines 2-16.

61. As a result of Modern's operations, the contamination caused by Modern's operations has been intermingled with, and therefore cannot be distinguished from, any

contamination that may have existed prior to the time Modern began operating on the Property.  Trial Tr. at 2-36, line 24 - 2-38, line 17, 3-10, lines 19-21, 3-78, lines 2-9.

62. The testimony of Pharmacia's expert Robert Duff Collins with respect to the nature of the tunnel fill layer, its permeability, the lack of a separation between surface and subsurface contamination and the intermingling of surface and subsurface contamination is credible and persuasive.  Trial Tr. at 3-6, line 8 - 3-14, line 11.

**D.    Contamination of Sediments**

63. Contamination has been detected in surifical sediment samples in the embayment.  This contamination includes lead, PAHs, and arsenic, as well as other substances.  Exh. 40.

64. Mr. Collins testified credibly that any contamination observed in the surifical sediments would not have originated from Pharamcia operations because surifical sediment samples would reflect sediment that had been deposited within the past 10 years, and Pharmacia ceased operations on the Property approximately 30 years ago. Trial Tr. at 3-26, line 1 - 3-17, line 1.  In addition, sediment samples taken in 1982 do not show the presence of lead, or significant concentrations of arsenic.  Trial Tr. at 1-190, line 3, 1-191, line 21; Exh. D-25.

65. The contamination has been identified in the surifical sediments in the embayment are largely consistent with "local conditions" in the Mystic River Basin in that they are similar to concentrations in sediments found elsewhere in the River.  Trial Tr. at 3-38, lines 6-23; Exh. D-278.

66. Numerous sources having nothing to do with the Property have contributed to the contamination of the Mystic River Basin, . Trial Tr. at 3-34, line 7 - 3-36, line 23, 1-89, lines 2-9; Exhs. D-254, D-255.

67. To the extent that arsenic has been located at concentrations higher than those of local conditions in the Mystic River Basin, this contamination appears to be limited in aerial extent and is likely attributable to a recent surface source. Trial Tr. at 3-38, line 24 - 3-39, line 19; Exh. 219.

68. It has not been demonstrated that sediment remediation will be required at the Property; nor has it been demonstrated that, if such remediation is required, it would be attributable to the presence of high arsenic concentrations. Trial Tr. at 3-40, lines 7-21.

69. Dr. Hughto's testimony that it is likely that contaminated groundwater from the Property flows into the embayment was not credible; rather, Mr. Collins' testimony that the limited data that Mystic and Modern have produced regarding groundwater flow contradicts Dr. Hughto's conclusion that contaminated groundwater from the property flows in the embayment was credible. Trial Tr. at 3-29, line 16 - 3-30, line 13. Mr. Collins testified credibly that Mystic and Modern have failed to conduct studies necessary to conclude whether groundwater flows toward the embayment, and, if so, whether such flow has contributed to the contamination that has been identified in the top six inches of the sediments in the embayment. Trial Tr. at 3-27, line 2 - 3-29, line 15, 3-31, line 2 - 3-32, line 16.

70. Mystic and Modern have failed to show that Pharmacia's operations on the Property from 1929 to 1975 caused the contamination that has been observed in the

sediments in the embayment at the Property.  Trial Tr. at 3-25, lines 17-25, 3-27, lines 2-8.

71. Modern has operated on the site for approximately ten years.  Trial Tr. at 2-68, lines 19-21.

72. Modern's operations have resulted in releases of contaminants, including lead and arsenic, in close proximity to the embayment.  Trial Tr. at 2-23, line 24 - 2-24, line 3, 3-24, lines 4-15.

73. There are no stormwater controls between the locations of these releases and the embayment.  Trial Tr. at 2-24, lines 4-6, 3-24, lines 4-15.

74. There is a pathway for stormwater runoff from the contaminated ground surface to the embayment.  Trial Tr. at 3-24, lines 4-15.

75. The top six inches of sediments represent those sediments deposited most recently.  Trial Tr. at 3-24, lines 16-19.

76. Modern's operations over the past ten years have contributed to the contamination identified in the top six inches of sediments in the embayment.  Trial Tr. at 3-23, lines 8-16, 3-78, line 20 - 3-79, line 3.

**V.    Findings of Fact as to the Circumstances of Purchases and Sales of the Property, Knowledge of the Parties Regarding Contamination and the Benefits That Will Be Achieved From the Remediation of the Property**

77. At the time Pharmacia sold the Property, it knew that the soils and groundwater were contaminated.  Exh. 138.

78. When Pharmacia placed the Property on the market, company policy required that any prospective purchaser be made aware of the condition and use of the Property and there be appropriate limitations on future uses.  Exhs. 138, 139, D-17.

79. Pursuant to company policy, Boston Edison Company ("Boston Edison"), the company that purchased the Property from Pharmacia, was provided information regarding activities and testing on the Property and was invited to test the soil and groundwater and interview Pharmacia personnel. Exhs. 143, D-22, D-23, D-26.

80. Tests and interviews conducted by Boston Edison's consultant showed that the contamination of concern consisted principally of sulfur, which could reduce the pH of soil and groundwater, and metals, principally lead. Exh. 144.

81. Tests by other consultants over the years have confirmed the analysis of Boston Edison's consultant. Exhs. D-50, D-53, D-124.

82. Pharmacia sold the Property to Boston Edison on or about June 20, 1983. Exh. 68.

83. The recorded deed from Pharmacia to Boston Edison placed a use restriction on the Property, limiting future uses to industrial and manufacturing uses and prohibiting future commercial, residential and recreational uses. Exh. 68.

84. Boston Edison sold the Property to O'Donnell Sand and Gravel, Inc. by deed dated March 6, 1995. Exh. 69.

85. Transactional documents relating to the sale by Boston Edison to O'Donnell Sand and Gravel, Inc. recited that the purchase price took account of environmental contamination of the Property and contained a modified version of the deed restriction limiting future uses to industrial and manufacturing purposes, and specifically mentioned the condition of the Property as the reason for the restriction. Exhs. 69, D-31.

86. By deed dated September 5, 1995, O'Donnell Sand and Gravel, Inc. sold the Property to Mary O'Donnell. Exh. 70.

87. On or about October 2, 1995, a consultant who had dug test pits on the Property on behalf of Mary O'Donnell, advised her of the results and of her legal obligation to notify the Massachusetts Department of Environmental Protection (the "DEP") of the contamination of the Property. Exh. D-47.

88. On October 21, 1995, Boston Edison submitted to DEP portions of the tests conducted by its consultants in 1982.  Exh. 60.

89. Mary O'Donnell notified DEP of the contamination of the Property by sending DEP a release notification form dated January 18, 1996.  Exh. D-48.

90. On February 22, 1996, DEP issued a notice of responsibility to Mary O'Donnell requiring that she take phased steps to respond to the contamination of the Property.  Exh. D-49.

91. On March 27, 1996, Mary O'Donnell's consultant submitted to DEP its October 2, 1995 Report.  Exh. 145.

92. The notice and notification are and were public records available at DEP's offices available for inspection by anyone interested in the Property.

93. On May 1, 1996 a consultant from Green Environmental, who had been tasked to review existing reports to determine the chemical quality of the soil, informed Peter Grela, an officer of Modern Continental, that Mary O'Donnell's site investigation had identified contamination of concern at the Property.  Exh. D-51.

94. As of May 1, 1996, Mary O'Donnell granted to Modern Continental Construction Company, Inc./Obayashi an option to purchase the Property at the agreed purchase price of $300,000 subject to certain adjustments, including an adjustment to take account of environmental contamination of the Property.  Exh. 72.

95. By agreement dated May 1, 1996, Mary O'Donnell leased the Property to Mary O'Donnell Construction Co., Inc., for an eight-year period ending April 30, 2004 at a rent of $12 per year.  Exh. 77.

96. On or about January 15, 1997, a consultant for a company affiliated with Mary O'Donnell submitted a Phase I Initial Site Investigation and Tier Classification to DEP.  Exh. D-53.

97. The Phase I assessment and Tier Classification are public records available at DEP's offices for inspection by anyone interested in the Property.

98. The option was amended on or about March 17, 1999 to provide for an exercise price of $300,000 in June 2001.  Exh. 73.

99. In the spring of 2001, Rizzo Associates, on behalf of counsel for Mystic and Modern, conducted extensive soil and groundwater testing at the Property.  Exh. D-124.

100.    On May 11, 2001, counsel for Modern and Mystic informed Solutia (as attorney-in-fact for Pharmacia) that one of its clients intended to purchase the Property and develop it, that the Property was contaminated and that the client expected that Monsanto would perform the remediation.  Exh. D-57.

101.    On May 15, 2001, Dr. Hughto provided counsel to Modern and Mystic with a draft of a Phase II Field Investigation which described the contaminated condition of the Property.  Exh. D-56.

102.    Also on May 15, 2001, Dr. Hughto provided counsel to Modern and Mystic with a remedial cost estimate which estimated that a permanent solution could be achieved at the Property at a cost of $810,000.  Exh. D-151.

103.    One week later, based on the same data, Dr. Hughto provided counsel to Modern and Mystic with a remedial cost estimate of $17 million.  Exh. D-152.

104.    On May 29, 2001, counsel for Modern and Mystic again informed Solutia that its client intended to purchase and develop the Property and that the Property "contains significant contamination that is the responsibility of Monsanto."  Exh. D-58.

105.    On June 7, 2001, plaintiff Mystic Landing LLC ("Mystic") was formed as a Massachusetts limited liability company with Modern to act as its managing member. Exh. D-60.

106.    By agreement dated June 19, 2001, Modern/Obayashi assigned the option to plaintiff Mystic.  Exh. 78.

107.    On June 21, 2001, Mystic purchased the Property from Mary O'Donnell; the total purchase price recited in the deed was $300,000.  Trial Tr. at 2-65, lines 12-17; Exh. D-43.  Massachusetts law requires that deeds recite the full consideration paid for property.  M.G.L. c. 183 §6; M.G.L. c. 64D §1, 7.

108.    Shortly before Mystic purchased the Property, an independent appraisal valued the Property to be approximately $17,390,000 without any adjustment for the presence of contamination.  Trial Tr. at 2-66, line 6 - 2-67, line 25; Exh. D-68.

109.    In 2002, Mystic used the property to secure a $10 million loan but the proceeds of the loan were not used to fund remediation or other activities related to the Property but were used by Modern in its business.  Trial Tr. at 2-68, lines 4-18.

110.    At the time Mystic purchased the Property, it was well aware of the environmental contamination of the Property.  Trial Tr. at 2-62, lines 1-10.

111.    Mr. Pastore's testimony that additional consideration was paid for the purchase of the Property was not credible.

112.    The subcontract between Modern/Obayashi does not state that any amounts to be paid thereunder are consideration for the purchase of the Property.  Exh. D-66.

113.    Modern/Obayashi used the subcontract with O'Donnell Construction to satisfy a requirement of a public contract on which it was the general contractor that at least a specified percentage of the contract work be performed by a company or companies owned and operated by members of minority groups or women.  Trial Tr. at 2-73, lines 3-25.

114.    In August 2001, Mystic sent a demand letter under § 4A of Chapter 21E to Pharmacia estimating future response costs of $17,600,000 for soil remediation and stating that "Pharmacia is responsible for all of the response costs and other damages related to the contamination" at the Property.  Exh. 62.

115.    In 2005 Mystic placed the Property on the market for sale and received offers of up to $34 million.  Exhs. D-139 - D-149.

116.    Mystic intends sell the Property to develop it for residential and/or commercial use.  Trial Tr. at 2-69, line 22 - 2-70, line 2.

117.    Because Mystic was aware of the contamination when it purchased the Property, paid a reduced price for the Property because of that contamination and will be the only party to benefit from the remediation of the Property, Mystic will receive a windfall profit if the costs of remediation are borne by Pharmacia.

**VI.     Findings of Fact Regarding the Parties' Compliance with Environmental Laws**

118.    Chapter 21E of the Massachusetts General Laws was enacted in 1983.

119.    Pharmacia sold the Property to Boston Edison on or about June 20, 1983. Exh. 68.

120.    The deed from Pharmacia to Boston Edison placed a use restriction on the Property, limiting future uses to industrial and manufacturing uses and prohibiting future commercial, residential and recreational uses.  Exh. 68.

121.    As a result of the manufacture of complex organic chemicals and on-site disposal of by-products of chemical manufacturing practices the occurred on the West Side, the West Side became contaminated by a number of hazardous materials. Trial Tr. at 2- 88, line 18 - 2-89, line 11.

122.    Pharmacia arranged for the contamination on the West Side to be investigated, contained and removed in accordance with the governing environmental laws.  Trial Tr. at 2-84, line 12 - 2-87, line 7.

123.    The remediation of the West Side Property was completed in late 1996 and Response Action Outcome statements were filed in 1997.  Trial Tr. at 2-88, lines 12-17; Exhs. D-161 - D164.

124.    Such remediation was completed within five years of when the Massachusetts Contingency Plan first established a five year deadline for the remediation of contaminated properties.  Trial Tr. at 2-89, line 22 - 2-90, line 4.

125.    Approximately $30 million was expended by Pharmacia responding to the contamination on the West Side.  Trial Tr. at 2-88, lines 5-13.

126.    Because of the differences in historical operations and uses between the West Side and the Property, the cost spent to remediate the Gateway is likely an order of

magnitude higher than what it would cost to remediate the Property. Trial Tr. at 3-21, lines 14-23.

127.    In early 1998, the Department of Environmental Protection indicated that the remediation had been completed to their satisfaction. Trial Tr. at 2-90, lines 19-22; Exh. D-165.

128.    In contrast to the West Side, there has been little or no remediation of the East Side.

129.    As a result of the January 1997 submission by Mary O'Donnell, DEP classified the Property as a Tier II Disposal Site. This classification required submission of a Phase II Comprehensive Site Assessment by January 1999, submission of a Phase III Remedial Action Plan by January 2000 and completion of response actions by January 2002. Exh. D-252.

130.    Mary O'Donnell did not take any of the response actions required by DEP's classification while she owned the Property.

131.    Before Mystic acquired the Property, Mystic and Modern's consultant submitted a report to counsel for Mystic and Modern in draft form in March 2001 and in final form in June 2001 which advised them of the obligation to perform phased response actions at the Property; thereafter, other consultants advised Mystic that it had succeeded to the obligations of Mary O'Donnell. Exhs. 63 at 9-10, 13; D-56 at 19; D-124 at 18.

132.    Although they had access to the Property, Mystic and its consultants failed to perform any sampling from the fall of 2001 to the winter of 2005, and when they did

not perform sampling, they failed to conduct such sampling in a manner sufficient to support their conclusions.  Trial Tr. at 1-139, lines 11-19.

133.    Mystic has not submitted a Phase II Comprehensive Site Assessment nor has it complied with other response action deadlines, Trial Tr. at 3-16, lines 19-20; it took no action to begin to prepare such an assessment until weeks after Pharmacia's consultant issued a report in September 2005 stating that Mystic was not in compliance with M.G.L. c. 21E and regulations promulgated thereunder as a result of its inaction.  Exhs. D-252, D-134.

134.    In November of 2005 Mystic filed a request for a Tier II Extension; however, the filing of such request did not excuse Mystic's noncompliance with the MCP.  Trial Tr. at 1-131, lines 17-25.

135.    All work performed by Dr. Hughto with respect to the Site until 45 days after an effective notice of transfer to him from the prior licensed site professional was filed on November 21, 2005 was in violation of law.  Trial Tr. at 3-17, lines 5-10.

136.    Had Mystic begun to assess and remediate the Property when it acquired ownership in 2001, it could have achieved a permanent solution before April 3, 2006. Trial Tr. at 3-19, lines 12-17.

137.    As a result of Mystic's failure to comply with the MCP's deadlines, the remediation will be governed by new, more stringent standards promulgated on April 3, 2006 and will therefore cost up to $1.4 million more than it would have been had Mystic complied with the deadlines established in the MCP.  Trial Tr. at 1-111, line 12 -112, line 1, 1-146, line 16 - 148, line 2, 3-19, lines 6-11.

138.    As a result of Mystic's and Modern's activities, Mystic also became ineligible for the Brownfields Tax Credit, which would have allowed 25% or 50% of the remediation costs to be treated as a credit off Massachusetts excise tax.  Trial Tr. 1-148, line 19 - 1-151, line 25.


139.    Dr. Hughto's testimony that Modern's use of the Property made it impossible or prohibitively expensive to collect samples is not credible; also not credible is Dr. Hughto's suggestion that Mystic's delay in complying with the MCP was justified by its desire to conduct response actions in conjunction with the development of the Property.  Trial Tr. 1-142, line 15 - 144, line 2.

140.    Had Mystic achieved a permanent solution prior to April 3, 2006, the new regulatory standards would not have applied to the Property.  Trial Tr. at 3-19, lines 18-22.

141.    In addition to failing to comply with deadlines established under the MCP, during Mystic's ownership Modern contributed to the contamination at the Property by causing releases of oil and hazardous materials including lead, arsenic and PAH's.  Trial Tr. at 2-23, line 24 - 2-23, line 3, 3-24, lines 4-15.

142.    DEP commenced an investigation of Modern's activities on the Property in or about 2002.  Exh. D-120.

143.    DEP's investigation concluded with entry of an Administrative Consent Order with Penalty (the "Administrative Consent Order") dated August 8, 2005.  The order contained findings by DEP that Modern had violated chapter 21E and regulations prohibiting the operation of an unpermitted solid waste facility, directed Modern to cease

using the Property to transfer or dispose of regulated solid waste, required removal of stockpiled material and disposal in the manner required by law and imposed a fine of $35,000 to be paid within 30 days.  Exh. D-116.  Trial Tr. at 2-69, lines 4-21.

144.    Modern failed to pay the fine imposed by the Administrative Consent Order or to take certain other actions required by that order within the time specified. Exhs. D-121, D-244.

145.    On November 30, 2005, DEP issued an Enforcement Notice and Demand for Payment to Modern for its failure to comply with the Administrative Consent Order. Exh. D-121.

146.    On March 1, 2006, DEP issued a further notice which described Modern's continued non-compliance with the Administrative Consent Order and reserved DEP's right to "exercise the full extent of its legal authority in order to obtain full compliance with all applicable requirements and provisions of the ACOP, including, but not limited to criminal prosecution …."  Exh. D-244.

## V.    Recovery of Past Response Costs

147.    Modern has not asserted a claim for past response costs.

148.    Neither Mystic nor Modern produced any document showing any back-charge or payment by Mystic of any cost alleged to be a response cost.  Trial Tr. at 2-64, line 6 - 65, line 2.

149.    Without documentary evidence to support his claim, I do not find credible Mr. Pastore's testimony that any past costs that may have been paid by Modern be incurred by Mystic.  Trial Tr. at 2-64, line 6 - 2-65, line 2.

150.    Mystic has not incurred any response costs under Chapter 21E as none of the activities for which Mr. Pastore testified Mystic paid approximately $16,000

constituted appropriate response costs.  Trial Tr. at 2-65, lines 3-10, 3-16, line 12 - 3-17, line 10.

151.    Neither Modern nor Mystic has made payment for services by Dr. Hughto and his subcontractors performed after January 1, 2006.  Trial Tr. at 2-31, lines 20-23.

**VI.    Reasonableness**

152.    Pharmacia made a timely response to the notification filed by Mystic Landing pursuant to M.G.L. c. 21E §4A, participated in negotiations in good faith, and had a reasonable basis, in light of actions and excessive demands of Mystic, for not entering into an agreement to participate in the performance of response action in the manner and to the extent demanded by Mystic or to pay for the costs demanded by Mystic.

153.    In light of Mystic's excessive demands, evasive discovery tactics, and overly aggressive settlement positions, Mystic did not participate in negotiations in good faith and maintained an unreasonable position with respect to the a

154.    Dr. Hughto's estimates for soil disposal during construction and other considerations are not necessary to achieve a permanent solution but rather are costs related to development.  Trial Tr. 3-17, lines 3-10.

By its attorneys,

/s/ John M. Stevens
John M. Stevens (BBO # 480140)
Adam P. Kahn (BBO # 561554)
Elisabeth M. DeLisle (BBO #658067)
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts  02210
Tel:  (617)  832-1000
Fax:  (617) 832-7000
jstevens@foleyhoag.com

Dated:    April 20, 2006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MYSTIC LANDING, LLC,
                    Plaintiff,
        v.

PHARMACIA CORPORATION,

                Defendant.

CIVIL ACTION No. 04-10180 NMG

PHARMACIA CORPORATION ,
                Third-Party Plaintiff,
        v.

MODERN CONTINENTAL CONSTRUCTION
  CO., INC.,
                Third-Party Defendant.

PHARMACIA CORPORATION,
                Third-Party Plaintiff,
        v.

BOSTON EDISON COMPANY,
                Third-Party Defendant.

BOSTON EDISON COMPANY,
                Fourth-Party Plaintiff,
        v.

O'DONNELL SAND & GRAVEL, INC.
  and MARY O'DONNELL,
                Fourth-Party Defendant.

**DEFENDANT PHARMACIA CORPORATION'S PROPOSED FINDINGS OF FACT**

B3192154.1

I.    **Claims and Proceedings**

1.    In December 2003, Mystic Landing, LLC ("Mystic") filed a Complaint against Pharmacia Corporation ("Pharmacia"), Monsanto Company ("Monsanto") and Solutia Inc. ("Solutia") asserting claims for property damage, contribution, negligence, continuing nuisance, trespass and attorney's fees related to contamination at a 35-acre parcel of land owned by Mystic.

2.    In January 2004, the action was removed to the United States District Court for the District of Massachusetts.  Docket No. 1.

3.    On February 17, 2004, Solutia filed a suggestion of bankruptcy.  Docket No. 6.  Solutia was not served and has not participated further in this lawsuit.

4.    Defendants Pharmacia and Monsanto asserted a counterclaim against Mystic and a third-party complaint against its affiliate Modern Continental Construction Co., Inc. ("Modern"), on the grounds that Mystic and Modern were both themselves liable for contributing to the contamination at the Property.  Docket No. 5.

5.    Modern asserted no counterclaim against Pharmacia in its answer to the third-party complaint.  Docket No. 10; Docket No. 162.

6.    Mystic's claims for negligence, continuing nuisance and trespass were dismissed by stipulation dated October 24, 2005.  Docket No. 96.

7.    Monsanto was dismissed as a defendant by stipulation dated November 8, 2005.  Docket No. 103.

8.   On January 22, 2006 Pharmacia's Motion for Partial Summary Judgment was granted in part, resulting in the dismissal of Mystic's property damage claim.  Docket No. 154.

9.   The parties agreed at the pretrial conference held on April 6, 2006, that any trial on the issue of attorneys' fees should be deferred until after a decision on the relative degree of liability of each of the parties.

10. Trial was held on April 10, 11, and 18, 2006.


## II.    History of the Property

11. The property at issue in the action (the "Property") is a 35-acre parcel located in Everett and Boston, Massachusetts.  Exh. D-124 at 1.  Approximately 12 of those acres are partially or entirely submerged at high tide.

12. The property is bordered on the north by a Massachusetts Bay Transportation Authority (the "MBTA") facility, on the west by railroad tracks owned now by the MBTA and formerly by the Boston and Maine Railroad Company (the "B & M"), on the south by the Mystic River (the "River") and on the east by Alford Street/Broadway (State Route 99).  Exh. D-124 at 1.

13. The Property began to be used for industrial activities, including the manufacture of chemicals, in the 1860's.  Trial Tr. at 1-152, lines 12-18.

14. The Property was, or it later became, a part of a larger chemical manufacturing plant, which was divided into an east parcel (the "Property") and a west parcel (the "West Side").  Trial Tr. at 1-39, lines 7-14.

15. Defendant Pharmacia (then known as the Monsanto Company) acquired the Property in 1929.  Amended Complaint at ¶ 7; Trial Tr. at 1-42, lines 6-8.

16. Operations on the West Side included the manufacture of complex organic chemicals and on-site disposal of by-products of chemical manufacturing.  Trial Tr. at 2-88, line 18 - 2-89, line 11; 3-20, line 16 - 3-21, line 13; Exh. 156; Exh. 234A at 65, lines 3-8, 66, line 19 - 67, line 17. In contrast to operations on the West Side, manufacturing operations on the Property during the period 1929 to 1975 were limited to traditional inorganic chemicals made from raw materials that could be brought to the facility in bulk by water, and on-site disposal was limited to the disposal of alum mud.  Trial Tr. at 3-20, line 16 - 3-21, line 13; Exh. 234A at 69, line 20 - 70, line 10.

17. The principal products manufactured on the Property during the period 1929 to 1975 were inorganic products including sulfuric acid, nitric acid and acid salts. Trial Tr. at 1-156, lines 5-9, lines 18-23; Exh. 234A at 55, lines 12-22, 56, lines 16-23.

18. Pharmacia's operations on the Property ceased in or about 1975, and all buildings were demolished prior to that time or shortly thereafter.  Trial Tr. at 2-94, lines 21-23; Exh. 234A at 61, line 24 - 62, line 3.

19. In 1983 Pharmacia sold the Property to Boston Edison.  Trial Tr. at 1-56, lines 1-10; Exh. 68.

20. Prior to the sale from Pharmacia to Boston Edison, the Property was appraised at $1,250,000.

21. O'Donnell Sand and Gravel, Inc., acquired the Property from Boston Edison in 1995.  Exh. 69.

22. Ownership of the Property was shortly thereafter transferred to Mary O'Donnell.  Exh. 70.

23. In 1996 Modern Continental began to use the Property for heavy industrial use in connection with the Central Artery/Tunnel Project.  Trial Tr. at 2-68, lines 19-21.

24. At some time during Mary O'Donnell's ownership of the Property,  rock fragments excavated during construction of the new outfall tunnel for the Massachusetts Water Resources Authority's new wastewater treatment facilities was brought to the Property, and some amount of this material, referred to by Plaintiff as "tunnel muck," was spread in varying thicknesses across some portion of the Property.  Trial Tr. at 1-57, line 8 - 1-60, line 1.

### III.    Current Condition of the Property and Need for Environmental Remediation

25. Soils at the Property have been found to contain elevated levels of lead, arsenic, PAHs,  oil (petroleum hydrocarbons).  Exhs. 1, 39.

26. The contaminants located at and near to the surface of the Property are the same types of contaminants located in the so-called "fill" layer.  Trial Tr. at 2-30, lines 15-21.

27. Groundwater at the Property has been found to have a low pH and to contain elevated levels of lead and arsenic.  Exhs. 1, 39.

28. Sediments in the embayment at the Property adjacent to the Mystic River have been found to contain lead, arsenic and PAHs.  Exhs. 39, 219.

29. The nature and extent of the remediation necessary at the Property has not yet been finally determined, but it is likely that remediation of lead, arsenic and petroleum hydrocarbons in the soils, both at and below the surface, and treatment of groundwater to address the metals and low pH condition will be necessary.  Trial Tr. at 1-96, lines 5-16, 3-17, line 17 - 3-18, line 2.

30. It has not yet been determined whether treatment of sediments at the Property will be necessary, and, based on the information presented at trial, it is not possible to attribute any remediation that may be necessary to any particular contaminant.  Trial Tr.. 1-89, line 18 - 1-91, line 3; 1-96, lines 5-15, 3-40, lines 7-21.

## IV.    Findings of Fact Regarding Sources of Contamination at the Property

### A.    Contribution to Soil and Groundwater Contamination by Entities Not Parties to this Lawsuit

31. The Property was originally composed mostly of marshland or the Mystic River.  During the late 19th Century and the early 20th Century, prior to 1929, the B & M Railroad, individual landowners and others filled the marshland on the Property with "urban fill", which typically consists of a mixture of soil and anthropogenically created materials such as ash and construction materials.  Exhs. D-169 - D-172; Trial Tr. at 1-162, line 21 - 1-163, line 19, 3-8, line 11 - 3-9, line 9.

32. Both lead and arsenic are naturally occurring in the environment and are commonly found in urban fill.  Trial Tr. at 1-116, lines 16-20, 3-8, line 11 - 3-9, line 9.

33. PAHs, or polynuclear aromatic compounds are also found in urban fill; the principal source of these compounds is ash from the burning of fossil fuels.  Trial Tr. at 1-164, lines 8-14.

34. The placement of urban fill on the Property is a likely source of the arsenic, lead and PAH's of the Property.  Trial Tr. at 3-8, line 11, 3-9, line 9.

35. The Property abuts the Mystic River, which has for centuries been a location where industrial chemicals and contaminants have been deposited through industrial activity.  Trial Tr. at 3-34, line 4, 3-36, line 13.

36. Historically, there were a number manufactured gas plants throughout the Mystic River Basin, including one immediately across the river from the Property.  Trial Tr. at 1-163, line 21 - 1-164, line 6, 3-35, line 7, 3-36, line 10; Exh. D-274.

37. Manufactured gas plant residuals have been used as fill in certain places. Trial Tr. at 1-164, lines 5-6.

38. Industrial activities carried on in the Mystic River Basin but off the Property are a source of contamination of sediments on the Property..  Trial Tr. at 3-36, line 14 - 3-37, line 19.

**B.    Contribution to Soil and Groundwater Contamination on the Property by Pharmacia**

39. Chemical manufacturing operations were conducted on the site by Pharmacia from 1929 until approximately 1975.  Complaint ¶ 7; Exh. 234A at 61, line 24 - 62, line 3.

40. During the period 1929 to 1975, small spills of sulfuric acid occurred.  Trial Tr. at 2-97, lines 9-16; Exh. 234A at 124, line 6-17.  There is no persuasive evidence of the occurrence of any other release of hazardous materials during this period.

41. The timing of the releases resulting in the contamination of the Property from pre-1983 activities cannot be determined.  Trial Tr. at 1-153, lines 11-22; Exh. 1 at 7. ("the actual sources and timing of releases resulting in soil contamination are industinguishable from each other and it is not possible to discern which operation was the source of the contamination or when the contaminants were released").

42. It is not possible to discern which operation was the source of the contamination observed on the Property. Trial Tr. at 1-153, line 23 - 1-154, line 6; Exh. 1 at 7.

43. Mystic has not demonstrated that Pharmacia's operations on the Property from 1929 to 1975 caused the contamination that has been observed in the soils and groundwater on the Property. Trial Tr. at 1-153, lines 11-22.

44. Contamination of the Property identified as existing prior to 1982 is attributable to the filling of the Property or to operations at the Property prior to 1929. Trial Tr. at 1-152, lines 7-18, 1-162, line 16, 1-164, line 14.

45. Mystic and Modern's expert Dr. Hughto did not demonstrate that lead was a waste product attributable to Pharmacia's operations at the Property. Trial Tr. 1-156, lines 10-12; Exh. 7.

46. With the exception of his testimony pertaining to "alum mud", Dr. Hughto's testimony that waste materials were disposed of on the Property during the period of 1929 to 1975 was not credible. Indeed, the bulk of his testimony from historic documentation related to disposal activities that, if they occurred at all, occurred on the West Side, not the Property. Trial Tr. at 1-157 - 1-173.

47. Alum mud ceased being disposed of on the Property prior to 1932. Exh. 234A at 24, lines 11-15.

48. Aluminum is not likely to require remediation of the Property. Trial Tr. at 1-162, lines 12-14; Trial Tr. at 1-185, line 25 - 186, line 5.

49. Dr. Hughto's testimony that phthalates or plasticizers have been located in the groundwater at the Property was not credible, and in any event, no remediation of such

compounds is expected.  Trial Tr. at 1-167 - 1-170.In general, Dr. Hughto's testimony

concerning the occurrence and attribution of contamination at the Property was not

credible because, in recent years his professional activities have concentrated on serving

as an expert witness rather than assessing and remediating contaminated sites and

because his attribution of disposal activities and contamination associated with

Pharmacia's former manufacturing facility to the Property were consistently shown to

have been erroneous.  Trial Tr. at 1-126, line 15 - 1-128, line 15, 1-157 - 1-173.

### C.      Modern and Mystic's Contribution to Soil and Groundwater Contamination

50. Since 1996, Modern has conducted heavy industrial activity on the Property.

Trial Tr. at 2-68, lines 19-21.

51. Specifically, Modern used the Property pursuant to a subcontract with

O'Donnell Construction from 1996 until the purchase of the Property by Mystic for

activities involved in the performance of several construction contracts that form a part of

the Central Artery/Tunnel Project.  Exhs. 75, 76.

52. After Mystic's purchase of the Property, Modern continued to use the

Property  for activities involved in the performance of several construction contracts that

form a part of the Central Artery/Tunnel Project.  Exh. D-45.

53. Modern's activities on the Property included transporting to and placing large

stockpiles of excavated soil, piles of construction and demolition debris, some of it

containing asbestos and other contaminants, and trash directly on the soil across

substantial portions of the Property; storing used structural members with flaking lead

paint; storing vehicles and storing and using oil on an unpaved area; and having a

subcontractor break up the lead painted steel that made up the old elevated Central

Artery.  Trial Tr. at 2-115, line 3, 2-117, line 19; Exh. D-45, D-76 - D-85, D-120, D-116.

54. Sampling of surficial soils identified concentrations of lead, PAHs, petroleum

hydrocarbons and arsenic attributable to Modern's operations during Modern's

ownership of the Site in excess of concentrations requiring reporting under the

Massachusetts Contingency Plan ("MCP"), 310 CMR 40.000).  Trial Tr. at 2-123, line 12

- 2-125, line 8; Exh. 29s, 147, D-252 at 9-12.  The MCP is the set of cleanup regulations

that implement M.G.L. c. 21E.   In several locations, lead and petroleum hydrocarbons

released as a result of Modern's operations were identified in concentrations that exceed

the "upper concentration limits" (UCLs) established under the MCP.  Trial Tr. at 2-22,

line 9 - 2-25, line 1, 2-125, line 21 - 2-126, line 2.  This contamination reflects the

disposal and release of hazardous materials on the Property by Modern.  Trial Tr. at 2-

113, line 16 - 2-114, line 1, 2-123, line 12 - 2-125, line 8.

55. Contamination in excess of UCLs will require remediation and thus will result

in the incurrence of response costs.  Trial Tr. at 1-95, line 15 - 1-96, line 7, 1-105, lines 7-

15, 2-36, lines 14-23, 3-80, line 22 - 3-81, line 7.


56. Stockpiles of excavated soil, piles of construction and demolition debris

Modern placed directly on the soil at the Property contained concentrations of asbestos

and other contaminants in excess of reportable standards.  Trial Tr. at 3-4, line 18 - 3-6,

line 9; Exhs. 56, 57, D-116, D-120.  This placement constituted the disposal and release

of hazardous substances. Trial Tr. at 3-4, line 24 - 3-6, line 9.

57. The tunnel fill layer referred to by Mystic and Modern as the "tunnel muck" layer has not isolated the contamination caused by Modern from contamination that may have been released on the Property earlier in time.  Trial Tr. at 3-10, lines 9-21.

58. The tunnel fill layer, which is absent or thin in some areas, is not a "clay cap" designed or functioning to isolate the surface but rather is a permeable layer that would not serve to isolate the contamination caused by Modern from the underlying soils.  Trial Tr. 3-11, line 14 - 3-12, line 24.

59. Mystic and Modern's own sampling shows that contamination extends through whatever tunnel fill layer might exist in several locations of the Property.  Trial Tr. at 1-76, line 22 - 1-77, line 6, 2-36, line 24 - 2-38, line 17, 3-15, line 5 - 3-16, line 11; Exhs. 26, 43 (RIZ 6B 0-4' (PAHs); CES 02-A 0-4' (lead);  CES 02-D 0-4' (lead and arsenic)), 211 (BOR 110 (arsenic)), D-124 ((BOR 11, 03' (lead); BOR, 0-3' (arsenic and lead); BOR 19, 0-03' (arsenic)).

60. There are areas on the Property where the tunnel fill layer either is not present or is only inches thick and that Modern's use of heavy equipment and other of its activities on the Property, including the demolition and cutting of of steel and concrete from Boston's former elevated Central Artery  have resulted in disturbances to, and the penetration of, the tunnel fill layer.  Trial Tr. at 3-12, lines 22 - 3-14, line 17, 3-78, Lines 2-16.

61. As a result of Modern's operations, the contamination caused by Modern's operations has been intermingled with, and therefore cannot be distinguished from, any

contamination that may have existed prior to the time Modern began operating on the Property.  Trial Tr. at 2-36, line 24 - 2-38, line 17, 3-10, lines 19-21, 3-78, lines 2-9.

62. The testimony of Pharmacia's expert Robert Duff Collins with respect to the nature of the tunnel fill layer, its permeability, the lack of a separation between surface and subsurface contamination and the intermingling of surface and subsurface contamination is credible and persuasive.  Trial Tr. at 3-6, line 8 - 3-14, line 11.

## D.    Contamination of Sediments

63. Contamination has been detected in surifical sediment samples in the embayment.  This contamination includes lead, PAHs, and arsenic, as well as other substances.  Exh. 40.

64. Mr. Collins testified credibly that any contamination observed in the surifical sediments would not have originated from Pharamcia operations because surifical sediment samples would reflect sediment that had been deposited within the past 10 years, and Pharmacia ceased operations on the Property approximately 30 years ago.  Trial Tr. at 3-26, line 1 - 3-17, line 1.  In addition, sediment samples taken in 1982 do not show the presence of lead, or significant concentrations of arsenic.  Trial Tr. at 1-190, line 3, 1-191, line 21; Exh. D-25.

65. The contamination has been identified in the surifical sediments in the embayment are largely consistent with "local conditions" in the Mystic River Basin in that they are similar to concentrations in sediments found elsewhere in the River.  Trial Tr. at 3-38, lines 6-23; Exh. D-278.

66. Numerous sources having nothing to do with the Property have contributed to the contamination of the Mystic River Basin, . Trial Tr. at 3-34, line 7 - 3-36, line 23, 1-89, lines 2-9; Exhs. D-254, D-255.

67. To the extent that arsenic has been located at concentrations higher than those of local conditions in the Mystic River Basin, this contamination appears to be limited in aerial extent and is likely attributable to a recent surface source. Trial Tr. at 3-38, line 24 - 3-39, line 19; Exh. 219.

68. It has not been demonstrated that sediment remediation will be required at the Property; nor has it been demonstrated that, if such remediation is required, it would be attributable to the presence of high arsenic concentrations. Trial Tr. at 3-40, lines 7-21.

69. Dr. Hughto's testimony that it is likely that contaminated groundwater from the Property flows into the embayment was not credible; rather, Mr. Collins' testimony that the limited data that Mystic and Modern have produced regarding groundwater flow contradicts Dr. Hughto's conclusion that contaminated groundwater from the property flows in the embayment was credible. Trial Tr. at 3-29, line 16 - 3-30, line 13. Mr. Collins testified credibly that Mystic and Modern have failed to conduct studies necessary to conclude whether groundwater flows toward the embayment, and, if so, whether such flow has contributed to the contamination that has been identified in the top six inches of the sediments in the embayment. Trial Tr. at 3-27, line 2 - 3-29, line 15, 3-31, line 2 - 3-32, line 16.

70. Mystic and Modern have failed to show that Pharmacia's operations on the Property from 1929 to 1975 caused the contamination that has been observed in the

sediments in the embayment at the Property. Trial Tr. at 3-25, lines 17-25, 3-27, lines 2-8.

71. Modern has operated on the site for approximately ten years. Trial Tr. at 2-68, lines 19-21.

72. Modern's operations have resulted in releases of contaminants, including lead and arsenic, in close proximity to the embayment. Trial Tr. at 2-23, line 24 - 2-24, line 3, 3-24, lines 4-15.

73. There are no stormwater controls between the locations of these releases and the embayment. Trial Tr. at 2-24, lines 4-6, 3-24, lines 4-15.

74. There is a pathway for stormwater runoff from the contaminated ground surface to the embayment. Trial Tr. at 3-24, lines 4-15.

75. The top six inches of sediments represent those sediments deposited most recently. Trial Tr. at 3-24, lines 16-19.

76. Modern's operations over the past ten years have contributed to the contamination identified in the top six inches of sediments in the embayment. Trial Tr. at 3-23, lines 8-16, 3-78, line 20 - 3-79, line 3.

## V.    Findings of Fact as to the Circumstances of Purchases and Sales of the Property, Knowledge of the Parties Regarding Contamination and the Benefits That Will Be Achieved From the Remediation of the Property

77. At the time Pharmacia sold the Property, it knew that the soils and groundwater were contaminated. Exh. 138.

78. When Pharmacia placed the Property on the market, company policy required that any prospective purchaser be made aware of the condition and use of the Property and there be appropriate limitations on future uses. Exhs. 138, 139, D-17.

79. Pursuant to company policy, Boston Edison Company ("Boston Edison"), the company that purchased the Property from Pharmacia, was provided information regarding activities and testing on the Property and was invited to test the soil and groundwater and interview Pharmacia personnel.  Exhs. 143, D-22, D-23, D-26.

80. Tests and interviews conducted by Boston Edison's consultant showed that the contamination of concern consisted principally of sulfur, which could reduce the pH of soil and groundwater, and metals, principally lead.  Exh. 144.

81. Tests by other consultants over the years have confirmed the analysis of Boston Edison's consultant.  Exhs. D-50, D-53, D-124.

82. Pharmacia sold the Property to Boston Edison on or about June 20, 1983.  Exh. 68.

83. The recorded deed from Pharmacia to Boston Edison placed a use restriction on the Property, limiting future uses to industrial and manufacturing uses and prohibiting future commercial, residential and recreational uses.  Exh. 68.

84. Boston Edison sold the Property to O'Donnell Sand and Gravel, Inc. by deed dated March 6, 1995.  Exh. 69.

85. Transactional documents relating to the sale by Boston Edison to O'Donnell Sand and Gravel, Inc. recited that the purchase price took account of environmental contamination of the Property and contained a modified version of the deed restriction limiting future uses to industrial and manufacturing purposes, and specifically mentioned the condition of the Property as the reason for the restriction.  Exhs. 69, D-31.

86. By deed dated September 5, 1995, O'Donnell Sand and Gravel, Inc. sold the Property to Mary O'Donnell.  Exh. 70.

87. On or about October 2, 1995, a consultant who had dug test pits on the Property on behalf of Mary O'Donnell, advised her of the results and of her legal obligation to notify the Massachusetts Department of Environmental Protection (the "DEP") of the contamination of the Property. Exh. D-47.

88. On October 21, 1995, Boston Edison submitted to DEP portions of the tests conducted by its consultants in 1982. Exh. 60.

89. Mary O'Donnell notified DEP of the contamination of the Property by sending DEP a release notification form dated January 18, 1996. Exh. D-48.

90. On February 22, 1996, DEP issued a notice of responsibility to Mary O'Donnell requiring that she take phased steps to respond to the contamination of the Property. Exh. D-49.

91. On March 27, 1996, Mary O'Donnell's consultant submitted to DEP its October 2, 1995 Report. Exh. 145.

92. The notice and notification are and were public records available at DEP's offices available for inspection by anyone interested in the Property.

93. On May 1, 1996 a consultant from Green Environmental, who had been tasked to review existing reports to determine the chemical quality of the soil, informed Peter Grela, an officer of Modern Continental, that Mary O'Donnell's site investigation had identified contamination of concern at the Property. Exh. D-51.

94. As of May 1, 1996, Mary O'Donnell granted to Modern Continental Construction Company, Inc./Obayashi an option to purchase the Property at the agreed purchase price of $300,000 subject to certain adjustments, including an adjustment to take account of environmental contamination of the Property. Exh. 72.

95. By agreement dated May 1, 1996, Mary O'Donnell leased the Property to Mary O'Donnell Construction Co., Inc., for an eight-year period ending April 30, 2004 at a rent of $12 per year.  Exh. 77.

96. On or about January 15, 1997, a consultant for a company affiliated with Mary O'Donnell submitted a Phase I Initial Site Investigation and Tier Classification to DEP.  Exh. D-53.

97. The Phase I assessment and Tier Classification are public records available at DEP's offices for inspection by anyone interested in the Property.

98. The option was amended on or about March 17, 1999 to provide for an exercise price of $300,000 in June 2001.  Exh. 73.

99. In the spring of 2001, Rizzo Associates, on behalf of counsel for Mystic and Modern, conducted extensive soil and groundwater testing at the Property.  Exh. D-124.

100.    On May 11, 2001, counsel for Modern and Mystic informed Solutia (as attorney-in-fact for Pharmacia) that one of its clients intended to purchase the Property and develop it, that the Property was contaminated and that the client expected that Monsanto would perform the remediation.  Exh. D-57.

101.    On May 15, 2001, Dr. Hughto provided counsel to Modern and Mystic with a draft of a Phase II Field Investigation which described the contaminated condition of the Property.  Exh. D-56.

102.    Also on May 15, 2001, Dr. Hughto provided counsel to Modern and Mystic with a remedial cost estimate which estimated that a permanent solution could be achieved at the Property at a cost of $810,000.  Exh. D-151.

103.    One week later, based on the same data, Dr. Hughto provided counsel to Modern and Mystic with a remedial cost estimate of $17 million.  Exh. D-152.

104.    On May 29, 2001, counsel for Modern and Mystic again informed Solutia that its client intended to purchase and develop the Property and that the Property "contains significant contamination that is the responsibility of Monsanto."  Exh. D-58.

105.    On June 7, 2001, plaintiff Mystic Landing LLC ("Mystic") was formed as a Massachusetts limited liability company with Modern to act as its managing member. Exh. D-60.

106.    By agreement dated June 19, 2001, Modern/Obayashi assigned the option to plaintiff Mystic.  Exh. 78.

107.    On June 21, 2001, Mystic purchased the Property from Mary O'Donnell; the total purchase price recited in the deed was $300,000.  Trial Tr. at 2-65, lines 12-17; Exh. D-43.  Massachusetts law requires that deeds recite the full consideration paid for property.  M.G.L. c. 183 §6; M.G.L. c. 64D §1, 7.

108.    Shortly before Mystic purchased the Property, an independent appraisal valued the Property to be approximately $17,390,000 without any adjustment for the presence of contamination.  Trial Tr. at 2-66, line 6 - 2-67, line 25; Exh. D-68.

109.    In 2002, Mystic used the property to secure a $10 million loan but the proceeds of the loan were not used to fund remediation or other activities related to the Property but were used by Modern in its business.  Trial Tr. at 2-68, lines 4-18.

110.    At the time Mystic purchased the Property, it was well aware of the environmental contamination of the Property.  Trial Tr. at 2-62, lines 1-10.

111.    Mr. Pastore's testimony that additional consideration was paid for the purchase of the Property was not credible.

112.    The subcontract between Modern/Obayashi does not state that any amounts to be paid thereunder are consideration for the purchase of the Property.  Exh. D-66.

113.    Modern/Obayashi used the subcontract with O'Donnell Construction to satisfy a requirement of a public contract on which it was the general contractor that at least a specified percentage of the contract work be performed by a company or companies owned and operated by members of minority groups or women.  Trial Tr. at 2-73, lines 3-25.

114.    In August 2001, Mystic sent a demand letter under § 4A of Chapter 21E to Pharmacia estimating future response costs of $17,600,000 for soil remediation and stating that "Pharmacia is responsible for all of the response costs and other damages related to the contamination" at the Property.  Exh. 62.

115.    In 2005 Mystic placed the Property on the market for sale and received offers of up to $34 million.  Exhs. D-139 - D-149.

116.    Mystic intends sell the Property to develop it for residential and/or commercial use.  Trial Tr. at 2-69, line 22 - 2-70, line 2.

117.    Because Mystic was aware of the contamination when it purchased the Property, paid a reduced price for the Property because of that contamination and will be the only party to benefit from the remediation of the Property, Mystic will receive a windfall profit if the costs of remediation are borne by Pharmacia.

## VI.    Findings of Fact Regarding the Parties' Compliance with Environmental Laws

118.    Chapter 21E of the Massachusetts General Laws was enacted in 1983.

119.    Pharmacia sold the Property to Boston Edison on or about June 20, 1983. Exh. 68.

120.    The deed from Pharmacia to Boston Edison placed a use restriction on the Property, limiting future uses to industrial and manufacturing uses and prohibiting future commercial, residential and recreational uses.  Exh. 68.

121.    As a result of the manufacture of complex organic chemicals and on-site disposal of by-products of chemical manufacturing practices the occurred on the West Side, the West Side became contaminated by a number of hazardous materials. Trial Tr. at 2- 88, line 18 - 2-89, line 11.

122.    Pharmacia arranged for the contamination on the West Side to be investigated, contained and removed in accordance with the governing environmental laws.  Trial Tr. at 2-84, line 12 - 2-87, line 7.

123.    The remediation of the West Side Property was completed in late 1996 and Response Action Outcome statements were filed in 1997.  Trial Tr. at 2-88, lines 12-17; Exhs. D-161 - D164.

124.    Such remediation was completed within five years of when the Massachusetts Contingency Plan first established a five year deadline for the remediation of contaminated properties.  Trial Tr. at 2-89, line 22 - 2-90, line 4.

125.    Approximately $30 million was expended by Pharmacia responding to the contamination on the West Side.  Trial Tr. at 2-88, lines 5-13.

126.    Because of the differences in historical operations and uses between the West Side and the Property, the cost spent to remediate the Gateway is likely an order of

magnitude higher than what it would cost to remediate the Property.  Trial Tr. at 3-21, lines 14-23.

127.    In early 1998, the Department of Environmental Protection indicated that the remediation had been completed to their satisfaction.  Trial Tr. at 2-90, lines 19-22; Exh. D-165.

128.    In contrast to the West Side, there has been little or no remediation of the East Side.

129.    As a result of the January 1997 submission by Mary O'Donnell, DEP classified the Property as a Tier II Disposal Site.  This classification required submission of a Phase II Comprehensive Site Assessment by January 1999, submission of a Phase III Remedial Action Plan by January 2000 and completion of response actions by January 2002.  Exh. D-252.

130.    Mary O'Donnell did not take any of the response actions required by DEP's classification while she owned the Property.


131.    Before Mystic acquired the Property, Mystic and Modern's consultant submitted a report to counsel for Mystic and Modern in draft form in March 2001 and in final form in June 2001 which advised them of the obligation to perform phased response actions at the Property; thereafter, other consultants advised Mystic that it had succeeded to the obligations of Mary O'Donnell.  Exhs. 63 at 9-10, 13; D-56 at 19; D-124 at 18.

132.    Although they had access to the Property, Mystic and its consultants failed to perform any sampling from the fall of 2001 to the winter of 2005, and when they did

not perform sampling, they failed to conduct such sampling in a manner sufficient to support their conclusions. Trial Tr. at 1-139, lines 11-19.

133.    Mystic has not submitted a Phase II Comprehensive Site Assessment nor has it complied with other response action deadlines, Trial Tr. at 3-16, lines 19-20; it took no action to begin to prepare such an assessment until weeks after Pharmacia's consultant issued a report in September 2005 stating that Mystic was not in compliance with M.G.L. c. 21E and regulations promulgated thereunder as a result of its inaction. Exhs. D-252, D-134.

134.    In November of 2005 Mystic filed a request for a Tier II Extension; however, the filing of such request did not excuse Mystic's noncompliance with the MCP. Trial Tr. at 1-131, lines 17-25.

135.    All work performed by Dr. Hughto with respect to the Site until 45 days after an effective notice of transfer to him from the prior licensed site professional was filed on November 21, 2005 was in violation of law. Trial Tr. at 3-17, lines 5-10.

136.    Had Mystic begun to assess and remediate the Property when it acquired ownership in 2001, it could have achieved a permanent solution before April 3, 2006. Trial Tr. at 3-19, lines 12-17.

137.    As a result of Mystic's failure to comply with the MCP's deadlines, the remediation will be governed by new, more stringent standards promulgated on April 3, 2006 and will therefore cost up to $1.4 million more than it would have been had Mystic complied with the deadlines established in the MCP. Trial Tr. at 1-111, line 12 -112, line 1, 1-146, line 16 - 148, line 2, 3-19, lines 6-11.

138.    As a result of Mystic's and Modern's activities, Mystic also became ineligible for the Brownfields Tax Credit, which would have allowed 25% or 50% of the remediation costs to be treated as a credit off Massachusetts excise tax.  Trial Tr. 1-148, line 19 - 1-151, line 25.

139.    Dr. Hughto's testimony that Modern's use of the Property made it impossible or prohibitively expensive to collect samples is not credible; also not credible is Dr. Hughto's suggestion that Mystic's delay in complying with the MCP was justified by its desire to conduct response actions in conjunction with the development of the Property.  Trial Tr. 1-142, line 15 - 144, line 2.

140.    Had Mystic achieved a permanent solution prior to April 3, 2006, the new regulatory standards would not have applied to the Property.  Trial Tr. at 3-19, lines 18-22.

141.    In addition to failing to comply with deadlines established under the MCP, during Mystic's ownership Modern contributed to the contamination at the Property by causing releases of oil and hazardous materials including lead, arsenic and PAH's.  Trial Tr. at 2-23, line 24 - 2-23, line 3, 3-24, lines 4-15.

142.    DEP commenced an investigation of Modern's activities on the Property in or about 2002.  Exh. D-120.

143.    DEP's investigation concluded with entry of an Administrative Consent Order with Penalty (the "Administrative Consent Order") dated August 8, 2005.  The order contained findings by DEP that Modern had violated chapter 21E and regulations prohibiting the operation of an unpermitted solid waste facility, directed Modern to cease

using the Property to transfer or dispose of regulated solid waste, required removal of stockpiled material and disposal in the manner required by law and imposed a fine of $35,000 to be paid within 30 days. Exh. D-116. Trial Tr. at 2-69, lines 4-21.

144.    Modern failed to pay the fine imposed by the Administrative Consent Order or to take certain other actions required by that order within the time specified. Exhs. D-121, D-244.

145.    On November 30, 2005, DEP issued an Enforcement Notice and Demand for Payment to Modern for its failure to comply with the Administrative Consent Order. Exh. D-121.

146.    On March 1, 2006, DEP issued a further notice which described Modern's continued non-compliance with the Administrative Consent Order and reserved DEP's right to "exercise the full extent of its legal authority in order to obtain full compliance with all applicable requirements and provisions of the ACOP, including, but not limited to criminal prosecution …." Exh. D-244.

## V.    Recovery of Past Response Costs

147.    Modern has not asserted a claim for past response costs.

148.    Neither Mystic nor Modern produced any document showing any back-charge or payment by Mystic of any cost alleged to be a response cost. Trial Tr. at 2-64, line 6 - 65, line 2.

149.    Without documentary evidence to support his claim, I do not find credible Mr. Pastore's testimony that any past costs that may have been paid by Modern be incurred by Mystic. Trial Tr. at 2-64, line 6 - 2-65, line 2.

150.    Mystic has not incurred any response costs under Chapter 21E as none of the activities for which Mr. Pastore testified Mystic paid approximately $16,000

constituted appropriate response costs.  Trial Tr. at 2-65, lines 3-10, 3-16, line 12 - 3-17, line 10.

151.    Neither Modern nor Mystic has made payment for services by Dr. Hughto and his subcontractors performed after January 1, 2006.  Trial Tr. at 2-31, lines 20-23.

**VI.    Reasonableness**

152.    Pharmacia made a timely response to the notification filed by Mystic Landing pursuant to M.G.L. c. 21E §4A, participated in negotiations in good faith, and had a reasonable basis, in light of actions and excessive demands of Mystic, for not entering into an agreement to participate in the performance of response action in the manner and to the extent demanded by Mystic or to pay for the costs demanded by Mystic.

153.    In light of Mystic's excessive demands, evasive discovery tactics, and overly aggressive settlement positions, Mystic did not participate in negotiations in good faith and maintained an unreasonable position with respect to the matter.

154.    Dr. Hughto's estimates for soil disposal during construction and other considerations are not necessary to achieve a permanent solution but rather are costs related to development.  Trial Tr. 3-17, lines 3-10.

By its attorneys,

/s/ John M. Stevens
John M. Stevens (BBO # 480140)
Adam P. Kahn (BBO # 561554)
Elisabeth M. DeLisle (BBO #658067)
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts   02210
Tel:  (617) 832-1000
Fax:  (617) 832-7000
jstevens@foleyhoag.com

Dated:    April 20, 2006