## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MYSTIC LANDING, LLC,<br>Plaintiff,<br><br>v.<br><br>PHARMACIA CORPORATION,<br>Defendant.<br><br>PHARMACIA CORPORATION,<br>Third-Party Plaintiff,<br><br>v.<br><br>MODERN CONTINENTAL CONSTRUCTION<br>CO., INC.,<br>Third-Party Defendant.<br><br>PHARMACIA CORPORATION,<br>Third-Party Plaintiff,<br><br>v.<br><br>BOSTON EDISON COMPANY,<br>Third-Party Defendant.<br><br>v.<br><br>BOSTON EDISON COMPANY,<br>Fourth-Party Plaintiff,<br><br>v.<br><br>O'DONNELL SAND & GRAVEL, INC.<br>And MARY O'DONNELL,<br>     Fourth-Party Defendants. | **CIVIL ACTION NO.**<br>**04-10180 NMG** |

## PLAINTIFF, MYSTIC LANDING, LLC AND THIRD-PARTY DEFENDANT
## MODERN CONTINTENTAL CONSTRUCTION CO., INC.'S
## REVISED REQUEST FOR FINDINGS OF FACT AND RULINGS OF LAW

As directed by the Court, J. Gorton, on Tuesday, April 18, 2006, Mystic Landing, LLC ("Mystic") and third-party Defendant, Modern Continental Construction Co., Inc., ("Modern") hereby submit their Revised Request for Findings of Fact and Rulings of Law, incorporating all Court Orders, facts in evidence, testimony of witnesses, and the legal basis for Mystic and Modern's request for declaratory judgment and other rulings.

## FINDINGS OF FACT

1.    On all of the evidence, a declaratory judgment in favor of the Plaintiff, Mystic Landing, LLC ("Mystic") and the third-party Defendant, Modern Continental Construction Co., Inc., ("Modern") is warranted.

2.    The Property which is the focus of this matter is an approximately 35 acre parcel of land located on the shore of the Mystic River at State Route 99 and Chemical Lane (Alford Street) in Boston and Everett, Massachusetts (the "Site" or the "Property"). See Ex. 1.

3.    The Property has been owned by Mystic since June 21, 2001. See Ex. D43; Transcript at Day 2, page 62 (hereinafter cited as T-(day)-(pages)).

### Pharmacia's Operations and Contamination of the Property

4.    Pharmacia is the current successor corporation to Monsanto and Merrimack Chemical Co. ("Merrimack"). T-2-77; January 25, 2006 Order, p. 2.

5.    The Property was formerly owned by Pharmacia, and Pharmacia (and its predecessors in interest) owned and operated a chemical manufacturing facility at the Property. Exs. 1, 234 at p. 17, line: 14-23; T-2-77

6.    From sometime in the 1860's to 1929, Pharmacia's predecessor in interest, Merrimack, utilized the Property for chemical manufacturing operations. Exs. 1, 5

7.    Pharmacia obtained the Property in or about 1929 when it acquired

Merrimack and continued the chemical manufacturing operations and chemical storage

facility at the Property until in or about 1975. (See generally Exs. 3, 4, 5, 8, 9, 234)

8.    Pharmacia's operations at the Property are described in several documents,

including but not limited to the following:

- 10/22/73 Monsanto Environmental Assessment of the Site;
- 11/19/81 Monsanto Memorandum and attached "Site History and Environmental Status Summary – Sale of Everett Plant East Side Property;"
- 6/3/80 Monsanto Memorandum ("Everett Plant, East Side Assessment"); and,
- 8/4/80 Monsanto Memorandum entitled "Sale of Monsanto Land.

(See generally Exs. 216, 65, 66, 139; see also Exs. 3, 4, 5, 8, 9)

The aforementioned documents clearly evidence that releases and threats of

releases of chemical contaminants occurred at the Property, and all such releases or

threats of releases of the chemical contaminants are consistent with Pharmacia's

operations at the Property.

11.    Releases of oil and hazardous materials occurred during the time the

Property was owned by Pharmacia. See generally Exs. 12, 234; T-2-94 and T-2-97.

12.    A series of environmental studies of the Property were conducted through

the years. Such studies documented contamination at the Property during the years of

Pharmacia's ownership and operations. Such studies include:

- Environmental Assessment Sale of 34 Acres-Everett Plant, 10/22/73 (0004951);
- Dames & Moore, Hydrogeologic Survey, 1/8/80 (000325);
- Monsanto Memo, Everett Plant, East Side Assessment, 6/3/80 (0009975)
- Monsanto Memo, Sale of Monsanto Land, 7/21/80 (0010702);
- Dames & Moore, Report, Hydrogeological Services, 12/23/80 (0000314);
- Monsanto, Site History and Environmental Status Summary, Sale of Everett Plant, East Side Property, 11/19/81 (0006322);

- Monsanto, Proposed Property Sale to Boston Edison Company, 1/22/82 (0006273);
- Perkins Jordan, Site Contamination and Liability Audit on Monsanto Property, 7/16/82 (0005923);
- Boston Edison, 10/17/85;
- Consulting Engineers & Scientists, Phase I, Initial Site Investigation Report, 1/15/97 (MONS1 0001554); and,
- Rizzo Associates, Environmental Studies, 6/19/01 and 8/10/01.

(See generally Exs. 216, 140, 66, 138, 141, 65, 143, 144, 60, 146, 53, 54).

The aforementioned documents clearly evidence that releases and threats of releases of chemical contaminants occurred at or near the Property, and all such releases or threats of releases of the chemical contaminants are consistent with Pharmacia's operations at or near the Property.

11.     Perkins Jordan performed a site assessment for Pharmacia in 1982, noting high sulfate concentrations, indicating the presence of sulfuric acid in the soil. See Ex. 12; T-1-53-54. The Perkins Jordan report also included findings of lead exceeding EPA standards. T-1-55.

12.     At the time of the Perkins Jordan assessment, the Property showed areas of high aluminum and iron concentrations below areas historically known to be alum and bauxite storage or disposal. Ex. 14 and T-1-56.

13.     The deposition of Gerald Rinaldi, current manager of Remediation at Solutia, Inc. and former employee of Pharmacia, was taken on September 8, 2005. Through Mr. Rinaldi's deposition testimony, Pharmacia admitted that releases and threats of releases of oil and hazardous materials occurred during Pharmacia's ownership and operations at the Property. Notably, Mr. Rinaldi testified in his depositions as follows:

- "The areas of impact which were considered to be significant include… sulfate, zinc and lead levels in groundwater samples from the two monitoring wells exceeded EPA's human health water quality criteria…

the upper layer two to four feet of ground fill material deposits... are contaminated with materials known to have been stored in the past." Rinaldi Deposition, pp. 26-27, lines: 20-25, 1-11;

- "[C]hemicals and waste materials may have been spilled onto or disposed of... any future use of the tract should be undertaken only after consideration of its possible contamination." Rinaldi Deposition, pp. 32-33, lines: 19-25, 1-2;

- "[A]n alum mud pond on the site... there were small leaks of sulfuric acid which was a product produced at the site... the possibility of leaching of sulfur and/or lead... from raw material storage at the site during the period of then-Monsanto Company's operation." Rinaldi Deposition, p. 37, lines: 2-14, see also p.43-44, lines: 18-25, 1-2;

- "[W]ith respect to the alum process... insoluble metal sulfates were filtered out prior to crystallization and disposed of into the river... with respect to ferric salts... insolubles were filtered from the product and discharged into the river..." Rinaldi Deposition, pp. 131-32, lines: 19-25, 1-24;

- "The oxidation of sulfur in a moist environment can produce sulfurous acid which may be oxidized to sulfuric acid. The presence of these acids may influence the soil and groundwater pH and consequently increase the dilution rate of metals from soil and waste." Rinaldi Deposition, pp. 141-42, lines 13-25, 1-25.

- As to what would account for elevated levels of lead on the property: "Possible leaching from pyrite ore storage." Rinaldi Deposition p. 185, lines: 13-19.

See also Exs. 5, 7, 9. 234.

The aforementioned testimony clearly evidences that releases and threats of releases of chemical contaminants occurred at the Property, and all such releases or threats of releases of the chemical contaminants are consistent with Pharmacia's operations at the Property.

14.    Pharmacia's (and its predecessors in interest) operations at the Property included manufacturing and/or storage of the following chemicals:

- Sulfuric acid;
- Nitric acid;
- Mixed acids;
- Alum (aluminum sulfate);
- Iron free alum;
- Sodium bisulfite;

- Ferric sulfate;
- Alcohol;
- Pyrites (iron sulfide);
- Sulfur; and
- DHCP (plasticizer)(solidified, granulated and packaged on site).

See also Exs. 7, 9, 10, 11, 12, 13.

15. The Property contained an alum pond or lagoon used for disposal, and raw

material storage areas for:

- Sulfur;
- Bauxite;
- Iron ore; and
- Salt.

See generally Exs. 7, 9, 10, 19, 20, 227.

16. Wastes produced from chemical manufacturing processes at the Property

included:

- Sodium bisulfite;
- Arsenic;
- Platinum catalyst; and,
- Alum mud (aluminum and potassium sulfate).

See generally Exs. 7, 9, 10, 19, 20.

17. Hazardous waste contamination has been discovered and documented at

the Property. The contamination consists of the residuals and from the chemicals

manufacturing, storage, release, spills and related waste disposal activities that took place

on the Property during the decades that Pharmacia and its predecessors in interest owned

and operated the chemical manufacturing facility at the Property. See generally Exs. 9-

15, 18-24, 30, 31, 33, 217-219, 224-227.

18.    Pharmacia's own internal documentation clearly evidences releases,

threats of releases and contamination of the Property:

- "The land surface is contaminated with some of the raw materials which were stored on site... the presence of sulfur, bauxite, iron ore, and other inorganic metal salts... lead [was] somewhat higher than would be expected for ambient groundwater" Ex. 19.
- "[Chemicals and waste materials may have spilled onto or were disposed of on the tract... any future use of the tract should be undertaken only after consideration of its possible contamination." Ex. 20.
- "As was the general practice of the industry at the time, Monsanto and its predecessors at the site commonly disposed of waste materials on plant property." Ex. 156.
- "No doubt, the ground water in the area is contaminated by inorganic dissolved solids. Seepage at the edge of the Mystic River at mid-tide appeared colored and contaminated." Ex. 224.
- "Intermittent process waste from bisulfate manufacture is discharged on the ground... and appears to percolate through the ground and into the Mystic River. When the tide is ebbing, there is a visible discolored seepage along the water line." Ex. 224.
- "We estimate that between 30 and 120 tons of sulfur is spread over an area of up to 60,000 sq. ft." Ex. 227
- "Condition of ground in sale tract – history of burial of toxic wastes, ground water contamination..." Ex. 225

See also Exs. 170, 174, 175.

19.    The chemical products, raw materials, byproducts and waste materials

listed in Paragraphs 14 through 16 are included within the definition of "hazardous

materials" under applicable law, M.G.L. 21E, §2; 42 U.S.C. § 9601(14); 310 C.M.R.

40.0000, Subpart P.

20.    Pharmacia, in connection with the sale of the west side of the former

chemical manufacturing plant property (also known as the Gateway parcel), undertook a

remediation of the significant contamination caused by Pharmacia's chemical

manufacturing operations, which such costs exceeded $33 million (in 1980s and 1990s

dollar value). T-2-88.

21.     In connection with the remediation of the west side of the former chemical manufacturing plant property, Pharmacia utilized, in large part, the clay cap materials, known as tunnel muck, to build a 6-7 foot cap on the west side – the same materials that were stockpiled and spread across the Property at issue in this litigation. T-1-58.

22.     Mystic and Dr. Hughto have engaged in significant sampling of the soils and groundwater below the clay cap. Ex. 18, T-1-64-66. Many areas of sampled soils beneath the clay cap exceeded the MCP upper concentration limits ("UCL"). Ex. 21; T-1-69. Similarly, a majority of the sampled soils below the clay cap showed concentrations of hazardous materials in excess of reportable concentrations. Ex. 22; T-1-70; see also generally Exs. 31, 33, 39, 217-219, 228-230).

23.     Areas beneath the prior sulfuric acid operations exhibited low pH (acidic) groundwater. Ex. 23; T-1-70-71. All of the groundwater on the site is below the layer of tunnel muck. T-1-72. Low pH groundwater will dissolve metals present in the soil. T-1-71.

24.     Pharmacia's consultant, Duff Collins, agrees that the groundwater, found below the clay tunnel muck, is contaminated, and that the groundwater flows to the river and the tidal flats. T-3-44-45 and T-3-55-57.

25.     The primary soil and groundwater contaminants identified by Dr. Hughto are consistent with the historic chemical operations on the Property by Pharmacia and its predecessors in interest. Ex. 30; T-1-76-77.

26.     Sampling and assessment activities during the years of ownership Mary O'Donnell showed areas of contamination below the clay cap of tunnel muck. T-1-81.

27.    Recent testing of the soils and groundwater below the clay cap by Dr. Hughto has located at least eleven (11) new areas showing lead and arsenic concentrations in excess of the MCP UCL. Exs. 217, 218, 228, 229, 230; T-1-86-89.

28.    Mr. Collins admitted that sulfur and acid releases in the soils could lead to low pH groundwater which could increase dissolution of metals such as arsenic and lead. T-3-69-72.

29.    Pharmacia's consultant, Mr. Collins, also agreed that soils below the clay cap of tunnel muck will require remediation.  T-3-61.

30.    Sediment samples around the Property have shown arsenic levels in excess of known local conditions, T-1-90, as a result of groundwater discharge from the Property.  T-1-91-92 and T-1-115.

31.    Pharmacia's consultant agrees with Dr. Hughto's findings that elevated concentrations of arsenic are present in the groundwater and sediments, and that such levels in the sediments are higher than documented and expected local conditions. T-3-48-49.

32.    Mr. Collins admits that contaminated groundwater flows into the tidal basin, which is part of the Mystic River.  T-3-55-57.  Arsenic concentrations are higher in the soils through which the groundwater flows.  T-3-67.

33.    As a result of further sampling, testing and analysis, the extent of the contamination below the clay cap continues to increase, with a total of 21 areas below the clay cap presently identified as being in exceedance of MCP UCL levels.  T-1-94-95, 111.

34.    Mr. Collins and Gerald Rinaldi admit that when Pharmacia sold the property to Boston Edison it was contaminated.  T-3-75 and Ex. 234.

**Mystic and Modern's Operations**

35.    After the sale from Pharmacia to Boston Edison Co. and the subsequent transfer to interests controlled by Mary O'Donnell, in or around 1995, a nearly impermeable clay cap of "tunnel muck" was physically spread over the site providing a clear delineation between Pharmacia's releases and contamination and any subsequent operations on the Property.  The "tunnel muck" consists of clean, low-permeability glacial till and tunnel rock removed from the construction of the Deer Island Outfall Tunnel.  See Ex. 1 at 4-5; T-1-58-61; see also Ex. 16.

36.    Pharmacia's consultant, Mr. Collins, erroneously refers to the clay tunnel muck as fill material used in the construction of the Deer Island waste treatment facility.  T-3-12.[1]

37.    The clay cap of tunnel muck covers the site in varying thicknesses of between one (1) foot and up to eight (8) feet.  Ex. 25; T-1-59.  Mr. Collins agreed that the clay tunnel muck is present over the course of the site.  T-3-43.

38.    Modern Continental Companies is the sole operating member of Mystic, which is organized as an LLC and owned by Modern.  T-2-59.

39.    On or about April 5, 1996, Mary O'Donnell Construction Co., Inc. ("O'Donnell"), entered into a subcontract with Modern Continental Construction Co.,

---

[1] Mr. Collins made further grandiose and unsupported statements, such as his assertion that certain barrels with markings could be interpreted to be a skull and cross-bones and contained waste oils, when no such investigation, sampling or analysis ever occurred. Also, Mr. Collins testimony that the Deer Island tunnel muck was used as fill on Deer Island is unsupported, as the tunnel muck came from well below the surface of inner Boston Harbor as the result of tunnel shaft excavation for the Deer Island wastewater treatment plant outfall, and such tunnel muck is commonly known as "Boston Blue Clay," an impermeable material. T-3-75-76.

Inc./Obayashi, a Joint Venture ("Modern/Obayashi"), pursuant to which O'Donnell agreed to provide, *inter alia*, a laydown/staging facility at the Site for use by Modern/Obayashi in its work on the Central Artery/Tunnel Project. Exs. 75, 76; T-2-71-72.

40.     The Modern/Obayashi and O'Donnell subcontract included what was, in practical effect, a "lease to own" arrangement, whereby Modern/Obayashi would make certain payments under the terms of the Subcontract, including payments for use of the Property, with the understanding that Modern/Obayashi would have an option to purchase the Property, and that, in the event that Modern/Obayashi did purchase the Property, it would receive a credit for the payments made during the course of the use period and amendments thereto.[2]  Exs. 72-76; T-2-71-72.

41.     On June 19, 2001, Modern/Obayashi executed an Assignment and Assumption of Rights and Obligations, which transferred Modern/Obayashi's option to purchase the Property to Mystic. Ex. 78.

42.     Mystic purchased the Property pursuant to an option agreement, with the option price being $300,000, added to the use payments in the total amount in excess of $7.0 million, paid by Modern to O'Donnell, thereby establishing the total consideration paid for use and purchase of the Property in the amount of approximately $7.4 million. Exs. 72-78; T-2-71-72.

43.     Modern's operations on the property consisted of a construction staging, lay-down and dismantling area for use in connection with its Central Artery//Tunnel ("Big Dig") construction projects. T-1-63, 82-83, 99.

---

[2] Modern's subcontract with O'Donnell included more than $7.4 million in payments for "use of a laydown area". This payment was for the leasing of the property. Exs. 75, 76.

44.     The use of the Property was integral to Modern's ability to stage necessary materials and equipment along with providing an area for the dismantling of the old elevated artery, which consisted of cutting, grinding and separating for recycling the structural steel, reinforcing rebar and concrete materials. T-1-63, 82-83, 99.

45.     Mystic and Modern currently have the Property filed with the Massachusetts Department of Environmental Protection ("MA DEP"), pursuant to the requirements set forth in the Massachusetts Contingency Plan. Ex. D134; T-2-70.

46.     Modern also was tasked by the MA DEP, pursuant to a duly negotiated and executed Administrative Consent Order, with removing certain stock piles of materials from the site (construction debris from the Central Artery/Tunnel "Big Dig" project), and providing the MA DEP with confirmatory sampling results evidencing the removal of the stockpiles and evidence that there is no residual contamination in the soils on the Site, which results were produced and accepted by the MA DEP. Ex. D224; T-2-70.

47.     Any de *minimus* contamination at the Property caused by Modern's operations is clearly separable from Pharmacia's contamination of the Property by virtue of the clay cap of tunnel muck, and Modern has provided conclusive evidence of remediation of any contamination alleged to have been caused by Modern. Exs. 25, 26; T-1-120-23. Even Mr. Collins agrees that the asbestos and solid waste on the Property have been remediated in an appropriate manner. T-3-51-52.

48.     Pharmacia's consultant performed no testing and presented no evidence that Modern's operations caused any run-off into the sediments or that the stockpiles contained any contaminants. T-3-51.

49. Mr. Collins further agreed, that of the 21 below the clay cap areas in excess of the MCP UCL, only a limited area on the surface of the property could be attributable to certain surface contamination from Modern's operations. T-3-85.

50. Pharmacia produced no evidence, conducted no sampling activities, and presented no test results showing that any of Mystic or Modern's operations contaminated soils or groundwater below the clay tunnel muck. T-3-64.

51. No findings of arsenic above the UCL limits were found on the surface of the site. T-3-53. The highest arsenic level found on the surface was no more than 100 parts per million. T-3-65. Arsenic levels in the sediments, however, exceed 500 parts per million. T-3-65. Mr. Collins agreed that any minor surface contamination cannot account for the significantly contaminated soils below the clay cap. T-3-65-66.

52. Mystic and Modern have stipulated that they accept 100% liability for the remediation costs for any releases or contamination of the soils in or *above* the clay cap.

53. No evidence has shown that Modern or Mystic's operations at the site have caused run-off into the sediments of the Mystic River, where the contamination is primarily from arsenic and lead, the two main constituents of the contaminated groundwater below the clay cap. T-1-123.

54. Pharmacia's consultant, Duff Collins, sampled, analyzed, and tested only the surface contamination by Modern. T-3-6, 41-43.

**Mystic's Response Costs and Proposed Response Actions**

55. Standard practice for a site assessment involves actual sampling of the property, collecting samples from the soil, groundwater, and surface water. T-1-25-26.

13

56.     Mystic's ability to meet MCP schedules was impaired by the operations on the site, which were vital to the construction of the Central Artery/Tunnel construction work performed by Modern.  T-1-63, 82-83, 99.

57.     Non-conformance with the MCP does not negate the utility of any response actions performed.  T-1-136.  "Response actions are different assessment and remedial types of efforts on a site… they may or may not be incorporated into some MCP deliverable."  T-1-137.

58.     Mystic, through its expert (and LSP of record), Dr. Richard Hughto, have performed a site assessment, evaluation, analysis of the contamination of the property below the clay cap of tunnel muck and the sediments surrounding the property in the Mystic River.  Exs. 1, 53, 54; T-1-25-26, 86.

59.     The response costs incurred by Mystic have related to sampling, testing, analysis, and investigation into those releases, threats of releases, pollutants, and contamination resulting from Pharmacia's (and its predecessors in interest) operations. Mystic does not seek recovery of response costs relating solely to Modern and Mystic's operations at the Property that may have caused releases above the clay cap.  Ex. 223; T-1-116.

60.     Pharmacia's consultant, Mr. Collins, concedes that he relied upon the work, findings, and analysis of Dr. Hughto in making his judgment about appropriate remediation of the Property.  T-3-59.  Pharmacia's consultant agrees that the data collected by Mystic and Modern is useful in determining response actions necessary for remediation, including Mr. Collins' concurrence that soil and groundwater must be remediated.  T-3-60.

61.     The MCP requires analysis of sediments if there is a potential impact. T-1-85.

62.     To date, Mystic has incurred response costs of approximately $223,861.20 to investigate and assess the environmental condition of the below the clay cap soils and groundwater as well as the sediment sampling and analysis at the Property, and such response costs are recoverable under M.G.L. 21E. Ex. 233.

63.     Response costs incurred to date have been paid for, or will be paid for by Mystic or on Mystic's behalf by Modern or its lawyers. T-2-62-63.

64.     As testified by John Pastore, any costs paid by Modern, or inter-company debt incurred by Mystic, is tracked, documented and Mystic is responsible for the repayment of same. T-2-62-63.

65.     Mystic will incur future response costs and remediation costs to cleanup the environmental contamination of the soils, groundwater, and sediments at the Property and bring the Property into compliance with the Massachusetts Contingency Plan, M.G.L. 21E. See generally T-1-97-120; Ex. 36, 37, 38, 39, 220.

66.     Pharmacia's consultant, Mr. Collins, agrees with Mystic and Modern's expert, Dr. Hughto, that low pH groundwater will need to be neutralized and soils above the UCL limits of the MPC will need to be stabilized. T-3-17, 46, 63.

67.     Mr. Collins agrees that remediation costs will be greatly increased as a result of the change in MCP. T-3-18-19.

68.     Mystic sent a M.G.L. 21E, §4A demand notice to Pharmacia on August 27, 2001. Ex. 62. But, to date, Pharmacia has failed and refused to contribute to the past and future response costs required to remediate the property.

## RULINGS OF LAW

### I.    The Pharmacia Is Liable Under the Oil and Hazardous Material Release Prevention Act, M.G.L.A. c. 21E, § 5.

1.    This matter is governed by M.G.L. c. 21E, §§ 4A and 5.

2.    M.G.L.A. c. 21E imposes strict liability upon, among others, "any person who, at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous materials was stored or disposed of and from which there has been a release or threat of release of hazardous material." See M.G.L. c. 21E, § 5(a)(2) (stating that liable persons "shall be liable, without regard to fault"); see also Guaranty-First Trust Co. v. Textron, Inc., 416 Mass. 332 (1993)

("General Laws c. 21E, § 5(*a* )(iii), provides a property owner with a strict liability claim against certain classes of persons for 'damage to his real or personal property incurred or suffered as a result of [a] release or threat of release' of hazardous materials").

3.    Pursuant to M.G.L. c. 21E, § 2, a "person" includes "any or private corporation...." Pharmacia is a legal person as defined under M.G.L. 21E.

4.    A successor corporation by merger is included among persons liable under M.G.L.A. c. 21E and CERCLA. See John S. Boyd Co. v. Boston Gas Co., 992 F.2d 401, 404 and n.3 (1st Cir. 1993).

5.    A person who was the owner or operator of a site at the time of storage or disposal of hazardous material may be held liable for a release, even if the release occurred *after* that person ceased to be an owner or operator of the site. See Byrnes v. Massachusetts Port Auth., 2 Mass.L.Rptr. 3 6-8, 1994 WL 879644, *6-8 (Mass. Super. Ct. 1994).

6. Pursuant to M.G.L. § 5(a)(5), a person is liable for a release of hazardous material from a site if it otherwise *caused* or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site." See Griffith v. New England Tel. & Tel. Co., 420 Mass. 365, 369 (1995) ("To impose liability under § 5(a)(5), a plaintiff must establish both the defendant caused the release and that the release caused the contamination").

7. Pharmacia is the current successor corporation to Monsanto and the Merrimack Chemical Co.; thus, Pharmacia is the liable party under M.G.L. 21E.

### A.    Pharmacia is Strictly Liable

8. Pharmacia is strictly liable under M.G.L. c. 21E, § 5(a) as "(2) any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material…and (5) any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site, shall be liable, without regard to fault…"

9. Pharmacia was an owner or operator on the Property at the time of a release of hazardous material and that Pharmacia's operations, manufacturing, storage, and disposal practices caused a release of hazardous material.

10. Once a party is liable under §5(a), that party has the opportunity to establish, via a preponderance of the evidence, that they are responsible for only a portion of the damages, thus escaping the full brunt of the joint and several liability. See M.G.L. c. 21E, § 5(b).

11.     "The plaintiff is not required to pinpoint each cost which is attributable to a particular defendant's release, but instead is only required to prove that the defendant's release resulted in some response costs. Once the plaintiff establishes that the release caused by the defendant resulted in response costs then the burden shifts to the defendant to prove what portion of the plaintiff's response costs are attributable to the release which the defendant caused." See Jean Beaudette, Inc. v. J.P. Noonan Transp., Inc., 419 Mass. 311, 314-15 (1995). In Section 5(b) cases, a party that is otherwise joint and severally liable can limit their liability to the owner to the "portion" of damages attributable to their activities, provided that they can carry the burden of proving what that portion is. Olin Corp. v. Fisons PLC, 1995 WL 811961 at *13 (D. Mass. 1995).

12.     Pharmacia has produced no evidence, sampling, or other data or analysis that absolves it from liability for its contamination of the soils and groundwater below the clay cap. The evidence has clearly shown contamination (and signature contaminants) below the clay cap consistent with the materials, processes, and products produced by Pharmacia (and its predecessors in interest) at the Property.

13.     Groundwater seeping from below the clay cap, which was noted by Pharmacia's own consultant, GZA, and admitted by Mr. Collins, is polluted with the signature contaminants found in soils and groundwater below the clay cap, which are sulfur, acids, lead and arsenic (and consistent with Pharmacia's operations) and their seepage is contaminating the sediments of the Mystic River.

14.     An analogue exists under CERLA, 42 U.S.C., §9607, wherein a party judged strictly liable is entitled to prove divisibility of the environmental harm, which is to be reflected in the amount of liability. In this case, Mystic, strictly liable under M.G.L.

21E, has proved that there is a divisible demarcation between it and Pharmacia's liabilities - namely, the clay cap. Accordingly, Mystic and modern cannot be liable to Pharmacia for those releases attributable to Pharmacia's operations and contamination below the clay cap and the contamination of the sediments in the nearby tidal area and Mystic River attributable to groundwater seepage. See M.G.L. c. 21E, § 5(b).

### B. No Windfall Exists if Pharmacia is Ordered to Pay for the Remediation of its own Contaminants.

15.    M.G.L. c. 21E assigns liability without regard to fault for those who owned or operated the property at the time of the release or who are legally responsible for the release.

16.    No provisions in 21E, the MCP, or the applicable case law permits the Court to allocate liability and responsibility based upon the purchase price of the property, the purchaser's knowledge of contamination at the time of the purchase or the ultimate cost of any necessary and appropriate remediation and response actions.

17.    Equitable factors such as Mystic's knowing purchase of contaminated property at a price reflective of such contamination do not supply a legal basis to reduce Pharmacia's liability in this action. To do so would turn the public policy of strict liability underlying M.G.L. c. 21E on its head. "Simply put, G.L. c. 21E was drafted in a comprehensive fashion to compel the prompt and efficient cleanup of hazardous material and to ensure that costs and damages are borne by the appropriate responsible parties." Taygeta v. Varian, 436 Mass. 217, 223 (2002).

18.    The primary purpose of 21E is:

"to respond to environmental contamination and to recover response costs from persons responsible for the contamination...A second significant purpose of 21E is to enable

private persons 'to obtain a certain measure of compensation for loss resulting from environmental damage." Taygeta v. Varian, 436 Mass. 217, 223 (2002) (citations omitted).

19. The overall purpose of 21E is to "force parties who are responsible for environmentally hazardous conditions, rather than the taxpayers, to bear the costs of cleanup." Commonwealth v. Boston Edison Co., 444 Mass. 324, 335 (2005). "Costs and damages are [to be] borne by the appropriate responsible parties." Id. (citations omitted)

20. Disallowing full cost recovery because the purchaser of the property knew about the contamination at the time of purchase and/or paid a lower price reflective of such contamination, would be counter to the clear goal, embodied in 21E, of encouraging private parties to buy contaminated party and to hold the polluters liable for the cleanup costs. It would also eviscerate the strict liability regime of c. 21E.

21. Similarly, CERCLA's purpose is to encourage timely cleanup of hazardous waste sites, which "would be frustrated if a plaintiff's motives were subject to question… [the court] will not look at the impetus behind a plaintiff's decision to begin the cleanup process; [the court] will look only to see if there has been a release or threatened release for which the defendant is responsible." Gen Elec. v. Litton Indus. Automation, 920 F.2d 1415, 1418 (8th Cir. 1990).

22. Pharmacia has a contractual indemnity agreement with Boston Edison Company for any liabilities it may incur as a result of Mystic's claims.

23. In the absence of Mystic or Modern, Pharmacia would be liable to the DEP for remediation and response costs incurred under M.G.L. 21E.

## II.    The Defendants Are Liable Under M.G.L.A. c. 21E, § 4A for Contribution.

24.    M.G.L.A. c. 21E, § 4A permits an injured party to seek contribution of

clean-up costs from the entity that caused the contamination.

25.    M.G.L.A. c. 21E, § 4A provides in pertinent part:

> (a) Any person...who has undertaken, is undertaking, *or intends to undertake* a necessary and appropriate response action or who is or reasonably believes that he might be liable pursuant to section five *may notify any person he reasonably believes is liable pursuant to section five* that the response action has been taken or is being taken or of the notifier's intent to take such response action or to seek contribution, reimbursement or equitable share from other persons...

(emphasis added).

26.    "Contribution is a standard legal term that enjoys a stable, well-known

denotation. It refers to a claim by and between jointly and severally liable parties for an

appropriate division of the payment one of them has been compelled to make." United

Technologies v. Browning-Ferris Ind., 33 F.3d 96, 99 (1st Cir. 1994)(citations omitted).

27.    Mystic is entitled to a Declaratory Judgment to have its future response

costs for remediation and clean-up of the soils and groundwater below the clay cap at the

Property and the nearby sediments in the tidal area and Mystic River paid for by the

liable party, Pharmacia.

28.    Pharmacia is further required to reimburse Mystic for its incurred response

costs relating to the analysis, investigation, sampling, and testing of soils, groundwater

and sediments contaminated by Pharmacia and its predecessors in interest.

29.    Pursuant to M.G.L.A. c. 21E, § 4A, an owner is entitled to recover all

costs and attorneys' fees related to its claim to recover response costs in the event that is

successful in prosecuting its claims. See, e.g., Black v. Coastal Oil New England, Inc., 45

Mass.App.Ct. 461, 468, review denied 707 N.E.2d 1077 (Mass. 1998). See also Buddy's

Inc. v. Town of Saugus, 62 Mass.App.Ct. 256, 258-259 (2004).

30.     Pursuant to M.G.L.A. c. 21E, § 4A, an owner can be awarded costs to

conduct a response action that he *intends to undertake*. Id.

31.     A plaintiff is not required to establish liability under a § 5 claim in order to

succeed on a § 4A claim. Martignetti v. Haigh-Farr, Inc., 425 Mass. 294, 297 (1997).

32.     No provision in 21E, the MCP, or applicable case law ties the

recoverability of response costs to the opinions, filings, and scheduling under the MCP.

The mere failure of a potentially responsible party to meet scheduling deadlines or MCP

filing requirements does not prevent that party from recovering response costs

attributable to the other party's actions and contamination.

### A.     Equitable Allocation is Improper

33.     Pharmacia failed to demonstrate that the clay clap was ineffective,

permeable or irrelevant to the Court's ability to determine responsibility for contribution.

A clear physical delineation between Pharmacia's releases and any subsequent operations

on the surface of site exists by virtue of a relatively impermeable clay cap of "tunnel

muck" that a previous owner spread over the site -- before Mystic acquired the property in

2001. Assigning responsibility for response costs to parties that are strictly liable under

M.G.L. 21E must be done on a case-by-case basis. Martignetti v. Haigh-Farr, Inc., 425

Mass. 294, 314 (1997).

34.     The "tunnel muck" consists of glacial till and tunnel rock from the

construction of the Deer Island Outfall Tunnel that a previous owner distributed over the

site in 1995 and 1996. See Ex. 1, at 4-5.

35.     The "tunnel muck" is a clean, low-permeability material, portions of which Pharmacia used to cap the adjoining western parcel that Pharmacia also contaminated.

36.     The presence of the "tunnel muck" cap provides the Court with a clearly demarcated line of responsibility for contamination by Pharmacia and its predecessors in interest.

37.     The Court should declare Pharmacia liable for all of the incurred and future costs to cleanup the contaminated soils, sediments, and groundwater below or leaching from below the clay cap.

38.     To pay for the cleanup of this contamination, Pharmacia alone should be liable, whereas any contamination on or above the clay cap has been stipulated to be the responsibility of Mystic and/or Modern.

39.     When seeking recovery of response costs, in the nature of contribution, recovery is only for a share of the cleanup costs. Martignetti v. Haigh-Farr, 1994 WL 879657 (Mass. Super. 1994) quoting Environmental Transp. Sys., Inc. v. Ensco, Inc., 969 F.2d 503, 508 (7th Cir. 1992). A party proven to be responsible for releases causing the contamination at issue is responsible for damages under M.G.L. 21E, and no equities need be considered. See Mailman's Steam Carpet Cleaning Corp. v. Lizotte, 415 Mass. 865, 874-75 (1993). When two parties are responsible for the releases causing the contamination at issue, allocation is appropriate with the parties each paying their share in proportion to their relative degree of contribution to the release at issue. Cantwell v. Haffner's Service Stations, Inc., 62 Mass.App.Ct. 1117 (2004)(release of home heating oil to be allocated between service company and homeowners).

40.    Chapter 21E is a release-specific and responsibility based statute; thus, the strict liability to the Commonwealth imposed upon all owners and operators, current and past, does not mean that all parties share responsibility and liability to each other for the costs of remediation.  See Mailman's Steam Carpet Cleaning Corp. v. Lizotte, 415 Mass. 865, 874-75 (1993)(response costs not equitably divided among three liable parties when only one such party was found to be responsible for the contamination); Sanitoy, Inc. v. Ilco Unican Corp., 413 Mass. 627, 630 (1992)(reimbursement of response costs from other liable-parties is to be "in proportion to their relative degrees of contribution to the contamination as a function of total response costs").

41.    A defendant found liable under M.G.L. c. 21E, § 5 will be apportioned liability according to the contamination for which it was found wholly liable.  Sanitoy, Inc. v. Ilco Unican Corp., 413 Mass. 627, 632 (1992); Martignetti v. Haigh-Farr, Inc., 425 Mass. 294, 319-20 (1997).

42.    A landowner may be found to be an "innocent party" and apportioned no liability for response costs under §5(b) with respect to contamination for which it is not responsible, but will be required to cover response costs for other areas in which it had some responsibility.  Sanitoy, Inc. v. Ilco Unican Corp., 413 Mass. 627, 630 (1992); Martignetti v. Haigh-Farr, Inc., 425 Mass. 294, 320 (1997).

43.    When interpreting a statute, "it is apodictic that [the Court's] first recourse must be to the statute's text and structure."  United Technologies v. Browning-Ferris Ind., 33 F.3d 96, 99 (1st Cir. 1994).

44.    "The statute [M.G.L. c. 21E, § 5(b)] does not, however, provide any criteria for this division of liability, other than general causation language regarding

losses "attributable to" a particular release which has led to the particular PRP's inclusion.
" 1 State Environmental Law, § 9.20 (2005).

45.    Under M.G.L. 21E, a Court should not engage in a balancing of equitable

factors when a party that is liable only by virtue of ownership of contaminated land sues a

polluter such as Pharmacia.  See M.G.L. c. 21E, § 5(b).

46.    The basis for any claim seeking reimbursement, contribution, or an

equitable share of any incurred or future response costs is addressed in the third

paragraph of Section 4, which states:

> "Any person who undertakes a necessary and appropriate response action
> regarding the release or threat of release of oil or hazardous material shall be
> entitled to reimbursement from any other person liable for such release or threat
> of release for the reasonable costs of such response action.  If two or more persons
> are liable pursuant to section five for such release or threat of release, each shall
> be liable to the others for their equitable share of the costs of such response
> action.  All claims and actions for contribution, reimbursement or equitable share
> by persons other than the commonwealth pursuant to this paragraph, except those
> pending in court on the effective date of section four A shall be subject to, and
> brought in accordance with, the procedures set forth in section four A." (Emphasis
> added).

47.    Section 4 establishes a remedy by which two or more persons who are

"liable" to the Commonwealth pursuant to § 5 for releases of hazardous material may

bring an action for reimbursement, contribution, or equitable share, against another party

or parties who are also "liable" pursuant to § 5 for such releases.1

48.    M.G.L. c. 21E differs significantly from CERCLA, 42 U.S.C., § 9613(f),

in that CERLA expressly provides that "...In resolving contribution claims, the court may

allocate response costs among liable parties using such equitable factors as the court

---

[1] In Braber v. Perlman, 1993 WL 818642 (Mass.Super.1993), the Court noted that Section 5 is relevant to a
suit under Section 4 for purposes of defining who is a "person liable" that may be sued for reimbursement,
contribution, or equitable share under Section 4.

deems appropriate," while M.G.L. c. 21E, § 4A focuses on responsibility rather than allocation, requiring that the "... the court shall award contribution, reimbursement or the equitable share of liability for which one or more parties is found to be responsible, if any." Section 4A suggests an equitable allocation only when contribution or reimbursement based on responsibility for releases causing contamination cannot be delineated. The Court is "not bound to follow holdings in CERCLA cases when interpreting c. 21E, and there are provisions in the two statutes that do not mirror each other as closely as do the provisions of operator status." Martignetti v. Haigh-Farr, 425 Mass. 294, 302 n.12 (1997).

     49.     In this case, neither Mystic nor Modern is liable under § 5(b) to Pharmacia for Pharmacia's under-the-cap releases or its contamination of the nearby sediments in the tidal area and Mystic River by groundwater seepage. Section 5 makes a key distinction with respect to parties, such as Mystic and Modern, who are entirely blameless with respect to the under-the-cap releases and sediments contamination in question.

     50.     The second paragraph of § 5 (b) provides:

No person who is liable solely [because they are a subsequent owner or operator of the site] and who did not own or operate the site at the time of the release or threat of release in question and did not cause or contribute to such release or threat of release shall be liable to any person who is liable [under any other provision of Section 5, because of some culpability relative to the release of contamination], except that any such [party who is liable solely due to their status as a subsequent owner or operator of the property] shall be liable to the commonwealth... (Emphases added).

51.     To permit Pharmacia to assert claims or defenses of equitable allocation

against Mystic and Modern with respect to its sole liability for its past contaminating

activities would, in essence, render Mystic and Modern liable to Pharmacia and render

Pharmacia liable for only part of the remediation cost for the pollution it caused, all of

which would be contrary to the language and intent of § 5(b).

52.     A party can be a "person liable" to the Commonwealth under Section 5(a)

of 21E, and yet not be a "responsible" party, in the sense of being responsible to share

with other parties in cleanup costs (unless the cost recovery suit is brought by the

Commonwealth). Martignetti v. Haigh-Farr Inc., 425 Mass. 294, at n. 29 (1997).

53.     The language of M.G.L. c. 21E, § 5(b) explicitly provides that a "person

liable" to the Commonwealth because of their status as an owner or operator of the site is

not necessarily a party who is " responsible" to a polluter for cleanup  costs at that site.

54.     Although courts in CERCLA cases have equitable power to hold who a

party that purchased property with knowledge of its contamination should also bear a

portion of the clean up cost - especially if the purchaser received a discount in the

purchase price due to the contamination.  When the defendant in the cost recovery suit is

several steps back in the chain of title, courts will not impose such an equitable

apportionment, even in a CERCLA case.  Al Tech Specialty Steel Corporation v.

Allegheny International Credit Corp., 104 F.3d 601, 607-608 (3rd Cir. 1997).

## III.     Delays to Compliance with Massachusetts Contingency Plan are not a Defense to Liability

55.     Mystic and Modern's delays in MCP compliance were excusable due to

the technical limitations of attempting remediation during Modern's use of the site as a

lay down yard for several years, as required by Modern's construction contracts with the Central Artery/Tunnel project.

56.    It was impractical and contrary to the public interest for Modern to have stopped using the site to clean it up immediately after its purchase of the Property. Such a course of action would have caused material and significant delays on many of its contracts with CA/T. Such delays would have lead to breach of contract claims, and millions of dollars in liquidated damages for delays in prosecuting the "Big Dig" contract work.

57.    The MCP itself allows for delays – for certain hardships – technical, financial, and legal inabilities; and the timing required under the MCP is for the Commonwealth's use in enforcement actions, not to be used as a shield by other liable parties to a contamination situation. MCP 40.0172, see also 40.0560(7)(providing for extension to Tier II classifications); 40-0720 (Tier I permit extensions).

58.    Any lack of compliance by Modern and Mystic was not a "substantial non-compliance." Missing of the deadlines is not a substantial issue. No pathways of exposure to contaminants were present and no immediate danger to human health or life was present.

59.    No case law interpreting the interaction between M.G.L. c. 21E. § 4A and the MCP suggest that the recovery of "response costs" will be barred in the event of noncompliance with the MCP. Neither M.G.L. c. 21E, nor the MCP provides for such a draconian remedy for untimely filings.

60.    Analogous case law under CERCLA and the National Contingency Plan ("NCP") provides that

> "The site evaluation does not have to comply strictly with the letter of the
> NCP, but only must be consistent with its requirements… It is not
> necessary that every factor mentioned by the NCP be dealt with
> explicitly."

Gen Elec. v. Litton Indus. Automation, 920 F.2d 1415, 1418 (8th Cir. 1990), citing

NL Indus. Inc., v. Kaplan, 792 F.2d 896, 898-99 (9th Cir. 1986). A party seeking

response costs under CERCLA must show only substantial, rather than strict, compliance

with the NCP. Artesian Water Co v. New Castle County, 659 F.Supp. 1269, 1292 (D.Del

1987), aff'd 851 F.2d 643 (3rd Cir. 1988), see also Hatco Crop. v. W.R. Grace & Co.-

Conn., 801 F.Supp. 1309, 1322-23 (D N.J. 1992). It is questionable whether compliance

with the NCP is even a prerequisite to recovery of response costs. See Hatco Corp. v.

W.R. Grace & Co.-Conn., 849 F.Supp. 931, 971 n.26 (D N.J. 1994).

61.     Delays in compliance have not prejudiced Pharmacia with respect to the

change in the MCP for lead and arsenic. Moreover, Pharmacia is at fault for failing to

remediate the Property in a timely fashion and for failing to do so in response to the 4A

notice served on Pharmacia in 2001. See Ex. 62. Timely clean-up of the Property would

not have obviated the need for further remediation in the event of MCP changes; further,

Pharmacia could have been equally liable to a downstream property owner, at a later date,

in the event Mystic did not take this action.

62.     "'Response' is defined in G.L. c. 21E, § 2 as including assessment,

containment and removal, and so the term 'response costs' [now termed a 'response

action'] is equivalent to the costs of 'assessment, containment and removal.'" Martignetti

v. Haigh-Farr, 425 Mass. 294, 306 n.22 (1997).

63.    Modern and Mystic complied with the 21E, 4A process, Pharmacia received notice that it was a liable party under the MCP, yet Pharmacia did not negotiate with Modern to work toward the permanent solution prior to the change in regulations.

64.    The MCP defines "response action" as a broad term to refer to assessment, containments and/or removals. MCP 40.0006(2)(a).

65.    In "undertaking", "conducting" or "performing" "response actions," an LSP *may* be required to be employed to provide professional services. MCP 40.0006(4). Accordingly, an LSP who has registered with the DEP is not a strict requirement in order to perform response actions or incur costs therewith.

66.    When reporting of a release or threat of a release to the DEP is required, a Licensed Site Professional is not required for the investigation and evaluation. MCP 40.0303.

67.    In responding to and remediating releases and threat of releases, the MCP does not dictate or expressly state that the response actions require the involvement of an LSP. MCP 40.0403.

68.    Modern and Mystic's actions constitute response actions as defined by M.G.L. c. 21E, § 2 and the MCP.

## IV.    It is Permissible for an Owner to Pursue Aggressive Remediation.

69.    The motivation of the remediating party is not relevant to determining whether the clean-up was "necessary." See Wallwork, *et al*., Environmental and Toxic Tort Matters: Advanced Civil Litigation: Spreading the Cost of Environmental Cleanup, SG084 ALI-ABA 231, at n. 51 (2002); General Electric Co. v. Litton Industrial Automation Systems, Inc., 920 F.2d 1415, 1418-1421 (8th Cir.), cert. denied Litton

Indus. Automation Systems, Inc. v. General Elec. Co., 499 U.S. 937, reh'g denied, 500
U.S. 911 (1991).

70.     CERCLA, the Federal equivalent of M.G.L.A. c. 21E, clearly evinces a
preference for complete, thorough, and permanent clean-ups. See, e.g., U.S. Steel Supply
Inc. v. Alco Standard Corp., 36 ERC 1330, 1339, 1992 WL 229252, *11 (N.D. Ill.)
("When actions are taken in response to a release or threat of release, and those actions
reasonably mitigate the release or threat of release, they will be considered necessary
[under CERCLA]").

## V.     The Deed Restriction is Inapplicable to the Matter Before the Court.

71.     It is black letter law in Massachusetts that restrictions on land, being
restraints on alienation, are highly disfavored. See Stop & Shop Supermarket Co. v.
Urstadt Biddle Properties, Inc., 433 Mass 285, 289 (2001).

72.     "For a covenant to run with the land at law, and thus be enforceable by
monetary damages, most courts require that a covenant meet the following requirements:
(1) The covenant must touch and concern the land; (2) The covenanting parties must have
intended that the covenant devolve on successors in interest; and (3) There must be some
form of privity of estate." "For a covenant to run with the land in equity, most courts
require that a covenant meet the "touch and concern" and the intent requirements. . . and
that the successor in interest not be purchaser for value without notice of the covenant."
That the benefit of a restriction not exist "in gross" is another requirement, although one
could argue that the "in gross" doctrine is merely another expression of the "touch and
concern" doctrine. Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 90 (1979) citing
Wolf, Michael A., *Powell on Real Property*, volume 9, Section 60.06[1], nn. 5 and 6.

73.     A restriction for the benefit of a private, non-governmental party will not run with the land if such benefit is "in gross" – i.e. the restriction does not benefit (or, to use real property jargon, is not "appurtenant to") a dominant estate owned by the benefited party. Garland v. Rosenshein, 420 Mass 319, 321 (1995); Orenberg v. Horan (a.k.a. Orenberg v. Johnston) 269 Mass 312, 314-315 (1929); Lincoln v. Burrage, 177 Mass 378, 379-380 (1901); Inhabitants of Middlefield v. Church Mills Knitting Co., 160 Mass 267, 271-272 (1894). Here, Pharmacia does not own any property on a dominant estate that would benefit form the restriction, thus, it is unenforceable against Mystic.

74.     It is essential that both the benefit and the burden of a real covenant 'touch and concern' the affected parcels of land before it will be considered to run" (emphasis added). Whitinsville Plaza, Inc., 378 Mass at 90 (1979).

75.     Under the "Massachusetts privity" requirement, the party seeking to enforce a restriction must be in privity of estate with the party against whom enforcement is sought. Thus, in Massachusetts not only must there be traditional "horizontal privity" (i.e., the original parties to the restriction must be in privity of estate with one another, which is satisfied by a grantor—grantee relationship), but also, the later parties down the chain of title must be in privity of estate with one another. Id.

76.     The deed restriction placed upon the land by Pharmacia is inapplicable to bind Mystic, where such restriction was not contained within the deed from O'Donnell and there is no privity between Pharmacia and Mystic, nor any dominant estate owned by Pharmacia appurtenant to the Property.

## RELIEF REQUESTED

Wherefore, Mystic and Modern request that a judgment enter against Pharmacia as follows:

1.      That Pharmacia is declared liable to pay for the necessary and appropriate future response costs required to remediate any contaminated soils and groundwater located below the clay cap of tunnel muck at the Property, as well as any contaminated sediments in the vicinity of the Property, to the extent the Massachusetts Department of Environmental Protection may require such remediation to achieve a permanent solution pursuant to a Response Action Outcome at the Property;

2.      That Pharmacia shall pay to Mystic the response costs attributable to response actions assessing the below the clay cap and sediment contamination at the Property through March 2006 in the amount of $223,861.20;

3.      That Mystic and Modern shall pay for the necessary and appropriate response actions to remediate any contaminants found in or above the clay cap at the Property that Massachusetts Department of Environmental Protection shall require be remediated to achieve a permanent solution pursuant to a Response Action Outcome at the Property; and

4.      The parties shall provide the Court with evidence pertinent to the claim for attorney's fees within fourteen (14) days of the entry of this judgment.

Respectfully submitted,

**MYSTIC LANDING, LLC and
MODERN CONTINENTAL CONSTRUCTION
CO., INC.**

By its attorneys:


/s/ Doreen M. Zankowski
Robert G. Flanders, Jr. (BBO #170820)
Doreen M. Zankowski (BBO #558381)
Jeremy Blackowicz (BBO #650945)
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109-1775
DATED:  April 20, 2006          (617) 345-9000

## CERTIFICATE OF SERVICE

I, Doreen M. Zankowski, hereby certify that on this 20th day of April 2006, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

John M. Stevens, Esq.
Adam P. Kahn, Esq.
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts  02210

Mark S. Granger, Esq.
Douglas B. Otto, Esq.
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210

Howard G. Guggenheim
P.O. Box 736
Scituate, MA 02066


/s/ Doreen M. Zankowski