United States District Court
District of Massachusetts

```
                                )
MYSTIC LANDING, LLC,            )
                                )
            Plaintiff,          )
                                )
        v.                      )      Civil Action No.
                                )      04-10180-NMG
PHARMACIA CORPORATION,          )
                                )
            Defendant.          )
                                )
                                )
PHARMACIA CORPORATION,          )
                                )
        Third-Party Plaintiff,  )
                                )
        v.                      )
                                )
MODERN CONTINENTAL              )
CONSTRUCTION CO., INC.,         )
                                )
        Third-Party Defendant.  )
                                )
```

### MEMORANDUM OF DECISION

GORTON, J.

This case involves liability under the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, Mass. Gen. Laws ch. 21E (hereinafter, "Chapter 21E"), for contamination of a parcel of approximately 35 acres in Everett and Boston, Massachusetts ("the Property"). Pursuant to Chapter 21E, § 4A, the current owner of the Property seeks contribution and reimbursement from a prior owner for past and future costs of remediating contamination of the site. The defendant has

-1-

counterclaimed against the current owner and an affiliated party on the grounds that those parties are also liable under Chapter 21E and should, therefore, contribute to any remediation costs.

The parties appeared for a bench trial before this Court on April 10, 11 and 18, 2006.  The Court now publishes its findings of fact and conclusions of law.

## I.   **Findings of Fact**

### A.   **Parties**

1.   Plaintiff, Mystic Landing, LLC ("Mystic"), is a Massachusetts limited liability company that was formed in June, 2001, for the sole purpose of holding title to the Property.

2.   Defendant, Pharmacia Corporation ("Pharmacia"), is a Delaware corporation that was known as the Monsanto Company or Monsanto Chemical Company ("Monsanto") while it owned the Property between 1929 and 1983.

3.   Third-party defendant, Modern Continental Construction Company, Inc. ("Modern"), is a Delaware corporation and an affiliate of Mystic.

### B.   **The Property**

4.   The Property is a 35-acre parcel located primarily in Everett, Massachusetts and bordered on the north by a Massachusetts Bay Transportation Authority facility, on the west by railroad tracks, on the south by the Mystic River and on the east by State Highway 99.

-2-

5. Development and use of the Property began in the 19th century. From 1929 to 1975, Pharmacia used the Property in connection with its chemical manufacturing operations which included production, storage of raw materials and research. Activity on the Property included a) the production of sulfuric acid, nitric acid and acid salts, b) storage of sulfur, bauxite, iron oxides and salt and c) disposal of aluminum sulfate.

6. In 1979, 1980 and 1982, environmental testing of the Property was performed on behalf of Pharmacia. Those tests focused on the site's groundwater and indicated that there was some contamination.

7. Boston Edison Company ("Boston Edison") purchased the Property from Pharmacia in 1983. Prior to that conveyance, Boston Edison was informed of the suspected contamination and hired a private firm to conduct an environmental assessment of the site. Results from that assessment indicated the presence of contaminants including sulfur, sulfates, aluminum, iron and lead.

8. Chapter 21E was enacted and became effective in 1983 and was substantially amended in the early 1990s.

9. O'Donnell Sand & Gravel, Inc. ("OS&G") bought the Property from Boston Edison in 1995 and shortly thereafter sold it for $1 to its president, Mary O'Donnell ("O'Donnell").

10. During the 1990s, earth materials excavated in connection with development of the Massachusetts Water Resources

-3-

Authority tunnel in Boston Harbor were transported to the
Property and deposited across it in varying levels of thickness
(hereinafter, "the tunnel muck").

11.   O'Donnell was notified by the Massachusetts Department
of Environmental Protection ("DEP") in 1996 that the Property was
likely contaminated and, if so, O'Donnell was legally responsible
for assessing and remediating any such contamination.

12.   Modern began using the Property as a "lay-down
facility" in 1996 in connection with the Central Artery/Tunnel
("Big Dig") project pursuant to subcontract and lease agreements
that it entered into with O'Donnell.

13.   Although not fully documented in writing, an agreement
between Modern and O'Donnell provided Modern with an option to
lease or buy the Property.   Pursuant to that agreement, Modern
paid O'Donnell between $4 million and $7 million from 1996 until
2001.

14.   The purchase option was assigned by Modern to Mystic
and Mystic exercised that option and bought the Property from
O'Donnell in June, 2001, for a recited purchase price of
$300,000.

15.   At the time of the purchase, the principals of Mystic
and Modern knew that the Property was contaminated as a result
of, among other things, an environmental site assessment that had
been completed on their behalf in the Spring of 2001.

-4-

16. A bank loan of approximately $10 million, secured by a mortgage on the Property, was obtained by Mystic/Modern.

17. Activities conducted on the Property from 1996 to the present include the breakdown and storage of steel and the storage of some petroleum products. Asbestos-containing materials were stored on the Property while it was owned by Mystic and occupied by Modern.

18. As a result of certain incidents beginning in 2002, the DEP alleged that Modern had failed to comply with Massachusetts regulations relating to solid waste. Modern agreed with the DEP to the entry of an administrative consent order in August, 2005, by which Modern agreed, without conceding liability, to clean up the Property in certain respects and to pay an administrative penalty of $35,000. In November, 2005, the DEP notified Modern that it had not complied with certain aspects of the consent order and, pursuant to the terms of that order, imposed an additional fine.

19. The Property has been and is currently contaminated with hazardous material and oil and requires remediation. More specifically, contamination of the Property includes, but is not limited to, a) the presence of dissolved metals in the groundwater caused by low pH levels and b) contaminants in the soils including lead, arsenic, sulfate, petroleum hydrocarbons and polycyclic aromatic hydrocarbons.

20. Although the tunnel muck has assisted in separating contamination of the surface of the Property from contamination below that material, the tunnel muck was neither impermeable nor uniformly spread across the Property. Consequently, intermixing of soils and at least some pollution above and below the tunnel muck has likely occurred.

21. Pursuant to Chapter 21E, the role of a licensed site professional ("LSP") is to supervise and administer activities for compliance with the statute and regulations promulgated thereunder. LSPs render opinions to the DEP with respect to the existence and extent of environmental contamination, the necessity of remediation and the implementation of cleanup activities. After any necessary remediation has been performed, the LSP files a Response Action Outcome ("RAO") with the DEP to document his/her determination that necessary cleanup has been completed and no further remediation is required.

22. An LSP-of-Record for the Property (not Mr. Hughto) was designated by the DEP when the Property was owned by O'Donnell.

23. Richard Hughto, Ph.D., ("Hughto") is an LSP who began inspecting and performing tests at the Property on behalf of Mystic and/or Modern in 2001. Hughto's environmental assessment included research of the Property's historical use and previous environmental studies. He was not officially designated as the Property's LSP-of-Record until October, 2005.

-6-

24.  R. Duff Collins ("Collins") is an LSP who performed a limited assessment of the environmental status of the Property on behalf of Pharmacia by means of a) two visits to the parcel in 2004 and 2005, b) collection and testing of superficial soils and c) review of relevant documents.

25.  As a practical matter, it is unlikely that the Property will be fully remediated, but even a partial remediation will require, at a minimum, additional testing, treatment of soils and treatment of low pH areas affecting the groundwater.

26.  It is unclear whether treatment of sediments adjacent to the Property will be necessary or required.

27.  The Property is currently on the market for sale. Mystic intends to remediate the contamination while it develops the Property for commercial use.  Mystic/Modern's current financial condition is guarded.  When the Property was purchased, Mystic intended to remediate and develop it with the assistance of and contribution by Pharmacia.

## C.  **Western Parcel**

28.  Pharmacia also owned a parcel adjacent to and west of the Property from 1929 until sometime during the 1990s ("the western parcel").  Pharmacia had used the western parcel more extensively than the Property in its chemical manufacturing operations.

29.  Testing for contamination of the western parcel was

-7-

commenced no later than 1980 and continued into the 1990s.
Implementation of remediation activities on the western parcel
began in the mid-1990s and were concluded in 1997.  The
remediation performed by Pharmacia was required as part of the
terms of a purchase and sale agreement with respect to the
western parcel.

30.  Pharmacia spent approximately $3 million to assess the
contamination of the western parcel and an additional $30 million
to remediate it.

## D.   Response Costs for Property

31.  Mystic and/or Modern have investigated contamination of
the Property by, inter alia, a) researching its historical use,
b) reviewing previously compiled records of environmental testing
and assessment, c) collecting samples of soil and groundwater and
d) testing and analyzing the data collected and have incurred
expenses in excess of $200,000 in connection with that
assessment.

32.  The future cost of necessary remediation is estimated
to be not less than $1.5 million nor more than $15 million.  That
broad range of estimated cost is based upon the Court's
consideration of a) costs anticipated by LSP Hughto, b) cost
estimates provided by LSP Collins, c) the enactment of more
stringent regulations that became effective in April, 2006 (which
significantly increase the costs of remediation), d) valuation of

-8-

the Property as evidenced by the $10 million loan and various
appraisals of and bids to purchase the Property in "clean"
condition and e) the cost of remediation of the western parcel.
The Court's estimate of future costs does not include any costs
for remediation of sediments of adjacent areas.

## II.  Conclusions of Law

### A.  Chapter 21E

1.  Chapter 21E, § 5(a) imposes liability for environmental
contamination upon five categories of persons "without regard to
fault":

> (1) the owner or operator of a vessel or a site from or at
> which there is or has been a release or threat of release of
> oil or hazardous material; (2) any person who at the time of
> storage or disposal of any hazardous material owned or
> operated any site at or upon which such hazardous material
> was stored or disposed of and from which there is or has
> been a release or threat of release of hazardous material;
> (3) any person who by contract, agreement, or otherwise,
> directly or indirectly, arranged for the transport,
> disposal, storage or treatment of hazardous material to or
> in a site or vessel from or at which there is or has been a
> release or threat of release of hazardous material; (4) any
> person who, directly or indirectly, transported any
> hazardous material to transport, disposal, storage or
> treatment vessels or sites from or at which there is or has
> been a release or threat of release of such material; and
> (5) any person who otherwise caused or is legally
> responsible for a release or threat of release of oil or
> hazardous material from a vessel or site.

2.  Chapter 21E, § 4 provides that

> [a]ny person who undertakes a necessary and appropriate
> response action regarding the release or threat of release
> of oil or hazardous material shall be entitled to
> reimbursement from any other person liable ... for the
> reasonable costs of such response action. If two or more
> persons are liable pursuant to section five ... each shall

-9-

be liable to the others for their equitable share of the costs of such response action.

3. When a person commences a civil action against a potentially liable party after undertaking (or intending to undertake) a response action, the court is authorized to award "contribution, reimbursement or the equitable share of liability for which one or more other parties is found to be responsible, if any". Chapter 21E, § 4A.

4. In addition to awarding reimbursement of past response costs, Chapter 21E authorizes courts to issue "a judgment declaring a [responsible party's] liability for all reasonable assessment, containment and removal costs incurred in the future". Redstone v. Signore, No. 924190, 1995 WL 1146177, at *2 (Mass. Super. Ct. Dec. 8, 1995) (citations omitted). See also Mailman's Steam Carpet Cleaning Corp. v. Lizotte, 616 N.E.2d 85, 91 n.8 (Mass. 1993) (enactment of Chapter 21E, § 4A permits parties to obtain contribution prior to beginning response actions). Cf. Am. Cyanid Co. v. Capuano, 381 F.3d 6, 26 (1st Cir. 2004) (district court's entry of monetary judgment for future response costs in CERCLA contribution action was not improper where such costs had been estimated but not determined).

5. Mystic is liable for environmental contamination under Chapter 21E, §§ 5(a)(1) and (a)(2) as the present owner of the Property and as the owner at the time that hazardous material was released.

-10-

6.   Modern is liable for environmental contamination under Chapter 21E, §§ 5(a)(1), (a)(2) and (a)(3) as the present operator of the Property, as an operator at the time that hazardous material was released and as one who directly or indirectly arranged for hazardous material to be deposited on the Property.

7.   Pharmacia is liable for environmental contamination under Chapter 21E, §§ 5(a)(2) and (a)(3) as an owner and operator of the Property at the time that hazardous material was released and as one who arranged for the storage and disposal of hazardous material on the Property.

8.   Mystic has causes of action against Pharmacia under §§ 4 and 4A. It does not, however, have an independent cause of action under § 5(a) because suits by private parties under that section are limited to property damages and the Court has previously determined that Mystic is not entitled to such damages.  See Mystic Landing, LLC v. Pharmacia Corp., 417 F. Supp. 2d 120 (D. Mass. 2006).

9.   Chapter 21E, § 5(b) sets forth certain defenses to liability.   The first paragraph of § 5(b) provides that certain parties may limit their liability where they can distinguish costs attributable to their own activities.  See Olin Corp. v. Fisons PLC, No. Civ. A. 93-11166-MLW, 1995 WL 811961, at *13 (D. Mass. April 24, 1995).   That limitation applies only to parties

-11-

who are liable a) to the Commonwealth or b) to a private party
for property damages or c) to a "good Samaritan" relieved of his
own liability because he was acting at the behest of the DEP.
Cf. Braber v. Pearlman, No. 904861, 1993 WL 818642, at *6 (Mass.
Super. Ct. Sept. 30, 1993) (§ 5(b) inapplicable where defendant
was not subject to cause of action under § 5(a)). The second
paragraph of § 5(b) states that a person liable solely on account
of his present ownership/operator status (§ 5(a)(1)) shall not be
liable to a person who is liable under clauses (a)(2), (3) or
(5).

10. None of the parties in this case is eligible for the
defenses set forth in § 5(b).

**B.   CERCLA**

11. The Massachusetts Oil and Hazardous Material Release
Prevention and Response Act is modeled after the federal
Comprehensive Environmental Response, Compensation, and Liability
Act, 42 U.S.C. § 9601 et seq., ("CERCLA"). Dedham Water Co. v.
Cumberland Farms Dairy, Inc., 889 F.2d 1146, 1156 (1st Cir. 1989)
(citing Sheehy v. Lipton Indus., Inc., 507 N.E.2d 781, 786 (Mass.
App. Ct. 1987)). See also Martignetti v. Haigh-Farr Inc., 680
N.E.2d 1131, 1137 n.12 (Mass. 1997) (stating that the two
statutes "have similar objectives and overlap in coverage").

12. Courts may consider judicial interpretations of CERCLA
to the extent that provisions in that statute are analogous to

-12-

relevant provisions of Chapter 21E and consistent interpretations of the two statutes are desirable. See Martignetti, 680 N.E.2d at 1137 n.12.

## C. Massachusetts Contingency Plan

13. The Massachusetts Contingency Plan ("MCP"), 310 Mass. Code Regs. 40.0001 et seq., comprises DEP regulations designed to implement Chapter 21E including substantive standards, deadlines and procedural requirements.

14. Mystic has not fully complied with the requirements set forth under the MCP. Specifically, Mystic has failed a) to report certain contaminants found to exceed reportable concentration levels, see 310 Mass. Code Regs. 40.0360-40.0362, and b) to meet various deadlines delineated within the MCP, see id. at 40.0560.

15. The Massachusetts Contingency Plan does not require DEP approval of Response Action Outcomes that are filed by LSPs. The DEP is, however, authorized and required to audit a number of response actions annually. See 310 Mass. Code Regs. 40.1101.

## D. Equitable Apportionment of Liability

16. Because Mystic, Modern and Pharmacia are each liable under, at least, § 5(a)(2), each is responsible to the others for its equitable share of reasonable costs incurred in the undertaking of necessary and appropriate response actions for the Property. Under §§ 4 and 4A, the Court may assign equitable

-13-

shares with respect to response costs previously incurred and response costs to be incurred.

17. The Court deems it appropriate in this case to treat Mystic and Modern as a single entity for the purpose of apportioning responsibility under Chapter 21E. Thus, those parties will be considered jointly and severally liable with respect to each other. Cf. Olin Corp., 1995 WL 811961, at *12 ("joint and several liability for a single equitable share may exist in exceptional cases where two or more parties are in some special relationship such as master and servant or principal and agent").

18. In assessing a liable person's "equitable share", the Court need not consult a prescribed list of equitable factors but should determine and weigh relevant considerations on a case-by-case basis. Martignetti, 680 N.E.2d at 1145. Cf. Am. Cyanid Co. v. Capuano, 381 F.3d 6, 19 (1st Cir. 2004) (stating that courts considering CERCLA claims have "broad discretion" to 'allocate response costs among liable parties using such equitable factors as the court determines are appropriate'") (quoting 42 U.S.C. § 9613(f)(1)).

19. Courts undertaking to allocate equitable responsibility under Chapter 21E commonly make reference to the so-called "Gore Factors", which were proposed (but not ultimately adopted) by Congressman Albert Gore in connection with congressional

-14-

consideration of CERCLA in 1980. See, e.g., Martignetti, 680

N.E.2d at 1144 & n.36. The "Gore Factors" include:

> (a)  a party's ability to distinguish releases of hazardous
>      material for which it bears responsibility from
>      releases caused by others;
>
> (b)  the amount of hazardous material involved;
>
> (c)  the toxicity of that material;
>
> (d)  the extent to which a party was involved in the
>      generation, transportation, treatment, storage or
>      disposal of hazardous material;
>
> (e)  the degree of care exercised by a party with respect to
>      the hazardous material at issue; and
>
> (f)  how cooperative the party has been with governmental
>      officials to prevent any harm to the public health or
>      environment.

See, e.g., Juniper Dev. Group v. Kahn (In re Hemingway Transport,

Inc.), 993 F.2d 915, 921 n.4 (1st Cir. 1993) (citation omitted).

20. Courts may also consider the purpose of strict

environmental liability when allocating responsibility. See

Sheehy v. Lipton Indus., Inc., 507 N.E.2d 781, 786 (Mass. App.

Ct. 1987) (considering Chapter 21E's purpose of "compel[ling] the

prompt and efficient cleanup of hazardous material" in explaining

the act's prohibition upon parties from avoiding liability

through artful contracting). See also Gemme v. Applied Envtl.

Technologies, Inc., No. 883261B, 2003 WL 21500549, at *3 (Mass.

Super. Ct. May 31, 2003) (stating that Chapter 21E "should be

liberally construed to effectuate the remedial goals of the

legislature").

21. Amendments to Chapter 21E in 1992 considerably "privatized" the act in order to facilitate cleanup of contaminated sites. See generally Christopher P. Davis, Reinventing Massachusetts' Superfund Law: Privatizing Cleanups Under the 1992 Amendments, 7 Toxics L. Rep. (BNA) 770 (November 25, 1992). Providing incentives for the private remediation of contamination is one of the purposes of Chapter 21E and may be considered by a court in determining equitable allocations of responsibility. Cf. United States v. Kramer, 757 F. Supp. 397, 416 (D.N.J. 1991) (reasoning that any windfall that a potentially responsible party might gain in an action to recover response costs under Section 107 of CERCLA "serves as an incentive for private parties to clean up hazardous waste sites, to risk their own capital initially, knowing that by then prevailing in a section 107 action, they will be reimbursed perhaps in excess of what might be shown in a section 113 action [for contribution] to have been their equitable share").

22. Common law defenses such as "caveat emptor" and "unclean hands" do not shield statutorily liable persons from the obligations of Chapter 21E. Cf. Smith Land & Improvement Corp. v. Celotex Corp., 851 F.2d 86 (3d Cir. 1988) (such defenses do not apply in CERCLA actions).

23. When equitably allocating responsibility, however, courts have discretion to consider the extent to which a

-16-

property's purchase price has been discounted to account for
environmental contamination. Id. at 90. See also W. Properties
Serv. Corp. v. Shell Oil Co., 359 F.3d 678, 691 (9th Cir. 2004)
(possibility of double recovery may be considered as equitable
factor in CERCLA contribution action); Amoco Oil Co v. Borden,
Inc., 889 F.2d 664, 673 (5th Cir. 1990) (stating that "the
circumstances and conditions involved in the property's
conveyance, including the price paid and discounts granted,
should be weighed in allocating response costs") (citing Smith
Land, supra). Cf. Am. Cyanid, 381 F.3d at 20 (courts considering
CERCLA contribution claims may consider settlements of non-
parties in allocating responsibility).

24.  Thus, while courts may appropriately allocate
responsibility in order

> to compensate the purchaser [of a contaminated site] and
> provide him with an incentive for taking the risk and making
> the effort necessary to get the land cleaned up and
> marketable, ... equity might require that the recovery be
> reduced.

W. Properties Serv. Corp., 359 F.3d at 691.

25.  Other equitable factors that may be considered by
courts (and have been by this Court) include the following:

  (a) the likely cost to remediate, see Smith Land, 851 F.2d
      at 90;

  (b) the relative duration of ownership by liable parties,
      see Martignetti, 680 N.E.2d at 1144; AL Tech Specialty
      Steel Corp. v. Allegheny Int'l, Inc. (In re Allegheny
      Int'l, Inc.), 158 B.R. 361, 383 (W.D. Penn. 1993),
      rev'd in part on other grounds, 104 F.3d 601 (3d Cir.

-17-

1997);

(c)  delay by a party that affects remediation, <u>see</u> <u>W.</u>
<u>Properties</u>, 358 F.3d at 692-93 (stating that delay and
laches could be considered as equitable factors even
though they did not constitute statutory defenses to
liability); and

(d)  the extent to which a party has financially benefited
from contaminating activities or stands to benefit from
remediation, <u>see</u> <u>Hatco Corp.</u> v. <u>W.R. Grace & Co.</u>, 836
F. Supp. 1049, 1090 (D.N.J. 1993).

26.  All of the foregoing equitable considerations are
relevant, in varying degrees, to the facts of this case.  The
Court has found particularly significant, however, evidence with
respect to the amount, type and duration of contamination for
which each party bears responsibility.

27.  The Court is aware that its allocation of costs may
significantly impact the remediation that Mystic chooses to
perform and, consequently, the market value of the Property post-
remediation.  <u>Cf.</u> <u>G.J. Leasing Co., Inc.</u> v. <u>Union Elec. Co.</u>, 54
F.3d 379, 386 (7th Cir. 1995) (stating that CERCLA's limitation
to reimbursement for "necessary" response costs was important
because "[w]ithout it there would be no check on the temptation
to improve one's property and charge the expense of improvement
to someone else").

28.  Consideration of Mystic's potential windfall is partly
counterbalanced, however, by other factors including a) the
Court's earlier decision to deny recovery to Mystic for property
damages, b) awareness of the purpose of Chapter 21E to facilitate

cleanup of contaminated sites and c) the extent to which
Pharmacia reaped financial benefits as a result of its
contaminating activities.

29.   The Court also concludes that Mystic's delay in
remediating the Property has resulted in increased costs (because
of, among other reasons, the enactment of more restrictive
regulations under the MCP) but that responsibility for such costs
is somewhat offset by a) Mystic's difficulty in remediating the
Property while it was under active use and b) delay caused by
Pharmacia's failure to negotiate an agreement with Mystic after
Mystic instituted the notification procedure pursuant to Chapter
21E, § 4A in 2001.

30.   After consideration of the evidence presented in this
case, the Court concludes that not more than 90% of the
contamination of the Property was caused by Pharmacia and at
least 10% by Mystic/Modern but that those percentages should be
adjusted to account for the equities of the situation.  Thus, the
Court apportions responsibility for future response costs in
accordance with a sliding scale.

## E.   Incurred Response Costs

31.   In order to obtain reimbursement for response costs it
has already incurred, Mystic bears the burden of demonstrating
that such costs are "reasonable" and that they derived from
"necessary and appropriate response action[s]" which were

causally related to releases by Pharmacia.  John Beaudette, Inc.
v. J.P. Noonan Transp., Inc., 644 N.E.2d 218, 220 (Mass. 1995).

32.   Despite Mystic's noncompliance with the MCP, the Court
concludes that the response actions taken were necessary and
appropriate activities related to releases caused by Pharmacia
and that the costs therefor were reasonable.

33.   There is no indication that full compliance with the
MCP is a statutory condition precedent to recovery of response
costs under Chapter 21E, § 4.  Although Chapter 21E, § 11
provides that violations of the statute or regulations
promulgated thereunder create a presumption of "irreparable harm
to the public health, safety, welfare or the environment", that
presumption is rebuttable by a preponderance of the evidence and
the Court is persuaded that Mystic's noncompliance did not
constitute irreparable harm.  Cf. Gen. Elec. Co. v. Litton Indus.
Automation Sys., Inc., 920 F.2d 1415, 1420 (8th Cir. 1990),
abrogated on unrelated grounds by Key Tronic Corp. v. United
States, 511 U.S. 809 (1994), (noting that the CERCLA provision
imposing liability for response costs incurred that are
"consistent" with the national contingency plan does not require
strict adherence to "the letter" of national regulations)
(citation omitted).

34.   Following from its determination that Pharmacia
ultimately caused not more than 90% of the Property's

-20-

contamination, the Court concludes that Pharmacia should pay 90%
of the response costs incurred by Mystic as of April 7, 2006.
Costs are deemed to have been incurred by Mystic if they derived
from response actions taken with respect to the Property and paid
for by Mystic or on Mystic's behalf (i.e., by Modern or by
counsel for Mystic and Modern).

**F.   Future Response Costs**

35.  In order to allocate responsibility for future response
costs in an equitable manner, taking into account the factors
discussed above, the Court will impose a sliding scale of
responsibility as follows:

| Future Costs | Share of Mystic/Modern | Share of Pharmacia |
|---|---|---|
| 1st $1 million | 50% | 50% |
| 2nd $1 million | 40% | 60% |
| 3rd $1 million | 30% | 70% |
| 4th $1 million | 20% | 80% |
| future costs exceeding $4 million | 10% | 90% |

36.  A sliding scale of responsibility appropriately
accounts for the parties' relative liability for contamination of
the Property with due consideration of a) the fact that the most
recent contamination (and that which is most likely and
necessarily to be remediated first) was caused by Modern, b)
increased remediation costs attributable to the voluntary delay

-21-

of Mystic and/or Modern, c) the extent to which financial considerations may influence Mystic's remediation plan and d) the total consideration paid by Mystic/Modern for the Property and the likely sales price of the Property after substantial remediation.

37. As is required by statute, the future costs for which Pharmacia is responsible are limited to "reasonable" costs associated with "necessary and appropriate" remediation. Chapter 21E, § 4.

38. Because Mystic has not demonstrated that treatment of sediments on and adjacent to the Property will be necessary, the Court's allocation of responsibility does not apply to treatment of sediments.

**ORDER**

In accordance with the foregoing memorandum, judgment will enter as follows:

1) Mystic, Modern and Pharmacia are each liable parties under Chapter 21E, § 5 and are therefore responsible to the others for an equitable share of response costs;

2) Pharmacia is responsible to Mystic for 90% of the response costs incurred by Mystic as of April 7, 2006 (which costs were introduced as evidence at trial); and

3) future response costs are allocated among the parties as follows:

-22-

| Future Costs | Share of Mystic/Modern | Share of Pharmacia |
|---|---|---|
| 1st $1 million | 50% | 50% |
| 2nd $1 million | 40% | 60% |
| 3rd $1 million | 30% | 70% |
| 4th $1 million | 20% | 80% |
| future costs exceeding $4 million | 10% | 90% |

**So ordered.**

Nathaniel M. Gorton
United States District Judge

Dated: June **5**, 2006

-23-