**EXHIBIT A**

28 STATE STREET
BOSTON, MASSACHUSETTS 02109-1775
617 345-9000

FAX: 617 345-9020

## HINCKLEY, ALLEN & SNYDER LLP

*Attorneys at Law*

May 11, 2001

Ms. Mary Cody
Assistant General Counsel
Solutia, Inc.
575 Maryville Centre Drive
St. Louis, MO  63141

### VIA FACSIMILE (314)674-5469 AND FIRST CLASS MAIL

Re:     Former Monsanto Site, Alford St. and Broadway, Everett, MA

Dear Ms. Cody:

Pursuant to the telephone message left for you earlier today and our subsequent discussion, we represent a buyer ("Buyer") that is about to exercise its option to purchase the above-referenced property from Mary O'Donnell. O'Donnell purchased the property from Boston Edison Co., who previously purchased the property from Monsanto. The Buyer expects to develop the site in the near term.

The site is impacted by environmental contamination. The information currently available to the Buyer clearly indicates that the contaminants at the site are the direct result of Monsanto's past operations at the site. Monsanto owned and operated a facility at both the site the Buyer will acquire, and the adjacent site now owned by DDRC Gateway, LLC, a Diversified Development Company. Monsanto previously remediated the Diversified site, which is now operated as a shopping mall. The Buyer would like to meet with you to discuss the site and the necessary remedial actions. The Buyer expects Monsanto, as the responsible party, to perform the remediation.

Please contact either Doreen M. Zankowski or me to discuss this matter and to schedule a meeting in May. We look forward to speaking with you early next week.

Very truly yours,

*G. Petros (DMZ)*

Gerald J. Petros

DMZ/med
cc:     Peter Grela
        Herman Snyder, Esq.
        Joel Lewin, Esq.
        Doreen M. Zankowski, Esq.
        Alan Gottlieb, Esq.

*346283*

**EXHIBIT B**

MCE Everett | Manso PD

1500 FLEET CENTER
PROVIDENCE, RHODE ISLAND 02903-2393
401 274-2000
FAX: 401 277-9600

# HINCKLEY, ALLEN & SNYDER LLP

*Attorneys at Law*

Gerald J. Petros
gpetros@haslaw.com

May 29, 2001

VIA TELECOPIER AND
FIRST CLASS MAIL

Ms. Mary Cody
Assistant General Counsel
Solutia, Inc.
575 Maryville Centre Drive
St. Louis, MO  63141

Re:  Former Monsanto Site, Alford St. and Broadway, Everett, MA

Dear Ms. Cody:

As you know from our conversation on May 11, 2001, our client ("Buyer") is moving forward with plans to develop the Site. The Site, however, contains significant contamination that is the responsibility of Monsanto. In our conversation and in the follow up letter that we sent to you, we invited Monsanto or Solutia, Inc. to sit down with us to discuss Monsanto's responsibility for the Site contamination and consider proposals to address the contamination issues.

We have not heard anything from you, Monsanto or Solutia, Inc. for two weeks now. While Monsanto is under no legal obligation to address these issues in a cooperative fashion, we strongly believe that such an approach is in Monsanto's best interest. If Monsanto wants to meet to discuss the Site issues, please call me before June 1 so that we can make arrangements. Otherwise, the Buyer will pursue its rights and remedies under the law.

Very truly yours,

Gerald J. Petros

GJP:cl

**EXHIBIT C**

JUN -6 2001



Applied Chemistry, Creative Solutions

Solutia Inc.
575 Maryville Centre Drive
St. Louis, Missouri 63141

P.O. Box 66760
St. Louis, Missouri 63166-6760
Tel 314-674-1000

Brent J. Gilhousen
Assistant General Counsel
  Environmental
Tel: 314-674-8504
Fax: 314-674-5588
E-Mail: BJGILH@Solutia.com

June 1, 2001

Gerald J. Petros
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109-1775

Re: Property, Alford Street and Broadway, Everett, MA ("Property")

Dear Mr. Petros:

I am in receipt of your May 11 and May 29, 2001 letters to Mary Cody pertaining to the above-referenced Property. Your client, which I understand to be an affiliate of Modern Continental, has requested a meeting to "discuss" Monsanto's "responsibility" for the contamination on the Property. So that the need for any such meeting can be evaluated further, Solutia requests that your client provide us with certain basic materials. Specifically, please provide me with the following:

1.    All environmental reports, test data, or other documents evidencing the present (or remediation) of oil or hazardous materials on the Property that your client believes in the "responsibility" of Monsanto;

2.    Purchase and Sale Agreement or other transactional documents between your client and the current Property owner and any other transactional documents between the current Property owner and predecessors in title;

3.    The closing date for the sale of the Property to your client and/or to the existing Property owner;

4.    Information regarding current Property use, as well as your client's expected short and long term future use for the Property (including specific development plans, if any);

5.  Evidence or other information giving rise to your belief of Monsanto's "responsibility" for contamination on the Property;

6.  Proposed or existing investigation or remediation plans (and associated cost estimates), whether or not final and whether or not filed with the Massachusetts DEP; and

7.  Evidence of costs incurred by your client or the current owner of the Property (if any) remediating the Property.

Thank you for your attention to this matter. Please contact me if you have any questions.

Sincerely,

Brent J. Gilhousen
Assistant General Counsel
Environmental

Cc:    Mary B. Cody, Esq.

**EXHIBIT D**

46 STATE STREET
BOSTON, MASSACHUSETTS 02109-1775
(617) 242-5000
FAX # 7 5465-9 5)

# HINCKLEY, ALLEN & SNYDER LLP

*Attorneys at Law*

Gerald J. Petros, Esq.
gpetros@haslaw.com

June 8, 2001

VIA FACSIMILE (314)674-5588 AND
FIRST CLASS MAIL

Brent J. Gilhousen, Esquire
Assistant General Counsel, Environmental
Solutia, Inc.
575 Maryville Centre Drive
St. Louis, Missouri 63141

Re:    **Former Monsanto Site
Alford Street, Everett, Massachusetts
~~DEP RTN 3-13341~~**

Dear Mr. Gilhousen:

In response to your letter dated June 6, 2001 regarding the former Monsanto site located at Alford Street in Everett, Massachusetts (the "Site"), we reiterate that on behalf of our client, the Buyer, we are interested in sitting down with you to discuss Monsanto/Solutia's (collectively "Solutia") responsibility for site remediation costs and related damages. To expedite and assist in facilitating such a meeting, we are in the process of drafting a Notification of Response Action Cost Liability letter pursuant to Massachusetts General Laws ch. 21E, § 4A. Much of the information requested in your June 6th letter will be further addressed in the Section 4A Notice Letter. In the meantime, the Buyer has authorized us to share information about the Site's environmental condition and proposed development with Solutia.

The Buyer is considering a plan to develop most of the Site. Within the next thirty (30) days, we will be in a better position to share this plan with Solutia and explain the Site remediation requirements necessary for the proposed development. In order to facilitate our discussions, we suggest that the parties share any information or documentation that they have concerning the Site or the adjacent property, the Gateway Center Mall (formerly the Monsanto Chemical Company) site. The Buyer has retained Rizzo Associates to conduct field investigation studies, including sampling and analysis, and would be willing to provide Solutia with copies of the report. We would also be willing to provide Solutia with historical aerial photographs of the site, as well as Sanborn Fire Insurance maps and Registry of Deed maps and documents that have been obtained for the Buyer by Rizzo Associates. We request that Solutia share any environmental reports, purchase and sale documents or any other pertinent information it

1500 FLEET CENTER  □  PROVIDENCE, RHODE ISLAND 02903-2393  □  401 274-2000  □  FAX: 401 277-9600
350029/DMZ



DEFENDANT'S
EXHIBIT
61

**MONS1 0001765**

JUN. 8. 2001    1:16PM    HINCKLEY, ALLEN, SNIDER 617 345 5020    NO. 3039    P. 2

HINCKLEY, ALLEN & SNYDER LLP

Brent J. Gilhousen, Esq.
June 8, 2001
Page 2 of 2

has concerning the Site or the Gateway Center Mall site.   We ask that Solutia provide us with a copy of the purchase and sale agreement between Solutia and Boston Edison Co. ("BeCo") transferring the Site to BeCo.

Additionally, Solutia may obtain further information requested in the June 6th letter from various public authorities.  Information can be obtained from the Commonwealth of Massachusetts, Department of Environmental Protection, Northeast Regional Office located in Wilmington, Massachusetts.  The DEP Site tracking number for the Site is DEP RTN 3-13341.

As part of the Section 4A demand process, the statute mandates that the parties "confer in good faith in an effort to resolve all disputes that may exist between them with respect to participation in or funding of the response action or other actual or potential liability in question."   We will serve the Section 4A Notice Letter upon Solutia shortly.

We look forward to mutual good faith efforts to resolve this matter.

Very truly yours,

Gerald J. Petros

350029/DMZ

MONS1 0001766

**EXHIBIT E**



**FOLEY HOAG**
ATTORNEYS AT LAW

JUN 2 8 2001

Adam P. Kahn
Boston Office
617.832.1206
akahn@foleyhoag.com

June 27, 2001

**BY HAND**

Gerald J. Petros
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109-1775

      Re:   *Modern Continental Property, Alford Street and Broadway, Everett, MA ("Property")*

Dear Mr. Petros:

      This office represents Monsanto Company ("Monsanto") and Solutia Inc. ("Solutia"). I am in receipt of your letter dated June 8, 2001 to Brent J. Gilhousen and your May 11 and 29, 2001 letters to Mary B. Cody. While Solutia is not necessarily opposed to meeting with your client, we do not believe we can have a meaningful discussion until the basic information previously requested from your client in Mr. Gilhousen's letter of June 1, 2001 is made available. The information requested is critical to our understanding the scope of any required remediation, who has the obligation to pay for such remediation, who needs to be involved in the discussions and for evaluating future courses of action. Moreover, the information can be provided at virtually no cost to your client.

      Although your client has not responded to Mr. Gilhousen's request to identify future development plans, Monsanto and Solutia assume that those plans will be consistent with constraints on future use of the Property, first imposed when Monsanto sold the Property to Boston Edison, and reaffirmed when Boston Edison sold the Property to O'Donnell Sand and Gravel. For example, paragraph "b" of the section entitled "Further Covenants and Conditions" in the Deed from Monsanto to Boston Edison provides that

> EDISON and its successors in title agree, for the benefit of MONSANTO and its successors in title, that the property hereby conveyed shall be used solely for industrial and manufacturing purposes and that the property hereby conveyed shall not be used for retail business, for multi or single family residential purposes, park purposes, recreational uses, food or feed facilities, agricultural or animal uses, even though such purposes may otherwise be

16/339534.2

Gerald J. Petros
June 27, 2001
Page 2

> permitted uses as the above terms are defined respectively
> in the zoning ordinance of the Cities of Boston and
> Everett, Massachusetts...

Paragraph "d" of the Further Covenants and Conditions states expressly that the covenants in the deed run with the land and bind the parties' successors in title, including your client. If we are mistaken in our assumption concerning your client's future use, please advise us.

In addition, although your client is no doubt aware of the information referenced in the DEP files pertaining to environmental conditions at the Property, I am enclosing other materials submitted to the DEP by Boston Edison in 1985 pertaining to the Property. The files pertaining to the remediation of the remainder of Monsanto's former property in Everett are available at the Massachusetts DEP, under file Numbers 3-0313, 3-4200, and 3-4425.

Thank you for your attention to this matter.

Very truly yours,

Adam P. Kahn

APK:pag
Enclosure
cc:    Mary B. Cody, Esq.
       Brent J. Gilhousen, Esq.

16/339534.2

**EXHIBIT F**

28 STATE STREET
BOSTON, MASSACHUSETTS 02109-1775
617 345-9000

FAX: 617 345-9020

## HINCKLEY, ALLEN & SNYDER LLP

*Attorneys at Law*

August 27, 2001

VIA FACSIMILE (908) 901-8379          VIA FACSIMILE (617) 832-7000
AND CERTIFIED MAIL                    AND CERTIFIED MAIL

Fred Hassan, Chairman and CEO         Adam P. Kahn, Esq.
Pharmacia Corporation                 Foley Hoag, LLP
100 Route 206 North                   One Post Office Square
Peapack, NJ 07977                     Boston, MA 02109

Richard T. Collier, Esquire
Pharmacia Corporation
100 Route 206 North
Peapack, NJ 07977

> **Re:    Mass. Gen. Laws ch. 21E, § 4A Demand Letter**
> **Former Monsanto Site**
> **Alford Street, Everett, Massachusetts**
> **DEP RTN 3-13341**

Dear Messrs. Hassan, Collier and Kahn:

On behalf of Mystic Landing, LLC ("Mystic"), this letter constitutes notice, pursuant to Mass. Gen. Laws ch. 21E, § 4A, that Pharmacia Corporation ("Pharmacia") is liable to Mystic for all damages pursuant to Mass. Gen. Laws ch. 21E, § 5, in connection with the release of hazardous material or oil ("OHM") at property located at Alford Street and Broadway, Everett and Boston, Massachusetts (the "Site").

### I.    Person Giving Notice

Pursuant to Mass. Gen. Laws ch. 21E, § 4A(a)(i), the entity providing this notice is Mystic, a limited liability company organized under the laws of the Commonwealth of Massachusetts. Mystic is the current owner of the Site.

### II.    Response Actions Taken

Pursuant to Mass. Gen. Laws ch. 21E, § 4A(a)(ii), to follow is a description of the response actions taken and to be taken at the Site, and the nature and amount of the potential liability.

HINCKLEY, ALLEN & SNYDER LLP

Adam Kahn, Esquire
August 27, 2001
Page 2

### A.    1995 – 1996 Limited Subsurface Investigation

A previous Site owner conducted a limited subsurface investigation of the Site in 1995, consisting of excavating test pits and collecting soil samples for laboratory analysis. The results of the analysis of the soil samples collected from the test pits indicated the presence of elevated concentrations of certain metals and petroleum hydrocarbons. As a result, the then owner submitted a Release Notification Form ("RNF") to the Commonwealth of Massachusetts, Department of Environmental Protection ("DEP") on January 18, 1996. The DEP assigned Release Tracking Number ("RTN") 3-13341 to the Site.

An additional subsurface investigation was conducted at the Site in December 1996, and included the installation and sampling of 7 soil borings/monitoring wells. Concentrations of arsenic and lead were identified in the soil samples at concentrations ranging from 33 to 1,400 milligrams per kilogram (mg/kg) and 630 to 11,000 mg/kg, respectively. In four of the wells, dissolved lead and arsenic were detected at concentrations greater than RCGW-2 reportable concentrations. In general, the highest levels of contamination were identified on the southwestern portion of the Site.

Using the data generated during their subsurface investigation, a Phase I – Initial Site Investigation report was prepared for the Site in January 1997.

### B.    Rizzo Associates Subsurface Investigation

Rizzo Associates performed additional subsurface investigation at the Site in April and May of 2001. The investigation included the installation of 31 shallow soil borings, 10 of which were completed as groundwater monitoring wells, the excavation of 15 test pits, and the collection and laboratory analysis of soil and groundwater samples.

#### 1.    Soil Analysis Results

With respect to the soil at the Site, lead and arsenic were detected at the highest concentrations and with the greatest frequency. Elevated concentrations of mercury, naphthalene, and selected PAHs were identified in selected samples. The following highlights the compounds detected in the soil samples, their general occurrence, and range of detected concentrations.

**Arsenic:** Total arsenic was detected in all of the 44 soil samples submitted for metals analysis, at concentrations ranging from 3.2 mg/kg to 560 mg/kg. The Massachusetts Contingency Plan ("MCP"), 310 CMR 40.0000, Method 1 S-1/GW-2 cleanup standard for arsenic is 30 mg/kg, and the Upper Concentration Limit ("UCL") for arsenic is 300 mg/kg. The average detected arsenic concentration for the samples collected by Rizzo Associates was 67 mg/kg.

357890v1

HINCKLEY, ALLEN & SNYDER LLP

Adam Kahn, Esquire
August 27, 2001
Page 3

**Lead:** Total lead was detected in 42 of the 44 soil samples submitted for analysis, at concentrations ranging from 4.2 mg/kg to 20,000 mg/kg. The MCP Method 1 S-1/GW-2 cleanup standard for lead is 300 mg/kg. The average detected lead concentration for the samples collected by Rizzo Associates was 1,260 mg/kg.

**Other Metals:** Other metals detected in the soil sample collected during the Rizzo Associates investigation included mercury at concentrations ranging from 0.29 to 61 mg/kg (the MCP S-1/GW-2 standard is 10 mg/kg), and selenium at concentrations ranging from 4.8 to 840 mg/kg (the MCP S-1/GW-2 standard is 400 mg/kg). These metals were detected with less frequency than the lead and arsenic, with mercury identified in 25 of the 44 samples submitted and selenium identified in 9 of the 44 samples submitted. The remaining RCRA 8 metals were detected in other soil samples collected at the Site, however, at concentrations below the MCP standards applicable to the Site.

**EPH/ VPH:** EPH target carbon compounds were detected in 38 of the 45 soil samples submitted for laboratory analysis by Rizzo Associates. Although the maximum detected total EPH concentration was 43,240 mg/kg, the average total EPH concentration across the Site was 1,896 mg/kg. VPH target carbon compounds were identified in 2 of the 45 soil samples submitted for analysis. The maximum detected VPH concentration was 4,115 mg/kg. Total EPH concentrations in the surficial soil samples ranged from 32 to 414 mg/kg. VPH target carbon compounds were not detected in the surficial soil samples collected at the Site.

**Polycyclic Aromatic Hydrocarbons:** PAH compounds were identified in 19 of the 45 samples submitted for analysis, with flouranthene being the most frequently detected. Seven of the PAHs were identified at concentrations above their applicable MCP Method 1 S1/GW-2 standards. 2-methylnaphthalene was identified at the highest concentration of all the PAHs (71mg/kg). The PAHs fluoranthene and phenanthrene were detected in one of the surficial soil samples collected at the Site (Boring 18) at concentrations below the MCP S-1/GW-2 standards. No other PAHs were identified in the surficial soils at the Site.

**Volatile Organic Compounds:** Naphthalene was the most frequently detected VOC at the Site, occurring in 13 of the 38 samples submitted for analysis. None of the VOCs identified in the samples exceeded their respective MCP S-1/GW-2 cleanup standards. VOCs were not identified in the surficial soil samples collected at the Site.

### 2.  Groundwater Analysis Results

With respect to groundwater at the Site, elevated concentrations of dissolved lead, arsenic, and cadmium were identified in the wells located on the southwestern portion of

HINCKLEY, ALLEN & SNYDER LLP

Adam Kahn, Esquire
August 27, 2001
Page 4

the Site. The following highlights the compounds detected in the groundwater samples, their general occurrence, and range of detected concentrations.

<u>Arsenic</u>: Dissolved arsenic was detected in 11 of the 16 groundwater samples collected at the Site by Rizzo Associates. Detected arsenic concentrations ranged from 12 to 50,500 ug/L. The average dissolved arsenic concentration identified in the groundwater samples collected by Rizzo Associates is 548 ug/L; the MCP Method 1 GW-3 standard is 400 ug/L

<u>Lead:</u> Dissolved lead was identified in 6 of the 16 groundwater samples submitted for analysis, and was detected at concentrations ranging from 13 to 1,420 ug/L. The average dissolved lead concentration identified in the samples collected by Rizzo Associates is 424 ug/L; the MCP Method 1 GW-3 standard for dissolved lead is 30 ug/L

<u>Other Metals</u>: Dissolved cadmium was identified in 4 of the 16 groundwater samples submitted by Rizzo Associates, with detected concentrations ranging from 11 to 114 ug/L. All of the samples contained dissolved cadmium concentrations at levels above the Method 1 GW-3 standard of 10 ug/L.

<u>EPH/VPH</u>: EPH was identified in 5 of the 16 groundwater samples submitted for analysis. The maximum total EPH concentration was 630 ug/L. None of the identified EPH carbon compounds exceeded their respective Method 1 GW-2 or GW-3 standards. VPH was detected in the groundwater sample at concentrations ranging from 80 ug/L to 20,950 ug/L. No other detectable levels of VPH were identified in the remainder of the groundwater samples submitted for analysis.

<u>Volatile Organic Compounds</u>: Low concentrations of petroleum-related VOCs, including benzene, naphthalene, ethylbenzene, toluene, and xylene, in addition to 1,1,1 trichloroethane and carbon disulfide, were identified in a few of the groundwater samples. None of the identified concentrations of these contaminants exceeded their respective Method 1 standards.

<u>pH:</u> Areas of low pH groundwater were identified during our investigation. Identified pH values ranged from 1.9 to 7.0 standard units ("su"). The wells with the lowest pH readings are generally located on the southern and southwestern portions of the Site. Any liquid that exhibits a pH of less than 2.0 su is considered corrosive, and is labeled as a hazardous material by the MCP.

C.    <u>Future Response Actions</u>

In order to achieve regulatory closure pursuant to the MCP, a Licensed Site Professional ("LSP") must determine that conditions at the Site pose No Significant Risk ("NSR") to public safety, human health, and the environment. In order to determine NSR

HINCKLEY, ALLEN & SNYDER LLP

Adam Kahn, Esquire
August 27, 2001
Page 5

for the Site without the use of an Activity and Use Limitation ("AUL"), concentrations of
soil contaminants need to be reduced to levels below the MCP Method 1 S1/GW-2 and S-
1/GW-3 cleanup standard. Although groundwater contamination is present at the Site,
we have assumed for purposes of future response actions that the excavation of the
contaminated soils in conjunction with dewatering activities may effectively remediate
the groundwater contamination. Please be advised, however, that if groundwater
contamination results in further action, including, but not limited to, pump and treat
activities, the costs associated with such groundwater remediation activities would also
be included in the Permanent Solution.

Based on the nature and extent of the contamination identified at the Site to date,
the following remedial scenario is anticipated to achieve a Permanent Solution at the Site.
The major components of the remedial approach include pre-characterization of the soils
for disposal, excavation and off-site disposal of impacted soils and associated dewatering,
Site restoration, and preparation of all necessary MCP plans, reports and submittals.

- **Pre Characterization Investigation**: A field investigation program would be
  implemented to collect pre-characterization soil samples. These samples would
  be collected from the contaminated fill layer and submitted for laboratory analysis
  for standard disposal parameters. Based on an area of approximately 900,000
  square feet, and an average fill thickness of 6.5 feet, approximately 216,000 cubic
  yards of the fill material are present at the Site. It is estimated that 125,000 cubic
  yards will require disposal.

- **Remedial Field Program**: Once the pre-characterization investigation is
  completed, and the soil disposal options have been evaluated and implemented,
  contaminated soils will be excavated from the Site. Approximately 1,700 cubic
  yards of soil can be excavated and removed from the Site per day. As a result, the
  excavation of 125,000 cubic yards of material is expected to take approximately
  75 days, or 2.5 months.

  During excavation, dewatering activities are likely to be required since the
  expected depth of excavation below the ground surface ("bgs") is approximately
  10 feet, while depth to groundwater varies from 3 to 8 feet bgs. Groundwater at
  the Site is impacted with dissolved metals and petroleum compounds in addition
  to exhibiting a low pH. These factors serve to complicate the treatment of
  extracted groundwater at the Site, which will likely include pH adjustment, metals
  removal and disposal of the resulting metals sludge.

  Once the excavation is completed, confirmatory samples are proposed to be
  collected from the bottom and sidewalls of the excavation. Pending the results of
  the samples, the excavation would be backfilled.

HINCKLEY, ALLEN & SNYDER LLP

Adam Kahn, Esquire
August 27, 2001
Page 6

- **Regulatory Filings**: To implement the response actions described above, several submittals to various federal, state, and municipal agencies will be required. With the completion of the Phase II field activities, a Method 3 Risk Characterization could be prepared to fully characterize the site and specify potential risks at the Site. The implementation of the excavation and dewatering activities would require the preparation of a Release Abatement Measure ("RAM") Plan. Additional approvals from the Boston and Everett Conservation Commissions and each City's respective Board's of Health may be required to complete the work. We are currently reviewing the impact of any Chapter 91 license requirements that may become an issue due to the soil and groundwater contamination remediation activities.

Once the remedial activities have been completed at the Site, a Class A-2 Response Actions Outcome ("RAO") statement would be prepared and submitted to the DEP.

### D.    Estimated Cost and Schedule

At this time, we have estimated the total remedial cost at $17,600,000. This estimate does not include costs to excavate the tunnel muck layer, which is estimated at approximately $150,000. The estimate does not include any costs for groundwater remediation.

The estimated time to the complete this remedial program is approximately 9 to 11 months, which includes 2 months to obtain the required approvals and perform the pre-characterization investigation, 2 months to develop bid specifications and mobilize site operations and prepare soil transportation documents, and 3 to 4 months to implement the field remedial program, and 2 to 3 months to prepare the RAO. Our time estimates assume State and local cooperation regarding any required permits and approvals and no appeals of any approvals.

This is a preliminary estimate that has been made without complete soil disposal parameter information and general assumptions and estimates about the dewatering requirements and costs. Additionally, groundwater treatment has only been factored into our estimate in a very limited manner. The estimated costs for obtaining a Class A-2 RAO for the Site could vary considerably, and Mystic reserves the right to supplement this estimate. The cost of the response actions to date is approximately $90,500. The total cost of response actions is approximately $17,600,000.

### III.    Factual and Legal Basis of Liability

Pharmacia is liable to Mystic for damages as a result of the contamination as the successor entity of Monsanto Company, a former owner/operator of the Site. Pursuant to

HINCKLEY, ALLEN & SNYDER LLP

Adam Kahn, Esquire
August 27, 2001
Page 7

Mass. Gen. Laws. Ch. 21E, §5(a), "any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material . . . shall be liable, without regard to fault . . . to any person for damage to his real or personal property incurred or suffered as a result of such release or threats of release." Pharmacia cannot avoid its liability to Mystic by attempting to convey its liability to another.[1] Nor can Pharmacia avoid liability by attempting to put Solutia in its place.

Monsanto owned and operated the Site at the time the releases of hazardous materials at issue occurred. It is our understanding, based upon documents from the Registry of Deeds of Suffolk and Middlesex, and the Suffolk and Middlesex land court, that Monsanto owned the Site from at least the 1950's to 1983. According to Solutia's documents, on August 18, 1997, Monsanto shareowners approved the spin-off of Monsanto's chemical business as Solutia, Inc., and the new company became independent on September 1, 1997.

It is our understanding that by 1943, the Site had been acquired by the Monsanto Chemical Company. The 1950 Sanborn Insurance Map indicates that large-scale chemical production was taking place over the entire Site. The map indicates that large quantities of sulfur were stored on the southwestern portion of the Site, which was used in the large-scale production of sulfuric acid. Numerous sulfuric acid storage tanks are indicated in the southwestern portion of the Site, adjacent to the railroad tracks. The northern portions of the Site appear to have housed various administration buildings and laboratories for Monsanto.

The source of the metals contamination in the soil is related to the previous use of the Site and the northwesterly abutting property previously owned by Monsanto as a chemical manufacturing facility. The red and green colors observed in the soil at the Site may have been related to the storage of sulfur and the production of sulfuric acid by Monsanto. According to an internal DEP Memorandum regarding the abutting Monsanto property (now the Gateway Center Mall), dated February 5, 1997, DEP staff was told that a material used to dry sulfur for the former sulfuric acid production (most of which appears to have been performed at the Site) contained arsenic and was reportedly used as fill at the Site.

---

[1] Mass. Gen. Laws c. 21E, § 5(f) states that, "No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer liability from the owner or operator of any vessel or site or from any person who may be liable for a release or threat of release of oil or hazardous material under this section, to any other person the liability imposed under this section."

HINCKLEY, ALLEN & SNYDER LLP

Adam Kahn, Esquire
August 27, 2001
Page 8

The petroleum-related contamination identified in the soil samples appears to be the result of a localized release. A review of the Sanborn maps for the Site document the storage of 80,000 gallons of crude oil storage in aboveground tanks. These tanks appear to have fed a boiler house associated with the former Monsanto operations. The source of the elevated areas of PAHs identified at the Site is likely the placement of fill materials containing ash and cinders or residual contamination resulting from the former storage of crude oil at the Site.

The source of the groundwater contamination is related to the historic use of the property as a chemical manufacturing facility and the placement of contaminated fill materials at the Site. Specifically, the areas of highest observed contamination at the Site were areas used to produce sulfuric acid. The Sanborn maps document the storage of in excess of 4 million gallons of acid in aboveground tanks on the central and southwestern portions of the Site through at least as late as 1972. A 5,000-gallon acid storage tank is indicated on the 1972 Sanborn map. This use likely resulted in the areas of low pH groundwater and elevated concentrations of dissolved metals. Elevated metals concentrations correlate with low pH values for groundwater, with the low pH groundwater causing leaching of the metals in the fill and resulting in the high dissolved metals concentrations. In addition, the placement of fill containing tank and still waste bottoms generated during Monsanto's former phthalic anhydride production resulted in low pH groundwater and elevated dissolved metals concentrations at the former Monsanto production area that abuts the Site to the west. Since the Site and the abutting property were once all owned and operated by Monsanto, it is likely that similar wastes have been used as fill at the Site, resulting in the low pH groundwater and dissolved arsenic and lead concentrations observed at the Site.

In general, and more specifically in response to your June 27, 2001 letter, none of the restrictions, covenants, or undertakings (the "Restrictions") in the June 20, 1983 deed from Monsanto to Boston Edison Company ("Edison"), or in the March 6, 1996 deed from Edison to O'Donnell Sand and Gravel, Inc., alters Monsanto's (and thus Solutia's, as Monsanto's corporate successor) liability under applicable environmental laws. Moreover, the Restrictions are irrelevant to the matter at hand, since as a matter of law the Restrictions cannot be enforced by Monsanto, or Solutia, as neither entity presently owns any land that is benefited by the Restrictions.

It is black letter law in Massachusetts that restrictions on land, being restraints on alienation, are highly disfavored. *See Stop & Shop Supermarket Co, v. Urstadt Biddle Properties, Inc.*, 433 Mass 285, 289, 740 N.E.2d 1286, 1289 (2001). This policy is reflected in the several strict requirements that are necessary, under Massachusetts law, for a real covenant, equitable servitude, or other such restriction (hereafter, a "restriction") to be enforceable against a successor to a covenanter's title (i.e., in this case, Mystic is the successor to a covenanter's title, since Mystic is the successor in title

HINCKLEY, ALLEN & SNYDER LLP

Adam Kahn, Esquire
August 27, 2001
Page 9

to Edison and S&G, each of whom covenanted in their respective deeds to adhere to the Restrictions). In the context of this case, chief among these obstacles to the enforceability of a restriction is the doctrine that a restriction for the benefit of a private, non-governmental party will not run with the land if such benefit is "in gross"[2] i.e., the restriction does not benefit (or, to use real property jargon, is not "appurtenant to") a dominant estate owned by the benefited party. *Garland v. Rosenshein*, 420 Mass 319 (1995); *Orenberg v. Horan* (a.k.a. Orenberg v. Johnston) 269 Mass 312 (1929); *Lincoln v. Burrage*, 177 Mass 378 (1901); *Inhabitants of Middlefield v. Church Mills Knitting Co.*, 160 Mass 267 (1894).

When Solutia sold the property abutting the Site (the "Abutting Property") to DDRC Gateway LLC ("DDRC") on or before March 5, 1999, Solutia divested itself of the only land to which the Restrictions are even arguably appurtenant. From that moment on, any benefit Monsanto or Solutia might derive from enforcement of the Restrictions was merely a benefit "in gross." Hence, as of the date of such transfer, the burden[3] of the Restrictions ceased to run, at least with respect to enforcement thereof by either Monsanto or Solutia.[4] Thus, the Restrictions, at least with respect to enforcement by Monsanto or Solutia, did not run with the burdened land when Mary O' Donnell (who had bought the Site from S&G in 1995), sold the Site to Mystic on June 21, 2001.

That neither Monsanto nor Solutia may enforce the Restrictions is also clear from an examination of the "touch and concern" requirement. In Massachusetts, "it is essential that both the benefit and the burden of a real covenant 'touch and concern' the affected parcels of land before it will be considered to run" (emphasis added). *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass 85, 90 (1979). Even assuming, for the purposes of analysis, that the burden of each of the Restrictions "touches and concerns" the Site, nonetheless, since Solutia's sale of the Abutting Property to DDRC, neither Monsanto nor Solutia has owned any parcel of land that the Restrictions arguably "touch and concern." Thus, as of the date of Solutia's sale of the Abutting Property to DDRC, even if the Restrictions did 'touch and concern' on the burdened side, the Restrictions clearly ceased to "touch and concern" on the benefited side, at least with respect to Monsanto and Solutia, whose only benefit from the Restrictions was "in gross." Consequently, due not only to the "in



---

[2] The burden of a restriction also will not run if the benefit is "personal" on the benefited side, which means that the restriction, although benefiting land owned by the covenantee, was not intended by the covenantee to run with that land.

[3] The benefit could not have "run with the land" either, since the benefit as of such date was merely "in gross," as discussed above.

[4] Indeed, it appears that as of such transfer date Monsanto and Solutia lost any right to enforce the Restrictions whatsoever. *See Wolf, Michael A., Powell on Real Property*, Volume 9, Section 60.04[3], p. 60-78 ("As to breaches [of restrictions] occurring subsequent to a complete transfer by the original covenantee, the remedy must be sought by the successor as the real party in interest.")

HINCKLEY, ALLEN & SNYDER LLP

Adam Kahn, Esquire
August 27, 2001
Page 10

gross" doctrine discussed above, but also, due to the "touch and concern" doctrine, the Restrictions ceased to run with the burdened land as of the date of Solutia's sale of the Abutting Property to DDRC, at least with respect to enforcement by Monsanto or Solutia.

The "in gross" doctrine and the "touch and concern" doctrine are merely the two most decisive reasons why neither Monsanto nor Solutia can enforce the Restrictions. Other reasons include, without limitation, the following: (a) it is unclear whether there exists the type of cross-easement scheme necessary to satisfy the "Massachusetts privity" requirement (See *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass 85, 90 (1979)); (b) it does not appear that the Restrictions are enforceable under M.G.L.c. 184, Section 30, and, in particular, the portion thereof severely limiting the enforcement of restrictions in situations where the "continuation of the restriction on the parcel against which enforcement is claimed. . . would impede reasonable use of the land for purposes for which it is most suitable, and would tend to impair the growth of the neighborhood or municipality in a manner inconsistent with the public interest or to contribute to deterioration of properties or to result in decadent or substandard areas or blighted open areas"; (c) with respect to the Restriction regarding indemnification (the "Indemnity Restriction"), it does not clearly appear, either from the language of that Restriction, or from the surrounding circumstances, that the parties intended for the burden of that Restriction to run with the land[5]; and (d) with respect to the Indemnity Restriction, there is no evident reason why an exception should be made to the general policy in Massachusetts of disfavoring the running of affirmative obligations. *Orenberg v. Horan* (a.k.a. Orenberg v. Johnston), 269 Mass 312, 315 (1929) ("(I)t never is to be forgotten that under all circumstances it is an anomaly requiring explanation when an active duty is other than personal, and is attached to land", quoting *Lincoln v. Burrage*, 177 Mass 378, 379-380 (1901)).

## IV.    Conclusion

As the former owner/operator of the Site at the time of the release of hazardous materials, Pharmacia is responsible for all of the response costs and other damages

---

[5] Whereas other Restriction clauses begin with the preamble "EDISON and its successors in title agree, for the benefit of MONSANTO and its successors in title. . ." the Indemnity Restriction begins "EDISON shall at all times indemnify and uphold MONSANTO harmless ..." without mentioning "and its successors in title" after either "EDISON" or "MONSANTO." Moreover, it is reasonable to assume that Monsanto was satisfied with the indemnity so long as it had Edison's credit behind that indemnity, without having to seek the additional credit of unknown successors in title. For its part, Edison presumably would not have wanted the Indemnity Restriction to run with the burdened land, since such running would have severely impacted the future marketability of the land. As for the clause in the deed stating "All of the covenants in this deed shall run with the land and bind and be for the benefit of, as appropriate, the parties' successors in title," this language appears to be mere boilerplate, and is belied by the absence, in the Indemnity Restriction, of any mention of "successors in title."

357890v1

HINCKLEY, ALLEN & SNYDER LLP

Adam Kahn, Esquire
August 27, 2001
Page 11

related to the contamination at the Site. Within forty five days of receipt of this letter, Pharmacia is required by Mass. Gen. Laws ch. 21E, § 4A to (1) indicate whether or not, and if so to what extent, Pharmacia will pay contribution, reimbursement or an equitable share to Mystic, or participate in the performance of the response action or in the discharge of liability pursuant to Chapter 21E, and (2) state with reasonable particularity the legal and factual basis for Pharmacia's response. Chapter 21E further states that within sixty days after Mystic has received Pharmacia's response, Pharmacia and Mystic shall confer in good faith in an effort to resolve all disputes that may exist between them with respect to participation in or funding of the response action or other actual or potential liability in question. Of course, Mystic is certainly willing to expedite this process.

If Pharmacia: (1) fails without a reasonable basis to make a timely response to this notification, (2) does not participate in negotiations or dispute resolution in good faith, or (3) fails without a reasonable basis to enter into or carry out an agreement to perform or participate in the performance of the response action on an equitable basis or pay its equitable share of the costs of such response action or of other liability pursuant to Chapter 21E, Mystic shall be entitled to its litigation costs and attorneys' fees.

This letter constitutes Notice of Liability for Damages pursuant to Mass. Gen. Laws, ch. 21E. Mystic expressly reserves its rights to assert claims based upon other statutory and common law causes of action including, but not limited to CERCLA, negligence and trespass.

We look forward to Solutia's reply.

Very truly yours,

Gerald J. Petros

cc:     Mr. Les Marino
        Mr. Charles Madden
        Mr. Massimo Marino
        Mr. Peter Grela
        Mr. Robert Shepard
        Herman Snyder, Esquire
        Joel Lewin, Esquire
        Doreen M. Zankowski, Esquire
        Alan Gottlieb, Esquire

357890v1

**EXHIBIT G**

**FOLEY**
**HOAG**
ATTORNEYS AT LAW

Adam P. Kahn
Boston Office
617.832.1206
apk@foleyhoag.com

October 12, 2001

**By Hand and Certified Mail, Return Receipt Requested**

Gerald J. Petros, Esq.
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA  02109-1775

Re:    *Response to August 27, 2001 Demand Letter Pursuant to*
*M.G.L. Chapter 21E, Section 4A Mystic Landing, LLC Site*
*Everett and Boston Massachusetts*

Dear Mr. Petros:

This office represents Pharmacia Corporation ("Pharmacia") through its attorney in fact, Solutia Inc. ("Solutia") with respect to the above-referenced demand letter ("Demand") from Mystic Landing, LLC ("Mystic") pertaining to the property located off Chemical Lane in Everett and Boston, Massachusetts (the "Site").

As an initial matter, I note that your client has unreasonably refused to respond to previous written requests for information regarding site conditions, future site use, identified contamination, and other information critical to evaluate this claim. Mystic's failure to provide that information has significantly hampered Pharmacia's attempt to evaluate the information in the Demand and to prepare this response. See, e.g., Brent Gilhousen's letter to you dated June 1, 2001 requesting, *inter alia* all environmental reports, test data or other documents representing the presence of oil or hazardous materials on the site, information regarding property use, proposed or existing investigation and remediation plans. Your letter of June 8, 2001 indicated that by July 8, 2001 your client would be in a position to share such information, but to date we have no concrete information about future use. Moreover, even though Pharmacia has provided Mystic with additional information regarding the Site as requested by Mystic, Pharmacia has even now received no reports from Mystic, only a condensed lawyer's summary of test data.

Although Pharmacia has not been provided with the information it previously requested and needs to fully evaluate this claim, Pharmacia has responded in good faith,

16/342408.3

Gerald J. Petros, Esq.
October 12, 2001
Page 2

but reserves its rights to modify, amend or supplement this response as information
becomes available to it.

## I.    Mystic's Liability for Costs to be Incurred at the Site

Mystic's demand that Pharmacia bear the full share of costs is patently
unreasonable and contrary to established equitable allocation principles. Mystic
purchased the Site with full knowledge of the contamination at a substantial discount
and now proposes an unreasonable, unnecessary, and inappropriate remediation plan.
Under those circumstances, and based on its understanding of the information provided
thus far, Pharmacia is not willing to offer to share in those expenses.

A.    Mystic purchased the Site with full knowledge of the contamination for
far less than its "clean" value and is now attempting to enrich itself at
Pharmacia's expense.

Chapter 21E was not intended to create a profit center for owners of
contaminated property. Mystic's dealings with the prior owner of the Site and with
Pharmacia show that Mystic seeks to be unjustly and improperly enriched under the
auspices of Chapter 21E.

Mystic was well aware of the contamination and bought with full knowledge of
that contamination. Its knowledge came from materials provided by Solutia at Mystic's
request, from publicly available files at the DEP, from the land use restrictions
prohibiting the very use that Mystic now apparently wants to make on the Site, and from
other sources. Armed with that knowledge, Mystic paid almost nothing for this large
parcel and now seeks to recover all of the costs of remediation.

As indicated in documents recorded by Mystic on the Suffolk and Middlesex
County Registry of Deeds, Mystic paid $300,000 for this approximately 36 acre site. By
any stretch of the imagination, this price reflects a dramatic discount from the true value
of the Site.[1]

In March 1999, Mystic's affiliate, Modern Continental Construction
Co./Obayashi (assignor of the Option Agreement pursuant to which Mystic purchased
the Site) recorded a Mortgage of Real Estate on the Middlesex and Suffolk County land
records. The Mortgage recited that the Option Agreement under which Mystic
ultimately purchased the Site had a value of $8 million. Accepting that recital as true,
Mystic purchased the Site at least $7.7 million under fair market value, a discount of

---

[1] Although beyond the scope of a response required under §4A, it is abundantly clear that Mystic's
purchase of the Site at this reduced price and with full knowledge of the contamination present thereon
precludes any viable claim for property damage under §5.

Gerald J. Petros, Esq.
October 12, 2001
Page 3

over 96%, which appears to be attributable to the presence of environmental contamination[2]. To avoid an unjustified windfall, Mystic should be required to bear at least the first $7.7 million in necessary and appropriate response costs simply on the basis of the discount alone and without regard to other equitable factors.

Although Modern Continental's averment of the market value of the Site may be the best indicia of its value, under any cognizable theory Mystic purchased the Site at a dramatic discount. Based on assessors' data, Mystic paid less than 6% of the assessed value of the Site. The Boston section of the Site alone was assessed at $820,800, and the Everett portion was assessed at $4,657,800, for a total of $5,478,600. Prior sales data further confirm the magnitude of the discount obtained by Mystic.

By demanding full cleanup costs from Pharmacia now, Mystic is seeking a double recovery -- first a reduction in price from the prior owner and second a reimbursement of costs that have already been figured into Mystic's purchase price. If the Site were remediated to residential standards at Pharmacia's expense, Mystic would reap a windfall. The 4A process was never intended to accomplish that result.

     B.    Mystic's proposed remediation program is neither "necessary" nor "appropriate" and the associated costs would not be recoverable under Chapter 21E.

Under M.G.L. c. 21E §4, only those response costs that are "necessary" and "appropriate" may be recovered. On its face, the Demand proposes a cleanup that is neither necessary nor appropriate. If Mystic wants to turn its back on rational, reasonable remediation techniques, it can do so, but it cannot expect another party to fund that effort.

Even the minimal, secondhand information in the Demand documents that the claimed costs are neither necessary nor appropriate, and thus would not be recoverable under Chapter 21E. The Demand asserts that Mystic expects to remove all soil from the Site that contains oil or hazardous materials above the Method 1 "S-1" soil standards listed in the Massachusetts Contingency Plan ("MCP"), 310 CMR 40.0000. Those standards are not applicable to most commercial or industrial uses, and indeed are not even required for many residential uses. At a site that has never been used for residential purposes, is surrounded by non-residential uses, is zoned for industrial use (and where residential uses are not permitted under Everett or Boston zoning codes) and which is encumbered by a recorded restriction prohibiting residential (or even commercial) use, such an approach is manifestly unnecessary and inappropriate.

---

[2] Pharmacia specifically denies that the contamination at the Site should have reduced the Site's market value by anything approaching $7.7 million; however, it appears that Mystic was able to obtain a reduction of at least that amount from the seller.

Gerald J. Petros, Esq.
October 12, 2001
Page 4

In selecting the Method 1 S-1 standard as its cleanup benchmark, Mystic has also ignored or overlooked major components of the MCP, such as the Method 3 risk assessment, which may further obviate the need for all or most of the remediation proposed, even if the Site were to be used for residential purposes. Again, if Mystic wants to proceed in that fashion, it cannot expect another to bear the cost.

Based on the limited information provided by Mystic, it is entirely possible that the Site will not require any soil excavation whatsoever to comply with the MCP, much less the wholesale excavation program proposed in the Demand[3]. The Demand summarizes the results apparently obtained by Rizzo Associates. It identifies arsenic, lead, and other metals at the site, but the average concentration of no metal exceeds the Upper Concentration Limit (UCL) specified in the MCP. Similarly, extractable petroleum hydrocarbons (EPH) were reportedly detected in a number of samples, but the concentrations appear well below the UCLs, and depending on the type of EPH detected (information not provided in the Demand), concentrations may even be well below the average residential standard. Volatile petroleum hydrocarbons (VPH) were found in only 2 of 45 samples. Although the Demand asserts that polycyclic aromatic hydrocarbons (PAHs) were detected above "Method 1 S1/GW-2 standards," the only specific concentration cited (for Methylnaphthalene) was below that standard. Moreover, the Demand states further that the PAHs resulted from ash or cinders, which would exclude those PAHs from regulation under the MCP and 21E entirely.

The groundwater results, even as reported in the Demand, similarly do not justify the massive remediation efforts proposed at the Site. Indeed, from the information presented, it appears that an appropriate remediation program for the Site would cost far less than the discount Mystic extracted from the prior owner of the property. As such, Mystic should be required to bear those costs.[4]

C.    Mystic has unclean hands.

The Demand makes no mention of the fact that Mystic or its affiliates at Modern Continental have controlled the site for some time and conducted substantial industrial activities there. Mystic has provided no information regarding those activities, but Pharmacia believes they are of the type that may cause or exacerbate contamination. For example, the Demand makes reference to costs to excavate the "tunnel muck layer" at a

---

[3] Assuming solely for the sake of argument that Mystic is an "innocent party", Mystic's costs -- and therefore its demand -- would be further reduced as a result of the substantial tax benefits from the remediation identified in the Demand. Under Massachusetts law, Mystic may be entitled to a state tax credit of up to 50% of the total remediation cost. Mystic may also be able to avail itself of other federal tax benefits.

[4] Apart from future response costs, Mystic's claim that it has expended in excess of $90,000 for response actions is a bald attempt to seek to have Pharmacia to pay for Mystic's due diligence on the Site. As far as can be determined from the Demand, Mystic has not drafted or submitted a single document to the DEP or otherwise sought any permission to conduct any response actions at the Site.

Gerald J. Petros, Esq.
October 12, 2001
Page 5

cost of $150,000. The "tunnel muck layer" -- whatever that may be -- was certainly not created by Pharmacia and may well be substantially more expensive than the $150,000 referenced in the Demand to remove and may by its mere placement have exacerbated existing contamination. The Demand also does not evaluate the contribution of other owners or operators of the Site, but rather asserts without substantiation that Pharmacia's predecessors caused all of the contamination.

In addition, during the time that Modern Continental has had a relationship with the Site, the Site has not been in compliance with the provisions of Chapter 21E and the MCP. For example, a Phase II report should have been submitted to the Massachusetts DEP more than a year ago, but has not. Mystic's affiliates had substantial control over the Site during that period, yet failed to ensure the Site complied with the very statute it now seeks to enforce against Pharmacia. (In contrast to Mystic's record of environmental compliance at the Site, the Demand does not even allege that Pharmacia's activities at the Site contravened any environmental law.)

## II.    Further information or documentation required to fully evaluate Mystic's claim.

Nearly four months ago, Pharmacia requested a number of items from you so that it could evaluate this then-anticipated claim. To date, we have received only the most general statements through your office. At this time we re-assert our demand and need for that information. Had it been provided when requested, it may have been possible to have a more detailed response at this time. Pharmacia renews its request for this information and has attached a copy of Brent Gilhousen's letter of June 1, 2001 to this letter for your convenience. In addition, in light of the allegations in the Demand, Pharmacia also requests the following information: (1) property appraisals known to or in the possession of Mystic or its affiliates; (2) all reports and test data pertaining to the environmental condition of the Site, and not merely a summary of those reports; (3) detailed development proposals, including the amount of soil that would otherwise need to be excavated or removed as part of development; (4) identities of individuals who worked for Modern Continental (or affiliates) at the Site; (5) all documents evidencing legal and financial arrangements between and among Modern Continental (and affiliates) and Mary O'Donnell or O'Donnell Sand and Gravel as those documents pertain to the Site.

Gerald J. Petros, Esq.
October 12, 2001
Page 6

## Conclusion

Upon receipt of the information to which Pharmacia is legally and equitably entitled pursuant to Chapter 21E Section 4A, Pharmacia is more than willing to confer in good faith to determine whether the dispute between the parties can be resolved. After Pharmacia receives this information, I will contact you promptly so that the parties can arrange for such a meeting.

Very truly yours,

Adam P. Kahn

APK:pag
Enclosure

16/342408.3

**EXHIBIT H**

28 STATE STREET
BOSTON, MASSACHUSETTS 02109-1775
617 345-9000

FAX: 617 345-9020

## HINCKLEY, ALLEN & SNYDER LLP

*Attorneys at Law*

*Doreen M. Zankowski, Esq.*
*E-Mail: dzankowski@haslaw.com*

November 16, 2001

Adam P. Kahn, Esq.
Foley Hoag LLP
One Post Office Square
Boston, Massachusetts 02109

CERTIFIED MAIL/RETURN RECEIPT

Re:     Mystic Landing, LLC Alford Street and Broadway, Everett and Boston, Massachusetts
        Pharmacia/Solutia/Monsanto Letter of October 12, 2001

Dear Mr. Kahn:

As you know, Hinckley, Allen & Snyder LLP represents Mystic Landing, LLC
("Mystic") in its M.G.L. Chapter 21E, Section 4A demand to Pharmacia Corporation
("Pharmacia"), in connection with the release of hazardous material or oil ("OHM") at the
property located at Alford Street and Broadway, Everett and Boston, Massachusetts (the "Site").
Pursuant to M.G.L. Chapter 21E, Section 5, Pharmacia is liable to Mystic for all damages
resulting from the release of OHM.

The purpose of this letter is to respond, in part, to your October 12, 2001 letter wherein
Pharmacia continues to raise immaterial issues in order to avoid or delay conferring in good
faith, with Mystic, in an effort to resolve all disputes that exist with respect to participation in, or
funding of, the response action, or other liability issues associated with release of OHM at the
Site. The issues that are not specifically addressed in this letter would be best addressed in a
meeting between the parties. As we stated in our August 27, 2001 letter, Mystic's representatives
are willing to meet with you and your client to discuss Site remediation and development
activities for the Site.

In addition to information that will be provided at the proposed meeting, Mystic will
continue to provide Pharmacia with information about the Site that is in Mystic's possession. In
response to one of your initial comments, wherein you suggest that Mystic has not responded to
requests for information regarding site conditions, future site use, identified contaminants, and
other information critical to evaluate the claim, we must respond that this comment is without
merit and is merely another attempt at a delay. First, Monsanto owned this site for many years
and has direct knowledge of its activities and related contamination. Further, our August 27,

#369519

HINCKLEY, ALLEN & SNYDER LLP

Adam P. Kahn, Esq.
Page 2
November 16, 2001

2001 letter included detailed information about site contamination issues, as well as all necessary and required information to effectively provide Pharmacia with Notice pursuant M.G.L. 21E, Section 4A. Notwithstanding the foregoing, included with this letter is a copy of the Rizzo Associates Report, dated June 19, 2001, and an addendum thereto dated August 10, 2001. As you will see, Rizzo states unequivocally that the OHM at the Site is due to Monsanto's past activities, thus dispelling your theory that Mystic has unclean hands. The "tunnel muck layer" that you reference in your letter was clean, uncontaminated material. As a matter of fact, the so-called tunnel muck layer may actually have served to control the migration of Monsanto's contaminants from or around the Site. Your numerous references to the tunnel muck layer are made in a vacuum with no understanding that the tunnel muck layer was actually an environmentally prudent stop gap for the Site.

Your letter contains numerous smoke screens in an attempt to delay the inevitable resultant liability of Pharmacia. Your contention that Pharmacia is not responsible for Site remediation because Mystic allegedly purchased the Site at a discount is without any basis in law or fact. Neither Mystic's purchase price, or any potential tax benefit, will serve to shield your client from liability under M.G.L. 21E. Moreover, your comment that a Phase II report should have been submitted to MA DEP more than a year ago simply does not make sense -- Mystic did not own the Site a year ago and therefore was not required to submit the Phase II report. Finally, your comment that Mystic's proposed remediation program is neither necessary nor appropriate is a conclusion that is essentially meaningless and will serve your client no benefit with regard to its liability for Site cleanup costs.

I ask that you and your consultants review the enclosed report and addendum and contact either Gerry Petros or me to arrange a meeting. Any further delays will result in Mystic filing suit and seeking its litigation costs and attorneys' fees as allowed by M.G.L. 21E. Pursuant to the Statute, the parties should confer, in good faith, on or before, December 11, 2001 in an effort to resolve all disputes regarding the Site remediation.

Very truly yours,

Doreen M. Zankowski

DMZ/jds

cc:    G. Petros, Esq.
       J. Lewin, Esq.
       A. Gottlieb, Esq.

#369519

**EXHIBIT I**

28 STATE STREET
BOSTON, MASSACHUSETT
617 345-9000
FAX: 617 345-9020

# HINCKLEY, ALLEN & SNYDER LLP

*Attorneys at Law*

*Doreen M. Zankowski, Esq.*
*E-Mail: dzankowski@haslaw.com*

November 29, 2001

Adam P. Kahn, Esq.
Foley Hoag LLP
One Post Office Square
Boston, Massachusetts 02109

HAND DELIVERED

Re:    Mystic Landing, LLC Alford Street and Broadway, Everett and Boston,
       Massachusetts
       Pharmacia/Solutia/Monsanto Letter of October 12, 2001

Dear Mr. Kahn:

Enclosed please find copies of the Limited Subsurface Investigation Report and
Phase II Field Investigation Report prepared by Rizzo Associates, Inc. concerning the
above-referenced site.

As requested in our previous letters, and as indicated in my e-mail to you today,
the parties should meet as soon as possible to discuss the situation and we could use the
meeting as an opportunity to discuss Mystic's plans for future site development.

Should you have any questions, please call me.

Very truly yours,

Doreen M. Zankowski

DMZ/jds
Enclosures

#371604 v2

**EXHIBIT J**



**FOLEY**
**HOAG**
ATTORNEYS AT LAW

Adam P. Kahn
Boston Office
617.832.1206
akahn@foleyhoag.com

December 6, 2001

*VIA FACSIMILE and U.S. MAIL*
*(617) 345-9020*

Doreen M. Zankowski, Esq.
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109-1775

      Re:   *Mystic Landing LLC: Response to Your Letter of November 16, 2001*

Dear Doreen:

      As you know, the purpose of the Section 4A consultation process is to minimize litigation by encouraging a full and fair disclosure of information and ideas in advance of litigation. Our letter to you of October 12, 2001 represented a good faith effort on the part of Solutia (as attorney in fact to Pharmacia) to explain to Mystic Landing LLC ("Mystic") the additional information it requires and its views as to its responsibility for the contamination at the site in light of the information provided at that time.

      We do not believe that Mystic has made a comparable effort. It was not until November 29, 2001, almost six months after Solutia first made its request, that Mystic provided even a single technical report. Solutia has now received and begun to review the June 19, 2001 and August 10, 2001 reports from Rizzo Associates. At this juncture, however, Solutia and Pharmacia renew their request for <u>all</u> written reports or other documents pertaining to the environmental condition and planned remediation of the site. It is manifestly clear on the face of the Rizzo reports that additional documents exist. For example, the cover letter to the August 10, 2001 report by Rizzo Associates references a July 13, 2001 letter prepared by Goldman Environmental Consultants that must pertain to site cleanup. In addition, we have not been provided with any substantiation of the cost estimate for remediation nor with any remediation scenarios. It is patently unreasonable for Mystic to demand a payment of approximately $18 million without a single piece of paper from an environmental professional justifying the amount of that demand. As we noted in our October 12, 2001 letter, a lawyer's summary of these arguments is no substitute for the actual documents. Pharmacia

15/78920.1

BOSTON  /  One Post Office Square  /  Boston, Massachusetts 02109  /  TEL: 617.832.1000  /  FAX: 617.832.7000
WASHINGTON, DC / 1747 Pennsylvania Ave., NW / Suite 1200 / Washington, DC 20006 / TEL: 202.223.1200 / FAX: 202.785.6687
Foley, Hoag & Eliot LLP                                         www.foleyhoag.com

Doreen M. Zankowski, Esq.
December 6, 2001
Page 2

awaits Mystic's full and complete production of all environmental reports, not simply
those that Mystic itself has deemed relevant. Apart from the Rizzo reports identified
above, we have not received any of the other documents requested in our letter of
October 12, 2001, or our letter of June 1, 2001, nor any explanation as to why Mystic
believes we are not entitled to them. If these documents simply do not exist, please
advise us of that fact as well.

        We have also not received any formal response to our request that Mystic
identify future uses of the property. In our telephone conversation of November 29,
2001, in response to my question, you confirmed that the property was being considered
as a future home of Fenway Park. We were aware of this potential use but only because
it had been reported in the media. You also indicated that your client was considering
alternative developments, including residential, commercial, and marina uses. Even
putting aside the fact that this proposal runs counter to established land use restrictions
and zoning, no remediation plan can logically be evaluated without a consideration of
the future land use. Therefore, we again request documentation of the current land use
development plans. We understand that these plans may change and that they may be
somewhat schematic at present, but we are nonetheless entitled to review what is
available at this time.

        Your letter of November 16 also dismisses without explanation or justification
large portions of Pharmacia's response to Mystic's Section 4A demand letter. For
example, Mystic has not provided any explanation as to why it believes purchasing
property with knowledge of contamination at a multi-million dollar discount is irrelevant
to the 4A process, or why it has any colorable right to recover any costs that are not
necessary, appropriate or in compliance with the MCP. If Pharmacia is incorrect, and
Mystic did not purchase the property at a discount, please advise us how our factual
analysis is incorrect. Similarly, if there is a report prepared by a Licensed Site
Professional indicating that the MCP requires the wholesale stripping of soil from the 35
acre site (Mystic's selected remedy), please provide it. That conclusion is certainly not
reflected in the Rizzo reports.

        As I indicated on the telephone on November 29, 2001, Solutia is willing to
confer with your client in good faith after receiving and having an adequate opportunity
to review the information which Pharmacia has reasonably requested and to which it is
statutorily entitled. The timing of that meeting is largely up to your client and how
quickly it can provide the information that Pharmacia has been requesting now for many
months. It is our view that until such time as this information has been provided, Mystic
will not have complied with its obligations under Section 4A of Chapter 21E, that any

Doreen M. Zankowski, Esq.
December 6, 2001
Page 3

lawsuit would be premature and subject to dismissal, and that Pharmacia would in that event be entitled to its attorneys' fees. Again, if we have requested documentation that does not exist, please advise us of that fact.

Thank you for your attention to this matter. I look forward to receiving the requested information, after which we will work together to schedule a meeting.

Very truly yours,

Adam P. Kahn

APK:pag

**EXHIBIT K**

28 STATE STREET
BOSTON, MASSACHUSETTS 02109-1775
617 345-9000
FAX: 617 345-9020

# HINCKLEY, ALLEN & SNYDER LLP

*Attorneys at Law*

**Doreen M. Zankowski, Esquire**
**E-mail: dzankowski@haslaw.com**

January 11, 2002

VIA FACSIMILE -- LETTER ONLY:  (617) 832-7000
AND FIRST CLASS MAIL

Adam P. Kahn, Esquire
Foley, Hoag & Eliot, LLP
One Post Office Square
Boston, Massachusetts 02109

> Re:    Mystic Landing LLC, Everett, Massachusetts Property
>         Monsanto/Solutia/Pharmacia Responses to Section 4A Demand

Dear Adam:

The purpose of this letter is to request once again that Monsanto/Solutia meet with representatives of Mystic Landing, LLC and its counsel to discuss the future development of the Everett site and to discuss planned remediation activities. As I mentioned to you in our telephone conversations of November 29, 2001, Mystic Landing is readily willing to have its environmental consultants from Rizzo Associates available to answer any questions you or your client may have regarding the information contained in Mystic's Section 4A demand, the Rizzo reports previously provided, or any other questions relating to the environmental investigation and the remediation cost estimates.

The Section 4A letter sent to you on August 27, 2001 had detailed information concerning the contaminants at the site. The Rizzo reports contain detailed results of groundwater and soil sampling activities. To continue to say that we have not provided you with sufficient information is simply a delay tactic. Additionally, you could have obtained information readily available at Massachusetts DEP. We provided you with copies of the Rizzo reports, more than fifty (50) days ago, yet, we still have not heard any substantive comments from you. You have certainly been provided with sufficient information to understand that your client has serious liability exposure for the contamination problems at the site.

In addition to your delay tactics that are simply cloned as requests for further information, you continue to raise as an issue, the property purchase price. As you are very well aware, the purchase price of the property is totally irrelevant for our

HINCKLEY, ALLEN & SNYDER LLP

    Adam P. Kahn, Esquire
    January 11, 2002
    Page 2

    discussions. What Mystic paid for the property does not change in any way
Monsanto/Solutia's liability under MGL 21E. I am sure you are well versed in the
contaminants at the Mystic site, as they are identical to the contamination problem at the
neighboring mall site. Monsanto/Solutia conceded liability for the diversified site. It
should not be a mystery that Monsanto/Solutia is responsible for the site contamination at
the Mystic site.

    Notwithstanding the foregoing, enclosed with this letter is all of the
environmental documentation that Mystic has in its possession concerning the Everett
site. In order to faciliate your review, and circumvent any further delays on your part, I
have researched and located another environmental report prepared by Consulting
Engineers & Scientists, Inc. (CE&S) on behalf of the former Site owner, O'Donnell Sand
& Gravel, Inc. A copy of the CE&S report is enclosed. In addition, a copy of the July
13, 2001 letter prepared by Goldman Environmental Consultants is also enclosed.

    As you will see, the information provided is immaterial and should not have
resulted in your continued delays. We will, however, give you another thirty (30) days to
review the information and establish a meeting with you. If we do not hear from you
within the next thirty days, we will file suit.

    Your continued delay will only serve to harm your client, as Mystic Landing's
only recourse will be to file suit, and we will seek our court costs and attorneys' fees.

    Please let me know if you have any questions.

                            Very truly yours,

                            Doreen M. Zankowski

DMZ:lmm
Enclosures
110580/115353
376330

**EXHIBIT L**



FOLEY
HOAG
ATTORNEYS AT LAW

Adam P. Kahn
Boston Office
617.832.1208
akahn@foleyhoag.com

January 22, 2002

*VIA FACSIMILE and U.S. MAIL*
*(617) 345-9020*

Doreen M. Zankowski, Esq.
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109-1775

     Re:   *Mystic Landing LLC: Response to Your Letter of January 11, 2002*

Dear Doreen:

     With regard to your latest letter, any delay in scheduling a meeting has resulted solely from the refusal by Mystic Landing LLC ("Mystic") to provide information that has been reasonably and repeatedly requested by Solutia to evaluate Mystic's $17 million demand. If the cost estimate is at all meaningful, it must have been based on an assumed remediation and redevelopment plan, neither of which we have seen even in preliminary form.[1]

     Additionally, and without reiterating all of the points made in our previous letters, the circumstances surrounding Mystic's purchase of the property are entirely relevant to the ultimate resolution of Mystic's demand. In the absence of contradiction from you, Solutia will assume that its factual analysis regarding Mystic's purchase of the property presented in our letter of October 12, 2001 is correct and will rely on it in evaluating Mystic's claim.

     Solutia believes that any future meeting would be more productive if Mystic would share details about redevelopment and remediation plans (even if preliminary in scope) in advance of the meeting. Nevertheless, Solutia is willing at this time to meet with representatives of Mystic, including at a minimum you or Mr. Petros, a representative of Rizzo Associates, and an individual (employed by Mystic or one of its

---

[1] Indeed, similar relevant and material issues were raised to Mystic in the letter from Goldman Environmental Consultants ("GEC") attached to your January 11, 2002 correspondence to me. The GEC letter refers to an earlier GEC letter dated July 3, 2001. We have not been provided with a copy of that letter and renew our request here for all documents pertaining to the environmental condition of the property or the remediation plans, including the July 3, 2001 letter. We are entitled to those documents under the §4A process and again urge you to provide them to us now.

16/346989.1

Doreen M. Zankowski, Esq.
Hinckley, Allen & Snyder LLP
January 22, 2002
Page 2

affiliates) familiar with the redevelopment plans at the property. Specifically, Solutia
expects to discuss the status of Mystic's redevelopment plans and remediation strategy,
as well as other issues relevant to our good faith effort to determine whether this matter
can be resolved without litigation. Representatives of Solutia are available to meet in
Boston on February 6, February 7, and February 21, 2001, but we will need to schedule
any meeting by the end of this week to coordinate travel schedules. If these dates are
not workable, please suggest other dates later in February or March.

    Please contact me when you receive this letter to finalize the date and time of the
meeting, confirm meeting attendees, and verify that Mystic will at that time be prepared
to discuss the status of redevelopment and remediation plans.

                                        Very truly yours,

                                        Adam P. Kahn

APK:pag

**EXHIBIT M**

28 STATE STREET
BOSTON, MASSACHUSETTS 02109-1775
617 345-9000
FAX: 617 345-9020

# HINCKLEY, ALLEN & SNYDER LLP

*Attorneys at Law*

> ***Doreen M. Zankowski, Esq.***
> ***dzankowski@haslaw.com***

April 8, 2002

VIA FACSIMILE (617) 832-7000 And First Class Mail

Adam P. Kahn, Esq.
Foley Hoag
One Post Office Square
Boston, Massachusetts  02109

> Re:    Mystic Landing, LLC – Alford and Broadway, Everett, Massachusetts Site
> Monsanto/Solutia/Pharmacia Site

Dear Mr. Kahn:

Pursuant to our discussions at the meeting on February 6, 2002, and as requested in your letter of March 12, 2002, this letter will serve to provide you with the cost estimate and scope of work for obtaining a permanent solution response action outcome statement, with an activity and use limitation ("AUL") relating to the above-referenced Site. This letter will set forth the background, remedial requirements, remedial scenario, pre-characterization investigation plan, remedial field program, regulatory filings, and the estimated cost and schedule, to complete the work to appropriately remediate the Site.

## **Background**

During previous environmental assessments, Rizzo Associates, Inc. and Consulting Engineers and Scientist, Inc. ("CES") have identified elevated concentrations of metals, preliminary arsenic and lead, in the soil and groundwater at the Site. In addition, areas of low pH groundwater have been observed in the groundwater monitoring wells with elevated metals concentrations. Other contaminants identified at the Site include other heavy metals and petroleum-related compounds.

The source of the elevated metal concentrations, low pH groundwater, and petroleum contamination is related to the previous use of the Site as a chemical manufacturing facility and the placement of contaminated fill materials at the Site by Monsanto. The specific source of the contamination appears to be from the sulfuric acid

HINCKLEY, ALLEN & SNYDER LLP

Adam P. Kahn, Esq.
April 8, 2002
Page 2

production and storage facilities operated and maintained at the Site by the Merrimack
and Monsanto Chemical Companies.

### Remedial Requirements

Based on the requirements to obtain a Permanent Solution under the MCP, one
must conclude the conditions at the Site are consistent with a determination of No
Significant Risk ("NSR") to public safety, human health and the environment, before an
RAO can be filed. In order to obtain an NSR determination for the Site without the use
of an AUL, the concentrations of soil contaminants would need to be reduced to levels
beyond the MCP Method 1 S/GW-2 and S-1/GW-3 Standards. Although groundwater
contamination is present at the Site, Rizzo Associates has assumed, for purposes of their
cost estimate, that the excavation of the contaminated soils in conjunction with
dewatering activities would effectively remediate the groundwater contamination. As
you are well aware, Rizzo's assumption could prove incorrect, and the cost to treat the
groundwater could further increase the remediation costs.

### Remedial Scenario

Based on the nature and the extent of the contamination identified at the Site to
date, the following remedial scenario has been developed by Rizzo Associates and such
remedial scenario will most likely ultimately result in a Permanent Solution at the Site.
The major components of the remedial approach would include pre-characterization of
the soils for disposal, removal of the tunnel muck layer, excavation and off-site disposal
of impacted soils and associated dewatering, Site restoration, and preparation of
associated MCP plans, reports, and submittals. The attached spreadsheet prepared by
Rizzo Associates, identifies their assumptions, and calculates volumes and associated
costs for this remedial estimate.

### Pre-Characterization Investigation

A field investigation program would be implemented to collect pre-
characterization soils samples. These samples will be collected from the contaminated
fill layer and submitted to a laboratory for analysis to determine standard disposal
parameters. Soil samples would be collected using a Geoprobe or other similar
equipment. Based on an area of approximately 900,000 sq. ft. and an average fill
thickness of 6.5 ft., Rizzo Associates has estimated that 216,000 cubic yards of the fill
material are present at the Site. Using this information, the appropriate soil disposal
options will be identified and the associated approvals for shipping documents will be
prepared.

For the purposes of the attached, Rizzo Associates has used the existing data to
estimate the types and volumes of soil types at the Site. Four potential soil disposal

388129

HINCKLEY, ALLEN & SNYDER LLP

Adam P. Kahn, Esq.
April 8, 2002
Page 3

options have been defined for the soil at the Site: (i) disposed at an unlined landfill (ii) asphalt batch and recycling, (iii) disposal at a RCRA Subtitle D facility, and (iv) disposal as hazardous waste. Rizzo Associates has assumed that the soil with contaminant levels below the MCP RCS-1 Reportable Concentrations will remain on Site. This volume has been subtracted by Rizzo Associates from the total volume of contaminated fill at the Site. Once the estimate is adjusted, taking into consideration the soil remaining on Site, Rizzo has estimated that 125,000 cubic yards will require some form of disposal.

### Remedial Field Program

Once the pre-characterization investigation is completed and the soil disposal options have been evaluated and implemented, contaminated soils will be excavated from the Site. Prior to the excavation of the impacted soils, the tunnel muck layer at the Site will be removed and stocked piled on a portion of the property. Rizzo has estimated that the average thickness of the tunnel muck is approximately 3.5 feet. Since approximately 40 percent of the Site will not require excavation (since the soils are below RCS-1) Rizzo has estimated that approximately 70,000 of cubic yards of tunnel muck will be displaced.

Once the tunnel muck has been removed, the excavation of the contamination of the fill at the Site can be performed. Rizzo Associates has assumed that 1,700 cubic yards of soil can be excavated and removed from the Site per day. As a result, the excavation of 125,000 cubic yards of material is expected to take approximately 75 days, or 3.5 months.

During excavation, dewatering activities are likely to be required since the expected depth of excavation below the ground surface (bgs) is approximately 10 feet, while depth of groundwater varies from three to 8 feet (bgs). Groundwater at the Site is contaminated with dissolved metals and petroleum compounds in addition to exhibiting a low pH. These factors serve to complicate the treatment of extracted groundwater at the Site, which would likely include pH adjustment, metals removal and disposal of the resulting metal sludge. Groundwater remedial costs and assumptions are included in the attached spreadsheet, prepared by Rizzo Associates.

Once the excavation is completed, confirmatory samples will be collected from the bottom inside walls of the excavation. Pending the results of the samples, the excavation will be backfilled using the tunnel muck and clean fill brought to the Site.

### Regulatory Filings

To implement the work described above, several submittals to various Federal, State, and Municipal agencies would be required. With the completion of the Phase II field activities, a method free risk characterization will be prepared by Rizzo to fully characterize the potential risks at the Site. The implementation of the excavation and

HINCKLEY, ALLEN & SNYDER LLP

Adam P. Kahn, Esq.
April 8, 2002
Page 4

dewatering activities would require the preparation of a release abatement measure
(RAM) plan. Additional approvals from the Everett Conservation Commission and
Everett's Board of Health, and the Boston Boards or Commissions having local authority,
may be required to complete the work. Cost to prepare the submittals and obtain the
required permits have been included in the attached cost estimate.

Once the remedial activities have been completed at the Site, a Class A-2 RAO
Would be prepared and submitted to MA DEP. Cost to prepare and file the RAO have
also been included in the estimate.

### Estimated Cost and Schedule

As previously reported to you, the total estimated remedial cost is $17,500,000.
This estimate does not include cost to excavate the tunnel muck layer, which is estimated
at approximately $150,000. A breakdown of the individual cost, prepared by Rizzo
Associates, is attached hereto, along with the general conditions and assumptions made
by Rizzo. The estimated time to complete this remedial program is approximately nine to
eleven months, which includes two months to obtain the required approvals and perform
the pre-characterization investigation; two months to develop appropriate bid
specifications and mobilize Site operations and prepare soil transportation documents;
and three to four months to implement the filed remedial program; and two to three
months to prepare the RAO.

This is a preliminary estimate that has been developed without complete soil
disposal parameter information and is based upon general assumptions and estimates
about the dewatering requirements and costs. The estimated costs for obtaining a Class
A-2 RAO for the Site could vary from that described herein and could actually increase
dramatically depending on dewatering and groundwater impacts.

Please review the enclosed information with your client and let me know if you
have any questions. Additionally, if you and your client would like to meet with
representatives of Mystic Landing and Rizzo Associates to go over the details of the
estimate, we would welcome such a meeting.

I look forward to hearing from you soon.

Very truly yours,

Doreen M. Zankowski

DMZ:lmm
Enclosures

388129

HINCKLEY, ALLEN & SNYDER LLP
    Adam P. Kahn, Esq.
    April 8, 2002
    Page 5


    cc:    Gerald J. Petros, Esq.

388129

# Remedial Cost Estimation Spreadsheet
## Off-Site Disposal of All Soil
(Note - Numbers in the boxes are variable, and require input by user)

| | | |
|---|---|---|
| Estimated Area of Excacavation | 900,000 | square feet |
| Estimated Depth of Excavation          (Excludes excavation of tunnel muck) | 6.5 | feet |
| Total number of samples | 59 | samples |
| Percentage of Debris in Soil | 2 | percent |
| | | |
| Number of samples that would classify as unregulated waste | 25 | samples |
| Number of samples that would be suitable for use as daily cover at an unlined landfill | 8 | samples |
| Number of samples that would require RCRA Subtitle D disposal | 3 | samples |
| Number of samples that would be suitable for asphalt batching/lined landfill disposal | 20 | samples |
| Number of samples that would be classified as TCLP hazardous waste | 3 | samples |
| (Note - total must equal value in on line 11) | 59 | |

Unit Costs

| | | |
|---|---|---|
| Transport and Disposal of Unregulated Waste | $10.00 | ton |
| Transport and Disposal for Daily Cover at an Unlined Landfill | $20.00 | ton |
| Transport and Disposal for Asphalt Batch or Lined Landfill | $45.00 | ton |
| Transport and Disposal for RCRA Subtitle D Disposal | $75.00 | ton |
| Transport and Disposal of TCLP Hazardous Waste | $200.00 | ton |
| Transport and Disposal of Debris | $15.00 | cubic yard |
| | | |
| Backfill (Gravel burrow, transport and compact) | $20.00 | ton |
| | | |
| Excavator | $1,500 | per day |
| Front End Loader | $1,200 | per day |
| Screener | $500 | per day |
| Mob/Demob (L.S.) | $1,000 | lump sum |
| | | |
| Number of Days Estimated for Completion | 62 | days |
| Number of Excavators on Site | 2 | each |
| Number of Loaders on Site | 2 | each |
| Number of Screeners on Site | 2 | each |

## Calculated Volume for Each Soil Category

| | | |
|---|---|---|
| Total Gross Estimated Volume of Soil | 216,450 | cubic yards |
| Total Gross Estimated Amount of Soil | 324,675 | tons |
| | | |
| Unregulated Waste (Below RCS-1 Material) | 137,574 | tons |
| Daily Cover at Unlined Landfill | 44,024 | tons |
| Asphalt Batch or Lined Landfill | 110,059 | tons |
| RCRA Subtitle D Disposal | 16,509 | tons |
| TCLP Hazardous Waste | 16,509 | tons |
| Debris | 4,329 | cubic yards |
| Backfill Volume (Assumes that tunnel muck will be used as backfill) | 57,500 | cubic yards |
| | | |
| Total Volume of Soil for Disposal (Assumes that Below RCS-1 Material Will Remain) | 187,101 | tons |
| | 124,734 | cubic yards |

## Estimated Off-Site Soil Disposal Costs
Estimated Cost for Off-Site Transport and Disposal of Soil

## Remedial Cost Estimation Spreadsheet

| | |
|---|---|
| Daily Cover at Unlined Landfill | $880,475 |
| Asphalt Batch/Lined Landfill | $4,952,669 |
| RCRA Subtitle D Disposal | $1,238,167 |
| TCLP Hazardous Waste | $3,301,780 |
| Debris Disposal | $64,935 |
| **Total Off-Site Disposal Costs** | **$10,438,026** |

### Excavation Cost Estimate
Estimated Soil Management Costs

| | |
|---|---|
| Excavator | $187,101 |
| Loader | $149,681 |
| Screener | $62,367 |
| Mob/Demob | $1,600 |
| **Total** | **$400,748** |

## Total Estimated Costs

| | |
|---|---|
| Excavation | $400,748 |
| Transport and Disposal | $10,438,026 |
| Laboratory Analysis | $352,500 |
| Dewatering | $205,000 |
| Backfill | $1,150,000 |
| *Subtotal* | *$12,546,275* |
| 15% Engineering | $1,913,307 |
| **SubTotal** | **$14,459,581** |
| 20% Contingency | $2,891,916 |
| **Total Estimated Cost** | **$17,351,498** |

Notes:

Soil classified as unregulated waste contains contaminants with concentrations less than Method 1 Cleanup Standards applicable to the Site.
Soil classified as suitable for disposal at as Daily Cover must meet the DEP criteria for an UNLINED landfill
Soil classified as suitable for asphalt batching must meet facility requirements or for disposal at a LINED landfill must meet DEP criteria.
Debris are assumed to be originally part of the unregulated soil volume, and the calculated value for unregulated soil volume reflects subtraction of the debris volume.

Days to complete assumes the excavation of 850 cubic yards of soil per day per excavator

Soil disposal costs do not assume that below RCS-1 material will be excavated.

Dewatering Costs

Assume 75 days to excavate and 35 of those will require dewatering          (Approximately 2 months)
Assume 300 GPM discharge for 8hr day - 144,000 GPD X 35 days = 5,040,000 gallons

Treatment involves pH addition to neutralize corrosive groundwater problem and metals removal. Additional polishing of effluent using ion exchange process. Resulting sludge will require dewatering and disposal.

Assume that 3 drums of sludge are generated per day = .8 cubic yards of sludge per day X 35 = 28 cubic yards or 42 tons of sludge

Assume that 1 gallon of NaOH will treat 100 gallons of water

Costs:

| | | |
|---|---|---|
| Frac tank rentals (4 tanks @ 500/month each) | 2 month duration | $4,000 |
| Pumping Equipment  (Extraction and Mixing) | | $15,000 |
| Well Point Installation | | $20,000 |
| Sludge Removal          (Plate and Filter press) | | $32,000 |
| Ion Exchange (Rental) | $2,500 month | $5,000 |
| Ion Exchange (Regeneration) | $6,000 lump sump  (Assume 3 generations) | $18,000 |
| Piping and Miscellaneous | | $10,000 |
| NaOH  50,400 gallons @ $1 gallon | | $50,400 |
| Sludge Disposal (42 tons @ $220/ton) | | $9,240 |
| Subtotal | | $163,640 |
| 25 % Contingency | | $40,910 |
| Total | | $204,550 |

**EXHIBIT N**



**FOLEY**
**HOAG**
ATTORNEYS AT LAW

Adam P. Kahn
Boston Office
617.832.1206
akahn@foleyhoag.com

May 6, 2002

### Confidential Settlement Communication

### Via Fax and U.S. Mail

Doreen M. Zankowski, Esq.
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA  02109-1775

> Re: *Mystic Landing LLC:  Confidential Settlement Offer*

Dear Doreen:

I have been authorized to make the following offer, which is made expressly in the context of settlement and on the understanding that the offer does not constitute an admission of any fact or liability for the claims asserted by Mystic Landing LLC ("Mystic").

In exchange for full and complete releases of all claims that Mystic has or may have against Monsanto, Solutia, Pharmacia, or any related entity, Solutia is willing to purchase the Mystic property in Boston and Everett for $300,000, the amount Mystic paid for the property only a few months ago.  Solutia, as the new owner of the site, would conduct any remediation required by law and would not look to Mystic or its affiliates to contribute to the site remediation, except to the extent that Mystic or its affiliates caused or contributed to the contamination.

This offer, if accepted, is subject to final confirmation in a form of a more detailed settlement and release agreement.  It will remain open until May 31, 2002, unless it is withdrawn earlier in writing by Solutia.

Very truly yours,

Adam P. Kahn

16/351059.1

BOSTON  /  One Post Office Square  /  Boston, Massachusetts 02109  /  TEL: 617.832.1000  /  FAX: 617.832.7000
WASHINGTON, DC / 1747 Pennsylvania Ave., NW / Suite 1200 / Washington, DC 20006 / TEL: 202.223.1200 / FAX: 202.785.6687
Foley, Hoag & Eliot LLP                                                                                          www.foleyhoag.com

**EXHIBIT O**

28 STATE STREET
BOSTON, MASSACHUSETTS 02109-1775
617 345-9000

FAX: 617 345-9020

# HINCKLEY, ALLEN & SNYDER LLP

*Attorneys at Law*

*Doreen M. Zankowski, Esq.*
*dzankowski@haslaw.com*

May 31, 2002

CONFIDENTIAL SETTLEMENT COMMUNICATION

VIA FACSIMILE (617) 832-7000 AND FIRST CLASS MAIL

Adam P. Kahn, Esq.
Foley Hoag
155 Seaport Boulevard
Boston, Massachusetts  02210

Re:   Mystic Landing, LLC:  Response to Confidential Settlement Offer

Dear Adam:

In response to your offer letter of May 6, 2002, Mystic Landing, LLC ("Mystic") rejects your client's, Solutia/Monsanto/Pharmacia's ("Solutia") offer of $300,000 to settle all of the claims Mystic has against Solutia regarding the Alford Street property located in Everett and Boston, Massachusetts.  The Alford Street site ("Site") is highly contaminated with constituents that mirror the operations of Monsanto when the Site was owned and operated by Monsanto, and the contamination issues are identical to the situation on the neighboring property (the Mall), which Monsanto assumed full liability for its cleanup.

Your logic is flawed in that Solutia's offer to settle for $300,000 is premised on what you continue to erroneously believe was Mystic's purchase price for the property.  The $300,000 you continue to refer to was merely consideration paid by Mystic to exercise an option to purchase the Site.  *As you are well aware*, Mystic paid millions of dollars for the property.

When we last spoke, we agreed that when Solutia was provided with Rizzo Associates' remediation estimates for the proposed ballfield, as well as the mixed-use development scenario, the parties would meet soon thereafter in a further attempt to resolve the matter.  Please be advised that I will be forwarding you the remediation

HINCKLEY, ALLEN & SNYDER LLP

    Adam P. Kahn, Esq.
    May 31, 2002
    Page 2

    estimates next week. I suggest that we set aside a time to meet during the week of June 17, 2002. Let me know if this will work with Solutia's and your schedules.

        Mystic continues to reserve all of its legal rights and remedies with regard to this matter.

        I look forward to hearing from you.

                           Very truly yours,

                           Doreen M. Zankowski

DMZ:lmm

396198
110580.114009