**EXHIBIT P**



**FOLEY HOAG LLP**
ATTORNEYS AT LAW

Adam P. Kahn
Boston Office
617.832.1206
akahn@foleyhoag.com

June 12, 2002

**Confidential Settlement Communication**
**Via Facsimile and U.S. Mail**

Doreen M. Zankowski
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA  02109

    Re:  ***Mystic Landing, LLC: Your Letter of May 31, 2002***

Dear Doreen:

   I was disappointed to receive your letter of May 31, 2002 rejecting Solutia's settlement offer. The offer as presented would relieve your client of 100% of the remediation-related costs at the site (excluding costs caused or exacerbated by your client or its affiliates) as well as reimburse your client for the entire purchase price for the property.

   Your letter asserts without corroboration that I am "well aware" that Mystic paid "millions" for the property. I am aware of no such fact. Although Solutia made repeated requests for documents relating to the transaction between Mystic and Mary O'Donnell, Mystic refused that request. More importantly, I am not aware of any document that could substantiate the assertion in your letter. The quitclaim deed between Ms. O'Donnell and Mystic states that the property was transferred "in full consideration of $300,000, receipt of which is hereby acknowledged." Contrary to the assertion in your letter, neither this deed nor any other document we were able to locate on the land records contains any reference whatsoever to any additional consideration paid by Mystic "to exercise an option to purchase the site." Moreover, I assume the stated sales price is correct, given that it is a criminal violation in Massachusetts to knowingly fail to state the true and full sales price in the deed, and thereby underpay the deed excise tax due. If you have any contrary information, I again urge you to bring it to my attention so that Solutia can consider it during these settlement negotiations.

   Solutia would still be willing to work with you to determine whether an amicable resolution to this matter can be achieved. To that end, Solutia hereby extends its offer for an additional sixty days from today. If its offer remains unacceptable to Mystic, Solutia would consider reasonable alternative proposals from Mystic.

16/352223.1

Doreen M. Zankowski
June 12, 2002
Page 2

In terms of timing, Solutia's representative, Gerald Rinaldi, is unavailable most
of the remainder of June, including the week of June 17 during which you proposed
another meeting, as well as the first two weeks of July. I will be out of the office on
vacation from July 19 through July 26. Given these schedules and the fact that we have
not received the follow-up estimate from Rizzo Associates referenced in your May 31
letter, we will not be able to meet the week of June 17. If we receive the Rizzo estimate
in the reasonably near future, then we will work diligently to try to arrange a mutually
convenient time to speak in August. Please advise as to when we should expect the
Rizzo estimate and the availability of you or your client in August.

Very truly yours,

Adam P. Kahn

APK:pag



RECEIVED

JUN 1 3 2002

HINCKLEY, ALLEN &
SNYDER

16/352223.1

**EXHIBIT Q**

28 STATE STREET
BOSTON, MASSACHUSETTS 02109-1775
617 345-9000
FAX: 617 345-9020

## HINCKLEY, ALLEN & SNYDER LLP

*Attorneys at Law*

*Doreen M. Zankowski*
*dzankowski@haslaw.com*

August 27, 2002

<u>VIA FACSIMILE ( 617) 832-7000 AND FIRST CLASS MAIL</u>

Adam P. Kahn, Esq.
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210

      Re:    Mystic Landing, LLC: Your Letter of June 12, 2002

Dear Adam:

      I received your June 12, 2002 letter, in which you restated Solutia's earlier settlement offer to buy back the property at $300,000, but also acknowledged Solutia's willingness to entertain "reasonable alternative proposals" from Mystic.

      Mystic is similarly willing to engage in further negotiations. Towards that end I have enclosed herewith those remediation estimates prepared by Rizzo Associates, Inc. that you had requested in your letter. As indicated by your request for these estimates, the true focus of our negotiation is a settlement price that corresponds to the estimated cost to remediate the property. Despite the space devoted in your June 12 letter to the matter of the $300,000 purchase price, that issue is a red herring that will not advance settlement talks. In the first place, that issue is irrelevant, because you do not appear to be seriously contesting that Mystic spent many millions to acquire the property; rather, your contention appears to be that those many millions were not properly stated in the deed's recital of consideration. How much Mystic spent to acquire the site perhaps has some relevance to settlement talks, but the probity of the deed consideration clearly has no relevance at all. That is an issue involving the rights and interests of The Commonwealth, not the rights and interests of Solutia. In any event, the consideration cited in the deed was <u>not</u> incorrect. At the time that the deed was recorded, only the amount recited changed hands. From a larger, functional, and economic perspective, there was a more complicated process, beginning several years prior to Mystic's actual decision to buy the property, which might be characterized as a mix of lease financing and option payments. However, we are unaware of any binding precedent that requires the fairly simple language of the deed excise statute to be interpreted as applying to these option payments. The option payments were not an evasion of the deed excise

15  FLEET CENTER  LI  PROVIDENCE, RHODE ISLAND 02903-2393  L  401 274-2000  LI  FAX: 401 277-9600
43 MAIN STREET  :: CONCORD, NEW HAMPSHIRE 03301-3744  LI  603 225-4334  LI  FAX: 603 224-8350

HINCKLEY, ALLEN & SNYDER LLP

Adam P. Kahn, Esq.
August 27, 2002
Page 2

statute, but rather, had independent business purpose. Again, however, we reiterate that this issue is simply irrelevant. Any further dwelling on this matter will only serve to derail the prospect that Mystic and Solutia can come to a mutually satisfactory settlement. Accordingly, I urge you to focus on the issue of the remediation estimates.

As mentioned, those remediation estimates are enclosed herewith. I previously supplied you with the the estimates concerning remediation of the property to residential standards. The enclosed estimates are for (A) remediation for development of a major league baseball park, and (B) remediation for development of a mixed use project. More specifically, "Ballpark – Scenario A" refers to the development of a ballpark, located in the center of the site; "Ballpark – Scenario B" refers to development of a ballpark in the center of the site, and, in the western portion of the site, construction of three multi-story residential buildings and an associated parking structure; and, "Mixed Use Development " refers to development of two multi-story office buildings, three multi-story residential buildings, and three multi-level parking structures, with integrated retail and residential space.

In addition to the Ballpark and Mixed Use Development scenarios, Rizzo Associates, Inc. has prepared a remedial estimate for sediment excavation and disposal. The enclosed estimate (C) is Rizzo's evaluation of the potential remedial costs associated with the excavation, characterization, management and disposal of potentially impacted sediments from the portions of the Mystic River that abut the property. As you are very well aware, the issue concerning the sediments is a potential unknown from a remedial cost perspective.

Please let me know when, in September 2002, Solutia would be available to meet with Mystic.

Very truly yours,

Doreen M. Zankowski

DMZ:lmm
Enclosures

cc:     Robert Shepard

**A**

# Modern Everett Estimated Remedial Costs

**Ballpark - Scenario A**

### Additional Investigation / Phase II/III MCP Submittals

| | |
|---|---:|
| Additional Subsurface Investigation | $15,000 |
| Method 3 Risk Characterization | $10,000 |
| Prepare Phase II / III Report | $20,000 |
| Prepare RAM Plan | $5,000 |
| Con Comm Costs (Phase II Work only) | $8,000 |

### Pre Characterization Investigation

| | |
|---|---:|
| Analytical Costs | $430,000 |
| Engineering Costs | $80,000 |

### Soil Management and Disposal (see attached sheet)

| | |
|---|---:|
| Disposal Costs | $6,000,000 |
| Engineering Costs | $225,000 |

### Groundwater Remediation (see attached sheet)

| | |
|---|---:|
| Implementation of Groundwater Remedial Program | $450,000 |
| Excavation Dewatering Treatment Costs | $285,000 |

### MCP Submittal Costs

| | |
|---|---:|
| MCP Phase IV - Remedy Implementation Plan | $15,000 |
| Response Action Outcome w Activity and Use Limitation | $15,000 |
| Bill of Lading Submittal | $10,000 |
| RAM Documents | $10,000 |
| ConComm Filings (MCP Activities Only) | $20,000 |

| | |
|---|---:|
| **SubTotal** | $7,598,000 |
| 25% Contingency | $1,899,500 |
| **Total** | **$9,497,500** |

# Modern Everett Estimated Remedial Costs
**Ballpark - Scenario B**

### Additional Investigation / Phase II/III MCP Submittals

| | |
|---|---|
| Additional Subsurface Investigation | $15,000 |
| Method 3 Risk Characterization | $10,000 |
| Prepare Phase II / III Report | $20,000 |
| Prepare RAM Plan | $5,000 |

### Pre Characterization Investigation

| | |
|---|---|
| Analytical Costs | $468,500 |
| Engineering Costs | $90,000 |

### Soil Management and Disposal (see attached sheet)

| | |
|---|---|
| Disposal Costs | $7,200,000 |
| Engineering Costs | $275,000 |

### Groundwater Remediation (see attached sheet)

| | |
|---|---|
| Excavation Dewatering Treatment Costs | $445,000 |

### MCP Submittal Costs

| | |
|---|---|
| MCP Phase IV - Remedy Implementation Plan | $15,000 |
| Response Action Outcome w Activity and Use Limitation | $15,000 |
| Bill of Lading Submittal | $10,000 |
| RAM Documents | $10,000 |
| ConComm Filings | $20,000 |

| | |
|---|---|
| **SubTotal** | **$8,598,500** |
| 25% Contingency | $2,149,625 |
| **Total** | **$10,748,125** |

## Ballpark Scenario A
## Mystic Landing - Everett, Massachusetts

|  | Cubic Yards | Tons |
|---|---|---|
| Total Estimated Volume | 306,000 | 459,000 |
| Estimated Volume of Contaminated Fill | 92,000 | 138,000 |
| Estimated Volume of Tunnel Muck / Native Soils | 214,000 | 321,000 |
| Estimated Days Required to Excavate[1] | 204 | |

| Soil Disposal Classification | Percentage[2] | Tons[3] | Unit Cost (per ton) | Total Cost |
|---|---|---|---|---|
| **Unregulated (Below RCS-1)** | 41 | 56,580 | $15 | $848,700 |
| **Asphalt Batching** | 24 | 33,120 | $50 | $1,656,000 |
| **Unlined Landfill (cover material)** | 15 | 20,700 | $30 | $621,000 |
| **RCRA Subtitle D Disposal (lined in-state landfill)** | 15 | 20,700 | $75 | $1,552,500 |
| **Hazardous Waste** | 5 | 6,900 | $190 | $1,311,000 |
| **Total Estimated Disposal Cost** | | | | $5,989,200 |

1- Assumes 1,500 cubic yards per day can be moved off site.

2- Percentages based on previous soil sample collection and analysis results

3 - Assumes 1.5tons/cubic yard

4 - All wastes generated will not incur off-spec charges and sufficient disposal site capacity is available for the cost estimates provided.

## Estimated Dewatering Costs

Based on previous groundwater sample collection and analysis, treatment of extracted groundwater from the excavation activities is assumed only to require GAC treatment to remove VOCs and influent water is low in suspended solids (< 20 mg/L total solids). Removal of metals and/or pH correction is assumed not to be required.

In addition, this cost assumes extraction of groundwater only (no intrusion from the Mystic River). Assumes that contractor will minimize groundwater inflow to excavation with the use of sheeting and excavation controls to achieve a 50 GPM maximum flow into the system.

One 21,000-gallon fractionation tank
2 - 1,000 lb GAC units
Assume that dewatering is needed for 110 days (5 months) of the 200 days estimated to dig the excavation, discharge rate = 50 GPM

Costs:

| | |
|---|---|
| Frac Tank Rental ($800/month X 5 months) | $4,000 |
| GAC System Rental (4,500 / week X 5 months) | $90,000 |
| GAC Changeout (disposal and rebed) 4 times @ $3,400 each | $13,600 |
| System Decontamination | $3,000 |
| Mobilization / Demobilization | $10,000 |
| NPDES Permit and Monitoring | $20,000 |
| Operator (@$45/hour) | $118,000 |
| **Subtotal** | **$258,600** |
| 10% misc materials | $25,860 |
| **Total** | **$284,460** |

GPM - Gallons per minute
GAC - granular activated carbon

## Ballpark Scenario B
## Mystic Landing - Everett, Massachusetts

|  | Cubic Yards | Tons |
|---|---|---|
| Estimated Volume (ballpark) | 306,000 | 459,000 |
| Estimated Volume (residential buildings) | 110,000 | 165,000 |
| Estimated Total Volume Displaced | 416,000 | 624,000 |
| Estimated Volume of Contaminated Fill | 110,300 | 165,450 |
| Estimated Volume of Tunnel Muck / Native Soils | 305,700 | 458,550 |
| Estimated Days Required to Excavate[1] | 280 | |

| Soil Disposal Classification | Percentage[2] | Tons[3] | Unit Cost (per ton) | Total Cost |
|---|---|---|---|---|
| **Unregulated (Below RCS-1)** | 41 | 67,835 | $15 | $1,017,518 |
| **Asphalt Batching** | 24 | 39,708 | $50 | $1,985,400 |
| **Unlined Landfill (cover material)** | 15 | 24,818 | $30 | $744,525 |
| **RCRA Subtitle D Disposal (in-state lined landfill)** | 15 | 24,818 | $75 | $1,861,313 |
| **Hazardous Waste** | 5 | 8,273 | $190 | $1,571,775 |
| **Total Estimated Disposal Cost** | | | | $7,180,530 |

1- Assumes 1,500 cubic yards per day can be moved off site.

2- Percentages based on previous soil sample collection and analysis results

3 - Assumes 1.5tons/cubic yard

4 - All wastes generated will not incur off-spec charges and sufficient disposal site

# Mystic Landing - Everett, Massachusetts
## Ballpark Scenario B - Dewatering Costs

### Estimated Dewatering Costs for Ballpark Only

Based on previous groundwater sample collection and analysis, treatment of extracted groundwater from the
excavation activities is assumed only to require GAC treatment to remove VOCs and influent water is low in suspended solids (< 20 mg/L total solids).
Removal of metals and/or pH correction is assumed not to be required.

In addition, this cost assumes extraction of groundwater only (no intrusion from the Mystic River). Assumes that contractor will minimize
groundwater inflow to excavation with the use of sheeting and excavation controls to achieve a 50 GPM maximum flow into the system.

One 21,000-gallon fractionation tank
2 - 1,000 lb GAC units
Assume that dewatering is needed for 110 days (5 months) of the 200 days estimated to dig the excavation, discharge rate = 50 GPM

Costs:

| | |
|---|---:|
| Frac Tank Rental ($800/month X 5 months) | $4,000 |
| GAC System Rental (4,500 / week X 5 months) | $90,000 |
| GAC Changeout (disposal and rebed) 4 times @ $3,400 each | $13,600 |
| System Decontamination | $3,000 |
| Mobilization / Demobilization | $10,000 |
| NPDES Permit and Monitoring | $20,000 |
| Operator (@$45/hour) | $118,000 |
| **Subtotal** | **$258,600** |
| 10% misc materials | $25,860 |
| **Total** | **$284,460** |

### Estimated Dewatering Costs for Residential Buildings Only

Dewatering at the Site will likely involve the use of pH adjustment to correct the low pH groundwater areas and to
precipitate out the metals dissolved in the groundwater at the Site. Treatment involves the use of caustic soda to
raise the pH and initiate the precipitation of the metals. Treatment occurs the first of three 21,000-gallon fractionation tanks
staged at the Site. Water passes through two subsequent tanks where primary settling of the precipitate settles out. Effluent
is polished through a sand filter bed and granulated activated carbon (GAC). Costs assume treatment to MCP GW-3 standards
and discharge of treated water to Site groundwater at the Site (not in the river). Treatment assumes low suspended solids in influent
and that there is no requirement for dewatering / pressing solids or the use of polymers, sedimentation, and/or flocculation.

These costs assume operation of a treatment system sized for a 50 gallon per minute (GPM) flow rate continuously for 40 days
(two months). Total volume to be treated is estimated at 2,880,000 gallons

### Equipment Costs

| | |
|---|---:|
| Fractionation Tank Rental (3 tanks for 2 months @ $800/month) | $4,800 |
| Mobilization / Demobilization | $10,000 |
| Sand Bed Rental ($6,500/month) | $13,000 |
| GAC Rental (2 - 1,000 lb units @ $4,500/week) | $18,000 |
| Temporary Storage (1.5MG @ $0.02/gallon) | $28,800 |
| Decontaminate Frac Tanks (3 @ $4,500 each) | $13,500 |
| RCRA Sludge Disposal (15 drums @ $400/drum) | $6,000 |
| Sand Disposal (RCRA Waste) | $1,800 |
| Cabon Changeouts (2) including disposal and rebed | $6,800 |
| Caustic Soda (10 drums @ $400/drum) | $4,000 |
| **Subtotal** | **$106,700** |
| Misc Materials | $10,000 |
| | $116,700 |

### Operation and Maintenance Costs

| | |
|---|---:|
| Full time operator (40 days @ $45/hr) | $43,200 |
| **Total** | **$159,900** |

| | |
|---|---:|
| **Total Estimated Dewatering Costs:** | **$444,360** |

**B**

# Modern Everett Estimated Remedial Costs
### Mixed Use Development

**Additional Investigation / Phase II/III MCP Submittals**

| | |
|---|---:|
| Additional Subsurface Investigation | $15,000 |
| Method 3 Risk Characterization | $10,000 |
| Prepare Phase II / III Report | $20,000 |
| Prepare RAM Plan | $5,000 |
| ConComm Costs (MCP related activities) | $8,000 |

**Pre Characterization Investigation**

| | |
|---|---:|
| Analytical Costs | $245,000 |
| Drilling Costs | $28,000 |
| Engineering Costs | $30,000 |

**Soil Management and Disposal (see attached sheet)**

| | |
|---|---:|
| Disposal Costs | $4,700,000 |
| Engineering Costs | $145,000 |

**Dewatering Treatment Costs (see attached sheet)**

| | |
|---|---:|
| Equipment Costs (includes disposal of waste products) | $122,000 |
| Operation and Maintenance | $70,200 |

**MCP Submittal Costs**

| | |
|---|---:|
| MCP Phase IV - Remedy Implementation Plan | $10,000 |
| Response Action Outcome w Activity and Use Limitation | $20,000 |
| Bill of Lading Submittal | $10,000 |
| RAM Documents | $10,000 |
| ConComm Costs (MCP activities only) | $20,000 |

| | |
|---|---:|
| **SubTotal** | **$5,468,200** |
| 25% Contingency | $1,367,050 |
| **Total** | **$6,835,250** |

Mixed Use .          - Soil Disposal Costs
Mystic Landing - Everett, Massachusetts

|  | Cubic Yards | Tons |
|---|---|---|
| Total Estimated Volume | 175,500 | 263,250 |
| Estimated Volume of Contaminated Fill | 70,200 | 105,950 |
| Estimated Volume of Tunnel Muck / Native Soils | 105,300 | 157,300 |
| Estimated Days Required to Excavate[1] | 117 | |

105300

| Soil Disposal Classification | Percentage[2] | Tons[3] | Unit Cost (per ton) | Total Cost |
|---|---|---|---|---|
| Unregulated (Below RCS-1) | 41 | 43,173 | $15 | $647,595 |
| Asphalt Batching | 24 | 25,272 | $50 | $1,263,600 |
| Unlined Landfill (cover material) | 15 | 15,795 | $30 | $473,850 |
| RCRA Subtitle D Disposal (in-state lined landfill) | 15 | 15,795 | $75 | $1,184,625 |
| Hazardous Waste (includes UCL soils) | 5 | 5,915 | $190 | $1,123,850 |
| | | | | $4,693,520 |

| Total Estimated Disposal Cost | $4,693,520 |
|---|---|

1- Assumes 1,500 cubic yards per day can be moved off site.
2- Percentages based on previous soil sample collection and analysis results
3 - Assumes 1.5tons/cubic yard
4- All wastes generated will not incur off-spec charges and sufficient disposal site
capacity is available for the cost estimate provided.

# Modern Everett Estimated Dewatering Treatment Costs
## - Mixed Use Development

**Estimated Dewatering Costs:**

Dewatering at the Site will likely involve the use of pH adjustment to correct the low pH groundwater areas and to precipitate out the metals dissolved in the groundwater at the Site. Treatment involves the use of caustic soda to raise the pH and initiate the precipitation of the metals. Treatment occurs the first of three 21,000-gallon fractionation tanks staged at the Site. Water passes through two subsequent tanks where primary settling of the precipitate settles out. Effluent is polished through a sand filter bed and granulated activated carbon (GAC). Costs assume treatment to MCP GW-3 standards and discharge of treated water to Site groundwater at the Site (not in the river). Treatment assumes low suspended solids in influent and that there is no requirement for dewatering / pressing solids or the use of polymers, sedimentation, and/or flocculation.

These costs assume operation of a treatment system sized for a 50 gallon per minute (GPM) flow rate continuously for three months (65 days). Estimate treatment of 4.3 million gallons of water.

**Equipment Costs**

| | |
|---|---|
| Fractionation Tank Rental (3 tanks for 3 months @ $800/month) | $7,200 |
| Mobilization / Demobilization | $10,000 |
| Sand Bed Rental ($6,500/month) | $19,500 |
| GAC Rental (2 - 1,000 lb units @ $3,600/month) | $10,800 |
| Temporary Storage (1.5MG @ $0.02/gallon) | $28,800 |
| Decontaminate Frac Tanks (3 @ $4,500 each) | $13,500 |
| RCRA Sludge Disposal (30 drums @ $400/drum) | $12,000 |
| Sand Bed Disposal (4 changes) | $2,400 |
| Carbon Disposal (4,000 lbs @ $0.30/lb) | $1,200 |
| Caustic Soda (15 drums @ $400/drum) | $6,000 |
| **Subtotal** | $111,400 |
| Misc Materials | $10,000 |
| | $121,400 |

**Operation and Maintenance Costs**

| | |
|---|---|
| Full time operator (20 days @ $45/hr) | $70,200 |

**Total** **$191,600**

C

# Mystic Landing - Everett, Massachusetts

**Sediment Management and Disposal Costs**

Excavate, characterize, manage, and dispose of approximately 20,000 cubic yards of impacted sediments

**Permitting Costs:**
Costs associated with the permitting to allow excavation of impacted sediments from the Mystic River
Restoration costs not included, are assumed part of Site development costs                                    $100,000

**Excavation costs: Assume only 500 cubic yards can be moved per day due to difficulty related to excavation of sediment vs. soil.**

| | |
|---|---:|
| Estimated duration 20,000 cubic yards / 500 cubic yards per day = 40 days | |
| Excavator with crew: $3,000/day X 40 days | $120,000 |
| Loader with Operator: $800/day X 40 days | $32,000 |
| Sheeting Rig Mobilization / Demobilization | $10,000 |
| Sheeting Costs (assume install and salvage) | $105,000 |
| Excavation oversight $1,000/day X 40 days | $40,000 |
| Additional soil handling charges $1,000/day X 15 days | $15,000 |
| Barges (3) @ $2,000/day/each for 16 days | $96,000 |
| Mobilization / Demobilization | $10,000 |
| Subtotal | $428,000 |
| 10% Misc Materials Cost | $42,800 |
| Total Estimated Excavation Cost | $470,800 |

**Precharacterization costs: Assume soil will be stockpiled then tested.**

| | |
|---|---:|
| One suite of samples for every 500 cubic yards = 40 samples | |
| $700 per sample X 40 samples | $28,000 |
| Soil disposal coordination and documentation | $20,000 |
| | $48,000 |

**Disposal Costs: Assume that sediment is primarily comprised of marine clay with a dry weight of approximately 0.9 tons/cubic yard**

| | |
|---|---:|
| 20,000 cubic yards X 0.9 tons per cubic yard (dry) = 18,000 tons | |
| Disposal at unlined landfill 18,000 tons X $30/ton | $540,000 |
| Disposal at RCRA D facility 18,000 tons X $75/ton | $1,350,000 |
| Disposal as a RCRA hazardous waste 18,000 tons X $190/ton | $3,420,000 |
| Engineering Oversight of Material Loading (assume 1,500 cubic yards per day @ $1,000/day) | $15,000 |

| | |
|---|---:|
| **Total Estimated Costs - Disposal at an Unlined Landfill** | $1,173,800 |
| **30% Contingency** | $352,140 |
| **Total Estimated Cost** | $1,525,940 |
| | |
| **Total Estimated Costs - Disposal at a RCRA D Facility** | $1,983,800 |
| **30% Contingency** | $595,140 |
| **Total Estimated Cost** | $2,578,940 |
| | |
| **Total Estimated Costs - Disposal at as a RCRA Hazardous Waste** | $4,053,800 |
| **30% Contingency** | $1,216,140 |
| **Total Estimated Cost** | $5,269,940 |

Sheeting costs are based on 250 linear feet of sheeting driven 30 feet deep. Assume that 25 linear feet can be driven per day
250 lf X 30 feet = 7500 square feet X $14 square foot = $105,000

**EXHIBIT R**



**FOLEY**
**HOAG** LLP
ATTORNEYS AT LAW

Adam P. Kahn
Boston Office
617.832.1206
akahn@foleyhoag.com

September 12, 2002

*VIA FACSIMILE and U.S. MAIL*
*(617) 345-9020*

Doreen M. Zankowski
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA  02109

   Re: *Mystic Landing: Your Letter of August 27, 2002*

Dear Doreen:

   I apologize if there has been a misunderstanding on Mystic's part regarding our prior correspondence pertaining to Mystic's $300,000 payment for the purchase of the Everett/Boston property. To be clear, Solutia does "seriously contest" your unsupported assertion that Mystic spent "many millions to acquire the property." We have requested on a number of occasions any document that supports a purchase price of greater than $300,000. That request, which we reiterate today, has been repeatedly refused (see, for example your March 18, 2002 letter to me). Solutia believes further that the issue of Mystic's payment for the property is a necessary part of any settlement discussion because Mystic should not expect to reap a windfall by paying next to nothing for a large piece of contaminated property and then avoiding the remediation costs. If settlement discussions continue, Solutia has no intention of dropping this issue, or of relegating it to the back burner.

   Solutia has begun its review of the cost calculations enclosed in your August 27 letter. So that we can continue that review, please confirm that the ballpark plans are the same as those which were provided to us on February 6, 2002, and that the mixed use development is the same as you provided me in your letter of April 26, 2002. Based on our initial review, although the current cost estimates are approximately half of the previous one, it appears that a significant amount of the claimed future costs still relate to site development issues, rather than representing necessary and appropriate response costs.

16/355751.1

BOSTON  /  155 Seaport Boulevard  /  Boston, Massachusetts 02210  /  TEL: 617.832.1000  /  FAX: 617.832.7000
WASHINGTON, DC  /  1747 Pennsylvania Ave., NW  /  Suite 1200  /  Washington, DC 20006  /  TEL: 202.223.1200  /  FAX: 202.785.6687
Foley Hoag LLP                          www.foleyhoag.com

Doreen M. Zankowski
Hinckley, Alley & Snyder LLP
September 12, 2002
Page 2

      To continue to investigate whether this matter can be resolved amicably, Solutia
would be willing to meet with representatives of Mystic Landing in Boston. Jerry
Rinaldi from Solutia and I are available on the following dates: October 8 (afternoon
only), October 9, October 15, October 16, and October 17. Please advise which of these
dates are acceptable (or, if none, please propose alternative dates later in October). I
suggest that we meet at our offices and request that a representative from Rizzo
Associates familiar with the cost estimates be present. If Mystic has any specific
settlement proposals for discussion at that meeting, I request that they be provided to me
as soon as possible and in any event at least one week prior to the meeting.

      I look forward to hearing from you soon.

                         Very truly yours,

                         Adam P. Kahn

APK:pag
cc:    G.M. Rinaldi

**EXHIBIT S**

28 STATE STREET
BOSTON, MASSACHUSETTS 02109-1775
617 345-9000
FAX: 617 345-9020

# HINCKLEY, ALLEN & SNYDER LLP

*Attorneys at Law*

*D. M. Zankowski, Esq.*
*dzankowski@haslaw.com*

October 10, 2003

Confidential Information
Settlement Use Only
Work Product Protected

VIA FACSIMILE (617) 832-7000 AND
FIRST CLASS MAIL

Adam P. Kahn, Esq.
Foley Hoag
155 Seaport Boulevard
Boston, Massachusetts 02210

Re:    Mystic Landing, LLC and Monsanto/Solutia/Pharmacia
Alford Street, Everett, MA Property

Dear Adam:

Attached please find another copy of the Rizzo Associates, Inc. Remedial Cost Estimate for the above-referenced Property. As we discussed, Rizzo's Cost Estimate is based on Mystic Landing's current development plans for the Property. Currently, Mystic Landing is in the process of obtaining all necessary permits to develop the Property as show on the plan referenced in the Rizzo Cost Estimate letter.

If you have not done so already, I encourage you to immediately review the enclosed Estimate with your client and let me know as soon as possible if your client has any desire to meet to discuss the remediation costs and your client's liability for the remediation. Mystic Landing is at the conclusion of discussions pursuant to the Mass. Gen. Laws ch. 21E, § 4A process.

Please let me know if you have any questions.

Very truly yours,

Doreen M. Zankowski

DMZ/mle
Attachment

August ___ 2003

***Privileged and Confidential – Attorney/Client Work Product***

Ms. Doreen Zankowski, Esq.
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109-1775

**Re:    Remedial Cost Estimate**
**Mixed Use Scenario**
**Mystic Landing Development Scenario**
**Everett, Massachusetts**

Dear Ms. Zankowski:

Rizzo Associates, Inc. is pleased to present this preliminary remedial cost estimate for the above-referenced property in Everett, Massachusetts (the Site). For this estimate, we have evaluated potential remedial costs associated with a mixed residential and commercial/retail use of the Site. The costs contained herein are based on the development scenario shown on a plan entitled *Mystic River Landing,* prepared by Carr Lynch Sandell & Denig Partners, Inc, dated April 10, 2003. Based on our conversations, this cost estimate assumes a four foot depth of excavation for the majority of the buildings proposed at the site. For two of the buildings, the 6 story labeled "Block F" and the 7 story building labeled "Block H", we have assumed a 20 foot deep excavation to facilitate construction of subgrade parking facilities.

## Background

Previous environmental assessments by Rizzo Associates, Inc. and Consulting Engineers and Scientists, Inc. (CES) have identified elevated concentrations of metals, primarily arsenic and lead, in the soil and groundwater at the Site. The soil contaminants generally occur in a layer of fill materials that averages approximately 6 feet in thickness and the majority of the Site is capped with a low permeability layer of tunnel muck that averages 4 feet in thickness. In addition, areas of low pH groundwater have been observed in the groundwater monitoring wells with elevated metals concentrations. Other contaminants identified at the Site property include other heavy metals and petroleum-related compounds.

The source of the elevated metals concentrations, low pH groundwater, and petroleum contamination is related to the previous use of the Site property as a chemical manufacturing facility and the placement of contaminated fill materials at the Site by the chemical

*Privileged and Confidential – Attorney/Client Work Product*
Ms. Doreen Zankowski
August 1, 2003
Page 2

manufacturers. The specific source of the contamination appears to be the former sulfuric acid production and storage at the Site by the Merrimac and Monsanto Chemical Companies.

Currently, the Site is classified as a Tier II Disposal Site under the Massachusetts Contingency Plan (MCP) 310 CMR 40.0000. The Tier Classification documents were submitted to the Department of Environmental Protection (DEP) in January 1997, a Phase II – Comprehensive Site Assessment and Phase III – Remedial Action Plan or a Response Action Outcome were due to the DEP in January 1999. The Phase IV – Remedy Implementation Plan (RIP) was due to the DEP in January 2000, and an RAO or Temporary Solution was due in January 2001. As a result, the Site is out of compliance with the MCP requirements. Therefore, it is likely that the DEP would require the submission of a Tier II Extension Application and Phase II – Comprehensive Site Assessment and Phase III – Remedial Alternatives Evaluation reports prior to the initiation of intrusive activities at the Site. Preparation of the Phase II report requires that the nature, extent, and potential sources of the contamination at the Site be fully evaluated. Since previous investigation did not evaluate the sediments in the embayment portion of the Site, additional subsurface investigation activities are likely to be required to complete the Phase II report.

We have assumed that the remedial objective will be to achieve a Permanent Solution, which can include remedial action beyond the excavation for development.

## Mixed Use Development with Variable Depths of Excavation

Under this scenario, the Site would be developed to serve a variety of residential, commercial, and retail uses based on the development plan dated April 10, 2003. As indicated on the plan, development would include the construction of approximately 234 town houses and four larger buildings housing a mixture of ground level retail space and upper level residences. Two of the buildings will be completed with subgrade parking facilities. General assumptions are as follows:

- All buildings are assumed to be constructed with 4-foot deep foundation excavations with the exception of the 6 and 7 story buildings where the depth of excavation is assumed to be 20 feet below the ground surface.

- Subsurface materials consist of approximately 4 feet of tunnel muck overlying approximately 6 feet of miscellaneous fill. Native materials including sand, peat and clay underlie the fill materials to an unknown depth above bedrock.

*Privileged and Confidential – Attorney/Client Work Product*
Ms. Doreen Zankowski
August 1, 2003
Page 3

- Dewatering will only be required during the excavation activities related to the construction of the two below grade parking structures. We have assumed that dewatering will not be required during construction activities associated with the shallow excavations.

- Remediation of impacted soil and groundwater at the Site would be required in three areas where detected contaminants exceed Upper Concentration Limits (UCLs). These efforts would be implemented prior to the initiation of Site development activities.

- Transportation and disposal costs for the layer of clean tunnel muck have not been included in this estimate.

- Excavation of the soil and sediment is assumed to be performed as part of Site development activities; therefore, costs associated with the excavation of the soil and sediment have not been included in this cost estimate.

The following elements comprise the proposed remedial approach.

- Prepare and submit to the DEP a Tier II Extension Application.

- Perform additional subsurface investigation to delineate areas of soil and groundwater contamination, evaluate sediment quality and meet the MCP requirements for a Phase II – Comprehensive Site and Phase III – Remedial Action Alternatives Evaluation investigation.

- Submit the Phase II/III report and a Release Abatement Measure (RAM) Plan to the DEP.

- Implement the remediation of areas where soil and/or groundwater contaminants exceed the UCLs.

- Manage, treat and/or dispose of excavated impacted soil/sediment and groundwater generated during Site development activities.

- Implement an AUL at the Site and file appropriate MCP submittals at the completion of Site development activities.

## MCP Submittal Preparation

Additional field work required to fulfill the MCP Phase II requirements would focus on additional delineation of the areas of low pH groundwater and an investigation into the sediments on the portions of the Site along the Mystic River. Once the field work was completed, the data

*Privileged and Confidential – Attorney/Client Work Product*
Ms. Doreen Zankowski
August 1, 2003
Page 4

would then be used to prepare a Method 3 Human Health and Environmental Risk Characterization to evaluate the risk posed by the contaminants of concern at the Site. Once the Risk Characterization was completed, the Phase II report could be prepared. In addition, a Phase III – Remedial Action Alternatives Evaluation would also be prepared for the Site, and would evaluate the financial and technical feasibility of various remedial alternatives for the Site. The cost for the implementation of the fieldwork and preparation and submission of the MCP documents including a Stage 3 Ecological Risk Assessment is estimated at $150,000. The need for an Ecological Risk Assessment would be determined by the nature of the impacts observed in the Mystic River sediments, if any.

## Precharacterization Investigation

Based on the proposed scope of development and associated excavation, approximately 110,000 cubic yards of soil would be displaced during the development of the Site. Previous investigations have indicated that the surficial tunnel muck layer has an average depth of approximately four feet and is underlain by approximately 6 feet of miscellaneous fill. The fill is underlain by native sand, peat and clay. Prior to the initiation of the excavation activities, a subsurface investigation would be implemented to collect soil samples for precharacterization of the soils for disposal. Based on a 500 cubic yard sampling interval, approximately 220 samples would need to be collected. Samples would be collected using a geoprobe or similar equipment. Estimated precharacterization costs, including laboratory analytical charges and drilling charges estimated at approximately $190,000.

## Soil Management and Disposal

**Tunnel Muck Layer** The majority of the material removed during the excavation of the shallow building foundations would be comprised of the tunnel muck. Since the thickness of the tunnel muck does vary across the Site, we have assumed that approximately 25% of the excavated tunnel muck would be intermixed with contaminated fill materials and would need to be sent off-site for disposal. Based on the proposed development scenario, we have estimated that approximately 10,600 cubic yards (approximately 15, 900 tons) of contaminated tunnel muck would be generated during Site construction activities. Costs for the management, handling, management, and disposal and/or reuse of the clean tunnel muck have not been included in this estimate. Although the pre-characterization investigation is required to fully evaluate the appropriate disposal options, we have assumed that the contaminated tunnel muck would be suitable for disposal at an unlined landfill in Massachusetts. This assumption is based on the results of previous subsurface investigations conducted at the Site that suggest that the majority

*Privileged and Confidential – Attorney/Client Work Product*
Ms. Doreen Zankowski
August 1, 2003
Page 5

of the soils at shallow depths have lower levels of contamination. Based on this assumption, contaminated tunnel muck disposal costs are estimated at approximately $ 477,000. A breakdown of the costs is included as an attachment to this letter.

**Contaminated Fill Layer** Deeper excavation for the 6 and 7 story buildings will include excavation of the tunnel muck and contaminated fill layers and will extend into the deeper native materials. We have assumed that the deeper native materials are not impacted, and costs for their disposal have not been included in this estimate. Based on the proposed development scenario, we have estimated that approximately 25,000 cubic yards of fill materials will be excavated during construction activities. Although the pre-characterization investigation is required to fully evaluate the appropriate disposal options, we have estimated percentages for each common disposal option based on the soil data previously collected at the Site. Since a portion of the fill removed from the excavations will likely be classified as unregulated (below MCP RCS-1), costs for disposal of this material have not been included in this cost estimate. Using these assumptions, total estimated disposal costs for the contaminated fill material displaced during construction are approximately $1.4 million. The attached spreadsheet provides the breakdown for each soil type using current unit cost information to estimate the total disposal costs for the material displaced during the development of the Site.

**UCL Soil Excavation Areas** In addition to the soil displaced during construction of the Site buildings, some additional areas of soil excavation either outside or beneath the proposed building footprints would be required to remediate soils with concentrations of contaminants in excess of the Upper Concentration Limits (UCLs). Removal of soils with concentrations above the UCLs is required to achieve a Permanent Solution under the MCP. Based on the sampling conducted to date, three areas of additional excavation have been identified. The first area is in the vicinity of boring CES-3 where total lead was identified at concentrations in excess of the UCL at depths up to 9 feet below the ground surface (bgs). The second area is in the vicinity of boring CES-2 where total arsenic concentrations exceeded UCLs at depths up to 11 feet bgs. The concentration of total lead exceeded UCLs in soil samples collected from Boring 4 at depths up to 7 feet bgs. The precharacterization investigation may identify additional areas requiring excavation beyond the scope of development-related earthwork. This cost estimate assumes the removal and disposal of 550 cubic yards of soil from each of the three locations, for a total of 1650 cubic yards (2475 tons) soil. Based on the levels of contamination, this material would likely be classified as a RCRA characteristic hazardous waste. Using these assumptions, additional disposal costs are estimated at approximately $470,000. Since removal of these soils is above and beyond the scope of the excavation for Site development, we have included an additional excavation cost of $30,000 for removal and handling of the UCL soils. A detailed breakdown of these costs is included in the attached spreadsheet. As indicated on the

*Privileged and Confidential – Attorney/Client Work Product*
Ms. Doreen Zankowski
August 1, 2003
Page 6

spreadsheet, total soil transport and disposal costs for the contaminated tunnel muck, contaminated fill, and UCL soils are estimated at approximately $2.4 million.

Excavation activities would require oversight and management in addition to the preparation and reconciling of shipping documentation and approvals. We have assumed 120 days of direct oversight at $1,000 day for a total estimated cost of $120,000.

## Sediment Management and Disposal

Proposed Site development activities include the construction of a marina and MBTA commuter boat stop along the portions of the Site that abut the Mystic River. Part of this work may include dredging of portions of the river to provide a uniform water depth of at least 8 feet during mean low tide for boat traffic. This estimate evaluates costs associated with characterization, management and disposal of the excavated sediment. Costs associated with permitting the work and performing the excavation are assumed to be part of Site development, and costs for these activities have not been included in this estimate.

Based on the need for a minimum water depth of 8 feet, the proposed development plans, and information obtained from a review of the United States Geological Survey topographic map of the Boston North Quadrangle, Rizzo Associates has estimated that approximately 12,500 cubic yards of sediment would need to be displaced. This estimate is based on an excavation that is 100 feet wide, 850 feet long and 4 feet deep. Management and disposal of the sediment would be conducted in a manner similar to that undertaken with the soil on the remainder of the Site. However, in this case, due to the high water content excavated sediment would likely need to either be dewatered or "bulked up" before being accepted by a disposal facility. Dewatering can generally be accomplished by allowing the stockpiles to naturally dry out or by the addition of soil or other bulk material to absorb the additional water and stabilize the consistency of the material. For the purposes of this cost estimate, we have assumed that the sediments will be allowed to dry out naturally to achieve the proper consistency for disposal.

Since pre-characterization of the material would be complicated by the need to collect bottom sediment samples from the river, we have assumed that disposal characterization samples would be collected from the stockpiled sediments after excavation. Based on the estimated volume and a sampling frequency of one suite of sample for every 500 cubic yards, estimated characterization costs are approximately $20,000.

We have assumed that excavated material will be primarily marine clay with a dry weight of approximately 0.7 tons per cubic yard. We have also assumed that the excavated material will be

*Privileged and Confidential – Attorney/Client Work Product*
Ms. Doreen Zankowski
August 1, 2003
Page 7

allowed to dry out prior to disposal; however, since it is unlikely that the material will be completely dry, we have used a ratio of 0.9 tons per cubic yard for estimating disposal costs. As a result, our estimates will consider disposal of approximately 11,250 tons of dried sediment. Based on the nature and degree of contamination at the Site, the historical industrial uses of properties upstream from the Site, we have estimated the following disposal distribution for the sediment excavated at the Site. In this cost estimate we have assumed that 40% of the material would be classified as suitable for disposal at an unlined landfill in Massachusetts; 30% would be suitable for disposal at a lined landfill in Massachusetts, 20% would require disposal at a RCRA Subtitle D permitted landfill, and the remaining 10% would be disposed of at an out-of-state hazardous waste landfill. Using these assumptions, we have estimated sediment disposal costs at approximately $650,000. A breakdown of the costs is presented on the attached spreadsheets.

## Construction Dewatering Treatment

We have assumed that construction related dewatering will not be required during the shallow (4 feet deep) excavations at the Site. However, construction related dewatering will be required during the deeper excavation work for the 6 and 7 story buildings. Laboratory analysis of groundwater samples collected at the Site has identified elevated concentrations of dissolved metals (primarily arsenic and lead) and petroleum-related compounds. In addition, groundwater on portions of the Site exhibits a very low pH. Groundwater extracted from these excavations would require extensive treatment to correct the pH and remove the metals and petroleum compounds prior to discharge.

A pilot study, using soil and groundwater obtained from the Site, would be performed to evaluate the effectiveness of sodium hydroxide in the buffering the pH of the groundwater and its ability to decrease dissolved metals concentrations through precipitation. During this process, the appropriate ratio of treatment solution to each gallon of groundwater to be treated will be evaluated.

Anticipated treatment would involve pumping the water to a series of fractionation tanks where pH adjustment would be performed. The resulting rise in pH would cause precipitation of the dissolved metals. Settling of the precipitate would occur in subsequent fractionation tanks. Treated water would be passed through sand filter beds to remove precipitated metals and then through granular activated carbon (GAC) to remove dissolved phase petroleum hydrocarbons. Additional polishing of the water through the ion exchange process may be required to meet discharge requirements.

*Privileged and Confidential – Attorney/Client Work Product*
Ms. Doreen Zankowski
August 1, 2003
Page 8

Dewatering costs are dependent on the discharge rate and duration of treatment. For purposes of cost estimating we have assumed a continuous discharge rate 50 gallon per minute (GPM) and a discharge duration of 6 months. Dewatering treatment costs are estimated at approximately $400,000. This cost does not include the costs associated with dewatering including installation of sumps, piping, and pumping equipment. A breakdown of estimated costs and assumptions associated with construction dewatering is presented in the attached spreadsheet.

## Groundwater Remediation Program

Since the area of metals impacted and low pH groundwater would not be remediated as part of the Site development activities, a groundwater remediation program would be required to achieve a Permanent Solution at the Site. The dissolved arsenic and lead concentrations identified in monitoring wells on the western and southern portions of the Site, specifically wells CES-2, CES-3, CES-5, and RIZ-1, and the low pH of the groundwater would likely pose a risk to the environment if not remediated.

A pilot study would be conducted in a manner similar to that employed during construction dewatering to identify the appropriate treatment methodology and dosage. Once the pilot study has been completed, the groundwater remediation system will be designed and installed at the Site. This work would most readily be completed prior to the initiation of Site development activities. Based on our current knowledge of conditions, we anticipate that remediation would involve the installation of several leaching galleries on the western portion of the Site, essentially in the area bounded by RIZ-10, CES-2, CES-4 and CES-5. Sodium hydroxide would be mixed in a 20,000-gallon fractionation tank at the Site using water pumped from a supply well installed in the contaminated area. Once mixed, the NaOH solution would be gravity fed to the treatment area piping. This type of approach would allow for greater contact area and influence than the use of individual injection points.

Based on the currently estimated extent of the groundwater contamination, an assumed saturated thickness of 10 feet, and an assumed porosity of 25 %, we estimate that approximately 3 million gallons of groundwater would require treatment. Assuming that 20,000 gallons can be treated per day (the volume of the fractionation tank), it would take approximately 150 days (six months) to perform the initial treatment of the contaminated groundwater at the Site. Periodic monitoring of pH and dissolved metals would then be performed to evaluate the effectiveness of the remedial approach, and to identify ongoing source areas and target them for additional remediation. Costs associated with the initial implementation of the groundwater remediation program at the Site are estimated at approximately $455,000. Ongoing operation, maintenance and monitoring of the system is estimated at approximately $75,000 per year. Assuming 5 years of OMM, the total

*Privileged and Confidential – Attorney/Client Work Product*
Ms. Doreen Zankowski
August 1, 2003
Page 9

estimated cost for groundwater remediation is approximately $830,000. A breakdown of the costs and assumptions is presented in the attached spreadsheets.

**Regulatory Filings** To implement the work described above, several submittals to various federal, state, and municipal agencies would be required. The construction of the Site building and implementation of the groundwater remediation program would either require the preparation of a Phase IV – Remedy Implementation Plan or a Release Abatement Measure (RAM) Plan. We have assumed that Site development activities would be completed prior to the need for filing a Phase V – Operation and Maintenance Plan. Since this disposal scenario proposes the construction of the building on a contaminated Site, the DEP requires that a Focused Feasibility Study and Risk Characterization be performed prior to the completion of the Site building.

Once the remedial activities have been completed at the Site, a Class A-3 RAO could be prepared and submitted to the DEP. The RAO would include an AUL to limit future uses of the property that might cause exposures to the impacted soil and groundwater at the Site.

Additional costs include preparation of shipping documents (Bills of Lading and Manifests), coordinating disposal facility approvals, preparation of excavation related MCP documents, collection of confirmatory samples and preparation of regulatory closure documents including the AUL., Engineering costs related to these tasks are estimated at approximately $150,000. A breakdown of estimated engineering costs is included as an attachment.

### Estimated Cost and Schedule

The total estimated remedial cost, including a 25% contingency, is estimated at approximately $6.1 million. A general breakdown of these costs is presented below:

| | |
|---|---|
| Soil and Sediment Disposal | $3,019,000 |
| Construction Dewatering | $400,000 |
| Groundwater Remediation | $830,000 |
| Soil and Sediment Pre-characterization | $210,000 |
| Engineering | $420,000 |
| Subtotal | $4,879,000 |
| 25% Contingency | $1,220,000 |
| Total Estimated Cost | $6,100,000 |

A breakdown of the individual costs is presented on the attached sheets, along with the general conditions and assumptions. Since the work would be implemented as part of Site development activities, the construction schedule would determine the length of time needed to complete the work.

*Privileged and Confidential – Attorney/Client Work Product*
Ms. Doreen Zankowski
August 1, 2003
Page 10

Please call if you have any questions.

Very truly yours,

Richard J. Hughto, Ph.D., P.E., L.S.P.               William C. Phelps
Senior Vice President                                Senior Project Geologist

P:\7000\7398\MYSTIC LANDING COST ESTIMATE\MYSTICLANDING080103.DOC

**EXHIBIT T**



**FOLEY**
**HOAG** LLP
ATTORNEYS AT LAW

*Copy to*
*L. Upton*

Adam P. Kahn
Boston Office
617.832.1206
akahn@foleyhoag.com

October 23, 2003

**By Hand**

Doreen Zankowski, Esq.
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA  02109-1775

Re:  ***Your Letter of October 10, 2003***

Dear Doreen:

I am in receipt of your letter of October 10.  For the record, and as I indicated to you on the telephone, we have never previously received a copy of the cost estimate attached to that letter.  In addition, we still have not received any of the attachments referenced in the cost estimate.

We also received your proposed confidentiality agreement. I enclose our comments on that agreement, and have tried to tailor it to the specific circumstances at hand.  I am hopeful that we can come to quick agreement on its terms.

Finally, you state in your letter that the "4A process is at a conclusion."  We note for the record that we have been requesting documents that are fundamental to further discussion for more than two years now, and have not yet received them.  Once the confidentiality agreement has been finalized, we will be able to review these documents and respond appropriately.  However, until we actually receive those documents and have an adequate opportunity to review and react to them, it is our opinion that Mystic Landing has failed to comply with the spirit and the letter of Section 4A. If Mystic were to file a complaint without providing these documents and allowing adequate time for review, then we would move to dismiss the complaint for failure to comply with Section 4A and to seek our attorneys' fees associated with that action.

16/371374.2

Doreen Zankowski, Esq.
October 23, 2003
Page 2

Please contact me if you have any questions.

Very truly yours,

Adam P. Kahn

Enclosure

APK/nw

**CONFIDENTIALITY
AND
NON-DISCLOSURE
AGREEMENT**

THIS CONFIDENTIALITY AGREEMENT (the "Agreement") is made and entered into as of this ____ day of October , 2003, by and between ~~Monsanto Corporation,~~ Solutia, Inc. (as attorney-in-fact for Pharmacia Corporation, formerly known as Monsanto Company, or ~~"Monsanto"), and Pharmacia Corporation, including its attorneys~~ (hereinafter referred to as the "Recipient") having offices at~~at~~ 575 Maryville Centre Drive, St. Louis, MO 63141~~—————————————~~, and Mystic Landing, LLC, having offices at 600 Memorial Drive, Cambridge, MA 02139 (hereinafter referred to as "Mystic"). Whenever used herein, the terms "Solutia~~Monsanto~~" or "Recipient" shall also be deemed to include any parent, subsidiary or entity affiliated with such entity.

WHEREAS, Mystic has made a demand to Monsanto for response costs pursuant to M.G.L. ch. 21E, which Mystic alleges will be incurred at certain real property located in Boston and Everett, Massachusetts ("Claim");

WHEREAS Solutia has requested certain documents pertaining Mystic's purchase of the property at issue, Solutia believes that it is entitled to such documents pursuant to M.G.L. ch. 21E, § 4A; and ⋀ and

WHEREAS Mystic has agreed to provide such documents, subject to certain agreements to maintain the confidentiality of those documents,

NOW THEREFORE, i

In consideration of the mutual promises and covenants herein stated, and each act performed or to be performed hereunder, the parties hereto hereby agree as follows:

1.    Confidential Information. All documents identified on Exhibit A (as it may be amended) ~~in the possession, custody or control of Mystic containing confidential technical or commercial, financial or proprietary business information which are produced by Mystic to the Recipient, including, but not limited to, lease and purchase and sale information concerning the Mystic Landing Property, Everett, Massachusetts, and other information relating thereto,~~ will be designated as "Confidential." The term "Confidential Information" shall include all such confidential technical and commercial, financial or proprietary business information of Mystic.

2.    Information Not Subject to this Agreement. The term "Confidential Information" shall not include information which is:

(a)    is in the public domain or becomes part of the public domain by publication or otherwise through no act or failure to act on the part of Recipient;

(b)    is known to Recipient prior to disclosure by Mystic~~, and Recipient can establish such prior knowledge by competent documentation or other competent evidence, including, without limitation, immediate disclosure of such prior knowledge~~; or

(c)    is disclosed to Recipient by a third party, and such disclosure is not in violation of any confidentiality agreement with or obligation to Mystic.

3.    Recipient's Covenants.  Recipient, on behalf of itself and its affiliates, officers, employees, attorneys and agents (collectively, "Representatives"), covenants and agrees that:

(a)    Recipient shall not disclose, directly or indirectly, or make available all or any portion of the Confidential Information to any third party, and Recipient shall not, without the prior written consent of Mystic, use, copy, photograph, reproduce or transcribe in any manner whatsoever, in whole or in part, all or any portion of any Confidential Information for any purpose other than solely in connection with the resolution of the provision of goods or services to Mystic Claim (including if necessary litigation of the Claim), and any litigation or claim by Recipient against third parties (e.g., insurers, indemnitors) arising out of or relating to the Claim. by Recipient.("Agreed Upon Activities").

(b)    Recipient shall not reveal to others any Confidential Information except to the extent that it is necessary to disclose such information to its Representatives having a demonstrated need to know such information for the sole purpose of carrying out an Aagreed Uupon Aactivity by Mystic and Recipient. All such Representatives of Recipient shall be informed by Recipient of the confidential nature of such information and shall agree (in the case of non-employees, in writing) to be bound by the terms and conditions of this Agreement prior to receiving such Confidential Information. No other use or disclosure of the Confidential Information shall be made by Recipient without the prior written consent of Mystic or Modern Continental Construction Co., Inc.

(c)    The Recipient agrees that it shall use the Confidential Information solely for the purposes of carrying out an Aagreed Uupon Aactivity by Mystic and Recipient and for no other purpose; provided, however, that Confidential Information may be disclosed by counsel for a Party to the following:

(i)    counsel and members, associates and employees of the firm of which counsel are members;

(ii)    in-house counsel for Recipient and those persons usually employed by Recipient for the purpose of providing necessary clerical and office support to such in-house counsel, provided all of the foregoing persons are directly involved in oversight of the dispute (including without limitation pre-litigation or litigation pursuant to the process prescribed by Mass. Gen. Laws. Ch. 21 E, § 4A and further provided that each such person first agrees in writing to be bound by the provisions of this Agreement;

(iii)    present employees of Recipient who are given access to the documents by counsel for said Recipient as is necessary for the purposes of carrying out an Aagreed Uupon Aactivity by Mystic and Recipient and/or for the dispute between Mystic and Recipient, and for no other purpose, provided

that each such person first agrees in writing to be bound by the provisions of this Agreement;

(iv)    former employees of Recipient who are given access to the documents by counsel for Recipient as is necessary for the purposes of any dispute between Mystic and Recipient and for no other purpose, *provided that* each such former employee first agrees in writing to be bound by the provisions of this Agreement;

(v)    the Court;

(vi)    stenographic personnel and court reporters providing services in any dispute between Mystic and Recipient;

(vii)    outside experts retained by Recipient for purposes of carrying out an ~~A~~agreed ~~U~~upon ~~A~~activity by ~~Mystic and~~ Recipient and/or for any dispute between Mystic and Recipient, provided that each such expert agrees in writing to be bound by the provisions of this Agreement;

(viii)    any witness or deponent who may or actually does give testimony in any dispute between Mystic and Recipient (and those personnel as are necessary to assist any such witness or deponent in preparing to give such testimony), provided that (i) the subject matter of the testimony of the witness or deponent pertains to the subject matter of the Confidential Information: (ii) such witness or deponent is listed on the face of the Confidential document; is the originator, author, or an identified recipient of such Confidential document; or has personal knowledge concerning such Confidential document; or has personal knowledge regarding the subject matter of the Confidential document; (iii) such witness or deponent is an officer, director, or employee of Mystic or Recipient; (iv~~ii~~) Mystic consents in writing to the disclosure of the Confidential material to such witness or deponent; or (~~i~~v) the Court orders such disclosure; *and provided that (the each such witness or deponent agrees in writing to be bound by the provision of this Agreement;)*

(ix)    Recipient's insurer or the insurer's in-house counsel, and third parties and counsel to third parties whom Recipient believes it may have rights to indemnification, or to entities whom Recipient may have claims in contribution, indemnity or otherwise arising out of or relating to the Claim provided that each such person agrees in writing to be bound by the provisions of this Agreement; and

(x)    any other person to whom Mystic agrees, in writing, that disclosure may be made, or to whom a Court determines that disclosure must be made.

Disclosure to any other persons is strictly prohibited unless ordered by the Court.

(d)    If Recipient (a) is subpoenaed in another proceeding; (b) is served with a demand in another action to which it is a party; or (c) is served with any other legal process for the purpose of obtaining the disclosure of the Confidential Information, the

Recipient shall give prompt written notice of its receipt of such subpoena, demand or legal process to Mystic so as to allow Mystic at least 10 days, or such lesser time as such subpoena, demand or legal process specifies for production, to intercede and protect its rights. Provided that such notice is given, nothing herein shall be construed as requiring the Recipient or anyone else covered by this Agreement to challenge or appeal any order requiring production of any Confidential Information, or to subject itself to any penalties for non-compliance with any subpoena, demand or legal process, or to seek any relief from the Court.

(e)Recipient acknowledges that the documents related to the Confidential Information are extremely voluminous. Given the volume and location of the documents involved and the proposed method of production, there exists a possibility that Mystic may inadvertently produce documents which would otherwise be subject to a claim of privilege against discovery. For purposes of this Agreement, "Privilege" or "Privileged" shall include, but not be limited to, documents constituting attorney/client communications and documents representing attorney work-product and/or documents prepared in anticipation of litigation as defined under applicable law. Recipient agrees that such inadvertent production of documents subject to a claim of privilege (whether or not said document(s) is(are) identified on any privilege log prepared by Mystic or counsel) shall not be construed as or operate as a waiver of any privilege with respect to such documents or other documents subject to a claim of privilege. Accordingly, the inadvertent production of originals or copies of documents, which would otherwise be subject to any privilege against discovery shall not constitute a waiver of Mystic's right to assert any privilege with respect to such documents or other documents subject to a claim of privilege.

(f)In the event that any Confidential or Privileged material is, either intentionally or inadvertently, disclosed to someone not authorized to receive such material under this Agreement, or if a person so authorized breaches any of his or her obligations under this Agreement, counsel of record of the Recipient immediately shall disclose the unauthorized disclosure or breach to Mystic's counsel of record, and also shall use his or her best efforts to obtain the return of all copies of the Confidential or Privileged material and to any prevent further disclosures of the same. Nothing herein is intended to limit any rights either Mystic or Recipient may have, independent of this Agreement, under applicable law to assert or challenge any Privilege asserted with respect to any document or information.

(g)(e)  Upon Mystic's request, after final resolution of Mystic's Claim and the resolution of any claims Recipient may make against third parties arising out of or relating to the Claim, Recipient shall immediately destroy or return to Mystic all copies of any documents or other tangible, magnetic or digital media containing Confidential Information, regardless of whether such material was furnished to Recipient by Mystic or was developed by Recipient.

(h)(f)  Neither the execution of this Agreement nor the furnishing of any information hereunder shall be construed as granting expressly or by implication any

license in and to the Confidential Information. Mystic is the exclusive owner of the Confidential Information.

4.    Reasonable Precautions. All reasonable precautions shall be taken by the parties hereto to insure compliance with the terms and conditions of this Agreement.

5.    Remedies. The parties hereto acknowledge that any breach or violation of this Agreement may be difficult to calculate in pecuniary damages, therefore Mystic may avail itself of injunctive relief, specific performance or other equitable relief under this Agreement, and such remedies shall be cumulative or, and in addition to, any other remedies available at law or in equity.

6.    Admissibility and Relevance of the Confidential Information. Nothing in this Agreement shall constitute an admission that the materials produced by Mystic to Recipient do in fact contain commercial, financial or proprietary information, nor shall anything in this Agreement constitute any admission concerning the relevance, admissibility or authenticity of any document(s).

7.    Entire Agreement. This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter of this Agreement and supersedes any and all prior agreements and understandings between the parties, whether written or oral, with respect to such subject matter. No change, alteration, waiver, or modification of this Agreement or of any covenant, condition, or limitation contained herein shall be effective unless made in writing and signed by both parties hereto.

8.    Governing Law. The validity and interpretation of this Agreement shall be governed by the laws of the Commonwealth of Massachusetts.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

RECIPIENT:                                          MYSTIC LANDING, LLC:

By:_____                          By:_____
Its:_____                         Its:_____

Date:_____                        Date:_____

**EXHIBIT U**

28 STATE STREET
BOSTON, MASSACHUSETTS 02109-1775
617 345-9000
FAX. 617 345-9020

# HINCKLEY, ALLEN & SNYDER LLP

*Attorneys at Law*

*D. M. Zankowski, Esq.*
*dzankowski@haslaw.com*

October 24, 2003

**Confidential Information**
**Settlement Use Only**
**Work Product Protected**

## VIA FACSIMILE (617) 832-7000
## AND FIRST CLASS MAIL

Adam P. Kahn, Esq.
Foley Hoag
155 Seaport Boulevard
Boston, Massachusetts 02210

### Re:    Mystic Landing, LLC and Monsanto/Solutia/Pharmacia
### Alford Street, Everett, MA Property

Dear Adam:

I am in receipt of your letter of October 23, 2003, and respond to the issues raised therein as follows:

As an initial matter, while Mystic Landing LLC ("Mystic") will agree to certain of your proposed changes in the draft Confidentiality and Non-disclosure Agreement, certain other changes are simply unacceptable.

The proposed introductory paragraphs are acceptable, as are the edits made to Paragraph 1 of the Agreement. Mystic rejects the edits made to Paragraph 2(b).

In Paragraph 3(a), Mystic will accept the proposed language "resolution of the Claim (including, if necessary, litigation of the Claim)," but rejects the remainder of the language proposed for Paragraph 3(a). The documents and information that Mystic is agreeing to produce are in no way relevant with regard to any claim that the Recipient may have against a third party arising out of or relating to the Claim. Mystic accepts the proposed changes in Paragraphs 3(b), 3(c), 3(c)(iii), and 3(c)(vii). With regard to Paragraph 3(c)(viii), Mystic will accept the proposed language "(and those personnel as are necessary to assist any such witness or deponent

HINCKLEY, ALLEN & SNYDER LLP

Adam P. Kahn, Esq.
October 24, 2003
Page 2

in preparing to give such testimony)," upon the condition that the language "*and provided that*
each such witness or deponent (or personnel who have assisted such witness or deponent) agrees
in writing to be bound by the provisions of this Agreement" is added at the end of the extant
paragraph. Mystic rejects, however, the remainder of the proposed changes to Paragraph
3(c)(viii). In addition, Mystic rejects the proposed changes to Paragraph 3(c)(ix); again, the
information and documents that Mystic is agreeing to produce are in no way relevant with regard
to any claim that the Recipient may have against a third party arising out of or relating to the
Claim.

Mystic also rejects the proposed edits to Paragraphs 3(e), 3(f) and 3(g). I would suggest
that Solutia's proposed elimination of these particular Paragraphs, relating directly to the
privileged and confidential nature of the documents to be produced, calls into question Solutia's
intention to actually abide by the terms of the Agreement, and will state specifically that these
terms are not subject to negotiation. Finally, you failed to append the proposed Exhibit A; please
forward a copy of said Exhibit at your earliest convenience.

Your suggestion that Mystic has not comported with "the spirit and letter of Section 4A"
is simply absurd. Mystic notified Pharmacia/Solutia *two years ago* of Pharmacia's liability
pursuant to Mass. Gen. Laws c. 21E, §5 in connection with the release of the hazardous materials
at the Site. Mystic's initial notice, sent pursuant to Mass. Gen. Laws c. 21E, § 4A, provided
Pharmacia with a comprehensive description of the investigations performed at the Site, both by
Pharmacia's predecessors- and successors-in-interest; a comprehensive analysis of Pharmacia's
factual and legal liability; and a description of the anticipated response actions necessary to
achieve regulatory closure pursuant to the MCP.

Since August 27, 2001, the date of Mystic's original 4A letter, Pharmacia/Solutia
personnel have obtained additional information by direct meeting and consultation with Mystic's
personnel on multiple occasions. Mystic has also provided revised estimated remediation costs
and schedules as Mystic's anticipated use of the Site has changed and as such costs and
schedules have become available, although these revised costs and schedules in no way effect
Pharmacia's underlying liability for the contaminants released on the Site. In addition,
Pharmacia has had the opportunity to directly interview Rizzo Associates Inc., who performed
all of the ground and water analyses and remedial cost estimates.

Pursuant to Mass. Gen. Laws c. 21E, § 4A, "[u]pon request by the responder, the notifier
shall provide additional information or documentation reasonably requested by the responder
concerning the basis of the responder's alleged liability or the response action or both." As an
initial matter, Mystic does not believe that Solutia's current request for certain confidential and
proprietary business information is "reasonable" within the meaning of M.G.L.C. c. 21E,
although in the interest of facilitating settlement of this issue, Mystic has agreed to provide such
information to the extent that the parties can agree on the language of the Confidentiality and

HINCKLEY, ALLEN & SNYDER LLP

Adam P. Kahn, Esq.
October 24, 2003
Page 3

Non-disclosure Agreement.  However, the documents now sought by Solutia concern neither the basis for Pharmacia/Solutia's liability nor the response action to be taken.  Simply put, the purchase price for the Site is irrelevant with regard to the matters at issue.  Accordingly, in the event that we are unable to reach a mutually agreeable resolution to these matters, and Mystic is compelled to file a Complaint, any motion to dismiss brought by Solutia on the grounds that Mystic has failed to comply with Section 4A will be met with a motion for all attorneys' fees incurred by Mystic in defending against such a clearly baseless motion.

I encourage you to again review the proposed Confidentiality and Non-disclosure Agreement with your client in light of the edits discussed above, and let me know as soon as possible if your client has any desire to meet to discuss the remediation costs and your client's liability for the remediation.  As we have previously stated, Mystic Landing is at the conclusion of discussions pursuant to the Mass. Gen. Laws ch. 21E, § 4A process.

Please let me know if you have any questions.

Very truly yours,

Doreen Zankowski ymye/

Doreen M. Zankowski

DMZ/ltu

#460514

**EXHIBIT V**



**FOLEY HOAG** LLP
ATTORNEYS AT LAW

Adam P. Kahn
Boston Office
617.832.1208
akahn@foleyhoag.com

December 11, 2003

**For Settlement and Compromise Purposes Only/By Facsimile and U.S. Mail**

Doreen Zankowski, Esq.
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109-1775

   Re: Confidentiality Agreement

Dear Doreen:

   Confidentiality Agreement

   I have left you several telephone messages in an attempt to address your comments on the Confidentiality Agreement without the delay and costs associated with further letters, but I have not heard back from you. Therefore, I have attached a redline showing our proposed changes to the Confidentiality Agreement, marked to show changes from the version I transmitted to you on October 23. We have accepted some but not all of your suggested changes.

   We accept the deletion of references to third parties against whom Monsanto may have claims. However, we do not accept your proposed modification to paragraph 3(c)(viii), specifically, the elimination of our right to provide documents to expert witnesses who might opine as to the meaning and import of the documents in question.

   We also do not accept the inclusion of your paragraph 3(e). Contrary to the baseless accusation in your letter that the proposed deletion of these paragraphs suggests a bad faith intent on Solutia, we simply do not consent in advance to giving your client a tactical advantage in the event that your office carelessly produces privileged documents that should not have been produced in the first place. Please note that we have not requested any documents that should be considered privileged, since we have only requested the transaction documents themselves. With respect to paragraph 3 (f) (dealing with Solutia's unauthorized disclosure of documents), we have made certain changes to clarify what we understand to be the intent.

   With respect to your paragraph 3(g), we do not consent to Mystic's unilateral right to recall documents at any point in the litigation. We do consent to return of the

16/371853.1

Doreen Zankowski, Esq.
December 11, 2003
Page 2

documents when the claim is finally disposed. Finally, we consent only to the return of
the actual documents themselves; we will endeavor to delete references to the
documents where we can, but, as you well appreciate, factual information in disputes of
this magnitude are often intertwined with many other legal and factual issues, and it
would not be practicable to eliminate all reference to these materials.

Finally, you requested that we forward you the copy of Exhibit A. Exhibit A is
intended to be a list of the documents that Mystic plans to provide to Solutia pertaining
to the transaction between Mystic and Mary O'Donnell through which Mystic acquired
the property. Since we have no idea what those documents actually are, we cannot
prepare Exhibit A; Mystic simply should prepare an index of the transaction documents
it is producing, which will be the Exhibit. To the extent that additional documents are
identified that we agree should be covered by this Agreement, then we will agree to
amend Exhibit A accordingly.

### The 4A Process

There is no basis for your accusation that Solutia somehow has been less than
forthcoming and consistent in this Section 4A process. It made requests for documents
that are objectively reasonable and has not expanded those requests in the two years
since the demand was first brought. The concern with the transaction documents, of
course, is entirely Mystic's doing: Mystic has asked us to accept on blind faith that it
paid millions more than the stated consideration for the property in the deed, and then
has unreasonably withheld the documents that it claims to support its position.

Solutia is also not responsible for the fact that we are two years into the 4A
process. Much of the past two years have been consumed by unexplained silences from
you or your client. For example, following our last meeting on November 25, 2002, at
which the transaction documents to be addressed by the confidentiality agreement was a
key topic of discussion, and at which your client agreed to consider providing the
documents in question, we heard nothing from you (despite several inquiries on our part)
until June, 2003, when you called and stated that you would provide the documents at
issue, subject to the confidentiality agreement that you were to prepare. I accepted that
arrangement. Four more months of silence then passed. No agreement was provided
until October 13, eleven months after the documents were first promised.

Doreen Zankowski, Esq.
December 11, 2003
Page 3

Please be assured that Solutia has approached this process in good faith and is as eager to see if this matter can be resolved in a fair and sensible matter. I look forward to hearing from you soon regarding the confidentiality agreement. It would make sense to provide the documents, allow us to review them, and to make final attempts to resolve this matter without active litigation.

Very truly yours,

Adam P. Kahn

Enclosure

APK

## CONFIDENTIALITY
## AND
## NON-DISCLOSURE
## AGREEMENT

THIS CONFIDENTIALITY AGREEMENT (the "Agreement") is made and entered into as of this ___ day of ~~October~~ November, 2003, by and between Solutia Inc. (as attorney-in-fact for Pharmacia Corporation, formerly known as Monsanto Company, or "Monsanto"), (hereinafter referred to as the "Recipient") having offices at 575 Maryville Centre Drive, St. Louis, MO  63141 and Mystic Landing, LLC, having offices at 600 Memorial Drive, Cambridge, MA 02139 (hereinafter referred to as "Mystic"). Whenever used herein, the terms "Solutia" or "Recipient" shall also be deemed to include any parent, subsidiary or entity affiliated with such entity.

WHEREAS, Mystic has made a demand to Monsanto for response costs pursuant to M.G.L. ch. 21E, which Mystic alleges will be incurred at certain real property located in Boston and Everett, Massachusetts ("Claim");

WHEREAS Solutia has requested certain documents pertaining Mystic's purchase of the property at issue. Solutia believes that it is entitled to such documents pursuant to M.G.L. ch. 21E, § 4A; and

WHEREAS Mystic has agreed to provide such documents, subject to certain agreements to maintain the confidentiality of those documents.

NOW THEREFORE, in consideration of the mutual promises and covenants herein stated, and each act performed or to be performed hereunder, the parties hereto hereby agree as follows:

1.    Confidential Information.  All documents identified on Exhibit A (as it may be amended) will be designated as "Confidential." The term "Confidential Information" shall include all such confidential technical and commercial, financial or proprietary business information of Mystic.

2.    Information Not Subject to this Agreement.  The term "Confidential Information" shall not include information which is:

(a) ~~is~~ in the public domain or becomes part of the public domain by publication or otherwise through no act or failure to act on the part of Recipient;

(b) ~~is~~ known to Recipient prior to disclosure by Mystic; or

(c) ~~is~~ disclosed to Recipient by a third party, and such disclosure is not in violation of any confidentiality agreement with or obligation to Mystic.

3.    Recipient's Covenants.  Recipient, on behalf of itself and its affiliates, officers, employees, attorneys and agents (collectively, "Representatives"), covenants and agrees that:

(a) Recipient shall not disclose, directly or indirectly, or make available all or any portion of the Confidential Information to any third party, and Recipient shall not, without the prior written consent of Mystic, use, copy, photograph, reproduce or transcribe in any manner whatsoever, in whole or in part, all or any portion of any Confidential Information for any purpose other than solely in connection with the resolution of the Claim (including if necessary litigation of the Claim), ~~and any litigation or claim by Recipient against third parties (e.g., insurers, indemnitors) arising out of or relating to the Claim.~~ ("Agreed Upon Activities").

(b) Recipient shall not reveal to others any Confidential Information except to the extent that it is necessary to disclose such information to its Representatives having a demonstrated need to know such information for the sole purpose of carrying out an Agreed Upon Activity by Recipient. All such Representatives of Recipient shall be informed by Recipient of the confidential nature of such information and shall agree (in the case of non-employees, in writing) to be bound by the terms and conditions of this Agreement prior to receiving such Confidential Information. No other use or disclosure of the Confidential Information shall be made by Recipient without the prior written consent of Mystic or Modern Continental Construction Co., Inc.

(c) The Recipient agrees that it shall use the Confidential Information solely for the purposes of carrying out an Agreed Upon Activity by Recipient and for no other purpose; provided, however, that Confidential Information may be disclosed by counsel for a Party to the following:

(i)     counsel and members, associates and employees of the firm of which counsel are members;

(ii)    in-house counsel for Recipient and those persons usually employed by Recipient for the purpose of providing necessary clerical and office support to such in-house counsel, provided all of the foregoing persons are directly involved in oversight of the dispute (including without limitation pre-litigation or litigation pursuant to the process prescribed by Mass. Gen. Laws. Ch. 21 E, § 4A) and further provided that each such person first agrees in writing to be bound by the provisions of this Agreement;

(iii)   present employees of Recipient who are given access to the documents by counsel for said Recipient as is necessary for the purposes of carrying out an Agreed Upon Activity by Recipient and/or for the dispute between Mystic and Recipient, and for no other purpose, provided that each such person first agrees in writing to be bound by the provisions of this Agreement;

(iv)    former employees of Recipient who are given access to the documents by counsel for Recipient as is necessary for the purposes of any dispute between Mystic and Recipient and for no other purpose, *provided that* each such former employee first agrees in writing to be bound by the provisions of this Agreement;

(v)     the Court;

(vi)    stenographic personnel and court reporters providing services in any dispute between Mystic and Recipient;

(vii)   outside experts retained by Recipient for purposes of carrying out an Agreed Upon Activity by Recipient and/or for any dispute between Mystic and Recipient, provided that each such expert agrees in writing to be bound by the provisions of this Agreement;

(viii)  any witness or deponent who may or actually does give testimony in any dispute between Mystic and Recipient (and those personnel as are necessary to assist any such witness or deponent in preparing to give such testimony), and provided that each such witness or deponent (or personnel who have assisted such witness or deponent) agrees in writing to be bound by the provisions of this Agreement, and provided further that (i) the subject matter of the testimony of the witness or deponent pertains to the subject matter of the Confidential Information: (ii) such witness or deponent is listed on the face of the Confidential document; is the originator, author, or an identified recipient of such Confidential document; or has personal knowledge concerning such Confidential document; or has personal knowledge regarding the subject matter of the Confidential document; (iii) such witness or deponent is an officer, director, or employee of Mystic or Recipient; (iv) Mystic consents in writing to the disclosure of the Confidential material to such witness or deponent; or (v) the Court orders such disclosure;

(ix)    Recipient's insurer or the insurer's in-house counsel, and third parties and counsel to third parties whom Recipient believes it may have rights to indemnification, or to entities whom Recipient may have claims in contribution, indemnity or otherwise arising out of or relating to the Claim provided that each such person agrees in writing to be bound by the provisions of this Agreement; and

(x)     any other person to whom Mystic agrees, in writing, that disclosure may be made, or to whom a Court determines that disclosure must be made.

Disclosure to any other persons is strictly prohibited unless ordered by the Court or authorized in writing by Mystic or Modern Continental Construction Co., Inc..

(d) If Recipient (a) is subpoenaed in another proceeding; (b) is served with a demand in another action to which it is a party; or (c) is served with any other legal process for the purpose of obtaining the disclosure of the Confidential Information, the Recipient shall give prompt written notice of its receipt of such subpoena, demand or legal process to Mystic so as to allow Mystic at least 10 days, or such lesser time as such subpoena, demand or legal process specifies for production, to intercede and protect its rights. Provided that such notice is given, nothing herein shall be construed as requiring

the Recipient or anyone else covered by this Agreement to challenge or appeal any order requiring production of any Confidential Information, or to subject itself to any penalties for non-compliance with any subpoena, demand or legal process, or to seek any relief from the Court.

(e) In the event that any Confidential Information is, either intentionally or inadvertently, disclosed by Recipient to someone not authorized to receive such material under this Agreement, or if a person so authorized breaches any of his or her obligations under this Agreement, upon obtaining knowledge of such disclosure or breach, Recipient immediately shall disclose the unauthorized disclosure or breach to Mystic's counsel of record, and also shall use its best efforts to obtain the return of all copies of the Confidential Information and to any prevent further disclosures of the same. Nothing herein is intended to limit any rights either Mystic or Recipient may have, independent of this Agreement, under applicable law to assert or challenge any Privilege asserted with respect to any document or information.

~~(e)~~(f) Upon Mystic's request, after final resolution of Mystic's Claim ~~and the resolution of any claims Recipient may make against third parties arising out of or relating to the Claim~~, Recipient shall immediately destroy or return to Mystic all copies of any Confidential Information

~~(f)~~(g) Neither the execution of this Agreement nor the furnishing of any information hereunder shall be construed as granting expressly or by implication any license in and to the Confidential Information. Mystic is the exclusive owner of the Confidential Information.

4. Reasonable Precautions. All reasonable precautions shall be taken by the parties hereto to insure compliance with the terms and conditions of this Agreement.

5. Remedies. The parties hereto acknowledge that any breach or violation of this Agreement may be difficult to calculate in pecuniary damages, therefore Mystic may avail itself of injunctive relief, specific performance or other equitable relief under this Agreement, and such remedies shall be cumulative or, and in addition to, any other remedies available at law or in equity.

6. Admissibility and Relevance of the Confidential Information. Nothing in this Agreement shall constitute an admission that the materials produced by Mystic to Recipient do in fact contain commercial, financial or proprietary information, nor shall anything in this Agreement constitute any admission concerning the relevance, admissibility or authenticity of any document(s).

7. Entire Agreement. This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter of this Agreement and supersedes any and all prior agreements and understandings between the parties, whether written or oral, with respect to such subject matter. No change, alteration, waiver, or modification of this Agreement or of any covenant, condition, or limitation contained herein shall be effective unless made in writing and signed by both parties hereto.

16/371440.3                                            - 4 -

8.    Governing Law. The validity and interpretation of this Agreement shall be governed by the laws of the Commonwealth of Massachusetts.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

RECIPIENT:                                    MYSTIC LANDING, LLC:


By:_____          By:_____
Its:_____          Its:_____

Date:_____          Date:_____

**EXHIBIT W**

28 STATE STREET
BOSTON, MASSACHUSETTS 02109-1775
617 345-9000
FAX: 617 345-9020

# HINCKLEY, ALLEN & SNYDER LLP

*Attorneys at Law*

*D. M. Zankowski, Esq.*
*dzankowski@haslaw.com*

December 22, 2003

**Confidential Information**
**Settlement Use Only**
**Work Product Protected**

**VIA FACSIMILE (617) 832-7000**
**AND FIRST CLASS MAIL**

Adam P. Kahn, Esq.
Foley Hoag
155 Seaport Boulevard
Boston, Massachusetts 02210

**Re:   Mystic Landing, LLC and Monsanto/Solutia/Pharmacia**
**Alford Street, Everett, MA Property**

Dear Adam:

I am in receipt of your letter of October 23, 2003, and respond to the issues raised therein as follows:

As an initial matter, while Mystic Landing LLC ("Mystic") will agree to certain of your proposed changes in the draft Confidentiality and Non-disclosure Agreement, certain other changes are simply unacceptable.

The proposed introductory paragraphs are acceptable, as are the edits made to Paragraph 1 of the Agreement. Mystic rejects the edits made to Paragraph 2(b).

In Paragraph 3(a), Mystic will accept the proposed language "resolution of the Claim (including, if necessary, litigation of the Claim)," but rejects the remainder of the language proposed for Paragraph 3(a). The documents and information that Mystic is agreeing to produce are in no way relevant with regard to any claim that the Recipient may have against a third party arising out of or relating to the Claim. Mystic accepts the proposed changes in Paragraphs 3(b), 3(c), 3(c)(iii), and 3(c)(vii). With regard to Paragraph 3(c)(viii), Mystic will accept the proposed language "(and those personnel as are necessary to assist any such witness or deponent

HINCKLEY, ALLEN & SNYDER LLP

Adam P. Kahn, Esq.
December 22, 2003
Page 2

in preparing to give such testimony)," upon the condition that the language "*and provided that* each such witness or deponent (or personnel who have assisted such witness or deponent) agrees in writing to be bound by the provisions of this Agreement" is added at the end of the extant paragraph. Mystic rejects, however, the remainder of the proposed changes to Paragraph 3(c)(viii). In addition, Mystic rejects the proposed changes to Paragraph 3(c)(ix); again, the information and documents that Mystic is agreeing to produce are in no way relevant with regard to any claim that the Recipient may have against a third party arising out of or relating to the Claim.

Mystic also rejects the proposed edits to Paragraphs 3(e), 3(f) and 3(g). I would suggest that Solutia's proposed elimination of these particular Paragraphs, relating directly to the privileged and confidential nature of the documents to be produced, calls into question Solutia's intention to actually abide by the terms of the Agreement, and will state specifically that these terms are not subject to negotiation. Finally, you failed to append the proposed Exhibit A; please forward a copy of said Exhibit at your earliest convenience.

Your suggestion that Mystic has not comported with "the spirit and letter of Section 4A" is simply absurd. Mystic notified Pharmacia/Solutia *two years ago* of Pharmacia's liability pursuant to Mass. Gen. Laws c. 21E, §5 in connection with the release of the hazardous materials at the Site. Mystic's initial notice, sent pursuant to Mass. Gen. Laws c. 21E, § 4A, provided Pharmacia with a comprehensive description of the investigations performed at the Site, both by Pharmacia's predecessors- and successors-in-interest; a comprehensive analysis of Pharmacia's factual and legal liability; and a description of the anticipated response actions necessary to achieve regulatory closure pursuant to the MCP.

Since August 27, 2001, the date of Mystic's original 4A letter, Pharmacia/Solutia personnel have obtained additional information by direct meeting and consultation with Mystic's personnel on multiple occasions. Mystic has also provided revised estimated remediation costs and schedules as Mystic's anticipated use of the Site has changed and as such costs and schedules have become available, although these revised costs and schedules in no way effect Pharmacia's underlying liability for the contaminants released on the Site. In addition, Pharmacia has had the opportunity to directly interview Rizzo Associates Inc., who performed all of the ground and water analyses and remedial cost estimates.

Pursuant to Mass. Gen. Laws c. 21E, § 4A, "[u]pon request by the responder, the notifier shall provide additional information or documentation reasonably requested by the responder concerning the basis of the responder's alleged liability or the response action or both." As an initial matter, Mystic does not believe that Solutia's current request for certain confidential and proprietary business information is "reasonable" within the meaning of M.G.L.C. c. 21E, although in the interest of facilitating settlement of this issue, Mystic has agreed to provide such information to the extent that the parties can agree on the language of the Confidentiality and

HINCKLEY, ALLEN & SNYDER LLP

Adam P. Kahn, Esq.
December 22, 2003
Page 3

Non-disclosure Agreement. However, the documents now sought by Solutia concern neither the basis for Pharmacia/Solutia's liability nor the response action to be taken. Simply put, the purchase price for the Site is irrelevant with regard to the matters at issue. Accordingly, in the event that we are unable to reach a mutually agreeable resolution to these matters, and Mystic is compelled to file a Complaint, any motion to dismiss brought by Solutia on the grounds that Mystic has failed to comply with Section 4A will be met with a motion for all attorneys' fees incurred by Mystic in defending against such a clearly baseless motion.

I encourage you to again review the proposed Confidentiality and Non-disclosure Agreement with your client in light of the edits discussed above, and let me know as soon as possible if your client has any desire to meet to discuss the remediation costs and your client's liability for the remediation. As we have previously stated, Mystic Landing is at the conclusion of discussions pursuant to the Mass. Gen. Laws ch. 21E, § 4A process.

Please let me know if you have any questions.

Very truly yours,

Doreen M. Zankowski

DMZ/mle
cc:    Gerald J. Petros, Esq.

#460514