UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MYSTIC LANDING, LLC,<br>          Plaintiff,<br>v.<br><br>PHARMACIA CORPORATION,<br>          Defendant.<br><br>PHARMACIA CORPORATION,<br>          Third-Party Plaintiff,<br>v.<br><br>MODERN CONTINENTAL CONSTRUCTION CO., INC.,<br>          Third-Party Defendant. | CIVIL ACTION No. 04-10180 NMG |

## AFFIDAVIT OF GERALD M. RINALDI

I, Gerald M. Rinaldi, do depose and state:

1. I am an employee of Solutia Inc. ("Solutia"), where I am employed, and have been employed since 1997, as Manager of Remediation. I am a resident of Clarkson Valley, Missouri.

2. In 2001, Solutia was acting as Attorney-in-fact to Pharmacia Corporation ("Pharmacia") for certain matters, including with respect to the demands made by Mystic Landing LLC ("Mystic") against Pharmacia pertaining to the Everett, Massachusetts, property formerly owned by Pharmacia and currently owned by Mystic ("the Site").

B3229424.2

3.  From May 2001 until December 2003, I was one of the primary individuals responsible for negotiating with Mystic on behalf of Pharmacia in an attempt to reach a settlement acceptable to both parties.

4.  Solutia first learned that a party was asking Solutia to perform remediation through a May 11, 2001, demand by Mystic's lawyers, Hinckley Allen and Snyder LLP ("Hinckley") to Mary Cody, an attorney who worked at Solutia.

5.  Because the letter contained little information about the contamination discovered, the nature of cleanup required, or even the identity of the party making the claim, Solutia requested additional information from Hinckley by a letter dated June 1, 2001.

6.  Solutia did not receive any documents responsive to its June 1, 2001, letter from Hinckley or Mystic for several months. Solutia's inability to obtain documents responsive to this and other requests for information from Hinckley, or Mystic, was a continuing source of difficulty for Solutia throughout the negotiations prior to Mystic's filing of a lawsuit in December 2003.

8.  Examples of information requested by Solutia that were not provided -- either at all or in a timely fashion -- include: technical reports about the condition of Site; remedial cost projections; documents pertaining to Modern Continental's use of the Site; and the terms and conditions pursuant to which Mystic purchased the Site.

9.  Despite Solutia's inability to obtain relevant information from Hinckley or Mystic, it endeavored to negotiate a resolution with Mystic. For example, I attended a meeting in Boston on February 6, 2002. Mystic's representatives at that meeting included Max Marino, Peter

Grela, Robert Shepard, Doreen Zankowski (a Hinckley lawyer), Alan Gottlieb (another Hinckley lawyer), Gerald Petros (another Hinckley lawyer), and Richard Hughto of Rizzo Associates.

10. At that February 6, 2002, meeting, Mystic asserted that the Site was likely to be the future home of the Boston Red Sox. It stated further that it hoped to sell the Site to the Red Sox for $75,000,000 in an undeveloped state. Representatives of Mystic stated that they believed the Red Sox would purchase the Site only if all contaminated soils across the entire Site were removed, regardless of whether they were required to be removed by regulation. Mystic's representatives projected the cost of that soil removal effort at $17 million. At the meeting, Mystic also stated that it was considering some additional development on at the Site, such as the construction of a marina in the river adjacent to the Site.

11. At the February 6, 2002, meeting, Mystic's representatives stated that Mystic would be flexible about how and when the soils would be excavated, and would allow Solutia to participate in or control the remediation, but that Solutia would need to bear the entire cost of the excavation and all other activities that reportedly comprised the $17 million estimate.

12. At the February 6, 2002, meeting, I reiterated Solutia's request for information about the Site, including the remediation estimates that were referenced by the Hinckley and Mystic participants in the meeting (but which had not yet been provided to Solutia). I also asked if any remediation estimates had been prepared that addressed reuse scenarios other than redevelopment of the Site into a stadium for the Boston Red Sox; Solutia was told that no cost estimates or remedial scenarios were prepared independent of the redevelopment plans. Finally, I asked again for the transaction documents documenting the terms and conditions pursuant to

which Mystic purchased the Site. While Mystic stated that it would consider Solutia's request, those documents were not provided at or after the meeting.

13. Despite Solutia's inability to obtain information from Mystic, which information Solutia believed was readily available and necessary to its evaluation of the contamination, the proposed cleanup, and the degree to which Pharmacia was responsible for that contamination or the costs of cleanup, in a letter dated May 6, 2002, Solutia made an offer to Mystic to assume 100% of the costs of remediation of the Site (except for remediation made necessary by Mystic or Modern Continental) and to repurchase the Site for the $300,000 price stated in the deed for the property. By a letter dated May 31, 2002, Mystic rejected this offer and did not present any counteroffer. In a letter dated June 12, 2002, Solutia indicated its willingness to consider reasonable alternative proposals. To my knowledge, Solutia did not hear from Mystic for three months after it rejected Solutia's offer.

14. In a letter dated August 27, 2002, Solutia received remediation cost estimates from Mystic. The remediation cost estimate for the Red Sox stadium scenarios had been reduced from $17 million mentioned in the February 6, 2002, meeting (and described in an April 8, 2002, letter from Hinckley to Adam Kahn) to $9.5 - 10.7 million, and a $6.8 million cost estimate for a mixed use development was also presented. It was clear that these estimates included costs that would not be required in the absence of development. For example, the estimates included substantial costs, some over $1 million, for disposal of what the estimates termed "unregulated soil (below RCS-1)". Based on my understanding of Massachusetts cleanup regulations, "RCS-1 soil" means soils that do not require reporting to the Commonwealth or other action even if located in areas used for residential, school, day care, or other purposes. Mystic also provided a sediment removal cost of $1.5 to $5.3 million.

15.     By a letter dated September 12, 2002, Solutia responded to this new information and offered to meet with Mystic between October 8 and 17, 2002, in light of the new cost estimates. Due to scheduling issues primarily on Mystic's end, that meeting occurred in Boston on November 25, 2002. Mystic was represented by Peter Grela, Robert Shepard, Max Marino, Richard Hughto, and Doreen Zankowski.

16.     At the November 25, 2002, meeting, Mystic stated that the Site would be needed for construction laydown for at least the next 24 months, but that it wished to begin permitting a residential, commercial, or mixed use development on the Site. Mystic stated that it was very unlikely that a new Boston Red Sox stadium would be built on the Site.

17.     At the November 25, 2002, meeting, Mystic stated that the revised cost estimate consisted of removing all non-native fill beneath the footprints of each of the structures (regardless of the degree of contamination), as well as addressing potentially contaminated sediments adjacent to the Site. The sediment cost estimate was based on excavation of those sediments which Mystic stated would need to be excavated in order to construct a marina.

18.     At the November 25, 2002, meeting, Mystic's representatives asserted that it wanted Solutia to pay for 100% of the costs identified in the August 2002 cost estimates.

19.     At the November 25, 2002, meeting, I again requested documents regarding the transaction pursuant to which Mystic purchased the Site. Mystic again stated that it would take that request under consideration. It stated that any documents would need to be provided under a confidentiality agreement, a concept I accepted in the meeting.

20. Despite several inquiries on its part, to my knowledge, Solutia did not hear again from Mystic until June 2003, when Doreen Zankowski placed a call to Solutia's attorney Adam Kahn. She indicated that Mystic was planning to construct a mixed use development, primarily townhomes, and a marina, and she advised that a new remediation cost estimate reflecting that development being prepared. I understand that in that call Ms. Zankowski also agreed to provide the transaction documents, subject to a confidentiality agreement which she indicated she would draft.

21. Solutia did not receive the revised remediation cost estimate or a draft of the confidentiality agreement for the transaction documents until two letters dated October 10, 2003, almost eleven months after the November 25, 2002, meeting. Mystic demanded an immediate response to the correspondence. Solutia provided a response to the draft confidentiality agreement by a letter dated October 23, 2003. It was my understanding that the confidentiality documents were under negotiation at the time Solutia learned that Mystic had filed a lawsuit against Solutia, Monsanto Company, and Pharmacia.

22. Solutia filed for bankruptcy on December 17, 2003. After that date, I was not involved in further discussions with Mystic in attempts to resolve this matter. However, during the entire course of negotiation up to that point, Mystic never agreed to accept anything other than Solutia paying 100% of response costs, never presented a remedial plan or cost estimate separate from its redevelopment plans, and never provided Solutia with all the information Solutia requested to evaluate Mystic's claim.

23. To my knowledge, at no time prior to the filing of the lawsuit by Mystic did Mystic indicate that the Site was under investigation by the Massachusetts Department of Environmental

B3229424.2

- 6 -

- 7 -

Protection for violations of environmental law. At no time did Mystic indicate that releases of contamination had been linked to the activities being conducted by Mystic and Modern Continental at the Site.

Further your affiant sayeth not.

Signed this 14th day of July 2006 under the pains and penalties of perjury.

_____
Gerald M. Rinaldi